UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                                 :
SERGEY LEONTIEV,                                                 :
                                                                 :
                            Plaintiff,                           :        16 Civ. _____
                                                                 :
            -against-                                            :        **COMPLAINT**
                                                                 :
ALEXANDER VARSHAVSKY,                                            :        **JURY TRIAL DEMANDED**
                                                                 :
                            Defendant.                           :
                                                                 :
                                                                 :
-----------------------------------------------------------------x

       Plaintiff Sergey Leontiev, by and through his undersigned attorneys, for his complaint

against Defendant Alexander Varshavsky, alleges as follows:

<u>SUMMARY AND NATURE OF THE CASE</u>

       1.      Plaintiff Sergey Leontiev is a well-known and highly regarded Russian

businessman.  In August 2015, Mr. Leontiev was forced to leave his native Russia after the

Russian Central Bank, in an effort to consolidate the banking sector, revoked the license of

Probusinessbank, a full-service commercial bank that Mr. Leontiev started in 1993 and

successfully managed for over 20 years.

       2.      Defendant Alexander Varshavsky is, upon information and belief, a Russian-born,

naturalized United States citizen, residing in Holmdel, New Jersey.  Mr. Varshavsky is a

multimillionaire with many business interests in the United States and Russia.  Upon information

and belief, Mr. Varshavsky has close relationships with Russian government officials.

       3.      Since August 2015, in New York and elsewhere, Mr. Varshavsky has engaged in

a campaign of threats, demands, and harassment in an effort to obtain payment from Mr.

Leontiev for a debt which Mr. Varshavsky claims Mr. Leontiev owes him (the "Alleged Loans").

Mr. Varshavsky is currently demanding that Mr. Leontiev pay him $83 million dollars pursuant to the Alleged Loans.

4.      Mr. Leontiev owes Mr. Varshavsky nothing.  In support of his alleged right to payment from Mr. Leontiev, Mr. Varshavsky has produced several loan agreements, promissory notes, and bank guarantees.  None of these documents provides any basis to hold Mr. Leontiev personally liable for any debt those documents purport to represent.

5.      Mr. Leontiev's name does not appear on the face of a single document relating to the Alleged Loans, nor is there any legal construction or theory that would establish his personal liability.

6.      Moreover, Mr. Varshavsky's name *also* does not appear on the documents relating to the Alleged Loans.  Mr. Varshavsky has provided no documentation of his authority to collect any monies that are allegedly owed under the documents provided by him.

7.      Although neither Mr. Leontiev nor Mr. Varshavsky is named in the documents relating to the Alleged Loans, Mr. Varshavsky has demanded, both personally and through counsel, that Mr. Leontiev pay him $83 million, claiming, without proof, that Mr. Leontiev has "acknowledged" the Alleged Loans.

8.      As part of his campaign to extract money from Mr. Leontiev, Mr. Varshavsky first targeted Mr. Leontiev's friend and business associate, Alexander Zheleznyak.

9.      Mr. Zheleznyak was also forced to flee Russia in August 2015 following the takeover of Probusinessbank.  Numerous members of Mr. Zheleznyak's family, including his brother, his uncles, and their children, continue to reside in Russia.

10.      In an effort to intimidate Mr. Leontiev, Mr. Varshavsky has repeatedly threatened to bring criminal charges against Mr. Leontiev and Mr. Zheleznyak.  Mr. Varshavsky has also

2

threatened to link Mr. Leontiev's name to terrorism financing.  Upon information and belief, Mr. Varshavsky is capable of carrying out these threats due to his well-established connections with government officials and other individuals in Russia.  Mr. Varshavsky has made these threats in phone calls to Mr. Zheleznyak and at in-person meetings with Mr. Leontiev, including a meeting in New York, where Mr. Leontiev and Mr. Zheleznyak currently reside.

11.     Within the State of New York, Mr. Varshavsky has demanded payment through his New York- and New Jersey-based counsel.  As recently as April 20, 2016, Mr. Varshavsky's New York counsel claimed to Mr. Leontiev's New York-based counsel that Mr. Leontiev owes Mr. Varshavsky $83 million.  Despite Mr. Leontiev's repeated requests for documentation or an explanation of the legal theory under which Mr. Leontiev would have personal liability with regard to the Alleged Loans, Mr. Varshavsky has refused to do more than continue to demand $83 million from Mr. Leontiev.

12.     Mr. Leontiev seeks a declaratory judgment that he owes no debt to Mr. Varshavsky, or to anyone acting in concert with him, relating to the Alleged Loans.  A declaratory judgment is necessary and appropriate to resolve this dispute and the rights of the parties.  Mr. Leontiev also seeks a permanent injunction preventing Mr. Varshavsky, or anyone acting in concert or participation with Mr. Varshavsky, from taking any further action to collect on the Alleged Loans against Mr. Leontiev in his personal capacity.  Both a declaratory judgment and injunctive relief are necessary to put an end to Mr. Varshavsky's campaign of threats and harassment against Mr. Leontiev.

13.     Mr. Leontiev also seeks redress for the damages caused by Mr. Varshavsky's unlawful and tortious conduct.  Mr. Varshavsky's campaign of threatened criminal actions

constitutes intentional infliction of emotional distress intended to harass and intimidate Mr. Leontiev.

**PARTIES**

14.     Sergey Leontiev is a Russian national and has been domiciled in Cyprus since June 2015.  Mr. Leontiev has been present in the United States since August 26, 2015 and resides in New York County, New York.

15.     Defendant Alexander Varshavsky is a citizen of the state of New Jersey and resides in Monmouth County, New Jersey.

**JURISDICTION & VENUE**

16.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, as there is complete diversity between Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of interests and costs.

17.     This Court has personal jurisdiction over Mr. Varshavsky under CPLR §§ 301 and 302(a)(1).  Upon information and belief, Mr. Varshavsky owns, directly or indirectly, an apartment at the Time Warner Center in Manhattan, New York, an apartment at 1311 Brightwater Avenue in Brooklyn, New York, and a business incorporated and headquartered in Brooklyn, New York.  In addition, Mr. Varshavsky has committed tortious actions seeking to obtain payment of the Alleged Loans from Mr. Leontiev in New York State, directly and through counsel.

18.     Venue is proper under 28 U.S.C. § 1391(b)(2), as a substantial number of the events giving rise to this action occurred in the Southern District of New York.

## FACTUAL ALLEGATIONS

19.     In 1993, Mr. Leontiev, together with Mr. Zheleznyak and another business associate, started Probusinessbank, a full-service commercial bank headquartered in Moscow, Russia.  The bank grew steadily notwithstanding Russia's turbulent economic environment.  By 2015, Probusinessbank grew to become the 51st largest bank in Russia, in terms of assets, and fourth largest in terms of branches with more than 700 in regions throughout Russia.

20.     In 2015, Probusinessbank fell victim to the collapse of the Russian financial system and to President Vladimir Putin's corresponding consolidation of Russian banks. Problems began in September 2014, when Probusinessbank first came under the scrutiny of Russia's Central Bank regulators.  Although Probusinessbank received multiple clean opinions from independent auditors, including from ZAO Deloitte & Touche CIS as recently as April 15, 2015, the government regulators purported to identify accounting irregularities.

21.     Over the next few months, Probusinessbank made every effort to comply with the Central Bank's requests, and its solvency was confirmed on at least two occasions by the Central Bank.  In June 2015, the Central Bank stated in an internal memorandum that Probusinessbank faced no serious financial problems and was in substantial compliance with relevant banking regulations.  Nevertheless, on August 7, 2015, one day after being told by the Central Bank that it was in compliance with nearly all requirements, temporary administrators from Russia's Deposit Insurance Agency arrived at Probusinessbank's offices and disconnected its access to banking networks.

22.     On August 12, 2015, the Central Bank revoked Probusinessbank's license. Probusinessbank was one of nearly 100 banks to lose its license in 2015.  At the behest of the Russian government, the Central Bank, in the words of one news source, "has been revoking

licenses on a near-daily basis" in efforts to consolidate the banking sector in the face of the ruble's collapse and the catastrophic impact of economic sanctions imposed on the country as a result of Russia's involvement in the Ukrainian crisis.

23.     Several days after revocation of Probusinessbank's license, the Central Bank filed a petition for bankruptcy on behalf of Probusinessbank. As these events were unfolding, Mr. Leontiev and Mr. Zheleznyak became concerned for their personal safety, given the Russian government's history of persecution of businessmen following state seizure of assets.  Mr. Leontiev and Mr. Zheleznyak left Russia in August 2015.

24.     Mr. Leontiev's concern for his personal safety was prescient.  On February 18, 2016, the Russian government arrested five former managers of Probusinessbank and charged them with embezzlement.  The arrests came despite a written opinion from the senior investigator on the Investigative Committee of the Russian Federation, issued on December 1, 2015, stating that criminal charges were unwarranted in connection with the bankruptcy.

25.     Mr. Varshavsky is a well-known wealthy businessman who lives in Holmdel, New Jersey.  Upon information and belief, Mr. Varshavsky is a Russian-born, naturalized United States citizen.

26.     Upon information and belief, Mr. Varshavsky has numerous business and property interests in the United States, owned directly or indirectly, including his home in Holmdel, New Jersey, an apartment at the Time Warner Center in Manhattan, New York, an apartment at 1311 Brightwater Avenue in Brooklyn, New York, and a business incorporated and headquartered in Brooklyn, New York.

27.     Upon information and belief, Mr. Varshavsky also has numerous property and business interests in Russia, including an apartment in Moscow, an automobile dealership, and an automobile logistics and customs brokerage business.

28.     Mr. Leontiev was first contacted by Mr. Varshavsky about the Alleged Loans in or around August 2015, when Mr. Varshavsky asked to meet with Mr. Leontiev in Moscow. Prior to that time, Mr. Leontiev had never met Mr. Varshavsky.  At the Moscow meeting, Mr. Varshavsky confronted Mr. Leontiev and demanded payment of $100 million.  Contrary to Mr. Varshavsky's later assertions, Mr. Leontiev never acknowledged the Alleged Loans as valid debts owed in his personal capacity.

29.     At that same meeting, Mr. Varshavsky hinted that Mr. Leontiev would have trouble with Russian prosecutors if he failed to pay Mr. Varshavsky.  Mr. Varshavsky further stated that if Mr. Leontiev transferred a 50% interest in Probusinessbank to Mr. Varshavsky, all of Mr. Leontiev's problems would be resolved.  Mr. Leontiev understood Mr. Varshavsky to be referring to Probusinessbank's difficulties with the Russian Central Bank, and upon information and belief, that is what Mr. Varshavsky intended.

30.     Shortly thereafter, Mr. Leontiev and Mr. Varshavsky met in London, where Mr. Varshavsky demanded that Mr. Leontiev agree to a payment schedule for the Alleged Loans. Mr. Leontiev denied that he had any responsibility for the Alleged Loans.  In response, Mr. Varshavsky threatened to institute criminal charges against Mr. Leontiev.

31.     In or around January 2016, Mr. Varshavsky scheduled and then abruptly cancelled a meeting in New York City with Mr. Leontiev.  Several days later, on January 15, 2016, Mr. Varshavsky and Mr. Leontiev, together with their respective counsel, met in New York to discuss Mr. Varshavsky's requests for payment.  Mr. Varshavsky ignored Mr.

Leontiev's numerous requests for documents or an explanation of the theory under which Mr. Leontiev is personally liable for any debt owed to Mr. Varshavsky or any other party.  Instead, Mr. Varshavsky maintained that Mr. Leontiev owed him $83 million and demanded immediate payment, claiming that he "need[s] security because what if God forbid you die tomorrow."  Mr. Varshavsky also suggested at the meeting that if he informed certain parties in Russia, "a criminal investigation will be opened."

32.     Beginning on January 20, 2016, Mr. Varshavsky, through counsel, provided to Mr. Leontiev's New York counsel copies of various loan agreements, promissory notes, and guarantees, purportedly comprising the documents underlying the Alleged Loans.  These documents, listed in Appendices A, B, and C hereto, include:

    a) 29 promissory notes, issued by two different corporate entities, Financial Group "Life" and Vennop Trading Limited, and made out to three different payees, Karen Avagumyan, Igor Renich, and Diana Karapetyan;

    b) 2 loan agreements (along with amendments thereto), purporting to be agreements between New York Motors Moscow or Avilon Automobile Group, as lender, and Ambika Investments Limited, as borrower; and

    c) 5 guarantees of loan agreements, issued by Probusinessbank, as guarantor, each of which had expired.

33.     Neither Mr. Leontiev nor Mr. Varshavsky is referred to, by name or title, in any of these documents.  On their face, the documents appear to represent obligations owed by various non-parties—none of whom is Mr. Leontiev—to various other non-parties—none of whom is Mr. Varshavsky.

34.     Mr. Varshavsky has never provided documentation that the full amounts in the Alleged Loans were actually funded, nor has he ever provided documentation that any funds were transferred to or used by Mr. Leontiev in his personal capacity.

35.     On February 20, 2016, Mr. Varshavsky, through counsel, told Mr. Leontiev's New York counsel that the funds reflected in these documents were lent to companies controlled by Probusinessbank and were used by the bank to finance construction projects, make interest payments, and for the cost of arbitrage.  Mr. Varshavsky did not explain how these allegations, even if true, establish Mr. Leontiev's personal liability for the debts.

36.     In or around February 2016, Mr. Varshavsky told Mr. Zheleznyak that, unless he receives immediate payment from Mr. Leontiev, he would arrange to have Mr. Leontiev's name linked to terrorism financing.

37.     In or around March 2016, Mr. Varshavsky told Mr. Zheleznyak that if Mr. Leontiev paid him approximately $40 million, Mr. Varshavsky would arrange it so that authorities in Russia would cease their investigation of certain individuals associated with Probusinessbank.  Mr. Leontiev refused this demand.

38.     Upon information and belief, Mr. Varshavsky has personal relationships with members of the Russian government, and is considered to be a politically powerful and influential person.

39.     Upon information and belief, Mr. Varshavsky's personal relationships with members of the Russian government give credence to his threats against Mr. Leontiev and Mr. Zheleznyak.  Mr. Leontiev believes that Mr. Varshavsky can, and would, carry out those threats.

40.     On April 20, 2016, Mr. Varshavsky, through his New York counsel, again demanded payment pursuant to a purported "agreed-upon schedule of payments" and asserted

that Mr. Leontiev has acknowledged liability for the Alleged Loans.  Mr. Leontiev has never

agreed to a schedule of payments, nor has he ever acknowledged personal liability for the

Alleged Loans.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201 and 2202)

41.     Mr. Leontiev repeats and realleges each and every allegation contained in

Paragraphs 1 through 40 above as if fully set forth herein.

42.     This Court has the power to grant declaratory relief under the Declaratory

Judgment Act, 28 U.S.C. §§ 2201 and 2202.  A case of actual controversy within this Court's

jurisdiction exists between the parties concerning the existence (or non-existence) of any valid

debt or obligation owed by Mr. Leontiev to Mr. Varshavsky.  A declaratory judgment is

necessary and appropriate to resolve this dispute and adjudicate the rights of the parties.

43.     There is no theory under which Mr. Leontiev can be held legally responsible for

repayment of any of the Alleged Loans.  At most, the documents relating to the Alleged Loans

reflect a potential obligation owed by certain corporate entities to the third parties named in the

instruments.

44.     Accordingly, Mr. Leontiev is entitled to a declaratory judgment stating that he

does not owe a debt or obligation to Mr. Varshavsky, or anyone acting in concert or participation

with Mr. Varshavsky, relating to the Alleged Loans.

45.     This Court also has the power to grant injunctive relief preventing Mr.

Varshavsky, or anyone acting in concert or participation with Mr. Varshavsky, from taking any

further steps to enforce these debts against Mr. Leontiev in his personal capacity, including, but

not limited to, continuing threats, demands for payment, and pursuing litigation.  Such relief is

necessary to put an end to Mr. Varshavsky's campaign of threats and harassment aimed at obtaining money from Mr. Leontiev.

**SECOND CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress)**

46.     Mr. Leontiev repeats and realleges each and every allegation contained in Paragraphs 1 through 45 above as if fully set forth herein.

47.     Mr. Varshavsky has intentionally inflicted emotional distress upon Mr. Leontiev by threatening to institute baseless criminal charges against him, threatening to link him to terrorism financing, and soliciting his participation in an unlawful bribery scheme, all in order to receive payment on the Alleged Loans for which Mr. Leontiev has no personal liability.

48.     Mr. Varshavsky has further intentionally inflicted emotional distress upon Mr. Leontiev by threatening baseless criminal charges against Mr. Zheleznyak.  Mr. Varshavsky is aware that Mr. Zheleznyak is a life-long friend and business associate of Mr. Leontiev, and has caused these threats to be made for the specific purpose of intimidating and harassing Mr. Leontiev.

49.     These threats constitute extreme and outrageous conduct that violates public policy and is intolerable in a civilized society.  The threats have been made without privilege or justification.

50.     Mr. Varshavsky has intentionally caused or recklessly disregarded a substantial probability of causing Mr. Leontiev severe emotional distress.

51.     The totality of Mr. Varshavky's systematic and unrelenting campaign of threats, intimidation, and harassment has caused Mr. Leontiev to suffer severe emotional distress and mental pain and anguish, including, but not limited to, anxiety, stress, loss of sleep, and exacerbation of other physical harms.  Moreover, Mr. Varshavsky's unlawful and tortious

conduct has also caused Mr. Leontiev to fear for his safety and for the safety of his family and friends.

52.      Because Mr. Varshavsky acted intentionally and with malice to inflict severe emotional distress on Mr. Leontiev, this Court should award punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

1.      Declare that Mr. Leontiev does not owe a debt or obligation to Mr. Varshavsky, or anyone acting in concert or participation with Mr. Varshavsky, relating to the Alleged Loans;

2.      Issue a permanent injunction barring Mr. Varshavsky, or anyone acting in concert or participation with Mr. Varshavsky, from taking any further steps to enforce the Alleged Loans against Mr. Leontiev in his personal capacity;

3.      Award Mr. Leontiev money damages in accordance with the evidence, together with interest thereon, to compensate Mr. Leontiev for Mr. Varshavsky's tortious conduct;

4.      Award Mr. Leontiev punitive damages sufficient to punish and deter the conduct complained of herein in an amount not less than $25,000,000;

5.      Award Mr. Leontiev his costs and reasonable attorneys' fees as appropriate; and

6.      Grant such further and other relief as this Court deems just and proper.

Dated:  May 13, 2016
        New York, New York                     GIBSON, DUNN & CRUTCHER LLP


                                               By: /s/ Robert L. Weigel
                                                   Robert L. Weigel
                                                   Marshall R. King

                                               200 Park Avenue
                                               New York, New York 10166
                                               T: (212) 351-4000
                                               F: (212) 351-4035

                                               *Attorneys for Plaintiff Sergey Leontiev*