# Exhibit A

**[HOUSE OF LORDS.]**

# ARON SALOMON (PAUPER) APPELLANT; AND  A. SALOMON AND COMPANY, LIMITED RESPONDENTS. BY ORIGINAL APPEAL.  AND  A. SALOMON AND COMPANY, LIMITED APPELLANTS; AND  ARON SALOMON RESPONDENT. BY CROSS APPEAL.

**1896 Nov. 16.**

**LORD HALSBURY L.C., LORD WATSON., LORD HERSCHELL., LORD MACNAGHTEN., LORD MORRIS., LORD DAVEY.**

*Company - Private Company - One Man Company - Limited Liability - Winding-up - Fraud upon Creditors - Liability to indemnify Company in respect of Debts - Rescission - Companies Act 1862 (25 & 26 Vict. c. 89) ss. 6, 8, 30, 43.*

It is not contrary to the true intent and meaning of the Companies Act 1862 for a trader, in order to limit his liability and obtain the preference of a debenture-holder over other creditors, to sell his business to a limited company consisting only of himself and six members of his own family, the business being then solvent, all the terms of sale being known to and approved by the shareholders, and all the requirements of the Act being complied with.

A trader sold a solvent business to a limited company with a nomina capital of 40,000 shares of 1*l.* each, the company consisting only of the vendor, his wife, a daughter and four sons, who subscribed for one share each, all the terms of sale being known to and approved by the shareholders.

In part payment of the purchase-money debentures forming a floating security were issued to the vendor. Twenty thousand shares were also issued to him and were paid for out of the purchase-money. These shares gave the vendor the power of outvoting the six other shareholders. No shares other than these 20,007 were ever issued. All the requirements of the Companies Act 1862 were complied with. The vendor was appointed managing director, bad times came, the company was wound up, and after satisfying the debentures there was not enough to pay the ordinary creditors: -

*Held*, that the proceedings were not contrary to the true intent and meaning of the Companies Act 1862; that the company was duly formed and registered and was not the mere "alias" or agent of or trustee for the vendor; that he was not liable to indemnify the company against the creditors' claims; that there was no fraud upon creditors or shareholders; and that the company (or the liquidator suing in the name of the company) was not entitled to rescission of the contract for purchase.

The decisions of Vaughan Williams J. and the Court of Appeal ([1895] 2 Ch. 323) reversed.

THE following statement of the facts material to this report is taken from the judgment of Lord Watson: -

The appellant, Aron Salomon, for many years carried on business, on his own account, as a leather merchant and wholesale boot manufacturer. With the design of transferring his business to a joint stock company, which was to consist exclusively of himself and members of his own family, he, on July 20, 1892, entered into a preliminary agreement with one Adolph Anholt, as trustee for the future company, settling the terms upon which the transfer was to be made by him, one of its conditions being that part payment might be made to him in debentures of the company. A memorandum of association was then executed by the appellant, his wife, a daughter, and four sons, each of them subscribing for one share, in which the leading object for which the company was formed was stated to be the adoption and carrying into effect, with such modifications (if any) as might be agreed on, of the provisional agreement of July 20. The memorandum was registered on July 28, 1892; and the effect of registration, if otherwise valid, was to incorporate the company, under the name of "Aron Salomon and Company, Limited," with liability limited by shares, and having a nominal capital of 40,000*l.*, divided into 40,000 shares of 1*l.* each. The company adopted

the agreement of July 20, subject to certain modifications which are not material; and an agreement to that effect was executed between them and the appellant on August 2, 1892. Within a month or two after that date the whole stipulations of the agreement were fulfilled by both parties. In terms thereof, 100 debentures, for 100*l.* each, were issued to the appellant, who, upon the security of these documents, obtained an advance of 5000*l.* from Edmund Broderip. In February 1893 the original debentures were returned to the company and cancelled; and in lieu thereof, with the consent of the appellant as beneficial owner, fresh debentures to the same amount were issued to Mr. Broderip, in order to secure the repayment of his loan, with interest at 8 per cent.

In September 1892 the appellant applied for and obtained an allotment of 20,000 shares; and from that date until an order was made for its compulsory liquidation, the share register of the company remained unaltered, 20,001 shares being held by the appellant, and six shares by his wife and family. It was all along the intention of these persons to retain the business in their own hands, and not to permit any outsider to acquire an interest in it.

Default having been made in the payment of interest upon his debentures, Mr. Broderip, in September 1893, instituted an action in order to enforce his security against the assets of the company. Thereafter a liquidation order was made, and a liquidator appointed, at the instance of unsecured creditors of the company. It has now been ascertained that, if the amount realised from the assets of the company were, in its first place, applied in extinction of Mr. Broderip's debt and interest, there would remain a balance of about 1055*l.*, which is claimed by the appellant as beneficial owner of the debentures. In the event of his claim being sustained there will be no funds left for payment of the unsecured creditors, whose debts amount to 7733*l.* 8*s.* 3*d.*

The liquidator lodged a defence, in name of the company, to the debenture suit, in which he counter-claimed against the appellant (who was made a party to the counter-claim), (1.) to have the agreements of July 20 and August 2, 1892 rescinded,

(2.) to have the debentures already mentioned delivered up and cancelled, (3.) judgment against the appellant for all sums paid by the company to the appellant under these agreements, and (4.) a lien for these sums upon the business and assets. The averments made in support of these claims were to the effect that the price paid by the company exceeded the real value of the business and assets by upwards of 8200*l.*; that the arrangements made by the appellant for the formation of the company were a fraud upon the creditors of the company; that no board of directors of the company was ever appointed, and that in any case such board consisted entirely of the appellant, and there never was an independent board. The action came on for trial on the counter-claim before Vaughan Williams J., when the liquidator was examined as a witness on behalf of the company, whilst evidence was given for the appellant by himself, and by his son, Emanuel Salomon, one of the members of the company, who had been employed in the business for nearly twenty years.

The evidence shews that, before its transfer to the new company, the business had been prosperous, and had yielded to the appellant annual profits sufficient to maintain himself and his family, and to add to his capital. It also shews that at the date of transfer the business was perfectly solvent. The liquidator, whose testimony was chiefly directed toward proving that the price paid by the company was excessive, admitted on cross-examination that the business, when transferred to the company, was in a sound condition, and that there was a substantial surplus. No evidence was led tending to support the allegation that no board of directors was ever appointed, or that the board consisted entirely of the appellant. The non-success and ultimate insolvency of the business, after it came into the hands of the company, was attributed by the witness Emanuel Salomon to a succession of strikes in the boot trade, and there is not a tittle of evidence tending to modify or contradict his statement. It also appears from the evidence that all the members of the company were fully cognisant of the terms of the agreements of July 20 and August 2, 1892, and that they were willing to accept and did accept these terms.

At the close of the argument Vaughan Williams J. announced that he was not prepared to grant the relief craved by the company. He at the same time suggested that a different remedy might be open to the company; and, on the motion of their counsel, he allowed the counter-claim to be amended. In conformity with the suggestion thus made by the Bench, a new and alternative claim was added for a declaration that the company or the liquidator was entitled (1.) to be indemnified by the appellant against the whole of the company's unsecured debts, namely, 7733*l.* 8*s.* 3*d.*; (2.) to judgment against the appellant for that sum; and (3.) to a lien for that amount upon all sums which might be payable to the appellant by the company in respect of his debentures or otherwise until the judgment was satisfied. There were also added averments to the effect that the company was formed by the appellant, and that the debentures for 10,000*l.* were issued in order that he might carry on the business, and take all the profits without risk to himself; and also that the company was the "mere nominee and agent" of the appellant.

Vaughan Williams J. made an order for a declaration in the terms of the new and alternative counter-claim above stated, without making any order on the original counter-claim.

Both parties having appealed, the Court of Appeal (Lindley, Lopes and Kay L.JJ.) being of opinion that the formation of the company, the agreement of August 1892, and the issue of debentures to the appellant pursuant to such agreement, were a mere scheme to enable him to carry on business in the name of the company with limited liability contrary to the true intent and meaning of the Companies Act 1862, and further to enable him to obtain a preference over other creditors of the company by procuring a first charge on the assets of the company by means of such debentures, dismissed the appeal with costs, and declined to make any order on the original counter-claim.(1)

Against this order the appellant appealed, and the company brought a cross-appeal against so much of it as declined to make any order upon the original counter-claim. Broderip having been paid off was no party to this appeal or cross-appeal.

(1)    Reported as *Broderip v. Salomon*, [1895] 2 Ch. 323.

June 15, 22, 29. **Cohen Q.C.** and **Buckley Q.C.** (**McCall Q.C.** and **Muri Mackenzie** with them), for the appellant in the original appeal. The view of Vaughan Williams J. that the company was the mere alias or agent of the appellant so as to make him liable to indemnify the company against creditors, was not adopted by the Court of Appeal, who seem to have considered the company as the appellant's trustee. There is no evidence in favour of either view. The sale of the business was bonâ fide: the business was genuine and solvent, with a substantial surplus. All the circumstances were known to and approved by the shareholders. All the requirements of the Companies Act, 1862, were strictly complied with: the purpose was lawful, the proceedings were regular. How could the registrar refuse to register such a company? What objection is it that the vendor desires to convert his unlimited into a limited liability? That is the prime object of turning a private business into a limited company, practised every day by banks and other great firms. And what difference to creditors could it make whether the debentures were held by the vendor or by strangers? Whoever held them had the preference over creditors - that is the future creditors - all the old creditors having been paid off by the vendor. There was no misrepresentation of fact, and no one was misled: where is "the fraud upon creditors" spoken of in the Court of Appeal? The creditors were under no obligation to trust the company; they might, if they had desired, have found out who held the shares, and in what proportion, and who held the debentures. There is not a word in ss. 6, 8, 30, 43, or any other section of the Companies Act, 1862, forbidding or even pointing against such a company so formed and for such objects. Then, if the company was a real company, fulfilling all the requirements of the Legislature, it must be treated as a company, as an entity, consisting indeed of certain corporators, but a distinct and independent corporation. The Court of Appeal seem to treat the company sometimes as substantial and sometimes as shadowy and unreal: it must be one or the other, it cannot be both. A Court cannot impose conditions not imposed by the Legislature, and say that the shareholders must not be related

to each other, or that they must hold more than one share each. There is nothing to prevent one shareholder or all the shareholders holding the shares in trust for some one person. What is prohibited is the entry of a trust on the register: s. 30. If all the shares were held in trust that would not make the company a trustee. The authorities relied upon below (which all turn upon some one being deceived or defrauded) do not touch the present case and do not support the judgment below.

[They referred to *Reg. v. Arnaud* (1); *In re Ambrose Lake Tin and Copper Mining Co.* (2); *In re British Seamless Paper Box Co.* (3); *Farrar v. Farrars, Limited* (4); *North-West Transportation Co. v. Beatty* (5); *In re National Debenture and Assets Corporation* (6); *In re George Newman & Co.* (7)]

As to the cross-appeal, there being no fraud, misrepresentation or deceit, not even any failure of consideration, there is no ground for rescission. Moreover, the company's assets having been sold the company is not in a position to ask for it.

**Farwell Q.C.** and **H. S. Theobald**, for the respondents. The question is one of fact rather than law, and the true inferences from the facts are these: The appellant incorporated the company to carry on his business without risk to himself and at his creditors' expense. The business was decaying when the company was formed, and though carried on as before, nay with more (borrowed) money, it failed very soon after the sale. To get an advantage over creditors the vendor took debentures and concealed the fact from them. The purchase-money was exorbitant, the price dictated solely by the vendor, and there was no independent person acting for the company. Though incorporated under the Acts the company never had an independent existence: it was in fact the appellant under another name; he was the managing director, the other directors being his sons and under his control. The shareholders other than himself were his own family, and his vast preponderance of shares made him absolute master.

(1)   (1846) 9 Q. B. 806.

(2)   (1880) 14 Ch. D. 390, 394, 398.

(3)   (1881) 17 Ch. D. 467, 476, 479.

(4)   (1888) 40 Ch. D. 395.

(5)   (1887) 12 App. Cas. 589.

(6)   [1891] 2 Ch. 505.

(7)   [1895] 1 Ch. 674, 685.

He could pass any resolution, and he would receive all the profits - if any. Whether therefore the company is considered as his agent, or his nominee or his trustee, matters little. The business was solely his, conducted solely for him and by him, and the company was a mere sham and fraud, in effect entirely contrary to the intent and meaning of the Companies Act. The liquidator is therefore entitled to counter-claim against him for an indemnity. As to the cross-appeal and the claim for rescission the decision in *Erlanger v. New Sombrero Phosphate Co.* (1) and the observations of Lord Cairns are precisely applicable and conclusive in favour of rescission. See also *Adam v. Newbigging.* (2)

[LORD WATSON referred to *Western Bank of Scotland v. Addie* (3), following *Clarke v. Dickson.* (4)]

[They also referred to *Ex parte Cowen* (5); *In re Smith.* (6)]

The House took time for consideration.

Nov. 16. LORD HALSBURY L.C. My Lords, the important question in this case, I am not certain it is not the only question, is whether the respondent company was a company at all - whether in truth that artificial creation of the Legislature had been validly constituted in this instance; and in order to determine that question it is necessary to look at what the statute itself has determined in that respect. I have no right to add to the requirements of the statute, nor to take from the requirements thus enacted. The sole guide must be the statute itself.

Now, that there were seven actual living persons who held shares in the company has not been doubted. As to the proportionate amounts held by each I will deal presently; but it is important to observe that this first condition of the statute is satisfied, and it follows as a consequence that it would not

(1)   (1878) 3 App. Cas. 1218, 1236, 1238.

(2)   (1888) 13 App. Cas. 308.

(3)   (1867) L. R. 1 H. L., Sc. 145.

(4)   (1858) E. B. & E. 148.

(5)   (1867) L. R. 2 Ch. 563.

(6)   (1890) 25 Q. B. D. 536, 541.

be competent to any one - and certainly not to these persons themselves - to deny that they were shareholders.

I must pause here to point out that the statute enacts nothing as to the extent or degree of interest which may be held by each of the seven, or as to the proportion of interest or influence possessed by one or the majority of the share-holders over the others. One share is enough. Still less is it possible to contend that the motive of becoming shareholders or of making them shareholders is a field of inquiry which the statute itself recognises as legitimate. If they are shareholders, they are shareholders for all purposes; and even if the statute was silent as to the recognition of trusts, I should be prepared to hold that if six of them were the cestuis que trust of the seventh, whatever might be their rights inter se, the statute would have made them shareholders to all intents and purposes with their respective rights and liabilities, and, dealing with them in their relation to the company, the only relations which I believe the law would sanction would be that they were corporators of the corporate body.

I am simply here dealing with the provisions of the statute, and it seems to me to be essential to the artificial creation that the law should recognise only that artificial existence - quite apart from the motives or conduct of individual corporators. In saying this, I do not at all mean to suggest that if it could be established that this provision of the statute to which I am adverting had not been complied with, you could not go behind the certificate of incorporation to shew that a fraud had been committed upon the officer entrusted with the duty of giving the certificate, and that by some proceeding in the nature of scire facias you could not prove the fact that the company had no real legal existence. But short of such proof it seems to me impossible to dispute that once the company is legally incorporated it must be treated like any other independent person with its rights and liabilities appropriate to itself, and that the motives of those who took part in the promotion of the company are absolutely irrelevant in discussing what those rights and liabilities are.

I will for the sake of argument assume the proposition that

the Court of Appeal lays down - that the formation of the company was a mere scheme to enable Aron Salomon to carry on business in the name of the company. I am wholly unable to follow the proposition that this was contrary to the true intent and meaning of the Companies Act. I can only find the true intent and meaning of the Act from the Act itself; and the Act appears to me to give a company a legal existence with, as I have said, rights and liabilities of its own, whatever may have been the ideas or schemes of those who brought it into existence.

I observe that the learned judge (Vaughan Williams J.) held that the business was Mr. Salomon's business, and no one else's, and that he chose to employ as agent a limited company; and he proceeded to argue that he was employing that limited company as agent, and that he was bound to indemnify that agent (the company). I confess it seems to me that that very learned judge becomes involved by this argument in a very singular contradiction. Either the limited company was a legal entity or it was not. If it was, the business belonged to it and not to Mr. Salomon. If it was not, there was no person and no thing to be an agent at all; and it is impossible to say at the same time that there is a company and there is not.

Lindley L.J., on the other hand, affirms that there were seven members of the company; but he says it is manifest that six of them were members simply in order to enable the seventh himself to carry on business with limited liability. The object of the whole arrangement is to do the very thing which the Legislature intended not to be done.

It is obvious to inquire where is that intention of the Legislature manifested in the statute. Even if we were at liberty to insert words to manifest that intention, I should have great difficulty in ascertaining what the exact intention thus imputed to the Legislature is, or was. In this particular case it is the members of one family that represent all the shares; but if the supposed intention is not limited to so narrow a proposition as this, that the seven shareholders must not be members of one family, to what extent may influence or authority or intentional purchase of a majority among the shareholders be carried so as

to bring it within the supposed prohibition? It is, of course, easy to say that it was contrary to the intention of the Legislature - a proposition which, by reason of its generality, it is difficult to bring to the test; but when one seeks to put as an affirmative proposition what the thing is which the Legislature has prohibited, there is, as it appears to me, an insuperable difficulty in the way of those who seek to insert by construction such a prohibition into the statute.

As one mode of testing the proposition, it would be pertinent to ask whether two or three, or indeed all seven, may constitute the whole of the shareholders? Whether they must be all independent of each other in the sense of each having an independent beneficial interest? And this is a question that cannot be answered by the reply that it is a matter of degree. If the Legislature intended to prohibit something, you ought to know what that something is. All it has said is that one share is sufficient to constitute a shareholder, though the shares may be 100,000 in number. Where am I to get from the statute itself a limitation of that provision that that shareholder must be an independent and beneficially interested person?

My Lords, I find all through the judgment of the Court of Appeal a repetition of the same proposition to which I have already adverted - that the business was the business of Aron Salomon, and that the company is variously described as a myth and a fiction. Lopes L.J. says: "The Act contemplated the incorporation of seven independent bonâ fide members, who had a mind and a will of their own, and were not the mere puppets of an individual who, adopting the machinery of the Act, carried on his old business in the same way as before, when he was a sole trader." The words "seven independent bonâ fide members with a mind and will of their own, and not the puppets of an individual," are by construction to be read into the Act. Lopes L.J. also said that the company was a mere nominis umbra. Kay L.J. says: "The statutes were intended to allow seven or more persons, bonâ fide associated for the purpose of trade, to limit their liability under certain conditions and to become a corporation. But they were not intended to legalise a pretended association for the purpose of

enabling an individual to carry on his own business with limited liability in the name of a joint stock company."

My Lords, the learned judges appear to me not to have been absolutely certain in their own minds whether to treat the company as a real thing or not. If it was a real thing; if it had a legal existence, and if consequently the law attributed to it certain rights and liabilities in its constitution as a company, it appears to me to follow as a consequence that it is impossible to deny the validity of the transactions into which it has entered.

Vaughan Williams J. appears to me to have disposed of the argument that the company (which for this purpose he assumed to be a legal entity) was defrauded into the purchase of Aron Salomon's business because, assuming that the price paid for the business was an exorbitant one, as to which I am myself not satisfied, but assuming that it was, the learned judge most cogently observes that when all the shareholders are perfectly cognisant of the conditions under which the company is formed and the conditions of the purchase, it is impossible to contend that the company is being defrauded.

The proposition laid down in *Erlanger v. New Sombrero Phosphate Co*. (1), (I quote the head-note), is that "Persons who purchase property and then create a company to purchase from them the property they possess, stand in a fiduciary position towards that company, and must faithfully state to the company the facts which apply to the property, and would influence the company in deciding on the reasonableness of acquiring it." But if every member of the company - every shareholder - knows exactly what is the true state of the facts (which for this purpose must be assumed to be the case here), Vaughan Williams J.'s conclusion seems to me to be inevitable that no case of fraud upon the company could here be established. If there was no fraud and no agency, and if the company was a real one and not a fiction or a myth, every one of the grounds upon which it is sought to support the judgment is disposed of.

My Lords, the truth is that the learned judges have never allowed in their own minds the proposition that the company

---

(1)   3 App. Cas. 1218.

has a real existence. Then have been struck by what they have considered the inexpediency of permitting one man to be in influence and authority the whole company; and, assuming that such a thing could not have been intended by the Legislature, they have sought various grounds upon which they might insert into the Act some prohibition of such a result. Whether such a result be right or wrong, politic or impolitic, I say, with the utmost deference to the learned judges, that we have nothing to do with that question if this company has been duly constituted by law; and, whatever may be the motives of those who constitute it, I must decline to insert into that Act of Parliament limitations which are not to be found there.

I have dealt with this matter upon the narrow hypothesis propounded by the learned judges below; but it is, I think, only justice to the appellant to say that I see nothing whatever to justify the imputations which are implied in some of the observations made by more than one of the learned judges. The appellant, in my opinion, is not shewn to have done or to have intended to do anything dishonest or unworthy, but to have suffered a great misfortune without any fault of his own.

The result is that I move your Lordships that the judgment appealed from be reversed, but as this is a pauper case, I regret to say it can only be with such costs in this House as are appropriate to that condition of things, and that the cross-appeal be dismissed with costs to the same extent.

LORD WATSON. My Lords, this appeal raises some questions of practical importance, depending upon the construction of the Companies Acts, which do not appear to have been settled by previous decisions. As I am not prepared to accept without reservation all the conclusions of fact which found favour with the Courts below, I shall, before adverting to the law, state what I conceive to be the material facts established by the evidence before us. [His Lordship stated the facts above set out.]

The allegations of the company, in so far as they have any relation to the amended claim, their pith consisting in the averments

made on amendment, were meant to convey a charge of fraud; and it is unfortunate that they are framed in such loose and general terms. A relevant charge of fraud ought to disclose facts necessitating the inference that a fraud was perpetrated upon some person specified. Whether it was a fraud upon the company and its members, or upon persons who had dealings with the company, is not indicated, although there may be very different considerations applicable to those two cases. The res gestæ which might imply that it was the appellant, and not the company, who actually carried on its business, are not set forth. Any person who holds a preponderating share in the stock of a limited company has necessarily the intention of taking the lion's share of its profits without any risk beyond loss of the money which he has paid for, or is liable to pay upon his shares; and the fact of his acquiring and holding debentures secured upon the assets of the company does not diminish the risk of that loss. What is meant by the assertion that the company "was the mere nominee or agent" of the appellant I cannot gather from the record; and I am not sure that I understand precisely in what sense it was interpreted by the learned judges whose decisions we have to consider.

No additional proof was led after the amendment of the counter-claim. The oral testimony has very little, if any, bearing upon the second claim; and any material facts relating to the fraudulent objects which the appellant is said to have had in view, and the alleged position of the company as his nominee or agent, must be mere matter of inference derived from the agreements of July 20 and August 2, 1892, the memorandum and articles of association, and the minute-book of the company.

On rehearing the case Vaughan Williams J., without disposing of the original claim, gave the company decree of indemnity in terms of their amended claim. I do not profess my ability to follow accurately the whole chain of reasoning by which the learned judge arrived at that conclusion; but he appears to have proceeded mainly upon the ground that the appellant was in truth the company, the other members being either his trustees or mere "dummies," and consequently that

the appellant carried on what was truly his own business under cover of the name of the company, which was nothing more than an alias for Aron Salomon. On appeal from his decision, the Court of Appeal, consisting of Lindley, Lopes, and Kay L.JJ., made an order finding it unnecessary to deal with the original claim, and dismissing the appeal in so far as it related to the amended claim. The ratio upon which that affirmance proceeded, as embodied in the order, was: "This Court being of opinion that the formation of the company, the agreement of August, 1892, and the issue of debentures to Aron Salomon pursuant to such agreement, were a mere scheme to enable him to carry on business in the name of the company, with limited liability, contrary to the true intent and meaning of the Companies Act, 1862, and further to enable him to obtain a preference over other creditors of the company by procuring a first charge on the assets of the company by means of such debentures." The opinions delivered by the Lords Justices are strictly in keeping with the reasons assigned in their order. Lindley L.J., observing "that the incorporation of the company cannot be disputed," refers to the scheme for the formation of the company, and says(1): "the object of the whole arrangement is to do the very thing which the Legislature intended not to be done"; and he adds that "Mr. Salomon's scheme is a device to defraud creditors."

Assuming that the company was well incorporated in terms of the Act of 1862, an assumption upon which the decisions appealed from appear to me to throw considerable doubt, I think it expedient, before considering the amended claim, to deal with the original claim for rescission, which was strongly pressed upon us by counsel for the company, under their cross-appeal. Upon that branch of the case there does not appear to me to be much room for doubt. With this exception, that the word "exorbitant" appears to me to be too strong an epithet, I entirely agree with Vaughan Williams J. when he says: "I do not think that where you have a private company, and all the shareholders in the company are perfectly cognisant of the conditions under which the company is formed, and the conditions

(1)   [1895] 2 Ch. 337, 339.

of purchase by the company, you can possibly say that purchasing at an exorbitant price (and I have no doubt whatever that the purchase here was at an exorbitant price) is a fraud upon those shareholders or upon the company." The learned judge goes on to say that the circumstances might have amounted to fraud if there had been an intention on the part of the original shareholders "to allot further shares at a later period to future allottees." Upon that point I do not find it necessary to express any opinion, because it is not raised by the facts of the case, and, in any view, these considerations are of no relevancy in a question as to rescission between the company and the appellant.

Mr. Farwell argued that the agreement of August 2 ought to be set aside upon the principle followed by this House in *Erlanger v. New Sombrero Phosphate Co.* (1) In that case the vendor, who got up the company, with the view of selling his adventure to it, attracted shareholders by a prospectus which was essentially false. The directors, who were virtually his nominees, purchased from him without being aware of the real facts; and on their assurance that, in so far as they knew, all was right, the shareholders sanctioned the transaction. The fraud by which the company and its shareholders had been misled was directly traceable to the vendor; and it was set aside at the instance of the liquidator, the Lord Chancellor (Earl Cairns) expressing a doubt whether, even in those circumstances, the remedy was not too late after a liquidation order. But in this case the agreement of July 20 was, in the full knowledge of the facts, approved and adopted by the company itself, if there was a company, and by all the shareholders who ever were, or were likely to be, members of the company. In my opinion, therefore, *Erlanger v. New Sombrero Phosphate Co.* (1) has no application, and the original claim of the liquidator is not maintainable.

The Lords Justices of Appeal, in disposing of the amended claim, have expressly found that the formation of the company, with limited liability, and the issue of 10,000*l.* worth of its debentures to the appellant, were "contrary to the true intent

(1)   3 App. Cas. 1218.

and meaning of the Companies Act, 1862." I have had great difficulty in endeavouring to interpret that finding. I am unable to comprehend how a company, which has been formed contrary to the true intent and meaning of a statute, and (in the language of Lindley L.J.) does the very thing which the Legislature intended not to be done, can yet be held to have been legally incorporated in terms of the statute. "Intention of the Legislature" is a common but very slippery phrase, which, popularly understood, may signify anything from intention embodied in positive enactment to speculative opinion as to what the Legislature probably would have meant, although there has been an omission to enact it. In a Court of Law or Equity, what the Legislature intended to be done or not to be done can only be legitimately ascertained from that which it has chosen to enact, either in express words or by reasonable and necessary implication. Accordingly, if the words "intent and meaning," as they occur in the finding of the Appeal Court, are used in their proper legal sense, it follows, in my opinion, that the company has not been well incorporated; that, there being no legal corporation, there can be no liquidation under the Companies Acts, and that the counter-claim preferred by its liquidator must fail. In that case its creditors would not be left without a remedy, because its members, as joint traders without limitation of their liability, would be jointly and severally responsible for the debts incurred by them in the name of the company.

The provisions of the Act of 1862 which seem to me to have any bearing upon this point lie within a very narrow compass. Sect. 6 provides that any seven or more persons, associated for a lawful purpose, such as the manufacture and sale of boots, may, by subscribing their names to a memorandum of association and otherwise complying with the provisions of the Act in respect of registration, form a company with or without limited liability; and s. 8, which prescribes the essentials of the memorandum in the case of a company limited by shares, inter alia, enacts that "no subscriber shall take less than one share." The first of these enactments does not require that the persons subscribing shall not be related to each other; and the second

plainly imports that the holding of a single share affords a sufficient qualification for membership; and I can find no other rule laid down or even suggested in the Act. Nor does the statute, either expressly or by implication, impose any limit upon the number of shares which a single member may subscribe for or take by allotment. At the date of registration all the requirements of the Act had been complied with; and, as matters then stood, there does not appear to have been any room for the pleas now advanced by the liquidator. The company was still free to modify or reject the agreement of July 20; and the fraud of which the appellant has been held guilty by the Court of Appeal, though it may have existed in animo, had not been carried into execution by the acceptance of the agreement, the issue of debentures to the appellant in terms of it, and by his receiving an allotment of shares which increased his interest in the company to  20001/20007 of its actual capital. I have already intimated my opinion that the acceptance of the agreement is binding on the company; and neither that acceptance, nor the preponderating share of the appellant, nor his payment in debentures, being forbidden by the Act, I do not think that any one of these things could subsequently render the registration of the company invalid. But I am willing to assume that proceedings which are permitted by the Act may be so used by the members of a limited company as to constitute a fraud upon others, to whom they in consequence incur personal liability. In this case the fraud is found to have been committed by the appellant against the creditors of the company; but it is clear that if so, though he may have been its originator and the only person who took benefit from it, he could not have done any one of those things, which taken together are said to constitute his fraud, without the consent and privity of the other shareholders. It seems doubtful whether a liquidator as representing and in the name of the company can sue its members for redress against a fraud which was committed by the company itself and by all its shareholders. However, I do not think it necessary to dwell upon that point, because I am not satisfied that the charge of fraud against creditors has any foundation in fact.

The memorandum of association gave notice that the main object for which the company was formed was to adopt and carry into effect, with or without modifications, the agreement of July, 1892, in terms of which the debentures for 10,000*l.* were subsequently given to the appellant in part payment of the price. By the articles of association (art. 62 (e)) the directors were empowered to issue mortgage or other debentures or bonds for any debts due, or to become due, from the company; and it is not alleged or proved that there way any failure to comply with s. 43 or the other clauses (Part III. of the Act) which relate to the protection of creditors. The unpaid creditors of the company, whose unfortunate position has been attributed to the fraud of the appellant, if they had thought fit to avail themselves of the means of protecting their interests which the Act provides, could have informed themselves of the terms of purchase by the company, of the issue of debentures to the appellant, and of the amount of shares held by each member. In my opinion, the statute casts upon them the duty of making inquiry in regard to these matters. Whatever may be the moral duty of a limited company and its share-holders, when the trade of the company is not thriving, the law does not lay any obligation upon them to warn those members of the public who deal with them on credit that they run the risk of not being paid. One of the learned judges asserts, and I see no reason to question the accuracy of his statement, that creditors never think of examining the register of debentures. But the apathy of a creditor cannot justify an imputation of fraud against a limited company or its members, who have provided all the means of information which the Act of 1862 requires; and, in my opinion, a creditor who will not take the trouble to use the means which the statute provides for enabling him to protect himself must bear the consequences of his own negligence.

For these reasons I have come to the conclusion that the orders appealed from ought to be reversed, with costs to the appellant here and in both Courts below. His costs in this House must, of course, be taxed in accordance with the rule applicable to pauper litigants.

LORD HERSCHELL. My Lords, by an order of the High Court, which was affirmed by the Court of Appeal, it was declared that the respondent company, or the liquidator of that company was entitled to be indemnified by the appellant against the sum of 7733*l. 8s.* 3*d.*, and it was ordered that the respondent company should recover that sum against the appellant.

On July 28, 1892, the respondent company was incorporated with a capital of 40,000*l.* divided into 40,000 shares of 1*l.* each. One of the objects for which the company was incorporated was to carry out an agreement, with such modifications therein as might be agreed to, of July 20, 1892, which had been entered into between the appellant and a trustee for a company intended to be formed, for the acquisition by the company of the business then carried on by the appellant. The company was, in fact, formed for the purpose of taking over the appellant's business of leather merchant and boot manufacturer, which he had carried on for many years. The business had been a prosperous one, and, as the learned judge who tried the action found, was solvent at the time when the company was incorporated. The memorandum of association of the company was subscribed by the appellant, his wife and daughter, and his four sons, each subscribing for one share. The appellant afterwards had 20,000 shares allotted to him. For these he paid 1*l.* per share out of the purchase-money which by agreement he was to receive for the transfer of his business to the company. The company afterwards became insolvent and went into liquidation.

In an action brought by a debenture-holder on behalf of himself and all the other debenture-holders, including the appellant, the respondent company set up by way of counter-claim that the company was formed by Aron Salomon, and the debentures were issued in order that he might carry on the said business, and take all the profits without risk to himself; that the company was the mere nominee and agent of Aron Salomon; and that the company or the liquidator thereof was entitled to be indemnified by Aron Salomon against all the debts owing by the company to creditors other than Aron Salomon. This counter-claim was not in the pleading as

originally delivered; it was inserted by way of amendment at the suggestion of Vaughan Williams J., before whom the action came on for trial. The learned judge thought the liquidator entitled to the relief asked for, and made the order complained of. He was of opinion that the company was only an "alias" for Salomon; that, the intention being that he should take the profits without running the risk of the debts, the company was merely an agent for him, and, having incurred liabilities at his instance, was, like any other agent under such circumstances, entitled to be indemnified by him against them. On appeal the judgment of Vaughan Williams J. was affirmed by the Court of Appeal, that Court "being of opinion that the formation of the company, the agreement of August, 1892, and the issue of debentures to Aron Salomon pursuant to such agreement were a mere scheme to enable him to carry on business in the name of the company with limited liability contrary to the true intent and meaning of the Companies Act, 1862, and further to enable him to obtain a preference over other creditors of the company by procuring a first charge on the assets of the company by means of such debentures."

The learned judges in the Court of Appeal dissented from the view taken by Vaughan Williams J., that the company was to be regarded as the agent of the appellant. They considered the relation between them to be that of trustee and cestui que trust; but this difference of view, of course, did not affect the conclusion that the right to the indemnity claimed had been established.

It is to be observed that both Courts treated the company as a legal entity distinct from Salomon and the then members who composed it, and therefore as a validly constituted corporation. This is, indeed, necessarily involved in the judgment which declared that the company was entitled to certain rights as against Salomon. Under these circumstances, I am at a loss to understand what is meant by saying that A. Salomon & Co., Limited, is but an "alias" for A. Salomon. It is not another name for the same person; the company is ex hypothesi a distinct legal persona. As little am I able to adopt the view

that the company was the agent of Salomon to carry on his business for him. In a popular sense, a company may in every case be said to carry on business for and on behalf of its share-holders; but this certainly does not in point of law constitute the relation of principal and agent between them or render the shareholders liable to indemnify the company against the debts which it incurs. Here, it is true, Salomon owned all the shares except six, so that if the business were profitable he would be entitled, substantially, to the whole of the profits. The other shareholders, too, are said to have been "dummies," the nominees of Salomon. But when once it is conceded that they were individual members of the company distinct from Salomon, and sufficiently so to bring into existence in conjunction with him a validly constituted corporation, I am unable to see how the facts to which I have just referred can affect the legal position of the company, or give it rights as against its members which it would not otherwise possess.

The Court of Appeal based their judgment on the proposition that the formation of the company and all that followed on it were a mere scheme to enable the appellant to carry on business in the name of the company, with limited liability, contrary to the true intent and meaning of the Companies Act, 1862. The conclusion which they drew from this premiss was, that the company was a trustee and Salomon their cestui que trust. I cannot think that the conclusion follows even if the premiss be sound. It seems to me that the logical result would be that the company had not been validly constituted, and therefore had no legal existence. But, apart from this, it is necessary to examine the proposition on which the Court have rested their judgment, as its effect would be far reaching. Many industrial and banking concerns of the highest standing and credit have, in recent years, been, to use a common expression, converted into joint stock companies, and often into what are called "private" companies, where the whole of the shares are held by the former partners. It appears to me that all these might be pronounced "schemes to enable" them "to carry on business in the name of the company, with limited liability," in the very sense in which those words are used in

the judgment of the Court of Appeal. The profits of the concern carried on by the company will go to the persons whose business it was before the transfer, and in the same proportions as before, the only difference being that the liability of those who take the profits will no longer be unlimited. The very object of the creation of the company and the transfer to it of the business is, that whereas the liability of the partners for debts incurred was without limit, the liability of the members for the debts incurred by the company shall be limited. In no other respect is it intended that there shall be any difference: the conduct of the business and the division of the profits are intended to be the same as before. If the judgment of the Court of Appeal be pushed to its logical conclusion, all these companies must, I think, be held to be trustees for the partners who transferred the business to them, and those partners must be declared liable without limit to discharge the debts of the company. For this is the effect of the judgment as regards the respondent company. The position of the members of a company is just the same whether they are declared liable to pay the debts incurred by the company, or by way of indemnity to furnish the company with the means of paying them. I do not think the learned judges in the Court below have contemplated the application of their judgment to such cases as I have been considering; but I can see no solid distinction between those cases and the present one.

It is said that the respondent company is a "one man" company, and that in this respect it differs from such companies as those to which I have alluded. But it has often happened that a business transferred to a joint stock company has been the property of three or four persons only, and that the other subscribers of the memorandum have been clerks or other persons who possessed little or no interest in the concern. I am unable to see how it can be lawful for three or four or six persons to form a company for the purpose of employing their capital in trading, with the benefit of limited liability, and not for one person to do so, provided, in each case, the requirements of the statute have been complied with and the company has been validly constituted. How does it concern the creditor

whether the capital of the company is owned by seven persons in equal shares, with the right to an equal share of the profits, or whether it is almost entirely owned by one person, who practically takes the whole of the profits? The creditor has notice that he is dealing with a company the liability of the members of which is limited, and the register of shareholders informs him how the shares are held, and that they are substantially in the hands of one person, if this be the fact. The creditors in the present case gave credit to and contracted with a limited company; the effect of the decision is to give them the benefit, as regards one of the shareholders, of unlimited liability. I have said that the liability of persons carrying on business can only be limited provided the requirements of the statute be complied with; and this leads naturally to the inquiry, What are those requirements?

The Court of Appeal has declared that the formation of the respondent company and the agreement to take over the business of the appellant were a scheme "contrary to the true intent and meaning of the Companies Act." I know of no means of ascertaining what is the intent and meaning of the Companies Act except by examining its provisions and finding what regulations it has imposed as a condition of trading with limited liability. The memorandum must state the amount of the capital of the company and the number of shares into which it is divided, and no subscriber is to take less than one share. The shares may, however, be of as small a nominal value as those who form the company please: the statute prescribes no minimum; and though there must be seven shareholders, it is enough if each of them holds one share, however small its denomination. The Legislature, therefore, clearly sanctions a scheme by which all the shares except six are owned by a single individual, and these six are of a value little more than nominal.

It was said that in the present case the six shareholders other than the appellant were mere dummies, his nominees, and held their shares in trust for him. I will assume that this was so. In my opinion, it makes no difference. The statute forbids the entry in the register of any trust; and it certainly

contains no enactment that each of the seven persons subscribing the memorandum must be beneficially entitled to the share or shares for which he subscribes. The persons who subscribe the memorandum, or who have agreed to become members of the company and whose names are on the register, are alone regarded as, and in fact are, the shareholders. They are subject to all the liability which attaches to the holding of the share. They can be compelled to make any payment which the ownership of a share involves. Whether they are beneficial owners or bare trustees is a matter with which neither the company nor creditors have anything to do: it concerns only them and their cestuis que trust if they have any. If, then, in the present case all the requirements of the statute were complied with, and a company was effectually constituted, and this is the hypothesis of the judgment appealed from, what warrant is there for saying that what was done was contrary to the true intent and meaning of the Companies Act?

It may be that a company constituted like that under consideration was not in the contemplation of the Legislature at the time when the Act authorizing limited liability was passed; that if what is possible under the enactments as they stand had been foreseen a minimum sum would have been fixed as the least denomination of share permissible; and that it would have been made a condition that each of the seven persons should have a substantial interest in the company. But we have to interpret the law, not to make it; and it must be remembered that no one need trust a limited liability company unless he so please, and that before he does so he can ascertain, if he so please, what is the capital of the company and how it is held.

I have hitherto made no reference to the debentures which the appellant received in part-payment of the purchase-money of the business which he transferred to the company. These are referred to in the judgment as part of the scheme which is pronounced contrary to the true intent and meaning of the Companies Act. But if apart from this the conclusion that the appellant is bound to indemnify the company against its debts cannot be sustained, I do not see how the circumstance

that he received these debentures can avail the respondent company. The issue of debentures to the vendor of a business as part of the price is certainly open to great abuse, and has often worked grave mischief. It may well be that some check should be placed upon the practice, and that, at all events, ample notice to all who may have dealings with the company should be secured. But as the law at present stands, there is certainly nothing unlawful in the creation of such debentures. For these reasons I have come to the conclusion that the appeal should be allowed.

It was contended on behalf of the company that the agreement between them and the appellant ought, at all events, to be set aside on the ground of fraud. In my opinion, no such case has been made out, and I do not think the respondent company are entitled to any such relief.

LORD MACNAGHTEN. My Lords, I cannot help thinking that the appellant, Aron Salomon, has been dealt with somewhat hardly in this case.

Mr. Salomon, who is now suing as a pauper, was a wealthy man in July, 1892. He was a boot and shoe manufacturer trading on his own sole account under the firm of "A. Salomon & Co.," in High Street, Whitechapel, where he had extensive warehouses and a large establishment. He had been in the trade over thirty years. He had lived in the same neighbourhood all along, and for many years past he had occupied the same premises. So far things had gone very well with him. Beginning with little or no capital, he had gradually built up a thriving business, and he was undoubtedly in good credit and repute.

It is impossible to say exactly what the value of the business was. But there was a substantial surplus of assets over liabilities. And it seems to me to be pretty clear that if Mr. Salomon had been minded to dispose of his business in the market as a going concern he might fairly have counted upon retiring with at least 10,000*l.* in his pocket.

Mr. Salomon, however, did not want to part with the business. He had a wife and a family consisting of five sons and a

daughter. Four of the sons were working with their father. The eldest, who was about thirty years of age, was practically the manager. But the sons were not partners: they were only servants. Not unnaturally, perhaps, they were dissatisfied with their position. They kept pressing their father to give them a share in the concern. "They troubled me," says Mr. Salomon, "all the while." So at length Mr. Salomon did what hundreds of others have done under similar circumstances. He turned his business into a limited company. He wanted, he says, to extend the business and make provision for his family. In those words, I think, he fairly describes the principal motives which influenced his action.

All the usual formalities were gone through; all the requirements of the Companies Act, 1862, were duly observed. There was a contract with a trustee in the usual form for the sale of the business to a company about to be formed. There was a memorandum of association duly signed and registered, stating that the company was formed to carry that contract into effect, and fixing the capital at 40,000*l.* in 40,000 shares of 1*l.* each. There were articles of association providing the usual machinery for conducting the business. The first directors were to be nominated by the majority of the subscribers to the memorandum of association. The directors, when appointed, were authorized to exercise all such powers of the company as were not by statute or by the articles required to be exercised in general meeting; and there was express power to borrow on debentures, with the limitation that the borrowing was not to exceed 10,000*l.* without the sanction of a general meeting.

The company was intended from the first to be a private company; it remained a private company to the end. No prospectus was issued; no invitation to take shares was ever addressed to the public.

The subscribers to the memorandum were Mr. Salomon, his wife, and five of his children who were grown up. The subscribers met and appointed Mr. Salomon and his two elder sons directors. The directors then proceeded to carry out the proposed transfer. By an agreement dated August 2, 1892, the company adopted the preliminary contract, and in accordance

with it the business was taken over by the company as from June 1, 1892. The price fixed by the contract was duly paid. The price on paper was extravagant. It amounted to over 39,000*l.* - a sum which represented the sanguine expectations of a fond owner rather than anything that can be called a businesslike or reasonable estimate of value. That, no doubt, is a circumstance which at first sight calls for observation; but when the facts of the case and the position of the parties are considered, it is difficult to see what bearing it has on the question before your Lordships. The purchase-money was paid in this way: as money came in, sums amounting in all to 30,000*l.* were paid to Mr. Salomon, and then immediately returned to the company in exchange for fully-paid shares. The sum of 10,000*l.* was paid in debentures for the like amount. The balance, with the exception of about 1000*l.* which Mr. Salomon seems to have received and retained, went in discharge of the debts and liabilities of the business at the time of the transfer, which were thus entirely wiped off. In the result, therefore, Mr. Salomon received for his business about 1000*l.* in cash, 10,000*l.* in debentures, and half the nominal capital of the company in fully paid shares for what they were worth. No other shares were issued except the seven shares taken by the subscribers to the memorandum, who, of course, knew all the circumstances, and had therefore no ground for complaint on the score of overvaluation.

The company had a brief career: it fell upon evil days. Shortly after it was started there seems to have come a period of great depression in the boot and shoe trade. There were strikes of workmen too; and in view of that danger contracts with public bodies, which were the principal source of Mr. Salomon's profit, were split up and divided between different firms. The attempts made to push the business on behalf of the new company crammed its warehouses with unsaleable stock. Mr. Salomon seems to have done what he could: both he and his wife lent the company money; and then he got his debentures cancelled and reissued to a Mr. Broderip, who advanced him 5000*l.*, which he immediately handed over to the company on loan. The temporary relief only hastened

ruin. Mr. Broderip's interest was not paid when it became due. He took proceedings at once and got a receiver appointed. Then, of course, came liquidation and a forced sale of the company's assets. They realized enough to pay Mr. Broderip, but not enough to pay the debentures in full; and the unsecured creditors were consequently left out in the cold.

In this state of things the liquidator met Mr. Broderip's claim by a counter-claim, to which he made Mr. Salomon a defendant. He disputed the validity of the debentures on the ground of fraud. On the same ground he claimed rescission of the agreement for the transfer of the business, cancellation of the debentures, and repayment by Mr. Salomon of the balance of the purchase-money. In the alternative, he claimed payment of 20,000*l.* on Mr. Salomon's shares, alleging that nothing had been paid on them.

When the trial came on before Vaughan Williams J., the validity of Mr. Broderip's claim was admitted, and it was not disputed that the 20,000 shares were fully paid up. The case presented by the liquidator broke down completely; but the learned judge suggested that the company had a right of indemnity against Mr. Salomon. The signatories of the memorandum of association were, he said, mere nominees of Mr. Salomon - mere dummies. The company was Mr. Salomon in another form. He used the name of the company as an alias. He employed the company as his agent; so the company, he thought, was entitled to indemnity against its principal. The counter-claim was accordingly amended to raise this point; and on the amendment being made the learned judge pronounced an order in accordance with the view he had expressed.

The order of the learned judge appears to me to be founded on a misconception of the scope and effect of the Companies Act, 1862. In order to form a company limited by shares, the Act requires that a memorandum of association should be signed by seven persons, who are each to take one share at least. If those conditions are complied with, what can it matter whether the signatories are relations or strangers? There is nothing in the Act requiring that the subscribers to the memorandum should be independent or unconnected, or

that they or any one of them should take a substantial interest in the undertaking, or that they should have a mind and will of their own, as one of the learned Lords Justices seems to think, or that there should be anything like a balance of power in the constitution of the company. In almost every company that is formed the statutory number is eked out by clerks or friends, who sign their names at the request of the promoter or promoters without intending to take any further part or interest in the matter.

When the memorandum is duly signed and registered, though there be only seven shares taken, the subscribers are a body corporate "capable forthwith," to use the words of the enactment, "of exercising all the functions of an incorporated company." Those are strong words. The company attains maturity on its birth. There is no period of minority - no interval of incapacity. I cannot understand how a body corporate thus made "capable" by statute can lose its individuality by issuing the bulk of its capital to one person, whether he be a subscriber to the memorandum or not. The company is at law a different person altogether from the subscribers to the memorandum; and, though it may be that after incorporation the business is precisely the same as it was before, and the same persons are managers, and the same hands receive the profits, the company is not in law the agent of the subscribers or trustee for them. Nor are the subscribers as members liable, in any shape or form, except to the extent and in the manner provided by the Act. That is, I think, the declared intention of the enactment. If the view of the learned judge were sound, it would follow that no common law partnership could register as a company limited by shares without remaining subject to unlimited liability.

Mr. Salomon appealed; but his appeal was dismissed with costs, though the Appellate Court did not entirely accept the view of the Court below. The decision of the Court of Appeal proceeds on a declaration of opinion embodied in the order which has been already read.

I must say that I, too, have great difficulty in understanding this declaration. If it only means that Mr. Salomon availed

himself to the full of the advantages offered by the Act of 1862, what is there wrong in that? Leave out the words "contrary to the true intent and meaning of the Companies Act, 1862," and bear in mind that "the creditors of the company" are not the creditors of Mr. Salomon, and the declaration is perfectly innocent: it has no sting in it.

In an early case, which in some of its aspects is not unlike the present, the owners of a colliery (to quote the language of Giffard L.J. in the Court of Appeal) "went on working the colliery not very successfully, and then determined to form a limited company in order to avoid incurring further personal liability." "It was," adds the Lord Justice, "the policy of the Companies Act to enable this to be done." And so he reversed the decision of Malins V.-C., who had expressed an opinion that if the laws of the country sanctioned such a proceeding they were "in a most lamentable state," and had fixed the former owners with liability for the amount of the shares they took in exchange for their property: *In re Baglan Hall Colliery Co*. (1)

Among the principal reasons which induce persons to form private companies, as is stated very clearly by Mr. Palmer in his treatise on the subject, are the desire to avoid the risk of bankruptcy, and the increased facility afforded for borrowing money. By means of a private company, as Mr. Palmer observes, a trade can be carried on with limited liability, and without exposing the persons interested in it in the event ot failure to the harsh provisions of the bankruptcy law. A company, too, can raise money on debentures, which an ordinary trader cannot do. Any member of a company, acting in good faith, is as much entitled to take and hold the company's debentures as any outside creditor. Every creditor is entitled to get and to hold the best security the law allows him to take.

If, however, the declaration of the Court of Appeal means that Mr. Salomon acted fraudulently or dishonestly, I must say I can find nothing in the evidence to support such an imputation. The purpose for which Mr. Salomon and the other

(1)    L. R. 5 Ch. 346.

subscribers to the memorandum were associated was "lawful." The fact that Mr. Salomon raised 5000*l.* for the company on debentures that belonged to him seems to me strong evidence of his good faith and of his confidence in the company. The unsecured creditors of A. Salomon and Company, Limited, may be entitled to sympathy, but they have only themselves to blame for their misfortunes. They trusted the company, I suppose, because they had long dealt with Mr. Salomon, and he had always paid his way; but they had full notice that they were no longer dealing with an individual, and they must be taken to have been cognisant of the memorandum and of the articles of association. For such a catastrophe as has occurred in this case some would blame the law that allows the creation of a floating charge. But a floating charge is too convenient a form of security to be lightly abolished. I have long thought, and I believe some of your Lordships also think, that the ordinary trade creditors of a trading company ought to have a preferential claim on the assets in liquidation in respect of debts incurred within a certain limited time before the winding-up. But that is not the law at present. Everybody knows that when there is a winding-up debenture-holders generally step in and sweep off everything; and a great scandal it is.

It has become the fashion to call companies of this class "one man companies." That is a taking nickname, but it does not help one much in the way of argument. If it is intended to convey the meaning that a company which is under the absolute control of one person is not a company legally incorporated, although the requirements of the Act of 1862 may have been complied with, it is inaccurate and misleading: if it merely means that there is a predominant partner possessing an overwhelming influence and entitled practically to the whole of the profits, there is nothing in that that I can see contrary to the true intention of the Act of 1862, or against public policy, or detrimental to the interests of creditors. If the shares are fully paid up, it cannot matter whether they are in the hands of one or many. If the shares are not fully paid, it is as easy to gauge the solvency of an individual as to estimate the financial ability of a crowd.

One argument was addressed to your Lordships which ought perhaps to be noticed, although it was not the ground of decision in either of the Courts below. It was argued that the agreement for the transfer of the business to the company ought to be set aside, because there was no independent board of directors, and the property was transferred at an overvalue. There are, it seems to me, two answers to that argument. In the first place, the directors did just what they were authorized to do by the memorandum of association. There was no fraud or misrepresentation, and there was nobody deceived. In the second place, the company have put it out of their power to restore the property which was transferred to them. It was said that the assets were sold by an order made in the presence of Mr. Salomon, though not with his consent, which declared that the sale was to be without prejudice to the rights claimed by the company by their counter-claim. I cannot see what difference that makes. The reservation in the order seems to me to be simply nugatory.

I am of opinion that the appeal ought to be allowed, and the counter-claim of the company dismissed with costs, both here and below,

LORD MORRIS. My Lords, I quite concur in the judgment which has been announced, and in the reasons which have been so fully given for it.

LORD DAVEY. My Lords, it is possible, and (I think) probable, that the conclusion to which I feel constrained to come in this case may not have been contemplated by the Legislature, and may be due to some defect in the machinery of the Act. But, after all, the intention of the Legislature must be collected from the language of its enactments; and I do not see my way to holding that if there are seven registered members the association is not a company formed in compliance with the provisions of the Act and capable of carrying on business with limited liability, either because the bulk of the shares are held by some only, or even one of the members, and the others are what is called "dummies," holding, it may be, only one share

of 1*l*. each, or because there are less than seven persons who are beneficially entitled to the shares.

I think that this result follows from the absence of any provision fixing a minimum nominal amount of a share - the provision in s. 8 that no subscriber shall take less than one share, and the provision in s. 30 that no notice of any trust shall be entered on the register. With regard to the latter provision, it would, in my opinion, be impossible to work the machinery of the Act on any other principle, and to attempt to do so would lead only to confusion and uncertainty. The learned counsel for the respondents (wisely, as I think) did not lay any stress on the members, other than the appellant, being trustees for him of their shares. Their argument was that they were "dummies," and did not hold a substantial interest in the company, i.e., what a jury would say is a substantial interest. In the language of some of the judges in the Court below, any jury, if asked the question, would say the business was Aron Salomon's and no one else's.

It was not argued in this case that there was no association of seven persons to be registered, and the registration therefore operated nothing, or that the so-called company was a sham and might be disregarded; and, indeed, it would have been difficult for the learned counsel for the respondents, appearing, as they did, at your Lordships' Bar for the company, who had been permitted to litigate in the Courts below as actors (on their counter-claim), to contend that their clients were nonexistent. I do not say that such an argument ought to or would prevail; I only observe that, having regard to the decisions, it is not certain that s. 18, making the certificate of the registrar conclusive evidence that all the requisitions of the Act in respect of registration had been complied with, would be an answer to it.

We start, then, with the assumption that the respondents have a corporate existence with power to sue and be sued, to incur debts and be wound up, and to act as agents or as trustees, and I suppose, therefore, to hold property. Both the Courts below have, however, held that the appellant is liable to indemnify the company against all its debts and liabilities.

Vaughan Williams J. held that the company was an "alias" for the appellant, who carried on his business through the company as his agent, and that he was bound to indemnify his own agent; and he arrived at this conclusion on the ground that the other members of the company had no substantial interest in it, and the business in substance was the appellant's. The Court of Appeal thought the relation of the company to the appellant was that of trustee to cestui que trust.

The ground on which the learned judges seem to have chiefly relied was that it was an attempt by an individual to carry on his business with limited liability, which was forbidden by the Act and unlawful. I observe, in passing, that nothing turns upon there being only one person interested. The argument would have been just as good if there had been six members holding the bulk of the shares and one member with a very small interest, say, one share. I am at a loss to see how in either view taken in the Courts below the conclusion follows from the premises, or in what way the company became an agent or trustee for the appellant, except in the sense in which every company may loosely and inaccurately be said to be an agent for earning profits for its members, or a trustee of its profits for the members amongst whom they are to be divided. There was certainly no express trust for the appellant; and an implied or constructive trust can only be raised by virtue of some equity. I took the liberty of asking the learned counsel what the equity was, but got no answer. By an "alias" is usually understood a second name for one individual; but here, as one of your Lordships has already observed, we have, ex hypothesi, a duly formed legal persona, with corporate attributes and capable of incurring legal liabilities. Nor do I think it legitimate to inquire whether the interest of any member is substantial when the Act has declared that no member need hold more than one share, and has not prescribed any minimum amount of a share. If, as was said in the Court of Appeal, the company was formed for an unlawful purpose, or in order to achieve an object not permitted by the provisions of the Act, the appropriate remedy (if any) would seem to be to set aside the certificate of incorporation, or to treat the company as a

nullity, or, if the appellant has committed a fraud or misdemeanour (which I do not think he has), he may be proceeded against civilly or criminally; but how either of those states of circumstances creates the relation of cestui que trust and trustee, or principal and agent, between the appellant and respondents, is not apparent to my understanding.

I am, therefore, of opinion that the order appealed from cannot be supported on the grounds stated by the learned judges.

But Mr. Farwell also relied on the alternative relief claimed by his pleadings, which was quite open to him here, namely, that the contract for purchase of the appellant's business ought to be set aside for fraud. The fraud seems to consist in the alleged exorbitance of the price and the fact that there was no independent board of directors with whom the appellant could contract. I am of opinion that the fraud was not made out. I do not think the price of the appellant's business (which seems to have been a genuine one, and for some time a prosperous business) was so excessive as to afford grounds for rescission; and as regards the cash portion of the price, it must be observed that, as the appellant held the bulk of the shares, or (the respondents say) was the only shareholder, the money required for the payment of it came from himself in the form either of calls on his shares or profits which would otherwise be divisible. Nor was the absence of any independent board material in a case like the present. I think it an inevitable inference from the circumstances of the case that every member of the company assented to the purchase, and the company is bound in a matter intra vires by the unanimous agreement of its members. In fact, it is impossible to say who was defrauded.

Mr. Farwell relied on some dicta in *Erlanger v. New Sombrero Phosphate Co.* (1), a case which is often quoted and not infrequently misunderstood. Of course, Lord Cairns' observations were directed only to a case such as he had before him, where it was attempted to bind a large body of shareholders by a contract which purported to have been made between the vendor and

(1)   3 App. Cas. 1218, 1236.

directors before the shares were offered for subscription; whereas it appeared that the directors were only the nominees of the vendor, who had accepted his bidding and exercised no judgment of their own. It has nothing to do with the present case. That a company may contract with the holder of the bulk of its shares, and such contract will be binding though carried by the votes of that shareholder, was decided in *North-West Transportation Co. v. Beatty*. (1)

For these reasons, I am of opinion that the appellant's appeal should be allowed and the cross-appeal should be dismissed. I agree to the proposed order as to costs.

*Order of the Court of Appeal reversed and cross-appeal dismissed with costs here and below; the costs in this House to be taxed in the manner usual when the appellant sues in formâ pauperis; cause remitted to the Chancery Division.*

*Lords' Journals, November 16, 1896.*

Solicitors for appellant: *Ralph Raphael & Co.*

Solicitors for respondents: *S. M. & J. B. Benson.*

(1)   12 App. Cas. 589.