Sean Hecker
William H. Taft V
Nicholas C. Tompkins
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Tel:  (212) 909-6000
Fax: (212) 521-6836
shecker@debevoise.com
whtaft@debevoise.com
ntompkin@debevoise.com
*Counsel to Defendant Alexander Varshavsky*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

SERGEY LEONTIEV,

               Plaintiff,

               - v. -

ALEXANDER VARSHAVSKY,

               Defendant.

-------------------------------------------------------------- X

Case No. 1:16-cv-03595 (JSR)

**AMENDED ANSWER**


        Pursuant to leave of the Court granted on August 26, 2016, Defendant Alexander

Varshavsky serves the following Amended Answer in response to the Complaint filed by

Plaintiff Sergey Leontiev on May 13, 2016.  Defendant responds only with regard to Plaintiff's

first cause of action seeking a declaratory judgment and not with regard to his second cause of

action for intentional infliction of emotional distress, which Defendant has moved to dismiss for

failure to state a claim.

# I.
## <u>PRELIMINARY STATEMENT</u>

1.      Plaintiff seeks a sweeping declaratory judgment that he is not liable for a debt, under any possible legal theory recognized by any applicable body of law, based solely on his allegations that his name does not appear on the face of the lending agreements.  Plaintiff does not, however, allege that he did not control the borrowers under those agreements, that the loaned funds were not transferred from those borrowers to other companies he controls, or that the loaned funds were not ultimately diverted to or used by him in his personal capacity – only that Defendant has not yet provided ***proof*** of the same establishing his personal liability.

2.      Defendant intends to provide that proof in this action.  Defendant believes and intends to establish that, as alleged below, Plaintiff set up a complicated web of companies in various off-shore jurisdictions and in the names of various straw men, which Plaintiff called the "cloud" because its purpose was to obscure the flow of money between and among those companies.  Plaintiff then took in hundreds of millions of dollars through various other shell companies he controlled, including the borrowers at issue in this dispute, which acted as "gates" through which money flowed into the cloud.  After those funds passed through the gates, Plaintiff caused them to be transferred between the various entities he controlled inside the cloud, and ultimately to be diverted to other companies he owned and controlled, leaving the borrowers insolvent and unable to repay the loaned amounts even as he obtained hundreds of millions of dollars for his own benefit.  Defendant looks forward to litigating this case and providing documents and testimony establishing these facts and proving Plaintiff's personal liability.

## II.
## ANSWER TO ALLEGATIONS OF THE COMPLAINT

### ANSWER TO SUMMARY AND NATURE OF THE CASE

1.      Defendant admits that Mr. Leontiev was a well-known and at one time highly regarded Russian businessman who left Russia in August 2015 after the Russian Central Bank revoked the license of Probusinessbank, a full-service commercial bank that Mr. Leontiev co-founded in 1993, and otherwise denies the remaining allegations in paragraph 1 of the Complaint.

2.      Defendant admits that he is a naturalized United States citizen who owns a residence in Holmdel, New Jersey and has business interests in the United States and Russia worth millions of dollars, and otherwise denies the remaining allegations in paragraph 2 of the Complaint.

3.      Defendant admits that since August 2015, in New York and elsewhere, he has requested that Mr. Leontiev make payment of a debt, and otherwise denies the remaining allegations in paragraph 3 of the Complaint.

4.      Defendant admits that he has produced several loan agreements, promissory notes, and bank guarantees, and otherwise denies the remaining allegations in paragraph 4 of the Complaint.

5.      Defendant states that the documents referred to in paragraph 5 of the Complaint speak for themselves, and that the remaining allegations are legal conclusions to which no responsive pleading is required; to the extent a response is required, Defendant denies the remaining allegations in paragraph 5 of the Complaint.

6.      Defendant states that the documents referred to in paragraph 6 of the Complaint speak for themselves, admits that he had not provided documentation of his authority to

personally collect any monies owed under the documents referred to as of the time the Complaint was filed, and otherwise denies the remaining allegations in paragraph 6 of the Complaint.

7.      Defendant states that the documents referred to in paragraph 7 of the Complaint speak for themselves, admits that he has requested, both personally and through counsel, that Mr. Leontiev make payment of a debt, and has asserted that Mr. Leontiev has acknowledged the debt, and otherwise denies the remaining allegations in paragraph 7 of the Complaint.

8.      Defendant denies the allegations in paragraph 8 of the Complaint.

9.      Defendant admits that Mr. Zheleznyak left Russia and otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 9 of the Complaint.

10.      Defendant admits that Mr. Leontiev currently resides in New York and otherwise denies the remaining allegations in paragraph 10 of the Complaint.

11.      Defendant admits that he has requested through his New York- and New Jersey-based counsel, including on April 20, 2016, that Mr. Leontiev make payment of a debt, and otherwise denies the remaining allegations in paragraph 11 of the Complaint.

12.      Defendant states that the allegations in paragraph 12 of the Complaint are legal conclusions and recitations of the grounds for relief sought by Plaintiff to which no responsive pleading is required; to the extent a response is required, Defendant denies the allegations in paragraph 12.

13.      Defendant states that the allegations in paragraph 13 of the Complaint are legal conclusions and recitations of the grounds for relief sought by Plaintiff to which no responsive pleading is required; to the extent a response is required, Defendant denies the allegations in paragraph 13.

## ANSWER TO PARTIES

14.     Defendant admits that Plaintiff is a Russian national and otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 14 of the Complaint.

15.     Defendant admits that he is a naturalized United States citizen and owns a residence in Monmouth County, New Jersey, and otherwise denies the remaining allegations in paragraph 15 of the Complaint.

## ANSWER TO JURISDICTION & VENUE

16.     Defendant states that paragraph 16 of the Complaint contains Plaintiff's statement of the jurisdictional basis for this action, to which no responsive pleading is required.

17.     Defendant states that the first sentence of paragraph 17 contains Plaintiff's statement of the basis for personal jurisdiction over Defendant, to which no responsive pleading is required, admits that he owns, directly or indirectly, an apartment at the Time Warner Center in Manhattan, New York and an apartment at 1311 Brightwater Avenue in Brooklyn, New York, and otherwise denies the remaining allegations in paragraph 17 of the Complaint.

18.     Defendant states that the paragraph 18 of the Complaint contains Plaintiff's statement of the basis for venue of this action, to which no responsive pleading is required.

## ANSWER TO FACTUAL ALLEGATIONS

19.     Defendant admits that in 1993 Mr. Leontiev, Mr. Zheleznyak, and another business associate started Probusinessbank, a full-service commercial bank headquartered in Moscow, Russia, and otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 19 of the Complaint.

20.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Complaint.

21.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Complaint.

22.     Defendant admits that on August 12, 2015, the Russian Central Bank revoked Probusinessbank's license, and otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 22 of the Complaint.

23.     Defendant admits that several days after the revocation of Probusinessbank's license, the Russian Central Bank filed a petition for bankruptcy on behalf of Probusinessbank, and otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 23 of the Complaint.

24.     Defendant admits that on February 18, 2016, the Russian government arrested five former managers of Probusinessbank and charged them with embezzlement, and otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 24 of the Complaint.

25.     Defendant admits that he is a naturalized United States citizen who owns a residence in Holmdel, New Jersey, states that the allegations that he is a "well-known wealthy businessman" are statements of opinion to which no responsive pleading is required, and otherwise denies the remaining allegations of paragraph 25 of the Complaint.

26.     Defendant admits that he owns, directly or indirectly, numerous business and property interests in the United States, including a residence in Holmdel, New Jersey, an apartment at the Time Warner Center in Manhattan, New York, and an apartment at 1311 Brightwater Avenue in Brooklyn, New York, and otherwise denies the remaining allegations in paragraph 26 of the Complaint.

27.     Defendant admits the allegations in paragraph 27 of the Complaint.

28.     Defendant admits that he first contacted Mr. Leontiev about a debt in or around August 2015 when he asked to meet with Mr. Leontiev in Moscow, that prior to that time he had never met Mr. Leontiev, and that at a meeting with Mr. Leontiev in Moscow, he requested that Mr. Leontiev make payment of a debt, and otherwise denies the remaining allegations in paragraph 28.

29.     Defendant denies the allegations in paragraph 29 of the Complaint.

30.     Defendant admits that at some time thereafter, he and Mr. Leontiev met in London and that he requested that Mr. Leontiev make payment of a debt, and otherwise denies the remaining allegations in paragraph 30 of the Complaint.

31.     Defendant admits that in or around January 2016, a scheduled meeting between him and Mr. Leontiev was canceled, and that on January 15, 2016, he and Mr. Leontiev, together with their respective counsel, met in New York to discuss his request that Mr. Leontiev make payment of a debt, and otherwise denies the remaining allegations in paragraph 31 of the Complaint.

32.     Defendant admits that beginning on or around January 20, 2016, his counsel provided to Mr. Leontiev's New York counsel copies of various loan agreements, promissory notes, and guarantees underlying a debt, states that these documents speak for themselves, and otherwise denies the remaining allegations in paragraph 32 of the Complaint.

a.     Defendant states that the documents referred to in paragraph 32(a) of the Complaint speak for themselves.

b.     Defendant states that the documents referred to in paragraph 32(b) of the Complaint speak for themselves.

7

c.     Defendant states that the documents referred to in paragraph 32(c) of the Complaint speak for themselves.

33.     Defendant states that the documents referred to in paragraph 33 of the Complaint speak for themselves.

34.     Defendant admits that he had not provided documentation that any funds were transferred to or used by Mr. Leontiev in his personal capacity as of the time the Complaint was filed, and otherwise denies the remaining allegations in paragraph 34 of the Complaint.

35.     Defendant admits that on February 20, 2016, his counsel corresponded with Mr. Leontiev's New York counsel, states that the correspondence referred to in paragraph 35 speaks for itself, and otherwise denies the remaining allegations of paragraph 35 of the Complaint.

36.     Defendant denies the allegations in paragraph 36 of the Complaint.

37.     Defendant denies the allegations in paragraph 37 of the Complaint.

38.     Defendant denies the allegations in paragraph 38 of the Complaint.

39.     Defendant denies the allegations in paragraph 39 of the Complaint.

40.     Defendant admits that on April 20, 2016, his New York counsel corresponded with Mr. Leontiev's counsel, states that the correspondence referred to in paragraph 40 speaks for itself, and otherwise denies the remaining allegations of paragraph 40 of the Complaint.

## ANSWER TO FIRST CAUSE OF ACTION
### (Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201 and 2202)

41.     Defendant repeats and realleges the responses contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

42.     Defendant states that the allegations in paragraph 42 of the Complaint are legal conclusions and recitations of the grounds for relief sought by Plaintiff to which no responsive

pleading is required; to the extent a response is required, Defendant denies the allegations in paragraph 42.

43.     Defendant states that the allegations in paragraph 43 of the Complaint are legal conclusions to which no responsive pleading is required; to the extent a response is required, Defendant denies the allegations in paragraph 43.

44.     Defendant states that the allegations in paragraph 44 of the Complaint are legal conclusions and recitations of the grounds for relief sought by Plaintiff to which no responsive pleading is required; to the extent a response is required, Defendant denies the allegations in paragraph 44.

45.     Defendant states that the allegations in paragraph 45 of the Complaint are legal conclusions and recitations of the grounds for relief sought by Plaintiff to which no responsive pleading is required; to the extent a response is required, Defendant denies the allegations in paragraph 45.

## ANSWER TO SECOND CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

46.     Defendant states that no response to paragraph 46 of the Complaint is required because Defendant has moved to dismiss the Second Cause of Action. To the extent a response is required, now or in the future, Defendant repeats and realleges the responses contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

47.     Defendant states that no response to paragraph 47 of the Complaint is required because Defendant has moved to dismiss the Second Cause of Action.  To the extent a response is required, now or in the future, Defendant denies the allegations in paragraph 47 of the Complaint.

48.     Defendant states that no response to paragraph 48 of the Complaint is required because Defendant has moved to dismiss the Second Cause of Action.  To the extent a response is required, now or in the future, Defendant admits that Mr. Zheleznyak is a friend and business associate of Mr. Leontiev and otherwise denies the remaining allegations in paragraph 48 of the Complaint.

49.     Defendant states that no response to paragraph 49 of the Complaint is required because Defendant has moved to dismiss the Second Cause of Action.  To the extent a response is required, now or in the future, Defendant states that the allegations in paragraph 49 of the Complaint are legal conclusions to which no responsive pleading is required and otherwise denies the remaining allegations in paragraph 49.

50.     Defendant states that no response to paragraph 50 of the Complaint is required because Defendant has moved to dismiss the Second Cause of Action.  To the extent a response is required, now or in the future, Defendant denies the allegations in paragraph 50 of the Complaint.

51.     Defendant states that no response to paragraph 51 of the Complaint is required because Defendant has moved to dismiss the Second Cause of Action.  To the extent a response is required, now or in the future, Defendant denies the allegations in paragraph 51 of the Complaint.

52.     Defendant states that no response to paragraph 52 of the Complaint is required because Defendant has moved to dismiss the Second Cause of Action.  To the extent a response is required, now or in the future, Defendant states that the allegations in paragraph 52 of the Complaint are legal conclusions and recitations of the grounds for relief sought by Plaintiff to

which no responsive pleading is required, and otherwise denies the remaining allegations in

paragraph 52.

## ANSWER TO PRAYER FOR RELIEF

Defendant denies that Plaintiff is entitled to the requested relief or to any other relief.

## III.
## DEFENSES

### FIRST DEFENSE

1.      Except as expressly admitted above, Defendant denies each and every allegation

of the Complaint.

### SECOND DEFENSE

2.      For the avoidance of doubt, Defendant states that Plaintiff's second cause of

action for intentional infliction of emotional distress fails to state a claim upon which relief can

be granted, and has moved to dismiss that cause of action.

### THIRD DEFENSE

3.      Plaintiff Sergey Leontiev seeks a sweeping declaratory judgment that he is not

personally liable for repayment of a debt, under any possible legal theory, on the grounds that his

name does not appear on the face of the lending documents.  However, Defendant intends to

prove, and the evidence will show, that Mr. Leontiev owns and/or controls the entities that

borrowed the funds; that he caused those entities to surreptitiously transfer the borrowed funds to

other entities that he also owns and/or controls; that as a result of these transfers the borrowers

were rendered insolvent; and that he currently controls and uses the borrowed funds for his own

benefit.  Accordingly, the Court should determine on the merits that Mr. Leontiev is personally

liable for the debt and on that basis deny his request for declaratory judgment.

4.      Although Mr. Leontiev previously represented to this Court through counsel, in a Proposed Case Management Plan dated June 14, 2016, that "the alleged loans do not involve Plaintiff in any way," multiple witnesses already have provided extensive evidence to the contrary.  Several former Probusinessbank employees have confirmed that Mr. Leontiev personally directed them to raise funds through various entities he owned and/or controlled, including the borrowers at issue in this case.  The beneficial owner of several of those entities, including Ambika Investments Limited ("Ambika"), has confirmed that although those entities were registered under his name, they were registered on Mr. Leontiev's behalf and for Mr. Leontiev's ultimate benefit.  Business records indicate that millions of dollars were transferred between these entities and other entities owned and/or controlled by Mr. Leontiev.  Mr. Leontiev's own business partner, Mr. Zheleznyak, has confirmed that Mr. Leontiev currently controls the borrowed funds, which he has invested in stocks and is holding in accounts that he controls.

<u>Mr. Leontiev and Mr. Zheleznyak Personally Directed Probusinessbank Employees to Raise Funds for Outside Entities Owned and/or Controlled by Mr. Leontiev</u>

5.      Mr. Leontiev and his partner Mr. Zheleznyak personally instructed Probusinessbank employees to raise funds from VIP banking clients for entities that Mr. Leontiev owned and/or controlled, including the borrowers on the loans in dispute in this action, Ambika, Vennop Trading Limited ("Vennop"), and Financial Group "Life."  These employees were directed by and reported their fundraising efforts directly to Mr. Leontiev and Mr. Zheleznyak.

6.      Mr. Leontiev and Mr. Zheleznyak attracted funding by offering lenders like Avilon Automotive Group (with its predecessors and affiliates, "Avilon") a high rate of return, typically in the range of 12-14%, on one-year loans that could be renewed from year to year.  On

multiple occasions, Mr. Varshavsky, as President of Avilon, negotiated the interest rates to be paid on Avilon's loans directly with Mr. Zheleznyak, who was a longtime friend of his.

7.      In 2005, Avilon loaned $12.5 million to Probusiness Holding (the "2005 Loan"), an entity owned and/or controlled by Mr. Leontiev; Mr. Leontiev signed a corporate assent in connection with that loan.  The 2005 Loan was fully repaid twice (rather than being rolled over at the end of its term), but each time a loan in the same amount and on the same terms was made to a new borrower also owned and/or controlled by Mr. Leontiev.  Ultimately, Ambika became the borrower on the 2005 Loan.  Avilon also loaned $19.9 million to Ambika in 2008 (the "2008 Loan"), and an additional $6.75 million to Ambika in 2011 (the "2011 Loan").

8.      Mr. Varshavsky also referred and introduced other friends and acquaintances to Mr. Zheleznyak, some of whom similarly loaned funds to entities owned and/or controlled by Mr. Leontiev.  When these loans – like the loans made by Avilon – ultimately were not repaid, certain of those individuals asked Mr. Varshavsky to negotiate for repayment of the loaned funds on their behalf, and as President of Avilon, he had authority to negotiate for repayment of Avilon's loans on behalf of Avilon.

Mr. Leontiev Caused the Borrowed Funds to be Transferred Between and Among a Complex Network of Shell Companies that He Owned and/or Controlled

9.      The loaned funds initially were deposited into the borrowing entities' accounts held at Probusinessbank, but – unknown to Mr. Varshavsky, Avilon, or, on information and belief, the other lenders – subsequently were transferred among a complex network of other shell entities also owned and/or controlled by Mr. Leontiev.  On information and belief, this network of shell entities was referred to by Mr. Leontiev and his associates as the "cloud" because it served to obscure the transfer of funds among these entities (collectively, the "Cloud Entities").

10.     Although these entities ultimately were owned and/or controlled by Mr. Leontiev, they were incorporated and registered under the names of various straw men in order to conceal Mr. Leontiev's interests in and involvement with them.

11.     In particular, Mr. Leontiev used a straw man, Aleksandr Shcheglyaev, to register a range of entities in Cyprus under his name, including Ambika and another Cloud Entity through which funds were raised, Vermenda Holdings Limited ("Vermenda").  Mr. Shcheglyaev, a friend of Mr. Zheleznyak, was approached by Mr. Leontiev's personal representative, Aleksandra Vyulkova, who explained that these entities ultimately would be for Mr. Leontiev's benefit.  Mr. Shcheglyaev agreed to be listed as the nominal beneficiary of these entities in place of Mr. Leontiev in exchange for a fee but had no involvement in their management or day-to-day operations.  Instead, these entities nominally were managed by a small group of directors appointed by the Trident Trust group, whom on information and belief acted under the direction and control of Mr. Leontiev.

12.     On information and belief, other Cloud Entities ultimately owned and/or controlled by Mr. Leontiev similarly were incorporated and registered under the names of other straw men in order to conceal Mr. Leontiev's interests in and involvement with them, and similarly nominally were managed by a small group of directors appointed by Trident Trust, under the direction and control of Mr. Leontiev.

13.     The Cloud Entities were incorporated in a number of jurisdictions around the world, and include, without limitation, the following entities:

a.     Ambika, a Cyprus entity with the registered address of  Griva Digeni 115, Trident Centre, 3101 Limassol, Cyprus.  On information and belief, Ambika served as a

"gate" through which funds were brought into the network before then being transferred between and among the other Cloud Entities.

b.        Greater Divide Limited, the sole shareholder of Ambika, a British Virgin Islands entity with the registered address of Drake Chambers, P.O. Box 3387, Tortola, British Virgin Islands.

c.        Biovilac Limited, a Cyprus entity with the registered address of Pikioni 4, Flat 201, 3075 Lemesos, Cyprus.  On information and belief, Biovilac Limited was involved in various transfers of funds between and among the Cloud Entities, including from Ambika.

d.        Vermenda, a Cyprus entity with the registered address of Griva Digeni 115, Trident Centre, 3101 Limassol, Cyprus.  On information and belief, Vermenda was involved in various transfers of funds between and among the Cloud Entities, including from Ambika, with whom it shares a common nominee owner.

e.        Clervaux Investments Limited, the sole shareholder of Vermenda, a British Virgin Islands entity with the registered address of Wickhams Cay, Road Town, Trident Chambers, Tortola, P.O. Box 146, Tortola, British Virgin Islands.

f.        Vennop, a Cyprus entity with the registered address of 17 Gr. Xenopoulou Street, 3106 Limassol, Cyprus.  On information and belief, Vennop served as a "gate" through which funds were brought into the network before then being transferred between and among the other Cloud Entities.

g.        Financial Group "Life," a Russian entity with the registered address of 6A Belomorskaya Street, Moscow 125195, Russia.  On information and belief, Financial

Group "Life" served as a "gate" through which funds were brought into the network before then being transferred between and among the other Cloud Entities.

h.      OOO "Vega," a Russian entity previously incorporated as OOO "Kollektorskoe Agentstvo Life."  On information and belief, OOO "Vega" was involved in various transfers of funds between and among the Cloud Entities.

i.      Valkera Investments Limited ("Valkera"), a Cyprus entity with the registered address of Griva Digeni 115, Trident Centre, 3101 Limassol, Cyprus.  On information and belief, Valkera was involved in various transfers of funds between and among the Cloud Entities. Valkera also acquired the 2005 Loan from Avilon to Ambika, as described in more detail below.

j.      Trigor Trading Limited, the sole shareholder of Valkera, a British Virgin Islands entity whose registered address currently is unknown.

k.      Finbay Group Ltd., a currently inactive British Virgin Islands entity whose registered address was Palm Grove House, P.O. Box 438, Road Town, Tortola, British Virgin Islands.  On information and belief, Finbay Group Ltd. was involved in various transfers of funds between and among the Cloud Entities.

l.      Greenex Trading Limited, a Marshall Islands entity with the registered address of Trust Company Complex, Ajeltake Island, Majuro, Marshall Islands.  On information and belief, Greenex Trading Limited was involved in various transfers of funds between and among the Cloud Entities.

m.      Dunning Finance, Inc., a British Virgin Islands entity with the registered address of Akara Bldg., 24 De Castro Street, Wickhams Cay, Road Town, Tortola,

British Virgin Islands.  On information and belief, Dunning Finance Inc. was involved in various transfers of funds between and among the Cloud Entities.

n.     Wonderworks Investments Limited ("Wonderworks"), a Cyprus entity with the registered address of Griva Digeni 115, Trident Centre, 3101 Limassol, Cyprus. On information and belief, Wonderworks was involved in various transfers of funds between and among the Cloud Entities, including transfers from the borrowers in this dispute, including Ambika.

o.     Wonderheart Assets Limited ("Wonderheart"), the sole shareholder of Wonderworks, which formerly was registered at Trident Trust Company (BVI), Tortola, British Virgin Islands, but reincorporated in Nevis as of December 22, 2015.

14.    Wonderworks is owned by Wonderheart and, on information and belief, both Wonderworks and Wonderheart are owned and/or controlled by Mr. Leontiev.  Additionally, a close associate of Mr. Leontiev, Vadim Kolotnikov, serves as a director of Wonderworks, and Mr. Leontiev has identified Mr. Kolotnikov as having personal knowledge of the debt at issue in this action.  Mr. Leontiev also is believed to be present in the United States on a work visa obtained through a subsidiary of Wonderworks, Grid Market Research.

15.    The Cloud Entities share myriad common links indicating their common ownership and/or control, including but not limited to nominally being managed by directors affiliated with the Trident Trust group.  For example, Ambika and Vermenda both were registered under the name of the same straw man and share the same registered address, the Cyprus headquarters of the Trident Trust group.  Valkera, which as described below effectively repaid Avilon's 2005 Loan to Ambika despite having no prior dealings with Avilon, also is

registered at that same address, as is Wonderworks, which regularly received transfers of millions of dollars from the other Cloud Entities, including Ambika.

16.     Several of the Cloud Entities, including Ambika, Vermenda, Wonderworks, Finbay Group Ltd., Greenex Trading Limited, and Dunning Finance Inc., also were parties to various loan and/or assignment agreements between and among themselves.  In particular, in January 2014 Avilon and Wonderworks entered into a so-called "Master Agreement" governing the transfer of funds between them.  The signatories to the Master Agreement were Petros Livanios, a director of Ambika, and Andreas Mercouri, a director of Wonderworks, both of whom are employees of the Trident Trust group.  (Ambika's only other director, Ria Christofides, also is an employee of Trident Trust, and is identified on her LinkedIn profile as an Office Manager for Trident Trust.)  Mr. Livanios also was the signatory on the loan agreements between Avilon and Ambika.

17.     These Cloud Entities were nothing more than shells used to transfer vast amounts of money between and among themselves, and ultimately to other entities controlled by Mr. Leontiev, without any independent business purpose.  For example, the records of Ambika's and Vermenda's accounts at Probusinessbank indicate that these two entities – which on information and belief had no genuine board of directors or staff – were involved in approximately $3 billion of financial transactions, the overwhelming majority of which were with other Cloud Entities owned and/or controlled by Mr. Leontiev.  In particular, Ambika transferred approximately $107 million to Vermenda, which in turn then transferred millions of dollars to Wonderworks.

18.     These transfers between and among the various Cloud Entities typically were papered as loans, but had no real business purpose or economic substance.  For example, although Ambika and other Cloud Entities were borrowing funds at high interest rates of

between 12-14%, the inter-company loans among the Cloud Entities were, in several cases, much lower, in the range of 3-4%.  Instead, the purpose of these transactions was to conceal and obscure the flow of the borrowed funds as they moved between and among the Cloud Entities.

**Mr. Leontiev's Transfers of the Borrowed Funds to Other Entities He Owned and/or Controlled Left the Borrowing Entities Insolvent and Unable to Repay the Borrowed Funds**

19. In August 2015, the Russian Central Bank suspended and then revoked Probusinessbank's banking license and put it into receivership after finding that its liabilities exceeded its assets by more than $1 billion, in part because many of the bank's assets appeared to be "fictitious" according to Russian Central Bank deputy chairman Mikhail Surkov. Following the collapse of Probusinessbank, five individuals associated with the bank and its related entities were detained and charged with embezzlement and misappropriation (including Sergey Kalachev, a director of one of the Cloud Entities, OOO "Vega"), while Mr. Leontiev fled Russia to avoid prosecution for his own role in the bank's failure.

20. The failure of Probusinessbank also led to the collapse of the house of cards Mr. Leontiev had created through the Cloud Entities.  Mr. Leontiev's transfers of the borrowed funds from the borrowers to other entities under his ownership and/or control rendered Ambika, Vennop, and Financial Group "Life" insolvent and unable to repay the borrowed funds.

21. On information and belief, Ambika and Vennop have not repaid, and have no assets with which they could repay, the borrowed funds.  Instead, the borrowed funds have been transferred to other entities owned and/or controlled by Mr. Leontiev, including on information and belief to Wonderworks.

22. Similarly, Financial Group "Life" has not repaid, and has no assets with which it could repay, the borrowed funds.  In August 2015, just before the Russian Central Bank suspended and then revoked Probusinessbank's banking license, Mr. Leontiev caused Financial

Group "Life" to be put into voluntary liquidation without repaying the borrowed funds and without giving advance notice to creditors as required by Russian law. Mr. Leontiev is the controlling shareholder of OOO Alivikt, the sole shareholder of Financial Group "Life," through a web of six Russian entities he owns and/or controls that collectively own approximately 78.4% of OOO Alivikt.

<u>Mr. Leontiev and His Partner Mr. Zheleznyak Repeatedly Have Confirmed Their Responsibility For and Agreed to Repay the Debt, and Mr. Leontiev Currently Controls the Borrowed Funds</u>

23.     Although Mr. Leontiev now seeks a judgment that he is not liable for the debt to Mr. Varshavsky or anyone acting in concert with him, both he and Mr. Zheleznyak repeatedly have confirmed their responsibility for and agreed to repay the debt.

24.     After the Russian Central Bank revoked Probusinessbank's license, Mr. Leontiev and Mr. Zheleznyak met with Mr. Varshavsky at Avilon's offices in Moscow on August 14, 2015 to discuss repayment of the debt. Prior to that meeting, Mr. Zheleznyak informed Mr. Varshavsky that Mr. Leontiev had taken control of the borrowed funds and invested them in securities, and showed Mr. Varshavsky an Excel schedule showing approximately $123 million invested in Apple, Google, and other securities, which Mr. Zheleznyak confirmed were being held in a brokerage account controlled by Mr. Leontiev.

25.     At the August 14 meeting, Mr. Leontiev and Mr. Zheleznyak confirmed their responsibility for the debt and promised to repay it, which Mr. Leontiev proposed to do according to a repayment schedule. At the end of that meeting, Mr. Leontiev suggested that they meet again the next morning to finalize that schedule. However, Mr. Leontiev did not show up for their scheduled meeting the next morning, but instead fled Russia overnight. At that morning meeting, Mr. Zheleznyak again promised that they would repay the debt.

26.     Later that month, Mr. Zheleznyak arranged another meeting in London to discuss repayment of the debt.  At that meeting – which was attended by multiple outside witnesses, including a partner at PwC Russia and another lender invited by Mr. Zheleznyak – Mr. Zheleznyak and Mr. Leontiev again confirmed their responsibility for the debt and agreed to repay it over the course of three years, without interest, according to a repayment schedule.  Mr. Zheleznyak subsequently prepared that payment schedule on behalf of himself and Mr. Leontiev with the assistance of Maksim Shamis, a former Probusinessbank lawyer.

27.     In September 2015, Mr. Leontiev and Mr. Zheleznyak made partial repayment of the debt through Valkera, one of the Cloud Entities they owned and/or controlled together. Valkera paid Avilon $17 million, nominally as consideration for Avilon's assignment to Valkera of the 2005 Loan from Avilon to Ambika (which Ambika was unable to repay), as repayment of the $12.5 million principal amount of the 2005 Loan plus accrued interest and penalties.  Avilon had never had any prior dealings with Valkera, and there was no business reason for Valkera to pay $17 million to acquire Ambika's defaulted debt other than Mr. Leontiev's and Mr. Zheleznyak's agreement to repay the debt and their ownership and/or control of both entities.

28.     On information and belief, Mr. Leontiev continues personally to control the remaining outstanding borrowed funds, as Mr. Zheleznyak repeatedly has confirmed to Mr. Varshavsky on numerous occasions.  However, Mr. Leontiev has refused to repay those funds to Avilon and to the other lenders.  Instead, Mr. Leontiev continues to hide behind the complex network of Cloud Entities that he created.

Personal Liability of Mr. Leontiev Under Applicable Law

29.     As set forth above, it appears that Mr. Leontiev controls Ambika, Vennop and Financial Group "Life" and the other corporate entities described above; that he has used each of

those entities as a means of illegality and fraud, for unlawful or improper purposes, and to conceal assets and evade debts; that he has caused the entities to become insolvent through his own improper acts and omissions; and that he has caused the liquidation of Financial Group "Life" to be carried out improperly and in bad faith without giving proper notice to creditors and without repaying its debts.

30.     On the basis of the acts and omissions alleged above, Mr. Leontiev is personally liable for repayment of the borrowed funds, with interest, under the laws of Cyprus, Russia and/or other jurisdictions whose laws the Court may find to be applicable.

31.     At present, Defendant does not have access to relevant evidence in Plaintiff's possession and reserves the right to supplement or amend these allegations and to make additional allegations after discovery.

## IV.
## REQUEST FOR RELIEF

For the reasons stated above, Defendant respectfully requests that the Court (1) determine on the merits that Plaintiff is personally liable for the debts in question and on that basis deny his claim for declaratory judgment, (2) dismiss Plaintiff's claim for intentional infliction of emotional distress for the reasons stated in Defendant's pending motion to dismiss, and (3) award Defendant his costs of the action and other relief allowable by law.

Dated: New York, New York
        August 26, 2016

                            DEBEVOISE & PLIMPTON LLP

                            /s/ William H. Taft V
                            Sean Hecker
                            William H. Taft V
                            Nicholas C. Tompkins
                            919 Third Avenue
                            New York, New York 10022
                            Tel:  (212) 909-6000
                            Fax: (212) 521-6386
                            shecker@debevoise.com
                            whtaft@debevoise.com
                            ntompkin@debevoise.com

                            *Counsel to Defendant Alexander Varshavsky*