```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------x
SERGEY LEONTIEV,                         :
                                         :      16 Civ. 3595
         Plaintiff,                      :
                                         :      MEMORANDUM ORDER
         -v-                             :
                                         :
ALEXANDER VARSHAVSKY,                    :
                                         :
         Defendant.                      :
-----------------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/2/16

JED S. RAKOFF, U.S.D.J.

On May 13, 2016, plaintiff Sergey Leontiev filed suit against defendant Alexander Varshavsky. See Complaint ("Compl."), ECF No. 1. Leontiev is a Russian businessman, now living in New York, who managed the Russian bank Probusinessbank until its banking license was revoked by the Russian Central Bank in August 2015. Id. ¶¶ 1, 14, 22. Varshavsky is a Russian-born United States citizen living in New Jersey. Id. ¶¶ 2, 15. Plaintiff Leontiev alleges that defendant Varshavsky has been demanding payment in a threatening and harassing manner for a debt that Leontiev alleges he does not owe. Id. ¶ 3. In his complaint, Leontiev seeks a declaratory judgment stating that he owes no debt to Varshavsky or his associates, id. ¶¶ 41-45, and also seeks damages for the New York tort of intentional infliction of emotional distress ("IIED") based on Varshavsky's alleged threats against Leontiev and Leontiev's friend and

business associate, Alexander Zheleznyak, id. ¶¶ 46-52. Zheleznyak is not a party to this action.

On June 24, 2016, defendant Varshavsky moved to dismiss plaintiff Leontiev's IIED claim. See Notice of Motion to Dismiss Plaintiff's Second Cause of Action, ECF No. 14; Memorandum of Law in Support of Motion to Dismiss Plaintiff's Second Cause of Action ("Def. Br."), ECF No. 15. Leontiev filed opposition papers on July 8, 2016, see Memorandum of Law in Opposition to Defendant's Motion to Dismiss Plaintiff's Second Cause of Action ("Pltf. Br."), ECF No. 17, and Varshavsky filed reply papers on July 15, 2016, see Reply Memorandum of Law in Further Support of Motion to Dismiss Plaintiff's Second Cause of Action, ECF No. 21. The Court held oral argument on August 4, 2016.[1] See Transcript dated Aug. 4, 2016. Having fully considered the parties' submissions and arguments, the Court hereby grants defendant's motion to dismiss the IIED claim.

In ruling on a motion to dismiss, the Court accepts as true the factual allegations in the complaint and draws all reasonable inferences in favor of the plaintiff. Apotex Inc. v. Acorda Therapeutics, Inc., 823 F.3d 51, 59 (2d Cir. 2016). "To survive a motion to dismiss, a complaint must contain sufficient

---

[1] With the Court's permission, see Transcript dated Aug. 4, 2016, at 19, 23, plaintiff, following oral argument, submitted four additional authorities for the Court's consideration.

factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

The allegations relevant to the IIED claim are as follows:

Leontiev is a well-known Russian businessman who was forced to leave Russia in August 2015 when the Russian Central Bank revoked the license of Probusinessbank (a commercial bank that Leontiev started in 1993). Compl. ¶¶ 1, 22-23. Varshavsky, a Russian-born United States citizen residing in New Jersey, has many business interests in the U.S. and Russia, as well as close relationships with Russian government officials. Id. ¶ 2. Since August 2015, Varshavsky has "engaged in a campaign of threats, demands, and harassment" in order to obtain payment of a debt that Varshavsky contends Leontiev owes him. Id. ¶ 3. Varshavsky most recently demanded $83 million, although the amount has varied. Id. The debt allegedly arises out of various loans, promissory notes, and bank guarantees, none of which is in the name of either plaintiff or defendant. Id. ¶¶ 4-6. Nonetheless, Varshavsky allegedly claims that Leontiev has "acknowledged" the loans, which Leontiev denies. Id. ¶¶ 7, 28. Varshavsky has also allegedly "targeted" Zheleznyak, Leontiev's friend and business associate, who was also forced to leave Russia in August 2015 after the takeover of Probusinessbank, and who has numerous family members still living in Russia. Id. ¶¶ 8-9.

3

In particular, Leontiev alleges that Varshavsky has "repeatedly threatened to bring criminal charges against Mr. Leontiev and Mr. Zheleznyak." Id. ¶ 10. After Probusinessbank's banking license was revoked, Leontiev and Zheleznyak became concerned for their personal safety (and in Leontiev's view, this concern was "prescient," because on February 18, 2016, the Russian government arrested five former managers of Probusinessbank, charging them with embezzlement). Id. ¶¶ 23-24. Varshavsky first alluded to legal difficulties that might arise for Leontiev at an in-person meeting with Leontiev in Moscow in August 2015, which was the first time the two men had met. Id. ¶ 28. At this meeting, Varshavsky demanded payment of $100 million for the alleged loans, "hinted that Mr. Leontiev would have trouble with Russian prosecutors if he failed to pay Mr. Varshavsky," and "stated that if Mr. Leontiev transferred a 50% interest in Probusinessbank to Mr. Varshavsky, all of Mr. Leontiev's problems would be resolved." Id. ¶ 29. Leontiev understood Varshavsky to be referring to the Russian Central Bank's takeover of Probusinessbank. Id.

At a meeting in London "[s]hortly thereafter," Varshavsky demanded that Leontiev agree to a payment schedule for the purported loans, and when Leontiev denied that he had responsibility to pay, Varshavsky threatened to institute criminal charges against him. Id. ¶ 30. Varshavsky and Leontiev

4

next met in New York on January 15, 2016 with their respective counsel present.[2] Id. ¶ 31. At this meeting, Varshavsky demanded immediate payment of $83 million and claimed that he "need[ed] security because what if God forbid you die tomorrow." Id. Varshavsky also suggested that if "he informed certain parties in Russia, 'a criminal investigation will be opened.'" Id.

Leontiev also alleges that Varshavsky has threatened to link him to terrorism financing. Id. ¶ 10. In or around February 2016, Varshavsky told Zheleznyak that unless Leontiev immediately paid Varshavsky, Varshavsky would arrange to have Leontiev's name linked to terrorism financing. Id. ¶ 36. Leontiev also alleges that Varshavsky has "solicit[ed] his participation in an unlawful bribery scheme." Id. ¶ 47. In or around March 2016, Varshavsky told Zheleznyak that if Leontiev paid him about $40 million, Varshavsky would arrange to have authorities in Russia cease investigating certain individuals associated with Probusinessbank, a demand Leontiev refused. Id. ¶ 37.

Leontiev alleges that Varshavsky is able to carry out his threats because he has personal relationships with members of the Russian government and "is considered to be a politically

---

[2] At oral argument, Leontiev's counsel stated that this meeting took place at the offices of Gibson, Dunn & Crutcher, the same law firm that filed the instant complaint on his behalf. See Transcript dated Aug. 4, 2016, at 10-11, 16-17.

powerful and influential person." Id. ¶¶ 10, 38-39. Further, Varshavsky's threats against Zheleznyak were made specifically in order to intimidate and harass Leontiev, a lifelong friend and business associate of Zheleznyak. Id. ¶ 48. Leontiev asserts that as a result of Varshavsky's "systematic and unrelenting campaign of threats, intimidation, and harassment," Leontiev has suffered "severe emotional distress and mental pain and anguish," including "anxiety, stress, loss of sleep, and exacerbation of other physical harms." Id. ¶ 51. Varshavsky's conduct has also allegedly caused Leontiev to fear for his safety and that of his family and friends. Id. For the IIED claim, Leontiev seeks compensatory damages, as well as punitive damages in the amount of $25 million "[b]ecause Mr. Varshavsky acted intentionally and with malice to inflict severe emotional distress on Mr. Leontiev." Id. ¶ 52, Prayer for Relief ¶¶ 3-4.

Under New York law, to state an IIED claim, a plaintiff must plead four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." Chanko v. Am. Broad. Cos. Inc., 49 N.E.3d 1171, 1178 (N.Y. 2016). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

6

regarded as atrocious, and utterly intolerable in a civilized community." Id. "When pleading intentional infliction of emotional distress, the bar is extremely high, and this highly disfavored cause of action is almost never successful. Indeed, such claims are routinely dismissed on pre-answer motion." See Sesto v. Slaine, 15-cv-1118 (AJN), 2016 WL 1126537, at *4 (S.D.N.Y. Mar. 18, 2016) (alterations, citation, and internal quotation marks omitted). In fact, the requirements are so "rigorous, and difficult to satisfy" that, of the IIED claims to come before the New York Court of Appeals, "every one has failed because the alleged conduct was not sufficiently outrageous." See Chanko, 49 N.E.3d at 1179 (emphasis in original).

"Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999). Given the severity of the standard, as indicated above, the Court concludes that the conduct alleged is insufficiently "extreme and outrageous" to state a claim.

As a threshold matter, the Court need not accept Leontiev's conclusory allegation that the criminal proceedings would be "baseless." See Ahmed v. Purcell, No. 14-cv-7491 (KPF), 2016 WL 1064610, at *6 (S.D.N.Y. Mar. 14, 2016) ("[W]hile the Court must accept the well-pleaded allegations in the Complaint, it need

not accept Plaintiff's characterization of any lawsuit contemplated by Defendant as 'frivolous.'"). Nor must the Court accept Leontiev's characterization of Varshavsky's alleged misconduct as felony extortion under New York state law. See Transcript dated Aug. 4, 2016, at 12-13; Pltf. Br. at 1, 7. But even accepting these allegations as true for purposes of the instant motion, Leontiev's complaint falls short.

To begin with, there are no allegations of threats of physical violence. While threats of physical violence are not the sine qua non of an IIED claim, there are only a few reported cases where an IIED claim has been sustained in the absence of such physical threats. See, e.g., Allam v. Meyers, No. 09-cv-10580 (KMW), 2011 WL 721648, at *10-11 (S.D.N.Y. Feb. 24, 2011) (sustaining IIED claim based on a "five month-long, deliberate and malicious campaign of harassment and intimidation" that included "threats of violence" and death threats, as well as "relentless humiliation and emotional abuse"); Eves v. Ray, 840 N.Y.S.2d 105 (2nd Dep't 2007) (upholding verdict for defendant on IIED counterclaim based on evidence that "on several occasions," plaintiff "threatened the defendant both physically and financially, and stalked him").[3]

---

[3] Although the complaint does not state that defendant made physical threats, plaintiff nonetheless argued in his papers that Varshavsky made "thinly veiled threats on Mr. Leontiev's life." Pltf. Br. at 1, 7. But this claim purportedly refers to a

8

Instead, Leontiev premises his IIED claim on allegations that Varshavsky sought to coerce payment on the alleged debt through threats of criminal prosecution, a threat to link Leontiev to terrorism financing, and through a bribery attempt. See Compl. ¶¶ 47-48. Plaintiff argues that together such actions constitute a "classic protection racket" that was "aimed at extorting tens of millions of dollars from Mr. Leontiev." Pltf. Br. at 1, 7. But it is well-established that allegations of criminal misconduct, without more, are insufficient to state an IIED claim. See Stuto, 164 F.3d at 827 ("[I]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which

---

single statement alleged in the complaint: that Varshavsky needed security for repayment of the loans "because what if God forbid you die tomorrow." Compl. ¶ 31. As defendant pointed out, the complaint does not allege that this statement was intended or understood as a death threat, see Def. Br. at 3; Def. Reply at 4 n.3, and even granting every reasonable inference to Leontiev, the Court agrees with defendant that it cannot be read as one. Varshavsky's statement merely refers to the truism that security for an unpaid loan is necessary because of the uncertainty of the future. The context also matters. The statement was made at a meeting at the offices of plaintiff's own counsel, Gibson Dunn, with counsel for both sides present, see Compl. ¶ 31; Transcript dated Aug. 4, 2016, at 10-11, 16-17, which was convened to discuss a disputed debt, as evidenced by defendant's reference to "security." The notion that Varshavsky's anodyne statement in this setting was a death threat is simply not credible.

would entitle the plaintiff to punitive damages for another tort." (quoting Restatement (Second) of Torts § 46 cmt. d)).

Indeed, many courts have rejected IIED claims based on allegations of very serious, and potentially criminal, misconduct that is similar to what was alleged here. See, e.g., Saleh v. United States, No. 12-cv-4598 (KBF), 2013 WL 5439140, at *11 (S.D.N.Y. Sept. 27, 2013), aff'd, 580 F. App'x 22 (2d Cir. 2014) (dismissing IIED claim based on allegations that government agents sought to coerce plaintiff into cooperating with the FBI in the arrest of a relative, denied him permanent resident status in retaliation for refusing to help, and threatened to kill him); Hong v. KBS Am., Inc., 951 F.Supp.2d 402, 425-26 (E.D.N.Y. 2013) (finding operation of a price-fixing scheme and defendants' coercive threats to force to plaintiff to join the conspiracy insufficiently outrageous); Stuart v. Danka Corp., 986 F. Supp. 741, 746 (E.D.N.Y. 1997) ("Plaintiff's constructive termination as a result of refusing to participate in an alleged bribery scheme does not, as a matter of law, rise to the level of 'outrageous conduct.'"); Owen v. Leventritt, 571 N.Y.S.2d 25 (1st Dep't 1991) (finding threat to kill plaintiff insufficiently outrageous). Even if the Court assumes that Varshavsky's alleged misconduct constitutes felony extortion under New York state law, it is no more outrageous than what was alleged in these cases.

Without multiplying examples further, the point is that defendant's alleged statements, while distasteful, do not remotely meet the very high standard that the New York courts have imposed as to what constitutes the "extreme and outrageous conduct" element of an IIED claim. Accordingly, the Court grants defendant's motion to dismiss the IIED claim.[4] The Clerk of Court is directed to close docket entry 14.

SO ORDERED.

Dated:   New York, NY
         September 1, 2016

                                              _____
                                              JED S. RAKOFF, U.S.D.J.

---

[4] It follows from this disposition that plaintiff's request for punitive damages must also be struck, because the IIED claim was the sole vehicle through which plaintiff sought them. See Compl. ¶¶ 46-52.

11