g842leoA

1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SERGEY LEONTIEV,

4             Plaintiff,         New York, N.Y.

5         v.             16 Civ. 3595(JSR)

6   ALEXANDER VARSHAVSKY,

7             Defendant.

8   ------------------------------x

9                       August 4, 2016
                       4:15 p.m.
10

11  Before:

12               HON. JED S. RAKOFF,

13                     District Judge

14                  APPEARANCES
15

16

17  GIBSON, DUNN & CRUTCHER, LLP
        Attorneys for Plaintiff
18  BY:  ROBERT L. WEIGEL
        ESTER MURDUKHAYEVA
19        ALISON L. WOLLIN

20

21  DEBEVOISE & PLIMPTON, LLP
        Attorneys for Defendant
22  BY:  SEAN HECKER
        NICHOLAS C. TOMPKINS
23

24

25

g842leoA

|    |                                                                              |
|----|------------------------------------------------------------------------------|
| 1  | (Case called; all parties present)                                           |
| 2  | THE COURT:  Good afternoon.  We are here on a motion                          |
| 3  | to dismiss.  Let me hear first from moving counsel.                           |
| 4  | MR. HECKER:  Thank you, your Honor.                                           |
| 5  | With respect to plaintiff's second claim for                                  |
| 6  | intentional --                                                                |
| 7  | THE COURT:  That's the only claim that we have on                             |
| 8  | today's argument.                                                             |
| 9  | MR. HECKER:  That's correct, Judge.                                           |
| 10 | There are four elements easily stated:  The first is                         |
| 11 | that plaintiff must allege extreme and outrageous conduct;                    |
| 12 | intent to cause or disregard a substantial probability of                    |
| 13 | causing severe emotional distress; a causal connection between               |
| 14 | the conduct and the injury; and severe emotional distress.                    |
| 15 | THE WITNESS:  And it is really the first element that                         |
| 16 | is most at issue, although we also take issue, as the court has               |
| 17 | seen in our papers, with the allegation here that there is a                  |
| 18 | sufficiently particularized pleading with respect to the                      |
| 19 | emotional distress allegedly caused.  This is a disfavored tort               |
| 20 | action in New York, and the Court of Appeals has repeated                     |
| 21 | numerous times, most recently this year, that they have never                 |
| 22 | seen a set of allegations sufficiently outrageous in terms of                 |
| 23 | the misconduct to survive dismissal at the pleading stage.  It                |
| 24 | depends which cases make their way up, but this court noted a                 |
| 25 | few years ago in the *Kiser* case and *Chanko* case earlier this             |

g842leoA

|     |                                                                         |
| --- | ----------------------------------------------------------------------- |
| 1   | year the Court of Appeals repeated that line, and the language          |
| 2   | they use in describing the pleading standard is that the                |
| 3   | conduct must be so outrageous in character and so extreme in             |
| 4   | degree as to go beyond all possible bounds of decency and to be          |
| 5   | disregarded as atrocious and utterly intolerable in a civilized          |
| 6   | society.  It is a whole lot of adjectives and we recognize               |
| 7   | there is some subjectivity in it, but I think every                      |
| 8   | articulation of the standard recognizes that we are talking              |
| 9   | about an extremely high bar.                                             |
| 10  | THE COURT:  I am glad the Court of Appeals referred to               |
| 11  | a civilized society rather than the streets of New York.                |
| 12  | MR. HECKER:  I think there is no question we are              |
| 13  | talking about a very narrow category of cases where the conduct          |
| 14  | alleged is sufficiently outside the bounds of decency as to              |
| 15  | survive a motion to dismiss.  And the plaintiffs here, in their          |
| 16  | briefs, really don't mention that heightened pleading standard.          |
| 17  | Instead, what they do is they latch on to a couple of cases in           |
| 18  | particular where courts have addressed the question of what              |
| 19  | happens when, in the context of claims where the conduct dates           |
| 20  | back a number of years, you can look back and find a continuous          |
| 21  | course of conduct typically in the sexual harassment context or          |
| 22  | something analogous.  So there have been cases where they have           |
| 23  | focused on conduct that could allege to be a campaign over               |
| 24  | time.  But even if you could construe a couple of discrete acts          |
| 25  | and then call it a campaign, that is not enough.  It still has           |

g842leoA

1    to be conduct that ultimately rises to this very heightened

2    standard.

3         Here, what is alleged principally relates to

4    statements that were made allegedly by Mr. Varshavsky during

5    three business meetings, all scheduled in advance by

6    experienced business people, including the plaintiff, who

7    founded and was the chair of one of the larger banks in Russia,

8    Probusinessbank.  These meetings were not the result of

9    stalking episodes or ambushing.  They were meetings set in

10   advance, and they were held to discuss this debt.

11        And the question that was discussed repeatedly between

12   the parties was whether our client could produce documentary

13   evidence and explain a legal theory pursuant to which

14   Mr. Leontiev would be personally held liable on the debt.  He

15   doesn't allege that he wasn't aware of the debt or he wasn't

16   familiar with the circumstances of the debt, and the documents

17   they have attached to the complaint reflect loan guarantees

18   from Probusinessbank, his bank.

19        So this is not some random person plucked off the

20   street at a vulnerable time in his life as part of an extortion

21   racket or racketeering scheme, as plaintiffs claim in their

22   papers, and the complaint doesn't allege as much.  What you see

23   are claims, in the context of these discussions, that our

24   client made a threat to instigate a criminal prosecution of

25   Mr. Leontiev in a context where there was an ongoing criminal

g842leoA

investigation for embezzlement involving other bank employees.
Plaintiff has alleged that that was baseless and would have us
read into it a history of baseless prosecutions of executives
in the context of closed businesses.  Mr. Leontiev fled the
country not because of meetings with my client, but because his
bank's closure and his fear associated with that, according to
the complaint.

          The second meeting occurs in London, more or less the
same conversation about this same debt and efforts to have a
payment schedule arranged.

          And the third, and the third is the most important,
the third meeting was arranged through counsel, held at Gibson
Dunn's offices in New York.  This is purportedly after the
first two episodes of this campaign of harassment that caused
him severe emotional distress.  Our client was invited to a
meeting at Gibson Dunn to talk about this alleged debt and,
again, the complaint alleges that demands were made on our
client --

          THE COURT:  I heard that the offices of Gibson Dunn
are very intimidating.

          MR. HECKER:  I am sure it was intimidating, but it was
plaintiff's home turf.  And I think context here is quite
important, because the notion that this meeting was part of a
campaign of harassment I think is belied by the circumstances
of these discussions between experienced business people,

g842leoA

1    ultimately involving experienced and able counsel, and meetings

2    held at Gibson Dunn.  In fact, it is at Gibson Dunn where, if

3    the court looks at paragraph 31 of the complaint, it is alleged

4    that Mr. Varshavsky maintained that Mr. Leontiev owed him $83

5    million and demanded immediate payment claiming "needs security

6    because what if, God forbid, you die tomorrow."  Now, in the

7    complaint, there is no allegation that that is a death threat,

8    although in plaintiff's papers to this court it suggested it is

9    a thinly veiled death threat.  They could have alleged that it

10   was understood to be a death threat or intended to be a death

11   threat, but they did nothing of the sort.

12          THE COURT:  Let me pause on that, because I raise this

13   really as much for your adversary as for you.  While the cases

14   are perhaps not totally consistent, as one would expect under

15   New York case law, where this kind of claim has survived a

16   motion to dismiss, it has often been because physical threats

17   were involved.  I don't see how this can be read as a physical

18   threat and, as you point out, the complaint doesn't claim it

19   was.

20          But putting aside that, because they could amend the

21   complaint or whatever, but what they appear to be saying, even

22   taking it most favorably to plaintiff -- that's why I am

23   raising it, in case they want to convince me otherwise -- is,

24   I've got to get my money now because who knows what might

25   happen tomorrow.  One would think that's even -- even in a more

g842leoA

cordial conversations than were going on here, it is not, one

would think, unusual to say, you know, I know you think you are

going to live forever, but God forbid you should die tomorrow,

I need my money, and that appears to be what he is saying.

MR. HECKER:  I couldn't agree more.  The use of the

word "security" makes that clear, makes that clear.  It is that

there is a discussion about a disputed debt; and if an

individual is going to be the one on the hook to repay it, the

question is, is there security for repayment?

THE COURT:  Am I right that that is the only thing in

the complaint that even your adversary suggests is a physical

threat?

MR. HECKER:  That's correct, your Honor, and it is not

alleged in the papers, in the complaint as such, but it is

referral to as a thinly veiled threat in their brief.  I agree

with the court, I think that many of the cases that have

survived motions, for example, the plaintiff cites *Allam v.*

*Meyers*, a case before Judge Wood.

THE COURT:  There was a direct threat of violence.

MR. HECKER:  And in fact there was violence on top of

the threats of violence.  There were acts of physical violence,

including kicking, hair pulling, grabbing, pushing, sexual

violence and then, on top of it, a sustained emotional abuse.

The case involving *Eves v. Ray*, a Second Department case,

involved a litigant going after the lawyer for an ex-spouse,

g842leoA

```
1    making physical threats to the lawyer, stalking the lawyer, and

2    in fact doing so even after a protective order was put in

3    place.  It is nothing like the context we have here, which

4    builds up to a meeting at Gibson Dunn.  It is just a completely

5    different context, and we have cited the court to --

6            THE COURT:  Both of those cases, and many of the other

7    cases where the allegations have survived motions to dismiss,

8    although they are far outnumber by the cases where the motion

9    has been granted, are cases involving spouses or ex-spouses,

10   with all the emotional freight, all the potential for violence

11   that that highly wrought context, as a matter of common

12   experience, often engenders, and this is not that context at

13   all.

14           MR. HECKER:  That is absolutely right.  The additional

15   case plaintiff cites, Green v. Fishbein, involves a

16   landlord/tenant dispute where a serious of frivolous lawsuits

17   are brought against the tenant to try to get the tenant out of

18   his home.  There is something about the power dynamic and

19   intense emotional aspect of having someone to try to extricate

20   you from your home is decidedly different from the

21   circumstances here.

22           In fact, it is interesting and, in fact, maybe even

23   timely, to look at the case involving Donald Trump which did

24   not survive a motion -- I mean, which did not survive a motion

25   to dismiss there, and that's Kay v. Trump, which was a First
```

g842leoA

 1    Department case from a few years ago.  There, the plaintiff had

 2    alleged that Trump had attempted to have her arrested, had

 3    initiated a couple of different frivolous suits against her,

 4    had frightened her and her daughter, and there, too, the

 5    allegations were found insufficiently extreme.  And there I

 6    think one might argue that the context was more sympathetic to

 7    this one involving two experienced business people.  So, your

 8    Honor, for --

 9         THE COURT:  It would be wrong for me to distinguish

10    that case on the ground that the defendant is well known to be

11    capable of saying anything.

12         MR. HECKER:  It is.  It would be, Judge.

13         MR. WEIGEL:  Not necessarily inaccurate.

14         MR. HECKER:  Your Honor, we have a second independent

15    basis for dismissal based on the very conclusory nature of the

16    claims of emotional distress allegedly suffered here,

17    particularly in the context where it is quite clear that the

18    plaintiff was already fleeing the country for reasons having

19    nothing to do with my client.  There really isn't any

20    particularized pleading with respect to how these efforts to

21    recoup on the debt or the attendant threats that are alleged

22    caused any specific emotional distress, and I think that is

23    important because the reason this tort has long been disfavored

24    and didn't exist in the earliest part of the 19th century is

25    very much because of a recognition that it is quite difficult

g842leoA

1    to verify claims of purely emotional injuries without physical

2    violence.  So I think this is actually exactly the kind of case

3    that this doctrine of disfavoring these torts is there for, and

4    I think if you look at the allegations, they are quite cursory

5    in nature and they don't particularize the way in which the

6    alleged conduct here has any causal connection to the harm.

7              THE COURT:  All right.  Thank you very much.

8              Let me hear from plaintiff's counsel.

9              MR. WEIGEL:  Thank you, your Honor.

10             It is interesting that they try and characterize this

11   as a series of business meetings, because that's not what is

12   allege in the complaint.

13             My client was summoned to go to Mr. Varshavsky's

14   office, a man he had never met.  Mr. Varshavsky tells him he

15   has to pay him $100 million.  He also offers that if my client

16   gives him half his bank, he will make the problems go away.

17             My client does not give him half the bank, and the

18   bank is seized.  My client travels to London, Mr. Varshavsky

19   travels to London, says, I want $83 million, pay it to me.  He

20   then makes threats that he will institute criminal charges,

21   criminal charges that we allege in the complaint would be

22   false.  He also threatens to put my client on a terrorism watch

23   list, and he says, Give me $40 million.

24             THE COURT:  Let me just go back a step.

25             Where was your client located?  Where was he residing

g842leoA

1    at the time of the second and third meeting?

2                MR. WEIGEL:  By the third meeting, your Honor, he was

3    in New York.  That was a meeting that took place in my office.

4    Although there were numerous communications between

5    Mr. Varshavsky and Mr. Leontiev and Mr. Leontiev's business

6    partner that are alleged in the complaint as well, I am not 100

7    percent sure, but I believe Mr. Leontiev was in London at the

8    time -- he clearly was in London at the time.  I don't know if

9    he had moved to the United States at that point in time or not.

10               THE COURT:  I guess the reason I am asking this is

11   what would it matter if, assuming for the sake of argument that

12   the defendant had the power to institute false criminal

13   proceedings in Russia, your client is already alienated from

14   Russia and its government in any event.  Why would it matter to

15   him?

16               MR. WEIGEL:  Why would it matter to him?

17               THE COURT:  Yes.

18               MR. WEIGEL:  Well, first off, nobody wants to be

19   charged with a crime.

20               THE COURT:  Well, but, you know, that's true, but we

21   are talking about intolerable, the very high standard here, and

22   it is well known that some even utterly saint-like people who

23   leave dictatorial societies are often charged with this, that,

24   or the other thing, on the most frivolous grounds whatsoever,

25   but that doesn't mean that that keeps them in such a state as

g842leoA

1    to constitute the very high standard for this tort.

2        MR. WEIGEL:  I agree it is a high standard, your

3    Honor, but the combination of threatening to invoke criminal

4    proceedings that were baseless, putting him on a terrorism

5    watch, list -- Russia, it may be lawless, but it is a real

6    country and it has power to restrict somebody's travel by

7    putting in a notice to Interpol.  They can essentially make it

8    so that my client can't travel by air.

9        This man has pursued him.  He is a powerful man.  It

10   is alleged in the complaint, and we certainly will be able to

11   demonstrate that he is very well connected at the highest

12   levels of the Russian government.  He transacts numerous

13   businesses with the former KGB.  He sells them cars.  He does

14   business with the Rotenbergs, who are on the list of people who

15   are sanctioned.  He is a very powerful man.  And the evidence

16   will show, if we are allowed to take discovery, that he has the

17   capacity and that my client was genuinely scared and genuinely

18   terrified.  That was the whole point of this.

19       What we have here, your Honor, in a nutshell, is they

20   are asking you to find that conduct that constitutes extortion

21   under New York law, larceny by extortion, is not sufficiently

22   outrageous.  The statute makes it plain that a person obtains

23   property by extortion when he compels or induces another person

24   to deliver such property to himself by means of installing in

25   him a fear that, if property is not so delivered, the actor or

g842leoA

1    another will.  And part 4 under that is, accuse some person of

2    a crime or cause criminal charges to be instituted against

3    him.

4           This is a felony.  We are alleging that they have said

5    to him, Pay me $83 million, to a stranger, to Sergey, to

6    Mr. Leontiev, to somebody who had no business dealings with

7    Mr. Leontiev himself.  They admit in their answer, although it

8    really shouldn't be relevant there, but they admit in their

9    answer that Mr. Leontiev has never met this guy before.  He

10   gets summoned to his office in a very high pressure situation,

11   and the guy says basically, Give me half your bank and I will

12   make your problems go away, and then he continues to pursue him

13   around the globe and to New York.  And this is extortion under

14   New York law.  It is -- the cases they cite --

15          THE COURT:  I'm not sure this bears on anything, but

16   just out of curiosity, so have you reported this to the

17   criminal authorities?

18          MR. WEIGEL:  We have not reported this to the criminal

19   authorities, no.  But we believe we will be able to establish

20   these facts with a minimal amount of discovery.

21          The cases they cite, they talk about cases where there

22   is -- somebody makes a threat at a co-op board meeting or, in

23   the *Saleh* case, where they cite the court found that the

24   threats were not directed to the plaintiff in that case.  There

25   is another case involving a Korean video store, where it is

g842leoA

1    asserted that there was price fixing and they cite that case,

2    saying that evidence of a crime is not enough.

3           But the Second Circuit actually came up with a -- in

4    the *Stuto* case, *Stuto*, that none of us cite in our brief for

5    some reason, 164 F.3d 820 --

6           THE COURT:  Wait a minute.  This is a case that is not

7    cited?

8           MR. WEIGEL:  Not cited in anybody's brief.

9           THE COURT:  So hold on a minute.  So did you alert

10   your adversary that you were going to refer to it today?

11          MR. WEIGEL:  I did not, your Honor.

12          THE COURT:  Well, you certainly didn't alert the

13   court.  Why not?  Why didn't you do that?  How is he going to

14   be able to respond to a case he doesn't even know you were

15   going to cite?

16          MR. WEIGEL:  Well, I did not understand that there was

17   going to be a question from your Honor about whether physical

18   harm was necessary, and this case makes it plain that physical

19   harm is not necessary.  The Second Circuit -- it is a 1999

20   case -- just goes through the cases that identify --

21          THE COURT:  To put your mind at rest, I wasn't

22   suggesting that physical harm was a *sine qua non*.  I was asking

23   whether -- it seemed to me that that was an important element

24   in many of the cases that have survived because one can -- it

25   makes it a much easier situation to say that it is intolerable

g842leoA

conduct of outrageous extreme and so forth if one goes and

makes a physical threat.  But I agree with you that that is not

a requirement.  So if that's all you were going to bring to my

attention, that's unnecessary.

MR. WEIGEL:  Thank you, your Honor.

If you look at the *Mulberry Street v. Columbia University* case that we cite, that was a case where there was

no threat of violence whatsoever.  Some knuckleheaded Columbia

University professor decided to send letters to various

restaurants telling them that he got food poisoning, as part of

some research assignment, to find out how they would respond.

And the First Department --

THE COURT:  I should note for the record that I am an

adjunct professor at Columbia University, but I have never

engaged in any such conduct.

MR. WEIGEL:  Well, this is pretty knuckleheaded, and

the First Department held that that was a basis for an

intentional infliction of emotional harm.  What we have here is

a situation where this conduct is continuous, it is a campaign,

and it is designed for one purpose, which is to make my client

pay $83 million.  These other -- if you look at the other

cases, and I will admit that there are clearly more cases that

dismiss than allow, but, your Honor, in the Syracuse University

case, *Ericson*, noting that it was a motion to dismiss, as we

are here, and quite a few of the cases that they cite are

g842leoA

summary judgment cases, that the parties got an opportunity to

take the discovery to prove their case and then were unable to

do so.

          We have not been able to find a single case where

there was effectively a scheme to extort money from someone,

which is what we are alleging, and I think at this point in

time, even with the benefit of an answer, they don't allege why

it is that this gentleman is entitled to collect this money on

the note, that they don't mention my client at all as the

borrower and, perhaps more importantly, don't mention him as a

lender.  He doesn't assert anywhere that he has got a power of

attorney to collect this money or that he has gotten an

assignment of claims to collect this money.  He has just come

and said, I am owed $83 million.  Pay it, or I am going to make

your life miserable.  It is an extortion scheme and it is

illegal.  We believe we will be able to prove that.  We believe

that he made these threats.

          We were very careful.  We knew when we filed this that

this is a disfavored cause of action.  But we believe that we

can establish these facts; and what we are really asking for,

your Honor, is a chance to take discovery to establish that in

fact he made these threats, he did it knowing that he didn't

have a personal basis for collecting this money, and that he

has made serious threats, and it is different --

          THE COURT:  With respect to the meeting at Gibson

g842leoA

Dunn, if I understand what your allegations, he had already had

two extortionate meetings, meetings at which he was the victim

of extortion, under your view of it.  So if he is feeling all

of this emotional distress and so forth, why is there a third

meeting set up by counsel?

MR. WEIGEL:  Because we wanted it to stop.  There were

repeated phone calls, particularly to Mr. Leontiev's business

partner, making all sorts of threats on a constant basis and we

want it to stop.  And oftentimes our clients are more

comfortable with Gibson Dunn sitting next to them, and we were

going to have this meeting and see if we could make this stop.

THE COURT:  Let me just ask a different question,

which is not before me today, but just so we don't have any

problems going forward, in addition to the parties themselves,

were there present at that meeting attorneys who are not

involved in the litigation of this case?

MR. WEIGEL:  Yes, there is --

THE COURT:  So if it comes to that, there are people

who can testify about what occurred at that meeting, other than

the parties themselves, without compromising counsel is really

what I am getting at.

MR. WEIGEL:  Yes, your Honor, and I appreciate that,

and I did think of that.  There are at least two individual who

could do that.

THE COURT:  All right.  I interrupted you.  Go ahead.

g842leoA

| | |
|---|---|
| 1 | MR. WEIGEL:  There is a one-year statute for this |
| 2 | offense and so when the Court of Appeals talks about, in the |
| 3 | *Nader* case, a continuing course of conduct, this is about as |
| 4 | long as it gets. |
| 5 | This started in August.  It went from Moscow to London |
| 6 | to New York.  They don't deny and they can't deny on this |
| 7 | motion that these threats were made, that it was an offer that |
| 8 | if we gave him half the bank, he would make the problems go |
| 9 | away; if we paid him $40 million, he would make the problems go |
| 10 | away.  They don't deny that he said, I am going to put you on a |
| 11 | terrorism watch list.  They seem to say that's really not that |
| 12 | outrageous. |
| 13 | I would submit that when you read a lot of these |
| 14 | cases, as I have, the courts tend to be pretty practical here, |
| 15 | and they look at the cases where somebody mouths off at a co-op |
| 16 | board meeting and they say, that's really not enough.  But this |
| 17 | is a very serious man who has enormous clout in Russia, who has |
| 18 | made real threats to my client, which has caused us to bring |
| 19 | this lawsuit, because we wanted these to get resolved in a |
| 20 | court where the rule of law applies as opposed to somewhere |
| 21 | else, and we wanted to make this stop, which is the whole point |
| 22 | of it. |
| 23 | As your Honor knows, we filed the motion.  We asked |
| 24 | for an injunction.  We want these threats to stop.  He has |
| 25 | suffered, and we allege in the complaint that he has suffered a |

g842leoA

1   lack of sleep, anxiety.  Damages, the cases, these allegations

2   are sufficient on the pleading stage.  We will be able to prove

3   it at trial or they will have a chance to disprove it.  But

4   this is the kind of damage that one has in this kind of a case,

5   and they really cannot dispute that this would be illegal.  If

6   what we allege is true, that their conduct, threatening to file

7   a lawsuit, is different than actually just filing a lawsuit.

8   We as a society have made a determination that it is worse to

9   say to somebody, If you don't do this, if you don't pay me

10  money, I will reveal this, I will file this lawsuit.  And the

11  *Posner* case in the Court of Appeals, which is another case I

12  realize that's not in the papers, the court makes reference to

13  the fact that --

14        THE COURT:  Well, I will tell you what.  I am going

15  to, since you seem to want to cite some cases that were not in

16  the briefs, I will, after this oral argument is concluded, give

17  each side the opportunity to send me a letter citing any

18  additional cases you want to cite, but I just want the

19  citations.  No argument, just the citations.

20        MR. WEIGEL:  Thank you, your Honor.

21        THE COURT:  I should also mention, and I mention this

22  for the record but not because I consider it really of any

23  moment, so -- and this is a matter of public record, after the

24  United States banned I think it was 16 people from coming to

25  the United States from Russia as a result of the *Magnitsky*

g842leoA

matter, the government of Russia banned 16 people from coming

from the United States to Russia.  It was an interesting

collection of people.  It included John Yoo, it included Preet

Bharara, and it also included me.  So I thought about that when

I first got this case and concluded there was no basis for my

recusing myself on that ground, but I just mentioned it for the

record.

        All right.  Anything else?

        MR. WEIGEL:  Just, in particular, my colleague took

the position that the Court of Appeals had said that they have

never seen a case where this has been upheld.  I would just

note that the cases that we are looking at, which were the

*Chanko* case, which involved ABC taking a video of somebody in

extremis and airing it, or the *Marmelstein* case, which involved

First Amendment issues and a rabbi and parishioner, in neither

of those cases was there any illegality, and I would submit

that --

        THE COURT:  You are not saying, are you, that an

allegation of illegality by itself is sufficient to state a

cause of action under this particular tort.

        MR. WEIGEL:  No.  What I am saying is that cases

involving illegality directed at the plaintiff for a continuous

period of time, as cited by the *Nader* case in the Court of

Appeals, are in fact actionable under the statute.

        THE COURT:  Okay.  Very good.

g842leoA

 1                Let me hear from defense counsel in rebuttal.

 2                MR. HECKER:  Your Honor, just briefly, because I think

 3      the critical point is the one your Honor just made.  There are

 4      a number of cases that establish that illegal conduct itself

 5      doesn't buy you an intentional infliction of emotional distress

 6      claim.  I think the *Saleh* case, which is cited in our papers,

 7      it was in front of Judge Forrest, and there the allegations

 8      were that government agents had tried to coerce someone in

 9      intensive interrogation to cooperate in a terrorism

10      investigation by conspiring to deny him his permanent residency

11      and threatening to kill him, and that that wasn't sufficiently

12      extreme and outrageous.  There the power dynamic of someone

13      being interrogated by FBI agents, I would submit, is far more

14      obviously at risk of causing extreme emotional distress than

15      what has been described here.  And the *Marmelstein* case, which

16      involved allegations that an orthodox rabbi had abused a

17      position of trust, had a relationship with a congregant and

18      then had threatened to have her put in a straitjacket if she

19      disclosed the relationship, that wasn't held to be sufficient,

20      and that clearly constitutes criminal conduct.  So I don't

21      think that the emphasis that plaintiff has put on that

22      particular issue is actually borne out in the case law.  I

23      haven't seen a single statement suggesting otherwise.  And I

24      don't hear counsel to be making that argument.  But I think it

25      is important that the courts have actually said explicitly that

g842leoA

illegal conduct itself doesn't get you over the bar.

So, look, I think the context here is quite important and I do think the meeting arranged by counsel at Gibson Dunn really puts the lie to any inference that their client had been the subject of an extortion racket and then they invite him for additional conversation about the debt, which is what the complaint says.  They brought him in to discuss the alleged debt, and then they pressed him again for evidence after that meeting.  According to the complaint, evidence was provided. And it doesn't take much imagination to understand that the theory here is that Mr. Varshavsky, acting through the entity that's listed in loan documents that have been attached to the complaint, is claiming that Mr. Leontiev has control of the money and that he controlled the entities that were the borrowers of these loans.  That's the only inference from the back and forth that is laid out in the complaint and the documents attached to the complaint.

So Mr. Leontiev wasn't picked out at random because he was vulnerable, and they don't allege that he was.  He knew full well what was being ask discussed in terms of the debt. And the debate was a legal one about whether he could be held personally liable.  Now, I understand we have denied them in the answer, of course, the claims about the threats that were made, but for purposes of this motion, accepting them as true, I understand that that's the issue that they want to focus on,

g842leoA

but the context of experienced commercial actors discussing a

debt really, I think, is the death knell for the claim in this

context.

THE COURT:  All right.  Well, thanks to both counsel

for an excellent argument.

Counsel are given leave to send to me by e-mail by

close of business tomorrow up to ten additional citations per

side.  I hope you won't need that many, but if you want that

many, you can have it, bearing on the issues discussed today.

No argument, not even a parentheses, just the citations.  If

you want, I will allow you the jump page to the page you think

is relevant, and then I will try to decide this promptly, not

least because we have another argument coming up I think in mid

September or something like that.

Very good.  Thanks so much.

– – –