UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                   :

SERGEY LEONTIEV,               :

             Plaintiff,       :     No. 16-cv-03595 (JSR)

    -against-           :     **ORAL ARGUMENT REQUESTED**

ALEXANDER VARSHAVSKY,   :     **CONFIDENTIAL - FILED UNDER SEAL**

             Defendant.   :

                                     :
------------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Plaintiff Sergey Leontiev*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 3

    I.    The Parties ....................................................................................... 3

    II.    PRBB's Business Model ................................................................. 4

    III.    The Alleged Loans .......................................................................... 5

        A.    Avilon AG's Loans to Ambika ............................................ 5

        B.    Promissory Notes Issued by ZAO FG Life and Vennop ........... 7

    IV.    Mr. Varshavsky's Collection Efforts and Failed Settlement Negotiations ............. 8

    V.    Procedural History ......................................................................... 9

STANDARD OF REVIEW .................................................................................. 11

ARGUMENT ...................................................................................................... 12

    I.    Mr. Varshavsky Has No Rights Under the Alleged Loans ................... 12

    II.    Mr. Leontiev is Not Personally Liable for the Alleged Loans ............... 14

        A.    Mr. Leontiev is Not Liable for Any Debts of Ambika and Vennop Under Cypriot Law ......................................... 14

        B.    Mr. Leontiev is Not Liable for Any Debts of ZAO FG Life Under Russian Law .............................................. 21

    III.    Mr. Leontiev Has Not Assumed or Accepted Responsibility for the Alleged Loans ...................................................... 23

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

Page

**Cases**

*Ben Hashem v. Ali Shayif*,
  [2008] EWHC (Fam) 2380 ........................................................................14, 20

*Castellotti v. Free*,
  138 A.D.3d 198 (1st Dep't 2016) ..........................................................25

*Chevron Corp. v. Salazar*,
  No. 11-cv-3718 (LAK), 2011 WL 3628843 (S.D.N.Y. Aug. 17, 2011)................................12

*CILP Assoc., L.P. v. PriceWaterhouse Coopers LLP*,
  735 F.3d 114 (2d Cir. 2013)..................................................................12

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l.*,
  790 F.3d 411 (2d Cir. 2015)...................................................................12

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l.*,
  142 A.D.3d 833 (1st Dep't 2016) ...........................................................13

*Guilbert v. Gardner*,
  480 F.3d 140 (2d Cir. 2007)...................................................................11

*Gural v. Drasner*,
  114 A.D.3d 25 (1st Dep't 2013) .............................................................25

*Hallock v. New York*,
  64 N.Y.2d 224 (1984) ...........................................................................19

*Hart v. RCI Hosp. Holdings, Inc.*,
  90 F. Supp. 3d 250 (S.D.N.Y. 2015)......................................................24

*Int'l Paper Co. v. Suwyn*,
  966 F. Supp. 246 (S.D.N.Y. 1997) .........................................................25

*Knight v. U.S. Fire Ins. Co.*,
  804 F.2d 9 (2d Cir. 1986)........................................................................22

*Koch v. Greenberg*,
  14 F. Supp. 3d 247 (S.D.N.Y. 2014), *aff'd*, 626 F. App'x 335 (2d Cir. 2015)......................24

*Matter of Lou Atkin Castings v. M. Fabrikant & Sons*,
  216 A.D.2d 111 (1st Dep't 1995) ...........................................................24

*Prest v. Petrodel Resources Ltd.*
  [2013] UKSC 34 ..................................................................................15, 16

# TABLE OF AUTHORITIES
## (continued)

Page

*Roe v. City of Waterbury*,
542 F.3d 31 (2d Cir. 2008)........................................................................11

*Roos v. Aloi*,
127 Misc. 2d 864 (Sup. Ct. Nassau Cty. 1985)...........................................25

*Schoeps v. Museum of Modern Art*,
594 F. Supp. 2d 461 (S.D.N.Y. 2009).........................................................12

*SCR Joint Venture L.P. v. Warshawsky*,
559 F.3d 133 (2d Cir. 2009)........................................................................11

*Sonders v. Roosevelt*,
64 N.Y.2d 869 (1985) .................................................................................25

*In re Tyson*,
433 B.R. 68 (S.D.N.Y. 2010)....................................................15, 16, 19, 20

*Vision Entm't, LLC v. Mary Jane Prods., Inc.*,
13 Civ. 4215 (AT), 2014 WL 5369776 (S.D.N.Y. Oct. 17, 2014) ...........18

*Walker v. Knowles*,
15 Misc. 3d 1124(A) (Sup. Ct. N.Y. Cty. 2007).........................................25

*Woolfson v. Strathclyde Reg'l Council*,
[1978] SC 90 (HL) 96 .................................................................................16

*Yukong Line Ltd. v. Rendsburg Invs. Corp. of Liberia*,
[1998] 1 W.L.R. 294 (Q.B.D.) ....................................................................15

**Statutes**

N.Y. Gen. Oblig. Law § 5-701(a)(2) ..............................................................24

**Rules**

Fed. R. Civ. P. 8(b)(4).......................................................................................1

Fed. R. Civ. P. 56(a) .......................................................................................11

Fed. R. Evid. 408 ............................................................................................24

Plaintiff Sergey Leontiev ("Plaintiff" or "Mr. Leontiev") respectfully submits this memorandum of law in support of his motion for summary judgment on the Complaint's first cause of action for a declaratory judgment.[1]

## PRELIMINARY STATEMENT

Despite the coy position taken by Mr. Varshavsky in his opposition to Plaintiff's motion for judgment on the pleadings, Mr. Varshavsky now admits that Mr. Leontiev owes him nothing.  SOF ¶¶ 277–78 ("Q. Are you personally owed any money by Mr. Leontiev?  A. No."). Mr. Leontiev did not borrow any money from Mr. Varshavsky.  Mr. Leontiev did not guarantee any loan for Mr. Varshavsky.  Mr. Varshavsky and the alleged lenders here never discussed the investments with Mr. Leontiev prior to August 2015.  Mr. Varshavsky admitted at his deposition that he has no rights under the loan agreements, promissory notes and guarantees at issue in this case (the "Alleged Loans"), and that the loans were never assigned to him.[2]  This admission was repeated in response to Plaintiff's Requests for Admission.  Mr. Varshavsky knew from the very start that he had no right to collect any money from Mr. Leontiev.  Yet, Mr. Varshavsky denied that fact when he answered the Complaint in this action back in June 2016 and again when he amended his answer in August 2016.

Had Mr. Varshavsky complied with his obligations under Federal Rule of Civil Procedure 8(b)(4) and admitted in his Answer—instead of at his deposition just eight days before

---

[1]  All references to "Compl. ¶ _" are to the Complaint filed in this action on May 13, 2016 (Dkt. 1).   All references to "Ans." are to the Amended Answer filed on August 26, 2016 (Dkt. 27).  All references to "SOF" are to Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, dated January 27, 2017.

[2]  SOF ¶¶ 132, 143 ("Q. Is any part of that $29.6 million owed to you personally?  A. No.  Q. Do you have any assignment from Avilon of any rights to collect that 29.6 million? A. No. . . . Q. Are you owed any portion of that $28 million personally?  A. No.  Q. Do you have any assignment from Mr. Avagumyan to pursue the claim for the $28 million?  A. No.").

the end of discovery—that the statement that "Mr. Leontiev owes Mr. Varshavsky nothing" was true, the admission could have been considered by the Court in deciding Mr. Leontiev's motion for judgment on the pleadings.  Dkt. 46 ("MJOP Order") at 8 ("[T]he only question . . . is whether Defendant's admissions . . . resolve the dispute as a matter of law.").  By intentionally denying a statement he knew to be true, Mr. Varshavsky engaged in a blatant "tactic[] . . . to keep Mr. Leontiev embroiled in the present suit."  *Id.* at 17.  He also wasted the Court's time and resources.  Mr. Varshavsky does not have—and never had—any claim against Mr. Leontiev.

Even if Mr. Varshavsky had some right to enforce the Alleged Loans, the undisputed evidence shows that Mr. Leontiev cannot be held liable for the alleged debts of the borrowers.  The loans at issue were arm's-length transactions entered into by sophisticated parties, and the lenders benefitted substantially from the high interest rates provided for in the relevant agreements.  In most instances, the lenders bargained for and received guarantees from Probusinessbank ("PRBB" or the "Bank").  In no instance did the lenders bargain for or receive a guarantee from Mr. Leontiev.  Having received high interest rates to bear the risk that the borrowers and/or PRBB as the sole guarantor might fail, Mr. Varshavsky now seeks to change the terms of the commercial deal that the lenders negotiated.  But the fact that PRBB's license was improperly revoked does not allow the lenders to transform the Bank's guarantee into a personal guarantee from Mr. Leontiev.  The lenders could have made a recourse loan to Mr. Leontiev, but they did not, and instead gladly accepted the high rate of return on the deal that was documented.

Mr. Varshavsky is unable to prove that he is personally entitled to any recovery under the Alleged Loans or that Mr. Leontiev personally owes any money under those agreements.  Consequently, summary judgment in Mr. Leontiev's favor is appropriate, and the Court should

issue a declaration that Mr. Leontiev owes nothing to Mr. Varshavsky under the Alleged Loans.

**STATEMENT OF FACTS**

**I.      The Parties**

Plaintiff Sergey Leontiev is a Russian entrepreneur and businessman.  SOF ¶ 1.  In 1993, Mr. Leontiev and his longtime friend Alexander Zheleznyak founded PRBB, a commercial bank that provided a full range of banking services to corporate and individual clients.  SOF ¶ 2.

In 2014 and 2015, PRBB received clean opinions from its auditor, Deloitte & Touche CIS, which found that the Bank was in compliance with the requirements and recommendations of the Central Bank of the Russian Federation.  SOF ¶ 6.  Nevertheless, in August 2015, the Central Bank revoked PRBB's license, claiming that the Bank was insolvent.  SOF ¶ 7.  The license revocation was part of the Central Bank's ongoing effort to benefit state-owned banks—in 2015 alone, nearly 100 banks had their licenses revoked.  SOF ¶¶ 8–9.

Until the Central Bank revoked PRBB's license in August 2015, Mr. Leontiev was the Bank's President and Chairman of the Board of Directors and served on its Management Board. SOF ¶ 10.  Separately, in 2011, Mr. Leontiev founded a company called Wonderworks Investments Limited ("Wonderworks"), ████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████

Defendant Alexander Varshavsky is a Russian-born businessman who owns multiple homes and has shares in several businesses worth millions of dollars.  SOF ¶ 18.  Mr. Varshavsky serves as President of Avilon Automobile Group ("Avilon AG"), a distributor of luxury cars in Russia with over $2 billion in annual sales, which is part of a larger group of companies comprising the Avilon Group.  SOF ¶¶ 19–21.

Mr. Varshavsky and his companies were longtime clients of PRBB and received ████

3

█ corporate banking services, including financing ██████████ .  SOF ¶ 22.  In 2014 and in July 2015, right before the Bank was seized, Sanbay Holdings Limited, an entity affiliated with the Avilon Group, received over 36 million Euros from entities affiliated with PRBB.  SOF ¶¶ 28–29.  None of Defendant's witnesses could explain what the loan was for or state that it was paid back.  SOF ¶ 30.

## II.    PRBB's Business Model

Mr. Leontiev's management philosophy was to provide wide-ranging autonomy and discretion to PRBB's managers who headed individual business units.  SOF ¶ 34.  Each business unit proposed its own strategies and products.  SOF ¶ 36.  Those proposals were then submitted to PRBB's Treasury, which used a dynamic model developed by Mr. Leontiev to identify the best business proposal or products.  *Id.*  The best products were then presented to the Bank's financial and strategy departments, and then to the management board for final approval.  SOF ¶ 37.  After the products were approved, each manager and the employees under his or her supervision were responsible for selecting products to present to their clients, based on their needs and demands, and compensation was based on a profit-sharing model to incentivize the managers' sound judgment.  SOF ¶ 38.  While Mr. Leontiev developed the rules for the Treasury's models, he was not involved in and did not interfere with day-to-day decision-making of the business units or Treasury managers.  SOF ¶ 36.

One of the products developed through this system was a high-interest rate investment, commonly referred to in the emerging markets as a "wealth management product," that gave customers the opportunity to receive a rate of return of between 10 and 15%—a significantly higher rate than that available from a regular bank deposit.  SOF ¶ 39.  The funds raised through this product were deposited into PRBB's Treasury, invested into PRBB's capital, and used for

various Bank-related purposes, such as growing a retail loan portfolio, financing development projects, and managing regulatory capital ratio requirements.  SOF ¶ 41.

To structure these products and facilitate other Bank projects, PRBB's business unit managers utilized a number of off-balance sheet entities in Russia and other jurisdictions, including the borrower entities at issue in this litigation.  SOF ¶¶ 42–43.  These off-balance sheet entities were set up and administered by an operations group within PRBB.  SOF ¶ 42.  Though Mr. Leontiev was the President of PRBB, he did not create these companies, did not instruct any operations group employees to create these companies, and had no role in their management. SOF ¶ 45.  The PRBB operations group which set up these entities, led by a senior manager named Alexandra Vyulkova, had complete discretion to manage and enter into transactions on behalf of these companies.  SOF ¶ 44.  Mr. Leontiev had minimal contact with Ms. Vyulkova and did not direct her with respect to any of her job responsibilities, including responsibilities pertaining to the off-balance sheet entities.  SOF ¶ 46.

## III.    The Alleged Loans

### A.    Avilon AG's Loans to Ambika

In 2008, in the midst of the global financial crisis, Mr. Leontiev discussed with PRBB's business unit managers offering wealth management products to their clients in order to raise capital for the Bank.  SOF ¶ 47.  In or around December 2008, Mr. Zheleznyak approached Mr. Varshavsky, the President of Avilon AG, to present this wealth management product as an investment opportunity.  SOF ¶ 48.  Following discussions with Mr. Zheleznyak, Mr. Varshavsky agreed on behalf of Avilon AG to invest $19.9 million at an annual interest rate of 14%.  SOF ¶¶ 49, 59.  Mr. Varshavsky was aware that the invested funds were to be used by PRBB to "finance the bank's construction projects," make "interest payments on other loans,

loan repayments and expenses," and for "other business."  SOF ¶ 55.

Irina Monakhova, the Avilon Group's Financial Director, then discussed the details of the agreement with Yanna Krisiuk, one of the Avilon Group's relationship managers at PRBB.  SOF ¶¶ 40, 50–51.  Ms. Monakhova and members of Avilon Group's legal and financial departments reviewed the terms of the investment, including the identity of the borrower, Ambika Investments Limited ("Ambika"), a Cypriot company, and the schedule of interest payments. SOF ¶¶ 52, 221.

On December 18, 2008, Ms. Monakhova and the Avilon Group's Chief Accountant signed a one-year loan agreement on behalf of Avilon AG and the company transferred $19.9 million to Ambika ("2008 Loan").  SOF ¶ 58.  On September 1, 2011, Avilon AG invested an additional $6.625 million in Ambika at an annual interest rate of 11% ("2011 Loan").  SOF ¶ 97.[3]  PRBB guaranteed the repayment of the 2008 and 2011 Loans.  SOF ¶¶ 62, 99.  Neither Mr. Varshavsky, nor Ms. Monakhova, nor anyone affiliated with Avilon AG spoke to Mr. Leontiev prior to making these investments.  SOF ¶¶ 56, 96.  Nor did Mr. Varshavsky or anyone affiliated with Avilon AG seek a guarantee from Mr. Leontiev for the loans to Ambika.  SOF ¶¶ 64, 101.

Each of the loan agreements was for a one-year term.  SOF ¶¶ 59, 97.  Nothing in the loan agreements restricted Ambika's use of the funds.  SOF ¶¶ 60, 95.  The loan agreements provided that any amendments thereto must be in writing.  SOF ¶¶ 61, 98.  Avilon AG chose to reinvest its money each year and renegotiated the terms of the extensions annually, including the interest rate for the upcoming year, the possibility of capitalizing interest into the principal, and the schedule of interest payments.  SOF ¶¶ 73–81, 108–16.  Again, Mr. Leontiev was not

---

[3]  On December 27, 2010, Avilon Plaza, a sister company of Avilon AG, invested $12.25 million in Ambika ("2010 Loan").  SOF ¶ 90.  The 2010 Loan is not at issue in this lawsuit.

involved and never gave a personal guarantee.  SOF ¶¶ 56, 64, 96, 101.  The two loans were renewed annually until December 2014, when the outstanding amount of the 2008 Loan was added to the principal of the 2011 Loan and the 2008 Loan was discharged.  SOF ¶¶ 81–82. Ambika made every scheduled interest payment on the loans until the Central Bank revoked PRBB's license in August 2015, paying a total of approximately $17.4 million to Avilon AG. SOF ¶¶ 83, 117–18.  Avilon AG has not assigned to Mr. Varshavsky its rights under the 2011 Loan, which is the only operative agreement.  SOF ¶ 132.

### B.    Promissory Notes Issued by ZAO FG Life and Vennop

PRBB's wealth management products were also made available to clients via promissory notes.  SOF ¶ 133.  One of these clients was Kamo Avagumyan, Mr. Varshavsky's business partner and co-owner of the Avilon Group.  SOF ¶¶ 23, 133.  Starting in approximately 2010, Mr. Avagumyan transferred large amounts in cash to Ms. Krisiuk or Natalia Abramova, another Avilon Group relationship manager at PRBB, in exchange for promissory notes issued by ZAO Financial Group "Life" ("ZAO FG Life"), a Russian corporation, in the name of Mr. Avagumyan's son, Karen Kamoevich Avagumyan.  SOF ¶¶ 40, 133, 135–36, 231.  Many of the notes were guaranteed by PRBB.  SOF ¶¶ 145–92.  None of the notes was personally guaranteed by Mr. Leontiev.  SOF ¶ 200.  The cash received from Mr. Avagumyan was deposited into PRBB's Treasury and was used for various bank projects.  SOF ¶ 41.  Neither Kamo nor Karen Avagumyan ever discussed the promissory notes—or any other subject—with Mr. Leontiev prior to investing in the wealth management products, nor did they request that Mr. Leontiev guarantee repayment of the notes.  SOF ¶¶ 134, 137.

The promissory notes were issued for one-year terms with interest rates between 10 and 11%.  SOF ¶ 138.  Depending on his financial needs at the time of maturity, Kamo Avagumyan

rolled over some investments and withdrew others.  SOF ¶ 140.  Until PRBB's license was revoked, Kamo Avagumyan received regular interest payments on these investments.  SOF ¶¶ 141-42.  In 2015, several of the ZAO FG Life notes were rolled over and re-issued by Vennop Trading Limited ("Vennop"), a Cypriot company.  SOF ¶¶ 193–99, 229.

After PRBB's license was revoked, Mr. Varshavsky began demanding payment on notes issued to Karen Avagumyan in the principal amount of approximately $25.9 million ($21.2 million for notes issued by ZAO FG Life and $4.7 million for notes issued by Vennop).  SOF ¶ 144.  Karen Avagumyan has not assigned his claims, if any, under the notes to Mr. Varshavsky.  SOF ¶ 143.

Mr. Varshavsky also demanded payment on notes issued by ZAO FG Life in the name of Igor Renich with a principal amount of approximately $22.4 million, and notes issued by Vennop in the name of Diana Karapetyan with a principal amount of $4 million.  SOF ¶¶ 201, 209.   Yet Mr. Varshavsky admitted that he does not have a legal assignment of any of Mr. Renich's or Ms. Karapetyan's claims under their notes.  SOF ¶¶ 208, 219.

## IV.    Mr. Varshavsky's Collection Efforts and Failed Settlement Negotiations

After PRBB's license was revoked, Mr. Varshavsky persistently demanded repayment of amounts he claimed were owed to Avilon AG, Mr. Avagumyan, Mr. Renich, and Ms. Karapetyan by Ambika, ZAO FG Life, and Vennop.  SOF ¶ 244.  A few days after the Bank's license was revoked, Mr. Varshavsky told Mr. Zheleznyak to bring Mr. Leontiev to a meeting at the Avilon Group's offices in Moscow.  *Id.*  Mr. Leontiev attended the meeting to try to mediate the dispute and relieve the pressure being placed on Mr. Zheleznyak by Mr. Varshavsky.  SOF ¶ 245.  The Moscow meeting ended with no agreement on any material terms.  SOF ¶ 249.

Approximately one week later, Mr. Varshavsky, Mr. Zheleznyak, and Mr. Leontiev met

in London.  SOF ¶ 250.  Because he feared for his safety, Mr. Leontiev recorded the meeting.
SOF ¶ 251.  Although Mr. Leontiev did not believe that he had any personal liability with respect
to the Alleged Loans, he hoped to negotiate a resolution to the dispute.  SOF ¶ 252.  The parties
failed to reach agreement at the London meeting on any material terms, including the amount
owed or a schedule for payment.  SOF ¶ 253.

In September 2015, Valkera Investments Limited ("Valkera"), one of the off-balance
sheet entities set up and operated by Ms. Vyulkova, settled the 2010 Loan from Avilon Plaza to
Ambika for which Mr. Varshavsky was also demanding repayment.  SOF ¶¶ 93, 254, 256.  In
exchange for a $17 million payment, Valkera received an assignment of Avilon Plaza's rights
under the 2010 Loan, which resolved the dispute with respect to that loan.  SOF ¶¶ 93, 256.

Over the next few months, Mr. Varshavsky and others representing Avilon AG pressured
Mr. Zheleznyak to persuade Mr. Leontiev to settle the dispute over the additional $83 million
that Mr. Varshavsky continued to demand.  SOF ¶ 257.  Ms. Monakhova and Avilon AG's
general counsel, Vitaliy Popov, prepared several draft agreements and schedules, but they were
never agreed to or signed by any of the parties.  SOF ¶¶ 258–60.  On January 20, 2016, Mr.
Varshavsky's counsel provided to Mr. Leontiev's counsel the loan agreements, guarantees, and
promissory notes listed in Appendices A through C to the Complaint.  SOF ¶ 262.

At no time did the parties reach an agreement over basic items such as the amount owed,
a payment schedule, potential collateral, or the structure of any transaction.  SOF ¶¶ 259, 263.

## V.    Procedural History

Mr. Leontiev filed this action on May 13, 2016, seeking a declaratory judgment that he
did not owe Mr. Varshavsky any money pursuant to the Alleged Loans and damages for
intentional infliction of emotional distress.  SOF ¶ 264.  Mr. Varshavsky successfully moved to

dismiss the tort claim, but filed an answer to the declaratory judgment claim.  SOF ¶ 265.

On August 3, 2016, Mr. Leontiev moved for judgment on the pleadings, arguing that Mr. Varshavsky had no legal right to seek repayment of the Alleged Loans because he was not a party, third-party beneficiary, or assignee to the loan agreements or promissory notes, and that Mr. Leontiev had no liability for the Alleged Loans as a matter of Cypriot or Russian veil-piercing law.  SOF ¶ 267.  Mr. Varshavsky filed an amended answer and opposed the motion, but refused to state whether he had an assignment of the claims at issue.  SOF ¶ 268.  This Court denied Mr. Leontiev's motion on September 23, 2016 by a "bottom line" order, and issued a written decision dated December 4, 2016.  SOF ¶ 270.  The Court held that because a defendant in a declaratory judgment claim bears no burden to plead facts in his answer, the pleadings left open the possibility of Mr. Leontiev's liability under a veil-piercing theory.  MJOP Order at 11-12.  With respect to Mr. Varshavsky's capacity to seek repayment, the Court recognized that Mr. Varshavsky's refusal to acknowledge whether he had an assignment of the claims was likely a "tactic[] . . . to keep Mr. Leontiev embroiled in the present suit," but that the pleadings did not eliminate the possibility that such an assignment could be produced.  *Id.* at 17.

On January 5, 2017, eight days before the end of discovery, Mr. Varshavsky admitted in his deposition that he never had an assignment of the Alleged Loans or any other legal basis to seek repayment of those loans or notes.  SOF ¶ 274.  Mr. Varshavsky also confirmed that Mr. Leontiev owes him no money.  SOF ¶ 277.  Mr. Varshavsky further admitted that the allegation contained in the first sentence of paragraph 4 of the Complaint was true:  "Q. Is the statement that 'Mr. Leontiev owes Mr. Varshavsky nothing' a true statement?  A. Yes."  SOF ¶ 278.[4]

---

[4]    In his earlier Answer and Amended Answer, Mr. Varshavsky had denied this allegation.
       SOF ¶ 269.  Had Mr. Varshavsky timely admitted the assertion in the Complaint as required

On January 13, 2017, the last day of discovery, Mr. Varshavsky admitted, in his response to Plaintiff's Requests for Admission, that: (1) "Avilon[ AG] did not assign [him] its rights under the loans identified in Appendix B to the Complaint"; (2) "Igor Renich did not assign [him] his rights under the promissory notes identified in Appendix A to the Complaint"; (3) "Diana Karapetyan did not assign [him] her rights under the promissory notes identified in Appendix A to the Complaint"; and (4) "Karen Avagumyan did not assign [him] his rights under the promissory notes identified in Appendix A to the Complaint." SOF ¶ 279.

On November 16, 2016, Avilon AG and Karen Avagumyan—but not Mr. Varshavsky— filed an action in New York state court against Mr. Leontiev for fraudulent conveyance and unjust enrichment arising from the same loan agreements and some of the same promissory notes at issue in this case. SOF ¶ 273.

## STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)). "A 'genuine issue' exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007).

While the moving party bears the initial burden to show there is no genuine dispute as to a material fact, "[w]hen the burden of proof at trial would fall on the nonmoving party, it

---

by the Federal Rules, that admission could have been considered by this Court in resolving Mr. Leontiev's motion for judgment on the pleadings. MJOP Order at 8.

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *CILP Assoc., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (internal citation and quotation marks omitted). "In an action for declaratory judgment, the burden of proof rests on the party who would bear it if the action were brought in due course as a claim for non-declaratory relief." *Schoeps v. Museum of Modern Art,* 594 F. Supp. 2d 461, 463 (S.D.N.Y. 2009) (Rakoff, J.); *Chevron Corp. v. Salazar*, No. 11-cv-3718 (LAK), 2011 WL 3628843 at *7 (S.D.N.Y. Aug. 17, 2011). Thus, the burden of proof rests on Mr. Varshavsky "to prove up the alleged loans, his right to enforce them, and Leontiev's personal liability," MJOP Order at 6, and, thus, he "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment," *CILP*, 735 F.3d at 123 (internal citation and quotation marks omitted). Because Mr. Varshavsky cannot do so, summary judgment in favor of Mr. Leontiev is appropriate.

**ARGUMENT**

## I.   Mr. Varshavsky Has No Rights Under the Alleged Loans

Mr. Varshavsky now admits that Mr. Leontiev owes him nothing. SOF ¶¶ 277–78 ("Q. Are you personally owed any money by Mr. Leontiev? A. No."). Yet in an effort to keep Mr. Leontiev enmeshed in the instant lawsuit, Mr. Varshavsky left it unclear in his court filings whether he was seeking to enforce the Alleged Loans in his personal capacity. MJOP Order at 17–18. Discovery, however, has borne out the unavoidable truth: Mr. Varshavsky has no rights under the Alleged Loans, as an assignee or otherwise, and, thus, he has—and had—no basis on which to demand payment from Mr. Leontiev.

Three circumstances exist in which a person can enforce a loan contract: (1) as a named party; (2) as a third-party beneficiary; or (iii) as an assignee of the lender's rights. *See, e.g.*, *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l.*, 790 F.3d 411, 418 (2d Cir. 2015),

12

refiled in state court and aff'd, *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l.*, 142 A.D.3d 833, 834 (1st Dep't 2016).

It remains undisputed that Mr. Varshavsky is not a named party to or third-party beneficiary of the Alleged Loans.  The underlying guarantees, loan agreements, and promissory notes do not name Mr. Varshavsky as a party or third-party beneficiary.  *See* SOF ¶¶ 58, 62, 72, 75, 84, 97, 99, 108, 119, 144, 201, 209.

Mr. Varshavsky's own admissions unequivocally establish that the Alleged Loans were not assigned to him.  In his response to Plaintiff's Requests for Admission, Mr. Varshavsky admitted that:  (1) "Avilon[ AG] did not assign [him] its rights under the loans identified in Appendix B to the Complaint"; (2) "Igor Renich did not assign [him] his rights under the promissory notes identified in Appendix A to the Complaint"; (3) "Diana Karapetyan did not assign [him] her rights under the promissory notes identified in Appendix A to the Complaint"; and (4) "Karen Avagumyan did not assign [him] his rights under the promissory notes identified in Appendix A to the Complaint."  SOF ¶ 279.  Mr. Varshavsky also testified that he does not have any assignment from Avilon AG or Karen Avagumyan of any rights to collect the money supposedly owed to them under the Alleged Loans.  SOF ¶¶ 132, 143.  Further, no written assignments of the Alleged Loans to Mr. Varshavsky were produced, and Karen Avagumyan confirmed that he did not assign his rights under the notes to Mr. Varshavsky.  SOF ¶ 143.

Indeed, the filing of the state court action by Mr. Varshavsky's counsel on behalf of Avilon AG and Karen Avagumyan demonstrates that it is Avilon AG and Mr. Avagumyan (if anyone) that hold the rights to enforce the loans and notes in their names.

Discovery has confirmed that Mr. Varshavsky has no basis on which to demand payment from Mr. Leontiev.  Accordingly, Mr. Leontiev is entitled to a declaration that Mr. Leontiev does

not owe any money to Mr. Varshavsky under the Alleged Loans.

## II.     Mr. Leontiev is Not Personally Liable for the Alleged Loans

Even if Mr. Varshavsky had rights with regard to the Alleged Loans—he does not—Mr. Leontiev is entitled to a declaratory judgment for a second, independent reason:  Mr. Leontiev is not personally liable for those debts.  Mr. Varshavsky's Amended Answer appears to set forth a theory of liability based on veil-piercing or alter ego liability, stating that Mr. Leontiev is personally liable for the Alleged Loans because he purportedly "owns and/or controls the entities that borrowed the funds" and caused those entities to transfer the borrowed funds to other entities that he owns for his personal use and benefit.  Ans. at 11.  Mr. Varshavsky's vague allegations are not supported by the undisputed facts, nor are they sufficient under the applicable veil-piercing law.

The undisputed evidence shows that Avilon AG and the other lenders knowingly and willingly entered into the Alleged Loans with corporate obligors, did not speak to Mr. Leontiev, and did not obtain a personal guarantee from Mr. Leontiev.  *See supra* at 5–8.  Mr. Leontiev is not liable for the Alleged Loans and there is no justification for piercing the corporate veil under either Cypriot or Russian law.[5]

### A.     Mr. Leontiev is Not Liable for Any Debts of Ambika and Vennop Under Cypriot Law

"Cypriot courts generally follow English law, and English decisions have 'great persuasive authority'" with regard to veil-piercing.  MJOP Order at 10.  Under English law, "ownership and control of a company are not of themselves sufficient to justify piercing the veil."  *Ben Hashem v. Ali Shayif*, [2008] EWHC (Fam) 2380, [159].  In fact, English law places

---

[5]  As this Court has already held, alter ego liability with regard to Ambika and Vennop is governed by Cypriot law, while alter ego liability with regard to ZAO FG Life is governed by Russian law.  *See* MJOP Order at 9.

14

an emphasis on respecting "[l]egal formalisms," and, for this reason, veil-piercing is "quite rare" in English law cases. *In re Tyson,* 433 B.R. 68, 86 (S.D.N.Y. 2010). Parties are entitled to structure their affairs to ensure that legal liability falls on a corporate entity, rather than on its owner. *Prest v. Petrodel Resources Ltd.* [2013] UKSC 34, [34] (judgment of Lord Sumption) ("It is not an abuse to cause a legal liability to be incurred by the company in the first place."). English law recognizes that although the principle of corporate limited liability may cause hardship, "those dealing with one-man companies may, and commonly do, seek to protect themselves by requiring a personal guarantee." *Tyson,* 433 B.R. at 90 (quoting *Yukong Line Ltd. v. Rendsburg Invs. Corp. of Liberia*, [1998] 1 W.L.R. 294, 305 (Q.B.D.)). Here, of course, Avilon AG sought protection by obtaining guarantees from PRBB, but it neither sought nor obtained anything from Mr. Leontiev personally. *See supra* at 6–7.

Despite the difficulty of piercing the corporate veil, this Court identified two circumstances where it may be permitted: (1) the "evasion" branch and (2) the "concealment" branch. MJOP Order at 10, 12 n.1. But the undisputed facts do not warrant veil-piercing under either theory.

Under the "evasion" branch, veil-piercing is allowed "where an individual tries to avoid an existing personal obligation by 'interposing' an entity between himself and the obligation." *Id.* at 12 n.1 (citing *Prest*, [2013] UKSC 34, [28, 35]). Mr. Leontiev cannot be held personally liable under the "evasion" branch because the obligations under the Alleged Loans were never in his name. Instead the Alleged Loans were knowingly entered into directly with the companies— Ambika and Vennop—thus creating an obligation between the lenders and the companies, not Mr. Leontiev. *See Tyson*, 433 B.R. at 94 (noting that "there is no evidence in the record to suggest that either Tyson or the Kentucky Defendants were unaware that Brearly [the company]

15

was their contractual counterparty"). It follows that Mr. Leontiev "did not 'interpose' Ambika and Vennop between himself and the debts to avoid repaying," as he never had any obligation to repay the loans. MJOP Order at 12 n.1. This Court previously recognized that this argument "has some force" (*id.*), and discovery confirms the absence of any evidence that would support liability under the "evasion" branch of veil-piercing.

The "concealment" branch of veil piercing provides that "'receipt by a company will count as receipt by the shareholder if the company received it as his agent or nominee, but not if it received it in its own right.'" MJOP Order at 10 (quoting *Prest*, [2013] UKSC 34, [32]).[6] Thus, "courts may 'pierce the corporate veil only where special circumstances exist indicating that it is a mere façade concealing the true facts.'" *Tyson*, 433 B.R. at 83 (quoting *Woolfson v. Strathclyde Reg'l Council*, [1978] SC 90 (HL) 96). This Court identified four factors that courts consider in determining whether an entity is serving as a "mere façade," such that funds received by the entity will be treated as funds of the individual: (1) "the individual's ownership and control of the entity"; (2) "the circumstances and the source of the receipt of the funds"; (3) "the nature of the [controlled] company's other transactions"; and (4) whether there was "misconduct connected to the corporate form." MJOP Order at 11 (internal citations and quotation marks omitted). An analysis of these factors demonstrates that Mr. Leontiev is not personally liable for the debts of Ambika and Vennop:

*(1) Individual's Ownership and Control of the Entity*. There is no evidence that Mr. Leontiev owns Ambika or Vennop, or that Mr. Leontiev personally exercised control over these entities. *See Tyson*, 433 B.R. at 93 ("the Court has located no support in English law for the

---

[6] Technically, as Lord Sumption noted, the "concealment" principle "does not involve piercing the corporate veil at all," but merely looking behind the corporate façade "to discover the facts which the corporate structure is concealing." *Prest*, [2013] UKSC 34, [28].

proposition that parties who are legally unrelated to the corporate entity may be held responsible for that entity's liabilities, at least in the absence of specific statutory authority").  PRBB managers, led by Ms. Vyulkova, set up these entities and had complete discretion to manage them.  *See supra* at 5.  Mr. Leontiev had minimal contact with Ms. Vyulkova and did not direct her with respect to any of her job responsibilities, including those pertaining to the off-balance sheet entities.  *See supra* at 5.  Mr. Leontiev was not involved in the operations or management of Ambika and Vennop.  *See supra* at 5.

Consistent with his overall management style, Mr. Leontiev was not directly involved in the offering of wealth management products through companies such as Ambika and Vennop. *See supra* at 4–5.  Mr. Leontiev had no involvement in the negotiations surrounding Avilon AG's initial investment in the wealth management products or the annual amendments to the underlying loan documents.  *See supra* at 5–7.  Avilon AG negotiated the 2008 and 2011 Loans, as well as the annual extensions, directly with PRBB employees, and had no interaction with Mr. Leontiev throughout the negotiations.  *See supra* at 5–7.  Nor did Mr. Leontiev have any involvement in the promissory notes issued to Mr. Avagumyan or Ms. Karapetyan by Vennop. *See supra* at 7–8.

None of Defendant's witnesses, whether connected to Avilon AG or the other lenders, testified that they had any contact with Mr. Leontiev over the seven years that the Alleged Loans were in existence before PRBB's license was revoked.  *See supra* at 6–7.

<u>(2) Circumstances and the Source of the Receipt of the Funds</u>.  The circumstances surrounding the loans between Avilon AG and the other lenders, on the one hand, and Ambika and Vennop, on the other hand, demonstrate that these were arm's-length transactions entered into by and between sophisticated parties, which are "hallmarks of legitimacy."  MJOP Order at

12.  The terms of each transaction were negotiated and documented in a written, signed agreement.  *See supra* at 6.  In fact, Avilon AG and the other lenders negotiated highly favorable rates of return, ranging between 10 and 15%, on the investments.  *See supra* at 6–7.  The loan documents and notes state on their face that the obligors were Ambika and Vennop, not Mr. Leontiev.  SOF ¶¶ 58, 62, 72, 75, 84, 97, 99, 108, 119, 144, 201.  And where the lenders negotiated for guarantees, those guarantees were provided by PRBB, not by Mr. Leontiev.  *See supra* at 6–7.  Mr. Varshavsky knew that funds were being "used by the bank to . . . finance the bank's construction projects, . . . interest payments on other loans, loan repayments and expenses, . . . bad debts purchase and costs of arbitrage."  SOF ¶ 55.  The Alleged Loans were just a piece of the extensive relationship between the Avilon Group and PRBB.  *See supra* at 3-4.

Any argument that Mr. Zheleznyak or others of PRBB told the lenders that Ambika was controlled by Mr. Zheleznyak and Mr. Leontiev, and that, as a result, the agreements were with them personally and/or guaranteed by them personally is both inadmissible hearsay and legally irrelevant.  What is clear from the evidence is that Avilon AG and the other lenders are sophisticated business parties who knew how to negotiate for and obtain a guarantee.  They did not seek such a guarantee from Mr. Leontiev personally, and Mr. Varshavsky cannot now rewrite the express terms of the Alleged Loans—which explicitly state that they can only be amended by a signed writing—to hold Mr. Leontiev responsible for the obligations under these agreements.  *See supra* at 6–7.

Even if Mr. Zheleznyak or Ms. Krisiuk *had* represented to Mr. Varshavsky or others that Mr. Leontiev personally guaranteed the Alleged Loans, such statements cannot bind Mr. Leontiev.  An "agent cannot by his own acts imbue himself with apparent authority" to bind the principal.  *Vision Entm't, LLC v. Mary Jane Prods., Inc.*, 13 Civ. 4215 (AT), 2014 WL 5369776,

at *3 (S.D.N.Y. Oct. 17, 2014) (quoting *Hallock v. New York*, 64 N.Y.2d 224, 231 (1984)).

"Apparent authority is created by words or conduct *of the principal*, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction." *Id.* (emphasis added) (internal citation and quotation marks omitted).  There is no evidence that Mr. Leontiev took any actions or made any statements to Mr. Varshavsky, others at Avilon AG, or any of the other lenders at the time the Alleged Loans were negotiated and signed—or thereafter—indicating that Mr. Zheleznyak or Ms. Krisiuk (or anyone else) were authorized to act as his representative in his personal capacity.

   *(3) Nature of the Controlled Company's Other Transactions*.  There is no evidence that the nature of Ambika's and Vennop's other transactions warrants piercing the corporate veil. The only relevant consideration is whether the corporate form was being used to conceal wrongdoing *at the time the loans were made*. *Tyson*, 433 B.R. at 87 n.33.  And there is no evidence of any wrongdoing by anyone at the time the Alleged Loans were entered into.  But even considering later developments, Mr. Varshavsky has failed to adduce any evidence that Mr. Leontiev "secretly syphoned off and pocketed the cash" (MJOP Order at 4) loaned to Ambika and Vennop. ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

   [7]  Mr. Varshavsky also complains about loans between Wonderworks and other "Cloud Entities," including Vermenda Holdings Ltd., Finbay Group Ltd., Greenex Trading Limited,

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

The evidence does show the full and regular performance of the borrowers and/or PRBB under the Alleged Loans.  Ambika made every scheduled interest payment on the 2008 and 2011 Loans until the Central Bank revoked PRBB's license in August 2015, paying a total of approximately $17.4 million to Avilon AG.  *See supra* at 7.  Similarly, Kamo Avagumyan testified that he received regular interest payments on the promissory notes issued in his son's name, including notes issued by Vennop.  *See supra* at 8.  According to the 2014 financial statements of PRBB audited by Deloitte & Touche CIS, Ambika was owed approximately $83 million in subordinated debt by PRBB at year end 2014—the last financial statement available before the Bank was seized—more than enough to pay back Avilon AG if the Bank could have paid back that debt.  SOF ¶ 223.  As for Vennop, Mr. Varshavsky has presented no evidence at all concerning its activities.

    *(4) Whether There was Misconduct Connected to the Corporate Form*.  Finally, the Court cannot pierce the corporate veil unless it finds that Mr. Leontiev committed an impropriety that was "linked to the use of the company structure to avoid or conceal liability."  *Ben Hashem*, [2008] EWHC (Fam) 2380, [161]-[162].  There is no evidence that Mr. Leontiev engaged in any activity, let alone misconduct, connected to *the use of* Ambika or Vennop—as distinct from their activities, *see Tyson*, 433 B.R. at 87—for the purpose of avoiding or concealing liability.

                    *       *       *

---

and Dunning Finance Inc. (Ans. at 18 ¶ 16), ████████████████████████████████
██████████████████████████████████████

The undisputed facts of this case do not permit piercing the veil under Cypriot law.  Mr. Leontiev is entitled to summary judgment in his favor and a declaratory judgment that he is not personally liable for Ambika's and Vennop's purported obligations under the Alleged Loans.

**B.     Mr. Leontiev is Not Liable for Any Debts of ZAO FG Life Under Russian Law**

It is undisputed that ZAO FG Life owes nothing to Mr. Varshavsky or his company Avilon AG.  Moreover, Mr. Leontiev cannot be held personally liable for ZAO FG Life's obligations to Messrs. Avagumyan and Renich under any of the three potential Russian law theories identified by this Court.  MJOP Order at 13–16.

First, as a general matter, Russian law does not recognize veil-piercing or "alter ego" liability except where the company at issue is in formal bankruptcy proceedings.  Declaration of Yuri Monastyrsky ("Monastyrsky Decl.") ¶¶ 3–4.  Under Article 10 of Russia's Insolvency Law, a controlling individual can be held liable for the debts of a controlled entity only where he *causes* the entity to enter bankruptcy.  *Id.* ¶ 8.  A party seeking to impose personal liability on a shareholder, therefore, must establish both the fault of the controlling individual and causation between his actions and the entity's bankruptcy.  *Id.* ¶¶ 9–12.

Here, there is simply no evidence that Mr. Leontiev *caused* ZAO FG Life to enter bankruptcy.  As an initial matter, ZAO FG Life is not *in* bankruptcy proceedings; rather, the entity was voluntarily liquidated in mid-2015, and remains in liquidation now.[8]  SOF ¶¶ 234-35.

_____

[8]  On April 1, 2015, ZAO FG Life filed a notice of voluntary liquidation and it was formally dissolved on August 5, 2015.  SOF ¶¶ 234-35.  Mr. Leontiev was not involved in the decision to liquidate ZAO FG Life and did not review or sign any liquidation documents.  SOF ¶ 236.  On August 23, 2016—three weeks after Mr. Leontiev filed his motion for judgment on the pleadings—a complaint purportedly signed by one Andrei Arminayts was filed alleging that the liquidation balance sheet of ZAO FG Life did not properly reflect an outstanding obligation to Mr. Arminayts.  SOF ¶ 237.  On the basis of this complaint, the Federal Tax Service reversed the voluntary liquidation.  SOF ¶ 238.  While this Court premised its denial

Russian law does not permit the imposition of liability on a controlling shareholder in such non-bankruptcy liquidation proceedings.  Monastyrsky Decl. ¶¶ 4–5.  But more fundamentally, even if ZAO FG Life were to be taken into a hypothetical bankruptcy in the future, there is simply no evidence to suggest that any action *by Mr. Leontiev* caused that bankruptcy.

Even if Mr. Varshavsky was able to surmount these hurdles (he is not), no claims were asserted in ZAO FG Life's liquidation based on the alleged debts at issue here, even after the liquidation was raised in this lawsuit.  SOF ¶ 242.  Without having first raised such debts in pre-bankruptcy liquidation proceedings, they cannot serve as a basis for imposing personal liability on Mr. Leontiev in any future bankruptcy proceeding.  *See* Monastyrsky Decl. ¶¶ 14–17.  Moreover, as set forth in Article 10(5) of the Insolvency Law, creditors must adjudicate their claims in the bankruptcy proceedings, and to the extent any individual liability determination were made, the amounts recovered would accrue *to ZAO FG Life's estate*, and not to any individual creditor.  *See id.* ¶ 13.

Second, Mr. Leontiev cannot be held personally liable for liquidating ZAO FG Life in bad faith.  *See* MJOP Order at 14–15.  There is no evidence that Mr. Leontiev played any role, in

---

of Mr. Leontiev's motion for judgment on the pleadings, at least in part, on the fact that the voluntary liquidation had been reversed (MJOP Order at 14), the Federal Tax Service's decision itself has since been reversed, the liquidation has been reaffirmed, and the proceedings have, once again, been closed.  SOF ¶ 241 (Monastyrsky Decl. Ex. 1 (December 26, 2016 Decision of Federal Tax Service, Russian Ministry of Finance ("FTS Decision")).  Indeed, the initial reopening of the liquidation itself was the result of apparent fraud:  Mr. Arminayts, the alleged creditor whose complaint prompted the reopening of liquidation proceedings, "did not sign and did not send" to the tax authority any such complaint.  SOF ¶ 240.  Therefore, the tax authority concluded, "the existence of [ZAO FG Life's] accounts payable to [that creditor] is not supported in the instant situation," and the initial decision closing liquidation proceedings was "rightly issued."  SOF ¶ 241.  The mere possibility that the liquidation might be reopened again at some point in the future is not enough to overcome a motion for summary judgment.  *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11–12 (2d Cir. 1986) ("Nor may a party rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.").

bad faith or otherwise, in ZAO FG Life's liquidation.  As this Court suspected might be the case (*see* MJOP Order at 15), liability under this theory rests only on the *liquidator* of a company. *See* Monastyrsky Decl. ¶ 7.  Mr. Leontiev was not the liquidator (SOF ¶ 239), and therefore cannot be liable.  Moreover, after the lenders had undeniable notice of the liquidation of ZAO FG Life—because it was raised before this Court—none of the lenders raised any issue before the Russian tax authorities and the liquidation was reinstated.  SOF ¶¶ 242–43.

Finally, Mr. Leontiev cannot be held personally liable for ZAO FG Life's obligations under the general equitable principles of Articles 1(4) and 10(1) of Russia's Civil Code.  Russian law does not support the use of these provisions—which merely espouse broad rules prohibiting parties from benefiting from unlawful or bad faith behavior, or exercising civil law rights based on such behavior—to pierce the corporate veil and impose personal liability on an individual. *See* Monastyrsky Decl. ¶¶ 18–19.  Once again, there is no evidence that Mr. Leontiev engaged in any wrongful conduct relating to ZAO FG Life and, even if the record reflected a violation of these provisions, veil-piercing is not one of the enumerated remedies for violations thereof.[9]

### III.    Mr. Leontiev Has Not Assumed or Accepted Responsibility for the Alleged Loans

Any attempt by Mr. Varshavsky to hold Mr. Leontiev personally responsible for repaying the Alleged Loans based on statements made by Mr. Leontiev during settlement negotiations in

---

[9] The sole basis previously argued by Mr. Varshavsky for imposing it as a remedy is a lone 2012 appellate level court decision, not binding in the Russian legal system and with wholly inapposite facts.  Monastyrsky Decl. ¶ 19.  In that decision, the court referenced Article 10(1), in dicta, not as a basis for imposing liability on an individual shareholder, but as a basis for a negative inference. *Id.*  Moreover, the defendant there had deliberately confused the plaintiff as to the identity of the obligor by executing invoices and reports in his personal capacity and paying invoiced amounts from his personal account. *Id.*  No such blending of Mr. Leontiev's personal and ZAO FG Life's corporate roles exists here.  Unlike the Russian court's decision, in which "the defendant had created a situation of legal uncertainty as to the identity of the person liable under the obligations," *id.*, there is no evidence of an attempt to mislead any lender as to the identity of the issuer of the promissory notes.

Moscow, London and elsewhere is unavailing.  *See* Ans. at 21.  No obligation was created

through these discussions for several independent reasons.

<u>First</u>:  Statements by Mr. Leontiev or others at the Moscow and London meetings are not

admissible to prove the validity of any claims against Mr. Leontiev.  Under Federal Rule of

Evidence 408(a), evidence of "furnishing, promising, or offering . . . a valuable consideration in

compromising or attempting to compromise the claim; and . . . conduct or a statement made

during compromise negotiations about the claim" is not admissible "on behalf of any party —

either to prove or disprove the validity or amount of a disputed claim."  Accordingly, Rule 408

prohibits precisely what Mr. Varshavsky is attempting here:  use of statements made by parties

during settlement negotiations, including settlement offers, "to reflect an admission of liability."

*Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 285 (S.D.N.Y. 2015); *see also Koch v.

Greenberg*, 14 F. Supp. 3d 247, 263–64 (S.D.N.Y. 2014) (finding statements made by party

during settlement negotiations, including offers to repay monies owed, to be inadmissible), *aff'd*,

626 F. App'x 335 (2d Cir. 2015).  To allow Mr. Varshavsky to use such statements to prove his

case here would be contrary to the "obvious purpose" of Rule 408 "to facilitate open and wide-

ranging settlement discussions."  *Hart*, 90 F. Supp. 3d at 284–86 (internal citation and quotation

marks omitted).

<u>Second</u>:  Under the Statute of Frauds, a "special promise to answer for the debt . . . of

another person" is void unless it is in writing and signed by the party to be charged.  N.Y. Gen.

Oblig. Law § 5-701(a)(2) (McKinney 2017); *see Matter of Lou Atkin Castings v. M. Fabrikant &

Sons*, 216 A.D.2d 111, 112 (1st Dep't 1995).  There is no writing signed by Mr. Leontiev in

which he agrees to repay the Alleged Loans.  SOF ¶¶ 258, 260.  Mr. Varshavsky's attempt to

divine a binding agreement based on oral statements made by Mr. Leontiev is contrary to law.

The fact that the London meeting was recorded is of no import.  Under New York law, an audio recording of an oral discussion does not remove a purported agreement from the purview of the Statute of Frauds.  *See Sonders v. Roosevelt*, 64 N.Y.2d 869, 871 (1985); *Roos v. Aloi*, 127 Misc. 2d 864, 870–71 (Sup. Ct. Nassau Cty. 1985).[10]

*Third*:  Even outside the Statute of Frauds, "[i]t is well settled under New York law that a contract is unenforceable where there is no meeting of the minds between the parties regarding material elements of the agreement."  *Int'l Paper Co. v. Suwyn*, 966 F. Supp. 246, 254 (S.D.N.Y. 1997).  Both Mr. Varshavsky and Mr. Leontiev testified that *no* agreement—on material terms or otherwise—was reached at the London meeting or afterwards.  *See supra* at 8–9.  Specifically, Mr. Varshavsky admitted that he and Mr. Leontiev "did not reach the agreement" at the London or Moscow meetings on the terms of any payments to be made by Mr. Leontiev.  SOF ¶ 253.

## CONCLUSION

For the reasons set forth above, this Court should grant Mr. Leontiev's motion for summary judgment as to the Complaint's first cause of action and declare that Mr. Leontiev does not owe a debt or obligation to Mr. Varshavsky relating to the Alleged Loans.

---

[10]  The payment made in September 2015 by Valkera to purchase Avilon Plaza's rights under the 2010 Loan with Ambika is also of no consequence.  "The partial performance exception . . . has not been extended to § 5–701" of the General Obligations Law.  *Castellotti v. Free*, 138 A.D.3d 198, 203 (1st Dep't 2016); *see also Gural v. Drasner*, 114 A.D.3d 25, 32 (1st Dep't 2013); *Walker v. Knowles*, 15 Misc. 3d 1124(A) (Sup. Ct. N.Y. Cty. 2007).  Mr. Varshavsky thus cannot rely on the fact that a separate debt was resolved by a payment by a separate company to enforce any alleged oral agreement with Mr. Leontiev regarding the Alleged Loans.

Dated:   January 27, 2017
         New York, New York

                                        GIBSON, DUNN & CRUTCHER LLP

                                        By:
                                             Robert L. Weigel
                                             Marshall R. King
                                             Alison L. Wollin

                                        200 Park Avenue
                                        New York, New York 10166
                                        Telephone: 212.351.4000
                                        Facsimile: 212.351.4035

                                        *Attorneys for Plaintiff Sergey Leontiev*

26