UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                        :

SERGEY LEONTIEV,                  :

                  Plaintiff,    :     No. 16-cv-03595 (JSR)

    -against-           :     **<u>ORAL ARGUMENT REQUESTED</u>**

ALEXANDER VARSHAVSKY,   :     **<u>CONFIDENTIAL – FILED UNDER</u>**

                  Defendant.  :     **<u>SEAL</u>**
                                          :
                                          :
-------------------------------------------------------------------x

## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Local Civil Rule 56.1, Plaintiff Sergey Leontiev ("Plaintiff" or "Mr. Leontiev") submits this statement of undisputed material facts in support of his motion for summary judgment.

**I.    The Parties**

    **A.    Plaintiff**

        1.    Plaintiff Sergey Leontiev is a Russian-born entrepreneur and businessman who currently resides in New York, NY.  Leontiev Decl.[1] ¶¶ 1, 25.

        2.    In 1993, Mr. Leontiev, together with his longtime friend Alexander Zheleznyak, founded Probusinessbank ("PRBB" or the "Bank"), a joint-stock commercial bank.  Leontiev Decl. ¶ 2; Exh.[2] 2 at 94:24-95:10, 95:15-96:3 (Zheleznyak Tr.); Exh. 3 at SL0001222 (PRBB 2014 Audited Financials).

---

[1]  "Leontiev Decl." refers to the Declaration of Sergey Leontiev in support of Plaintiff's Motion for Summary Judgment, dated January 26, 2017.

[2]  "Exh. __" refers to the Exhibits attached to the Declaration of Robert L. Weigel in support of Plaintiff's Motion for Summary Judgment, dated January 27, 2017.

3.      PRBB provided a full range of banking services to corporate and individual clients pursuant to a general banking license issued by the Central Bank of the Russian Federation.  Leontiev Decl. ¶ 3; Exh. 3 at SL0001222 (PRBB 2014 Audited Financials).

4.      PRBB served as the parent entity to numerous smaller banks that were organized under the brand Financial Group 'Life' (the "Life Group").  Leontiev Decl. ¶ 4; Exh. 3 at SL0001222 (PRBB 2014 Audited Financials); Exh. 1 at 77:8-10, 77:14-15, 82:4-22 (Leontiev Tr.).

5.      As of December 31, 2014, the banks in the Life Group employed more than 13,000 people and operated hundreds of offices and branches throughout Russia.  Exh. 3 at SL0001224, SL0001227 (PRBB 2014 Audited Financials).

6.      In March 2014 and April 2015, PRBB received two clean opinions from its auditors, ZAO Deloitte & Touche CIS, which found that the Bank was in compliance with the requirements and recommendations of the Central Bank of the Russian Federation.  Exh. 4 at SL0001330-31 (PRBB 2013 Audited Financials); Exh. 3 at SL0001214-15 (PRBB 2014 Audited Financials).

7.      Nevertheless, in August 2015, the Central Bank suddenly revoked PRBB's license, claiming that the Bank was insolvent.  Leontiev Decl. ¶ 24.

8.      Over the past five years, the Central Bank has revoked hundreds of bank licenses in an effort to consolidate the Russian banking industry for the benefit of state-owned banks.  Exh. 5 (3/17/2016 Forbes article).

9.      Since the start of 2013, the Central Bank has revoked more than 250 bank licenses, including over 100 in 2015 alone.  Exh. 5 (3/17/2016 Forbes article).

10.     Until the Central Bank revoked PRBB's banking license in August 2015, Mr. Leontiev was the President of the Bank and Chairman of the Board of Directors and served on PRBB's Management Board.  Leontiev Decl. ¶ 5; Exh. 1 at 84:9-20, 84:24-85:3 (Leontiev Tr.).

11.     In addition to these responsibilities, Mr. Leontiev separately founded a new company in 2011 called Wonderworks Investments Limited ("Wonderworks").  Leontiev Decl. ¶ 27; Exh. 6 at SL0024211 (Wonderworks Certificate of Incorporation).



17.     Mr. Leontiev is currently the CEO of Grid Market Research, a company which provides market research and analysis.  Leontiev Decl. ¶ 31.

**B.** **Alexander Varshavsky**

18.    Defendant Alexander Varshavsky is a Russian-born businessman who owns multiple homes and has shares in several businesses worth millions of dollars.  Dkt. No.[3] 27 at 3 (¶ 2) (Amended Answer).

19.    Mr. Varshavsky serves as President of Avilon Automobile Group ("Avilon AG").  Exh. 9 at 19:7-15 (Varshavsky Tr.); Exh. 10 at 12:25-13:2 (Pavlovich Tr.).

20.    Avilon AG was previously known as New York Motors Moscow.  Exh. 9 at 27:22-28:9 (Varshavsky Tr.).[4]

21.    Avilon AG is a distributor of luxury automobiles in Russia with over $2 billion in annual sales.  Exh. 21 at 27:18-24, 39:23-40:4 (Varshavsky Tr.); Exh. 11 at 14:25-15:19 (Kamo Avagumyan Tr.); Exh. 10 at 41:3-6 (Pavlovich Tr.); Exh. 12 at AVPE0000011 (8/17/2011 email from I. Meshkova to V. Nazanskaya attaching Avilon Group structure and financial statement).

22.    Mr. Varshavsky holds an ownership interest in a number of companies including Avilon AG, Avilon Plaza, European Realty Corp., Avtologistika, and others (together, the "Avilon Group").  Exh. 9 at 115:6-21 (Varshavsky Tr.); Exh. 10 at 11:19-12:7 (Pavlovich Tr.); Exh. 12 at AVPE0000011 (8/17/2011 email from I. Meshkova to V. Nazanskaya attaching Avilon Group structure and financial statement).

23.    Avilon AG's other shareholders are Kamo Avagumyan and Igor Bakunenko.  Exh. 11 at 8:7-24 (Kamo Avagumyan Tr.).

---

[3]  "Dkt. No. __" refers to documents appearing on the docket in this action.

[4]  For clarity, New York Motors Moscow and Avilon AG will be referred to interchangeably as "Avilon AG".

24.     During the relevant time period, the Avilon Group employed numerous lawyers and accountants, including Financial Director Irina Monakhova, Chief Accountant Yulia Semenova, Deputy Chief Accountant Valentina Nazanskaya, and Head of the Legal Department, Vitaliy Popov. Exh. 13 at 11:14-17 (Monakhova Tr.); Exh. 14 at 9:6-14, 39:12-15 (Semenova Tr.); Exh. 15 at 5:18-7:9 (Popov Tr.).

25.     In late 2015, the Avilon Group restructured and created a new management company called Akita, which currently employs Ms. Monakhova, Ms. Semenova, and Mr. Popov, and manages several companies including Avilon AG.  Exh. 13 at 10:21-11:6 (Monakhova Tr.); Exh. 14 at 9:17-20 (Semenova Tr.); Exh. 15 at 5:8-9, 7:10-8:5 (Popov Tr.); Exh. 11 at 7:2-7, 7:16-18 (Kamo Avagumyan Tr.); Exh. 10 at 13:8-19 (Pavlovich Tr.).

26.     Akita is owned by Mr. Varshavsky and Kamo Avagumyan through an off-shore entity called Maxbond.  Exh. 11 at 7:8-15, 12:21-13:9 (Kamo Avagumyan Tr.); Exh. 15 at 8:6-12 (Popov Tr.).

27.     Mr. Varshavsky, the companies within the Avilon Group, and various employees and executives of those companies were longtime customers of PRBB and received ██████████ and corporate banking services, such as payroll, financing of inventory ██ ████████████. Exh. 9 at 206:8-14 (Varshavsky Tr.); Exh. 11 at 17:9-12 (Kamo Avagumyan Tr.); Exh. 10 at 17:6-8, 17:19-18:9 (Pavlovich Tr.); Exh. 16 at 61:19-25 (Karen Avagumyan Tr.); Exh. 17 at AVPE0002068-70 (2/12/2014 email from Y. Semenova to I. Monakhova).

28.     In 2014 and 2015, Sanbay Holdings Limited ("Sanbay"), an entity affiliated with Karen Kimovich Avagumyan, brother of Kamo Avagumyan and an Avilon Group executive, received over 36 million Euros in financing from entities affiliated with PRBB, of

which over 14.4 million Euros were advanced weeks before PRBB's license was revoked.  Exhs. 18 at SL0033756-60 and 19 at SL0033754-55 (8/6/2014 and 8/7/2014 loan agreements between Digitime Alliance Ltd. and Sanbay) and Exh. 20 (7/15/2015 loan from Trustway Investments Limited to Sanbay).

29.     Ms. Monakhova and Ms. Semenova managed Sanbay in their capacities as Financial Director and Chief Accountant, respectively, of the Avilon Group.  Exh. 21 at SL0033766-68 (10/23/2014 email from I. Monakhova to Y. Krisiuk); Exh. 22 at AVPE0001456 (11/3/2015 email from I. Monakhova to Y. Semenova); Exh. 13 at 98:19-99:2 (Monakhova Tr.).

30.     None of Defendant's witnesses knew about the Sanbay loans or could state that the loans were repaid.  Exh. 9 at 127:20-128:2, 134:11-135:2 (Varshavsky Tr.); Exh. 13 at 99:13-16 (Monakhova Tr.).

**II.     Probusinessbank**

31.     In addition to a general banking license, PRBB held licenses that permitted it to engage in depositary activities, securities management, broker-dealer activity, serving as an intermediary for dealing in futures and options, non-governmental pension funds asset management, precious metal transactions, and acting as a guarantor in relations with customs authorities.  Exh. 3 at SL0001222 (PRBB 2014 Audited Financials).

32.     With these licenses, the bank had authority to manage investments in a wide variety of financial instruments on behalf of its clients.  Exh. 3 at SL0001222 (PRBB 2014 Audited Financials).

33.     PRBB consisted of numerous business units, infrastructure units, and systems units, each of which was headed by a manager.  Leontiev Decl. ¶ 7; Exh. 1 at 95:14-16 (Leontiev Tr.).

34.     Mr. Leontiev's management philosophy was to provide wide-ranging autonomy and discretion to PRBB's managers without interference or micromanagement from Mr. Leontiev or others.  Leontiev Decl. ¶ 9; Exh. 1 at 239:16-18, 245:9-246:14, 270:13-24 (Leontiev Tr.); Exh. 2 at 101:3-12, 103:2-8 (Zheleznyak Tr.).

35.     For example, PRBB's bank managers, or the heads of the business units, were each responsible for making loan decisions with respect to their individual or corporate customers because each manager was in the best position to base loan decisions on his or her own personal experience with and knowledge of the customer.  The manager was incentivized to exercise sound business judgment through a profit-sharing model.  Leontiev Decl. ¶¶ 10-11, 13; Exh. 1 at 245:9-246:14 (Leontiev Tr.).

36.     Each head of a business unit was also responsible for proposing its own strategies and products.  Those proposals were then submitted to PRBB's Treasury, which used a dynamic model developed by Mr. Leontiev to identify the best business proposal or products. While Mr. Leontiev developed the rules for the Treasury's model, he was not involved in and did not interfere with day-to-day decision making of the business unit or Treasury managers. Leontiev Decl. ¶¶ 12-13; Exh. 1 at 99:13-23 (Leontiev Tr.).

37.     After the model identified the best products, the product was presented to the financial and strategy departments before being presented to the management board for final approval.  Leontiev Decl. ¶ 14; Exh. 1 at 99:24-101:16 (Leontiev Tr.).

38.     After the products were approved, the heads of the business units and the employees under their supervision were responsible for selecting products to present to their clients, based on their needs and demands.  Leontiev Decl. ¶ 15; Exh. 1 at 98:8-13, 104:10-105:2 (Leontiev Tr.); Exh. 2 at 111:24-112:4 (Zheleznyak Tr.).

39.     One of the products developed through this system was a high-interest rate investment, commonly referred to in the emerging markets as a "wealth management product," that gave customers the opportunity to receive a rate of return of between 10 and 15%, a significantly higher rate than that available with a regular bank deposit.  Leontiev Decl. ¶ 16; Exh. 1 at 102:9-19, 111:12-113:5, 303:3-304:7 (Leontiev Tr.); Exh. 11 at 24:23-25:11 (Kamo Avagumyan Tr.); Exh. 23 (June 2015 Reserve Bank of Australia Bulletin).

40.     Natalia Abramova and Yanna Krisiuk were two members of PRBB's business unit that serviced VIP clients.  Exh. 2 at 108:23-109:23 (Zheleznyak Tr.).

41.     The funds raised through the wealth management product were deposited into PRBB's Treasury and were invested into PRBB's capital and used for various bank-related purposes, such as growing a retail loan portfolio, financing development projects, and managing regulatory capital ratio requirements.  Leontiev Decl. ¶ 17; Exh. 1 at 108:2-20; 311:11-13 (Leontiev Tr.); Exh. 2 at 66:6-8, 120:8-20 (Zheleznyak Tr.).

42.     To facilitate bank projects including, for example, structuring these wealth management products, PRBB's business unit managers utilized off-balance sheet entities in Russia and in other jurisdictions, which were set up and administered by an operations group within PRBB.  Leontiev Decl. ¶ 18; Exh. 1 at 118:11-119:9, 220:4-12 (Leontiev Tr.).

43.     The borrower entities in this litigation, including Ambika Investments Limited ("Ambika") and ZAO Financial Group Life ("ZAO FG Life"), were among the off-balance sheet entities created by this operations group within PRBB and utilized by PRBB's business unit managers.  Exh. 1 at 110:13-15, 167:14-168:9 (Leontiev Tr.); Exh. 2 at 92:16-20 (Zheleznyak Tr.).

44.     The PRBB operations group which set up the off-balance sheet entities, led by a senior manager named Alexandra Vyulkova, had complete discretion to manage and enter into transactions on behalf of these companies.  Exh. 1 at 169:11-15, 235:16-236:20 (Leontiev Tr.); Exh. 2 at 102:11-103:25 (Zheleznyak Tr.).

45.     Mr. Leontiev did not create these companies, did not instruct any operations group employees to create these companies, and had no role in their management. Leontiev Decl. ¶¶ 19-20; Exh. 2 at 130:8-131:18 (Zheleznyak Tr.).

46.     Mr. Leontiev had minimal contact with Ms. Vyulkova and did not direct her with respect to any of her job responsibilities, including any responsibilities pertaining to the off-balance sheet entities.  Leontiev Decl. ¶ 20; Exh. 2 at 104:10-13 (Zheleznyak Tr.).

III.    **The Alleged Loans**

A.      **Avilon AG's Loans to Ambika**

47.     In 2008, Mr. Leontiev discussed with Mr. Zheleznyak and other bank managers the idea of attracting capital to PRBB by offering to its clients the option of investing their funds with PRBB through high-interest wealth management products.  Exh. 1 at 308:12-310:5 (Leontiev Tr.); Exh. 2 at 62:4-22 (Zheleznyak Tr.).

48.     In or around December 2008, Mr. Zheleznyak approached Mr. Varshavsky and inquired whether Avilon AG would be interested in making an investment in the wealth management products offered by PRBB.  Exh. 2 at 62:25-67:22 (Zheleznyak Tr.); Exh. 9 at 29:18-30:7 (Varshavsky Tr.).

49.     After negotiating the terms with Mr. Zheleznyak, Mr. Varshavsky agreed on behalf of Avilon AG to make the investment in a wealth management product.  Exh. 9 at 25:13-20, 29:8-17 (Varshavsky Tr.); Exh. 13 at 17:20-18:10 (Monakhova Tr.).

50.     Mr. Varshavsky informed Ms. Monakhova of the plan to make this investment and instructed her to contact Ms. Krisiuk and to ensure that the transaction was properly documented and executed.  Exh. 9 at 25:7-12 (Varshavsky Tr.).

51.     Ms. Monakhova and Ms. Krisiuk "discussed the structure of the transaction and who [would] be involved on [Avilon AG's] part" and exchanged contact information for each side's attorneys, who already had begun preparing the agreements.  During this conversation, Ms. Krisiuk also informed Ms. Monakhova that Ambika would be the borrower in this transaction.  Exh. 13 at 20:16-22:15 (Monakhova Tr.).

52.     Avilon AG employed a "working group" consisting of members of Avilon AG's legal and financial departments working under the direction of Ms. Monakhova to review and finalize the investment.  Exh. 13 at 67:3-68:16 (Monakhova Tr.).

53.     Ms. Monakhova directed Mr. Popov to review and approve a draft of the loan agreement for the transaction, which identified Ambika as the borrower.  Exh. 15 at 14:13-19:9 (Popov Tr.).

54.     Ms. Monakhova also provided Ms. Semenova with the documentation necessary for Ms. Semenova to transfer the funds to Ambika pursuant to the loan agreement.  Exh. 14 at 17:11-18:21 (Semenova Tr.).

55.     Mr. Varshavsky understood "when negotiat[ing] the rate on the $19.9 million," that the invested funds were to be used by PRBB to "finance the bank's construction projects," make "interest payments on other loans, loan repayments and expenses" and for "other business."  Exh. 9 at 77:12-78:12 (Varshavsky Tr.).

56.     Neither Mr. Varshavsky nor any other employee of Avilon AG discussed the investment with Mr. Leontiev.  Exh. 9 at 60:18-62:6 (Varshavsky Tr.); Exh. 13 at 16:23-17:8 (Monakhova Tr.); Exh. 15 at 76:3-8 (Popov Tr.); Exh. 14 at 10:17-23 (Semenova Tr.).

57.     Mr. Varshavsky first spoke to Mr. Leontiev about Avilon AG, Ambika, and PRBB in August 2015, almost seven years after Avilon AG's initial investment.  Exh. 9 at 60:18-62:6 (Varshavsky Tr.).

58.     Loan Agreement No. 1812/08 ("2008 Loan Agreement") was executed on December 18, 2008, with Ms. Monakhova and Ms. Semenova signing for Avilon AG and Petros Livanios signing for Ambika.  Exh. 24 at SL0000030-33.

59.     The 2008 Loan Agreement provided that Avilon AG would loan $19.9 million to Ambika for a one-year term with an annual interest rate of 14%.  Exh. 24 at SL0000030.

60.     The 2008 Loan Agreement contained no restrictions upon Ambika's use of the loaned funds.  Exh. 24 at SL0000030-33.

61.     The 2008 Loan Agreement provided that "[a]ny amendments hereto shall be valid only if they are executed in writing and duly signed by authorized representatives of the parties."  Exh. 24 at SL0000031.

62.     Avilon AG also requested and obtained a written guarantee of the 2008 Loan Agreement from PRBB.  Exh. 25 at SL0000066; Exh. 15 at 30:14-31:16 (Popov Tr.); Exh. 14 at 23:21-24:9 (Semenova Tr.).

63.     Bank Guarantee No. 127-188, signed on December 18, 2008, provided that PRBB agreed to pay up to $22,685,749.74 in the event of Ambika's breach of its obligations

under the 2008 Loan Agreement.  The guarantee was signed by Mr. Zheleznyak, in his capacity as Chairman of PRBB's Management Board.  Exh. 25 at SL0000066.

64.     Avilon AG did not request or receive a written guarantee of the 2008 Loan Agreement from Mr. Leontiev in his personal capacity.  Exh. 15 at 36:13-17 (Popov Tr.); Exh. 14 at 24:10-13 (Semenova Tr.); Exh. 13 at 66:16-20 (Monakhova Tr.).

65.     After the 2008 Loan Agreement was executed and Avilon AG transferred the funds to Ambika, Ms. Semenova recorded this transaction in Avilon AG's books as, "Loans issued . . . [to] . . . Ambika Investments Limited."  Exh. 14 at 19:22-20:2 (Semenova Tr.).

66.     Avilon AG obtained the funds to make the 2008 Loan to Ambika through a loan for $19.9 million at an annual interest rate of 13.85% from a related entity, European Realty Corp. ("ERC").  Exh. 14 at 24:14-25:21 (Semenova Tr.); Exh. 26 at AVPE0003015 (12/17/2008 loan agreement between Avilon AG and ERC); Exh. 27 at AVPE0000472 (12/18/2008 email from I. Monakhova to V. Nazanskaya).

67.     On June 30, 2009, Avilon AG assigned its rights under the 2008 Loan Agreement to ERC.  Exh. 28 at AVPE0001029-30 (6/30/2009 assignment of claims agreement between Avilon AG and ERC).

68.     On the same day, Avilon AG and ERC entered into a setoff agreement, pursuant to which Avilon AG and ERC agreed to offset their respective obligations.  Exh. 28 at AVPE0001032-33 (6/30/2009 setoff agreement between Avilon AG and ERC).

69.     On July 6, 2010, Avilon AG and ERC cancelled the assignment, due to Avilon's purported failure to provide ERC with "all the required documentation" in a timely manner.  Exh. 29 (7/6/2010 agreement on the termination of assignment).

70.     The $19.9 million loan from ERC to Avilon AG remains outstanding today.  Exh. 14 at 26:8-22 (Semenova Tr.); Exh. 13 at 71:21-25 (Monakhova Tr.).

71.     Throughout 2009, Avilon AG received interest payments from Ambika on a quarterly basis, as provided in the 2008 Loan Agreement, including $686,709 received on March 23, 2009, $702,225 received on June 19, 2009, $843,415 received on September 18, 2009, and $752,384 received on December 21, 2009.  These payments were recorded in Avilon AG's books as "[i]nterest received from Ambika on $19.9 million."  Exh. 30 at AVP0000950 (Avilon Group's spreadsheet of loans and interest payments).

72.     During this same time period, Avilon AG and Ambika entered into two amendments to the 2008 Loan Agreement.  Exh. 24 at SL0000033-35.

73.     Additional Agreement #1, dated June 30, 2009, and signed by Ms. Monakhova for Avilon AG and Mr. Livanios for Ambika, changed the annual interest rate on the 2008 Loan Agreement to 15% through December 19, 2009.  Exh. 24 at SL0000033.

74.     Additional Agreement #2, dated June 30, 2009, and signed by Ms. Monakhova for Avilon AG and Mr. Livanios for Ambika, extended the 2008 Loan Agreement's validity and the 15% annual interest rate through December 20, 2010.  Exh. 24 at SL0000034-35.

75.     Between 2010 and 2014, Avilon AG and Ambika entered into five subsequent additional agreements to the 2008 Loan Agreement, all signed by Ms. Monakhova for Avilon AG and Mr. Livanios for Ambika.  Exh. 24 at SL0000036-45.

76.     While Avilon AG decided on a yearly basis whether to extend the term of and whether to renegotiate the interest rate of the 2008 Loan Agreement through these additional agreements, none of these decisions involved or resulted in discussions with Mr. Leontiev.  Exh. 9 at 62:2-6, 62:18-22 (Varshavsky Tr.).

77.     Additional Agreement #3, dated December 20, 2010, extended the 2008 Loan Agreement's validity through December 20, 2011 and lowered the interest rate to 11%. Exh. 24 at SL0000036-37.

78.     Ms. Krisiuk informed Mr. Varshavsky about these changed terms on or around November 30, 2010, and Mr. Varshavsky approved the revised interest rate.  Exh. 31 at SL0033715 (12/7/2010 email from V. Nazanskaya to I. Monakhova); Exh. 9 at 46:16-47:24 (Varshavsky Tr.).

79.     Additional Agreement #4, dated December 20, 2011, extended the 2008 Loan Agreement's validity through December 20, 2012 and kept the interest rate at 11%.  Exh. 24 at SL0000038-39.

80.     Additional Agreement #6, dated December 20, 2013, extended the 2008 Loan Agreement's validity through December 22, 2014 and changed the interest payment schedule from quarterly to monthly.  Exh. 24 at SL0000042-43.

81.     Additional Agreement #7, dated December 9, 2014, converted the principal amount on the 2008 Loan Agreement from US dollars to Euros and capitalized the accrued interest amount for the period between November 21, 2014 and December 9, 2014 into the principal.  Exh. 24 at SL0000044-45.

82.     On December 9, 2014, Avilon AG and Ambika also entered into an Agreement, whereby Ambika's obligations under the 2008 Loan Agreement were discharged because the outstanding principal on the 2008 Loan Agreement was added to another loan agreement between Avilon AG and Ambika.  Ms. Monakhova signed the December 9, 2014 agreement for Avilon AG and Mr. Livanios signed for Ambika.  Exh. 32 at SL0000065.

14

83.     Ambika made regular and timely interest payments under the 2008 Loan Agreement until the 2008 Loan Agreement was discharged.  Avilon AG recorded the last payment of "interest received from Ambika on $19.9 million" on November 20, 2014.  Exh. 30 at AVP0000950-51 (Avilon Group's spreadsheet of loans and interest payments); Exh. 14 at 22:18-25 (Semenova Tr.).

84.     Avilon AG requested and obtained guarantees for the amendments to the 2008 Loan Agreement from PRBB on at least four additional occasions.  Exh. 25 at SL0000068, SL0001759-60, SL0001762, AVPE0000174-75 (PRBB guarantees to 2008 Loan Agreement).

85.     Each of PRBB's guarantees provided that Avilon AG's rights under the guarantee may not be assigned or transferred to third parties.  Exh. 25 at SL0000068, SL0001759-60, SL0001762, AVPE0000174-75 (PRBB guarantees to 2008 Loan Agreement).

86.     Under Bank Guarantee No. 127-793, dated December 19, 2009, PRBB agreed to pay up to $22,893,178.08 in the event of Ambika's breach of its obligations under the 2008 Loan Agreement.  The guarantee was signed by Mr. Zheleznyak, in his capacity as Chairman of the PRBB's Management Board.  Exh. 25 at SL0001762.

87.     Under a Bank Guarantee dated December 20, 2010, PRBB agreed to pay up to $22,089,000 in the event of Ambika's breach of its obligations under the 2008 Loan Agreement.  The guarantee was signed by Mr. Zheleznyak, in his capacity as Chairman of PRBB's Management Board.  Exh. 25 at SL0000068.

88.     Under Bank Guarantee No. 127-879, dated December 20, 2012, PRBB agreed to pay up to $22,287,803.37 in the event of Ambika's breach of its obligations under the 2008 Loan Agreement.  The guarantee was signed by Mr. Zheleznyak, in his capacity as Chairman of PRBB's Management Board.  Exh. 25 at SL0001759-60.

89.     Finally, under an unnumbered Bank Guarantee, dated December 20, 2013, PRBB agreed to pay up to $22,301,084.93 in the event of Ambika's breach of its obligations under the 2008 Loan Agreement.  This guarantee expired on January 27, 2015, after Ambika's obligations under the 2008 Loan Agreement were discharged.  Exh. 25 at AVP0000174-75; Exh. 32 at SL0000065.

90.     On December 27, 2010, European Realty Company, the predecessor entity to Avilon Plaza,[5] entered into Loan Agreement No. 2712/10 ("2010 Loan Agreement"), by which Avilon Plaza loaned $12.25 million to Ambika at an annual interest rate of 11%.  Exh. 33 at AVPE0002466-68.

91.     The 2010 Loan Agreement was signed by Ms. Monakhova on behalf of Avilon Plaza and by Mr. Livanios on behalf of Ambika.  Exh. 33 at AVPE0002466-67.

92.     Between December 2011 and January 2015, Avilon Plaza and Ambika entered into six amendments to the 2010 Loan Agreement, with the final amendment extending the validity of the agreement to December 9, 2015.  Exh. 33 at AVPE0002468-80.

93.     On or around September 17, 2015, Avilon Plaza assigned its rights under the 2010 Loan Agreement to Avilon Holdings Limited, which in turn assigned those rights to Valkera Investments Limited ("Valkera").  Exh. 34 at AVPE0002555-62 (9/17/2015 email from A. Zheleznyak and V. Popov attaching assignments agreements).

94.     In the fall of 2011, Mr. Varshavsky and Mr. Zheleznyak negotiated another investment from Avilon AG.  Exh. 9 at 56:8-59:17 (Varshavsky Tr.); Exh. 2 at 117:19-118:11 (Zheleznyak Tr.); Exh. 13 at 74:2-25 (Monakhova Tr.).

---

[5]  For clarity, European Realty Company (which is distinct from ERC) and Avilon Plaza will be referred to interchangeably as "Avilon Plaza."

95.     On September 1, 2011, Ms. Krisiuk, Ms. Monakhova, and Ms. Nazanskaya exchanged emails to ensure that the terms of this new investment were "the same as with respect to $19.9 mln." Exh. 35 at SL0033741.

96.     Neither Mr. Varshavsky nor any other Avilon AG employee spoke with Mr. Leontiev prior to making the 2011 investment.  Exh. 9 at 60:18-62:6 (Varshavsky Tr.); Exh. 13 at 16:23-17:8 (Monakhova Tr.); Exh. 15 at 76:3-8 (Popov Tr.); Exh. 14 at 10:17-23 (Semenova Tr.).

97.     On September 1, 2011, Avilon AG and Ambika entered into Loan Agreement No. 0109/11 ("2011 Loan Agreement"), by which Avilon AG loaned to Ambika $6.625 million for a one-year term at an annual interest rate of 11%.  The agreement was signed by Ms. Monakhova on behalf of Avilon AG and Mr. Livanios on behalf of Ambika.  Exh. 36 at SL0000046-48.

98.     The 2011 Loan Agreement provided that "[a]ny amendments hereto shall be valid only if they are executed in writing and duly signed by the authorized representatives of the parties."  Exh. 36 at SL0000048.

99.     Avilon AG requested and obtained a written guarantee of the 2011 Loan Agreement from PRBB, in accordance with Avilon AG's practice of "ensuring and guaranteeing" its loans.  Exh. 37 at 53:18-54:6 (Semenova Tr.); Exh. 37 at SL0001763 (PRBB guarantee of 2011 Loan Agreement).

100.     Under Bank Guarantee No. 127-433, dated September 1, 2011, PRBB agreed to pay up to $7,358,392.31 in the event of Ambika's breach of its obligations under the 2011 Loan Agreement.  The guarantee was signed by Lyubov Alkhovaya, in her capacity as PRBB's chief accountant.  Exh. 37 at SL0001763.

101.     Avilon AG did not request or receive a written guarantee of the 2011 Loan Agreement from Mr. Leontiev in his personal capacity.  Exh. 9 at 86:6-11 (Varshavsky Tr.); Exh. 14 at 54:7-10 (Semenova Tr.); Exh. 13 at 66:8-20 (Monakhova Tr.).

102.     After the 2011 Loan Agreement was executed, and Avilon AG transferred the funds to Ambika, Ms. Semenova recorded this transaction in Avilon AG's books as, "[l]oan issued . . . [to] . . . Ambika."  Exh. 14 at 41:2-4 (Semenova Tr.).

103.     Avilon AG obtained the funds to make the 2011 Loan to Ambika through a loan for $6.625 million at an annual interest rate of 11% from TO Jets Transporter Inc. ("TO Jets").  Exh. 38 at AVPE0003041 (8/29/2011 loan agreement between Avilon AG and TO Jets); Exh. 14 at 52:21-25 (Semenova Tr.); Exh. 13 at 86:22-87:3 (Monakhova Tr.).

104.     On September 1, 2011, Avilon AG assigned its rights under the 2011 Loan Agreement to TO Jets.  Exh. 39 at AVPE0002834 (9/1/2011 agreement on the assignment of rights between Avilon AG and TO Jets).

105.     On the same day, Avilon AG and TO Jets entered into Setoff Agreement No. J-6625, pursuant to which Avilon AG and TO Jets agreed to offset their respective obligations.  Exh. 39 at AVPE0002836.

106.     On September 5, 2011, Avilon AG and TO Jets cancelled the assignment agreement due to Avilon AG's purported failure to provide TO Jets with "all the required documentation" in a timely manner.  Exh. 40 at AVP0005500 (9/5/2011 agreement on the termination of assignment between Avilon AG and TO Jets).

107.     The $6.625 million loan from TO Jets to Avilon AG remains outstanding today.  Exh. 14 at 52:15-20 (Semenova Tr.); Exh. 13 at 89:4-7 (Monakhova Tr.).

108.    Between 2012 and 2015, Avilon AG and Ambika entered into eight amendments to the 2011 Loan Agreement, each of which was signed by Ms. Monakhova on behalf of Avilon AG and Mr. Livanios on behalf of Ambika.  Exh. 36 at SL0000049-64.

109.    Additional Agreement #1, dated March 2, 2012, changed the frequency of the interest payments on the 2011 Loan Agreement from quarterly to monthly.  Exh. 36 at SL0000049.

110.    Additional Agreement #2, dated September 3, 2012, extended the 2011 Loan Agreement's period of validity through September 3, 2013, raised the annual interest rate to 12%, and revised the interest payment schedule.  Exh. 36 at SL0000051.

111.    Additional Agreement #3, dated September 3, 2013, extended the 2011 Loan Agreement's period of validity through November 5, 2014, reduced the annual interest rate to 11%, and added $738,540.46 in accrued interest to the principal amount.  Exh. 36 at SL0000053.

112.    Additional Agreement #4, dated September 16, 2013, capitalized an additional $136,459.54 of accrued interest into the principal of the 2011 Loan Agreement, and revised the interest payment schedule to quarterly payments.  Exh. 36 at SL0000055.

113.    Additional Agreement #5, dated November 5, 2014, extended the 2011 Loan Agreement's period of validity through November 5, 2015.  Exh. 36 at SL0000057.

114.    Additional Agreement #6, dated December 9, 2014, converted the sum of the principal and the accrued but unpaid interest from U.S. dollars into Euros and added the sum of the principal and the accrued but unpaid interest for the 2008 Loan Agreement to the principal of the 2011 Loan Agreement, for a new principal amount of 22,489,331.18 Euros.  Additional

Agreement #6 also extended the 2011 Loan Agreement's period of validity through December 9, 2015, and raised the annual interest rate to 12%.  Exh. 36 at SL0000059-60.

115.    Additional Agreement #7, dated January 19, 2015, provided that interest on 6,173,591.88 Euros would accrue and be disbursed on December 12, 2015, while interest on 16,315,739.30 Euros would be disbursed in monthly payments in accordance with a schedule set forth in Additional Agreement #7.  Exh. 36 at SL0000061-62.

116.    Additional Agreement #8, dated January 26, 2015, converted the sum of the principal and the accrued but unpaid interest from Euros back into U.S. dollars for a revised principal amount of $27,601,156.17, and revised the schedule of interest payments.  Exh. 36 at SL0000063-64.

117.    From December 19, 2011 through July 24, 2015, Ambika made regular and timely interest payments under the 2011 Loan Agreement and Avilon AG recorded them as "interest received from Ambika on" the relevant amount of principal:  $6.625 million through September 2013 and increased amounts thereafter.  Exh. 30 at AVP0000950-51.

118.    Between March 2009 and July 2015 Ambika paid Avilon AG a total of $17,428,109 in interest payments on the 2008 and 2011 Loans.  Exh. 30 at AVP0000950-51 (Avilon Group's spreadsheet of loans and interest payments).

119.    Avilon AG requested and obtained bank guarantees from PRBB for the amendments to the 2011 Loan Agreement on at least five occasions.  Exh. 37 (PRBB guarantees to 2011 Loan Agreement).

120.    Each of PRBB's guarantees provided that Avilon AG's rights under the guarantee may not be assigned or transferred to third parties.  Exh. 37 at SL0000069, SL0001756, SL0001758, SL0001763, SL0001764 (PRBB guarantees to 2011 Loan Agreement).

121.    Under Bank Guarantee No. 127-106, dated March 2, 2012, PRBB agreed to pay up to $6,995,348.38 in the event of Ambika's breach of its obligations under the 2011 Loan Agreement.  The guarantee was signed by Mr. Zheleznyak, in his capacity as Chairman of PRBB's Management Board.  Exh. 37 at SL0001764-65.

122.    Under Bank Guarantee No. 127-962, dated September 3, 2012, PRBB agreed to pay up to $7,353,100.84 in the event of Ambika's breach of its obligations under the 2011 Loan Agreement.  The guarantee was signed by Mr. Zheleznyak, in his capacity as Chairman of PRBB's Management Board.  Exh. 37 at SL0000069-70.

123.    Under Bank Guarantee No. 127-806, dated September 3, 2013, PRBB agreed to pay up to $7,503,346.86 in the event of Ambika's breach of its obligations under the 2011 Loan Agreement.  The guarantee was signed by Ms. Alkhovaya,in her capacity as PRBB's chief accountant.  Exh. 37 at SL0001758.

124.    Under Bank Guarantee No. 127-1015, dated November 5, 2013, PRBB agreed to pay up to $8,325,000 in the event of Ambika's breach of its obligations under the 2011 Loan Agreement.  The guarantee was signed by Ms. Alkhovaya in her capacity as PRBB's chief accountant.  Exh. 37 at SL0001756-57.

125.    Under Bank Guarantee No. 127-945, dated November 5, 2014, PRBB agreed to pay up to $8,325,000 in the event of Ambika's breach of its obligations under the 2011 Loan Agreement.  The guarantee was signed by Mr. Zheleznyak, in his capacity as Chairman of PRBB's Management Board.  Avilon AG's demand right under this guarantee expired on December 5, 2015.  Exh. 37 at SL0000071-72.

126.   Avilon AG did not request or receive any written guarantees for the amendments to the 2011 Loan Agreement from Mr. Leontiev in his personal capacity.  Exh. 14 at 54:7-9 (Semenova Tr.); Exh. 13 at 77:9-17 (Monakhova Tr.).

127.   On August 12, 2015, the same day as the revocation of PRBB's banking license, Ms. Monakhova sent to her colleagues an email with the subject line, "Ambika," in which she asked, "What is the deposit secured by?  Is there a PBB guarantee?"  Ms. Nazanskaya replied, "I only have 1 BG (attached)," and attached to her email Bank Guarantee No. 127-945, which obligated PRBB to pay up to $8,325,000 in the event of Ambika's breach of the 2011 Loan Agreement.  Exh. 41 at AVPE0004795-98.

128.   After Ms. Nazanskaya's response to her email, Ms. Monakhova followed up with, "Look for the guarantee or restore it."  Exh. 42 at AVPE0004801 (8/12/2015 email from I. Monakhova to V. Nazanskaya).

129.   Two hours after Ms. Nazanskaya's email, Mr. Popov replied, "Yan[n]a [Krisiuk] promised to do everything today (to issue a new copy).  Just in case, we have prepared an alternative text for signing on their letterhead.  [Zheleznyak] is still in a meeting at the CB, after which he is supposed to come to the office and sign everything."  Exh. 43 at AVPE0004849 (8/12/2015 email from V. Popov to I. Monakhova, Y. Semenova, and V. Nazanskaya).

130.   On August 25, 2015, Ms. Semenova sent to Ms. Krisiuk blank copies of two guarantees, both dated January 26, 2015:  one for the 2010 Loan Agreement, and one for the 2011 Loan Agreement.  Exh. 44 at AVPE0004970-74.

131.   On August 26, 2015, Ms. Semenova sent to Ms. Nazanskaya a third guarantee—dated January 26, 2015, and seemingly bearing the signatures of Mr. Zheleznyak and Ms. Alkhovaya—that purported to obligate PRBB to pay up to $22,588,294.90 in the event of

Ambika's non-payment of the 2011 Loan Agreement, as long as Avilon AG's demand was received by December 31, 2015.  The purported guarantees did not have a PRBB seal.  Exh. 45 at AVPE0005003-04.

132.    Avilon AG has not assigned its rights under the 2011 Loan Agreement, which is the only operative agreement, to Mr. Varshavsky, and Mr. Varshavsky has admitted that no part of any monies allegedly owed to Avilon AG are owed to him personally.  Exh. 9 at 8:24-9:6 (Varshavsky Tr.).

**B.    Promissory Notes Issued by ZAO FG Life and Vennop**

133.    In 2010 or 2011, Mr. Zheleznyak and Kamo Avagumyan discussed an investment opportunity in a wealth management product offered through promissory notes issued by ZAO FG Life.  Exh. 11 at 22:13-19, 24:23-25:11 (Kamo Avagumyan Tr.); Exh. 2 at 124:3-126:6 (Zheleznyak Tr.).

134.    Kamo Avagumyan did not discuss this investment opportunity or any other subject with Mr. Leontiev at any point.  Exh. 11 at 37:5-6 (Kamo Avagumyan Tr.).

135.    Kamo Avagumyan made the investments in cash.  When he wanted to make an investment, Mr. Avagumyan contacted either Ms. Krisiuk or Ms. Abramova, who would come to his office, where Mr. Avagumyan provided a bag of cash in exchange for a promissory note.  Exh. 11 at 26:24-29:14 (Kamo Avagumyan Tr.); Exh. 46 at Request 1 (Defendant's Responses to Plaintiff's Requests for Admission).

136.    Kamo Avagumyan instructed Ms. Krisiuk or Ms. Abramova to issue the promissory notes in the name of his son, Karen Kamoevich Avagumyan.  Exh. 11 at 30:8-31:20 (Kamo Avagumyan Tr.).

137.    Mr. Leontiev has never met or spoken with Karen Avagumyan.  Leontiev Decl. ¶ 44.

138.    The promissory notes were issued for one-year terms with annual interest rates ranging from 10 to 11%.   Exh. 47 at SL0000001, SL0000003-04, SL0000007-15, SL0000017-23, SL0000028-29 (Avagumyan promissory notes listed in Appendix A).

139.    At the end of the one-year term, the noteholder could choose to roll over the note or receive repayment of his investment.  Exh. 11 at 48:14-23 (Kamo Avagumyan Tr.).

140.    Given his financial needs at the time, Kamo Avagumyan rolled over some notes and withdrew the principal on others.   Exh. 11 at 48:25-49:12 (Kamo Avagumyan Tr.).

141.    The interest on each note was payable monthly.  The interest payments were hand-delivered by Ms. Krisiuk to Kamo Avagumyan in cash.  Exh. 11 at 32:2-12 (Kamo Avagumyan Tr.).

142.    ZAO FG Life made regular and timely interest payments on Mr. Avagumyan's notes until August 2015.  Mr. Avagumyan "always received money on the same day that it was promised."  Exh. 11 at 35:25-36:3, 53:10-14 (Kamo Avagumyan Tr.).

143.    Neither Kamo nor Karen Avagumyan has executed a written assignment granting Mr. Varshavsky a legal interest in the notes issued in Karen Avagumyan's name.  Mr. Varshavsky has admitted that he is not personally owed any money under these notes.  Exh. 11 at 83:24-84:17 (Kamo Avagumyan Tr.); Exh. 9 at 9:14-20 (Varshavsky Tr.); Exh. 16 at 27:23-28:3 (Karen Avagumyan Tr.); Exh. 46 at Request 4 (Defendant's Responses to Plaintiff's Requests for Admission).

144.    Nevertheless, Mr. Varshavsky has sought repayment of 21 promissory notes issued in the name of Karen Avagumyan and funded by Kamo Avagumyan.  Exh. 47 at

SL0000001, SL0000003-04, SL0000007-15, SL0000017-23, SL0000028-29 (Avagumyan

promissory notes listed in Appendix A); Exh. 48 (1/20/2016 email from R. Stahl to R. Weigel

attaching Avagumyan notes).

145.    Promissory Note No. 1938 was issued to Karen Avagumyan by ZAO FG

Life on January 19, 2015 in the amount of 1,500,000 EUR, for a term of one year at an annual

interest rate of 11%.  Exh. 47 at SL0000019.

146.    Promissory Note No. 1938 was guaranteed, or avalized, by PRBB.  Exh.

47 at SL0000019.

147.    Promissory Note No. 1938 was issued in exchange for funds that were

originally delivered at least as early as January 17, 2012, and the investment was rolled over

annually in exchange for a new promissory note.  Exh. 49 at SL0002405 (Note No. 9179 issued

by ZAO FG Life on January 17, 2012) and SL0002432 (Note No. 2407 issued by ZAO FG Life

on January 17, 2013).

148.    Promissory Note No. 785 was issued to Karen Avagumyan by ZAO FG

Life on August 6, 2014 in the amount of $1,500,000, for a term of one year at an annual interest

rate of 10%.  Exh. 47 at SL0000001.

149.    Promissory Note No. 785 was issued in exchange for funds that were

originally delivered at least as early as August 6, 2012, and the investment was rolled over

annually in exchange for a new promissory note.  Exh. 49 at SL0002413 (Note No. 2322 issued

by ZAO FG Life on August 6, 2012) and SL0002442 (Note No. 2482 issued by ZAO FG Life on

August 6, 2013).

150.     Promissory Note No. 792 was issued to Karen Avagumyan by ZAO FG Life on August 15, 2014 in the amount of $500,000, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000003.

151.     Promissory Note No. 792 was issued in exchange for funds that were originally delivered at least as early as August 15, 2012, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002414 (Note No. 2323 issued by ZAO FG Life on August 15, 2012) and SL0002443 (Note No. 2489 issued by ZAO FG Life on August 15, 2013).

152.     Promissory Note No. 798 was issued to Karen Avagumyan by ZAO FG Life on September 8, 2014 in the amount of $1,000,000, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000004.

153.     Promissory Note No. 798 was issued in exchange for funds that were originally delivered at least as early as September 6, 2012, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002415 (Note No. 2336 issued by ZAO FG Life on September 6, 2012) and SL0002444 (Note No. 2496 issued by ZAO FG Life on September 6, 2013).

154.     Promissory Note No. 806 was issued to Karen Avagumyan by ZAO FG Life on October 2, 2014 in the amount of $500,000, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000007.

155.     Promissory Note No. 806 was guaranteed, or avalized, by PRBB.  Exh. 47 at SL0000007.

156.     Promissory Note No. 806 was issued in exchange for funds that were originally delivered at least as early as October 2, 2012, and the investment was rolled over

annually in exchange for a new promissory note.  Exh. 49 at SL0002416 (Note No. 2340 issued by ZAO FG Life on October 2, 2012) and SL0002445 (Note No. 631 issued by ZAO FG Life on October 2, 2013).

157.    Promissory Note No. 813 was issued to Karen Avagumyan by ZAO FG Life on October 10, 2014 in the amount of $500,000, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000008.

158.    Promissory Note No. 813 was guaranteed, or avalized, by PRBB.  Exh. 47 at SL0000008.

159.    Promissory Note No. 813 was issued in exchange for funds that were originally delivered at least as early as October 10, 2012, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002417 (Note No. 2344 issued by ZAO FG Life on October 10, 2012) and SL0002446 (Note No. 638 issued by ZAO FG Life on October 10, 2013).

160.    Promissory Note No. 825 was issued to Karen Avagumyan by ZAO FG Life on November 5, 2014 in the amount of $1,000,000, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000009.

161.    Promissory Note No. 825 was guaranteed, or avalized, by PRBB.  Exh. 47 at SL0000009.

162.    Promissory Note No. 825 was issued in exchange for funds that were originally delivered at least as early as November 1, 2011, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002397 (Note No. 9087 issued by ZAO FG Life on November 1, 2011), SL0002418 (Note No. 2363 issued by ZAO FG Life on

November 1, 2012), and SL0002447 (Note No. 647 issued by ZAO FG Life on November 1, 2013).

163.    Promissory Note No. 826 was issued to Karen Avagumyan by ZAO FG Life on November 14, 2014 in the amount of $1,500,000, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000010.

164.    Promissory Note No. 826 was guaranteed, or avalized, by PRBB.  Exh. 47 at SL0000010.

165.    Promissory Note No. 826 was issued in exchange for funds that were originally delivered at least as early as November 14, 2012, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002419 (Note No. 2365 issued by ZAO FG Life on November 14, 2012) and SL0002448 (Note No. 653 issued by ZAO FG Life on November 14, 2013).

166.    Promissory Note No. 1902 was issued to Karen Avagumyan by ZAO FG Life on December 3, 2014 in the amount of $2,000,000, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000011.

167.    Promissory Note No. 1902 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000011.

168.    Promissory Note No. 1902 was issued in exchange for funds that were originally delivered at least as early as December 2, 2011, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002398 (Note No. 9001 issued by ZAO FG Life on December 2, 2011), SL0002420 (Note No. 2369 issued by ZAO FG Life on December 3, 2012), and SL0002449 (Note No. 656 issued by ZAO FG Life on December 3, 2013).

169.     Promissory Note No. 1904 was issued to Karen Avagumyan by ZAO FG Life on December 10, 2014 in the amount of $1,500,000, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000012.

170.     Promissory Note No. 1904 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000012.

171.     Promissory Note No. 1904 was issued in exchange for funds that were originally delivered at least as early as December 10, 2012, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002421 (Note No. 2399 issued by ZAO FG Life on December 10, 2012) and SL0002450 (Note No. 658 issued by ZAO FG Life on December 10, 2013).

172.     Promissory Note No. 1906 was issued to Karen Avagumyan by ZAO FG Life on December 15, 2014 in the amount of $500,000, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000013.

173.     Promissory Note No. 1906 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000013.

174.     Promissory Note No. 1906 was issued in exchange for funds that were originally delivered at least as early as December 13, 2013, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002451 (Note No. 660 issued by ZAO FG Life on December 13, 2013).

175.     Promissory Note No. 1907 was issued to Karen Avagumyan by ZAO FG Life on December 17, 2014 in the amount of 500,000 EUR, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000014.

176.     Promissory Note No. 1907 was guaranteed, or avalized, by PRBB. Exh.47  at SL0000014.

177.     Promissory Note No. 1907 was issued in exchange for funds that were originally delivered at least as early as December 15, 2011, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002399 (Note No. 9077 issued by ZAO FG Life on December 15, 2011), SL0002422 (Note No. 2400 issued by ZAO FG Life on December 17, 2012), and SL0002452 (Note No. 662 issued by ZAO FG Life on December 17, 2013).

178.     Promissory Note No. 1908 was issued to Karen Avagumyan by ZAO FG Life on December 24, 2014 in the amount of 2,300,000 EUR, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000015.

179.     Promissory Note No. 1908 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000015.

180.     Promissory Note No. 1908 was issued in exchange for funds that were originally delivered at least as early as December 23, 2011, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002400 (Note No. 9194 issued by ZAO FG Life on December 23, 2011), SL0002423 (Note No. 2382 issued by ZAO FG Life on December 24, 2012), and SL0002453 (Note No. 668 issued by ZAO FG Life on December 24, 2013).

181.     Promissory Note No. 1936 was issued to Karen Avagumyan by ZAO FG Life on December 29, 2014 in the amount of $1,000,000, for a term of one year at an annual interest rate of 11%.  Exh. 47 at SL0000017.

182.    Promissory Note No. 1936 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000017.

183.    Promissory Note No. 1936 was issued in exchange for funds that were originally delivered at least as early as December 27, 2012, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002424 (Note No. 2392 issued by ZAO FG Life on December 27, 2012).

184.    Promissory Note No. 1937 was issued to Karen Avagumyan by ZAO FG Life on January 19, 2015 in the amount of $2,500,000, for a term of one year at an annual interest rate of 11%.  Exh. 47 at SL0000018.

185.    Promissory Note No. 1937 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000018.

186.    Promissory Note No. 1937 was issued in exchange for funds that were originally delivered at least as early as January 17, 2012, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002406 (Note No. 9195 issued by ZAO FG Life on January 17, 2012) and SL0002431 (Note No. 2408 issued by ZAO FG Life on January 17, 2013).

187.    Promissory Note No. 1941 was issued to Karen Avagumyan by ZAO FG Life on February 2, 2015 in the amount of $1,000,000, for a term of one year at an annual interest rate of 11%.  Exh. 47 at SL0000020.

188.    Promissory Note No. 1941 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000020.

189.    Promissory Note No. 1941 was issued in exchange for funds that were originally delivered at least as early as January 31, 2012, and the investment was rolled over

annually in exchange for a new promissory note.  Exh. 49 at SL0002407 (Note No. 9185 issued by ZAO FG Life on January 31, 2012) and SL0002433 (Note No. 2414 issued by ZAO FG Life on January 31, 2013).

190.    Promissory Note No. 1948 was issued to Karen Avagumyan by ZAO FG Life on March 5, 2015 in the amount of $1,000,000, for a term of one year at an annual interest rate of 11%.  Exh. 47 at SL0000021.

191.    Promissory Note No. 1948 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000021.

192.    Promissory Note No. 1948 was issued in exchange for funds that were originally delivered at least as early as March 5, 2013, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002434 (Note No. 2428 issued by ZAO FG Life on March 5, 2013) and AVP0000983 (Note No. 714 issued by ZAO FG Life on March 5, 2014).

193.    Promissory Note No. 2000 was issued to Karen Avagumyan by Vennop Trading Limited ("Vennop") on April 16, 2015 in the amount of 700,000 EUR, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000029.

194.    Promissory Note No. 2000 was issued in exchange for funds that were originally delivered at least as early as April 16, 2012, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002409 (Note No. 9167 issued by ZAO FG Life on April 16, 2012), SL0002436 (Note No. 2444 issued by ZAO FG Life on April 16, 2013), and AVP0000978 (Note No. 735 issued by ZAO FG Life on April 16, 2014).

195.     Promissory Note No. 1953 was issued to Karen Avagumyan by Vennop on June 22, 2015 in the amount of $1,500,000, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000022.

196.     Promissory Note No. 1953 was issued in exchange for funds that were originally delivered at least as early as June 20, 2013, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002438 (Note No. 2465 issued by ZAO FG Life on June 20, 2013) and AVP0000977 (Note No. 765 issued by ZAO FG Life on June 20, 2014).

197.     Promissory Note No. 1954 was issued to Karen Avagumyan by Vennop on June 29, 2015 in the amount of $2,000,000, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000023.

198.     Promissory Note No. 1962 was issued to Karen Avagumyan by Vennop on July 13, 2015 in the amount of $500,000, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000028.

199.     Promissory Note No. 1962 was issued in exchange for funds that were originally delivered at least as early as July 11, 2012, and the investment was rolled over annually in exchange for a new promissory note.  Exh. 49 at SL0002412 (Note No. 2310 issued by ZAO FG Life on July 11, 2012), SL0002440 (Note No. 2471 issued by ZAO FG Life on July 11, 2013), and AVP0000982 (Note No. 777 issued by ZAO FG Life on July 11, 2014).

200.     None of the promissory notes issued by ZAO FG Life or Vennop in the name of Karen Avagumyan were guaranteed or avalized by Mr. Leontiev in his personal capacity.  Exh. 47 at SL0000001, SL0000003-04, SL0000007-15, SL0000017-23, SL0000028-29 (Avagumyan promissory notes listed in Appendix A); Exh. 49 at SL0002397-2400,

SL0002405-07, SL0002409, SL0002412-24, SL0002431-34, SL0002436, SL0002438, SL0002440, SL0002442-53, AVP0000977-78, AVP0000982-83 (predecessor Avagumyan promissory notes).

201. Mr. Varshavsky also has sought repayment of four promissory notes issued by Vennop in the name of Diana Karapetyan. Exh. 47 at SL0000024-27 (Karapetyan promissory notes listed in Appendix A); Exh. 50 (1/20/2016 email from R. Stahl to R. Weigel attaching Karapetyan notes).

202. Promissory Note No. 1955 was issued to Ms. Karapetyan by Vennop on April 4, 2015 in the amount of $1,000,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000024.

203. Promissory Note No. 1956 was issued to Ms. Karapetyan by Vennop on May 22, 2015 in the amount of $1,000,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000025.

204. Promissory Note No. 1957 was issued to Ms. Karapetyan by Vennop on June 24, 2015 in the amount of $1,000,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000026.

205. Promissory Note No. 1958 was issued to Ms. Karapetyan by Vennop on June 30, 2015 in the amount of $1,000,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000027.

206. None of the promissory notes issued by Vennop in the name of Ms. Karapetyan were guaranteed or avalized by Mr. Leontiev in his personal capacity. Exh. 47 at SL0000024-27 (Karapetyan promissory notes listed in Appendix A).

207.    Mr. Varshavsky and the Avilon Group's witnesses now disclaim knowledge of Ms. Karapetyan.  Exh. 9 at 14:8-16 (Varshavsky Tr.); Exh. 11 at 74:22-23 (Kamo Avagumyan Tr.); Exh. 14 at 108:12-13 (Semenova Tr.); Exh. 15 at 109:5-7 (Popov Tr.); Exh. 13 at 145:19-21 (Monakhova Tr.).

208.    Mr. Varshavsky does not have a legal assignment of any claims held by Ms. Karapetyan with respect to the Vennop promissory notes.  Exh. 46 at Request 3 (Defendant's Responses to Plaintiff's Requests for Admission).

209.    Mr. Varshavsky also has sought repayment of four promissory notes issued by ZAO FG Life in the name of Igor Renich.  Exh. 47 at SL0000002, SL0000005-6, SL0000016 (Renich promissory notes listed in Appendix A); Exh. 50 (1/20/2016 email from R. Stahl to R. Weigel attaching Renich notes).

210.    Promissory Note No. 788 was issued to Mr. Renich by ZAO FG Life on August 6, 2014 in the amount of $14,293,096, scheduled to increase to $14.4 million on December 9, 2014, for a term of one year at an annual interest rate of 11%.  Exh. 47 at SL0000002.

211.    Promissory Note No. 800 was issued to Mr. Renich by ZAO FG Life on August 6, 2014 in the amount of $6,000,000, for a term of one year at an annual interest rate of 11%.  Exh. 47 at SL0000005.

212.    Promissory Note No. 800 was guaranteed, or avalized, by PRBB.  Exh. 47 at SL0000005.

213.    Promissory Note No. 802 was issued to Mr. Renich by ZAO FG Life on September 12, 2014 in the amount of $1,000,000, for a term of one year at an annual interest rate of 11%.  Exh. 47 at SL0000006.

214.    Promissory Note No. 802 was guaranteed, or avalized, by PRBB.  Exh. 47 at SL0000006.

215.    Promissory Note No. 1929 was issued to Mr. Renich by ZAO FG Life on January 12, 2015 in the amount of $1,110,904, for a term of one year at an annual interest rate of 11%.  Exh. 47 at SL0000016.

216.    Promissory Note No. 1929 was guaranteed, or avalized, by PRBB.  Exh. 47 at SL0000016.

217.    None of the promissory notes issued by ZAO FG Life in the name of Mr. Renich were guaranteed or avalized by Mr. Leontiev in his personal capacity.  Exh. 47 at SL0000002, SL0000005-6, SL0000016 (Renich promissory notes listed in Appendix A).

218.    As of November 2015, Mr. Renich had received either three million U.S. dollars or three million Euros with respect to the amount due under the promissory notes, but had not returned any of the underlying promissory notes.  Exh. 51 at AVPE0004204 (11/30/2015 email from V. Popov to I. Monakhova, forwarding 11/29/2015 email from M. Shamis).

219.    Mr. Varshavsky does not have a legal assignment of any claims held by Mr. Renich with respect to the ZAO FG Life promissory notes.  Exh. 46 at Request 2 (Defendant's Responses to Plaintiff's Requests for Admission).

220.    Mr. Leontiev has never met or spoken with Mr. Renich or Ms. Karapetyan.  Leontiev Decl. ¶ 44.

## IV.    The Borrower Entities

### A.    Ambika Investments Limited

221.    Ambika was incorporated under the laws of Cyprus on July 4, 2006. Exh. 52 (Ambika corporate registration records).

222.    Its current directors are Petros Livanios and Ria Christofidi.  Exh. 52 (Ambika corporate registration records).

223.    As of December 31, 2014, Ambika had issued approximately $83 million in subordinated debt to PRBB.  Exh. 3 at SL0001293 (PRBB 2014 Audited Financials).



B.    **Vennop Trading Limited**

229.    Vennop was incorporated under the laws of Cyprus on January 10, 2013. Exh. 55 (Vennop corporate registration records).

230.    Vennop's current director is Mykyta Zvyagin.  Exh. 55 (Vennop corporate registration records).

C.   **ZAO Financial Group Life**

231.   ZAO FG Life was incorporated under the laws of the Russian Federation on September 13, 2006.  Monastyrsky Exh.[6] 2 at 1 (ZAO FG Life corporate registration records).

232.   Its sole shareholder was OOO Alivikt.  Monastyrsky Exh. 2 at 3 (ZAO FG Life corporate registration records).

233.   OOO Alivikt is an entity incorporated under the laws of the Russian Federation and was beneficially owned by Mr. Leontiev, Mr. Zheleznyak, and, at different times, Eduard Panteleev or Eldar Bikmaev.  Exh. 56 (OOO Alivikt corporate registration records); Exh. 1 at 76:19-77:4, 78:15-25 (Leontiev Tr.).

234.   On April 1, 2015, ZAO FG Life filed a notice of voluntary liquidation. Exh. 57 (4/1/2015 Notice of Liquidation).

235.   On August 5, 2015, ZAO FG Life was formally dissolved.  Monastyrsky Exh. 2 at 11 (ZAO FG Life corporate registration records).

236.   Mr. Leontiev was not involved in the decision to liquidate ZAO FG Life and did not review or sign any liquidation documents.  Leontiev Decl. ¶ 33; Exh. 1 at 113:22-114:17 (Leontiev Tr.).

237.   On August 23, 2016, a complaint purportedly signed by Andrey Arminayts was filed with the Moscow Directorate of the Federal Tax Authority alleging that ZAO FG Life's liquidation balance sheet did not properly reflect an outstanding obligation to Mr. Arminayts.  Monastyrsky Exh. 1 at SL0038706 (12/26/2016 decision of the Federal Tax Authority).

---

[6] "Monastyrsky Exh. __" refers to the Exhibits attached to the Declaration of Yuri Monastyrsky in support of Plaintiff's Motion for Summary Judgment, dated January 26, 2017

238.    On the basis of this complaint, the Federal Tax Authority reversed the voluntary liquidation of ZAO FG Life on September 2, 2016.  Monastyrsky Exh. 1 at SL0038706 (12/26/2016 decision of the Federal Tax Authority).

239.    ZAO FG Life's liquidator, Aleksey Saltykov, appealed the reversal. Monastyrsky Exh. 1 at SL0038706 (12/26/2016 decision of the Federal Tax Authority).

240.    Mr. Arminayts filed an affidavit in support of the appeal, attesting that he neither signed nor submitted the August 23 complaint.  Monastyrsky Exh. 1 at SL0038706-07 (12/26/2016 decision of the Federal Tax Authority).

241.    Because the complaint purportedly made by Mr. Arminayts was the sole basis for reversing the liquidation, the Federal Tax Authority granted Mr. Saltykov's appeal and reinstated ZAO FG Life's dissolution on December 26, 2016.  Monastyrsky Exh. 1 at SL0038707 (12/26/2016 decision of the Federal Tax Authority).

242.    Mr. Varshavsky became aware of the liquidation of ZAO FG Life no later than August 3, 2016, when the notice of liquidation was submitted in support of Mr. Leontiev's motion for judgment on the pleadings.  Dkt. Nos. 24-8 (ZAO FG Life's notice of liquidation) and 24-9 (corporate registration records of ZAO FG Life).

243.    Neither Mr. Varshavsky nor any individual named in the promissory notes at issue in this case have filed a complaint with the Federal Tax Authority.  Monastyrsky Exh. 1 at SL0038707 (12/26/2016 decision of the Federal Tax Authority); Exh. 16 at 59:20-25 (Karen Avagumyan Tr.).

## V.    Mr. Varshavsky's Collection Efforts and the Settlement Negotiations

244.    In August 2015, several days after PRBB's license was revoked, Mr. Varshavsky told Mr. Zheleznyak to bring Mr. Leontiev to a meeting at the Avilon Group's

offices to discuss Mr. Varshavsky's assertion that Mr. Zheleznyak and Mr. Leontiev should pay the monies allegedly owed by Ambika, ZAO FG Life, and Vennop.  Exh. 9 at 80:15-22 (Varshavsky Tr.); Exh. 2 at 142:7-13 (Zheleznyak Tr.); Exh. 13 at 132:19-133:5 (Monakhova Tr.).

245.    In August 2015, Mr. Leontiev attended the meeting at Mr. Zheleznyak's request that he mediate the dispute and relieve the pressure that was being placed on Mr. Zheleznyak by Mr. Varshavsky.  Leontiev Decl. ¶ 34; Exh. 1 at 123:17-124:3 (Leontiev Tr.).

246.    The Moscow meeting was brief and lasted approximately 15 to 20 minutes.  Exh. 9 at 82:18-20 (Varshavsky Tr.).

247.    The Moscow meeting was the first time that Mr. Varshavsky ever discussed Ambika, ZAO FG Life, Vennop, or any wealth management product with Mr. Leontiev.  Exh. 9 at 61:12-62:6 (Varshavsky Tr.).

248.    The Moscow meeting was the first and only time that Ms. Monakhova ever spoke with Mr. Leontiev on any subject.  Exh. 13 at 136:17-20 (Monakhova Tr.).

249.    There was no agreement on any material terms, such as the amount of the obligation or a schedule of repayment, at the Moscow meeting.  Exh. 1 at 124:4-13 (Leontiev Tr.); Exh. 9 at 64:18-22, 81:14-82:17, 87:9-23 (Varshavsky Tr.); Exh. 2 at 146:7-14 (Zheleznyak Tr.).

250.    Approximately one week later, Mr. Varshavsky, Mr. Zheleznyak, and Mr. Leontiev met in London.  Exh. 2 at 148:8-15 (Zheleznyak Tr.).

251.    Because he feared for his safety, Mr. Leontiev recorded the meeting in London.  Leontiev Decl. ¶ 40; Exh. 1 at 124:18-21 (Leontiev Tr.); Exh. 2 at 113:19-114:9 (Zheleznyak Tr.).

252.    Although Mr. Leontiev did not believe that he had any personal liability with respect to the Ambika loans or the ZAO FG Life and Vennop promissory notes, he hoped to negotiate a resolution to the dispute between Mr. Varshavsky and Mr. Zheleznyak, because Mr. Varshavsky was seeking to impose a legal obligation of the bank onto Mr. Zheleznyak as a moral obligation.  Leontiev Decl. ¶¶ 35, 39; Exh. 1 at 69:3-9 (Leontiev Tr.).

253.    The parties did not reach agreement on any material terms, including the amount owed, collateral, an interest rate, or a schedule for payment, at the London meeting. Exh. 9 at 104:10-18, 105:9-13 (Varshavsky Tr.); Exh. 1 at 134:20-135:4 (Leontiev Tr.).

254.    In September 2015, Mr. Zheleznyak persuaded Mr. Leontiev to refrain from trying to stop a payment of $17 million to the Avilon Group from Valkera, one of the off-balance sheet entities operated by Ms. Vyulkova.  Exh. 2 at 71:16-23, 73:24-74:2 (Zheleznyak Tr.); Exh. 58 at 52:6-11 (Zubiy Tr.).

255.    Mr. Zheleznyak facilitated the payment by instructing Ms. Vyulkova to make the wire transfer from Valkera to the Avilon Group.  Exh. 2 at 71:12-15 (Zheleznyak Tr.); Exh. 1 at 138:20-21 (Leontiev Tr.).

256.    In exchange for the $17 million payment, Valkera received an assignment of Avilon Plaza's rights under the 2010 Loan, which resolved the dispute with respect to that loan.  Exh. 34 at AVPE0002555-59 (9/17/2015 email from A. Zheleznyak to Mr. Popov attaching assignments agreements).

257.    Over the next few months, Mr. Varshavsky consistently pressured Mr. Zheleznyak to persuade Mr. Leontiev to settle the dispute over an additional $83 million that Mr. Varshavsky was demanding.  Exh. 1 at 135:17-136:3 (Leontiev Tr.); Leontiev Decl. ¶ 45.

258.    Between September and December 2015, Ms. Monakhova and Mr. Popov
and Avilon AG employees working under their direction prepared multiple drafts of payment
schedules and settlement agreements, none of which were ever signed.  Exh. 59 at
AVPE0006163-66 (unsigned deed of arrangement); Exh. 60 at AVPE0006115-17 (unsigned
deed of arrangement); Exh. 61 at AVPE0006126-28 (unsigned surety agreement); Exh. 62 at
AVPE0006134-36 (unsigned agreement on promissory note acquisition); Exh. 63 at
AVPE0006137-39 (unsigned agreement on promissory note acquisition); Exh. 64 at
AVPE0006140-42 (unsigned note purchase agreement); Exh. 65 at AVP0002718-19 (unsigned
deed of arrangement); Exh. 15 at 95:10-97:5 (Popov Tr.).

259.    No agreement was reached as a result of these negotiations with respect to
the amount owed, the parties to whom any debt was owed, the structure of a deal, collateral, or
releases of liability.  Exh. 13 at 141:23-142:8 (Monakhova Tr.); Exh. 15 at 96:3-97:10, 104:15-
21, 108:6-8, 113:13-116:7 (Popov Tr.); Exh. 66 at AVPE0004244-46 (November and December
2015 emails between V. Popov, I. Monakhova, A. Varshavsky, and M. Shamis); Exh. 67 at
AVPE0006232-37 (December 2015 emails between I. Monakhova, V. Popov, A. Varshavsky,
and Y. Semenova).

260.    On December 24, 2015, Mr. Popov circulated another draft agreement to
Mr. Leontiev's and Mr. Zheleznyak's counsel, and noted that "this Draft Agreement is not
deemed to be concluded until signed by all Parties, as well as all conditions, terms,
representation, and warranties are not deemed to be agreed by our side."  The draft agreement
was never signed.  Exh. 68 at AVPE0001007-14; Exh. 15 at 126:4-10 (Popov Tr.).

261.     On January 15, 2016, Mr. Leontiev and Mr. Varshavsky, represented by counsel, met in New York to discuss a potential resolution to the dispute.  Exh. 9 at 80:9-14, 105:14-23. (Varshavsky Tr.).

262.     On January 20, 2016, Mr. Varshavsky's counsel provided the loan agreements, guarantees, and promissory notes listed in Appendices A through C to the Complaint (the "Alleged Loans") as the documents underlying Mr. Varshavsky's claims.  Exhs. 48, 50, 69 (1/20/2016 emails from R. Stahl to R. Weigel attaching loan agreements and promissory notes); Exh. 70 (2/1/2016 email from R. Stahl to R. Weigel attaching bank guarantees).

263.     These negotiations did not result in a settlement agreement between the parties.  Leontiev Decl. ¶ 46.

**VI.     Procedural History**

264.     Mr. Leontiev filed the present action on May 13, 2016, seeking a declaratory judgment that he does not owe Mr. Varshavsky any money pursuant to the Alleged Loans and damages for intentional infliction of emotional distress.  Dkt. No. 1 ¶¶ 12-13 (Complaint).

265.     Mr. Varshavsky moved to dismiss the tort claim, but filed an answer to the declaratory judgment claim.  Dkt. Nos. 14-15 (Defendant's Notice of Motion and Memorandum of Law in Support of Motion to Dismiss); Dkt. No. 16 (Answer).

266.     This Court granted Mr. Varshavsky's motion to dismiss the intentional infliction of emotional distress claim on September 2, 2016.  Dkt. No. 31.

267.     On August 3, 2016, Mr. Leontiev moved for a judgment on the pleadings, arguing that Mr. Varshavsky had no legal right to seek repayment of the Alleged Loans because

he was not a party or a third-party beneficiary to the loan agreements or promissory notes and did not have an assignment of the claims, and that Mr. Leontiev had no liability for the Alleged Loans as a matter of Cypriot and Russian veil-piercing law.  Dkt. No. 23 at 8-11, 15-20 (Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Pleadings).

268.    Mr. Varshavsky filed an amended answer and opposed the motion, but refused to state whether he had an assignment of the claims at issue in this lawsuit.  Dkt. No. 27 at 13 (¶ 8) (Amended Answer); Dkt. No. 28 at 11-12 (Defendant's Memorandum of Law in Opposition to Motion for Judgment on the Pleadings).

269.    In both his original and amended answers, Mr. Varshavsky denied the allegation that "Mr. Leontiev owes Mr. Varshavsky nothing."  Dkt. No. 1 ¶ 4 (Complaint); Dkt. No. 16 at 3 (¶ 4) (Answer); Dkt. No. 27 at 3 (¶ 4) (Amended Answer).

270.    This Court denied Mr. Leontiev's motion on September 23, 2016 by a "bottom line" order, and issued a written decision dated December 4, 2016.  Dkt. Nos. 41 and 46.

271.    The Court held that because a defendant in a declaratory judgment claim bears no burden to plead facts in his answer, the pleadings left open the possibility of Mr. Leontiev's liability under a veil-piercing theory.  Dkt. No. 46 at 11-12.

272.    The Court recognized that Mr. Varshavsky's refusal to acknowledge whether he had an assignment of the claims was likely a "tactic[] . . . to keep Mr. Leontiev embroiled in the present suit," but held that the pleadings left open the possibility that such an assignment could be produced in discovery.  Dkt. No. 46 at 17.

273.    On November 16, 2016, Avilon AG and Karen Kamoevich Avagumyan— but not Mr. Varshavsky—filed an action in New York state court against Mr. Leontiev for fraudulent conveyance and unjust enrichment arising from the same loan agreements and some

of the same promissory notes at issue in this case.  Exh. 71 (Complaint in *Avilon AG v. Leontiev*,

Index No. 656007/2016 (New York State Supreme Court)).

274.    On January 5, 2016, eight days before the end of discovery, Mr.

Varshavsky admitted in his deposition that he does not have and has never had an assignment of

Avilon AG's rights under the Ambika loans or of Karen Avagumyan's rights under his

promissory notes or any proprietary interest in those claims.  Exh. 9 at 9:3–6, 9:17-20

(Varshavsky Tr.).

275.    Mr. Varshavsky admitted that he never had an assignment of any claims

from people on whose behalf he purported to negotiate.  Exh. 9 at 14:17-22 (Varshavsky Tr.).

276.    Mr. Varshavsky testified that he does not know who Diana Karapetyan is.

Exh. 9 at 14:8-10 (Varshavsky Tr.).

277.    Mr. Varshavsky confirmed that he is not personally owed any money by

Mr. Leontiev.  Exh. 9 at 9:21-23 (Varshavsky Tr.) ("Q. Are you personally owed any money by

Mr. Leontiev?  A. No.").

278.    Mr. Varshavsky admitted that the allegation in paragraph 4 of the

Complaint that "Mr. Leontiev owes Mr. Varshavsky nothing" is true, despite having denied it in

both his Answer and Amended Answer.  Exh. 9 at 11:7-10 (Varshavsky Tr.).

279.    On January 13, 2016, the last day of discovery, Mr. Varshavsky admitted

that he did not have a legal assignment of the claims held by Avilon AG, Karen Avagumyan,

Igor Renich, or Diana Karapetyan, in his responses to Plaintiff's Requests for Admission.  Exh.

46 at Requests 1-4 (Defendant's Response to Plaintiff's Requests for Admission).

Dated:          New York, New York
                January 27, 2017

                                GIBSON, DUNN & CRUTCHER LLP

                                By: _____
                                    Robert L. Weigel
                                    Marshall R. King
                                    Alison L. Wollin

                                200 Park Avenue
                                New York, New York 10166
                                Telephone: 212.351.4000
                                Facsimile: 212.351.4035

                                *Attorneys for Plaintiff Sergey Leontiev*