# EXHIBIT 2

Page 1

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    ——————————————————————————————————————

4    SERGEY LEONTIEV,

5                         Plaintiff,

6              -against-

7    ALEXANDER VARSHAVSKY,

8                         Defendant.

9    Case No. 1:16-cv-03595-JSR

     ——————————————————————————————————————

10

11                    December 16, 2016

                      9:50 a.m.

12

13

                 *** CONFIDENTIAL ***

14

15              DEPOSITION of ALEXANDER

16   ZHELEZNYAK, taken by Defendant, pursuant

17   to Notice, held at the offices of

18   DEBEVOISE & PLIMPTON LLP, 919 Third

19   Avenue, New York, New York before Wayne

20   Hock, a Notary Public of the State of New

21   York.

22

23

24

25

```
                                              Page 2
1
2    A P P E A R A N C E S:
3
          GIBSON, DUNN & CRUTCHER LLP
4         Attorneys for Plaintiff
                    200 Park Avenue
5                   New York, New York 10166
6         BY:       ROBERT L. WEIGEL, ESQ.
                    rweigel@gibsondunn.com
7                   ANDREI F. MALIKOV, ESQ.
                    amalikov@gibsondunn.com
8
9         DEBEVOISE & PLIMPTON LLP
          Attorneys for Defendant
10                  919 Third Avenue
                    New York, New York 10022
11
          BY:       SEAN HECKER, ESQ.
12                  shecker@debevoise.com
                    PETER S. ROSS, ESQ.
13                  pross@debevoise.com
                    WILLIAM H. TAFT V, ESQ.
14                  whtaft@debevoise.com
15
16        ALSO PRESENT:
17
                    RONALD MARRAZZO, Videographer
18                  ROMAN SANNIKOV, Interpreter
                    EVGENIYA SOKOLOVA
19                  VLADIMIR KHRENOV
                    ALEKSEI ROMANOVSKI
20                      *       *       *
21
22
23
24
25
```

```
 1              A.  Zheleznyak -- CONFIDENTIAL
 2         A.    I'm sorry, the other way around,
 3    the reverse.
 4         Q.    Explain.
 5         A.    Could you repeat the question?
 6         Q.    Sure.
 7               You're aware, are you not, that
 8    in September, 2015 there were discussions
 9    about having Valkera repay certain moneys
10    owed to Avilon pursuant to loan agreements
11    with Ambika?
12         A.    Yes, I know that.
13         Q.    And the decision about whether
14    to have Valkera repay moneys to Avilon
15    that were owed pursuant to loan agreements
16    with Ambika was a decision made by Sergey
17    Leontiev; true?
18         A.    He gave his agreement to this.
19         Q.    And Alexander Shcheglyaev had
20    absolutely no decision-making authority
21    with respect to that payment; correct?
22         A.    He did not.
23         Q.    And there's a reference in this
24    e-mail to Fedor.
25               MR. WEIGEL: Can you show it to
```

1          A.  Zheleznyak -- CONFIDENTIAL

2    organized, those are the ones I'm asking

3    you about.

4               Did Sergey Leontiev direct you

5    to arrange those loans?

6        A.    Well, what do you mean by

7    directed?  In 2008, Sergey asked to get a

8    large loan, to acquire a large loan from

9    Avilon.

10       Q.    He asked who?

11       A.    Myself.

12       Q.    For what purpose?

13       A.    In 2008, there was a significant

14   world crisis and in Russia that had a

15   significant impact -- reflected

16   significantly on the banks and

17   Probusinessbank was in a difficult

18   situation with respect to the amount of

19   capital it was holding.  We needed a large

20   sum in order to continue business and to

21   increase the capital.  Sergey asked me to

22   try to obtain a large loan from Avilon.

23       Q.    And you did that?

24       A.    Yes.

25       Q.    At Sergey Leontiev's direction?

```
 1              A.  Zheleznyak -- CONFIDENTIAL
 2       A.    At the request, at the request
 3   of Sergey Leontiev I went and I discussed
 4   the terms.
 5       Q.    And that was papered as a loan
 6   that was made to Ambika Investments; is
 7   that right?
 8              MR. WEIGEL: I object.
 9       Argumentative, the term "papered."
10              THE WITNESS:  Subsequently, the
11       loan was signed between Avilon and
12       Ambika.
13       Q.    Okay.
14              And that was based on
15   negotiations that you had with
16   representatives of Avilon?
17       A.    By this, what do you mean?
18       Q.    The loan we're talking about in
19   2008.
20       A.    I only discussed the terms.
21       Q.    With whom?
22       A.    With Alexander Varshavsky.
23       Q.    How much was that loan for?
24       A.    In terms of time frame or sum?
25       Q.    Sum.
```

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2      A.    I don't remember exactly right
 3  now.
 4      Q.    Well, is it identified in this
 5  document?
 6      A.    I think it was nineteen million.
 7  It looks like nineteen million nine
 8  hundred.
 9      Q.    And that money is still owed; is
10  it not?
11          MR. WEIGEL: By whom?
12      Q.    You can answer.
13          MR. WEIGEL: I object.  Vague.
14      Ambiguous.
15          THE WITNESS:  Ambika has not
16      paid off all of the money to Avilon.
17      Q.    Right.
18          Avilon is still owed the money;
19  correct?
20      A.    By Ambika, no, it has not paid
21  off the full amount.
22      Q.    Has anyone paid it off, to your
23  knowledge?
24      A.    Which one?  There's several
25  loans here.
```

```
 1          A.  Zheleznyak -- CONFIDENTIAL
 2      Q.     The one we're talking about
 3  right now.
 4      A.     There's a lot of them here.
 5      Q.     Well, you said that you recall
 6  negotiating the terms of the loan in 2008
 7  for approximately $19 million with Mr.
 8  Varshavsky.
 9          Do you recall that testimony?
10      A.     I don't remember the exact
11  amount but we did discuss with him
12  bringing in a loan and the terms of that
13  loan.
14      Q.     Okay.
15          And -- go ahead.
16      A.     I just don't remember right now
17  what the amount was in -- it was 2008.  I
18  don't remember the amount.  I remember
19  that it was a large amount.
20      Q.     You said you thought it was $19
21  million or so?
22      A.     Yes.
23      Q.     And you said that the purpose of
24  the loan proceeds was to cover a capital
25  shortfall at Probusinessbank?
```

Page 66

```
 1          A.  Zheleznyak -- CONFIDENTIAL
 2               MR. WEIGEL: I object.  Misstates
 3      the testimony.
 4      Q.     You were nodding.  You need to
 5  speak your answers.
 6      A.     The money was taken in order to
 7  fill the capital -- to add to the capital
 8  of Probusinessbank.
 9      Q.     And you negotiated the terms of
10  that loan at Mr. Leontiev's request;
11  correct?
12      A.     Yes, because there was a crisis.
13      Q.     And you understood that Mr.
14  Leontiev would take steps to ensure that
15  the moneys were repaid to Avilon; correct?
16               MR. WEIGEL: I object.  Vague.
17      Lacks foundation.
18      Q.     You can answer.
19      A.     Well, bank always wants all of
20  the -- the return of all of the deposits
21  that are outstanding including this one,
22  of course.  Of course we assumed that we
23  would fulfill these obligations.
24      Q.     And you thought Mr. Leontiev
25  would ensure that the money was repaid?
```

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2               MR. WEIGEL: Objection.  That
 3          question's already been asked.
 4               If you have anything new to add,
 5          feel free.
 6               THE WITNESS:  I said that we
 7          would fulfill all of the -- all of our
 8          obligations -- that we would fulfill
 9          all our obligations to Avilon for --
10          so that I would not be -- so that I
11          wouldn't worry.
12     Q.     Right.
13               Because you had given your word
14     that the money would be repaid?
15               MR. WEIGEL: I object.  Vague.
16     Q.     You can answer.
17     A.     I have a friendly relationship
18     with Alexander Varshavsky and my
19     reputation and my moral standing is not
20     the least of my concerns.
21     Q.     You've been directly involved in
22     discussions regarding the proposed
23     repayment of the loans identified in the
24     document we were just looking at since
25     August of last year; right?
```

```
1            A. Zheleznyak -- CONFIDENTIAL
2       A.    Which amount, the one that was
3  repaid?
4       Q.    Yes.
5       A.    Yes.
6       Q.    So Ambika didn't have the $17
7  million; right?
8       A.    It didn't.
9       Q.    Okay.
10            So the money was repaid by a
11 company called Valkera; right?
12      A.    Correct.
13      Q.    Okay.
14            And you were involved in the
15 negotiations that led to Valkera making
16 the $17 million available to Avilon even
17 though the money was owed by Ambika?
18      A.    Yes, I participated, yes.
19      Q.    And you testified, I believe,
20 that Sergey Leontiev ultimately agreed to
21 allow Valkera to pay back the $17 million
22 owed by Ambika; correct?
23      A.    Yes.
24      Q.    The $17 million that was repaid
25 by Valkera, that wasn't money that was
```

```
 1        A.  Zheleznyak -- CONFIDENTIAL
 2  yours personally; was it?
 3     A.    Yes, absolutely.  Unfortunately.
 4     Q.    It's unfortunate for all of us.
 5           Are you aware that Sergey
 6  Leontiev told Alexander Varshavsky that
 7  you personally repaid the $17 million that
 8  came from Valkera?
 9           MR. WEIGEL: I object.
10     Foundation.
11     Q.    You can answer.
12     A.    I was the one who made the
13  instructions -- who instructed Vyulkova to
14  make the payment, the final instruction to
15  make that payment.
16     Q.    You gave her the final
17  instruction after getting permission from
18  Sergey Leontiev; right?
19     A.    Yes, he gave his agreement, yes.
20     Q.    You couldn't have made that
21  instruction without Sergey Leontiev's
22  agreement; could you?
23     A.    I couldn't, right.
24     Q.    Because ultimately he's the one
25  who is responsible for making decisions
```

```
 1          A.  Zheleznyak -- CONFIDENTIAL
 2   like that; right?
 3              MR.  WEIGEL: I'm going to object.
 4       It's vague and ambiguous as to what
 5       you mean decisions like that.
 6              THE WITNESS:  If you could be a
 7       little bit more specific what you mean
 8       by he's the person who makes these
 9       kinds of decisions.
10       Q.    Let me try it this way.
11              You've testified that you
12   couldn't decide that Valkera would repay
13   the $17 million; correct?
14       A.    Correct.
15       Q.    You had to get Sergey Leontiev's
16   permission to do that; right?
17       A.    Of course.
18       Q.    Did you need to check with Mr.
19   Shcheglyaev before you made that decision?
20       A.    No.
21       Q.    Because he has absolutely no
22   decision-making authority with respect to
23   the activities of Valkera; correct?
24       A.    Yes, I answered that.
25       Q.    Right.
```

```
                                          Page 73
 1          A. Zheleznyak -- CONFIDENTIAL
 2              Did you need to check with
 3   anyone other than Sergey Leontiev about
 4   the decision to instruct Valkera to repay
 5   the $17 million?
 6      A.    Check, what do you mean?
 7      Q.    Did you need permission from
 8   anyone else?
 9      A.    No.
10      Q.    So Sergey Leontiev is the only
11   person who really could make that
12   decision; right?
13      A.    This, what do you mean by this?
14      Q.    The decision for Valkera to pay
15   back the $17 million.
16      A.    Yes.
17      Q.    Okay.
18              Mr. Leontiev ultimately
19   controlled the activities of Valkera, to
20   your understanding?
21              MR. WEIGEL: I object to the
22      form.  Foundation.
23      Q.    You can answer.
24      A.    Valkera was the same type of
25   company as Ambika and the bank controlled
```

```
 1          A.  Zheleznyak -- CONFIDENTIAL
 2   it.
 3       Q.    And Leontiev controlled the
 4   bank?
 5       A.    Leontiev controlled the bank.
 6       Q.    Right.
 7             So someone like Vyulkova
 8   wouldn't direct Ambika directors of
 9   Valkera directors to take action to move
10   significant sums around without Sergey
11   Leontiev being in favor of doing that;
12   right?
13             MR. WEIGEL: Sean, I'm going to
14       object unless you clarify the time
15       frame.
16             Are you talking about the time
17       period before the bank was taken over
18       or after?
19             THE WITNESS: Can my
20       translator --
21             MR. HECKER: No, no.
22             Listen, Mr. Weigel, from now on
23       you can state your objection.  You
24       cannot make speaking objections.  You
25       can't do it.  You're not permitted to
```

```
                                        Page 91

 1            A. Zheleznyak -- CONFIDENTIAL

 2        A F T E R N O O N    S E S S I O N

 3                  December 16, 2016

 4                      1:16 p.m.

 5              THE VIDEOGRAPHER: It is

 6        approximately 1:16 p.m.

 7              We are back on the record.

 8    A L E X A N D E R    Z H E L E Z N Y A K,

 9          having been previously duly sworn by

10          a Notary Public of the State of

11          New York, upon being examined,

12          testified as follows:

13    EXAMINATION CONTINUED BY

14    MR. HECKER:

15        Q.    Mr. Zheleznyak, earlier you

16    testified about a loan that you arranged

17    from Avilon that was documented as a loan

18    to Ambika.

19              Do you recall that testimony?

20        A.    Yes.

21        Q.    That was in 2008, that loan?

22        A.    Yes.

23        Q.    And you said that the reason you

24    were asked to arrange that loan by Mr.

25    Leontiev is because there was a capital
```

1          A.  Zheleznyak -- CONFIDENTIAL

2    deficiency at Probusinessbank; is that

3    right?

4          A.     Correct.

5          Q.     But you didn't arrange a loan

6    from Avilon to Probusinessbank; right?

7          A.     It was for Probusinessbank,

8    correct.

9          Q.     The loan was made by Avilon to

10   Ambika; correct?

11         A.     Correct.

12         Q.     And Probusinessbank is not the

13   owner of Ambika; right?

14         A.     It is not but it controls it.

15   It's not the legal owner.

16         Q.     Why was Ambika created?

17         A.     Ambika was created -- organized

18   as a brokerage company including as a way

19   of attracting funds, resources for the

20   bank.

21         Q.     Whose idea was it to create

22   Ambika?

23         A.     I don't know whose idea it was.

24         Q.     Are there any employees who work

25   for Ambika?

```
                                        Page 93
 1          A.  Zheleznyak -- CONFIDENTIAL
 2      A.    I didn't deal with these
 3  companies.  I wasn't working on these
 4  companies.  This was outside my sphere.
 5      Q.    Are you aware of whether Ambika
 6  had an office?
 7      A.    I don't know.
 8      Q.    And you don't know whether it
 9  had employees?
10      A.    I don't know.
11      Q.    And your testimony is the bank
12  didn't own Ambika but ultimately
13  controlled it?
14      A.    Yes.
15      Q.    And your understanding is that
16  if Ambika borrowed money from Avilon that
17  Probusinessbank could get access to the
18  funds that were loaned to Ambika?
19          MR. WEIGEL: I'm going to object
20      on the grounds that it is vague and
21      ambiguous.
22      Q.    You can answer.
23      A.    Probusinessbank guaranteed the
24  return of the funds.
25      Q.    That wasn't my question though.
```

```
                                           Page 94
 1          A. Zheleznyak -- CONFIDENTIAL
 2          My question was whether
 3   Probusinessbank could use funds owned by
 4   Avilon to Ambika.
 5      A.    Yes.
 6          (Discussion held in Russian)
 7          MR. HECKER: Let me try
 8      rephrasing it so we don't have a
 9      debate over the translation.
10      Q.    Was it your understanding that
11   Probusinessbank was able to use funds that
12   were loaned by Avilon to Ambika?
13      A.    It could.
14      Q.    And the reason it could, to your
15   understanding, was because Sergey Leontiev
16   ultimately controlled both Ambika and
17   Probusinessbank?
18          MR. WEIGEL: I object.
19      Argumentative.  Lacks foundation.
20      Asked and answered.
21      Q.    You can answer.
22      A.    Controlled, yes.
23      Q.    Okay.
24          Now, how long have you known Mr.
25   Leontiev?
```

```
                                        Page 95
 1         A. Zheleznyak -- CONFIDENTIAL
 2      A.    Forty-three years.
 3      Q.    How old are you, sir?
 4      A.    Fifty.
 5      Q.    So you met as children?
 6      A.    In school.
 7      Q.    You were school friends?
 8      A.    Yes, yes.
 9      Q.    You grew up together?
10      A.    Yes.
11      Q.    And is the first time that you
12   did work for him when you were a lawyer
13   back in 1991?
14      A.    That's correct.
15      Q.    At what point did you -- at any
16   point did you go into business with Mr.
17   Leontiev?
18      A.    Yes.
19      Q.    When was that?
20      A.    I think it was probably around
21   that time, '91, '92.
22      Q.    And what business did you go
23   into together?
24      A.    Initially?
25      Q.    Sure.
```

1          A. Zheleznyak -- CONFIDENTIAL

2      A.    An international business

3   center, Probusiness.

4      Q.    What were the activities of

5   Probusiness?

6      A.    Initially it was consultation on

7   foreign economic activity.  Subsequently

8   there were different businesses that at

9   different stages were added to it.

10      Q.    Like what?

11      A.    Business for auto

12   transportation, transportation of cars,

13   servicing of large commercial enterprises,

14   and specifically focused on export of

15   their production.  At a certain point it

16   added tourism business, and so on.

17      Q.    Did you have a division of labor

18   as between you and Mr. Leontiev in terms

19   of who handled what aspects of the

20   businesses?

21      A.    In the bank or in the business?

22      Q.    Well, why don't you start with

23   the business and then you can describe

24   when the bank was created.

25      A.    I handled strictly the legal

```
                                        Page 100
 1          A. Zheleznyak -- CONFIDENTIAL
 2   by Probusinessbank or any of the other
 3   businesses that you were in with Mr.
 4   Leontiev?
 5          MR. WEIGEL: No, that's not what
 6      the question was in the first
 7      instance.
 8          MR. HECKER: Really?  That's what
 9      the transcript says.
10          MR. WEIGEL: All right.  Let's
11      go.
12          THE WITNESS:  No, I did not
13      participate.
14   Q.    So who made those decisions?
15   A.    Which ones specifically?
16   Q.    Investment decisions.
17          MR. WEIGEL: I'm going to object.
18      It's overbroad.
19          THE WITNESS:  For different
20      types of investment activity there
21      were different departments.
22   Q.    Are you speaking about
23   Probusinessbank in particular?
24   A.    About the whole financial group,
25   about all the banks including
```

Page 101

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2     Probusinessbank.
 3          Q.    Who made investment decisions at
 4     Probusinessbank?
 5          A.    There were different decisions,
 6     so you could buy a car, you could buy
 7     bonds.  Each one had a -- each individual
 8     had a limit onto what kind of decisions
 9     they could -- what sort of decisions they
10     can make.  In other words, everyone was
11     delegated a certain authority to make
12     certain decisions.
13          Q.    You said earlier that you
14     understood that Ambika was set up in order
15     to act as a brokerage firm; is that what
16     you said?
17          A.    Yes, like a broker company, yes.
18          Q.    What do you mean by a broker
19     company?
20          A.    It worked on financial markets.
21          Q.    And who was responsible for
22     making decisions about Ambika's role in
23     the financial markets?
24          A.    The financial departments.
25          Q.    Of?  Financial departments of
```

1          A. Zheleznyak -- CONFIDENTIAL

2   what?

3        A.     Probusinessbank.

4        Q.     And who was that?

5        A.     There were several departments

6   that handled the capital, their

7   accounting, the plan, the financial

8   models, forecasting.

9        Q.     Whose idea was it to establish

10  Valkera?

11       A.     I don't know whose idea it was

12  to establish this company.  There was a

13  department in the financial bloc that was

14  specifically responsible with making these

15  -- taking these actions.

16       Q.     Did that include Aleksandra

17  Vyulkova?

18       A.     It included her, yes, and other

19  individuals as well.

20       Q.     Did it include Fedor Brazhnikov?

21       A.     Fedor Brazhnikov reported to

22  Aleksandra Vyulkova.  He was one of her

23  subordinates.

24       Q.     Who did Aleksandra Vyulkova

25  report to?

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2      A.     She was part of the financial
 3  bloc.  They were all very independent
 4  there.  It was a horizontal structure.
 5  There was a specific requirement for
 6  fulfilling a financial model and each head
 7  of each of the departments would then go
 8  and work on fulfilling that requirement.
 9      Q.     Who did Aleksandra Vyulkova
10  report to?  Who was her supervisor?
11      A.     It was this financial bloc and
12  her part was -- her department was part of
13  that financial bloc.  She had her own
14  functions in fulfilling the requirements
15  that were provided to that financial bloc.
16  In other words, the requirements were
17  presented to the whole financial bloc, not
18  to the individual departments within that
19  financial bloc, and that that would then
20  be fulfilled by these individual
21  departments and they would then work on
22  their own piece of that and would then
23  report on that.  The financial director
24  would then report on fulfilling that
25  requirement.
```

```
 1          A.  Zheleznyak -- CONFIDENTIAL
 2      Q.    Was she a financial director.
 3            (Discussion held in Russian)
 4      Q.    Was she a financial director?
 5      A.    No, she wasn't.  She was part of
 6   the financial bloc.
 7      Q.    Who set the requirements for the
 8   financial bloc?
 9      A.    Sergey Leontiev.
10      Q.    So ultimately she reported up to
11   Sergey Leontiev; right?
12      A.    I think he's probably only seen
13   her two times in his life.
14      Q.    She worked for him; right?
15            MR. WEIGEL: I'm sorry, what is
16      the -- excuse me, one second, let me
17      object.
18            I don't understand the laughter.
19      Q.    She worked for Sergey Leontiev
20   ultimately?
21            MR. WEIGEL: I'm going to object
22      on the grounds that you're misstating
23      the testimony and it's vague as to use
24      of the term "ultimately."
25            THE WITNESS:  Even the drivers
```

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2   been set up like Ambika and Valkera.
 3             (Discussion held in Russian)
 4      A.    Yes, yes.
 5      Q.    You said that you paid some
 6   money to Mr. Shcheglyaev to allow you to
 7   use his name as the beneficial owner of
 8   certain companies; is that right?
 9             MR. WEIGEL: I object.  Vague as
10      to who you mean by you.
11             THE WITNESS:  Yes, yes.
12      Q.    Who asked you to recruit someone
13   to act as the beneficial owner of Ambika,
14   Valkera, other entities?
15      A.    Vyulkova, she was looking
16   herself and she asked me and she asked her
17   people as well to look for someone.
18      Q.    And you were looking for someone
19   who would be willing to let you use their
20   name as the beneficial owner?
21      A.    Yes.
22      Q.    Is there some reason that Ms.
23   Vyulkova didn't want to use her name or
24   the name of some Probusinessbank employee
25   as the beneficial owner?
```

```
 1           A. Zheleznyak -- CONFIDENTIAL
 2        A.    I can only guess that she was
 3   already -- she already was one somewhere
 4   else, but I am not certain.
 5        Q.    Did Probusinessbank report in
 6   its -- did report publicly that it
 7   controlled these Cyprus entities like
 8   Ambika, Valkera?
 9        A.    I don't know.  That's also
10   beyond my sphere.
11        Q.    Are you familiar with Vermenda
12   Holdings Limited?
13        A.    I've heard that name, yes.
14        Q.    Do you know what its purpose
15   was?
16        A.    No, I don't know.
17        Q.    And I believe you already
18   testified you don't know what Vennop
19   Trading Limited is?
20        A.    No, no, I hadn't even heard of
21   it prior to today, before I saw the
22   documents.
23        Q.    Who is Yanna Krisyuk?
24        A.    She's the vice president of the
25   department for working with VIP clients.
```

1          A. Zheleznyak -- CONFIDENTIAL
2     She is the deputy head of the department
3     for working with VIP clients.
4          Q.    Who is the head of that
5     department?
6          A.    Natalia Abramova.
7          Q.    And did Ms. Krisyuk and Ms.
8     Abramova play any role in raising funds
9     from either entities or individuals who
10    lent money to any of the Cyprus companies
11    we've been talking about?
12         A.    I didn't understand.  If you
13    could repeat it one more time.
14         Q.    Sure.
15              Did either Ms. Krisyuk or Ms.
16    Abramova play a role in raising funds from
17    either entities or individuals who were
18    lending money to the Cyprus entities we've
19    been talking about?
20         A.    They were involved in bringing
21    in the funds, but the companies were
22    determined by Ms. Vyulkova depending or
23    based on the financial model.
24         Q.    Who established the financial
25    model?

```
 1            A. Zheleznyak -- CONFIDENTIAL
 2       A.     Sergey Leontiev, he approved the
 3   financial model for the group and
 4   translated it down.
 5       Q.     And the financial model for the
 6   group included creating the Cyprus
 7   entities that would act as borrowers of
 8   funds that would be used by the group?
 9            MR. WEIGEL: I'm just going to
10       object in terms of it's overbroad, the
11       use of the term "the Cyprus entities."
12            MR. HECKER: Let's hear what he
13       said.
14            (Discussion held in Russian)
15            THE WITNESS:  Yes, including
16       bringing in the funds for the company.
17            MR. HECKER: I think the record's
18       very messy.
19       Q.     Let's -- let me try the question
20   again.
21            Am I correct that Sergey
22   Leontiev ultimately approved the financial
23   model for the group?
24       A.     Correct.
25       Q.     And am I right to understand
```

```
 1          A.  Zheleznyak -- CONFIDENTIAL
 2    that the financial model for the group
 3    included creating entities like Ambika and
 4    Valkera to act as borrowers of funds that
 5    would be raised from entities like Avilon?
 6               MR. ROMANOVSKI: Could you
 7         translate the whole question again,
 8         please?
 9               THE INTERPRETER: (Complying).
10               THE WITNESS:  So it wasn't the
11         organization of the entities.  The
12         financial model revolved around
13         bringing in funds.  Yes, it included
14         bringing in funds to these companies.
15         Q.    And your testimony is that Ms.
16    Abramova and Ms. Krisyuk would be involved
17    in raising moneys that Sergey Leontiev had
18    decided should be raised through
19    borrowing?
20               MR. WEIGEL: I object.  Lacks
21         foundation.  It's vague as to what you
22         mean by used in borrowing.
23         Q.    Go ahead.
24         A.    Abramova and Krisyuk sold the
25    product of the bank both to individuals
```

1          A.  Zheleznyak -- CONFIDENTIAL

2    and to legal entities and the product was

3    to bring in funds to the balance of the

4    company.

5          Q.    And when you're talking about

6    the products of the bank, you're talking

7    about loans that were made to Ambika and

8    Valkera, for example?

9          A.    Not only those companies.

10         Q.    Others as well?

11         A.    Yes.

12         Q.    Right.

13               And Ms. Vyulkova would decide

14   whether additional entities should be

15   established offshore in Cyprus in order to

16   act as the borrower of those funds?

17         A.    Yes.

18         Q.    But Mr. Leontiev ultimately

19   determined what to do with the moneys that

20   were raised in this manner; correct?

21              MR. WEIGEL: Objection.  Vague as

22        to what you mean by ultimately.

23              THE WITNESS:  Each business had

24        its own requirements, its own needs,

25        and whether to fulfill the ambitions

```
 1        A.  Zheleznyak -- CONFIDENTIAL
 2     of each of the businesses was decided
 3     by Mr. Leontiev.
 4     Q.    And he decided what to do with
 5   the moneys that were raised; right?
 6          MR. WEIGEL: I object.  Vague.
 7     Asked and answered.
 8          THE WITNESS:  He either approved
 9     or did not approve the proposals from
10     the businesses.  In our case, the
11     businesses would propose and then
12     Sergey would decide ultimately and
13     provide, approve funds to the business
14     that was most profitable.
15     Q.    You attended a meeting in London
16   between Sergey Leontiev, Alex Varshavsky,
17   and others?
18     A.    Yes.
19     Q.    Did you know that Sergey
20   Leontiev was recording the meeting?
21     A.    Yes.
22     Q.    He told you before the meeting?
23     A.    Yes, yes, yes.
24     Q.    Did he tell you why he was
25   recording it?
```

```
1          A. Zheleznyak -- CONFIDENTIAL
2      A.     He said that there may be some
3  instigators or instigation and that I want
4  to record it just in case.
5      Q.     Do you understand what
6  instigation means in that context?
7      A.     Well, I think it probably meant
8  something like threats or exerting
9  pressure.
10     Q.     Did that happen in the meeting?
11     A.     No.
12     Q.     Did you tell Alex Varshavsky
13 before the meeting with Mr. Leontiev that
14 Mr. Leontiev was going to be recording the
15 meeting?
16     A.     No.
17     Q.     Did any of the other attendees
18 other than you and Mr. Leontiev know that
19 he was recording the meeting?
20     A.     No, no.
21     Q.     Did Mr. Varshavsky ever
22 communicate any threats to you as it
23 related to the proposal to repay the debt?
24     A.     Varshavsky did not threaten me.
25     Q.     Did you ever tell Mr. Leontiev
```

```
 1            A.  Zheleznyak -- CONFIDENTIAL
 2      Q.      Okay.
 3              And you were involved in
 4   arranging for each of these loans, the
 5   2008 loan and the 2011 loan and the
 6   subsequent agreements.
 7              (Discussion held in Russian)?
 8              THE INTERPRETER: I apologize,
 9       can I get clarification?  Was it
10       stated subsequent loans?
11              MR. HECKER: Subsequent
12       agreements.
13              THE INTERPRETER: Subsequent
14       agreements to other loans or to these
15       loans?  I'm sorry, I just want to make
16       sure I understand what we discussed.
17              Let me get clarification to make
18       sure I'm translating correctly.
19              MR. HECKER: My question is were
20       you involved in arranging each of the
21       loans, the 2008 loan agreement and the
22       2011 loan agreement as well as the
23       subsequent agreements that are
24       identified in appendix B.
25              THE WITNESS:  Well, you see,
```

1          A. Zheleznyak -- CONFIDENTIAL

2      afterwards it was just the work of the

3      manager and the client so -- and then

4      after that, I didn't need to -- after

5      that, Varshavsky, Sasha, he came in,

6      he deposited funds, he withdrew funds.

7      So he didn't need my participation

8      after that.  We already agreed on the

9      terms.  When the term came up, he

10     would either say I'll extend it or he

11     would bring in more money.

12          It wasn't only for Ambika.

13     Sometimes he would go directly to the

14     bank and deposit funds directly as a

15     deposit at the bank.  He brought in

16     some of his friends.  But this was

17     already part of the day-to-day work of

18     the manager with the client.

19          When the question came about the

20     terms, that's when he would reach out

21     to me.

22     Q.   And the terms --

23          EVGENIYA SOKOLOVA: Interest

24     rate.

25          THE INTERPRETER: Interest rate.

1          A.  Zheleznyak -- CONFIDENTIAL

2      Q.    The  term  meaning  the  interest

3  rate  that  would  be  paid  on  the  loans?

4      A.    Yes,  for  the  use  of  the  funds,

5  yes,  the  rate.   Or  sometimes  I  would  call

6  him  and  say  the  rate  is  a  little  high  or

7  let's  bring  it  down  a  little  bit.

8  Sometimes  it  would  change  depending  on  the

9  market  rates.

10      Q.    You  negotiated  the  interest

11  rate?

12      A.    When  that  came  up.

13      Q.    And  over  time  am  I  correct  that

14  the  agreed-upon  interest  for  a  period  of

15  time  was  paid  on  the  loans?   The

16  agreed-upon  interest  was,  in  fact,  paid  on

17  these  loans  for  a  period  of  time?

18      A.    Could  I  just  clarify  which  funds

19  are  we  talking  about  right  now?

20      Q.    The  loans  identified  in  appendix

21  B.

22      A.    Until  the  license  was  withdrawn.

23      Q.    Interest  was  paid  on  these  loans

24  until  Probusinessbank's  license  was

25  withdrawn;  is  that  your  testimony?

```
                                    Page 120
 1          A.  Zheleznyak -- CONFIDENTIAL
 2      A.    Yes, as far as I understand, to
 3   the very end.
 4      Q.    Do you know what happened to the
 5   moneys that were loaned by Avilon to
 6   Ambika?
 7      A.    No.
 8      Q.    You don't know where the moneys
 9   went?
10      A.    No, this is outside my sphere of
11   competence, but the funds that went into
12   Ambika went into the bank and then were
13   spent on the very -- went to different
14   things.  In other words, the idea was that
15   -- so the general concept was to bring in
16   funds so that they could be added to the
17   general capital and that would be
18   distributed among the businesses.
19          I don't know the specific
20   nuances, of course.
21      Q.    So the general capital -- it
22   would either be brought in and added to
23   the general capital and distributed among
24   the businesses according to the plan that
25   was approved by Sergey Leontiev?
```

1          A.  Zheleznyak -- CONFIDENTIAL

2    recognize these to be promissory notes

3    that are listed in the chart in appendix

4    A?

5               MR. WEIGEL: Counsel, are you

6          representing that the document you

7          just handed us, Exhibit 5 is it,

8          contains all the promissory notes that

9          are identified in Exhibit A or do you

10         want the witness to actually go

11         through it one by one?

12              MR. HECKER: No, my understanding

13         is this represents all of those that

14         are listed in appendix A.

15              MR. WEIGEL: And no others?

16              MR. HECKER: Correct.

17              THE WITNESS:  I recognize them,

18         yes.

19         Q.    And a number of these are signed

20    by you; right?

21         A.    Yeah, it looks very similar,

22    yes.

23         Q.    No, I'm asking if you see your

24    signature on this.

25         A.    I see it.  It's part of them,

```
 1          A.  Zheleznyak -- CONFIDENTIAL
 2   some of them.
 3       Q.     And why did you sign the ones
 4   you signed?
 5       A.     Either -- there were two
 6   reasons.  Either the client asked that I
 7   sign or I may have just been in the office
 8   at the time as a signatory.  I wasn't
 9   always at the office.
10       Q.     You signed on behalf of FAO
11   Life, Financial Group Life?
12       A.     Yes.
13       Q.     What was your position at
14   Financial Group Life?
15       A.     At which point in time?
16       Q.     At any time.
17              Did you have different positions
18   in Financial Group Life at the time?
19       A.     I had the power of attorney from
20   Financial Group Life to be a signatory.
21       Q.     Okay.
22              Who suggested to you that you
23   should sign these on behalf of Financial
24   Group Life?
25       A.     The setup was organized a little
```

1           A.  Zheleznyak -- CONFIDENTIAL

2    differently.  The deposits were brought

3    in, Vyulkova would identify the company,

4    and then documents were prepared.  The

5    documents would then just be brought in to

6    me for signature and then they had the

7    visas or rather the approval from the

8    authorized individuals and the power of

9    attorney and I would sign them.

10          Q.   Did you personally have

11   discussions with Karen Avagumyan about

12   certain of these promissory notes?

13          A.    Never.

14          Q.    Have you ever met Karen

15   Avagumyan?

16          A.    That's Kamo's son.

17          Q.    Have you ever met him?

18          A.    Of course.

19          Q.    But you never discussed the

20   promissory notes with Karen?

21          A.    The money wasn't Karen's, it was

22   Kamo's money.

23          Q.    Did you have discussions with

24   Kamo Avagumyan about the promissory notes?

25          A.    It was the same.  We had one

1        A. Zheleznyak -- CONFIDENTIAL

2   conversation.  He said that I will be just

3   like Alexander, I would be depositing

4   funds just like Alexander and are my terms

5   going to be the same, my percentage going

6   to be the same.  Yes, okay.

7              Sometimes he would have more,

8   sometimes he would have less, but I

9   wouldn't verify each and every amount with

10  him.  That was what the manager handled.

11     Q.    And did you talk with Kamo

12  Avagumyan about certain of the loans in

13  the June, 2015 time period?

14     A.    There was just a general

15  discussion not about any specific loans,

16  we were just talking in general.

17     Q.    Certain of these notes were

18  signed in June, 2015.  So for example, if

19  you want to look at note number 1953 which

20  has a Bates number of 961.

21     A.    I don't have 961.  I have 962.

22  57, 58, 62.

23           MR. WEIGEL: Sean, my version

24      goes from 61 to 63, so apparently they

25      were --

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2              MR. WEIGEL: It's by another
 3      company called Vennop, so I hope
 4      you're not trying to mislead the
 5      witness.
 6              MR. HECKER: I'm not.
 7              MR. WEIGEL: The June 22, 2015
 8      note is in the name of Vennop, not in
 9      the name of Financial Group Life.
10              MR. HECKER: You're correct.  I
11      stand corrected.
12              Hang on one second.
13              I stand corrected.  I apologize.
14      Q.    The one we were just looking at
15  with Vennop Trading was the one you didn't
16  know existed until you were preparing for
17  your deposition?
18      A.    Yes, correct.
19      Q.    Do you have any idea who
20  arranged for the promissory note we just
21  looked at that was executed with Vennop
22  Trading?
23      A.    I don't have any idea, but I
24  think that probably happened the way it
25  usually does.
```

```
                                    Page 130
 1         A. Zheleznyak -- CONFIDENTIAL
 2      Q.    And so who would have knowledge
 3   about that, from your understanding?
 4      A.    About what?
 5      Q.    About the note with Vennop
 6   Trading signed at the end of June of 2015.
 7      A.    Definitely Vyulkova.
 8      Q.    What about Mr. Leontiev?
 9      A.    No.
10      Q.    He wouldn't know about Vennop
11   Trading?
12      A.    I don't think so.  I don't think
13   so.  I doubt that he knows the specific
14   companies.  That's Vyulkova's sphere of
15   competence.
16      Q.    In terms of whether to set up
17   additional offshore companies?
18      A.    Yes.
19      Q.    But regardless of what actually
20   mechanically was involved in setting them
21   up, in terms of giving them direction
22   about taking steps like this, isn't that
23   ultimately something that Sergey Leontiev
24   would have to approve?
25           MR. WEIGEL: I'm going to object
```

1           A.  Zheleznyak -- CONFIDENTIAL

2      to the form of the question, it's

3      vague, what you mean by steps like

4      this.

5               THE WITNESS:  As to how to --

6               THE INTERPRETER: Could you read

7      back the question?  I'll make sure

8      that it's translated properly.  I

9      apologize.

10              (Whereupon the requested portion

11     was read back by the reporter)

12              THE WITNESS:  Which steps?  I

13     don't understand which steps.

14     Q.    Setting up a company like Vennop

15 in order to issue promissory notes.

16     A.    Leontiev did not create these

17 companies, did not instruct to create the

18 companies.  That was done by Vyulkova.

19 Leontiev approved the model, how much to

20 bring in, and then how much -- how to

21 distribute it.  He's the one who approved

22 that.

23     Q.    Right.

24              So, for example, when Valkera's

25 going to make a repayment of $17 million,

1          A.  Zheleznyak -- CONFIDENTIAL

2     table of securities controlled by Mr.

3     Leontiev to try to persuade him that Mr.

4     Leontiev had assets from which he could

5     repay these outstanding loans; right?

6          A.    Correct.

7          Q.    And in fact, you then set up a

8     meeting between Mr. Varshavsky and Mr.

9     Leontiev; right?

10         A.    Correct.

11         Q.    Then you met at Avilon's

12    offices?

13         A.    Yes.

14         Q.    And was anyone else present

15    aside from you, Leontiev, and Varshavsky?

16         A.    I believe Irina Monakhova came

17    by later on.

18         Q.    And who is Irina Monakhova?

19         A.    I don't know her exact title,

20    but she's like the financial director of

21    the Avilon group.

22         Q.    Okay.

23              So she participated in part of

24    the meeting?

25         A.    I think part of it.

```
 1        A.  Zheleznyak -- CONFIDENTIAL
 2     question.
 3             MR. HECKER: Mr. Weigel, you can
 4     object but state the objection.
 5             MR. WEIGEL: Asked and answered.
 6     Q.    Go ahead.
 7     A.    That's correct.  But the
 8  conditions of the transaction, they
 9  couldn't come to a resolution of the terms
10  of this -- of the agreement, of the
11  transaction.  Sergey asked for a day to
12  think it over and to come up with a
13  proposal and after that, he proposed -- he
14  did come up with proposals.
15     Q.    Now, am I right that the meeting
16  ended with a plan to meet the next day
17  again to discuss the proposal?
18     A.    That's correct.
19     Q.    Did Mr. Leontiev show up the
20  next day?
21     A.    No.  Well, we had an agreement
22  in theory to meet the next day, so there
23  was no set time or place.  It was like
24  let's get together tomorrow and discuss
25  it.
```

1        A.  Zheleznyak -- CONFIDENTIAL

2   2015.  I can't say for certain but it was

3   in 2015.

4        Q.    And since he's been in the

5   United States, to your knowledge, he

6   hasn't returned to Russia?

7        A.    He did not return.

8        Q.    Now, we spoke earlier about the

9   meeting that you had in London, I believe

10  it was August 21, 2015?

11       A.    August 15?  August, 2015.  I

12  don't know if it was the twenty-first.

13       Q.    Was there more than one meeting

14  in London or just the one?

15       A.    One.  With Varshavsky.  One.

16       Q.    This was the one that was

17  recorded by Mr. Leontiev?

18       A.    Yes.

19       Q.    And who else attended that

20  meeting?

21       A.    Myself, Boris Zuev, Alexander

22  Varshavsky, Galena Malygina.  I'm sorry,

23  Ekaterina Malygina.

24            I think that's it.

25       Q.    Who's Boris Zuev?

Page 202

1

2              CERTIFICATION BY REPORTER

3

4      I, Wayne Hock, a Notary Public of the

5   State of New York, do hereby certify:

6      That the testimony in the within

7   proceeding was held before me at the

8   aforesaid time and place;

9      That said witness was duly sworn

10   before the commencement of the testimony,

11   and that the testimony was taken

12   stenographically by me, then transcribed

13   under my supervision, and that the within

14   transcript is a true record of the

15   testimony of said witness.

16      I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, that I am not

19   interested directly or indirectly in the

20   matter in controversy, nor am I in the

21   employ of any of the counsel.

22      IN WITNESS WHEREOF, I have hereunto

23   set my hand this 19th day of December,

24   2016.

25