# EXHIBIT 9

Page 1

1
2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3
    - - - - - - - - - - - - - - - - - - -x
4
    SERGEY LEONTIEV,
5
                     Plaintiff,
6                                  Case No. 16-cv-3595
             -against-
7
    ALEXANDER VARSHAVSKY,
8
                     Defendant.
9
    - - - - - - - - - - - - - - - - - - -x
10
                       January 5, 2017
11                     9:41 a.m.
12
13
14
15           Videotaped deposition of
16   ALEXANDER VARSHAVSKY, taken by Plaintiff,
17   pursuant to Notice, held at the offices of
18   Gibson, Dunn & Crutcher LLP, 200 Park
19   Avenue, New York, New York, before
20   Sharon Lengel, a Registered Professional
21   Reporter, Certified Realtime Reporter, and
22   Notary Public of the State of New York.
23
24           *     *     *
25

Page 2

```
 1
 2   A P P E A R A N C E S:
 3
        GIBSON, DUNN & CRUTCHER LLP
 4           Attorneys for Plaintiff
             200 Park Avenue
 5           New York, New York 10166
 6      BY:  ROBERT WEIGEL, ESQ.
             ANDREI MALIKOV, ESQ.
 7           ESTER MURDUKHAYEVA, ESQ.
 8
 9
        DEBEVOISE & PLIMPTON LLP
10           Attorneys for Defendant
             801 Pennsylvania Avenue, N.W.
11           Washington, D.C. 20004
12      BY:  SEAN HECKER, ESQ.
             ALISA MELEKHINA, ESQ.
13
14
15   ALSO PRESENT:
16           WAYNE SALINE, Videographer
17           ROMAN SANIKOV, Interpreter
18           ALEXANDER KULNEV, ESQ.
19
                  *      *      *
20
21
22
23
24
25
```

1                    VARSHAVSKY

2  statements in it to be true?

3       A.    Yes.

4       Q.    Let me direct your attention to

5  paragraph 32, which is on page 7 of the

6  document.

7            The second sentence of

8  paragraph 32 reads, "As of August 1, 2016,

9  the total debt owed to Avilon was

10 approximately 29.6 million, including

11 interest, and the total debt owed to

12 Mr. Avagumyan was approximately

13 $28 million, including interest."

14            Do you see that?

15      A.    Yes.

16            MR. HECKER:  You need to answer

17      verbally.

18      A.    Yes.

19      Q.    Is the statement that the total

20 debt owed to Avilon was approximately

21 29.6 million, including interest, a true

22 statement?

23      A.    Yes.

24      Q.    Is any part of that

25 $29.6 million owed to you personally?

```
 1               VARSHAVSKY
 2      A.    No.
 3      Q.    Do you have any assignment from
 4  Avilon of any rights to collect that
 5  29.6 million?
 6      A.    No.
 7      Q.    Is the statement that
 8  Mr. Avagumyan was owed approximately 28
 9  million, including interest, a true
10  statement?
11           MR. HECKER:  Why don't you --
12      use the interpreter if you need to.
13      A.    Yes.  Yes.
14      Q.    And are you owed any portion of
15  that $28 million personally?
16      A.    No.
17      Q.    Do you have any assignment from
18  Mr. Avagumyan to pursue the claim for the
19  $28 million?
20      A.    No.
21      Q.    Okay.  Are you personally owed
22  any money by Mr. Leontiev?
23      A.    No.  No.
24      Q.    Are you personally owed any
25  money from Probusinessbank?
```

```
 1                    VARSHAVSKY
 2       A.     No.
 3              (Plaintiff's Exhibit 60, A
 4       claim, was hereby marked for
 5       identification, as of this date.)
 6       Q.     Mr. Varshavsky, I've handed you
 7   what's been marked as Exhibit 60, which is
 8   the claim that was filed in this action in
 9   the Southern District of New York.
10              Do you have that in front of
11   you?
12       A.     Yes.
13       Q.     Did you had occasion to look at
14   that document?
15       A.     Yes.
16       Q.     Okay.  I'm going to direct your
17   attention to paragraph 4.  There are three
18   sentences in paragraph 4.  I want to
19   direct your attention to the first one.
20   The first one says, "Mr. Leontiev owes
21   Mr. Varshavsky nothing."
22              Do you see that?
23       A.     Yes.
24       Q.     Is that a true statement?
25       A.     Personally.
```

```
                                           Page 11
 1                    VARSHAVSKY
 2      Q.     Personally, yes.
 3      A.     No.  I see the statement.
 4      Q.     There's too many "nos" in that
 5   answer.  Let me see if we can get this
 6   straight.
 7             Is the statement that
 8   "Mr. Leontiev owes Mr. Varshavsky nothing"
 9   a true statement?
10      A.     Yes.
11      Q.     Thank you.
12             MR. HECKER:  Are we done with
13        this document?
14             MR. WEIGEL:  You can set it
15        aside.
16             (Plaintiff's Exhibit 61, An
17        amended answer, was hereby marked for
18        identification, as of this date.)
19      Q.     Do you have Exhibit 61 in front
20   of you?
21      A.     Yes.
22      Q.     Exhibit 61 is the answer that
23   was filed -- the amended answer that was
24   filed on your behalf in this current
25   action that we're sitting here today in --
```

```
 1                    VARSHAVSKY
 2      Q.    Anyone else?
 3      A.    Yes.  Some -- some people from
 4  Russia as well.
 5      Q.    Can you give me their names?
 6      A.    Yes.  Anna Babkina, Sergey
 7  Sturov.  I don't remember another name.
 8      Q.    Do you know who Diana Karapetyan
 9  is?
10      A.    No.
11      Q.    Was she one of the individuals
12  who asked you to negotiate on his or her
13  behalf?
14            MR. HECKER:  Objection to form.
15      Foundation.  Go ahead.
16      A.    I don't know her.
17      Q.    Okay.  Did any of the
18  individuals who you -- who asked you to
19  negotiate on their behalf ever give you an
20  assignment of their claims against any
21  entity?
22      A.    No.
23            MR. HECKER:  Objection.  You
24      need to give me a second --
25            THE WITNESS:  Oh, okay.
```

```
 1                   VARSHAVSKY
 2   Avilon, he" -- meaning yourself -- "had
 3   authority to negotiate for repayment of
 4   Avilon's loans on behalf of Avilon."
 5             Do you see that?
 6       A.   Yes.
 7       Q.   Were you the president of
 8   Avilon?
 9       A.   Yes.
10       Q.   Are you currently the president
11   of Avilon?
12       A.   Yes.
13       Q.   When did you become the
14   president of Avilon?
15       A.   Since the first day.
16       Q.   Did you have any written
17   authorization from Avilon to negotiate for
18   the repayment of Avilon's loans on behalf
19   of Avilon?
20             MR. HECKER:  Objection to form.
21       Foundation.  You can answer.
22       A.   No.
23             MR. WEIGEL:  What's the
24       foundation objection?
25             MR. HECKER:  It presupposes that
```

```
 1                    VARSHAVSKY
 2          MR. HECKER:  Objection to form.
 3     I'm going to instruct you not to
 4     answer that question.
 5          MR. WEIGEL:  On what basis?
 6          MR. HECKER:  What documents we
 7     showed him during his preparation is
 8     work product.  It's the same
 9     instruction you gave your client.  If
10     you want to ask him if he remembers
11     seeing this document at any point in
12     time, you can ask him that question.
13          MR. WEIGEL:  Sure.
14     Q.    Have you seen this document at
15  any point in time?
16     A.    Specifically this one, no.  I
17  cannot recall.  Maybe -- maybe during the
18  preparation, I saw the document.  But I do
19  not -- I do not recall.
20     Q.    Okay.  Were you aware that New
21  York Motors Moscow and Ambika Invest --
22  made a loan to Ambika Investments Limited
23  in -- on or about December 18, 2008?
24     A.    Yes.
25     Q.    And were you aware that that
```

```
 1              VARSHAVSKY
 2  loan was documented in writing?
 3      A.    Yes.
 4      Q.    Did you -- did you ever review
 5  the loan agreement?
 6      A.    No.
 7      Q.    Who would have been responsible
 8  for making sure that the loan was properly
 9  documented?
10      A.    Our CFO.
11      Q.    And who is that?
12      A.    Irina Monakhova.
13      Q.    And who negotiated the terms of
14  the loan with Ambika?
15      A.    Me.
16      Q.    You personally?
17      A.    Yes.
18      Q.    Who did you negotiate those
19  terms with?
20      A.    With Mr. Zheleznyak.
21      Q.    Who is Mr. Zheleznyak?
22      A.    He's the partner of
23  Mr. Leontiev.
24      Q.    Does he have a role at
25  Probusinessbank?  Did he have a role at
```

Page 27

```
 1                    VARSHAVSKY
 2   takeover of the bank and --
 3       A.    No.  Before they stopped paying
 4   the interest and repaying the loan.
 5       Q.    When did that happen?
 6       A.    In August 2015.
 7       Q.    Before that, before August 2015,
 8   you had no idea what Ambika was?
 9       A.    Absolutely.
10       Q.    Did you do any investigation
11   into Ambika's financial condition before
12   you lent it -- before your company lent it
13   $19.9 million?
14       A.    Me personally, not.
15       Q.    Okay.  Did anybody -- well,
16   first off, what is -- what is New York
17   Motors Moscow?
18       A.    It is the company which sells
19   cars.
20       Q.    What is its relationship to
21   Avilon?
22       A.    It was re-branding.  Before, it
23   was New York Motors Moscow.  Then it's
24   Avilon.
25       Q.    All right.  So New York Motors
```

Page 28

```
 1              VARSHAVSKY
 2  Moscow and Avilon are the same company.
 3      A.    The same.  The same.
 4      Q.    Okay.  Now I understand.  Thank
 5  you.
 6            If I use Avilon for New York
 7  Motors, will you understand what I'm
 8  meaning?
 9      A.    Yeah, absolutely.
10      Q.    Okay.  Who at Avilon was
11  responsible for investigating the
12  financial condition of Ambika prior to
13  making a loan?
14            MR. HECKER:  Objection to form.
15      Foundation.  You can answer.
16      A.    Finance department and the legal
17  department.
18      Q.    And who in the finance
19  department?
20      A.    Irina Monakhova.
21      Q.    Did you ever speak to
22  Ms. Monakhova about whether investing in
23  Ambika was a good idea?
24      A.    No.
25      Q.    How did you make the decision to
```

```
 1                    VARSHAVSKY
 2   make the loan to Ambika?
 3       A.    As I said before, all the
 4   decision been made by -- by finance
 5   department, not by me.  I'm only
 6   negotiating the terms.  The rest, it go to
 7   my legal people and finance people.
 8       Q.    What terms did you negotiate?
 9       A.    I don't remember right now.
10       Q.    But generally, what were the
11   types of terms that you negotiated?
12       A.    What was in the beginning,
13   Avilon was always lending money to
14   Probusinessbank.  And the terms was -- the
15   general terms, like, on the date of the
16   negotiation, the -- the rate, the interest
17   rate.
18            So the one point, Zheleznyak
19   came to me, and he said, "I, with
20   Mr. Leontiev, we opened the company, which
21   also in our group, but it has nothing to
22   do with the bank.  It's offshore company.
23   If you want to have the higher interest
24   rate, you put your money there."  I said,
25   "Okay.  What's the difference?"  He said,
```

```
 1                    VARSHAVSKY
 2  "You will have more -- about four, five
 3  percent more than you put your money in
 4  the bank."  I said, "Okay.  Then I will
 5  instruct my finance department, and I will
 6  instruct my legal department.  You talk to
 7  them.  If they feel comfortable, do it."
 8       Q.    Did you ever discuss any terms
 9  with any employee of Avilon or any officer
10  of Avilon?
11             MR. HECKER:  Objection to form.
12       You may answer.
13       Q.    Excuse me.  I misspoke.
14             Did you ever discuss any terms
15  with any officer or employee of Ambika?
16       A.    No.
17       Q.    Okay.  Did you ever visit
18  Ambika's offices?
19       A.    No.
20       Q.    Do you know if anyone from
21  Avilon ever visited Ambika's offices?
22             MR. HECKER:  Objection to form.
23       Foundation.
24       A.    I don't know.  I don't think so.
25       Q.    Were -- is it fair to say that
```

```
 1                    VARSHAVSKY
 2           MR. HECKER:  That's one of the
 3      easy ones.
 4           MR. WEIGEL:  I know.  I know.
 5      I'm just having real trouble today.
 6      Q.    Do you see that?
 7      A.    Yes.
 8      Q.    Okay.  Was the $19.9 million put
 9  in a foreign currency deposit at
10  Probusinessbank for a year at 14 percent?
11      A.    If it says here, yes, probably
12  yes.
13      Q.    Okay.  And does Exhibit 7, which
14  is the loan agreement between Avilon and
15  Ambika, represent the $19.9 million
16  investment at 14 percent that's referred
17  to in Exhibit 62?
18           MR. HECKER:  Objection to form.
19      A.    Maybe.
20      Q.    Are you aware of another
21  $19.9 million investment at 14 percent
22  that was made on December 18, 2008?
23      A.    I will explain you.  I'm not
24  dealing with any financial or legal terms.
25  I mean, my role is business development
```

```
 1                    VARSHAVSKY
 2  and strategy.  The turnover of Avilon
 3  close to $2 billion.  I don't remember 19,
 4  15, 12 -- I don't remember.
 5      Q.    Okay.  Well, as you sit here
 6  today, do you have any reason to believe
 7  that the $19.9 million that's reflected in
 8  the loan agreement that is Exhibit 7 is
 9  the same $19.9 million that came from
10  Sveta and was to be placed in a U.S.
11  foreign currency deposit at
12  Probusinessbank, as set forth in
13  Exhibit 62?
14            MR. HECKER:  Objection to form
15      of the question.
16      A.    Possibly.
17      Q.    As you sit here today, do you
18  have any reason to think that that's not
19  the case?
20            MR. HECKER:  Same objection.
21      You can answer.
22      A.    No.
23      Q.    Okay.
24
25
```

1                    VARSHAVSKY
2       Q.    Okay.
3             (Plaintiff's Exhibit 64, An
4       email, Bates SL0033715, was hereby
5       marked for identification, as of this
6       date.)
7       Q.    Mr. Varshavsky, I've handed you
8  what's been marked as Exhibit 64.
9             Do you have that in front of
10 you?
11      A.    Yes.
12      Q.    And this is an email from
13 Ms. Nazanskaya to Ms. Monakhova.
14            Do you see that?
15      A.    Yes.
16      Q.    And she writes, "On
17 December 20th, the transit loan for
18 19.9 million will expire."
19            Do you understand that to refer
20 to the loan to Avilon?
21      A.    Yes.
22      Q.    By Avilon to Ambika?
23      A.    Yes.
24      Q.    "The rate Probusinessbank is
25 offering for the next year is 11 percent.

```
 1                  VARSHAVSKY
 2   The existing rate is 15 percent."
 3            Do you see that?
 4       A.    Yes.
 5       Q.    Were you aware that
 6   Probusinessbank was proposing to reduce
 7   the interest rate on the loan?
 8            MR. HECKER:  Objection to form
 9       of the question.
10       A.    It says here what I know and I
11   agreed.  Probably yes.
12       Q.    Okay.  It says here that "Yanna
13   Krisiuk" --
14       A.    Krisiuk.
15       Q.    -- "Krisiuk reported that
16   Alexander is aware of this and agreed to
17   this rate on November 30th."
18            Is that you, the Alexander she's
19   referring to there?
20       A.    Yes.
21       Q.    Okay.  And did you, in fact,
22   agree to a reduction of the rate from
23   15 percent to 11 percent?
24       A.    Probably, yes.
25       Q.    Okay.  And up top, Ms. Monakhova
```

```
                                        Page 56
 1                    VARSHAVSKY
 2      Q.      Okay.  Are you -- did you
 3   approve the placement of 7 and a half
 4   million dollars at Probusinessbank for
 5   11 percent?
 6              MR. HECKER:  Objection to form.
 7      Foundation.
 8      A.      I only approving the terms.  I'm
 9   not approving where the terms -- my role
10   is approve the terms.  If 11 percent, 12,
11   which I'm negotiating with the -- with the
12   Zheleznyak.  The rest, it goes to our
13   people.  From his side, it goes to
14   Krisiuk.  From my side, it goes to
15   Monakhova.  And they deal between them --
16   between -- they're dealing between them.
17   My role only approve the terms.  That's
18   it.
19              MR. HECKER:  Bob, when you reach
20      a logical breaking point -- we've been
21      going about an hour -- can we take a
22      short break?
23              MR. WEIGEL:  Sure.
24              MR. HECKER:  Thanks.
25              THE VIDEOGRAPHER:  This marks
```

```
 1                    VARSHAVSKY
 2       the end of Tape No. 1 in the
 3       videotaped deposition of Alexander
 4       Varshavsky.  We're going off the
 5       record.  The time is 10:47.
 6            (Recess)
 7            THE VIDEOGRAPHER:  This marks
 8       the beginning of Tape No. 2 in the
 9       videotaped deposition of Alexander
10       Varshavsky.  We're going on the
11       record.  The time is 11:03.
12  BY MR. WEIGEL:
13       Q.    Mr. Varshavsky, before the
14  break, we were looking at -- we looked at
15  Exhibit 66.
16            Do you have that in front of
17  you?
18       A.    Yes.
19       Q.    It's dated September 1, 2011,
20  and it's an email from Ms. Nazanskaya, and
21  it says, "The rate Probusinessbank is
22  offering for the placement of the newly
23  received 6,625,000 is 11 percent, same as
24  under existing technical loans."
25            Do you see that?
```

```
 1                    VARSHAVSKY
 2      A.    Yes.
 3      Q.    Okay.  I've handed you
 4   Exhibit 12.
 5            Have you ever seen that document
 6   before?
 7      A.    Probably, yes, but I don't
 8   recall.
 9      Q.    Okay.  And that's a loan
10   agreement dated September 1, 2011, between
11   Avilon and Ambika Investments Limited for
12   6,625,000 at 11 percent.
13            Do you see that?
14      A.    Yes.
15      Q.    Okay.  Is that the same loan
16   that Ms. Nazanskaya was referencing on
17   Exhibit 66?
18      A.    Possible.
19      Q.    Okay.  Do you have any reason to
20   doubt that it's a different -- to think
21   it's a different loan?
22      A.    I don't know.
23      Q.    Okay.  As you sit here today,
24   you have no reason to believe this is not
25   the same loan, the same placement; is that
```

```
                                              Page 59
 1                    VARSHAVSKY
 2   correct?
 3               MR. HECKER:  Objection to form.
 4      You can answer.
 5      A.     Our finance department, they do
 6   the -- they loan money to the bank or to
 7   Ambika almost every month.  So I don't
 8   know if it's the same amount, it's not the
 9   same amount.  But the number is the same.
10   But if it's the same money or not, I
11   cannot tell.
12      Q.     Okay.  Did you negotiate the
13   rate of 11 percent on this 6 point --
14      A.     I always negotiating rates.
15      Q.     Okay.  And you always negotiated
16   those rates with Mr. Zheleznyak?
17      A.     Only.
18      Q.     Okay.  I've handed you
19   Exhibit 13.
20               And do you see that is a
21   guarantee by Probusinessbank of the loan
22   from Avilon to Ambika?
23      A.     Yes.
24      Q.     The same loan that we just
25   looked at that was Exhibit 12?
```

Page 60

```
 1                    VARSHAVSKY
 2       A.    The same amount.
 3       Q.    Okay.  Did you negotiate this
 4    guarantee with Mr. Zheleznyak?
 5       A.    No.
 6       Q.    Did you insist upon a bank
 7    guarantee for the loans you made to
 8    Ambika?
 9             MR. HECKER:  Objection to the
10       form.
11       A.    Not me personally.
12       Q.    Did you insist upon a bank
13    guarantee for the loans that Avilon made
14    to Ambika?
15       A.    No.  I already explained several
16    times.  I mean, it's not my role.
17       Q.    Okay.
18       A.    I'm only negotiating the terms
19    and, specifically, what I did, I agree
20    with Mr. Zheleznyak two different terms.
21    One term is for bank.  One is for the
22    outside of bank offshore company, which
23    belongs to him and Leontiev.  So two
24    different terms.  That's what I negotiate
25    with Zheleznyak, and I pass all this
```

Page 61

1                    VARSHAVSKY
2   information to Irina Monakhova, and the
3   rest she's dealing.
4       Q.     When did you first meet
5   Mr. Leontiev?
6       A.     I met him a long time ago, first
7   time at Zheleznyak's birthday.  But we
8   didn't even speak -- it was -- I don't
9   know -- 15, 20 years ago maybe.  And the
10  first time when we was talking, I met him
11  in my office.  It was in August 2015.
12      Q.     Okay.  Before August 2015, you
13  never discussed Avilon's lending to Ambika
14  or its business dealings with
15  Probusinessbank with Mr. Leontiev; is that
16  correct?
17      A.     No.
18      Q.     When did you first discuss
19  Avilon's business dealings with
20  Mr. Leontiev?
21      A.     In my office when I met him.
22      Q.     And when was that?
23      A.     In August 2015.
24      Q.     All right.  I may have asked a
25  bad question.

```
 1                    VARSHAVSKY
 2           Is it accurate to say that,
 3   prior to August 2015, you had never
 4   discussed Avilon's business with
 5   Mr. Leontiev?
 6      A.      Never.
 7      Q.      Okay.
 8              (Pause)
 9      Q.      Do you recognize Exhibit 15?
10      A.      Yes, probably.
11      Q.      What is it?
12      A.      It's agreement.
13      Q.      Were you involved in any way in
14   negotiating Plaintiff's Exhibit 14 -- 15?
15              MR. HECKER:   Objection to form.
16      A.      Can you repeat your question,
17   please?
18      Q.      Were you involved in any way in
19   negotiating the agreement that's reflected
20   on Plaintiff's Exhibit 15?
21      A.      Terms, probably yes, as I said
22   before.   I'm only involved in the terms.
23      Q.      Were you aware that in 2014, the
24   loans to Ambika from Avilon were
25   consolidated into one loan agreement?
```

```
                                              Page 63
 1                    VARSHAVSKY
 2      A.     To what?
 3      Q.     Were you aware that in 2014, the
 4   loans from Avilon to Ambika were
 5   consolidated into one -- into one loan
 6   agreement?
 7      A.     No.
 8      Q.     Do you know why that was done?
 9             MR. HECKER:  Objection to form.
10      A.     I don't even know.
11      Q.     Okay.  Exhibit 47 is a
12   promissory note in the amount of
13   $1 million issued by Vennop Trading to
14   Ms. Karapetyan.
15             Do you see that?
16      A.     Yes.
17      Q.     Were you at any point in time
18   trying to collect that loan?
19      A.     Never.
20      Q.     Do you know why your counsel
21   provided that loan to -- note to us as one
22   of the loans you were trying to collect?
23             MR. HECKER:  Objection to the
24      form of the question.  I'll instruct
25      you not to disclose any discussions
```

```
 1                    VARSHAVSKY
 2      you've had with counsel.  But if you
 3      have an understanding, you could
 4      answer the question.
 5      A.    As far as I remember, that
 6  information being supplied to my lawyer
 7  from -- Probusinessbank lawyer.  His name
 8  is Shamis Maxim, Maxim Shamis, and
 9  probably accidentally, they supplied with
10  some wrong party which not involved in our
11  case.
12      Q.    Okay.  Do you know -- you were
13  trying to collect at one point in time
14  $100 million from Mr. Leontiev; is that
15  correct?
16            MR. HECKER:  Objection to the
17      form.  You can answer.
18      A.    Yes, but it's not accurate
19  number.  We was always talking around,
20  because we don't know what's the -- the
21  amount, what's the interest.  But we said
22  it's around 100 million.
23      Q.    Okay.  Do you know if these
24  $4 million worth of promissory notes were
25  included in that hundred million dollars?
```

```
 1                    VARSHAVSKY
 2            MR. HECKER:  Objection to form.
 3      This?
 4      A.    Not -- I have no idea who this
 5   person is.  I have no instruction from
 6   these people to collect their money.  So
 7   that -- and they not on our list.
 8      Q.    Okay.  So if this $4 million was
 9   included in the money you were trying to
10   collect, that was just a mistake?
11            MR. HECKER:  Objection to form.
12      Foundation.
13      A.    I never tried -- was trying to
14   collect that money.
15      Q.    Okay.
16            (Plaintiff's Exhibit 67, A
17      service agreement, Bates AVPE0003173,
18      was hereby marked for identification,
19      as of this date.)
20      A.    (Witness perusing document.)
21      Q.    Mr. Varshavsky, have you had a
22   chance to look at Exhibit 67?
23      A.    Yes.
24      Q.    And do you recognize that?
25      A.    Yes.
```

```
 1                    VARSHAVSKY
 2      Q.    And what is it?
 3      A.    It's a service agreement.
 4      Q.    Between European Realty Corp and
 5   Avilon; is that correct?
 6      A.    Yes.
 7      Q.    And this states that European
 8   Realty is going to provide a foreign
 9   specialist to Avilon in exchange for
10   consideration?
11      A.    Yes.
12      Q.    And you are the specialist that
13   was being provided by European Realty; is
14   that correct?
15      A.    I don't know.  Maybe.
16           MR. HECKER:  Do you want him to
17      read the whole agreement?
18      Q.    You can take your time.  But if
19   you look at paragraph 3185 -- page 3185 at
20   the bottom, you get to Annex 1 of the
21   service agreement on provision personnel.
22           MR. HECKER:  Okay.  Why don't
23      you take some time to familiarize
24      yourself with the agreement.
25           THE WITNESS:  Okay.  31.
```

```
                                              Page 67

 1                    VARSHAVSKY
 2            MR. HECKER:  He's pointing to
 3      the page, the Bates number at the
 4      bottom right.
 5            THE WITNESS:  3185?
 6      Q.    It's in Russian and in English.
 7 It's been tran -- no, I guess it's not
 8 been translated.  It was originally in
 9 Russian.
10            MR. HECKER:  Yeah.
11      A.    (Witness perusing document.)
12            MR. HECKER:  What's the
13      question?
14      Q.    Are you through it?
15      A.    Yes.
16      Q.    Okay.  This is an agreement
17 whereby your services are being provided
18 to Avilon by European Realty; is that
19 correct?
20            MR. HECKER:  Objection.
21      A.    Yes.
22            MR. HECKER:  Objection to form.
23      You can answer.
24      Q.    And do you know why your
25 employment was structured in this fashion?
```

```
                                              Page 68
 1                 VARSHAVSKY
 2      A.     I have no idea.
 3      Q.     And do you see Annex 1 to the
 4   service agreement on Provision of
 5   Personnel No. 45?
 6             Do you see that, page AVPE3185?
 7      A.     Yes.
 8      Q.     And that surname of specialist,
 9   that is you there, Alexander Varshavsky;
10   correct?
11      A.     Correct.
12      Q.     Okay.  It says here that "The
13   specialist work regime consists not more
14   than four working hours per day or
15   20 working hours per week with five
16   working day weeks and two days off."
17             Did you observe that contractual
18   provision?
19             MR. HECKER:  Objection to form.
20      Foundation.
21      A.     I didn't see that agreement
22   before.
23      Q.     You've never seen this agreement
24   before?
25      A.     No.
```

```
 1                    VARSHAVSKY
 2      Q.     Do you know if there was a tax
 3   reason for doing it this way, setting up
 4   your employment this way?
 5      A.     I don't think it's -- has
 6   something to do with the tax.  It's
 7   probably to have the working visa.  I
 8   don't think it's --
 9      Q.     It goes on to say, "The
10   specialist shall perform the following
11   positions' duties:  Development proper and
12   establish new relationship with state
13   organization key accounts as a customers
14   representative, manage company's
15   reputation amongst government and public
16   affairs audiences, create and manage
17   priority events which build and improve
18   customers, customer companies' brand and
19   reputations."
20             Do you see that?
21      A.     Yes.
22      Q.     Were those duties that you
23   performed for Avilon?
24      A.     Yes.
25      Q.     Did you perform other duties for
```

```
                                        Page 77
 1                   VARSHAVSKY
 2   payments and repayments is an accurate
 3   statement?
 4             MR. HECKER:  Objection.  Asked
 5        and answered.
 6        A.    Technically, yes.
 7        Q.    Okay.  It says, "The last loan
 8   repayment of $17 million was made by the
 9   bank three months ago."
10             Is that an accurate statement?
11        A.    I think yes.
12        Q.    It goes on to say, "The funds
13   were used by the bank to 1" -- or dash --
14   "finance the bank's construction
15   projects," dash, "interest payments on
16   other loans, loan repayments and
17   expenses," and dash, "bad debts purchase
18   and costs of arbitrage."
19             Do you see that?
20        A.    Yes.
21        Q.    Was that an accurate statement?
22        A.    Yes.  One of -- one of the all
23   the -- the purpose what they was raising
24   money for.
25        Q.    Okay.  Did Mr. Zheleznyak tell
```

```
 1                    VARSHAVSKY
 2  you that those were the purposes that the
 3  bank was going to use the money for when
 4  you negotiated the rate on the
 5  $19.9 million?
 6      A.    Mr. Zheleznyak -- Mr. Zheleznyak
 7  always was telling me what -- they have
 8  two direction:  One, it's a bank they
 9  using partially for their construction
10  business, some development, some -- some
11  other business, which not related actually
12  to the banking.
13            But some of the money they using
14  for the offshore, how they call, which is
15  controlled and managed by Sergey, because
16  what -- how Zheleznyak explained to me,
17  what -- Zheleznyak runs the banking --
18  bank, and Sergey runs everything which
19  of -- of the bank.  He's not do -- he's
20  not doing any work which is related to the
21  bank.  He's only controlling all the
22  offshore company.
23            That's why even when they rent
24  the bank -- I mean, the space in our
25  building, Sergey wasn't there; only was
```

```
 1                VARSHAVSKY
 2   Zheleznyak.  So nobody knows Leontiev
 3   like -- except he's the -- formally the
 4   president of the bank.  But nobody knows
 5   him -- or the person who runs the business
 6   day-to-day operation.
 7       Q.     So it's your testimony that
 8   Mr. Zheleznyak told you that Mr. Leontiev
 9   had nothing to do with running
10   Probusinessbank?
11           MR. HECKER:  Objection to form.
12       Mischaracterizes his testimony.
13       A.     No.  He said -- he was telling
14   me always he's formally the president of
15   the bank.  He got the big -- bigger
16   portion of the bank.  But physically,
17   Zheleznyak run the bank.  And Mr. Leontiev
18   runs all offshore companies.
19       Q.     Okay.  Did you ever review a
20   financial statement of Ambika?
21       A.     No.
22       Q.     This email goes on, "The debt
23   was confirmed by Sergey to a number of
24   people."
25           Is that an accurate statement,
```

```
 1                    VARSHAVSKY
 2   as you understand it?
 3        A.    Yes.
 4        Q.    What debt are they referring to
 5   there -- is Mr. Stahl referring to?
 6        A.    All the conversation what I have
 7   with Mr. Leontiev, it's in London in my
 8   office.
 9        Q.    Apart from the meeting in your
10   office and in London, did you have any
11   communications with Mr. Leontiev after --
12   and the meeting in Gibson Dunn -- after
13   August 2015?
14        A.    No.
15        Q.    Let's talk about the meeting you
16   had in Moscow with Mr. Leontiev.
17              How did that meeting come about?
18        A.    I called Mr. Zheleznyak and
19   asked him to come with Mr. Leontiev,
20   because always Zheleznyak was telling me
21   what -- all the money is secured,
22   guaranteed by Mr. Leontiev.  He was even
23   giving me the statement from -- from
24   the -- I don't know which company it was,
25   but the company controlled all this -- I
```

```
                                          Page 81
 1                    VARSHAVSKY
 2   will say -- assets.
 3            And they came with Mr. Leontiev.
 4   It was -- I don't remember -- five -- it
 5   was me, Irina Monakhova, Sergey Leontiev,
 6   Zheleznyak -- I think that's it.  Maybe
 7   somebody -- I don't remember if it's
 8   anybody else, but it's not important.  We
 9   was in the office.  And the question was
10   raised, so would they owe us the money,
11   and what's going to be the terms of the
12   repayment of -- payment of the loan back
13   to us.
14            He said, "I know what" -- "I owe
15   you the money, but" -- this was actually
16   about 4:00 or 5:00 in the evening.  He
17   said, "I just got up.  I need a little bit
18   time.  Can we schedule for tomorrow?  I
19   will come with a plan how we going to
20   repay the loan back."
21            So several times, he confirmed
22   what he owes the money.  He said, "You
23   don't have to worry about.  We was taking
24   money -- we was using your money since
25   2008 or even earlier.  We never fail.  We
```

Page 82

1                    VARSHAVSKY
2    always was fulfilling our obligation.  And
3    you don't have to have any doubts.  We
4    will pay you all the money back.  So let's
5    schedule for tomorrow."
6            I remember this was a Friday, I
7    believe.  So -- and we schedule specially
8    on Saturday to meet again in my office to
9    go with a schedule, which I actually was
10   telling them, "We understand what the
11   situation you have right now.  We not
12   desperate.  We not in a rush.  But only we
13   need the plan, how you going to repay us
14   the money back.  Just a plan."
15           He said, "Okay.  I will come
16   with a plan tomorrow.  We will sit down,
17   and we will -- we will agree."
18           So that's how we left that
19   meeting.  It was maybe 15 minutes meeting,
20   maybe 20 -- short meeting.  So we agree
21   we'll meet in my office, if I remember
22   correctly, around 2:00 or 3:00.  He said,
23   "Because I cannot get up early, so let's
24   meet 2:00 or 3:00."
25           So I -- we agreed.  So I call

```
 1                    VARSHAVSKY
 2              MR. HECKER:  You need to wait
 3         for him to finish his question and
 4         then verbally answer; not "uh-huh."
 5         A.    Yes.  Yes.
 6         Q.    Okay.  Did you ever tell either
 7    the lawyers or the finance people at
 8    Avilon who were tending to the details of
 9    the loan that they should get a written
10    guarantee by Mr. Leontiev?
11         A.    No.
12         Q.    Okay.  Do you know why Avilon
13    got a written guarantee from
14    Probusinessbank but not a written
15    agreement from Mr. Leontiev?
16         A.    No.
17         Q.    Okay.  Did you reach any
18    agreement with Mr. Leontiev as to
19    repayment of any sums at the meeting in
20    your office in Moscow?
21         A.    No.  He just said, "I need some
22    time.  I will come with a plan, and we
23    will sit down, and we will -- we will sign
24    the -- the agreement."
25         Q.    Okay.  And I think you said that
```

```
                                              Page 87
  1                   VARSHAVSKY
  2   you contend that he told you that he would
  3   make a repayment back to us.
  4              Who were you representing in the
  5   August meeting at your office?
  6        A.    Avilon, Avagumyan, and Renich.
  7        Q.    Anyone else?
  8        A.    No.
  9        Q.    Okay.  And what was the -- you
 10   said Mr. Leontiev said, "I owe you the
 11   money."
 12              Was the amount of the money
 13   discussed at the meeting in Moscow?
 14        A.    Yeah, I assume, yes, absolutely.
 15        Q.    And what amount of money was
 16   discussed at the meeting in Moscow?
 17        A.    I don't remember right now.
 18        Q.    Did Mr. Leontiev at the meeting
 19   say -- say that he owed a particular sum
 20   of money?
 21        A.    I don't remember right now
 22   exactly.  But what I can confirm, he never
 23   say he -- he never say no.
 24        Q.    Okay.
 25        A.    He always confirm what's been
```

Page 104

1                     VARSHAVSKY
2       Q.      Okay.   How long did the London
3   meeting go for?
4       A.      Maybe one hour.
5       Q.      Okay.   Was any agreement reached
6   at the London meeting?
7       A.      Always we reaching the same
8   agreement -- that he owes the money and he
9   will pay the money back.
10      Q.      Did you reach any agreement on
11  the terms by which Mr. Leontiev would --
12  would repay the money?
13      A.      He -- we did not reach the
14  agreement at that point, because what he
15  was proposing what he's going to pay in
16  certain installment and what we've been
17  asking, just as you just mentioned, some
18  guarantee, collateral.
19      Q.      And Mr. Leontiev wasn't prepared
20  to give you any guarantee --
21      A.      No.
22      Q.      -- or any collateral; is that
23  correct?
24      A.      No.
25      Q.      I think I may have gotten too

```
 1                  VARSHAVSKY
 2   many negatives in that.
 3            Was Mr. Leontiev prepared to
 4   give you any collateral at the London
 5   meeting?
 6            MR. HECKER:  Objection to form.
 7       A.    We did not talk about the
 8   collateral.
 9       Q.    Okay.  Did Mr. Leontiev decline
10   to give you any guarantees at the London
11   meeting?
12       A.    He declined to give us the
13   personal guarantee.
14       Q.    Okay.  After the London meeting,
15   did you have any further communications
16   with Mr. Leontiev prior to the meeting at
17   Gibson Dunn?
18       A.    No.
19       Q.    So between the London meeting
20   and the meeting at Gibson Dunn, you never
21   spoke to Mr. Leontiev on the telephone or
22   in person; correct?
23       A.    No.  As far as I remember, he
24   was trying to call me, but I don't want to
25   talk to him.  I don't know if -- maybe,
```

```
 1                    VARSHAVSKY
 2        A.     Yes.
 3        Q.     What is his job title?
 4        A.     I don't remember.
 5        Q.     What are his duties?
 6        A.     Avilon, it's a holding company
 7   which includes Avilon, the car sales, and
 8   transportation company, logistics company.
 9   Avilon -- Karen Avagumyan, he's in charge
10   of the logistics company, which is also
11   part of the Avilon group, not Avilon
12   itself.  So we have -- so for you to
13   understand, we have Avilon, like, a
14   holding company.
15        Q.     Yes.
16        A.     Then we have Avilon sales
17   company.  Then we have Auto Logistics.
18   It's a logistics company.  It's a
19   different company.  But anyway, it's part
20   of the Avilon group.  So sometimes maybe
21   you can mix up.
22        Q.     So Big Karen is in charge of the
23   Auto Logistics company?
24        A.     Absolutely.
25        Q.     And is the Auto Logistics
```

```
                                       Page 127
 1                    VARSHAVSKY
 2   management first.
 3       Q.     I asked a separate question.
 4              Who of the Avilon upper
 5   management has an initial "A" besides
 6   yourself?
 7              MR. HECKER:  Objection to form.
 8         Asked and answered.
 9       A.     Avagumyan.  Two Avagumyan.
10       Q.     Okay.  And who of Avilon's
11   senior management had authority to direct
12   Yanna Krisiuk to make payments?
13              MR. HECKER:  Objection to form.
14         Foundation.
15       A.     Shall I answer?
16              MR. HECKER:  If you can answer
17         that question as framed.
18       A.     If this is referred to
19   Avagumyan, probably him.
20       Q.     Okay.  Do you know if the funds
21   that were advanced by Probusinessbank to
22   Sanbay were ever repaid?
23              MR. HECKER:  Objection to form.
24         Foundation.  Mischaracterizes the
25         document and his testimony.
```

Page 128

1                    VARSHAVSKY

2      A.     No idea.

3      Q.     Okay.  Would this be a good time

4   for lunch?

5            MR. HECKER:  Sure.

6            THE VIDEOGRAPHER:  This marks

7      the end of Tape No. 2 in the

8      videotaped deposition of Alexander

9      Varshavsky.  We're going off the

10     record.  The time is 12:44.

11           (Luncheon recess:  12:44 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         VARSHAVSKY
1
2    the other is for 400 -- 4 million even,
3    one on the 23rd and one on the 24th.
4              Do you see that?
5        A.    Yes.
6        Q.    And both of them also indicate
7    that they are for payment under the loan
8    agreement 15/07/15.
9              Do you see that?
10       A.    Yes.
11       Q.    Okay.  Were you aware that
12   $14.4 million was advanced to Big Karen's
13   company, Sanbay, in mid-July 2015?
14             MR. HECKER:  Objection to form.
15       Foundation.
16       A.    I don't recall.
17       Q.    Do you recall that he was
18   paying -- making progress payments to
19   Benetti for the construction of his yacht
20   at that time?
21       A.    Yes.
22       Q.    Okay.  Do you know if Sanbay has
23   ever repaid that loan?
24             MR. HECKER:  Objection to form.
25       Foundation.

```
 1                    VARSHAVSKY
 2      A.    I have no idea.
 3      Q.    Okay.
 4            (Plaintiff's Exhibit 75, An
 5      email, Bates AVPE0001453, was hereby
 6      marked for identification, as of this
 7      date.)
 8            (Plaintiff's Exhibit 76, An
 9      email, Bates AVPE0001439, was hereby
10      marked for identification, as of this
11      date.)
12      A.    (Witness perusing document.)
13      Q.    Have you had a chance to look at
14  Exhibit 76?
15      A.    75.  76 I'm looking at right
16  now.
17      Q.    Yeah.  Please take a look at 76.
18  I'm going to come back to 75.
19      A.    (Witness perusing document.)
20            Yes.
21      Q.    All right.  On October 26, 2015,
22  at 11:04 p.m., Ms. --
23      A.    76 or 75?
24      Q.    I'm looking at 76 now.  I'm
25  sorry.  Ms. Monakhova sends an email to
```

```
 1                    VARSHAVSKY
 2              (Plaintiff's Exhibit 82, An
 3         email dated November 10, 2016, was
 4         hereby marked for identification, as
 5         of this date.)
 6              THE VIDEOGRAPHER:  This marks
 7         the beginning of Tape No. 4 in the
 8         videotaped deposition of Alexander
 9         Varshavsky.  We're going on the
10         record.  The time is 3:14.
11    BY MR. WEIGEL:
12         Q.    Mr. Varshavsky, at the time that
13    Probusinessbank's license was revoked, did
14    Avilon or any of its related companies owe
15    any money to Probusinessbank?
16         A.    Yes.  Avilon.
17         Q.    How much?
18         A.    300 million Rubles.
19         Q.    Under what credit facility?
20         A.    I don't know.
21         Q.    Was that money ever repaid?
22         A.    Yes.
23         Q.    When?
24         A.    As soon as all the assets and
25    obligation being transferred to Bin Bank,
```

1          VARSHAVSKY

2   owe to the bank or anybody.  I think it's

3   more technical transaction than the loan

4   what I was taking.  I didn't take any

5   loans.

6       Q.    What do you mean a technical

7   transaction?

8       A.    We, as Avilon, as a group, have

9   the point of credit limit from the

10  Probusinessbank up to $100 million.  So

11  maybe Avilon was taking some money, some

12  money, they decide, so they're going to

13  put under my name personal.  I don't know.

14  I cannot comment on that.

15      Q.    Do you not remember borrowing

16  $22 million from Avilon -- I mean -- from

17  Probusinessbank?

18      A.    I never borrow.  That's what I'm

19  saying.  It's probably the way they

20  structure.  But I think Irina, she will

21  better -- she can explain better.

22      Q.    Well, is that your signature on

23  the last page?

24      A.    I cannot see it.  How can I see

25  it?  It's hardly to see.  If you have a

Page 238

1

2                    CERTIFICATION

3

4      I, SHARON LENGEL, a Notary Public for

5   and within the State of New York, do

6   hereby certify:

7      That the witness whose testimony as

8   herein set forth, was duly sworn by me;

9   and that the within transcript is a true

10  record of the testimony given by said

11  witness.

12     I further certify that I am not

13  related to any of the parties to this

14  action by blood or marriage, and that I am

15  in no way interested in the outcome of

16  this matter.

17     IN WITNESS WHEREOF, I have hereunto

18  set my hand this 16th day of January,

19  2017.

20

21  _____

22  SHARON LENGEL, RPR, CRR

23                *     *     *

24

25