# EXHIBIT 14

Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

3
     - - - - - - - - - - - - - - - - - - -x

4
     SERGEY LEONTIEV,

5
                      Plaintiff,

6                                  Case No. 16-cv-3595
             -against-

7
     ALEXANDER VARSHAVSKY,

8
                      Defendant.

9
     - - - - - - - - - - - - - - - - - - -x

10
                      December 19, 2016

11                    9:37 a.m.

12

13

14           Videotaped deposition of

15    YULIA SEMENOVA, taken by Plaintiff,

16    pursuant to Notice, held at the offices of

17    Roschier Asianajotoimisto Oy, Keskuskatu

18    7A, Helsinki, Finland, before

19    Sharon Lengel, a Registered Professional

20    Reporter, Certified Realtime Reporter, and

21    Notary Public of the State of New York.

22

23             *     *     *

24

25

Page 2

```
 1
 2   A P P E A R A N C E S:
 3
       GIBSON, DUNN & CRUTCHER LLP
 4          Attorneys for Plaintiff
            200 Park Avenue
 5          New York, New York 10166
 6      BY:  MARSHALL KING, ESQ.
            ALISON A. WOLLIN, ESQ.
 7          ANDREI MALIKOV, ESQ.
 8
 9     DEBEVOISE & PLIMPTON LLP
            Attorneys for Defendant
10          801 Pennsylvania Avenue, N.W.
            Washington, D.C. 20004
11
        BY:  NICHOLAS C. TOMPKINS, ESQ.
12          COLBY A. SMITH, ESQ.
            ALISA MELEKHINA, ESQ.
13
14
15   ALSO PRESENT:
16          DAVID ROSS ELLIOTT, Videographer
17          VICTORIA FRANTSEVA, Interpreter
18          VICTOR POTAPOV, Check Interpreter
19          VITALIY POPOV, ESQ.
20
                *     *     *
21
22
23
24
25
```

1                    SEMENOVA

2    Avilon.

3        Q.    Did your title or the company

4    for which you worked change in 2015?

5        A.    No.  No.

6        Q.    You said that you were the chief

7    accountant for Avilon from 2007 to 2015,

8    and you said that you're the chief

9    accountant of Avilon today.

10             I'm just trying to figure out if

11   there's something that changed between

12   2015 and 2016.

13       A.    No.  I worked from 2007 to 2015,

14   including as a chief accountant of Avilon.

15       Q.    What was your title in 2016 and

16   your employer?

17       A.    In 2016, I am still working as a

18   chief accountant of Avilon Automobile

19   Group but based on the managing agreement

20   with Akita.

21       Q.    What are your responsibilities

22   as the chief accountant of Avilon?

23       A.    So accounting and also taxation

24   statements and accounting and compiling

25   the statements, control of the assets, and

```
 1                    SEMENOVA
 2   the obligations of the company,
 3   liabilities.
 4        Q.    Who do you report to?
 5        A.    The management of the company.
 6        Q.    Who in particular?
 7        A.    Financial executive directors.
 8        Q.    And what are their names?
 9        A.    The general director, Pavlovich
10   Andrei Nikolaevich.
11        Q.    Do you report to anyone else,
12   besides Mr. Pavlovich?
13        A.    The financial director,
14   Monakhova, Irina Nikolayevna.
15        Q.    Do you report to anyone else?
16        A.    That's it.
17        Q.    Do you know Sergey Leontiev?
18        A.    No.
19        Q.    Have you ever met Mr. Leontiev?
20        A.    No.
21        Q.    Have you ever spoken to
22   Mr. Leontiev?
23        A.    No.
24        Q.    Does Mr. Leontiev owe Avilon
25   money?
```

```
 1                  SEMENOVA
 2  before?
 3      A.    No.
 4      Q.    How did you first come to learn
 5  about Ambika?
 6      A.    When we issued the loan.
 7      Q.    From whom did you first hear
 8  about Ambika?
 9      A.    From the shareholder and the
10  financial director.
11      Q.    And what did Ms. Monakhova tell
12  you about Ambika in 2008?
13      A.    I was given the documentation to
14  issue the loan.
15      Q.    Did Ms. Monakhova tell you
16  anything about Ambika in 2008 when she
17  gave you the documentation to issue the
18  loan?
19      A.    No.
20      Q.    Did Mr. Varshavsky tell you
21  anything about Ambika in 2008?
22      A.    No.
23      Q.    Did you review Ambika's
24  financial statements before you issued the
25  loan?
```

Page 18

1                    SEMENOVA
2       A.    No.
3       Q.    I'd like to show you what was
4    previously marked as Exhibit 7.  It's the
5    December 18, 2008, loan agreement and its
6    amendments.
7             Do you recognize this as the
8    December 18, 2008, loan agreement between
9    New York Motors and Ambika?
10      A.    Yes.
11      Q.    If you look at the third page of
12   the exhibit, is that your signature there?
13      A.    Yes.
14      Q.    What did you do to issue the
15   loan?
16      A.    Can you clarify the question,
17   please?
18      Q.    You said you were given the
19   documentation to issue the loan.
20            What exactly was your role?
21      A.    To transfer the money.
22      Q.    And how much money was
23   transferred pursuant to this loan
24   agreement?
25      A.    $19.9 million.

```
 1                    SEMENOVA
 2      Q.     Other than transferring the
 3   money and signing the loan agreement, did
 4   you have any other role?
 5      A.     No.
 6      Q.     Did you know who owned Ambika at
 7   the time this loan was entered into?
 8      A.     No.
 9      Q.     Did you know what the money that
10   New York Motors was lending would be used
11   for?
12      A.     No.
13      Q.     Who negotiated the terms of the
14   loan on behalf of New York Motors?
15      A.     The shareholder.
16      Q.     Do you know who Mr. Varshavsky
17   negotiated with?
18      A.     No.
19      Q.     Did you make any record of the
20   loan in New York Motors' books?
21      A.     Yes.
22      Q.     What kind of record did you make
23   in New York Motors' books?
24      A.     "Loan issued."
25      Q.     Loan issued to whom?
```

```
 1              SEMENOVA
 2      A.     Ambika Investments Limited.
 3      Q.     You didn't make any record of a
 4  loan issued to Mr. Leontiev at this time,
 5  did you?
 6      A.     No.
 7      Q.     Do you recall that there were a
 8  series of amendments entered into to this
 9  loan agreement?
10      A.     No.
11      Q.     If you could flip through this
12  document that's in front of you,
13  Exhibit 7, you'll see that there's a
14  series of additional agreements to the
15  loan.
16           MS. WOLLIN:  I understand we
17      might have a translation issue, Madam
18      Interpreter.  If you want to -- if you
19      could point her to the --
20           THE INTERPRETER:  I have.
21           MS. WOLLIN:  I'd like to ask --
22      let me re-ask one of my questions.
23      Q.     Ms. Semenova, do you recall that
24  there were a series of amendments entered
25  into in connection with this loan
```

Page 22

```
 1              SEMENOVA
 2      A.    Yes, I see.
 3      Q.    Did you make any record of this
 4   extension of the loan in Avilon's books
 5   and records at the time?
 6      A.    No.
 7      Q.    Why not?
 8      A.    Because it was a valid
 9   agreement.
10            MS. WOLLIN:  Madam Interpreter,
11      can you clarify?  Did she say it was a
12      valid agreement or an active
13      agreement?
14      A.    So the additional agreement
15   extends the validity of the -- of the
16   agreement.  That's why there were no
17   additional entries into the books made.
18      Q.    Did you keep track in the books
19   of interest payments that were made
20   pursuant to the loan agreement?
21      A.    Yes.
22      Q.    Was interest paid regularly
23   under the loan agreement?
24            MR. SMITH:  Objection to form.
25      A.    Yes.
```

```
 1                 SEMENOVA
 2     Q.     Did Avilon consider having the
 3  money repaid instead of extending the
 4  validity of the loan at any point in time?
 5             MR. SMITH:  Objection to form.
 6     A.     I did not understand the
 7  question.
 8     Q.     Avilon regularly extended the
 9  time period of this loan rather than
10  collecting when it was due; right?
11     A.     That is correct.  The agreement
12  was extended.  The term of the contract
13  was extended.
14     Q.     Why did Avilon decide to keep
15  extending the term of the contract rather
16  than have the money be repaid?
17             MR. SMITH:  Objection to form.
18     A.     I do not know.
19     Q.     Who would know that?
20     A.     Alexander Varshavsky.
21     Q.     Do you recall that, when New
22  York Motors entered into this loan in
23  December 2008, it got a guarantee from
24  Probusinessbank for the loan to Ambika?
25     A.     Yes, I do.
```

1            SEMENOVA

2      Q.    Why did New York Motors get a

3   guarantee from Probusinessbank?

4      A.    This is a regular practice for

5   securing the loan, including pay loans

6   that were issued.

7      Q.    And New York Motors got a

8   guarantee from Probusinessbank; right?

9      A.    Yes.

10     Q.    Did New York Motors get a

11  personal guarantee from Mr. Leontiev for

12  the loan to Ambika?

13     A.    No.

14     Q.    I'd like to show you what was

15  previously marked as Exhibit 8.  This is a

16  loan agreement dated December 17, 2008,

17  between European Realty and New York

18  Motors Moscow.

19           Do you recognize this agreement?

20     A.    Yes.

21     Q.    What is European Realty

22  Corporation?

23     A.    This is one of the shareholders

24  of Avilon.

25     Q.    Do you know what percentage of

```
 1                SEMENOVA
 2  Avilon European Realty holds?
 3       A.    No, I do not.
 4       Q.    Do you know who negotiated this
 5  loan?
 6       A.    Shareholders.
 7       Q.    Who do you mean by the
 8  shareholders?
 9       A.    Alexander Varshavsky.
10       Q.    Which entity was Mr. Varshavsky
11  negotiating on behalf of?
12       A.    On behalf of the European Realty
13  Corp and also on behalf of New York Motors
14  Moscow.
15       Q.    Was anyone else negotiating on
16  behalf of either company?
17       A.    I do not know.
18       Q.    This loan is for 19.9 million.
19             Are these the funds that were
20  then lent to Ambika by New York Motors?
21       A.    Yes.
22       Q.    Why did New York Motors borrow
23  the 19.9 million from European Realty to
24  lend it to Ambika?
25             MR. SMITH:  Objection to form.
```

```
 1                SEMENOVA
 2       A.     I do not know.
 3       Q.     Did you make any record of this
 4  loan in New York Motors' books?
 5       A.     Yes.
 6       Q.     How did you record this loan?
 7       A.     "Loan received."
 8       Q.     What is the current status of
 9  this loan?
10       A.     It is on the balance of the
11  company.
12       Q.     Do you know how much money is
13  still outstanding under this loan?
14       A.     The whole sum.
15       Q.     So New York Motors still owes
16  European Realty 19.9 million under this
17  loan agreement; is that right?
18       A.     Yes.
19       Q.     And New York Motors is now
20  Avilon; right?
21       A.     New York Motors Moscow is now
22  Avilon, yes.
23       Q.     And that's the party that is a
24  party -- New York Motors Moscow is the
25  party to this loan agreement; right?
```

Page 39

```
 1                   SEMENOVA
 2   specifically to this company?
 3        Q.    Specifically, whose
 4   responsibility is it to arrange for the
 5   wire transfer to Bookajet?
 6        A.    The shareholder, Alexander
 7   Varshavsky, approves the wire transfer.
 8        Q.    Who is the employee who actually
 9   arranges for the wire transfer?
10        A.    The bank account accountant.
11        Q.    Who is that?
12        A.    Valentina Nazanskaya.
13        Q.    What is Ms. Nazanskaya's title
14   at Avilon?
15        A.    Deputy chief accountant.
16        Q.    Does she work for you?
17        A.    Yes.
18        Q.    What are her responsibilities?
19        A.    Making payments to the clients,
20   making wire transfers.
21        Q.    Does she have any other
22   responsibilities?
23        A.    No.
24        Q.    When does Avilon's fiscal year
25   end?
```

```
 1              SEMENOVA
 2      A.    "Loan issued."
 3      Q.    To whom?
 4      A.    To Ambika.
 5      Q.    Did you record anything about a
 6  loan issued to Mr. Leontiev in connection
 7  with the loan to Ambika?
 8      A.    No, I do not recall.
 9      Q.    Why did Avilon make this loan to
10  Ambika in 2011?
11            MR. SMITH:  Objection to form.
12      A.    I do not know.
13      Q.    Who decided that Avilon would
14  loan this money to Ambika in 2011?
15      A.    Alexander Varshavsky.
16      Q.    What did you know about Ambika
17  in 2011?
18      A.    I knew that, on behalf of this
19  company, representatives from
20  Probusinessbank -- the representatives
21  from Probusinessbank were representing
22  this company.  And later on, they were
23  also the representatives from the Group
24  Life.
25      Q.    Who in particular are you
```

```
                                              Page 52
 1                   SEMENOVA
 2            MR.  SMITH:   Objection  to  form.
 3       A.    Because  here,  we  have  the  bank
 4   account  information  for  the  European
 5   Realty  Corporation.
 6       Q.    And  in  the  loan  agreement,  it
 7   has  bank  account  information  for  TO  Jets;
 8   right?
 9       A.    Yes.
10       Q.    Why  was  money  being  paid  to
11   European  Realty  and  not  TO  Jets?
12            MR.  SMITH:   Objection  to  form.
13       Lack  of  foundation.
14       A.    I  do  not  know.
15       Q.    What  is  the  current  status  of
16   the  loan  to  TO  Jets?
17       A.    It's  on  the  balance.   It's  owed.
18       Q.    Is  the  full  amount  still
19   outstanding?
20       A.    Yes,  the  whole  amount.
21       Q.    This  loan  is  for  $6.625  million.
22            Is  this  the  money  that  was  used
23   to  fund  the  loan  that  Avilon  made  to
24   Ambika?
25       A.    Yes.
```

```
                                        Page 53
 1                SEMENOVA
 2      Q.    Why did Avilon borrow the
 3   $6.625 million from TO Jets to lend it to
 4   Ambika?
 5             MR. SMITH:  Objection to form.
 6      A.    I do not know.
 7      Q.    Do you know if TO Jets is still
 8   in business today?
 9      A.    I cannot tell.
10      Q.    Have any payments been made to
11   TO Jets pursuant to this loan agreement?
12      A.    No.
13      Q.    How is this loan recorded on
14   Avilon's books?
15      A.    "Loan received."
16      Q.    From whom?
17      A.    From TO Jets.
18      Q.    Do you recall that Avilon got a
19   guarantee from Probusinessbank for the
20   2011 loan to Ambika?
21      A.    Yes.
22      Q.    Were you involved in obtaining
23   that guarantee from Probusinessbank?
24      A.    I do not remember.
25      Q.    Why did Avilon get a guarantee
```

```
 1              SEMENOVA
 2   from Probusinessbank for the loan to
 3   Ambika?
 4        A.    Like I said, this is the regular
 5   practice for ensuring and guaranteeing the
 6   loans.
 7        Q.    Did Avilon try to get a personal
 8   guarantee from Mr. Leontiev for the loan
 9   to Ambika?
10        A.    I do not know.
11        Q.    Do you recall, we saw in
12   Amendment No. 6 to the 2011 loan, that it
13   was combined with the principal from the
14   2008 loan?
15        A.    Yes.
16        Q.    Have you ever seen a signed
17   guarantee for the combined increased
18   amount of the 2011 loan?
19        A.    I do not recall.
20        Q.    I'd like to show you what's
21   previously been marked as Exhibit 15.
22   It's an agreement between Avilon and
23   Ambika dated December 9, 2014.
24             MR. SMITH:  Just before we leave
25        Exhibit 14, I wanted to note for the
```

```
 1                 SEMENOVA
 2      form.
 3      A.    I do not know.
 4      Q.    Are you aware that the Avagumyan
 5   family invested money with Financial Group
 6   "Life"?
 7      A.    No.
 8      Q.    Do you know what Vennop is?
 9      A.    No.
10      Q.    Do you know Igor Renich?
11      A.    No.
12      Q.    Do you know Diana Karapetyan?
13      A.    No.
14      Q.    Did Avilon file a claim in the
15   Probusinessbank bankruptcy?
16           THE INTERPRETER:  I'm not sure
17      exactly what you mean, so I don't know
18      how to translate this.  In bankruptcy,
19      it can be, like, translated in
20      different ways.  So maybe you can
21      rephrase it so I can translate it
22      exactly.
23           MR. TOMPKINS:  Is there a
24      particular phrase -- is there a
25      particular phrase you would suggest to
```

Page 154

1

2                        CERTIFICATION

3

4        I, SHARON LENGEL, a Notary Public for and within the

5    State of New York, do hereby certify:

6        That the witness whose testimony as herein set forth,

7    was duly sworn by me; and that the within transcript is a

8    true record of the testimony given by said witness.

9        I further certify that I am not related to any of the

10   parties to this action by blood or marriage, and that I

11   am in no way interested in the outcome of this matter.

12       IN WITNESS WHEREOF, I have hereunto set my hand this

13   29th day of December, 2016.

14

15   _____

16            SHARON LENGEL

17            *      *      *

18

19

20

21

22

23

24

25