# EXHIBIT 15

Page 1

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

3

    - - - - - - - - - - - - - - - - - - - -x

4

    SERGEY LEONTIEV,

5

                    Plaintiff,

6                                       Case No. 16-cv-3595

            -against-

7

    ALEXANDER VARSHAVSKY,

8

                    Defendant.

9

    - - - - - - - - - - - - - - - - - - - -x

10

                        January 9, 2017

11                      9:40 a.m.

12

            *** CONFIDENTIAL ***

13

14

15              Videotaped deposition of

16   VITALIY POPOV, taken by Plaintiff,

17   pursuant to Notice, held at the offices of

18   Roschier Asianajotoimisto Oy, Keskuskatu

19   7A, Helsinki, Finland, before

20   Sharon Lengel, a Registered Professional

21   Reporter, Certified Realtime Reporter, and

22   Notary Public of the State of New York.

23

24              *     *     *

25

Page 2

1

2  A P P E A R A N C E S:

3

       GIBSON, DUNN & CRUTCHER LLP
4           Attorneys for Plaintiff
            200 Park Avenue
5           New York, New York 10166
6      BY:  MARSHALL KING, ESQ.
            ANDREI MALIKOV, ESQ.
7

8

9

       DEBEVOISE & PLIMPTON LLP
10          Attorneys for Defendant
            801 Pennsylvania Avenue, N.W.
11          Washington, D.C. 20004
12     BY:  NICHOLAS C. TOMPKINS, ESQ.
            COLBY A. SMITH, ESQ.
13

14

15  ALSO PRESENT:
16          DAVID ROSS ELLIOTT, Videographer
17          PAVEL KHOKHLACHEV, Interpreter
18          VICTOR POTAPOV, Check Interpreter
19
                    *      *      *
20

21

22

23

24

25

```
 1              POPOV - CONFIDENTIAL
 2   BY MR. KING:
 3        Q.     Good morning, Mr. Popov.
 4        A.     Good morning.
 5        Q.     Could you state your full name,
 6   please, for the record.
 7        A.     Popov Vitaliy Nikolaevich.
 8        Q.     Where are you employed?
 9        A.     A company called Akita.
10        Q.     How long have you been employed
11   by Akita?
12        A.     Since January 2016.
13        Q.     And is that when Akita was
14   created?
15        A.     It was created not long before
16   that.
17        Q.     Prior to January of 2016, where
18   were you employed?
19        A.     I worked for a company called
20   Avilon Automobile Group.
21        Q.     How long did you work for
22   Avilon?
23        A.     I worked for that company since
24   May 2012 -- 2013.  And before that, I had
25   been working for the company for two
```

1              POPOV - CONFIDENTIAL

2    years, since 2008 to 2010.

3         Q.    Okay.  During 2008 to 2010, what

4    was your job for Avilon?

5         A.    I was the head of the legal

6    department.

7         Q.    And then in 2010, where did you

8    go work?

9         A.    I moved to another company.  The

10   company was called -- group of

11   companies -- Russian Sea.

12        Q.    And you worked there until May

13   of 2013?

14        A.    Yes.

15        Q.    And then you returned to work

16   for Avilon?

17        A.    Yes.

18        Q.    Was the company called Russian

19   Sea related in any way to Avilon?

20        A.    No.

21        Q.    So beginning in May of 2013,

22   what was your job at Avilon?

23        A.    Head of the legal department.

24        Q.    How many employees worked in the

25   legal department between 2013 and 2016?

Page 7

1              POPOV - CONFIDENTIAL

2        A.    The number kept changing.  At

3    one time, it was 18 people.  Now it is 13

4    people.

5              THE INTERPRETER:  Sorry.

6        A.    Twelve.

7        Q.    How many of those -- how many

8    lawyers in the legal department?

9        A.    Nine.

10       Q.    Is the structure of the legal

11   department at Akita the same as it was at

12   Avilon immediately prior to the formation

13   of Akita?

14       A.    Did you mean the legal

15   department structure?

16       Q.    Yes.

17       A.    No.  The structure has changed.

18       Q.    How has the structure changed?

19       A.    So it was the purpose of the

20   management company to consolidate.  So if,

21   before, we used to have a legal department

22   for -- or separate lawyers for car

23   business and separate lawyers for leasing

24   business, now they decided to put them

25   together.

1           POPOV - CONFIDENTIAL

2      Q.     So when you said there's now 12

3   people, you mean 12 -- 12 people in the

4   legal department of Akita?

5      A.     Yes.

6      Q.     Who owns Akita?

7      A.     It belongs to Alexander

8   Varshavsky and Kamo Avagumyan through

9   other legal persons.

10      Q.     Through what other legal

11   persons?

12      A.     Company Maxbond.

13      Q.     Is there a contractual

14   relationship between Akita and Avilon

15   Automobile Group?

16      A.     Yes.

17      Q.     And what's the nature of that

18   contractual relationship?

19      A.     It's a mixed contract with

20   elements of management and consulting.

21      Q.     Do you have any ownership

22   interest in Akita?

23      A.     No.

24      Q.     Do you have any ownership

25   interest in Avilon?

1          POPOV - CONFIDENTIAL
2    and pass it on for signature to the
3    shareholders.
4         Q.    You're aware that, in December
5    of 2008, Avilon, or as it was then known,
6    New York Motors Moscow, made a loan to a
7    company called Ambika; is that correct?
8         A.    Yes.
9         Q.    Did you have any involvement in
10   the transaction?
11        A.    Yes.
12        Q.    What was your involvement?
13        A.    We received a draft contract --
14   I received a draft contract from Yanna
15   Krisiuk.  We possibly made some
16   amendments.  I don't remember exactly.
17   And after that, our mission in this regard
18   was over.
19        Q.    How did you find out that the
20   transaction was happening?
21        A.    That it was happening or it had
22   happened?
23        Q.    That it was happening.
24        A.    First, it was Irina Monakhova
25   who phoned me, and she said that we are

```
 1                POPOV - CONFIDENTIAL
 2    signing this contract, and I need to --
 3    and I need to agree.  I need to look at
 4    it, approve it.  And after that, we
 5    communicated with Yanna.  We were
 6    exchanging some documents.  And we also
 7    communicated with Aleksander Vyulkova.
 8         Q.      Aleksandra.
 9         A.      Aleksandra.
10         Q.      What did Ms. Monakhova tell you
11    was the transaction?
12         A.      That our shareholders decided to
13    provide a loan to the shareholders of
14    Probusinessbank.
15         Q.      Did she say how much your
16    shareholders had decided to provide?
17         A.      I don't remember figures outside
18    of my -- outside of my responsibility.
19         Q.      Did she tell you what the terms
20    of the loan were going to be?
21         A.      Possibly, at the time we were
22    discussing this.  I don't remember.  But
23    most likely, there was a term of the loan,
24    conditions of the loan, and other
25    parameters, maybe the interest rate.
```

POPOV - CONFIDENTIAL

1

2     Q.    When she said that your

3  shareholders had decided to provide a

4  loan, who was she referring to?

5     A.    At the time, we had two main

6  shareholders -- Alexander Varshavsky and

7  Igor Bakonenko.

8     Q.    Was Mr. Avagumyan a shareholder

9  at the time?

10     A.    In 2008, no.  He was a

11  shareholder in another company.  He was a

12  shareholder in European Realty.

13     Q.    Okay.  So when Ms. Monakhova

14  told you that your shareholders had

15  decided to provide a loan, did she mean

16  both Mr. Varshavsky and Mr. Bakonenko?

17          MR. SMITH:  Objection to form.

18     A.    It's difficult for me to answer

19  this question.  It was ten years ago.  And

20  what she meant -- and what she meant at

21  the time is not clear.  But most likely,

22  yes.

23     Q.    Before the loan agreement was

24  finalized, did you have any conversations

25  about the loan with Mr. Varshavsky?

1              POPOV - CONFIDENTIAL

2      A.     No.   At that time, I practically

3  did not communicate at all with Alexander.

4      Q.     Did Ms. Monakhova tell you why

5  the shareholders had decided to provide a

6  loan?

7      A.     No.   At least I don't remember.

8      Q.     Had you ever heard of the

9  company Ambika prior to that time?

10     A.     No.

11     Q.     Did Ms. Monakhova tell you

12  anything about Ambika?

13     A.     Well, she said that this is a

14  company that belonged to the shareholders

15  of Probusinessbank, and I can find out all

16  the details from Yanna and Aleksandra

17  Vyulkova.

18     Q.     Who was Yanna?

19     A.     Yanna was the head of VIP

20  department.

21     Q.     For who?

22     A.     She was communicating with

23  corporate clients, as far as I remember.

24     Q.     Corporate clients of

25  Probusinessbank?

                   POPOV - CONFIDENTIAL

1

2       A.      At that time, yes, after that

3   Financial Group "Life" was created and

4   their signature then said Financial Group

5   "Life."

6       Q.      And who was Ms. Vyulkova?

7       A.      I don't know what her position

8   was.  But she was handling the

9   companies -- foreign companies that

10  belonged to the shareholders of the bank.

11      Q.      Had you had any dealings with

12  her prior to the loan in December of 2008?

13      A.      I don't remember.

14      Q.      How did you come to learn that

15  she was handling foreign companies that

16  belonged to the shareholders of the bank?

17      A.      I was told by Yanna Krisiuk.

18  She introduced me.  She gave me her

19  number, and she said that all the matters

20  to do with foreign companies have to go

21  through her.

22      Q.      Okay.  Let me show you what has

23  previously been marked as Plaintiff's

24  Exhibit 7.

25              Mr. Popov, take a moment to look

1                POPOV - CONFIDENTIAL

2    at the documents that are part of

3    Exhibit 7.  And I ask you if the first

4    three pages -- sorry -- first three pages

5    of that are the contract that you worked

6    on in conjunction with Ms. Krisiuk in

7    December of 2008.

8                MR. SMITH:  Objection to form.

9        A.    It looks like, yes.

10       Q.    Do you recall who drafted the

11   initial version of the agreement?

12       A.    I don't remember, but it seems

13   to me that it was Yanna who sent the

14   initial version.

15       Q.    Okay.  What do you recall of

16   your discussions with Yanna about the

17   contract?

18       A.    I don't remember any of the

19   details at all.

20       Q.    Did you have an understanding of

21   what the company called Ambika did?

22       A.    No, but we understood that there

23   was some financial company that was

24   connected to the shareholders of the bank.

25       Q.    Okay.  And who told you that?

```
1              POPOV - CONFIDENTIAL
2         with a document, I think.
3              MR. SMITH:  Okay.
4         A.    Possibly, you mean that it
5    wasn't settled, but that the liability
6    from the original loan agreement was
7    adjoined to the subsequent loan agreement.
8         Q.    Yeah.  And do you know why that
9    was done?
10        A.    No.
11        Q.    Did you have any involvement in
12   documenting that change?
13        A.    I don't remember specifically.
14        Q.    At the time the 2008 loan was
15   originally entered into, do you recall any
16   discussions about whether there would be
17   guarantees provided for repayment of the
18   loan?
19        A.    I remember that we were
20   discussing with Yanna the actual text of
21   this guarantee, because finance people
22   needed that guarantee.
23        Q.    What do you recall about those
24   discussions?
25        A.    I just remember that there was
```

1           POPOV - CONFIDENTIAL

2  some exchange of documents, and we passed

3  those documents on to the finance

4  department.

5     Q.   And so is it the case that

6  Ms. Monakhova told you that the terms of

7  the transaction involved getting a

8  guarantee?

9     A.   No.  I do not -- no.  I do not

10  remember this.  It's just that, for

11  finance people, all the transactions have

12  to be secured.  But I do not have -- but I

13  don't remember specific discussion about

14  the guarantee.  I don't remember the fact

15  that a guarantee was a condition of the

16  transaction.

17     Q.   Why do you say that the finance

18  people needed to have all the transactions

19  secured?

20     A.   I didn't -- I am not a

21  specialist on this.  I only know this from

22  what Yulia Semenova said to me.

23     Q.   So Ms. Semenova told you this at

24  what point in time?

25     A.   I don't remember specific

```
 1              POPOV - CONFIDENTIAL
 2    guarantee that appears at page SL66 in
 3    Exhibit 9, did you show that guarantee to
 4    anyone in the financial department?
 5              MR. SMITH:  Objection.  Lack of
 6         foundation.
 7         A.    I am -- I'm not even sure I
 8    received this guarantee directly.  It
 9    could have been received by the finance
10    department, and then I could have just
11    seen the text when they came with a draft
12    of the agreement.
13         Q.    Did you ask Ms. Krisiuk whether
14    there would be a written guarantee
15    directly from the shareholders of the
16    bank?
17         A.    No, I didn't.
18              MR. KING:  I think we should
19         take a short break so that we can
20         change the tape.
21              MR. SMITH:  Sure.
22              THE VIDEOGRAPHER:  Thank you.
23         This is the end of Media 1, Volume I,
24         in the video deposition of Mr. Vitaliy
25         Popov off.  Going off the record at
```

1              POPOV - CONFIDENTIAL

2    of the Russian ERK?

3         A.    As far as I know, Kamo

4    Avagumyan.

5         Q.    Who is Svetlana Geris?

6         A.    Svetlana Geris was the manager

7    of New York Motors Corporation.

8         Q.    And what was New York Motors

9    Corporation?  How did it fit into the

10   structure that you've just described?

11        A.    In 2008, this company was the

12   only shareholders -- shareholder of New

13   York Motors Moscow.

14        Q.    And how did New York Motors

15   Corporation relate, if it did, to European

16   Realty Corporation, the American entity?

17        A.    They had the same shareholders.

18        Q.    And that would be Mr. Varshavsky

19   and Mr. Bakonenko?

20        A.    Yes.

21        Q.    Did Ms. Geris have any role at

22   European Realty Corporation?

23             MR. SMITH:  Either entity or --

24             MR. KING:  The American entity.

25        A.    I -- I don't remember exactly.

Page 76

                        POPOV - CONFIDENTIAL

 1                      POPOV - CONFIDENTIAL
 2   company.
 3        Q.    Have you ever had a conversation
 4   with Mr. Leontiev?
 5        A.    No.
 6        Q.    Have you ever communicated with
 7   him in any way?
 8        A.    No.
 9        Q.    What was your involvement in the
10   payment by Valkera?  What was your
11   involvement in that transaction?
12        A.    They sent a draft of agreement,
13   and I did the review of the document.  I
14   made some amendments.  They were mixing up
15   the names of the companies, the amounts,
16   and they were even prepared to pay under
17   the agreement, about which we have these
18   proceedings.  There were some technical
19   mistakes there also.  So with Maxim
20   Shamis, we prepared the final text.  Apart
21   from that, I communicated with Ekaterina
22   Malygina, because we needed to get legal
23   opinion from PwC.
24        Q.    Let's take a step back.
25              You had a call with

```
                                        Page 95
 1              POPOV - CONFIDENTIAL
 2          A F T E R N O O N   S E S S I O N
 3                    2:20 p.m.
 4              THE VIDEOGRAPHER:  This is the
 5       beginning of Media 4, Volume I, in the
 6       video deposition of Vitaliy Popov.
 7       We're back on the record at 2:20 p.m.,
 8       as indicated on the video screen.
 9  BY MR. KING:
10       Q.    After Avilon received payment of
11  the $17 million from Valkera, you
12  continued to have negotiations with
13  Mr. Shamis concerning repayment of the
14  2008 and 2011 loans; is that right?
15       A.    Yes.  And not only with Shamis.
16       Q.    Who else?
17       A.    With Zheleznyak.
18       Q.    You continued to negotiate the
19  documentation concerning the repayment; is
20  that right?
21       A.    Yes.  We prepared drafts for the
22  following -- for the following tranches.
23       Q.    Okay.  And you recall that there
24  were a number of different structures that
25  were exchanged; is that right?
```

1              POPOV - CONFIDENTIAL

2       A.     Yes.

3       Q.     Did you ever reach agreement on

4  the terms of payment?

5       A.     My objective was to prepare

6  drafts of documents.  I did not conduct

7  negotiations specifically on the schedule

8  of the payments.  I needed to prepare

9  drafts of the documents for the next

10  tranche of 27 million and overall

11  framework agreement, which would include

12  the schedule of payments.

13      Q.     What was the total amount to be

14  paid under the framework agreement that

15  you drafted?

16      A.     I don't recall exactly.

17      Q.     Did that include payments that

18  were to be made to parties other than

19  Avilon?

20      A.     I said already that I don't

21  remember the figure.  Figures are not my

22  specialty.

23      Q.     Okay.  Did it include

24  payments -- regardless of the figures, did

25  it include payments that were to be made

```
                                          Page 97
 1              POPOV - CONFIDENTIAL
 2   to parties other than Avilon?
 3       A.    Again, it only had the overall
 4   amount.  It didn't have the basis for
 5   payments.
 6       Q.    And who was payment to be made
 7   to under the framework agreement that you
 8   drafted?
 9       A.    As far as I remember, to Avilon
10   and to Avagumyan.
11              MR. KING:  Let's mark this as
12       the next exhibit.
13              (Plaintiff's Exhibit 99, An
14       email, Bates AVPE0004194, was hereby
15       marked for identification, as of this
16       date.)
17       Q.    Exhibit 99 is another email
18   chain, the original of which is in
19   Russian.  And I want to direct your
20   attention first to the very first email on
21   the chain, meaning all the way at the
22   bottom of the chain, at the end of the
23   chain.
24              Do you see that's an email from
25   Ms. Monakhova dated October 20, 2015?
```

1              POPOV - CONFIDENTIAL

2        Q.     You didn't look into whether

3    these amounts were owed to Avilon or owed

4    to Mr. Avagumyan or owed to others?

5        A.     No.   This was not important.

6    What was important is the overall schedule

7    of payments.

8        Q.     Why do you say what was

9    important was the overall schedule of

10   payments?

11       A.     I don't understand the question.

12       Q.     Why was it not important to know

13   to whom the money was owed?

14              MR. SMITH:   Objection to form.

15       A.     Because at this stage, we were

16   preparing a draft of the framework

17   agreement, which was establishing the

18   overall amount owed.   And at a later

19   stage, there would be more specific

20   agreements that would identify which

21   amounts were owed to who.

22       Q.     Who did you have a discussion

23   with about the idea that there would be

24   more specific agreements at a later date?

25       A.     With everyone -- with Monakhova,

```
                                        Page 108
 1              POPOV - CONFIDENTIAL
 2   million; is that correct?
 3              MR. SMITH:  Objection to form.
 4       A.    Most likely, yes.  I don't
 5   remember the specific amount.
 6       Q.    Did Mr. Leontiev and
 7   Mr. Zheleznyak sign that agreement?
 8       A.    I am not aware of it.
 9              MR. KING:  Let's mark as
10       Exhibit 100 another email chain.
11              (Plaintiff's Exhibit 100, An
12       email, Bates AVPE0004204, was hereby
13       marked for identification, as of this
14       date.)
15       Q.    The email on the bottom here
16   from Mr. Shamis dated November 29th says,
17   "For RIF, approximately 3 million was
18   paid.  However, the promissory notes have
19   not been returned yet."
20              Do you know what that -- do you
21   know what Mr. Shamis was referring to?
22       A.    No.
23       Q.    Did you ask him what he was
24   referring to?
25       A.    No.
```

1              POPOV - CONFIDENTIAL
2      Q.      Did you factor that into your
3   drafting of the agreements?
4      A.      No.
5      Q.      Do you know who Diana Karapetyan
6   is?
7      A.      No.
8              MR. KING:   Let's mark the next
9      exhibit.
10             (Plaintiff's Exhibit 101, An
11     agreement, Bates AVPE0006134, was
12     hereby marked for identification, as
13     of this date.)
14     Q.      Exhibit 101 is a document Bates
15   numbered AVPE6134 to 36.
16             Do you recognize that as one of
17   the documents that you drafted?
18     A.      No.  I did not prepare this
19   document.
20     Q.      Do you know if someone at Avilon
21   prepared this document?
22     A.      As I said before, it is possible
23   that I asked my employees to prepare
24   drafts of documents for transactions, for
25   various options of transactions.

```
 1              POPOV - CONFIDENTIAL
 2    to prepare specific agreements for each
 3    transaction.
 4        Q.    Did Mr. Shamis or Mr. Zheleznyak
 5    ever get back to you to tell you that the
 6    draft framework agreement that you had
 7    prepared was acceptable?
 8              MR. SMITH:  Objection to form.
 9        A.    Yes.  There was a letter
10    somewhere from Shamis where he said that
11    he was happy with everything, and then he
12    passed it on somewhere.
13        Q.    But did he tell you -- did he
14    get back to you to say whether the draft
15    framework agreement was acceptable to
16    Mr. Leontiev?
17        A.    I don't remember specifically
18    whether it got to Leontiev.
19        Q.    Who were you waiting on approval
20    from?
21              MR. SMITH:  Objection to form.
22        Asked and answered.
23        A.    I was waiting for Maxim Shamis
24    for the final confirmation that everyone
25    was happy with everything.
```

POPOV - CONFIDENTIAL

1

2     Q.     Who is "everyone," Mr. Popov?

3            MR. SMITH:  Same objection.

4     A.     I mean all the lawyers who were

5   involved.

6     Q.     The lawyers for who?

7     A.     Of Zheleznyak and Leontiev.

8     Q.     And did Mr. Shamis ever get back

9   to you to tell you that everyone was happy

10  with the framework agreement that you had

11  drafted?

12    A.     He was saying that there are no

13  disagreements, in principle, but they are

14  asking for additional documents.

15    Q.     What documents did he tell you

16  they were asking for?

17    A.     So it was the same every time --

18  loan agreements, additional agreements,

19  promissory notes.

20           MR. KING:  Mark this as the next

21      exhibit, please.

22           (Plaintiff's Exhibit 102, A

23      surety agreement, Bates AVPE0006126,

24      was hereby marked for identification,

25      as of this date.)

```
 1              POPOV - CONFIDENTIAL
 2      Q.     Do you recognize Exhibit 102,
 3  Mr. Popov?
 4      A.     Yes.  It is likely that it was
 5  also prepared by my staff.
 6      Q.     And did you send it to anyone?
 7      A.     I don't remember.
 8      Q.     Did anyone draft a surety
 9  agreement with Mr. Leontiev's name on it?
10      A.     Most likely, yes.
11      Q.     And who drafted that?
12      A.     Also Galina Lipina.
13      Q.     And what obligations did -- were
14  included in the surety agreement with
15  Mr. Leontiev's name on it?
16              MR. SMITH:  Objection to form.
17      A.     This doesn't matter.  All of
18  this was included just as an initial
19  draft.
20      Q.     In other words, it had never
21  been agreed to by Mr. Leontiev?
22              MR. SMITH:  Objection to form.
23      A.     What was -- what had never been
24  agreed by Mr. Leontiev?
25      Q.     Did Mr. Leontiev ever agree to
```

```
 1              POPOV - CONFIDENTIAL
 2   sign a surety agreement with his name on
 3   it?
 4              MR. SMITH:  Objection to form.
 5       Lack of foundation.
 6       A.    As far as I'm aware, there is no
 7   such written document.
 8       Q.    Did there come a time in
 9   December of 2015 when you told
10   Mr. Zheleznyak that Avilon needed an
11   immediate payment of about $11.8 million?
12       A.    Yes, I did write a letter like
13   that.
14       Q.    What was the reason that Avilon
15   needed an immediate payment of
16   $11.8 million?
17       A.    Because it was the end of the
18   year, and there was a date for maturity of
19   some loan agreement, and we urgently
20   needed that money.
21       Q.    Did you get the money?
22       A.    No.
23       Q.    How did you deal with your loan
24   agreement?
25       A.    Maybe we borrowed money from
```

```
 1           POPOV - CONFIDENTIAL
 2   you didn't want an agreement to exist
 3   until it was fully signed?
 4       A.    The disclaimer was there because
 5   we did not know who the assignee would be,
 6   and we did not want to have a party that
 7   we did not know.
 8       Q.    Meaning that the agreement was
 9   not finalized yet; is that right?
10       A.    No doubt this was just a draft.
11             MR. KING:  Let's mark that.
12             (Plaintiff's Exhibit 108, An
13       email, Bates AVPE0006232, was hereby
14       marked for identification, as of this
15       date.)
16       Q.    Let me know if you recognize
17   this email chain, Mr. Popov.
18       A.    Yes.
19       Q.    Okay.  Could you turn to
20   page 6236.  And I want to ask you about
21   Ms. Semenova's email.
22             Did you have an understanding of
23   what she meant when she said, "Perhaps
24   it's possible to cement the Ambika loan
25   for 27 million, and if the money arrives,
```

Page 178

1

2                    **CERTIFICATION**

3

4       I, SHARON LENGEL, a Notary Public for

5    and within the State of New York, do

6    hereby certify:

7       That the witness whose testimony as

8    herein set forth, was duly sworn by me;

9    and that the within transcript is a true

10   record of the testimony given by said

11   witness.

12      I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage, and that I am

15   in no way interested in the outcome of

16   this matter.

17      IN WITNESS WHEREOF, I have hereunto

18   set my hand this 17th day of January,

19   2017.

20

21   _____

22   SHARON LENGEL, RPR, CRR

23                  *     *     *

24

25