UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                :

SERGEY LEONTIEV,                     :

                        :     Case No. 1:16-cv-03595 (JSR)

          Plaintiff,        :

                        :     **ORAL ARGUMENT IS**

          - v. -           :     **REQUESTED**

                        :

ALEXANDER VARSHAVSKY,      :     **CONFIDENTIAL – FILED**

                        :     **UNDER SEAL**

          Defendant.      :

                        :

------------------------------------------------------------- X

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

DEBEVOISE & PLIMPTON LLP
Sean Hecker
Colby Smith
William H. Taft V
919 Third Avenue
New York, New York 10022
Tel:  (212) 909-6000
Fax: (212) 909-6836
shecker@debevoise.com
csmith@debevoise.com
whtaft@debevoise.com

*Counsel to Defendant Alexander Varshavsky*

Dated:  February 10, 2017

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

COUNTER-STATEMENT OF FACTS ..................................................... 3

I.     Leontiev and His Partner Raised Millions of Dollars from Avilon and Others Through Offshore Entities They Controlled. ................................. 3

II.    Ambika Was Deliberately Rendered Insolvent by the Transfer of Its Assets to Other Companies for Leontiev's Benefit. .......................... 5

III.   Leontiev Ultimately Controlled the Transfers of Funds That Rendered Ambika Insolvent and Unable to Repay Its Debts. ............................ 7

IV.   Leontiev Voluntarily Liquidated FGL Without Repaying the Amounts It Owed ............ 8

V.    Leontiev Acknowledged the Debts and Promised to Repay the Loaned Funds. ................. 9

VI.   While Promising to Repay the Debt, Leontiev Was Secretly Taking Steps to Transfer His Assets Out of the Reach of Creditors .......................... 10

VII.  Procedural History ...................................................................... 11

STANDARD OF REVIEW .................................................................... 11

ARGUMENT ...................................................................................... 12

I.     Varshavsky Never Asserted a Personal Right to Receive Payment Under the Loans. .............................................................................. 12

II.    The Court Should Not Grant Leontiev Declaratory Relief Adjudicating His Rights Against Non-Parties. ................................................... 13

III.   Leontiev Can (and Should) Be Held Personally Liable for Debts Owed by Ambika, Vennop, and FGL. ................................................... 14

A.   Material Issues of Fact Exist as to Whether a Court Should Pierce Ambika's Corporate Veil to Hold Leontiev Personally Liable for Its Debts. ............... 14

    1.  Leontiev controlled Ambika. ........................................... 15

    2.  Leontiev was the "real actor" who received and promised to manage the loaned funds. ........................................................ 16

    3.  There is no evidence that Ambika's other transactions had any business purpose. .......................................................... 17

    4.  Leontiev used Ambika's corporate form to engage in and conceal misconduct. .......... 20

i

B.  Leontiev Is Likewise Liable for Vennop's Debts Under Cypriot Law ................................ 21

C.  Leontiev Can Also Be Liable for Debts of Ambika and Vennop Under Cypriot Statutory Law .......................................................................................................... 22

D.  Leontiev Can Be Liable Under Russian Law for Loans to FGL. ......................................... 22

E.  Leontiev's Commitment to Repay the Loans During the Meeting in London Is an Enforceable Obligation Under English Law ....................................................................... 24

CONCLUSION .......................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

CASES

*Am. Protein Corp. v. AB Volvo*, 844 F.2d 56 (2d Cir. 1988) ........................................12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................11

*Aplex Computer Corp. v. Nintendo Co., Ltd.*, 770 F.Supp. 161 (S.D.N.Y. 1991) ........................17

*Banker v. Nighswander, Martin & Mitchell*, 37 F.3d 866 (2d Cir. 1994) ...................................17

*Carte Blanche (Singapore) PTE., Ltd. V. Diners Club Int'l., Inc.*, 758 F. Supp. 908 (S.D.N.Y. 1991) ................................................12

*Coppotelli v. Ins. Co. of N. Am.*, 631 F.2d 146 (2d Cir. 1980) ......................................13

*Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299 (S.D.N.Y. 2011) ....................................17

*GlobalNet Financial.com, Inc. v. Frank Crystal & Co., Inc.* 449 F.3d 377 (2d Cir. 2006) ................................................24

*Green v. Mansour*, 474 U.S. 64 (1985) ................................................13

*Hashem v. Shayif*, [2008] EWHC 2380 (Fam.) ................................................15

*In re Old Carco LLC*, 530 B.R. 614 (Bankr. S.D.N.Y. 2015) ........................................13

*In re Tyson*, 433 B.R. 68 (2010) ................................................15, 17, 20

*Niagara Mohawk Power Corp. v. Hudson River-Black Water Regulating Dist.*, 673 F.3d 84 (2d Cir. 2012) ................................................14

*Oost-Lievense v. N. Am. Consortium, P.C.*, 969 F. Supp. 874 (S.D.N.Y. 1997) ........................12

*Parklane Hosiery Co. v. Shore,* 439 U.S. 322 (1979) ................................................13

*Prest v. Petrodel Res. Ltd.* [2013] UKSC 34 ................................................15

*Re a Company*, [1985] 1 B.C.C. 99421, 99425 (C.A.) (Cumming-Bruce, L.J.) ....................15, 20

*Rule v. Brine, Inc.*, 85 F.3d 1002 (2d Cir. 1996) ................................................11

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77 (2d Cir. 2004) ..........11

*Smith v. Bayer Corp.*, 564 U.S. 299 (2011) ................................................13

*Spink & Son, Ltd. v. Gen. Atl. Corp.*, 637 N.Y.S.2d 921 (N.Y. Sup. Ct. 1996) ........................24

*Starter Corp. v. Converse*, 170 F.3d 286 (2d Cir. 1999) ................................................................17

*Torah Soft, Ltd. v. Drosnin*, 268 A.D.2d 367 (N.Y. App. Div. 2000) ...........................................24

*U.S. Trust Co. of NY v. Shapiro*, 835 F.2d 1007 (2d Cir. 1987) .....................................................13

**STATUTES**

18 U.S.C. § 3181 ................................................................................................................................1

**RULES**

Fed. R. Civ. P. 56(a) ........................................................................................................................11

Fed. R. Evid. 408 .............................................................................................................................17

Defendant Alexander Varshavsky respectfully submits this memorandum in opposition to Plaintiff Sergey Leontiev's motion for summary judgment (the "MSJ") on the Complaint's sole surviving cause of action for a declaratory judgment of non-liability.

## PRELIMINARY STATEMENT

Leontiev's MSJ seeks absolution from this Court for conduct that left him in control of hundreds of millions of dollars that he claims and uses as his own, but that left those who loaned funds to Leontiev-controlled entities with massive financial losses.  Leontiev, through his agents and minions, caused entities he controlled to borrow money and then diverted the proceeds to other entities he controlled through a web of offshore vehicles.

As a result of this scheme, Probusinessbank ("PRBB"), which Leontiev controlled, has been put out of business by the Russian government; ZAO Financial Group "Life" ("FGL"), which he also controlled, is insolvent; and Ambika Investments Ltd. ("Ambika"), the entity to which Avilon (of which Varshavsky is the largest shareholder and President) loaned funds, became insolvent by 2011.  Leontiev has fled Russia, seeking refuge from his wrongdoing in the United States, with which Russia has no extradition treaty.  18 U.S.C. § 3181.  This Court should not allow Leontiev to turn this lawsuit into the capstone of his scheme to make off with other people's money.

Leontiev's MSJ asks for a ruling that he is not personally liable to *anyone*, under *any* legal theory, for debts owed by entities he controlled and used for his own personal benefit.  Pl. Mem. at 21.  As such, his request goes far beyond an adjudication of issues that may exist between him and Varshavsky in his personal capacity.  Leontiev explicitly has invited this Court to address the existing and prospective claims of lenders who are not before it, some of whom have already brought suit against Leontiev in a pending action in New York state court.

The plaintive tone of Leontiev's MSJ ignores that it was his decision—not Varshavsky's—to initiate this action.  It was also his decision, not Varshavsky's, to attempt to convince this Court to rule on the rights of non-parties.  In fact, Leontiev's request for declaratory judgment continues to be litigated only because he refuses to take "yes" for an answer: Varshavsky does not assert, and never has asserted, that he is personally entitled to receive any money from Leontiev.  There are no material facts in dispute with respect to that issue, and if the Court is inclined to enter a narrow order to that effect, Varshavsky would have no objection and this case would be over.

Even if Leontiev's liability to non-parties were properly before the Court, summary judgment should be denied.  The record reflects that Leontiev is responsible for diverting assets from the borrowers to other companies under his control, that he caused the borrowers to engage in transactions on non-market terms for his benefit, that he continued to control these entities following PRBB's collapse, and that he kept the companies chronically undercapitalized, so that they could not repay their debts to Avilon and other lenders.  Because this scheme was orchestrated by and for the benefit of Leontiev, there is a genuine dispute as to whether the Court should exercise its discretion to disregard the corporate form and find Leontiev personally liable for debts owed to Avilon and other lenders.

Leontiev is also directly liable, having promised to repay the debts of the entities he controlled, and in the process acknowledging that he had access to and controlled the borrowed funds long after the borrowing companies had been declared insolvent or cast into liquidation.  He later reneged on that promise, but only after secreting away the loaned funds in an offshore trust designed to put the assets beyond the reach of creditors.  Leontiev's retention of those funds is not only legally improper, but also inequitable under applicable law.

2

## COUNTER-STATEMENT OF FACTS

I.   **Leontiev and His Partner Raised Millions of Dollars from Avilon and Others Through Offshore Entities They Controlled.**

Leontiev and his long-time business partner, Zheleznyak, jointly owned a group of companies, including PRBB, a large Russian bank they founded in 1993.  Pl. SOF ¶¶ 2-4, 31.  Leontiev and Zheleznyak were two of the ultimate shareholders of PRBB and together owned a controlling stake.  Def. SOF ¶ 3.  Leontiev served as the Chairman of its Board of Directors and President since 1996.  Pl. SOF ¶ 10.  Over a decade, Leontiev and Zheleznyak worked as partners to raise and manage funds through offshore entities.  Def. SOF ¶¶ 5-7, 9-14, 17-21.  Zheleznyak—often drawing on his personal relationships, Def. SOF ¶¶ 8, 16—solicited loans, promising that Leontiev would use the funds in trading activities, producing high returns.  Def. SOF ¶¶ 10-11, 18.

In 2008, Leontiev instructed Zheleznyak to obtain a large loan from Avilon.  Def. SOF ¶ 9.  Acting on that instruction, Zheleznyak approached Varshavsky, a friend of many years, and told him that he and Leontiev had created an offshore company that had "nothing to do with" PRBB.  Def. SOF ¶¶ 8-10.  Avilon agreed to lend that company, Ambika, $19.9 million under Loan Agreement No. 1812/08.  Pl. SOF ¶¶ 58-59, Def. SOF ¶ 10.  Avilon (or its affiliates) loaned Ambika another $12.5 million under Loan Agreement No. 2712-10, Pl. SOF ¶¶ 90-93, and another $6.625 million under Loan Agreement No. 0109/11.  Pl. SOF ¶ 97.[1]  For all loans, Varshavsky and Zheleznyak negotiated the interest rate and the renewable one-year term of the loans and left it to their representatives to finalize other clauses.  Def. SOF ¶ 13.  During annual renewal negotiations and throughout the course of the loans, Zheleznyak repeatedly represented

---

[1]    In December 2014, Loan No. 1812/08 was formally discharged and the principal and interest due thereunder were rolled into Loan No. 0109/11.  Pl. SOF ¶¶ 82, 114.

to Varshavsky that Leontiev had invested the loaned funds in blue-chip securities and that

Avilon's money was secure and "outside of Russia, specifically in London."  Def. SOF ¶ 14.

Zheleznyak also raised millions of dollars from individual lenders.  He solicited Kamo

Avagumyan to lend funds to FGL, which he and Leontiev controlled, and, later, to Vennop

Trading Ltd. ("Vennop"), which Zheleznyak stated they also controlled.  Def. SOF ¶ 17.

Vennop, he said, was in "exactly the same business" as FGL.  *Id.*  Zheleznyak represented that

Leontiev would invest the loaned funds in securities, ensuring "high percentage rates" and

keeping the loaned funds separate and apart from PRBB.  Def. SOF ¶ 18.  Zheleznyak personally

guaranteed the loans—and signed a number of promissory notes on FGL's behalf, Def. SOF ¶

24—avowing that this also constituted a guarantee from Leontiev because the two were equal

partners.  Def. SOF ¶ 19.  Avagumyan decided to loan funds, and to renew his loans, relying on

that representation and Leontiev's reputed trading skills.  Def. SOF ¶ 20.  Avagumyan provided

the loaned funds to Leontiev's and Zheleznyak's representatives in cash, in exchange for the

FGL and Vennop promissory notes.  Def. SOF ¶ 21.

In August 2015, the Russian Central Bank revoked PRBB's banking license, claiming

that PRBB was insolvent.  Pl. SOF ¶ 7.  A government investigation has found evidence of

billions of dollars in fictitious or overvalued assets on PRBB's books, including loans to related

companies not engaged in any economic activities, and the embezzlement of funds through those

companies.  Def. SOF ¶¶ 124-38.  After the revocation of PRBB's license, the offshore

infrastructure controlled by Leontiev, which included Ambika, FGL, and Vennop, defaulted on

the loans and Leontiev ceased to honor the obligations he undertook through those entities.  The

principal and interest due under those loans remains unpaid.  Pl. SOF ¶¶ 117-18; Def. SOF ¶¶ 15,

23.

**II.     Ambika Was Deliberately Rendered Insolvent by the Transfer of Its Assets to Other Companies for Leontiev's Benefit.**

  The funds Avilon provided to Leontiev through Ambika could not be repaid because Ambika had been rendered insolvent by the transfer of all its assets—including the loaned funds—to other entities under Leontiev's control.  Leontiev and Zheleznyak testified that— contrary to Zheleznyak's representations to Varshavsky that Leontiev would invest the loaned funds in securities, independent of PRBB—███████████████████████████████ ███████████████████████ and the loaned funds were treated as part of PRBB's general treasury, Def. SOF ¶¶ 27-28, violating Russian law in the process.  *See* Supplemental Declaration of Svetlana Volodina ("Volodina Supp. Decl.") ¶¶ 9, 25-28.  These offshore companies were not identified as affiliates or related parties on PRBB's audited financial statements and their substantial liabilities were not reported on PRBB's books.  Def. SOF ¶ 30. These circumstances, at the very least, cast doubt upon Leontiev's and Zheleznyak's accounts of the purpose and use of the loans.

  There is also ample evidence that Leontiev used his control over Ambika and other offshore entities to funnel millions of dollars from Ambika to his company, Wonderworks Investments Limited ("Wonderworks"), on terms that made no economic sense.  For example, Ambika raised money from Avilon at interest rates of 11-15%, ████████████████████ ███████████████████████████████████ Def. SOF ¶¶ 105-06.

███████████████████████████████████ Def. SOF ¶¶ 117-20.

██████████████████████████████████████████

█████████████████████████████ *Id.* ███████████████████████

█████████████████████████ *Id.*



Ambika and Wonderworks also engaged in hundreds of forward sale transactions involving securities and bonds in 2014 and 2015, which resulted in Ambika making net payments of roughly $17 million to Wonderworks.  Def. SOF ¶ 84.

It is undisputed, however, that Leontiev's company, Wonderworks, profited handsomely.

, Ambika itself was left without any assets to repay its debts to parties unaffiliated with Leontiev.  According to restated financial statements issued in March 2016, by the end of 2013, Ambika had a $119-million hole in its balance sheet.  Def. SOF ¶ 103.[2]

Leontiev claims that Ambika held $82 million of PRBB's subordinated debt when PRBB lost its license, destroying the investment's value.  However, documents Leontiev produced show that the interest rate on that debt was around 6.6%, much lower than Ambika's cost of borrowing, indicating that Ambika's business model was headed for collapse before PRBB lost

---

[2]

its license.  Def. SOF ¶ 109.  In fact, Ambika's audited financial statements indicate that it was

"dependent upon the continuing financial support of its shareholder" who stated an "intention to

continue providing" financial assistance to Ambika to allow it to continue as a going concern

"and to meet its obligations as they fall due."  Def. SOF ¶¶ 92-94.  Although Avilon renewed its

loans to Ambika annually between 2011 and 2014, there is no evidence that Zheleznyak revealed

that Ambika's auditors had issued going-concern opinions.

### III.  Leontiev Ultimately Controlled the Transfers of Funds That Rendered Ambika Insolvent and Unable to Repay Its Debts.

Although Leontiev now seeks to distance himself from Ambika and other offshore

entities, the evidence shows that he controlled the flow of funds among them.  Def. SOF ¶¶ 31-

35.  These entities were created and operated by PRBB employees who reported to Leontiev in

his capacity as PRBB's President.  Def. SOF ¶ 32.  Leontiev not only established the financial

model that governed the transfer of funds among these entities, Def. SOF ¶ 33,



Leontiev relied on the same individuals to manage the operations of both the offshore

entities and Wonderworks.  The offshore entities were registered in the names of nominal

"owners" who did not own or control them.  Def. SOF ¶¶ 56, 59-67.



Tellingly, when PRBB's license was revoked, Zubiy took over the management of "operations" of Ambika, Vermenda, Valkera, and other offshore entities. Def. SOF ¶ 49.

This seamless transition of Ambika's control from a PRBB employee to someone working for Wonderworks belies Leontiev's assertion that the offshore entities were part of PRBB's "infrastructure" and beyond his control.

## IV.   Leontiev Voluntarily Liquidated FGL Without Repaying the Amounts It Owed

Like the funds loaned by Avilon to Leontiev through Ambika, the funds Avagumyan loaned to Leontiev through FGL were not repaid. Def. SOF ¶ 23. On February 20, 2015, FGL's sole shareholder, OOO Alivikt, signed a resolution providing for its voluntary liquidation. Def. SOF ¶ 76. Leontiev testified that he could not recall his involvement in the decision to liquidate FGL, Def. SOF ¶ 77, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ FGL could not have been liquidated without his knowledge and approval.[3]

---

[3]   Leontiev did not produce any documents concerning FGL's liquidation until after the close of discovery. The Court denied Varshavsky's request to question Leontiev on these documents on the grounds that Leontiev could be questioned at trial and the parties were free to ask the Court to draw reasonable inferences from the documents.

FGL's creditors were not informed of its impending liquidation.  Def. SOF ¶ 78.  Indeed, FGL issued at least one more promissory note after the liquidation had been authorized in exchange for Avagumyan's agreement to roll over his loans for another year.  Pl. SOF ¶ 190, Def. SOF ¶ 76.

FGL's liquidation was finalized on August 5, 2015.  Def. SOF ¶ 79.  The accounting statements prepared in connection with the liquidation—approved by OOO Alivikt as FGL's sole shareholder, Def. SOF ¶ 82—failed to reflect the millions of dollars owed to Avagumyan and instead falsely stated that FGL had no liabilities whatsoever.  Def. SOF ¶ 80.  The financial statements also show that, as of June 2015, FGL had no assets to repay its obligations under the promissory notes.  Def. SOF ¶ 81.

## V.    Leontiev Acknowledged the Debts and Promised to Repay the Loaned Funds.

Although Leontiev now disputes his responsibility to repay the loaned funds, he previously repeatedly acknowledged his possession of those funds and his responsibility for the debts, which he promised to repay.  Following PRBB's collapse, Leontiev, Zheleznyak, and Varshavsky met to discuss the repayment, Def. SOF ¶ 152, which Varshavsky, as Avilon's President, had authority to seek on Avilon's behalf.  Other lenders, including Avagumyan and Igor Renich, asked Varshavsky to negotiate on their behalf.  Def. SOF ¶ 153.

Leontiev repeatedly and unambiguously promised Varshavsky that he would repay the debt.  In particular, at a meeting among Leontiev, Zheleznyak, and Varshavsky at Avilon's office in Moscow in August 2015, Leontiev acknowledged that he owed the money and told Varshavsky not to worry because it was invested in securities, he would pay it all back, and he would devise a payment plan for doing so.  Def. SOF ¶ 157.

A week later, Leontiev again promised to repay the loaned funds at a meeting in London, which he secretly recorded.  Def. SOF ¶¶ 160, 162.  Leontiev acknowledged that he and

Zheleznyak were partners when they raised millions of dollars from Avilon and other lenders, confirmed that the loaned funds were in his possession and under his control, and repeatedly promised to repay the debt owed to Avilon, Avagumyan, and others.  Def. SOF ¶¶ 160-62 (Leontiev: "[Zheleznyak] and I are partners, and his obligations are my obligations, no doubt about it."; "We had a business with you. …We paid interest."; "You can be certain that we will perform our obligations to you … I give you my word, we will perform the obligation.").   A few weeks after the London meeting and consistent with his promise to repay and his statement that the funds were in his possession and control, ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ Def. SOF ¶¶ 168-70.

## VI.    While Promising to Repay the Debt, Leontiev Was Secretly Taking Steps to Transfer His Assets Out of the Reach of Creditors.

In the months after the Moscow and London meetings, representatives of Leontiev, Zheleznyak, and Varshavsky continued to discuss a timetable for the loan repayment.  Def. SOF ¶¶ 172-73. ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████

Leontiev also took other preventative measures.  Upon fleeing Moscow, he arrived in the United States in late summer 2015.  Def. SOF ¶¶ 139, 182.  In October 2015, he began applying for an L-1 intracompany transferee visa, which he ultimately received.  Def. SOF ¶¶ 140-42. ████████████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████████████

███████████████████     ████████████████████████████

████████████████████████████████████████████████████

   After Leontiev squirreled away his assets and secured Cypriot citizenship and U.S.

residence, he reneged on his commitment to repay the debts and filed the complaint in this case.

## VII. Procedural History

   In his complaint, Leontiev sought a sweeping declaratory judgment that he is not

personally liable for a debt or obligation to "Mr. Varshavsky, or anyone acting in concert or

participation with Mr. Varshavsky, related to the Alleged Loans," under any possible legal

theory recognized by any applicable body of law.  He asked for a permanent injunction "barring

Mr. Varshavsky, or anyone acting in concert or participation with Mr. Varshavsky, from taking

any further steps to enforce the Alleged Loans against Mr. Leontiev in his personal capacity."

Compl. ¶¶ 41-45, Prayer for Relief, ¶¶ 1-2.  At a hearing on Leontiev's motion for judgment on

the pleadings, he "narrowed the scope of the requested relief to a declaration that he does not

owe a debt to Varshavsky alone."  Mem. Opp. at 16 n.3 (citing Tr. dated Sept. 21, 2016, at 5-6).

### STANDARD OF REVIEW

   Summary judgment may be granted only when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The Court must resolve all ambiguities and draw all factual

inferences in favor of, and take all factual assertions in the light most favorable to, the party

opposing summary judgment.  *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391

F.3d 77, 83 (2d Cir. 2004); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  "The Second Circuit has noted that

the question of piercing the corporate veil is a fact-intensive issue that generally must be

submitted to the jury." *Carte Blanche (Singapore) PTE., Ltd. V. Diners Club Int'l., Inc.*, 758 F. Supp. 908, 914 (S.D.N.Y. 1991) (citing *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 59-60 (2d Cir. 1988)); *see also Oost-Lievense v. N. Am. Consortium, P.C.*, 969 F. Supp. 874, 880 (S.D.N.Y. 1997) ("[r]esolution of the alter ego issue is heavily fact-specific"; summary judgment denied).

## ARGUMENT

### I.     Varshavsky Never Asserted a Personal Right to Receive Payment Under the Loans.

Varshavsky sought to negotiate the repayment of loans with Leontiev on behalf of Avilon and others.  He never claimed that the funds were owed to him personally; that they are not is undisputed and was never in dispute.[4]  This Court could choose to give its imprimatur to that fact, but it would be a declaration on an issue as to which there is and never was any controversy.

The scope of any such order should be limited to Varshavsky's right to collect personally on the loans.  This would resolve the only issue properly before the Court, because after filing the complaint, Leontiev limited his request for relief to "a declaration that [he] owes nothing to Mr. Varshavsky personally." Sept. 21, 2016 Oral Arg. Tr. 5-6, 12 (Dkt. 42); Pl.'s Reply Supp. Mot. J. Pleadings, at 6 (Dkt. 32).  Leontiev's MSJ, however, reverts to the broader relief sought in the Complaint, Pl. Mem. at 25, which would prevent Varshavsky, "or anyone acting in concert or participation" with him, including Avilon, from seeking to hold Leontiev liable for the debts. As the Court has noted, the relief Leontiev once again appears to be seeking is inconsistent with

---

[4]     Eager to distract from his own bad faith and overreaching claim, Leontiev complains of Varshavsky's denial, in his Answer, of the statement, "Mr. Leontiev owes Mr. Varshavsky nothing." Pl. Mem. at 1-2.  That statement is conclusory and indefinite, and Varshavsky was entitled to deny it.  Varshavsky never asserted that Leontiev owes him personally *under the loans*, but a claim that "Leontiev owes Varshavsky *nothing*" is much broader.  Among other things, Leontiev should compensate Varshavsky for the costs of responding to knowingly false allegations, in particular that Varshavsky threatened Leontiev, which were denied by Leontiev's business partner and flatly contradicted by the transcript of the surreptitiously recorded August 2015 London meeting.  Def. SOF ¶ 154.

the dispute as narrowed by Leontiev in later proceedings.  May 12, 2016 Mem. Order, at 16 n.3

(Dkt. 46).  Leontiev is bound by his prior concession.  *See U.S. Trust Co. of NY v. Shapiro*, 835

F.2d 1007, 1008-09 (2d Cir. 1987) (plaintiff bound by counsel's concessions at oral argument).

## II.  The Court Should Not Grant Leontiev Declaratory Relief Adjudicating His Rights Against Non-Parties.

Leontiev chose to sue only Varshavsky and not the actual lenders to Ambika, FGL, and

Vennop.  Those lenders—Avilon, Avagumyan, and others—are not before the Court, within its

jurisdiction, or subject to its rulings.  By asking the Court to adjudicate his potential liability to

these non-parties, Leontiev strays far beyond anything the Court can or should adjudicate.

Indeed, some of the lenders already have sued Leontiev in New York state court and may seek

relief in other forums.  A judicial declaration of Leontiev's liability to those lenders should be

reserved to litigation in which they have appeared and had an opportunity to be heard.

"It is a violation of due process for a judgment to be binding on a litigant who was not a

party or a privy," *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 327 n.7 (1979), and any

declaration here of Leontiev's liability with respect to the rights of the lenders would have no

preclusive effect on them.  *See Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011); *Coppotelli v.

Ins. Co. of N. Am.*, 631 F.2d 146, 149-50 (2d Cir. 1980) ("[A]n interested party to a declaratory

judgment action who has not been joined as a party is not bound by the adjudication."); *cf. In re

Old Carco LLC*, 530 B.R. 614, 620-21 (Bankr. S.D.N.Y. 2015) (declining to issue declaratory

judgment in absence of "true adversary" where proceeding was brought to obtain a ruling that

could be used against a non-party and the "better and more effective remedy would be to litigate

the question in the court where the true adversary parties are present").  Leontiev's failure to join

the lenders—who could not have been joined without destroying diversity jurisdiction—warrants

a denial of broad declaratory relief.  *Green v. Mansour*, 474 U.S. 64, 73 n.2 (1985) (if

declaratory judgment would have no *res judicata* effect, it "would serve no purpose whatever in resolving the … dispute" and "is unavailable for that reason").

Leontiev has intimated that he would attempt to leverage a declaratory judgment against non-parties, an abuse the Court should not permit.  *See* Pl.'s Reply Supp. Mot. J. Pleadings, at 6 (Dkt. 32) ("[T]he *res judicata* effect of a judgment upon any particular person can be determined only in a subsequent proceeding."); Sept. 21, 2016 Tr. at 6  (Dkt. 42) ("Your Honor could decide this on several different grounds and some of those grounds might be applicable to other parties.").  Leontiev's clear intention to weaponize this Court's ruling against non-parties should weigh against issuing such a ruling in the first place.[5]

## III.   Leontiev Can (and Should) Be Held Personally Liable for Debts Owed by Ambika, Vennop, and FGL.

This case should be disposed of on the basis of the above points.  But if the Court reaches Leontiev's potential personal liability to non-parties, it should deny his MSJ because material disputed facts exist that can only be resolved by the jury.

### A.   Material Issues of Fact Exist as to Whether a Court Should Pierce Ambika's Corporate Veil to Hold Leontiev Personally Liable for Its Debts.

Cypriot law, which the parties agree applies to Leontiev's personal liability for Ambika's debts, allows piercing the corporate veil where the corporate form is used "to conceal the identity

---

[5]   In addition, Requests for Judicial Assistance to Cyprus and the British Virgin Islands, seeking information relevant to the offshore entities controlled by Leontiev, are still pending in this litigation and can be continued in the New York state court action.  It would be inequitable to declare Leontiev's liability as to non-parties where relevant evidence has not yet been made available due to Leontiev's choice of forum.  *Cf. Niagara Mohawk Power Corp. v. Hudson River-Black Water Regulating Dist.*, 673 F.3d 84, 106 n.7 (2d Cir. 2012) ("Equitable discretion as to whether a declaratory remedy should be granted is best exercised after a fuller record has been developed.").

of the real actors." *Prest v. Petrodel Res. Ltd.* [2013] UKSC 34, ¶ 28 (Sumption, L.J.).[6]  Under

the "concealment" branch of the veil-piercing doctrine, liability may be imposed on a controlling

party who uses the corporate form as a "mere façade" to conceal wrongdoing.  Mem. Op. (Dkt.

46) at 10-11.  Applying this doctrine, courts have pierced the corporate veil where an individual

exploited his control over a network of entities to divert assets to serve his personal interests.

*See In re Tyson*, 433 B.R. 68, 83 (2010) (quoting *Re a Company*, [1985] 1 B.C.C. 99421, 99425

(C.A.) (Cumming-Bruce, L.J.)) (imposing "liability on an individual defendant who had created

a 'sophisticated and intricate network' of some eighty 'interrelated English and foreign

companies and foreign trusts as a mechanism through which [he] could at will dispose of his

English assets'").  The factors identified in the Court's Memorandum Opinion as relevant to the

concealment analysis all support a finding that Ambika was a "mere façade."  There is no basis

to preclude a trial of these issues through a grant of summary judgment in Leontiev's favor.

### 1.     Leontiev controlled Ambika.

Leontiev controlled Ambika through his position as PRBB President and other means.

█████████████████████████████████████████████████████████

██████████████████████████  Zheleznyak testified that Leontiev controlled Ambika.

Def. SOF ¶ 31.  In fact, following PRBB's collapse Leontiev *continued* to exercise control over

Ambika through Zubiy.  Def. SOF ¶ 49.

That Leontiev was not Ambika's registered "owner" is not dispositive.  The concealment

inquiry focuses on identifying the "real actors."  *Prest* at ¶ 28; *see also Hashem v. Shayif*, [2008]

EWHC 2380 (Fam.) [¶ 163] (focusing on "both control of the company by the wrongdoer(s) and

---

[6]     In papers and argument for judgment on the pleadings, the parties agreed that English law
has great persuasive authority in Cypriot jurisprudence and that English judgments on veil-
piercing should apply.  Mem. Op. (Dkt. 46) at 10.

impropriety").  Ambika's purported "owner," Shcheglyaev, was a strawman with no economic

stake in the company or knowledge of or involvement in its operations.  ████████████

██████████████████████████████████████████████████████████████████

██████████████████  Shcheglyaev himself described being recruited by a PRBB

employee "to become the beneficiary of several companies for a certain remuneration."  Def.

SOF ¶ 63.  He could not even recall the names of the companies he supposedly owned, and was

never given a list.  Def. SOF ¶ 68.  He was not given access to email accounts set up in his name

and used by PRBB employees and Zubiy to correspond with Ambika's directors.  Def. SOF ¶¶

69-70, 72,-73, 75.  All instructions came from individuals ultimately reporting to Leontiev, not

Ambika's director or officer.  Def. SOF ¶ 66.  Beyond highlighting the irrelevance of formal

"ownership" for purposes of identifying the "real actors," these facts support the conclusion that

Ambika and other companies for which Shcheglyaev served as the "owner" were mere façades.

Indeed, they were part of an elaborate fraud scheme.

Similarly, the suggestion that Leontiev was "not involved in the operations or

management of Ambika," Pl. Mem. at 17, is irrelevant because Ambika had no independent

operations to speak of.  It had no employees and no operating expenses other than licensing and

brokerage fees and compensation for auditors and other professionals.  Def. SOF ¶ 89.  The only

thing Ambika "did" was borrow money and enter into trades and financing arrangements as part

of Leontiev's self-interested scheme—a scheme that ultimately rendered it insolvent.

> **2.    Leontiev was the "real actor" who received and promised to manage
> the loaned funds.**

When negotiating the loans at issue, Zheleznyak represented that Leontiev would hold

the funds through his companies and manage trades using the loaned funds to ensure high rates

of return.  Def. SOF ¶¶ 9-11.  Leontiev subsequently confirmed that he had control of the money

and would ensure the debts were repaid.  Def. SOF ¶¶ 157, 162-63.[7]  A factfinder could easily determine that Leontiev was the "real actor" responsible for the disposition of the funds, including how they were used, where they were directed, and whether the debts were repaid.

Leontiev focuses extensively on the documentation surrounding the loans, noting that their formal terms do not mention Leontiev.  But veil-piercing doctrine looks at substance, over form, to determine whether the corporate form is concealing the "real actor."  Viewed in the light most favorable to Varshavsky, the evidence that the lenders understood that Leontiev was the real actor who would use the loan proceeds supports piercing Ambika's corporate veil.  At the very least, the facts which the factfinder would need to make that determination remain disputed.

### 3.   There is no evidence that Ambika's other transactions had any business purpose.

Leontiev is correct that the relevant time for determining whether the corporate form is used as a façade is when the loans are made.  Pl. Mem. at 19 (citing *Tyson*, 433 B.R. at 87 n.33).  But Leontiev is wrong that this directs the inquiry to 2008 and 2011.  The Ambika loans at issue had a one-year term.  The 2008 and 2011 loans were fully performed and new loans were entered into each year upon the maturity of the prior loan.  Hence, it is the loan consolidation agreement,

---

[7]   Leontiev's statements at the London meeting were not settlement offers under Fed. R. Evid. 408, which bars evidence of compromise efforts only if there is "an actual dispute, or at least an apparent difference of opinion between parties as to the validity of the claim."  *Aplex Computer Corp. v. Nintendo Co., Ltd.*, 770 F. Supp. 161, 163 (S.D.N.Y. 1991).  The transcript of the meeting shows that there was no such difference of opinion; Leontiev only sought more time to repay agreed obligations.  Def. SOF ¶¶ 160-67.  Leontiev's statements also serve as evidence of a new contract under the controlling English law, *see infra* at 25, and are admissible as evidence of a new contract.  *Banker v. Nighswander, Martin & Mitchell*, 37 F.3d 866, 872 (2d Cir. 1994).  Finally, the court has broad discretion to admit statements, if, as here, they are offered for a purpose other than as proof of validity or amount of a claim.  *Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 316 (S.D.N.Y. 2011); *see also Starter Corp. v. Converse*, 170 F.3d 286, 293-94 (2d Cir. 1999) (upholding admission of evidence of prior negotiations to prove an element of a fraud claim).

signed in December 2014, that Ambika breached.  Pl. SOF ¶¶ 82, 114.  Ambika's other

transactions and its financial position in 2014 provide ample evidence that Ambika was a façade.

Ambika's financial statements reflect that the company was woefully undercapitalized

and entirely dependent on its shareholder.  It had net losses of $17 million, $37 million, and $66

million, respectively, from 2011 to 2013.  Def. SOF ¶ 90.  The accumulated losses of over $119

million at year-end 2013 dwarfed Ambika's equity capital, which amounted to a single issued

and paid share valued at $2.  Def. SOF ¶¶ 91, 103.  Despite its dire financial condition, Ambika

engaged in financing transactions involving hundreds of millions of dollars during this period.

Leontiev has never alleged or testified that this information was disclosed to Avilon.

Def. SOF ¶ 104.

Ambika's insolvency, moreover, was a direct result of trades and investments that

resulted in mounting losses caused by money-losing trades with other Leontiev-controlled

companies that made no economic sense, except that they benefitted Leontiev.



These are, by no means, the only indications of impropriety with respect to Ambika's

massive disguised losses. ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Economically, these

loans were disastrous for Ambika, which was borrowing money from Avilon at 11%-15%

interest rates ████████████████████████████████████████████████

Def. SOF ¶¶ 105-06. ████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████ Even if the funds had been

repaid, Ambika was bound to lose money.[8]  A factfinder could conclude that the overall financial

scheme shows that Leontiev used Ambika and other entities he controlled as a slush fund to

funnel money to Wonderworks and other entities for his personal benefit.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████ No economic

---

[8]    Later, when Ambika was still borrowing funds at high rates, it purchased PRBB's
subordinated debt that paid only approximately 6.6% interest.  Def. SOF ¶ 109.  This capital
would have enabled PRBB to make further loans to companies controlled by Leontiev until
the scheme collapsed in August 2015.

rationale exists for this transaction other than that Leontiev decided to use Valkera's assets to pay Ambika's debts.  It further supports a finding that Leontiev controlled these entities and disregarded their separate corporate identities, with the ultimate purpose of controlling large sums of money for his personal benefit.

        4.        **Leontiev used Ambika's corporate form to engage in and conceal misconduct.**

Leontiev used his control to secretly siphon off cash from Ambika, leaving it unable to repay its debts.  His strategy of concentrating liabilities in Ambika and other entities while dissipating the proceeds through self-interested, non-arms-length, and irregularly documented transactions leaving the borrowers insolvent further supports piercing the corporate veil.  *See, e.g.*, *In re Tyson*, 433 B.R. at 83; *accord. Re a Company*, [1985] 1 B.C.C. at 99425.

In addition to the inexplicable, money-losing forward purchase contracts, Ambika appears to have provided Wonderworks its initial capital.  ███████████████████ ████████████████████████████████████████████████ No loan documents or underwriting materials to support these purported loans have been produced.  If the loans never existed, Leontiev provided no explanation for why Wonderworks' counsel made a contrary representation, or what (if anything) was done to correct that misstatement.  ██████

████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

The evidence is overwhelming that Leontiev caused the entities he controlled to lend to Wonderworks at below-market rates.  In 2012 and 2013, Wonderworks had negative equity and a history of operating losses, and it had no credit history before 2011.  Def. SOF ¶¶ 111-16.  █████

████████████████████████████████████████████  ████████████



A factfinder could easily conclude that this web of transactions was an unsustainable scheme, personally benefitting Leontiev, which could end only in Ambika's insolvency and inability to repay the lenders.[9]

### B.    Leontiev Is Likewise Liable for Vennop's Debts Under Cypriot Law

Further demonstrating the interchangeability of such entities, Vennop replaced FGL as the borrower on some promissory notes when FGL was liquidated.  Avagumyan was misleadingly told that the swap was due to "an internal restructuring," with no substantive change made to the arrangement.  Def. SOF ¶ 25.  Leontiev faults Varshavsky for "present[ing] no evidence" of Vennop's "activities," Pl. Mem. at 20, but

---

[9]    The promise of high returns based upon a proprietary trading model, the effort to roll over investments to avoid repaying principal, and the use of an intricate web of companies to attract and disperse funds, exhibits many hallmarks of a classic Ponzi scheme.  Indeed, Zheleznyak himself described using borrowed funds to "pay[] out previously attracted deposits and interest."  Def. SOF ¶ 27.  The rapid collapse of Leontiev's structure after PRBB's troubles is consistent with the manner in which such schemes fall apart.

that is, of course, the point.  First, Vennop has no connection to Varshavsky or Avilon and relates only to Avagumyan, who is not a party to this case.  Second, Leontiev produced no such evidence about Vennop in discovery.  Apart from overreaching the bounds of proper litigation by making arguments and seeking an order about debts unrelated to any legitimate interest in this case, Leontiev is wrong to think that summary judgment could be warranted on the current record.  A jury easily could infer that no records of Vennop's business activities exist because it had no legitimate purpose and was, like Ambika, a mere façade.

### C.   Leontiev Can Also Be Liable for Debts of Ambika and Vennop Under Cypriot Statutory Law.

Leontiev could be personally liable for debts of Ambika and Vennop under Cypriot statutory law if either company's liquidator finds that it carried on business with the intent to defraud creditors.  *See* Aristodemou Expert Report ¶ 25 (Dkt. 29).  A factfinder could easily so determine.  As discussed, it is reasonably disputed that Leontiev controlled Ambika and Vennop and dissipated the funds loaned to those entities with no reasonable expectation that their debts could be repaid.

### D.   Leontiev Can Be Liable Under Russian Law for Loans to FGL.

Leontiev's liability for FGL's unpaid debts under Russian law is the subject of many factual disputes, and his request for summary judgment regarding his responsibility for those debts fails for the same reasons as his request regarding Vennop.  ██████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████ Leontiev and Zheleznyak raised millions of dollars through FGL, assuring lenders that Leontiev would use the funds to trade and generate returns for them.  Def. SOF ¶¶ 17-20, 23-24.  As with Vennop, Leontiev produced no relevant documentation and claimed to have no knowledge of FGL's operations or liquidation,

Def. SOF ¶ 77, despite his clear and direct ownership interest.  A factfinder could reasonably infer from the absence of such documentation that FGL had no legitimate business operations for which documentation would be generated.  Leontiev, moreover, admitted at the recorded August 2015 meeting in London that the funds loaned to FGL and other entities ended up in his hands and remained under his control.  Def. SOF ¶¶ 162-64.

There is no dispute that FGL filed a liquidation notice on April 1, 2015.  Pl. SOF ¶ 234. What is disputed is Leontiev's role in the liquidation decision—especially since it was taken without notice to FGL's creditors like Avagumyan, Def. SOF ¶ 78, and was based on patently false statements that FGL had no obligations to any creditors that had not been or could not be satisfied—a requirement for liquidation under Russian law.  Declaration of Svetlana Volodina (Dkt. 30) ("Volodina Decl.") ¶ 22; Def. SOF ¶¶ 80-82.  In fact, as Leontiev knew, FGL owed millions of dollars to Avagumyan and others.  Indeed, FGL renewed the loans with Avagumyan after commencing its liquidation proceedings.  Pl. SOF ¶ 190; Def. SOF ¶ 76.

Under Russian law, the proper procedure for dealing with a company that cannot satisfy its obligations to lenders is not liquidation, but bankruptcy.  Volodina Decl. ¶ 14.  Under Russian bankruptcy law, Leontiev can be held personally liable for FGL's debts.  *Id.* at ¶¶ 11-12.  Indeed, contrary to the arguments made in Leontiev's MSJ, he may imminently be held liable for the debt in light of a second reversal of FGL's improper liquidation.  Def. SOF ¶ 83; Volodina Supp. Decl. ¶¶ 3-5; Volodina Decl. ¶¶ 7, 17, 25.  At the very least, Leontiev's ownership and control of FGL and a web of offshore companies, combined with his admission that he possessed these funds as of August 2015, create a genuine dispute as to whether he caused the wrongful dissipation of FGL's assets.

Leontiev also can be held personally liable on the basis of equitable principles set out in the Russian Civil Code, which prohibit unjust enrichment and abuse of rights of others. Volodina Decl. ¶¶ 8-9.  Contrary to the statement of Leontiev's Russian law expert that veil-piercing is unavailable as a remedy for violations of these principles, Russian courts have applied veil piercing in a number of recent cases where defendants used corporate formalities to shield their wrongdoing.  Volodina Supp. Decl. ¶¶ 6-8.

### E.   Leontiev's Commitment to Repay the Loans During the Meeting in London Is an Enforceable Obligation Under English Law.

Leontiev's MSJ assumes that New York law applies to Leontiev's oral commitment to repay the debts owed by Ambika, Vennop, and FGL made in August 2015 in London.  Pl. Mem. at 24-25.  That assumption is mistaken.  New York applies a "grouping of contacts" choice-of-law analysis to contract claims, including with respect to a Statute of Frauds defense.  *GlobalNet Financial.com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 383 (2d Cir. 2006); *Torah Soft, Ltd. v. Drosnin*, 268 A.D.2d 367, 367-68 (N.Y. App. Div. 2000) (rejecting a New York Statute of Frauds defense and applying Israeli law to breach of oral contract claim); *Spink & Son, Ltd. v. Gen. Atl. Corp.*, 637 N.Y.S.2d 921, 923-24 (N.Y. Sup. Ct. 1996) (English law determines enforceability of oral contract).  The factors considered—the place of contracting, negotiation, and performance; the location of the subject matter of the contract; and the domicile of the contracting parties—establish that English law governs the agreement reached during the London meeting.  *See GlobalNet Financial.com*, 449 F.3d at 383 (listing factors).

The English Statute of Frauds applies to guarantees, where one takes on a secondary responsibility for the debt of the borrower.  Declaration of Richard Millett Q.C. ("Millett Decl.") ¶¶ 12-14, 21.  It does not apply to indemnities, where one takes on the primary liability for the

debt. *Id.* ¶¶ 25-26, 28, 33-34.  Whether an oral agreement to pay is a guarantee or an indemnity is a fact-specific inquiry and the parties' characterization of it is not determinative. *Id.* ¶ 38.

Although Leontiev glibly states that no "material terms" were agreed at the London meeting, Pl. Mem. at 9, the undisputed record belies that claim.  The total amount owed to the lenders was understood, Leontiev's personal commitment to pay that debt was understood, and Leontiev's understanding that he owed the money from his personal funds was clear.  Def. SOF ¶ 164.  The only open term was the payment schedule, not Leontiev's commitment to pay.

Nothing about the London discussion alluded to Leontiev's provision of a guarantee on the debt.  In fact, Leontiev took on an obligation that combined debts owed by several nominally independent entities and materially altered the terms under which those debts would be repaid, including the repayment schedule.  Def. SOF ¶¶ 164-66.  He offered the repayment schedule in exchange for more time to repay.  Def. SOF ¶ 167.  Leontiev's commitment to pay the debt therefore fails to satisfy an essential characteristic of a guarantee—that it be co-extensive with the primary obligation in all material ways, including the time frame of the repayment—and conclusively renders it an enforceable oral indemnity.  Millett Decl. ¶¶ 18, 25-26.

In light of the above, there is at least a material dispute as to whether Leontiev can be personally liable to the lenders for the loans because he agreed to indemnify the lenders for the amount of the unpaid loans, and that agreement is enforceable under English law.

## CONCLUSION

For the foregoing reasons, Varshavsky respectfully concedes that Leontiev is entitled to a final order of declaratory judgment that Leontiev is not liable to Varshavsky in his personal capacity, and otherwise requests that Leontiev's MSJ be DENIED.

Dated: New York, New York
       February 10, 2017

                              DEBEVOISE & PLIMPTON LLP

                              _____
                              Sean Hecker
                              Colby Smith
                              William H. Taft V
                              919 Third Avenue
                              New York, New York 10022
                              Tel:  (212) 909-6000
                              Fax: (212) 909-6836
                              shecker@debevoise.com
                              csmith@debevoise.com
                              whtaft@debevoise.com

                              *Counsel to Defendant Alexander Varshavsky*

26