UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                              :

SERGEY LEONTIEV,                   :

                 :   No. 16-cv-03595 (JSR)

          Plaintiff,    :

                 :   **ORAL ARGUMENT REQUESTED**

   -against-          :

                 :   **CONFIDENTIAL – FILED UNDER**

ALEXANDER VARSHAVSKY,   :   **SEAL**

                 :

         Defendant.    :

                 :

-------------------------------------------------------------- x

### DEFENDANT ALEXANDER VARSHAVSKY'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Local Civil Rule 56.1, Defendant Alexander Varshavsky ("Defendant" or "Varshavsky") submits the following specific responses and statement of additional material facts (many of which are undoubtedly disputed) in support of his opposition to Plaintiff's motion for summary judgment.  This response is solely for the purpose of complying with Local Rule 56.1 and should not be deemed an admission for any other purpose.  The nature of Plaintiffs' Motion for Summary Judgment puts a large swath of facts at issue, because he seeks a declaration that no facts or legal theory exists that gives rise to liability on his part.  A range of facts are material to rebutting this broad request and are set forth below.

### I.  Specific Responses to Plaintiff's Additional Material Facts Pursuant to Local Civil Rule 56.1(b)

**I.**      **The Parties**

      **A.**     **Plaintiff**

       1.     Plaintiff Sergey Leontiev is a Russian-born entrepreneur and businessman who currently resides in New York, NY. Leontiev Decl. ¶¶ 1, 25.

**RESPONSE**: Undisputed.

2.      In 1993, Mr. Leontiev, together with his longtime friend Alexander Zheleznyak, founded Probusinessbank ("PRBB" or the "Bank"), a joint-stock commercial bank. Leontiev Decl. ¶ 2; Exh. 2 at 94:24-95:10, 95:15-96:3 (Zheleznyak Tr.); Exh. 3 at SL0001222 (PRBB 2014 Audited Financials).

**RESPONSE**: Undisputed.

3.      PRBB provided a full range of banking services to corporate and individual clients pursuant to a general banking license issued by the Central Bank of the Russian Federation. Leontiev Decl. ¶ 3; Exh. 3 at SL0001222 (PRBB 2014 Audited Financials).

**RESPONSE**: Undisputed.

4.      PRBB served as the parent entity to numerous smaller banks that were organized under the brand Financial Group 'Life' (the "Life Group"). Leontiev Decl. ¶ 4; Exh. 3 at SL0001222 (PRBB 2014 Audited Financials); Exh. 1 at 77:8-10, 77:14-15, 82:4-22 (Leontiev Tr.).

**RESPONSE**: Undisputed.

5.      As of December 31, 2014, the banks in the Life Group employed more than 13,000 people and operated hundreds of offices and branches throughout Russia. Exh. 3 at SL0001224, SL0001227 (PRBB 2014 Audited Financials).

**RESPONSE**: Undisputed.

6.      In March 2014 and April 2015, PRBB received two clean opinions from its auditors, ZAO Deloitte & Touche CIS, which found that the Bank was in compliance with the requirements and recommendations of the Central Bank of the Russian Federation. Exh. 4 at SL0001330-31 (PRBB 2013 Audited Financials); Exh. 3 at SL0001214-15 (PRBB 2014 Audited Financials).

**RESPONSE**:  Disputed as incomplete and not fully supported by the cited documents. The cited excerpts of the PRBB 2014 Audited Financials do not contain specific language as to compliance with the requirements and recommendations of the Central Bank of the Russian Federation; the 2014 auditor's findings comment only on compliance with "International Financial Reporting Standards."

Furthermore, subsequent official documents revealed that PRBB and its management had been engaged in fraudulent activities for years, including for the years covered

by statements.  The Russian Central Bank revoked PRBB's license based on an analysis that indicated PRBB's assets were insufficient to satisfy its liabilities. Def. Ex. 1, SL0035954, at SL0035956 (Letter from the Russian Central Bank to Y. Chaika, the Prosecutor General of the Russian Federation (ENG) (produced translation of SL0000496)).  Among its findings, the Central Bank discovered that "Ambika Investment Limited was practically exclusive (single) counterparty of the Bank in its transactions of purchase and sale of foreign currency" and that PRBB transferred around 3 billion rubles out of the bank into a web of "technical" economically connected borrowers, which transferred the funds to the mutual counterparty of Vermenda Holdings Limited ("Vermenda").  *Id*. at SL0035955-56.   Evidence showed that these transactions, along with the "suspicious" quality of assets and PRBB's high-risk loan policy constituted allegedly fraudulent criminal activity undertaken by Leontiev and Zheleznyak, together in their capacity as owners of the Life Group.  *Id*. at SL0035956 ("Outlined facts of withdrawal of assets from the Bank, including assets provided to it by the banks, members of the group, proves implementation by owners of banking group of their powers in order to gain profit, benefits and advantages for themselves in spite of legal interests of creditors and depositors, which a [*sic*] reason to suggest presence in their actions of penal criminal acts, set out by the article 159 'Fraud', article 160 'Embezzlement', article 196 'Deliberate bankruptcy' and article 201 'Abuse of powers' of the Penal Code of the Russian Federation.").

On January 14, 2016, the Russian Deposit Insurance Agency ("DIA") submitted to the Russian Federal Security Service ("FSB") a letter detailing criminal activities undertaken by PRBB executives, including activities related to loans to Vermenda.  Def. Ex. 2, SL0032531.

In an announcement dated February 17, 2016, the Russian Investigative Committee stated that it was bringing charges against former PRBB executives.  It noted that

their crimes involved "extending loans to fictitious enterprises under their control that were not engaged in any economic activities, where these loans were deliberately impossible to recover, were not secured by any property collateral, and were transferred to current accounts held by fictitious enterprises."  The announcement noted that approximately 2.5 billion rubles of PRBB's funds were embezzled.  Def. Ex. 3 (February 17, 2016, Announcement on the Official Website of the Investigative Committee of the Russian Federation, http://sledcom.ru/news/item/1017596/).

7.      Nevertheless, in August 2015, the Central Bank suddenly revoked PRBB's license, claiming that the Bank was insolvent. Leontiev Decl. ¶ 24.

**RESPONSE**:  Disputed that the license revocation was "sudden" for the reasons stated in response to paragraph 6.  Undisputed that, in August 2015, the Central Bank revoked PRBB's license, claiming that the Bank was insolvent.

8.      Over the past five years, the Central Bank has revoked hundreds of bank licenses in an effort to consolidate the Russian banking industry for the benefit of state-owned banks. Exh. 5 (3/17/2016 Forbes article).

**RESPONSE**:  Disputed as mischaracterizing the cited article, which does not specify a principal reason for revocation of bank licenses.  Moreover, according to the lead expert at the Center for Development at the Higher School of Economics National Research University cited in the article, "There is no evil CB [Central Bank] destroying good banks, but there are bankrupt banks and criminal banks."  The article also noted that, as a result of the bank closures, "over the past three years the size of dubious operations … fell from USD 38.8 billion to USD 558 million."  Pl. Ex. 5.

9.      Since the start of 2013, the Central Bank has revoked more than 250 bank licenses, including over 100 in 2015 alone. Exh. 5 (3/17/2016 Forbes article).

**RESPONSE**:  Undisputed.

10.     Until the Central Bank revoked PRBB's banking license in August 2015, Mr. Leontiev was the President of the Bank and Chairman of the Board of Directors and served on PRBB's Management Board. Leontiev Decl. ¶ 5; Exh. 1 at 84:9-20, 84:24-85:3 (Leontiev Tr.).

**RESPONSE**:  Undisputed.

11.     In addition to these responsibilities, Mr. Leontiev separately founded a new company in 2011 called Wonderworks Investments Limited ("Wonderworks"). Leontiev Decl. ¶ 27; Exh. 6 at SL0024211 (Wonderworks Certificate of Incorporation).

**RESPONSE**:  Undisputed.

12.     ███████████████████████████████████
████████████████████████████████

**RESPONSE**:  ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

13.     █████████████████████████████████

**RESPONSE**:  ███████████████████████████

████████████████████████████████████████

█████████████

14.     █████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

**RESPONSE**:  ███████████████████████████

████████████████████████████████████████

15.

**<u>RESPONSE</u>**:

16.

**RESPONSE**: ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

     17.    Mr. Leontiev is currently the CEO of Grid Market Research, a company which provides market research and analysis. Leontiev Decl. ¶ 31.

    **RESPONSE**:  Undisputed.

**B.    Alexander Varshavsky**

     18.    Defendant Alexander Varshavsky is a Russian-born businessman who owns multiple homes and has shares in several businesses worth millions of dollars. Dkt. No. 27 at 3 (¶ 2) (Amended Answer).

    **RESPONSE**:  Disputed as unsupported by the citation, which states only that

Varshavsky "is a naturalized United States citizen who owns a residence in Holmdel, New Jersey

and has business interests in the United States and Russia worth millions of dollars." Dkt. No. 27

at 3 (¶ 2) (Amended Answer).

     19.    Mr. Varshavsky serves as President of Avilon Automobile Group ("Avilon AG"). Exh. 9 at 19:7-15 (Varshavsky Tr.); Exh. 10 at 12:25-13:2 (Pavlovich Tr.).

    **RESPONSE**:  Undisputed.

     20.    Avilon AG was previously known as New York Motors Moscow. Exh. 9 at 27:22-28:9 (Varshavsky Tr.).

    **RESPONSE**:  Undisputed.

     21.    Avilon AG is a distributor of luxury automobiles in Russia with over $2 billion in annual sales. Exh. 21 at 27:18-24, 39:23-40:4 (Varshavsky Tr.); Exh. 11 at 14:2515:19 (Kamo Avagumyan Tr.); Exh. 10 at 41:3-6 (Pavlovich Tr.); Exh. 12 at AVPE0000011 (8/17/2011 email from I. Meshkova to V. Nazanskaya attaching Avilon Group structure and financial statement).

**RESPONSE**:  Undisputed.

22.     Mr. Varshavsky holds an ownership interest in a number of companies including Avilon AG, Avilon Plaza, European Realty Corp., Avtologistika, and others (together, the "Avilon Group"). Exh. 9 at 115:6-21 (Varshavsky Tr.); Exh. 10 at 11:19-12:7 (Pavlovich Tr.); Exh. 12 at AVPE0000011 (8/17/2011 email from I. Meshkova to V. Nazanskaya attaching Avilon Group structure and financial statement).

**RESPONSE**:  Disputed to the extent that paragraph 22 suggests Varshavsky holds a direct ownership interest in all of these entities.  Further disputed as vague with respect to what "other" companies are referred to as being part of the "Avilon Group."

23.     Avilon AG's other shareholders are Kamo Avagumyan and Igor Bakunenko. Exh. 11 at 8:7-24 (Kamo Avagumyan Tr.).

**RESPONSE**:  Disputed as unsupported by the record.  Def. Ex. 12 at 9:18-22 (Pavlovich Tr.); Def. Ex. 18 at 10:20-25 (Kamo Avagumyan Tr.).

24.     During the relevant time period, the Avilon Group employed numerous lawyers and accountants, including Financial Director Irina Monakhova, Chief Accountant Yulia Semenova, Deputy Chief Accountant Valentina Nazanskaya, and Head of the Legal Department, Vitaliy Popov. Exh. 13 at 11:14-17 (Monakhova Tr.); Exh. 14 at 9:6-14, 39:12-15 (Semenova Tr.); Exh. 15 at 5:18-7:9 (Popov Tr.).

**RESPONSE**:  Undisputed that, consistent with the evidence cited by Leontiev, Monakhova worked as Avilon's Financial Director, starting in November 2004; that Semenova worked as Chief Accountant beginning in 2007; that Nazanskaya worked as Deputy Chief Accountant for an unspecified time period; and that Popov worked as the Head of the Legal Department from 2008 to 2010 and again from May 2013.  In all cases, their direct employment with Avilon ended in 2015, when they continued in their positions under the Akita management contract described in the following paragraph.

25.     In late 2015, the Avilon Group restructured and created a new management company called Akita, which currently employs Ms. Monakhova, Ms. Semenova, and Mr. Popov, and manages several companies including Avilon AG. Exh. 13 at 10:21-11:6 (Monakhova Tr.); Exh. 14 at 9:17-20 (Semenova Tr.); Exh. 15 at 5:8-9, 7:10-8:5 (Popov Tr.); Exh. 11 at 7:2-7, 7:16-18 (Kamo Avagumyan Tr.); Exh. 10 at 13:8-19 (Pavlovich Tr.).

**RESPONSE**:  Undisputed.

26.     Akita is owned by Mr. Varshavsky and Kamo Avagumyan through an off-shore entity called Maxbond. Exh. 11 at 7:8-15, 12:21-13:9 (Kamo Avagumyan Tr.); Exh. 15 at 8:6-12 (Popov Tr.).

**RESPONSE**:  Disputed as unsupported by the citations to the extent that paragraph 26 suggests Varshavsky and Kamo Avagumyan hold direct interests in Maxbond and otherwise undisputed.

27.     Mr. Varshavsky, the companies within the Avilon Group, and various employees and executives of those companies were longtime customers of PRBB and received ███████████ and corporate banking services, such as payroll, financing of inventory ██ ████████. Exh. 9 at 206:8-14 (Varshavsky Tr.); Exh. 11 at 17:9-12 (Kamo Avagumyan Tr.); Exh. 10 at 17:6-8, 17:19-18:9 (Pavlovich Tr.); Exh. 16 at 61:19-25 (Karen Avagumyan Tr.); Exh. 17 at AVPE0002068-70 (2/12/2014 email from Y. Semenova to I. Monakhova).

**RESPONSE**:  Disputed as unsupported by the record with respect to Varshavsky. Def. Ex. 13 at 206:15-18 (Varshavsky Tr.) (Q: "Do you not remember borrowing $22 million from … Probusinessbank?"  A: "I never borrow.").  Disputed as vague as to scope of "companies within the Avilon Group," but undisputed with respect to companies specifically defined as within the Avilon Group.

28.     In 2014 and 2015, Sanbay Holdings Limited ("Sanbay"), an entity affiliated with Karen Kimovich Avagumyan, brother of Kamo Avagumyan and an Avilon Group executive, received over 36 million Euros in financing from entities affiliated with PRBB, of which over 14.4 million Euros were advanced weeks before PRBB's license was revoked. Exhs. 18 at SL0033756-60 and 19 at SL0033754-55 (8/6/2014 and 8/7/2014 loan agreements between Digitime Alliance Ltd. and Sanbay) and Exh. 20 (7/15/2015 loan from Trustway Investments Limited to Sanbay).

**RESPONSE**:  Undisputed that Sanbay entered into loan agreements with Digitime Alliance Ltd. and Trustway Investments Limited.  Disputed in that the evidence cited does not establish that the entities were affiliated with PRBB, or that the funds were actually advanced in 2015 according to the timetable set out in the loan agreements.  The cited exhibits do not demonstrate an affiliation between Sanbay Holdings Limited and Karen Kimovich

Avagumyan, nor do they demonstrate an affiliation between PRBB and Digitime Alliance Ltd. or Trustway Investment Limited. Furthermore, the cited exhibits are loan agreements that are insufficient to demonstrate that the loans were funded and that Sanbay actually "received" over 36 million Euros.

29.     Ms. Monakhova and Ms. Semenova managed Sanbay in their capacities as Financial Director and Chief Accountant, respectively, of the Avilon Group. Exh. 21 at SL0033766-68 (10/23/2014 email from I. Monakhova to Y. Krisiuk); Exh. 22 at AVPE0001456 (11/3/2015 email from I. Monakhova to Y. Semenova); Exh. 13 at 98:19-99:2 (Monakhova Tr.).

**RESPONSE**:  Disputed as mischaracterizing the cited testimony of Monakhova and as overbroad.  Monakhova testified only that "[s]ome transactions that went through Sanbay were implemented under my control."  Pl. Ex. 13 at 98:19-99:8 (Monakhova Tr.). The evidence cited does not support the proposition that she and Semenova "managed Sanbay."

30.     None of Defendant's witnesses knew about the Sanbay loans or could state that the loans were repaid. Exh. 9 at 127:20-128:2, 134:11-135:2 (Varshavsky Tr.); Exh. 13 at 99:13-16 (Monakhova Tr.).

**RESPONSE**:  Disputed.  Monakhova testified that she did not recall if she had arranged for a loan to be made to Sanbay by PRBB or a company controlled by PRBB.  Pl. Ex. 13 at 99:13-16 (Monakhova Tr.).   Varshavsky's witnesses Karen Avagumyan, Kamo Avagumyan, Andrei Pavlovich, and Yulia Semenova were not questioned about Sanbay.

## II.     Probusinessbank

31.     In addition to a general banking license, PRBB held licenses that permitted it to engage in depositary activities, securities management, broker-dealer activity, serving as an intermediary for dealing in futures and options, non-governmental pension funds asset management, precious metal transactions, and acting as a guarantor in relations with customs authorities. Exh. 3 at SL0001222 (PRBB 2014 Audited Financials).

**RESPONSE**:  Undisputed.

32.     With these licenses, the bank had authority to manage investments in a wide variety of financial instruments on behalf of its clients. Exh. 3 at SL0001222 (PRBB 2014 Audited Financials).

**RESPONSE**:  Undisputed.

33.     PRBB consisted of numerous business units, infrastructure units, and systems units, each of which was headed by a manager. Leontiev Decl. ¶ 7; Exh. 1 at 95:14-16 (Leontiev Tr.).

**RESPONSE**:  Disputed as ambiguous with respect to "infrastructure units" and "systems units."

34.     Mr. Leontiev's management philosophy was to provide wide-ranging autonomy and discretion to PRBB's managers without interference or micromanagement from Mr. Leontiev or others. Leontiev Decl. ¶ 9; Exh. 1 at 239:16-18, 245:9-246:14, 270:13-24 (Leontiev Tr.); Exh. 2 at 101:3-12, 103:2-8 (Zheleznyak Tr.).

**RESPONSE**:  Disputed.  The scope of authority delegated by Leontiev to PRBB managers was limited.  Leontiev testified multiple times that the *Bank*, of which he was President, and not the Bank employees, controlled the offshore entities.  Def. Ex. 14 at 116:22-25, 119:10-16 (Leontiev Tr.).  Leontiev set out the requirements for and was the ultimate authority over the various Bank departments.  Def. Ex. 15 at 101:10-12, 104:7-9 (Zheleznyak Tr.) (Q: "Who set the requirements for the financial bloc?" A: "Sergey Leontiev.").  Even under Leontiev's own characterization of PRBB, business strategies were presented to the financial and strategy departments and then to Bank's management board, which Leontiev was a member of, for final approval.  Pl. SOF ¶ 37; Def. Ex. 14 at 91:15-17 (Leontiev Tr.).  ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

35.     For example, PRBB's bank managers, or the heads of the business units, were each responsible for making loan decisions with respect to their individual or corporate customers because each manager was in the best position to base loan decisions on his or her own personal experience with and knowledge of the customer. The manager was incentivized to exercise sound business judgment through a profit-sharing model. Leontiev Decl. ¶¶ 10-11, 13; Exh. 1 at 245:9-246:14 (Leontiev Tr.).

**RESPONSE**:   Disputed for the reasons stated in response to paragraph 34. Disputed that the investment decisions were rational business decisions for the reasons stated in response to paragraph 12.

36.     Each head of a business unit was also responsible for proposing its own strategies and products. Those proposals were then submitted to PRBB's Treasury, which used a dynamic model developed by Mr. Leontiev to identify the best business proposal or products. While Mr. Leontiev developed the rules for the Treasury's model, he was not involved in and did not interfere with day-to-day decision making of the business unit or Treasury managers. Leontiev Decl. ¶¶ 12-13; Exh. 1 at 99:13-23 (Leontiev Tr.).

**RESPONSE**:   Disputed for the reasons stated in response to paragraph 34.

37.     After the model identified the best products, the product was presented to the financial and strategy departments before being presented to the management board for final approval. Leontiev Decl. ¶ 14; Exh. 1 at 99:24-101:16 (Leontiev Tr.).

**RESPONSE**:   Disputed as incomplete. As Chairman of the Management Board of PRBB, Pl. SOF ¶ 10, Leontiev was personally responsible for the final approval of the products.

38.     After the products were approved, the heads of the business units and the employees under their supervision were responsible for selecting products to present to their clients, based on their needs and demands. Leontiev Decl. ¶ 15; Exh. 1 at 98:8-13, 104:10-105:2 (Leontiev Tr.); Exh. 2 at 111:24-112:4 (Zheleznyak Tr.).

**RESPONSE**:   Disputed as mischaracterizing the degree of independence of the heads of PRBB's business units for the reasons stated in response to paragraph 34.

39.     One of the products developed through this system was a high-interest rate investment, commonly referred to in the emerging markets as a "wealth management product," that gave customers the opportunity to receive a rate of return of between 10 and 15%, a significantly higher rate than that available with a regular bank deposit. Leontiev Decl. ¶ 16; Exh. 1 at 102:9-19, 111:12-113:5, 303:3-304:7 (Leontiev Tr.); Exh. 11 at 24:23-25:11 (Kamo Avagumyan Tr.); Exh. 23 (June 2015 Reserve Bank of Australia Bulletin).

**RESPONSE**:   Disputed as vague with respect to "wealth management product," a term that appears to have been adopted by Leontiev after the loans were made.  Agreements in question are described on their face as "Loans" and "Promissory Notes."  Pl. SOF ¶¶ 47-220.

The lenders, including Kamo Avagumyan, never described themselves as investors in a "wealth management product," and Leontiev's own partner Zheleznyak never used that term in his deposition.   Leontiev's Exhibit 23 is an article about how "Chinese wealth management products" fit into the Chinese regulatory scheme and says nothing about broader emerging market trends.

40.     Natalia Abramova and Yanna Krisiuk were two members of PRBB's business unit that serviced VIP clients. Exh. 2 at 108:23-109:23 (Zheleznyak Tr.).

**RESPONSE**:  Undisputed.

41.     The funds raised through the wealth management product were deposited into PRBB's Treasury and were invested into PRBB's capital and used for various bank-related purposes, such as growing a retail loan portfolio, financing development projects, and managing regulatory capital ratio requirements. Leontiev Decl. ¶ 17; Exh. 1 at 108:2-20; 311:11-13 (Leontiev Tr.); Exh. 2 at 66:6-8, 120:8-20 (Zheleznyak Tr.).

**RESPONSE**:   Disputed as misleading, incomplete, and inconsistent with representations made to the lenders. Throughout the course of the loans, Zheleznyak regularly represented to Varshavsky that Leontiev had invested the loaned funds in securities, and that the funds were outside of PRBB, had been invested through a Cypriot company unconnected to the Bank, and were outside of Russia and in London.   Def. Ex. 13 at 36:22-24, 78:6-22, 180:3-8, 181:24-182:4 (Varshavsky Tr.).   Moreover, Leontiev testified that raised funds were invested in the offshore entities. Def. Ex. 14 at 311:14 – 311:20 (Leontiev Tr.) ("Q. And in addition to going to the treasury, some of the moneys also went to other offshore off-balance-sheet entities created by Probusinessbank employees; correct? A. They went for a short period of time and then went treasury.").   Further disputed as vague with respect to "wealth management product" for the reasons stated in response to paragraph 39.

42.     To facilitate bank projects including, for example, structuring these wealth management products, PRBB's business unit managers utilized off-balance sheet entities in Russia and in other jurisdictions, which were set up and administered by an operations group within PRBB. Leontiev Decl. ¶ 18; Exh. 1 at 118:11-119:9, 220:4-12 (Leontiev Tr.).

**RESPONSE**:  Disputed as incomplete and misleading for the reasons stated in response to paragraph 41. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██

43.     The borrower entities in this litigation, including Ambika Investments Limited ("Ambika") and ZAO Financial Group Life ("ZAO FG Life"), were among the off-balance sheet entities created by this operations group within PRBB and utilized by PRBB's business unit managers. Exh. 1 at 110:13-15, 167:14-168:9 (Leontiev Tr.); Exh. 2 at 92:16-20 (Zheleznyak Tr.).

**RESPONSE**:  Disputed as mischaracterizing the status of ZAO FG Life as an "off-balance sheet" entity.   FG Life was wholly owned by OOO Alivikt, which in turn was owned by Leontiev and Zheleznyak. Pl. SOF ¶¶ 4, 232-233; Def. Ex. 14 at 77:8-77:10; 77:14-77:15; 82:4-82:13 (Leontiev Tr.).

44.     The PRBB operations group which set up the off-balance sheet entities, led by a senior manager named Alexandra Vyulkova, had complete discretion to manage and enter into transactions on behalf of these companies. Exh. 1 at 169:11-15, 235:16-236:20 (Leontiev Tr.); Exh. 2 at 102:11-103:25 (Zheleznyak Tr.).

**RESPONSE**:  Disputed.   Leontiev approved the model for the offshore companies, including how much funding to bring in and how to distribute it.   His authorization was necessary to approve the movement of funds in and out of those companies, which Leontiev's business partner and the former chair of the PRBB management board, Zheleznyak, testified Vyulkova "of course" could not decide on her own.   Def. Ex. 15 at 131:14-132:15. (Zheleznyak Tr.).   The offshore entities were operated by PRBB employees who reported to Leontiev in his capacity as PRBB's President, and Leontiev testified multiple times that PRBB,

under his direction, controlled the offshore entities.   Def. Ex. 14 at 116:16-25, 119:17-21, 168:17-169:10 (Leontiev Tr.); Def. Ex. 15 at 104:4-9 (Zheleznyak Tr.).

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████   Leontiev's partner, Zheleznyak, sent the agreement after PRBB had lost its license.   Pl. Ex. 34 (assignment agreement to Valkera, sent on September 17, 2015); Pl. SOF ¶ 10 (license revoked in August 2015).

45.    Mr. Leontiev did not create these companies, did not instruct any operations group employees to create these companies, and had no role in their management. Leontiev Decl. ¶¶ 19-20; Exh. 2 at 130:8-131:18 (Zheleznyak Tr.).

**RESPONSE**:  Disputed for the reasons stated in responses to paragraphs 34 and 44.

46.    Mr. Leontiev had minimal contact with Ms. Vyulkova and did not direct her with respect to any of her job responsibilities, including any responsibilities pertaining to the off-balance sheet entities. Leontiev Decl. ¶ 20; Exh. 2 at 104:10-13 (Zheleznyak Tr.).

**RESPONSE**:  Disputed for the reasons stated in response to paragraph 44.

## III.    The Alleged Loans

### A.    Avilon AG's Loans to Ambika

47.    In 2008, Mr. Leontiev discussed with Mr. Zheleznyak and other bank managers the idea of attracting capital to PRBB by offering to its clients the option of investing their funds with PRBB through high-interest wealth management products. Exh. 1 at 308:12-310:5 (Leontiev Tr.); Exh. 2 at 62:4-22 (Zheleznyak Tr.).

**RESPONSE**:  Disputed.  In 2008, Leontiev asked Zheleznyak to acquire a large loan from Avilon.  Def. Ex. 14 at 308:6-310:5 (Leontiev Tr.); Def. Ex. 15 at 62:7-62:22

(Zheleznyak Tr.).  Further disputed as vague with respect to "wealth management product" for the reasons stated in response to paragraph 39.

48.     In or around December 2008, Mr. Zheleznyak approached Mr. Varshavsky and inquired whether Avilon AG would be interested in making an investment in the wealth management products offered by PRBB. Exh. 2 at 62:25-67:22 (Zheleznyak Tr.); Exh. 9 at 29:18-30:7 (Varshavsky Tr.).

**RESPONSE**:  Disputed.  In or around December 2008, Zheleznyak approached Varshavsky at Leontiev's request.  Def. Ex. 14 at 308:6-310:5 (Leontiev Tr.); Def. Ex. 15 at 62:21-63:4 (Zheleznyak Tr.).  Zheleznyak told Varshavsky that he had established a company with Leontiev, that it had "nothing to do with the Bank," that it was an "offshore company," and that it would yield interest rates of four to five percentage points above what Varshavsky would get if investing with the Bank.  Def. Ex. 13 at 29:18-30:7 (Varshavsky Tr.).  Further disputed as vague with respect to "wealth management product" for the reasons stated in response to paragraph 39.

49.     After negotiating the terms with Mr. Zheleznyak, Mr. Varshavsky agreed on behalf of Avilon AG to make the investment in a wealth management product. Exh. 9 at 25:13-20, 29:8-17 (Varshavsky Tr.); Exh. 13 at 17:20-18:10 (Monakhova Tr.).

**RESPONSE**:  Disputed.  Zheleznyak and Varshavsky negotiated the terms of a proposed loan between Avilon and Ambika. Def. Ex. 13 at 29:18-30:7 (Varshavsky Tr.).  Varshavsky was only involved in negotiating the general terms of the loans such as the interest rate; the implementation details were handled by the legal and finance departments. Def. Ex. 13 at 29:3-30:7 (Varshavsky Tr.).  Further disputed that the lenders understood any investment to be in a "wealth management product" for the reasons stated in response to paragraph 39.

50.     Mr. Varshavsky informed Ms. Monakhova of the plan to make this investment and instructed her to contact Ms. Krisiuk and to ensure that the transaction was properly documented and executed. Exh. 9 at 25:7-12 (Varshavsky Tr.).

**RESPONSE**: Undisputed.

51.     Ms. Monakhova and Ms. Krisiuk "discussed the structure of the transaction and who [would] be involved on [Avilon AG's] part" and exchanged contact information for each side's attorneys, who already had begun preparing the agreements. During this conversation, Ms. Krisiuk also informed Ms. Monakhova that Ambika would be the borrower in this transaction. Exh. 13 at 20:16-22:15 (Monakhova Tr.).

**RESPONSE**:  Disputed as mischaracterizing the cited testimony.  Monakhova

and Krisiuk confirmed that the loan details they had received from Varshavsky and Zheleznyak,

respectively, matched.  Pl. Ex. 13 at 21:16-22:15 (Monakhova Tr.).

52.     Avilon AG employed a "working group" consisting of members of Avilon AG's legal and financial departments working under the direction of Ms. Monakhova to review and finalize the investment. Exh. 13 at 67:3-68:16 (Monakhova Tr.).

**RESPONSE**:  Disputed as mischaracterizing the cited testimony, which states

that such a working group existed but does not say that it worked under Monakhova's direction.

Pl. Ex. 13 at 67:3-68:16 (Monakhova Tr.).

53.     Ms. Monakhova directed Mr. Popov to review and approve a draft of the loan agreement for the transaction, which identified Ambika as the borrower. Exh. 15 at 14:13-19:9 (Popov Tr.).

**RESPONSE**:  Disputed as mischaracterizing the cited testimony.  Monakhova

asked, rather than directed, Popov "to look at [and] approve" the draft agreement.  Pl. Ex. 15 at

14:13-19:9 (Popov Tr.).

54.     Ms. Monakhova also provided Ms. Semenova with the documentation necessary for Ms. Semenova to transfer the funds to Ambika pursuant to the loan agreement. Exh. 14 at 17:11-18:21 (Semenova Tr.).

**RESPONSE**:  Undisputed.

55.     Mr. Varshavsky understood "when negotiat[ing] the rate on the $19.9 million," that the invested funds were to be used by PRBB to "finance the bank's construction projects," make "interest payments on other loans, loan repayments and expenses" and for "other business." Exh. 9 at 77:12-78:12 (Varshavsky Tr.).

**RESPONSE**:  Disputed.  The quoted statements were read into the record from

SL0000080, an email between the parties' counsel exchanged on February 20, 2016.  Def. Ex. 13

at 73:2-14 (Varshavsky Tr.).   In interpreting the cited statement, Varshavsky testified that Zheleznyak told him that one of the ways in which Zheleznyak and Leontiev would use the raised funds was investing in the offshore companies that were separate from PRBB and were controlled by Leontiev.  *Id*. at 78:6-22.   Based on the representations that Zheleznyak made to him at the start of and throughout the loan period, Varshavsky understood that the loaned funds were being invested in securities and held not only outside of the Bank, but outside of Russia. Def. Ex. 13 at 36:22-24, 78:6-22, 180:3-8, 181:24-182:4 (Varshavsky Tr.).   Leontiev himself testified that some raised funds were invested into the offshore entities. Def. Ex. 14 at 311:14-311:20 (Leontiev Tr.).

56.   Neither Mr. Varshavsky nor any other employee of Avilon AG discussed the investment with Mr. Leontiev. Exh. 9 at 60:18-62:6 (Varshavsky Tr.); Exh. 13 at 16:23-17:8 (Monakhova Tr.); Exh. 15 at 76:3-8 (Popov Tr.); Exh. 14 at 10:17-23 (Semenova Tr.).

**RESPONSE**:   Disputed as incomplete.   Varshavsky, on behalf of Avilon, communicated with Zheleznyak, who represented himself and his partner, Leontiev, in the loan negotiations.  Def. Ex. 13 at 25:21-23, 156:6-11, 170:2-6 (Varshavsky Tr.); Def. Ex. 14 at 67:18-69:25 (Leontiev Tr.); Def. Ex. 22 at 12:13-14 (London Tr.) (Leontiev saying of Zheleznyak, "He and I are partners, and his obligations are my obligations, no doubt about it.").

57.   Mr. Varshavsky first spoke to Mr. Leontiev about Avilon AG, Ambika, and PRBB in August 2015, almost seven years after Avilon AG's initial investment. Exh. 9 at 60:18-62:6 (Varshavsky Tr.).

**RESPONSE**:   Disputed as incomplete for the reasons stated in response to paragraph 56.

58.   Loan Agreement No. 1812/08 ("2008 Loan Agreement") was executed on December 18, 2008, with Ms. Monakhova and Ms. Semenova signing for Avilon AG and Petros Livanios signing for Ambika. Exh. 24 at SL0000030-33.

**RESPONSE**:   Undisputed.

59.     The 2008 Loan Agreement provided that Avilon AG would loan $19.9 million to Ambika for a one-year term with an annual interest rate of 14%. Exh. 24 at SL0000030.

**RESPONSE**:  Undisputed.

60.     The 2008 Loan Agreement contained no restrictions upon Ambika's use of the loaned funds. Exh. 24 at SL0000030-33.

**RESPONSE**:  Disputed as incomplete.  The agreement contained no restrictions

on its face, but Zheleznyak represented to Varshavsky that the funds would be used, and later

were used, for various investments separate from the Bank.  Def. Ex. 13 at 36:16-37:2, 78:3-78:3

(Varshavsky Tr.).

61.     The 2008 Loan Agreement provided that "[a]ny amendments hereto shall be valid only if they are executed in writing and duly signed by authorized representatives of the parties." Exh. 24 at SL0000031.

**RESPONSE**:  Undisputed.

62.     Avilon AG also requested and obtained a written guarantee of the 2008 Loan Agreement from PRBB. Exh. 25 at SL0000066; Exh. 15 at 30:14-31:16 (Popov Tr.); Exh. 14 at 23:21-24:9 (Semenova Tr.).

**RESPONSE**:  Undisputed.

63.     Bank Guarantee No. 127-188, signed on December 18, 2008, provided that PRBB agreed to pay up to $22,685,749.74 in the event of Ambika's breach of its obligations under the 2008 Loan Agreement. The guarantee was signed by Mr. Zheleznyak, in his capacity as Chairman of PRBB's Management Board. Exh. 25 at SL0000066.

**RESPONSE**:  Undisputed.

64.     Avilon AG did not request or receive a written guarantee of the 2008 Loan Agreement from Mr. Leontiev in his personal capacity. Exh. 15 at 36:13-17 (Popov Tr.); Exh. 14 at 24:10-13 (Semenova Tr.); Exh. 13 at 66:16-20 (Monakhova Tr.).

**RESPONSE**:  Disputed as incomplete.  Varshavsky testified that, throughout the

life of the loans, Zheleznyak, speaking on behalf of himself and Leontiev, was "always" telling

him that the Avilon loans were guaranteed by Leontiev.  Def. Ex. 13 at 83:22-84:7 (Varshavsky

Tr.).

65.    After the 2008 Loan Agreement was executed and Avilon AG transferred the funds to Ambika, Ms. Semenova recorded this transaction in Avilon AG's books as, "Loans issued . . . [to] . . . Ambika Investments Limited." Exh. 14 at 19:22-20:2 (Semenova Tr.).

**RESPONSE**:  Undisputed.

66.    Avilon AG obtained the funds to make the 2008 Loan to Ambika through a loan for $19.9 million at an annual interest rate of 13.85% from a related entity, European Realty Corp. ("ERC"). Exh. 14 at 24:14-25:21 (Semenova Tr.); Exh. 26 at AVPE0003015 (12/17/2008 loan agreement between Avilon AG and ERC); Exh. 27 at AVPE0000472 (12/18/2008 email from I. Monakhova to V. Nazanskaya).

**RESPONSE**:  Undisputed.

67.    On June 30, 2009, Avilon AG assigned its rights under the 2008 Loan Agreement to ERC. Exh. 28 at AVPE0001029-30 (6/30/2009 assignment of claims agreement between Avilon AG and ERC).

**RESPONSE**:  Undisputed.

68.    On the same day, Avilon AG and ERC entered into a setoff agreement, pursuant to which Avilon AG and ERC agreed to offset their respective obligations. Exh. 28 at AVPE0001032-33 (6/30/2009 setoff agreement between Avilon AG and ERC).

**RESPONSE**:  Undisputed.

69.    On July 6, 2010, Avilon AG and ERC cancelled the assignment, due to Avilon's purported failure to provide ERC with "all the required documentation" in a timely manner. Exh. 29 (7/6/2010 agreement on the termination of assignment).

**RESPONSE**:  Disputed as misleading, vague, and unsupported as to "purported failure."  Undisputed that the note was cancelled on July 6, 2010.

70.    The $19.9 million loan from ERC to Avilon AG remains outstanding today. Exh. 14 at 26:8-22 (Semenova Tr.); Exh. 13 at 71:21-25 (Monakhova Tr.).

**RESPONSE**:  Undisputed.

71.    Throughout 2009, Avilon AG received interest payments from Ambika on a quarterly basis, as provided in the 2008 Loan Agreement, including $686,709 received on March 23, 2009, $702,225 received on June 19, 2009, $843,415 received on September 18, 2009, and $752,384 received on December 21, 2009. These payments were recorded in Avilon AG's books as "[i]nterest received from Ambika on $19.9 million." Exh. 30 at AVP0000950 (Avilon Group's spreadsheet of loans and interest payments).

**RESPONSE**:  Undisputed.

72.     During this same time period, Avilon AG and Ambika entered into two amendments to the 2008 Loan Agreement. Exh. 24 at SL0000033-35.

**RESPONSE**:  Undisputed.

73.     Additional Agreement #1, dated June 30, 2009, and signed by Ms. Monakhova for Avilon AG and Mr. Livanios for Ambika, changed the annual interest rate on the 2008 Loan Agreement to 15% through December 19, 2009. Exh. 24 at SL0000033.

**RESPONSE**:  Undisputed, except to note that Additional Agreement #1 changed

the annual interest rate for the entire term of the loan, not only for the remaining part of the term:

"The loan interest rate shall be 15 (Fifteen) % p.a. for the period from 18/12/2008 till

19/12/2009." Pl. Ex. 24 at SL0000033 at ¶ 1.

74.     Additional Agreement #2, dated June 30, 2009, and signed by Ms. Monakhova for Avilon AG and Mr. Livanios for Ambika, extended the 2008 Loan Agreement's validity and the 15% annual interest rate through December 20, 2010. Exh. 24 at SL0000034-35.

**RESPONSE**:  Undisputed, except that the revision to the 2008 Loan Agreement

extended the "repayment period."

75.     Between 2010 and 2014, Avilon AG and Ambika entered into five subsequent additional agreements to the 2008 Loan Agreement, all signed by Ms. Monakhova for Avilon AG and Mr. Livanios for Ambika. Exh. 24 at SL0000036-45.

**RESPONSE**:  Undisputed.

76.     While Avilon AG decided on a yearly basis whether to extend the term of and whether to renegotiate the interest rate of the 2008 Loan Agreement through these additional agreements, none of these decisions involved or resulted in discussions with Mr. Leontiev. Exh. 9 at 62:2-6, 62:18-22 (Varshavsky Tr.).

**RESPONSE**:  Disputed as incomplete.  When there were changes to the terms of

the loans, such as changes to the interest rate, Varshavsky discussed them with Zheleznyak.  Def.

Ex. 15 at 118:19-119:12 (Zheleznyak Tr.).  For the reasons stated in response paragraph 56,

Zheleznyak represented himself and his partner, Leontiev, in discussions with Varshavsky.

77.     Additional Agreement #3, dated December 20, 2010, extended the 2008 Loan Agreement's validity through December 20, 2011 and lowered the interest rate to 11%. Exh. 24 at SL0000036-37.

**RESPONSE**:   Undisputed, except that that the revision to the 2008 Loan Agreement extended the "repayment period," and to note that Additional Agreement #3, unlike Additional Agreement #1, changed only the interest rate going forward, leaving it at 15% for the period December 18, 2008 through December 20, 2010, and changing it to 11% for the period December 21, 2010 through December 20, 2011.  Pl. Ex. SL0000036 at ¶ 2.

78.     Ms. Krisiuk informed Mr. Varshavsky about these changed terms on or around November 30, 2010, and Mr. Varshavsky approved the revised interest rate. Exh. 31 at SL0033715 (12/7/2010 email from V. Nazanskaya to I. Monakhova); Exh. 9 at 46:16-47:24 (Varshavsky Tr.).

**RESPONSE**:  Disputed as not fully supported by the evidence, which shows that Krisiuk said that Varshavsky knew about and approved the changed rate, but does not show that Krisiuk was the one who informed Varshavsky about the changed terms.

79.     Additional Agreement #4, dated December 20, 2011, extended the 2008 Loan Agreement's validity through December 20, 2012 and kept the interest rate at 11%. Exh. 24 at SL0000038-39.

**RESPONSE**:  Undisputed, except that the revision to the 2008 Loan Agreement extended the "repayment period," and to note that Additional Agreement #4, unlike Additional Agreement #1, only set the interest rate going forward, leaving it at 11% for the period December 21, 2011 through December 20, 2012. Pl. Ex. 24 at SL0000038 at ¶ 2.

80.     Additional Agreement #6, dated December 20, 2013, extended the 2008 Loan Agreement's validity through December 22, 2014 and changed the interest payment schedule from quarterly to monthly. Exh. 24 at SL0000042-43.

**RESPONSE**:  Undisputed, except that the revision to the 2008 Loan Agreement extended the "repayment period."

81.     Additional Agreement #7, dated December 9, 2014, converted the principal amount on the 2008 Loan Agreement from US dollars to Euros and capitalized the accrued interest amount for the period between November 21, 2014 and December 9, 2014 into the principal. Exh. 24 at SL0000044-45.

**RESPONSE**:  Disputed. To the extent that "capitalize" is used in the ordinary meaning of adding interest to the principal, Additional Agreement #7 did not capitalize the interest for the period of November 21, 2014 through December 9, 2014 but simply converted the principal loan amount, in one calculation, and accrued and payable interest, in another, from U.S. Dollars to Euros.  Pl. Ex. 24 at SL0000044-45 at ¶ 1.

82.     On December 9, 2014, Avilon AG and Ambika also entered into an Agreement, whereby Ambika's obligations under the 2008 Loan Agreement were discharged because the outstanding principal on the 2008 Loan Agreement was added to another loan agreement between Avilon AG and Ambika. Ms. Monakhova signed the December 9, 2014 agreement for Avilon AG and Mr. Livanios signed for Ambika. Exh. 32 at SL0000065.

**RESPONSE**:  Disputed as incomplete. The cited agreement also added "accrued and payable interest for the period from 21.11.2014 till 09.12.2014," not only the "outstanding principal."  Pl. Ex. 32 at SL0000065 at ¶ 1.

83.     Ambika made regular and timely interest payments under the 2008 Loan Agreement until the 2008 Loan Agreement was discharged. Avilon AG recorded the last payment of "interest received from Ambika on $19.9 million" on November 20, 2014. Exh. 30 at AVP0000950-51 (Avilon Group's spreadsheet of loans and interest payments); Exh. 14 at 22:18-25 (Semenova Tr.).

**RESPONSE**:  Undisputed.

84.     Avilon AG requested and obtained guarantees for the amendments to the 2008 Loan Agreement from PRBB on at least four additional occasions. Exh. 25 at SL0000068, SL0001759-60, SL0001762, AVPE0000174-75 (PRBB guarantees to 2008 Loan Agreement).

**RESPONSE**:  Undisputed.

85.     Each of PRBB's guarantees provided that Avilon AG's rights under the guarantee may not be assigned or transferred to third parties. Exh. 25 at SL0000068, SL0001759-60, SL0001762, AVPE0000174-75 (PRBB guarantees to 2008 Loan Agreement).

**RESPONSE**:  Disputed.  The guarantees discuss only transfer, not assignment.

86.     Under Bank Guarantee No. 127-793, dated December 19, 2009, PRBB agreed to pay up to $22,893,178.08 in the event of Ambika's breach of its obligations under the 2008 Loan Agreement. The guarantee was signed by Mr. Zheleznyak, in his capacity as Chairman of the PRBB's Management Board. Exh. 25 at SL0001762.

**RESPONSE**: Undisputed.

87.     Under a Bank Guarantee dated December 20, 2010, PRBB agreed to pay up to $22,089,000 in the event of Ambika's breach of its obligations under the 2008 Loan Agreement. The guarantee was signed by Mr. Zheleznyak, in his capacity as Chairman of PRBB's Management Board. Exh. 25 at SL0000068.

**RESPONSE**: Undisputed.

88.     Under Bank Guarantee No. 127-879, dated December 20, 2012, PRBB agreed to pay up to $22,287,803.37 in the event of Ambika's breach of its obligations under the 2008 Loan Agreement. The guarantee was signed by Mr. Zheleznyak, in his capacity as Chairman of PRBB's Management Board. Exh. 25 at SL0001759-60.

**RESPONSE**: Undisputed.

89.     Finally, under an unnumbered Bank Guarantee, dated December 20, 2013, PRBB agreed to pay up to $22,301,084.93 in the event of Ambika's breach of its obligations under the 2008 Loan Agreement. This guarantee expired on January 27, 2015, after Ambika's obligations under the 2008 Loan Agreement were discharged. Exh. 25 at AVP0000174-75; Exh. 32 at SL0000065.

**RESPONSE**: Disputed as misleading to the extent the statement implies that

Ambika's obligations were fully discharged under the agreement cited in Pl. Ex. 32 at

SL0000065.  Rather, the 2008 loan was discharged in consideration of being consolidated into

Loan No. 0109/11.  Pl. SOF ¶ 114.

90.     On December 27, 2010, European Realty Company, the predecessor entity to Avilon Plaza, entered into Loan Agreement No. 2712/10 ("2010 Loan Agreement"), by which Avilon Plaza loaned $12.25 million to Ambika at an annual interest rate of 11%. Exh. 33 at AVPE0002466-68.

**RESPONSE**: Undisputed.

91.     The 2010 Loan Agreement was signed by Ms. Monakhova on behalf of Avilon Plaza and by Mr. Livanios on behalf of Ambika. Exh. 33 at AVPE0002466-67.

**RESPONSE**:   Undisputed, except to note that the document contains an additional page, AVPE0002468, with the signature.

92.     Between December 2011 and January 2015, Avilon Plaza and Ambika entered into six amendments to the 2010 Loan Agreement, with the final amendment extending the validity of the agreement to December 9, 2015. Exh. 33 at AVPE0002468-80.

**RESPONSE**:   Undisputed, except that the amendments to the 2010 Loan Agreement extended the "repayment period."

93.     On or around September 17, 2015, Avilon Plaza assigned its rights under the 2010 Loan Agreement to Avilon Holdings Limited, which in turn assigned those rights to Valkera Investments Limited ("Valkera"). Exh. 34 at AVPE0002555-62 (9/17/2015 email from A. Zheleznyak and V. Popov attaching assignments agreements).

**RESPONSE**:   Undisputed, except to note that the email is from Zheleznyak to Popov and others.

94.     In the fall of 2011, Mr. Varshavsky and Mr. Zheleznyak negotiated another investment from Avilon AG. Exh. 9 at 56:8-59:17 (Varshavsky Tr.); Exh. 2 at 117:19-118:11 (Zheleznyak Tr.); Exh. 13 at 74:2-25 (Monakhova Tr.).

**RESPONSE**:   Disputed.  The transaction negotiated was an additional loan, not an "investment."  Pl. Ex. 13 at 74:2-75:22; Pl. SOF at ¶ 97.

95.     On   September   1,   2011,   Ms. Krisiuk,   Ms. Monakhova,   and Ms. Nazanskaya exchanged emails to ensure that the terms of this new investment were "the same as with respect to $19.9 mln." Exh. 35 at SL0033741.

**RESPONSE**:   Disputed as overbroad.  The email exchange confirmed that the rate and procedure for payment of interest would be the same as for the $19.9 million in existing loans but did not confirm the full terms of the new agreement.  Further disputed with respect to the loan's characterization as an "investment" for the reasons set forth in paragraph 94.

96.     Neither Mr. Varshavsky nor any other Avilon AG employee spoke with Mr. Leontiev prior to making the 2011 investment. Exh. 9 at 60:18-62:6 (Varshavsky Tr.); Exh. 13 at 16:23-17:8 (Monakhova Tr.); Exh. 15 at 76:3-8 (Popov Tr.); Exh. 14 at 10:17-23 (Semenova Tr.).

**RESPONSE**:  Disputed as incomplete.  Before agreeing to the 2011 loan, Avilon employees communicated with PRBB employees about the status of Avilon's funds and the proposed terms of the loan.  Def. Ex. 13 at 48:23-52:13 (Varshavsky Tr.).  For the reasons stated in response to paragraph 34, PRBB employees arranging activities with off-shore companies were doing so under Leontiev's supervision.  Further disputed with respect to the loan's characterization as an "investment" for the reasons set forth in paragraph 94.

97.    On September 1, 2011, Avilon AG and Ambika entered into Loan Agreement No. 0109/11 ("2011 Loan Agreement"), by which Avilon AG loaned to Ambika $6.625 million for a one-year term at an annual interest rate of 11%. The agreement was signed by Ms. Monakhova on behalf of Avilon AG and Mr. Livanios on behalf of Ambika. Exh. 36 at SL0000046-48.

**RESPONSE**:  Undisputed.

98.    The 2011 Loan Agreement provided that "[a]ny amendments hereto shall be valid only if they are executed in writing and duly signed by the authorized representatives of the parties." Exh. 36 at SL0000048.

**RESPONSE**:  Undisputed.

99.    Avilon AG requested and obtained a written guarantee of the 2011 Loan Agreement from PRBB, in accordance with Avilon AG's practice of "ensuring and guaranteeing" its loans. Exh. 37 at 53:18-54:6 (Semenova Tr.); Exh. 37 at SL0001763 (PRBB guarantee of 2011 Loan Agreement).

**RESPONSE**:  Disputed as not supported by the evidence cited, which does not indicate that Avilon requested the cited guarantees.

100.    Under Bank Guarantee No. 127-433, dated September 1, 2011, PRBB agreed to pay up to $7,358,392.31 in the event of Ambika's breach of its obligations under the 2011 Loan Agreement. The guarantee was signed by Lyubov Alkhovaya, in her capacity as PRBB's chief accountant. Exh. 37 at SL0001763.

**RESPONSE**:  Disputed as incomplete to the extent the statement omits that the cited guarantee contains a signature block to be signed by Zheleznyak.

101.    Avilon AG did not request or receive a written guarantee of the 2011 Loan Agreement from Mr. Leontiev in his personal capacity. Exh. 9 at 86:6-11 (Varshavsky Tr.); Exh. 14 at 54:7-10 (Semenova Tr.); Exh. 13 at 66:8-20 (Monakhova Tr.).

**RESPONSE**:  Disputed as characterized for the reasons stated in response to paragraph 64.

102.    After the 2011 Loan Agreement was executed, and Avilon AG transferred the funds to Ambika, Ms. Semenova recorded this transaction in Avilon AG's books as, "[l]oan issued . . . [to] . . . Ambika." Exh. 14 at 41:2-4 (Semenova Tr.).

**RESPONSE**:  Undisputed.

103.    Avilon AG obtained the funds to make the 2011 Loan to Ambika through a loan for $6.625 million at an annual interest rate of 11% from TO Jets Transporter Inc. ("TO Jets"). Exh. 38 at AVPE0003041 (8/29/2011 loan agreement between Avilon AG and TO Jets); Exh. 14 at 52:21-25 (Semenova Tr.); Exh. 13 at 86:22-87:3 (Monakhova Tr.).

**RESPONSE**:  Undisputed.

104.    On September 1, 2011, Avilon AG assigned its rights under the 2011 Loan Agreement to TO Jets. Exh. 39 at AVPE0002834 (9/1/2011 agreement on the assignment of rights between Avilon AG and TO Jets).

**RESPONSE**:  Undisputed.

105.    On the same day, Avilon AG and TO Jets entered into Setoff Agreement No. J-6625, pursuant to which Avilon AG and TO Jets agreed to offset their respective obligations. Exh. 39 at AVPE0002836.

**RESPONSE**:  Undisputed.

106.    On September 5, 2011, Avilon AG and TO Jets cancelled the assignment agreement due to Avilon AG's purported failure to provide TO Jets with "all the required documentation" in a timely manner. Exh. 40 at AVP0005500 (9/5/2011 agreement on the termination of assignment between Avilon AG and TO Jets).

**RESPONSE**:  Disputed as misleading, vague, and unsupported as to "purported failure." Undisputed that the parties cancelled the assignment agreement on September 5, 2011.

107.    The $6.625 million loan from TO Jets to Avilon AG remains outstanding today. Exh. 14 at 52:15-20 (Semenova Tr.); Exh. 13 at 89:4-7 (Monakhova Tr.).

**RESPONSE**:  Disputed as incomplete and vague as to "outstanding."  The $6.625 million is governed by a series of additional agreements to the original assignment that was

executed on September 1, 2011.  Def. Ex. 17 (AVPE0004239, AVPE0006133, AVPE0007686, AVPE0007702).

108.    Between 2012 and 2015, Avilon AG and Ambika entered into eight amendments to the 2011 Loan Agreement, each of which was signed by Ms. Monakhova on behalf of Avilon AG and Mr. Livanios on behalf of Ambika. Exh. 36 at SL0000049-64.

**RESPONSE**:  Undisputed.

109.    Additional Agreement #1, dated March 2, 2012, changed the frequency of the interest payments on the 2011 Loan Agreement from quarterly to monthly. Exh. 36 at SL0000049.

**RESPONSE**:  Undisputed.

110.    Additional Agreement #2, dated September 3, 2012, extended the 2011 Loan Agreement's period of validity through September 3, 2013, raised the annual interest rate to 12%, and revised the interest payment schedule. Exh. 36 at SL0000051.

**RESPONSE**:  Undisputed, except that the amendment to the 2011 Loan Agreement extended the "repayment period," and to note that Additional Agreement #2 changed the interest rate for the loan to 12% only for the period going forward, from September 4, 2012 through September 3, 2013.

111.    Additional Agreement #3, dated September 3, 2013, extended the 2011 Loan Agreement's period of validity through November 5, 2014, reduced the annual interest rate to 11%, and added $738,540.46 in accrued interest to the principal amount. Exh. 36 at SL0000053.

**RESPONSE**:  Undisputed, except that the amendment to the 2010 Loan Agreement extended the "repayment period," and to note that Additional Agreement #3 changed the interest rate for the loan to 11% only for the period going forward, from September 4, 2013 through November 5, 2014.

112.    Additional Agreement #4, dated September 16, 2013, capitalized an additional $136,459.54 of accrued interest into the principal of the 2011 Loan Agreement, and revised the interest payment schedule to quarterly payments. Exh. 36 at SL0000055.

**RESPONSE**:  Undisputed.

113.    Additional Agreement #5, dated November 5, 2014, extended the 2011 Loan Agreement's period of validity through November 5, 2015. Exh. 36 at SL0000057.

**RESPONSE**:    Undisputed, except that the amendment to the 2011 Loan Agreement extended the "repayment period."

114.    Additional Agreement #6, dated December 9, 2014, converted the sum of the principal and the accrued but unpaid interest from U.S. dollars into Euros and added the sum of the principal and the accrued but unpaid interest for the 2008 Loan Agreement to the principal of the 2011 Loan Agreement, for a new principal amount of 22,489,331.18 Euros. Additional Agreement #6 also extended the 2011 Loan Agreement's period of validity through December 9, 2015, and raised the annual interest rate to 12%. Exh. 36 at SL0000059-60.

**RESPONSE**:    Undisputed, except that the amendment to the 2011 Loan Agreement extended the "repayment period."

115.    Additional Agreement #7, dated January 19, 2015, provided that interest on 6,173,591.88 Euros would accrue and be disbursed on December 12, 2015, while interest on 16,315,739.30 Euros would be disbursed in monthly payments in accordance with a schedule set forth in Additional Agreement #7. Exh. 36 at SL0000061-62.

**RESPONSE**:    Undisputed.

116.    Additional Agreement #8, dated January 26, 2015, converted the sum of the principal and the accrued but unpaid interest from Euros back into U.S. dollars for a revised principal amount of $27,601,156.17, and revised the schedule of interest payments. Exh. 36 at SL0000063-64.

**RESPONSE**:    Undisputed.

117.    From December 19, 2011 through July 24, 2015, Ambika made regular and timely interest payments under the 2011 Loan Agreement and Avilon AG recorded them as "interest received from Ambika on" the relevant amount of principal:  $6.625 million through September 2013 and increased amounts thereafter. Exh. 30 at AVP0000950-51.

**RESPONSE**:    Undisputed.

118.    Between March 2009 and July 2015 Ambika paid Avilon AG a total of $17,428,109 in interest payments on the 2008 and 2011 Loans. Exh. 30 at AVP0000950-51 (Avilon Group's spreadsheet of loans and interest payments).

**RESPONSE**:    Undisputed.

119.    Avilon AG requested and obtained bank guarantees from PRBB for the amendments to the 2011 Loan Agreement on at least five occasions. Exh. 37 (PRBB guarantees to 2011 Loan Agreement).

**RESPONSE**:  Disputed as not supported by the evidence cited, which does not indicate that Avilon requested the cited guarantees.

120.    Each of PRBB's guarantees provided that Avilon AG's rights under the guarantee may not be assigned or transferred to third parties. Exh. 37 at SL0000069, SL0001756, SL0001758, SL0001763, SL0001764 (PRBB guarantees to 2011 Loan Agreement).

**RESPONSE**:  Disputed.  The guarantees limit transfer but do not discuss assignment.

121.    Under Bank Guarantee No. 127-106, dated March 2, 2012, PRBB agreed to pay up to $6,995,348.38 in the event of Ambika's breach of its obligations under the 2011 Loan Agreement. The guarantee was signed by Mr. Zheleznyak, in his capacity as Chairman of PRBB's Management Board. Exh. 37 at SL0001764-65.

**RESPONSE**:  Undisputed.

122.    Under Bank Guarantee No. 127-962, dated September 3, 2012, PRBB agreed to pay up to $7,353,100.84 in the event of Ambika's breach of its obligations under the 2011 Loan Agreement. The guarantee was signed by Mr. Zheleznyak, in his capacity as Chairman of PRBB's Management Board. Exh. 37 at SL0000069-70.

**RESPONSE**:  Undisputed.

123.    Under Bank Guarantee No. 127-806, dated September 3, 2013, PRBB agreed to pay up to $7,503,346.86 in the event of Ambika's breach of its obligations under the 2011 Loan Agreement. The guarantee was signed by Ms. Alkhovaya, in her capacity as PRBB's chief accountant. Exh. 37 at SL0001758.

**RESPONSE**:  Undisputed.

124.    Under Bank Guarantee No. 127-1015, dated November 5, 2013, PRBB agreed to pay up to $8,325,000 in the event of Ambika's breach of its obligations under the 2011 Loan Agreement. The guarantee was signed by Ms. Alkhovaya in her capacity as PRBB's chief accountant. Exh. 37 at SL0001756-57.

**RESPONSE**:  Undisputed.

125.    Under Bank Guarantee No. 127-945, dated November 5, 2014, PRBB agreed to pay up to $8,325,000 in the event of Ambika's breach of its obligations under the 2011 Loan Agreement. The guarantee was signed by Mr. Zheleznyak, in his capacity as Chairman of

PRBB's Management Board. Avilon AG's demand right under this guarantee expired on December 5, 2015. Exh. 37 at SL0000071-72.

     **RESPONSE**: Undisputed.

     126.   Avilon AG did not request or receive any written guarantees for the amendments to the 2011 Loan Agreement from Mr. Leontiev in his personal capacity. Exh. 14 at 54:7-9 (Semenova Tr.); Exh. 13 at 77:9-17 (Monakhova Tr.).

     **RESPONSE**:  Disputed as incomplete and unsupported by the evidence cited, which shows that Monakhova did not personally request a guarantee and does not recall if anyone else did and that Semenova did not recall if Avilon tried to get a personal, written guarantee. Furthermore, Varshavsky testified that, over the life of the loans, Zheleznyak was "always" telling him that the money was secured and guaranteed by Leontiev. Def. Ex. 15 at 36:20-37:2, 84:4-7 (Varshavsky Tr.).

     127.   On August 12, 2015, the same day as the revocation of PRBB's banking license, Ms. Monakhova sent to her colleagues an email with the subject line, "Ambika," in which she asked, "What is the deposit secured by? Is there a PBB guarantee?" Ms. Nazanskaya replied, "I only have 1 BG (attached)," and attached to her email Bank Guarantee No. 127-945, which obligated PRBB to pay up to $8,325,000 in the event of Ambika's breach of the 2011 Loan Agreement. Exh. 41 at AVPE0004795-98.

     **RESPONSE**: Undisputed.

     128.   After Ms. Nazanskaya's response to her email, Ms. Monakhova followed up with, "Look for the guarantee or restore it." Exh. 42 at AVPE0004801 (8/12/2015 email from I. Monakhova to V. Nazanskaya).

     **RESPONSE**: Undisputed.

     129.   Two hours after Ms. Nazanskaya's email, Mr. Popov replied, "Yan[n]a [Krisiuk] promised to do everything today (to issue a new copy). Just in case, we have prepared an alternative text for signing on their letterhead. [Zheleznyak] is still in a meeting at the CB, after which he is supposed to come to the office and sign everything." Exh. 43 at AVPE0004849 (8/12/2015 email from V. Popov to I. Monakhova, Y. Semenova, and V. Nazanskaya).

     **RESPONSE**: Undisputed.

     130.   On August 25, 2015, Ms. Semenova sent to Ms. Krisiuk blank copies of two guarantees, both dated January 26, 2015: one for the 2010 Loan Agreement, and one for the 2011 Loan Agreement. Exh. 44 at AVPE0004970-74.

**RESPONSE**:  Undisputed.

131.   On August 26, 2015, Ms. Semenova sent to Ms. Nazanskaya a third guarantee—dated January 26, 2015, and seemingly bearing the signatures of Mr. Zheleznyak and Ms. Alkhovaya—that purported to obligate PRBB to pay up to $22,588,294.90 in the event of Ambika's non-payment of the 2011 Loan Agreement, as long as Avilon AG's demand was received by December 31, 2015. The purported guarantees did not have a PRBB seal. Exh. 45 at AVPE0005003-04.

**RESPONSE**:  Disputed as vague and misleading with respect to "seemingly."

132.   Avilon AG has not assigned its rights under the 2011 Loan Agreement, which is the only operative agreement, to Mr. Varshavsky, and Mr. Varshavsky has admitted that no part of any monies allegedly owed to Avilon AG are owed to him personally. Exh. 9 at 8:24-9:6 (Varshavsky Tr.).

**RESPONSE**:   Disputed as unsupported by the cited testimony. The issue of which loan agreement is operative is not addressed in the cited excerpt. In December 2014, Loan No. 1812/08 was formally discharged and the principal and interest due thereunder were rolled into Loan No. 0109/11, Pl. SOF ¶¶ 82, 114, which would render the 2014 consolidation agreement operative.  Undisputed that no amounts owed under Loan No. 0109/11 are owed to Mr. Varshavsky personally.

**B.     Promissory Notes Issued by ZAO FG Life and Vennop**

133.   In 2010 or 2011, Mr. Zheleznyak and Kamo Avagumyan discussed an investment opportunity in a wealth management product offered through promissory notes issued by ZAO FG Life. Exh. 11 at 22:13-19, 24:23-25:11 (Kamo Avagumyan Tr.); Exh. 2 at 124:3--126:6 (Zheleznyak Tr.).

**RESPONSE**:  Disputed as vague with respect to "wealth management product" for the reasons stated in response to paragraph 39.  Zheleznyak offered an investment in the form of promissory notes.  Def. Ex. 18 at 30:22-31:4 (Kamo Avagumyan Tr.).

134.   Kamo Avagumyan did not discuss this investment opportunity or any other subject with Mr. Leontiev at any point. Exh. 11 at 37:5-6 (Kamo Avagumyan Tr.).

**RESPONSE**:   Disputed as incomplete.   Kamo Avagumyan understood that Zheleznyak represented himself and his business partner, Leontiev, when he proposed that

Avagumyan loan money to ZAO FG Life.   Zheleznyak described FG Life as controlled by himself and "his partner, Leontiev." Def. Ex. 18 at 22:14-19, 45:6-7 (Kamo Avagumyan Tr.). Kamo Avagumyan initially invested and continued to invest in ZAO FG Life in reliance on Leontiev's reputed trading skills.  Def. Ex. 18 at 25:15-21, 46:11-15 (Kamo Avagumyan Tr.).

135.   Kamo Avagumyan made the investments in cash. When he wanted to make an investment, Mr. Avagumyan contacted either Ms. Krisiuk or Ms. Abramova, who would come to his office, where Mr. Avagumyan provided a bag of cash in exchange for a promissory note. Exh. 11 at 26:24-29:14 (Kamo Avagumyan Tr.); Exh. 46 at Request 1 (Defendant's Responses to Plaintiff's Requests for Admission).

**RESPONSE**:  Disputed as mischaracterizing the cited testimony.   Kamo Avagumyan did not state that he contacted Krisiuk or Abramova when he wanted to make an investment, only that they came to his office to collect the money that was supposed to be invested.  The cited Response to Plaintiff's Requests for Admission does not support the paragraph.

136.   Kamo Avagumyan instructed Ms. Krisiuk or Ms. Abramova to issue the promissory notes in the name of his son, Karen Kamoevich Avagumyan. Exh. 11 at 30:8-31:20 (Kamo Avagumyan Tr.).

**RESPONSE**:  Disputed as mischaracterizing the testimony.  Avagumyan did not instruct Krisiuk or Abramova to issue the promissory notes.   Rather, Zheleznyak offered to formalize the investments via promissory notes, and only afterwards did Krisiuk and Abramova handle the exchange of promissory notes for investment funds.  Def. Ex. 18 at 26:24-29:14; 30:8-31:20 (Kamo Avagumyan Tr.)

137.   Mr. Leontiev has never met or spoken with Karen Avagumyan. Leontiev Decl. ¶ 44.

**RESPONSE**:  Disputed as incomplete.  Zheleznyak, acting as Leontiev's agent for the reasons stated in response to paragraph 134, engaged in frequent conversations with

Kamo Avagumyan, who negotiated for promissory notes that he designated for his son, Karen Avagumyan.  Def. Ex. 18 at 46:9-20 (Kamo Avagumyan Tr.).

138.    The promissory notes were issued for one-year terms with annual interest rates ranging from 10 to 11%. Exh. 47 at SL0000001, SL0000003-04, SL0000007-15, SL0000017-23, SL0000028-29 (Avagumyan promissory notes listed in Appendix A).

**RESPONSE**: Undisputed.

139.    At the end of the one-year term, the noteholder could choose to roll over the note or receive repayment of his investment.  Exh. 11 at 48:14-23 (Kamo Avagumyan Tr.).

**RESPONSE**:  Undisputed.

140.    Given his financial needs at the time, Kamo Avagumyan rolled over some notes and withdrew the principal on others.  Exh. 11 at 48:25-49:12 (Kamo Avagumyan Tr.).

**RESPONSE**:  Undisputed.

141.    The interest on each note was payable monthly. The interest payments were hand-delivered by Ms. Krisiuk to Kamo Avagumyan in cash. Exh. 11 at 32:2-12 (Kamo Avagumyan Tr.).

**RESPONSE**:  Disputed as incomplete to the extent that Kamo Avagumyan explicitly stated that Abramova also delivered interest payments and served as another contact person concerning the promissory notes.   Def. Ex. 18 at 29:11-14, 59:25-60:16 (Kamo Avagumyan Tr.).

142.    ZAO FG Life made regular and timely interest payments on Mr. Avagumyan's notes until August 2015. Mr. Avagumyan "always received money on the same day that it was promised." Exh. 11 at 35:25-36:3, 53:10-14 (Kamo Avagumyan Tr.).

**RESPONSE**:  Undisputed.

143.    Neither Kamo nor Karen Avagumyan has executed a written assignment granting Mr. Varshavsky a legal interest in the notes issued in Karen Avagumyan's name. Mr. Varshavsky has admitted that he is not personally owed any money under these notes. Exh. 11 at 83:24-84:17 (Kamo Avagumyan Tr.); Exh. 9 at 9:14-20 (Varshavsky Tr.); Exh. 16 at 27:23-28:3 (Karen Avagumyan Tr.); Exh. 46 at Request 4 (Defendant's Responses to Plaintiff's Requests for Admission).

**RESPONSE**:  Undisputed.

144.     Nevertheless, Mr. Varshavsky has sought repayment of 21 promissory notes issued in the name of Karen Avagumyan and funded by Kamo Avagumyan. Exh. 47 at SL0000001, SL0000003-04, SL0000007-15, SL0000017-23, SL0000028-29 (Avagumyan promissory notes listed in Appendix A); Exh. 48 (1/20/2016 email from R. Stahl to R. Weigel attaching Avagumyan notes).

**RESPONSE**:   Disputed as vague and misleading with respect to the phrase "Varshavsky has sought repayment."   At the Avagumyans' request, Varshavsky has negotiated with Leontiev and others in an attempt to obtain for Kamo and Karen Avagumyan the funds to which they are entitled under the promissory notes.   Def. Ex. 13 at 15:16-16:2 (Varshavsky Tr.); Def. Ex. 18 at 84:5-85:24 (Kamo Avagumyan Tr.).

145.     Promissory Note No. 1938 was issued to Karen Avagumyan by ZAO FG Life on January 19, 2015 in the amount of 1,500,000 EUR, for a term of one year at an annual interest rate of 11%. Exh. 47 at SL0000019.

**RESPONSE**:  Undisputed.

146.     Promissory Note No. 1938 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000019.

**RESPONSE**:  Undisputed.

147.     Promissory Note No. 1938 was issued in exchange for funds that were originally delivered at least as early as January 17, 2012, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002405 (Note No. 9179 issued by ZAO FG Life on January 17, 2012) and SL0002432 (Note No. 2407 issued by ZAO FG Life on January 17, 2013).

**RESPONSE**:   Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis, as evidenced by changes in the interest rates. Compare Exh. 49 at SL0002405 (Note No. 9179 issued by ZAO FG Life on January 17, 2012 at an annual interest rate of 10%).   On their face, the promissory notes do not state that they are in exchange for an old promissory note.   Furthermore, the documents fail to show how the funds loaned under Promissory Note No. 9179, issued by ZAO FG Life on January 17, 2012 and payable by January 17, 2013, or Promissory Note No. 2407, issued on January 17, 2013 and

payable by January 17, 2014, have any connection to the funds loaned under Promissory Note No. 1938, issued by ZAO FG Life on January 19, 2015, which is more than one year after the date on which Promissory Note No. 2407 was payable.  Pl. Ex. 47 at SL0000019; Pl. Ex. 49 at SL0002405, SL0002432.

148.    Promissory Note No. 785 was issued to Karen Avagumyan by ZAO FG Life on August 6, 2014 in the amount of $1,500,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000001.

**RESPONSE**:  Undisputed.

149.    Promissory Note No. 785 was issued in exchange for funds that were originally delivered at least as early as August 6, 2012, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002413 (Note No. 2322 issued by ZAO FG Life on August 6, 2012) and SL0002442 (Note No. 2482 issued by ZAO FG Life on August 6, 2013).

**RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis, as evidenced by changes in the interest rates. Compare Pl. Ex. 49 at SL0002413 (Note No. 2322 issued by ZAO FG Life on August 6, 2012 at an annual interest rate of 11%), SL0002442 (Note No. 2482 issued by ZAO FG Life on August 6, 2013 at an annual interest rate of 10%).  On their face, the promissory notes do not state that are in exchange for an old promissory note.

150.    Promissory Note No. 792 was issued to Karen Avagumyan by ZAO FG Life on August 15, 2014 in the amount of $500,000, for a term of one year at an annual interest rate of 10%.  Exh. 47 at SL0000003.

**RESPONSE**:  Undisputed.

151.    Promissory Note No. 792 was issued in exchange for funds that were originally delivered at least as early as August 15, 2012, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002414 (Note No. 2323 issued by ZAO FG Life on August 15, 2012) and SL0002443 (Note No. 2489 issued by ZAO FG Life on August 15, 2013).

**RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis, as evidenced by changes in the interest rates.

Compare Pl. Ex. 49 at SL0002414 (Note No. 2323 issued by ZAO FG Life on August 15, 2012 at an annual interest rate of 11%), SL0002443 (Note No. 2489 issued by ZAO FG Life on August 15, 2013 at an annual interest rate of 10%).  On their face, the promissory notes do not state that they are in exchange for an old promissory note.

152.    Promissory Note No. 798 was issued to Karen Avagumyan by ZAO FG Life on September 8, 2014 in the amount of $1,000,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000004.

**RESPONSE**:  Undisputed.

153.    Promissory Note No. 798 was issued in exchange for funds that were originally delivered at least as early as September 6, 2012, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002415 (Note No. 2336 issued by ZAO FG Life on September 6, 2012) and SL0002444 (Note No. 2496 issued by ZAO FG Life on September 6, 2013).

**RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis, as evidenced by changes in the interest rates. Compare Pl. Ex. 49 at SL0002415 (Note No. 2336 issued by ZAO FG Life on September 6, 2012 at an annual interest rate of 11%), SL0002444 (Note No. 2496 issued by ZAO FG Life on September 6, 2013 at an annual interest rate of 10%).  On their face, the promissory notes do not state that they are in exchange for an old promissory note.

154.    Promissory Note No. 806 was issued to Karen Avagumyan by ZAO FG Life on October 2, 2014 in the amount of $500,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000007.

**RESPONSE**:  Undisputed.

155.    Promissory Note No. 806 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000007.

**RESPONSE**:  Undisputed.

156.    Promissory Note No. 806 was issued in exchange for funds that were originally delivered at least as early as October 2, 2012, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002416 (Note No. 2340 issued

by ZAO FG Life on October 2, 2012) and SL0002445 (Note No. 631 issued by ZAO FG Life on October 2, 2013).

  **RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis, as evidenced by changes in the interest rates. Compare Pl. Ex. 49 at SL0002416 (Note No. 2340 issued by ZAO FG Life on October 2, 2012 at an annual interest rate of 11%), SL0002445 (Note No. 631 issued by ZAO FG Life on October 2, 2013 at an annual interest rate of 10%).  On their face, the promissory notes do not state that they are in exchange for an old promissory note.

  157. Promissory Note No. 813 was issued to Karen Avagumyan by ZAO FG Life on October 10, 2014 in the amount of $500,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000008.

  **RESPONSE**:  Undisputed.

  158. Promissory Note No. 813 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000008.

  **RESPONSE**:  Undisputed.

  159. Promissory Note No. 813 was issued in exchange for funds that were originally delivered at least as early as October 10, 2012, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002417 (Note No. 2344 issued by ZAO FG Life on October 10, 2012) and SL0002446 (Note No. 638 issued by ZAO FG Life on October 10, 2013).

  **RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis, as evidenced by changes in the interest rates. Compare Pl. Ex. 49 at SL0002417 (Note No. 2344 issued by ZAO FG Life on October 10, 2012 at an annual interest rate of 11%), SL0002446 (Note No. 638 issued by ZAO FG Life on October 10, 2013 at an annual rate of 10%).  On their face, the promissory notes do not state that they are in exchange for an old promissory note.

  160. Promissory Note No. 825 was issued to Karen Avagumyan by ZAO FG Life on November 5, 2014 in the amount of $1,000,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000009.

**RESPONSE**:  Undisputed.

161.    Promissory Note No. 825 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000009.

**RESPONSE**:  Undisputed.

162.    Promissory Note No. 825 was issued in exchange for funds that were originally delivered at least as early as November 1, 2011, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002397 (Note No. 9087 issued by ZAO FG Life on November 1, 2011), SL0002418 (Note No. 2363 issued by ZAO FG Life on November 1, 2012), and SL0002447 (Note No. 647 issued by ZAO FG Life on November 1, 2013).

**RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory

notes were not negotiated on an annual basis.  Def. Ex. 18 at 29:15-30:2 (Kamo Avagumyan

Tr.).  On their face, the promissory notes do not state that they are in exchange for an old

promissory note.

163.    Promissory Note No. 826 was issued to Karen Avagumyan by ZAO FG Life on November 14, 2014 in the amount of $1,500,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000010.

**RESPONSE**:  Undisputed.

164.    Promissory Note No. 826 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000010.

**RESPONSE**:  Undisputed.

165.    Promissory Note No. 826 was issued in exchange for funds that were originally delivered at least as early as November 14, 2012, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002419 (Note No. 2365 issued by ZAO FG Life on November 14, 2012) and SL0002448 (Note No. 653 issued by ZAO FG Life on November 14, 2013).

**RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory

notes were not negotiated on an annual basis, as evidenced by changes in the interest rates.

Compare Pl. Ex. 49 at SL0002419 (Note No. 2365 issued by ZAO FG Life on November 14,

2012 at an annual interest rate of 11%), SL0002448 (Note No. 653 issued by ZAO FG Life on

November 14, 2013 at an annual interest rate of 10%).  On their face, the promissory notes do not state that they are in exchange for an old promissory note.

166.    Promissory Note No. 1902 was issued to Karen Avagumyan by ZAO FG Life on December 3, 2014 in the amount of $2,000,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000011.

**RESPONSE**:  Undisputed.

167.    Promissory Note No. 1902 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000011.

**RESPONSE**:  Undisputed.

168.    Promissory Note No. 1902 was issued in exchange for funds that were originally delivered at least as early as December 2, 2011, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002398 (Note No. 9001 issued by ZAO FG Life on December 2, 2011), SL0002420 (Note No. 2369 issued by ZAO FG Life on December 3, 2012), and SL0002449 (Note No. 656 issued by ZAO FG Life on December 3, 2013).

**RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis, as evidenced by changes in the interest rates. Compare Pl. Ex. 49 at SL0002420 (Note No. 2369 issued by ZAO FG Life on December 3, 2012 at an annual interest rate of 11%), SL0002449 (Note No. 656 issued by ZAO FG Life on December 3, 2013 at an annual interest rate of 10%).  On their face, the promissory notes do not state that they are in exchange for an old promissory note.

169.    Promissory Note No. 1904 was issued to Karen Avagumyan by ZAO FG Life on December 10, 2014 in the amount of $1,500,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000012.

**RESPONSE**:  Undisputed.

170.    Promissory Note No. 1904 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000012.

**RESPONSE**:  Undisputed.

171.    Promissory Note No. 1904 was issued in exchange for funds that were originally delivered at least as early as December 10, 2012, and the investment was rolled over

annually in exchange for a new promissory note. Exh. 49 at SL0002421 (Note No. 2399 issued by ZAO FG Life on December 10, 2012) and SL0002450 (Note No. 658 issued by ZAO FG Life on December 10, 2013).

**RESPONSE**: Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis, as evidenced by changes in the interest rates. Compare Pl. Ex. 49 at SL0002421 (Note No. 2399 issued by ZAO FG Life on December 10, 2012 at an annual interest rate of 11%), SL0002450 (Note No. 658 issued by ZAO FG Life on December 10, 2013 at an annual interest rate of 10%). On their face, the promissory notes do not state that they are in exchange for an old promissory note.

172. Promissory Note No. 1906 was issued to Karen Avagumyan by ZAO FG Life on December 15, 2014 in the amount of $500,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000013.

**RESPONSE**: Undisputed.

173. Promissory Note No. 1906 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000013.

**RESPONSE**: Undisputed.

174. Promissory Note No. 1906 was issued in exchange for funds that were originally delivered at least as early as December 13, 2013, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002451 (Note No. 660 issued by ZAO FG Life on December 13, 2013).

**RESPONSE**: Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis. Def. Ex. 18 at 29:15-30:2 (Kamo Avagumyan Tr.). On its face, the promissory note does not state that it is in exchange for an old promissory note.

175. Promissory Note No. 1907 was issued to Karen Avagumyan by ZAO FG Life on December 17, 2014 in the amount of 500,000 EUR, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000014.

**RESPONSE**: Undisputed.

176.    Promissory Note No. 1907 was guaranteed, or avalized, by PRBB. Exh.47 at SL0000014.

**RESPONSE**:  Undisputed.

177.    Promissory Note No. 1907 was issued in exchange for funds that were originally delivered at least as early as December 15, 2011, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002399 (Note No. 9077 issued by ZAO FG Life on December 15, 2011), SL0002422 (Note No. 2400 issued by ZAO FG Life on December 17, 2012), and SL0002452 (Note No. 662 issued by ZAO FG Life on December 17, 2013).

**RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory

notes were not negotiated on an annual basis, as evidenced by changes in the interest rates.

Compare Pl. Ex. 49 at SL00024221 (Note No. 2400 issued by ZAO FG Life on December 17,

2012 at an annual interest rate of 11%), SL0002452 (Note No. 662 issued by ZAO FG Life on

December 17, 2013 at an annual interest rate of 10%).  On their face, the promissory notes do not

state that they are in exchange for an old promissory note.

178.    Promissory Note No. 1908 was issued to Karen Avagumyan by ZAO FG Life on December 24, 2014 in the amount of 2,300,000 EUR, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000015.

**RESPONSE**:  Undisputed.

179.    Promissory Note No. 1908 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000015.

**RESPONSE**:  Undisputed.

180.    Promissory Note No. 1908 was issued in exchange for funds that were originally delivered at least as early as December 23, 2011, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002400 (Note No. 9194 issued by ZAO FG Life on December 23, 2011), SL0002423 (Note No. 2382 issued by ZAO FG Life on December 24, 2012), and SL0002453 (Note No. 668 issued by ZAO FG Life on December 24, 2013).

**RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory

notes were not negotiated on an annual basis, as evidenced by changes in the interest rates.

Compare Pl. Ex. 49 at SL0002423 (Note No. 2382 issued by ZAO FG Life on December 24,

2012 at an annual interest rate of 11%), SL0002423 (Note No. 2382 issued by ZAO FG Life on December 24, 2012 at an annual interest rate of 11%), SL0002453 (Note No. 668 issued by ZAO FG Life on December 24, 2013 at an annual interest rate of 10%). On their face, the promissory notes do not state that they are in exchange for an old promissory note.

181. Promissory Note No. 1936 was issued to Karen Avagumyan by ZAO FG Life on December 29, 2014 in the amount of $1,000,000, for a term of one year at an annual interest rate of 11%. Exh. 47 at SL0000017.

**RESPONSE**: Undisputed.

182. Promissory Note No. 1936 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000017.

**RESPONSE**: Undisputed.

183. Promissory Note No. 1936 was issued in exchange for funds that were originally delivered at least as early as December 27, 2012, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002424 (Note No. 2392 issued by ZAO FG Life on December 27, 2012).

**RESPONSE**: Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis. Def. Ex. 18 at 29:15-30:2 (Kamo Avagumyan Tr.). On its face, the promissory note does not state that it is in exchange for an old promissory note. Furthermore, the documents fail to show how the funds loaned under Promissory Note No. 2392, issued by ZAO FG Life on December 27, 2012 and payable by December 27, 2013, have any connection to the funds loaned under Promissory Note No. 1936, issued by ZAO FG Life on December 29, 2014, which is more than one year after the date Promissory Note No. 2392 was payable by. Pl. Ex. 47 at SL0000017, AVP0000967; Pl. Ex. 49 at SL0002424.

184. Promissory Note No. 1937 was issued to Karen Avagumyan by ZAO FG Life on January 19, 2015 in the amount of $2,500,000, for a term of one year at an annual interest rate of 11%. Exh. 47 at SL0000018.

**RESPONSE**: Undisputed.

185.    Promissory Note No. 1937 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000018.

**RESPONSE**:  Undisputed.

186.    Promissory Note No. 1937 was issued in exchange for funds that were originally delivered at least as early as January 17, 2012, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002406 (Note No. 9195 issued by ZAO FG Life on January 17, 2012) and SL0002431 (Note No. 2408 issued by ZAO FG Life on January 17, 2013).

**RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis, as evidenced by changes in the interest rates. Compare Pl Ex. 49 at SL0002406 (Note No. 9195 issued by ZAO FG Life on January 17, 2012 at an annual interest rate of 10%), SL0002431 (Note No. 2408 issued by ZAO FG Life on January 17, 2013 at an annual interest rate of 11%).  On their face, the promissory notes do not state that they are in exchange for an old promissory note.  Furthermore, the documents fail to show how the funds loaned under Promissory Note No. 9195, issued by ZAO FG Life on January 17, 2012 and payable by January 17, 2013, or Promissory Note No. 2408, issued on January 17, 2013 and payable by January 17, 2014, have any connection to the funds loaned under Promissory Note No. 1937, issued by ZAO FG Life on January 19, 2015, which is one year and two days after the date Promissory Note No. 2408 was payable by.  Pl. Ex. 47 at SL0000018; Pl. Ex. 49 at SL0002406 and SL0002431.

187.    Promissory Note No. 1941 was issued to Karen Avagumyan by ZAO FG Life on February 2, 2015 in the amount of $1,000,000, for a term of one year at an annual interest rate of 11%. Exh. 47 at SL0000020.

**RESPONSE**:  Undisputed.

188.    Promissory Note No. 1941 was guaranteed, or avalized, by PRBB. Pl. Ex. 47 at SL0000020.

**RESPONSE**:  Undisputed.

189.    Promissory Note No. 1941 was issued in exchange for funds that were originally delivered at least as early as January 31, 2012, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002407 (Note No. 9185 issued by ZAO FG Life on January 31, 2012) and SL0002433 (Note No. 2414 issued by ZAO FG Life on January 31, 2013).

**RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis.  Pl. Ex. 18 at 29:15-30:2 (Kamo Avagumyan Tr.).  On their face, the promissory notes do not state that they are in exchange for an old promissory note.  Furthermore, the documents fail to show how the funds loaned under Promissory Note No. 9185, issued by ZAO FG Life on January 31, 2012 and payable by January 31, 2013, or Promissory Note No. 2414, issued on January 31, 2013 and payable by January 31, 2014, have any connection to the funds loaned under Promissory Note No. 1941, issued by ZAO FG Life on February 2, 2015, which is two days after the date Promissory Note No. 2414 was payable by.  Pl. Ex. 47 at SL0000020; Pl. Ex. 49 at SL0002407 and SL0002433.

190.    Promissory Note No. 1948 was issued to Karen Avagumyan by ZAO FG Life on March 5, 2015 in the amount of $1,000,000, for a term of one year at an annual interest rate of 11%. Exh. 47 at SL0000021.

**RESPONSE**:  Undisputed.

191.    Promissory Note No. 1948 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000021.

**RESPONSE**:  Undisputed.

192.    Promissory Note No. 1948 was issued in exchange for funds that were originally delivered at least as early as March 5, 2013, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002434 (Note No. 2428 issued by ZAO FG Life on March 5, 2013) and AVP0000983 (Note No. 714 issued by ZAO FG Life on March 5, 2014).

**RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis, as evidenced by changes in the interest rates.  Compare Pl. Ex. 49 at SL0002434 (Note No. 2428 issued by ZAO FG Life on March 5, 2013, at

an annual interest rate of 11%), AVP0000983 (Note No. 714 issued by ZAO FG Life on March 5, 2014, at an annual interest rate of 10%).   On their face, the promissory notes do not state that are in exchange for an old promissory note.

193.   Promissory Note No. 2000 was issued to Karen Avagumyan by Vennop Trading Limited ("Vennop") on April 16, 2015 in the amount of 700,000 EUR, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000029.

**RESPONSE**: Undisputed.

194.   Promissory Note No. 2000 was issued in exchange for funds that were originally delivered at least as early as April 16, 2012, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002409 (Note No. 9167 issued by ZAO FG Life on April 16, 2012), SL0002436 (Note No. 2444 issued by ZAO FG Life on April 16, 2013), and AVP0000978 (Note No. 735 issued by ZAO FG Life on April 16, 2014).

**RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis, as evidenced by changes in the interest rates. Compare Pl. Ex. 49 at SL0002409 (Note No. 9167 issued by ZAO FG Life on April 16, 2012 at an annual interest rate of 10%), SL0002436 (Note No. 2444 issued by ZAO FG Life on April 16, 2013 at an annual interest rate of 11%), and AVP0000978 (Note No. 735 issued by ZAO FG Life on April 16, 2014 at an annual interest rate of 10%).  On their face, the promissory notes do not state that are in exchange for an old promissory note.

195.   Promissory Note No. 1953 was issued to Karen Avagumyan by Vennop on June 22, 2015 in the amount of $1,500,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000022.

**RESPONSE**: Undisputed.

196.   Promissory Note No. 1953 was issued in exchange for funds that were originally delivered at least as early as June 20, 2013, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002438 (Note No. 2465 issued by ZAO FG Life on June 20, 2013) and AVP0000977 (Note No. 765 issued by ZAO FG Life on June 20, 2014).

**RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis.  Def. Ex. 18 at 29:15-30:2 (Kamo Avagumyan

Tr.).  On their face, the promissory notes do not state that are in exchange for an old promissory note.

197.    Promissory Note No. 1954 was issued to Karen Avagumyan by Vennop on June 29, 2015 in the amount of $2,000,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000023.

**RESPONSE**:  Undisputed.

198.    Promissory Note No. 1962 was issued to Karen Avagumyan by Vennop on July 13, 2015 in the amount of $500,000, for a term of one year at an annual interest rate of 10%. Exh. 47 at SL0000028.

**RESPONSE**:  Undisputed.

199.    Promissory Note No. 1962 was issued in exchange for funds that were originally delivered at least as early as July 11, 2012, and the investment was rolled over annually in exchange for a new promissory note. Exh. 49 at SL0002412 (Note No. 2310 issued by ZAO FG Life on July 11, 2012), SL0002440 (Note No. 2471 issued by ZAO FG Life on July 11, 2013), and AVP0000982 (Note No. 777 issued by ZAO FG Life on July 11, 2014).

**RESPONSE**:  Disputed to the extent "rolled over" suggests that the promissory notes were not negotiated on an annual basis, as evidenced by changes in the interest rates. Compare Pl. Ex. 49 at SL0002412 (Note No. 2310 issued by ZAO FG Life on July 11, 2012 at an annual interest rate of 11%), SL0002440 (Note No. 2471 issued by ZAO FG Life on July 11, 2013 at an annual interest rate of 10%), and AVP0000982 (Note No. 777 issued by ZAO FG Life at an annual interest rate of 10%).  On their face, the promissory notes do not state that are in exchange for an old promissory note.

200.    None of the promissory notes issued by ZAO FG Life or Vennop in the name of Karen Avagumyan were guaranteed or avalized by Mr. Leontiev in his personal capacity. Exh. 47 at SL0000001, SL0000003-04, SL0000007-15, SL0000017-23, SL0000028-29 (Avagumyan promissory notes listed in Appendix A); Exh. 49 at SL0002397-2400, SL0002405-07, SL0002409, SL0002412-24, SL0002431-34, SL0002436, SL0002438, SL0002440, SL0002442-53, AVP0000977-78, AVP0000982-83 (predecessor Avagumyan promissory notes).

**RESPONSE**:  Disputed as incomplete.  Zheleznyak personally signed at least 60 of the promissory notes issued to Karen Avagumyan.  Def. SOF ¶ 24.  When Zheleznyak

suggested to Kamo Avagumyan that he invest in ZAO FG Life, Zheleznyak said that Leontiev

"personally guarantees this money" and that a separate written guarantee from Leontiev was

unnecessary because Leontiev is "my partner, 50/50."   Def. Ex. 18 at 44:16-45:25 (Kamo

Avagumyan Tr.).  Indeed, Avagumyan understood Zheleznyak's signature on the notes to

represent both Zheleznyak and Leontiev, "because I knew that they were partners."  Def. Ex. 18

at 59:21-60:3 (Kamo Avagumyan Tr.).

> 201.   Mr. Varshavsky also has sought repayment of four promissory notes
> issued by Vennop in the name of Diana Karapetyan. Exh. 47 at SL0000024-27 (Karapetyan
> promissory notes listed in Appendix A); Exh. 50 (1/20/2016 email from R. Stahl to R. Weigel
> attaching Karapetyan notes).

**RESPONSE**:  Disputed as not fully supported by the cited evidence and vague as

to "Varshavsky has sought repayment."  The documents show only that the notes were included

in communications between counsel for Avilon and counsel for Leontiev.

> 202.   Promissory Note No. 1955 was issued to Ms. Karapetyan by Vennop on
> April 4, 2015 in the amount of $1,000,000, for a term of one year at an annual interest rate of
> 10%. Exh. 47 at SL0000024.

**RESPONSE**:  Undisputed.

> 203.   Promissory Note No. 1956 was issued to Ms. Karapetyan by Vennop on
> May 22, 2015 in the amount of $1,000,000, for a term of one year at an annual interest rate of
> 10%. Exh. 47 at SL0000025.

**RESPONSE**:  Undisputed.

> 204.   Promissory Note No. 1957 was issued to Ms. Karapetyan by Vennop on
> June 24, 2015 in the amount of $1,000,000, for a term of one year at an annual interest rate of
> 10%. Exh. 47 at SL0000026.

**RESPONSE**:  Undisputed.

> 205.   Promissory Note No. 1958 was issued to Ms. Karapetyan by Vennop on
> June 30, 2015 in the amount of $1,000,000, for a term of one year at an annual interest rate of
> 10%. Exh. 47 at SL0000027.

**RESPONSE**:  Undisputed.

206.    None of the promissory notes issued by Vennop in the name of Ms. Karapetyan were guaranteed or avalized by Mr. Leontiev in his personal capacity. Exh. 47 at SL0000024-27 (Karapetyan promissory notes listed in Appendix A).

   **RESPONSE**:  Undisputed.

207.    Mr. Varshavsky and the Avilon Group's witnesses now disclaim knowledge of Ms. Karapetyan. Exh. 9 at 14:8-16 (Varshavsky Tr.); Exh. 11 at 74:22-23 (Kamo Avagumyan Tr.); Exh. 14 at 108:12-13 (Semenova Tr.); Exh. 15 at 109:5-7 (Popov Tr.); Exh. 13 at 145:19-21 (Monakhova Tr.).

   **RESPONSE**:  Undisputed.

208.    Mr. Varshavsky does not have a legal assignment of any claims held by Ms. Karapetyan with respect to the Vennop promissory notes. Exh. 46 at Request 3 (Defendant's Responses to Plaintiff's Requests for Admission).

   **RESPONSE**:  Undisputed.

209.    Mr. Varshavsky also has sought repayment of four promissory notes issued by ZAO FG Life in the name of Igor Renich. Exh. 47 at SL0000002, SL0000005-6, SL0000016 (Renich promissory notes listed in Appendix A); Exh. 50 (1/20/2016 email from R. Stahl to R. Weigel attaching Renich notes).

   **RESPONSE**:  Disputed as not fully supported by the cited evidence and vague as to "Varshavsky has sought repayment."  The documents show only that the notes were included in communications between counsel for Avilon and counsel for Leontiev.

210.    Promissory Note No. 788 was issued to Mr. Renich by ZAO FG Life on August 6, 2014 in the amount of $14,293,096, scheduled to increase to $14.4 million on December 9, 2014, for a term of one year at an annual interest rate of 11%. Exh. 47 at SL0000002.

   **RESPONSE**:  Undisputed.

211.    Promissory Note No. 800 was issued to Mr. Renich by ZAO FG Life on August 6, 2014 in the amount of $6,000,000, for a term of one year at an annual interest rate of 11%. Exh. 47 at SL0000005.

   **RESPONSE**:  Undisputed.

212.    Promissory Note No. 800 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000005.

   **RESPONSE**:  Undisputed.

213.    Promissory Note No. 802 was issued to Mr. Renich by ZAO FG Life on September 12, 2014 in the amount of $1,000,000, for a term of one year at an annual interest rate of 11%. Exh. 47 at SL0000006.

**RESPONSE**:  Undisputed.

214.    Promissory Note No. 802 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000006.

**RESPONSE**:  Undisputed.

215.    Promissory Note No. 1929 was issued to Mr. Renich by ZAO FG Life on January 12, 2015 in the amount of $1,110,904, for a term of one year at an annual interest rate of 11%. Exh. 47 at SL0000016.

**RESPONSE**:  Undisputed.

216.    Promissory Note No. 1929 was guaranteed, or avalized, by PRBB. Exh. 47 at SL0000016.

**RESPONSE**:  Undisputed.

217.    None of the promissory notes issued by ZAO FG Life in the name of Mr. Renich were guaranteed or avalized by Mr. Leontiev in his personal capacity. Exh. 47 at SL0000002, SL0000005-6, SL0000016 (Renich promissory notes listed in Appendix A).

**RESPONSE**:  Undisputed.

218.    As of November 2015, Mr. Renich had received either three million U.S. dollars or three million Euros with respect to the amount due under the promissory notes, but had not returned any of the underlying promissory notes. Exh. 51 at AVPE0004204 (11/30/2015 email from V. Popov to I. Monakhova, forwarding 11/29/2015 email from M. Shamis).

**RESPONSE**:  Disputed as unsupported by any admissible evidence.  The

proposed fact relies on a single and unilateral statement, sent to Popov on November 29, 2015,

from the email address 5391146@gmail.com, for the truth of the matter asserted.

219.    Mr. Varshavsky does not have a legal assignment of any claims held by Mr. Renich with respect to the ZAO FG Life promissory notes. Exh. 46 at Request 2 (Defendant's Responses to Plaintiff's Requests for Admission).

**RESPONSE**:  Undisputed.

220.    Mr. Leontiev has never met or spoken with Mr. Renich or Ms. Karapetyan. Leontiev Decl. ¶ 44.

**RESPONSE**:  Undisputed.

IV.     **The Borrower Entities**

A.     **Ambika Investments Limited**

221.    Ambika was incorporated under the laws of Cyprus on July 4, 2006. Exh. 52 (Ambika corporate registration records).

**RESPONSE**:  Undisputed.

222.    Its current directors are Petros Livanios and Ria Christofidi. Exh. 52 (Ambika corporate registration records).

**RESPONSE**:  Undisputed.

223.    As of December 31, 2014, Ambika had issued approximately $83 million in subordinated debt to PRBB. Exh. 3 at SL0001293 (PRBB 2014 Audited Financials).

**RESPONSE**:  Disputed. The support cited describes debt issued by PRBB, but does not support the statement that Ambika issued debt to PRBB. Pl. Ex. 3 at SL0001293 (PRBB 2014 Audited Financials).  Further disputed as misleading to the extent source describes value of subordinated debt held by Ambika in Russian Rubles.  *Id.*  Further disputed as misleading to the extent the reported value of subordinated debt held by Ambika as of December 31, 2014 is attributable to devaluation of Russian Ruble.  Def. Ex. 59 at 62:6-9 (Voronin Tr.).

224.    ███████████████████████████████████████████
██████████████████████████████████████████

**RESPONSE**:  ███████████

225.    ███████████████████████████████████████████
██████████████

**RESPONSE**:  ███████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

226.   ██████████████████████████████████

███████████████████████████

**RESPONSE**:   █████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████

227.   ██████████████████████████████████

██

**RESPONSE**:   █████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

228.   ██████████████████████████████████████

███████████████████████████

**RESPONSE**:   ████████████

**B.      Vennop Trading Limited**

229.     Vennop was incorporated under the laws of Cyprus on January 10, 2013. Exh. 55 (Vennop corporate registration records).

**RESPONSE**:  Undisputed.

230.    Vennop's current director is Mykyta Zvyagin. Exh. 55 (Vennop corporate registration records).

**RESPONSE**:  Undisputed that Mykyta Zvyagin was the nominal director listed at the time that the records were printed.

### C.    ZAO Financial Group Life

231.    ZAO FG Life was incorporated under the laws of the Russian Federation on September 13, 2006. Monastyrsky Exh. 2 at 1 (ZAO FG Life corporate registration records).

**RESPONSE**: Undisputed.

232.    Its sole shareholder was OOO Alivikt. Monastyrsky Exh. 2 at 3 (ZAO FG Life corporate registration records).

**RESPONSE**:  Undisputed.

233.    OOO Alivikt is an entity incorporated under the laws of the Russian Federation and was beneficially owned by Mr. Leontiev, Mr. Zheleznyak, and, at different times, Eduard Panteleev or Eldar Bikmaev. Exh. 56 (OOO Alivikt corporate registration records); Exh. 1 at 76:19-77:4, 78:15-25 (Leontiev Tr.).

**RESPONSE**:  Undisputed.

234.    On April 1, 2015, ZAO FG Life filed a notice of voluntary liquidation. Exh. 57 (4/1/2015 Notice of Liquidation).

**RESPONSE**:  Undisputed.

235.    On August 5, 2015, ZAO FG Life was formally dissolved. Monastyrsky Exh. 2 at 11 (ZAO FG Life corporate registration records).

**RESPONSE**:  Disputed.  On August 5, 2015, ZAO FG Life's liquidation was approved.  The liquidation was then canceled once and reinstated.  Pl. SOF ¶¶ 238, 241.  In January 2017, the liquidation was canceled a second time.  Def. Ex. 20 (January 2017 ZAO FG Life Corporate Registry Record).

236.    Mr. Leontiev was not involved in the decision to liquidate ZAO FG Life and did not review or sign any liquidation documents. Leontiev Decl. ¶ 33; Exh. 1 at 113:22-114:17 (Leontiev Tr.).

**RESPONSE**:  Disputed.  ███████████████████

████████████████████████████████████████████

███████████████████████████████████ Alivikt, as sole

shareholder of ZAO FG Life, resolved to liquidate the company.  Def. Ex. 40, SL0038683-84.

Further disputed as unsupported by the quoted testimony, in which Leontiev states only he didn't

remember how the decision was made.  Pl. Ex. 1 at 113:22-114:17.

237.    On August 23, 2016, a complaint purportedly signed by Andrey Arminayts was filed with the Moscow Directorate of the Federal Tax Authority alleging that ZAO FG Life's liquidation balance sheet did not properly reflect an outstanding obligation to Mr. Arminayts. Monastyrsky Exh. 1 at SL0038706 (12/26/2016 decision of the Federal Tax Authority).

**RESPONSE**:  Undisputed.

238.    On the basis of this complaint, the Federal Tax Authority reversed the voluntary liquidation of ZAO FG Life on September 2, 2016. Monastyrsky Exh. 1 at SL0038706 (12/26/2016 decision of the Federal Tax Authority).

**RESPONSE**:  Undisputed.

239.    ZAO FG Life's liquidator, Aleksey Saltykov, appealed the reversal. Monastyrsky Exh. 1 at SL0038706 (12/26/2016 decision of the Federal Tax Authority).

**RESPONSE**:  Undisputed.

240.    Mr. Arminayts filed an affidavit in support of the appeal, attesting that he neither signed nor submitted the August 23 complaint. Monastyrsky Exh. 1 at SL0038706-07 (12/26/2016 decision of the Federal Tax Authority).

**RESPONSE**:  Undisputed.

241.    Because the complaint purportedly made by Mr. Arminayts was the sole basis for reversing the liquidation, the Federal Tax Authority granted Mr. Saltykov's appeal and reinstated ZAO FG Life's dissolution on December 26, 2016. Monastyrsky Exh. 1 at SL0038707 (12/26/2016 decision of the Federal Tax Authority).

**RESPONSE**:  Undisputed.

242.    Mr. Varshavsky became aware of the liquidation of ZAO FG Life no later than August 3, 2016, when the notice of liquidation was submitted in support of Mr. Leontiev's

motion for judgment on the pleadings. Dkt. Nos. 24-8 (ZAO FG Life's notice of liquidation) and 24-9 (corporate registration records of ZAO FG Life).

**RESPONSE**:  Disputed as incomplete.  To the extent that anyone may have

become aware of ZAO FG Life's liquidation through the court filing of August 3, 2016, it would

have been too late to act on that information.  The notice of liquidation was published on April 1,

2015, and stated that all creditors' claims must be submitted within two months of that

publication.  Dkt. No. 24-8 at 2.

243.    Neither Mr. Varshavsky nor any individual named in the promissory notes at issue in this case have filed a complaint with the Federal Tax Authority. Monastyrsky Exh. 1 at SL0038707 (12/26/2016 decision of the Federal Tax Authority); Exh. 16 at 59:20-25 (Karen Avagumyan Tr.).

**RESPONSE**:  Undisputed.

## V.    Mr. Varshavsky's Collection Efforts and the Settlement Negotiations

244.    In August 2015, several days after PRBB's license was revoked, Mr. Varshavsky told Mr. Zheleznyak to bring Mr. Leontiev to a meeting at the Avilon Group's offices to discuss Mr. Varshavsky's assertion that Mr. Zheleznyak and Mr. Leontiev should pay the monies allegedly owed by Ambika, ZAO FG Life, and Vennop. Exh. 9 at 80:15-22 (Varshavsky Tr.); Exh. 2 at 142:7-13 (Zheleznyak Tr.); Exh. 13 at 132:19-133:5 (Monakhova Tr.).

**RESPONSE**:  Disputed as misleading and mischaracterizing the record.  After

PRBB's license was revoked, Varshavsky asked Zheleznyak to come to Avilon's offices with

Leontiev to discuss the repayment of Avilon's funds in light of the license revocation.  Def. Ex.

13 at 80:15-81:13 (Varshavsky Tr.); Def. Ex. 14 at 123:17-124:13 (Leontiev Tr.); Def. Ex. 15 at

142:7-13 (Zheleznyak Tr.); Def. Ex. 21 at 132:19-133:10 (Monakhova Tr.).

245.    In August 2015, Mr. Leontiev attended the meeting at Mr. Zheleznyak's request that he mediate the dispute and relieve the pressure that was being placed on Mr. Zheleznyak by Mr. Varshavsky. Leontiev Decl. ¶ 34; Exh. 1 at 123:17-124:3 (Leontiev Tr.).

**RESPONSE**:  Disputed as incomplete, misleading and mischaracterizing the

record.  The cited testimony does not support the assertion that there was "pressure … being

placed on Mr. Zheleznyak by Mr. Varshavsky," only that Zheleznyak asked repeatedly that Leontiev attend.  Leontiev Decl. ¶ 34; Pl. Ex. 1 at 123:17-124:3 (Leontiev Tr.).  According to the other attendees, the purpose of the meeting was to discuss repayment of funds owed to Avilon and obtain guarantees and assurances regarding repayment.   Def. Ex. 13 at 80:15-82:14 (Varshavsky Tr.);  Def. Ex. 14 at 123:17-124:13 (Leontiev Tr.);  Def. Ex. 15 at 142:7-13 (Zheleznyak Tr.); Def. Ex. 21 at 132:19-133:10 (Monakhova Tr.).

246.   The Moscow meeting was brief and lasted approximately 15 to 20 minutes. Exh. 9 at 82:18-20 (Varshavsky Tr.).

**RESPONSE**:  Undisputed.

247.   The Moscow meeting was the first time that Mr. Varshavsky ever discussed Ambika, ZAO FG Life, Vennop, or any wealth management product with Mr. Leontiev. Exh. 9 at 61:12-62:6 (Varshavsky Tr.).

**RESPONSE**:  Disputed as incomplete.  Varshavsky had spoken many times with Zheleznyak, who was representing both himself and his partner Leontiev, as described in response to paragraphs 56 and 76.  Disputed as vague with respect to "wealth management product" for the reasons stated in response to paragraph 39.

248.   The Moscow meeting was the first and only time that Ms. Monakhova ever spoke with Mr. Leontiev on any subject. Exh. 13 at 136:17-20 (Monakhova Tr.).

**RESPONSE**:  Disputed as incomplete.  Monakhova had regularly communicated with Zheleznyak's contact person, who, for the purposes of carrying out the loans, represented Zheleznyak and Leontiev, just as Monakhova represented Avilon.  Def. Ex. 21 at 20:19-25 (Monakhova Tr.).

249.   There was no agreement on any material terms, such as the amount of the obligation or a schedule of repayment, at the Moscow meeting. Exh. 1 at 124:4-13 (Leontiev Tr.); Exh. 9 at 64:18-22, 81:14-82:17, 87:9-23 (Varshavsky Tr.); Exh. 2 at 146:7-14 (Zheleznyak Tr.).

**RESPONSE**:  Disputed as misleading and mischaracterizing the record.  At the Moscow meeting, Leontiev and Zheleznyak confirmed their personal responsibility for the loaned funds and assured Varshavsky that the loaned funds would be repaid. Def. Ex. 22 at 17:10-13 (London Tr.) (discussing previous meeting); Def. Ex. 13 at 81:14-82:17, 87:9-23 (Varshavsky Tr.); Def. Ex. 15 at 143:2-146:14 (Zheleznyak Tr.). At the end of that meeting, Leontiev, Zheleznyak, and Varshavsky all agreed to meet again the following morning to finalize the terms of repayment. Def. Ex. 15 at 146:15-18 (Zheleznyak Tr.).

250.    Approximately one week later, Mr. Varshavsky, Mr. Zheleznyak, and Mr. Leontiev met in London. Exh. 2 at 148:8-15 (Zheleznyak Tr.).

**RESPONSE**:  Undisputed.

251.    Because he feared for his safety, Mr. Leontiev recorded the meeting in London. Leontiev Decl. ¶ 40; Exh. 1 at 124:18-21 (Leontiev Tr.); Exh. 2 at 113:19-114:9 (Zheleznyak Tr.).

**RESPONSE**:  Disputed as false and misleading. Leontiev's cited deposition testimony does not discuss safety concerns, and apart from a conclusory statement in his declaration that he feared for his safety, Leontiev does not provide facts to support this claim. Furthermore, Zheleznyak testified that he did not perceive as threats any of the statements from Varshavsky or Avagumyan that he relayed to Leontiev. Def. Ex. 15 at 114:21-115:25 (Zheleznyak Tr.).

252.    Although Mr. Leontiev did not believe that he had any personal liability with respect to the Ambika loans or the ZAO FG Life and Vennop promissory notes, he hoped to negotiate a resolution to the dispute between Mr. Varshavsky and Mr. Zheleznyak, because Mr. Varshavsky was seeking to impose a legal obligation of the bank onto Mr. Zheleznyak as a moral obligation. Leontiev Decl. ¶¶ 35, 39; Exh. 1 at 69:3-9 (Leontiev Tr.).

**RESPONSE**:  Disputed. At the London meeting, Leontiev and Zheleznyak expressly and repeatedly acknowledged the Debt and gave repeated assurances that they would repay the Loaned Funds. Def. Ex. 22 at 3:7-13; 9:3-6; 18:16-21; 30:7-8; 38:8-14; 38:23-39:4;

48:3-15 (London Tr.). For example, Leontiev stated that "You can be certain that we will perform our obligations to you" and "I give you my word, we will perform the obligation." Def. Ex. 22 at 13:21-22; 22:22 (London Tr.). Leontiev stated of Zheleznyak, "He and I are partners, and his obligations are my obligations, no doubt about it." Def. Ex. 22 at 12:13-14 (London Tr.).

Indeed, when Varshavsky stated that he had previously spoken to Zheleznyak seeking assurances of repayment, Leontiev responded that he would have to be the one to repay the loaned funds because he had all of the money. Def. Ex. 22 at 12:3-6 (London Tr.). ("He [Zheleznyak] can't repay you … because I have the money. I manage the business… that part of the business is managed by me.").

253.    The parties did not reach agreement on any material terms, including the amount owed, collateral, an interest rate, or a schedule for payment, at the London meeting. Exh. 9 at 104:10-18, 105:9-13 (Varshavsky Tr.); Exh. 1 at 134:20-135:4 (Leontiev Tr.).

**RESPONSE**:   Disputed as misleading and mischaracterizing the record.   The material terms for payment of the debt by Leontiev were agreed upon and confirmed among the parties at the London meeting, including: (1) Leontiev's express acknowledgment of a personal obligation to pay, his promise to fulfill that obligation; (2) the amount to be paid ($100 million); (3) the fact of Leontiev's partnership with Zheleznyak and Zheleznyak's responsibility for the debt; and (4) Leontiev's promise to repay the loaned funds over the course of the next two years, without interest, according to a repayment schedule.  Def. Ex. 22 at 3:7-13; 4:9-12; 9:3-6; 12:3-6; 18:16-21; 25:3-6; 30:7-8; 31:6-8; 38:8-14; 38:23-39:4; 48:3-15 (London Tr.).

254.    In September 2015, Mr. Zheleznyak persuaded Mr. Leontiev to refrain from trying to stop a payment of $17 million to the Avilon Group from Valkera, one of the off-balance sheet entities operated by Ms. Vyulkova. Exh. 2 at 71:16-23, 73:24-74:2 (Zheleznyak Tr.); Exh. 58 at 52:6-11 (Zubiy Tr.).

**RESPONSE**:   Disputed as misleading and mischaracterizing the record. Zheleznyak testified that he was the person who made "the final instruction" to Vyulkova to

make a payment of $17 million to Avilon from Valkera. He also stated that he gave that instruction after receiving Leontiev's "agreement" and he "couldn't have made that instruction without Sergey Leontiev's agreement." Def. Ex. 15 at 70:24-71:23 (Zheleznyak Tr.).

255.    Mr. Zheleznyak facilitated the payment by instructing Ms. Vyulkova to make the wire transfer from Valkera to the Avilon Group. Exh. 2 at 71:12-15 (Zheleznyak Tr.); Exh. 1 at 138:20-21 (Leontiev Tr.).

**RESPONSE**:  Undisputed.

256.    In exchange for the $17 million payment, Valkera received an assignment of Avilon Plaza's rights under the 2010 Loan, which resolved the dispute with respect to that loan. Exh. 34 at AVPE0002555-59 (9/17/2015 email from A. Zheleznyak to Mr. Popov attaching assignments agreements).

**RESPONSE**:  Disputed as misleading and mischaracterizing the record.   In exchange for the $17 million payment, Valkera received an assignment of Avilon Plaza's rights under Loan Agreement No. 2712/10, dated December 27, 2010.  The payment served to repay the funds owed under that Loan Agreement.  Pl. Ex. 34 at AVPE0002555-59 (9/17/2015 email from A. Zheleznyak to Mr. Popov attaching assignment agreements).

257.    Over the next few months, Mr. Varshavsky consistently pressured Mr. Zheleznyak to persuade Mr. Leontiev to settle the dispute over an additional $83 million that Mr. Varshavsky was demanding. Exh. 1 at 135:17-136:3 (Leontiev Tr.); Leontiev Decl. ¶ 45.

**RESPONSE**: Disputed as misleading, vague, and unsupported by the record with respect to "pressured."  Def. Ex. 15 at 114:21-114:24 (Zheleznyak Tr.) ("Q. Did Mr. Varshavsky ever communicate any threats to you as it related to the proposal to repay the debt?   A. Varshavsky did not threaten me.").

258.    Between September and December 2015, Ms. Monakhova and Mr. Popov and Avilon AG employees working under their direction prepared multiple drafts of payment

schedules and settlement agreements, none of which were ever signed. Exh. 59 at AVPE0006163-66 (unsigned deed of arrangement); Exh. 60 at AVPE0006115-17 (unsigned deed of arrangement); Exh. 61 at AVPE0006126-28 (unsigned surety agreement); Exh. 62 at AVPE0006134-36 (unsigned agreement on promissory note acquisition); Exh. 63 at AVPE0006137-39 (unsigned agreement on promissory note acquisition); Exh. 64 at AVPE0006140-42 (unsigned note purchase agreement); Exh. 65 at AVP0002718-19 (unsigned deed of arrangement); Exh. 15 at 95:10-97:5 (Popov Tr.).

**RESPONSE**:  Disputed as misleading, incomplete, and mischaracterizing the cited sources.  The statement omits the fact that, during the referenced time period, Maxim. Shamis, who represented Leontiev and Zheleznyak in the repayment negotiations, was also involved in the preparation of some of the settlement agreements and payment schedules.  Def. Ex. 23 at AVPE0006100 (November 30, 2015 Cover email to Pl. Ex. 60 at AVPE0006115-17 (unsigned deed of arrangement); Def. Ex. 24 at AVPE0006123-24 (December 1, 2015 Cover email to Pl. Ex. 61 at AVPE0006126-28 (unsigned surety agreement); Def. Ex. 25 at AVP0002705-17 (November 18, 2015 Cover email to Pl. Ex. at AVP0002718-19 (unsigned deed of arrangement)).

Plaintiff's cited evidence supports the proposition that the following materials were prepared: three draft Deeds of Agreement, which incorporated payment schedules; three draft agreements on promissory note acquisition; and one surety agreement regarding some specific promissory notes.

259.    No agreement was reached as a result of these negotiations with respect to the amount owed, the parties to whom any debt was owed, the structure of a deal, collateral, or releases of liability. Exh. 13 at 141:23-142:8 (Monakhova Tr.); Exh. 15 at 96:3-97:10, 104:1521, 108:6-8, 113:13-116:7 (Popov Tr.); Exh. 66 at AVPE0004244-46 (November and December 2015 emails between V. Popov, I. Monakhova, A. Varshavsky, and M. Shamis); Exh. 67 at AVPE0006232-37 (December 2015 emails between I. Monakhova, V. Popov, A. Varshavsky, and Y. Semenova).

**RESPONSE**:  Disputed as misleading and characterized for the reasons stated in response to paragraphs 249, 252, and 253.  Disputed to the extent it states a legal conclusion as to the absence of an "agreement."

Further disputed as unsupported by the evidence cited, which in fact shows several discussions of draft settlement materials.  Pl. Ex. 13 at 141:23-142:8 (Monakhova Tr.); Pl. Ex. 15 at 96:3-97:10, 104:15-21, 108:6-8, 113:13-116:7 (Popov Tr.); Pl. Ex. 66 at AVPE0004244-46 (November and December 2015 emails between V. Popov, I. Monakhova, A. Varshavsky, and M. Shamis); Pl. Ex. 67 at AVPE0006232-37 (December 2015 emails between I. Monakhova, V. Popov, A. Varshavsky, and Y. Semenova).  Further, Popov testified that Shamis made representations to him that "there [were] no disagreements, in principle" concerning "the framework agreement that [Popov] had drafted."  Def. Ex. 26 at 113:13-116:7 (Popov Tr.).

260.    On December 24, 2015, Mr. Popov circulated another draft agreement to Mr. Leontiev's and Mr. Zheleznyak's counsel, and noted that "this Draft Agreement is not deemed to be concluded until signed by all Parties, as well as all conditions, terms, representation, and warranties are not deemed to be agreed by our side." The draft agreement was never signed. Exh. 68 at AVPE0001007-14; Exh. 15 at 126:4-10 (Popov Tr.).

**RESPONSE**:  Disputed as incomplete.  Popov testified that the quoted language was a "standard disclaimer."  Def. Ex. 26 at 125:21-126:10 (Popov Tr.).

261.    On January 15, 2016, Mr. Leontiev and Mr. Varshavsky, represented by counsel, met in New York to discuss a potential resolution to the dispute. Exh. 9 at 80:9-14, 105:14-23. (Varshavsky Tr.).

**RESPONSE**:  Undisputed that Leontiev and Varshavsky, represented by counsel, met at Gibson Dunn on January 15, 2016.

262.    On January 20, 2016, Mr. Varshavsky's counsel provided the loan agreements, guarantees, and promissory notes listed in Appendices A through C to the Complaint (the "Alleged Loans") as the documents underlying Mr. Varshavsky's claims. Exhs. 48, 50, 69 (1/20/2016 emails from R. Stahl to R. Weigel attaching loan agreements and promissory notes); Exh. 70 (2/1/2016 email from R. Stahl to R. Weigel attaching bank guarantees).

**RESPONSE**:  Disputed as mischaracterizing the subject of the underlying dispute as "Mr. Varshavsky's claims," when Mr. Varshavsky has never sought to collect in his personal capacity.

Further disputed as incomplete to the extent that the cited sources omit the provision of the following loan agreements, which are listed on Appendix B to the Complaint: Additional Agreements Nos. 1-4, and 6 to Loan Agreement No. 1812/08, dated September 18, 2008; Loan Agreement No. 0109/11, dated September 1, 2011; and Additional Agreements Nos. 1-4, and 7-8 to Loan Agreement No. 0109/11.

263.    These negotiations did not result in a settlement agreement between the parties. Leontiev Decl. ¶ 46.

**RESPONSE**:  Disputed.  The further negotiations did not resolve disputed issues regarding the implementation of the agreement reached during the London meeting.

## VI.    Procedural History

264.    Mr. Leontiev filed the present action on May 13, 2016, seeking a declaratory judgment that he does not owe Mr. Varshavsky any money pursuant to the Alleged Loans and damages for intentional infliction of emotional distress. Dkt. No. 1 ¶¶ 12-13 (Complaint).

**RESPONSE**:  Disputed.   The complaint seeks a declaratory judgment that Leontiev "owes no debt to Varshavsky, or to anyone acting in concert with him"; seeks a permanent injunction "preventing Varshavsky, or anyone acting in concert or participation with Varshavsky, from taking any further action" to collect on the loans, as well as damages under a now-dismissed tort claim.  Dkt. No. 1 ¶¶ 12-13 (Complaint).

265.    Mr. Varshavsky moved to dismiss the tort claim, but filed an answer to the declaratory judgment claim. Dkt. Nos. 14-15 (Defendant's Notice of Motion and Memorandum of Law in Support of Motion to Dismiss); Dkt. No. 16 (Answer).

**RESPONSE**:  Undisputed.

266.    This Court granted Mr. Varshavsky's motion to dismiss the intentional infliction of emotional distress claim on September 2, 2016. Dkt. No. 31.

**RESPONSE**:  Undisputed (noting that the Court's order was dated September 1, 2016, and filed September 2, 2016).

267.    On August 3, 2016, Mr. Leontiev moved for a judgment on the pleadings, arguing that Mr. Varshavsky had no legal right to seek repayment of the Alleged Loans because he was not a party or a third-party beneficiary to the loan agreements or promissory notes and did not have an assignment of the claims, and that Mr. Leontiev had no liability for the Alleged Loans as a matter of Cypriot and Russian veil-piercing law. Dkt. No. 23 at 8-11, 15-20 (Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Pleadings).

RESPONSE:  Undisputed.

268.    Mr. Varshavsky filed an amended answer and opposed the motion, but refused to state whether he had an assignment of the claims at issue in this lawsuit. Dkt. No. 27 at 13 (¶ 8) (Amended Answer); Dkt. No. 28 at 11-12 (Defendant's Memorandum of Law in Opposition to Motion for Judgment on the Pleadings).

RESPONSE:  Disputed because use of the phrase "refused to state" is misleading when Varshavsky was under no obligation to allege any facts in response to the Complaint.  Dkt. No. 46 at 7 (Mem. Op.).  The documents cited accurately described Varshavsky's relationship with others who authorized Mr. Varshavsky to negotiate with Leontiev for repayment on their behalf.

269.    In both his original and amended answers, Mr. Varshavsky denied the allegation that "Mr. Leontiev owes Mr. Varshavsky nothing." Dkt. No. 1 ¶ 4 (Complaint); Dkt. No. 16 at 3 (¶ 4) (Answer); Dkt. No. 27 at 3 (¶ 4) (Amended Answer).

RESPONSE:  Undisputed as to Varshavsky's response, but the "allegation" states a legal conclusion rather than a statement of fact.

270.    This Court denied Mr. Leontiev's motion on September 23, 2016 by a "bottom line" order, and issued a written decision dated December 4, 2016. Dkt. Nos. 41 and 46.

RESPONSE:  Undisputed (noting that the Court's order was dated September 22, 2016, and filed September 23, 2016).

271.    The Court held that because a defendant in a declaratory judgment claim bears no burden to plead facts in his answer, the pleadings left open the possibility of Mr. Leontiev's liability under a veil-piercing theory. Dkt. No. 46 at 11-12.

RESPONSE:  Disputed as characterized.  The Court's memorandum opinion speaks for itself.

272.   The Court recognized that Mr. Varshavsky's refusal to acknowledge whether he had an assignment of the claims was likely a "tactic[] . . . to keep Mr. Leontiev embroiled in the present suit," but held that the pleadings left open the possibility that such an assignment could be produced in discovery. Dkt. No. 46 at 17.

**RESPONSE**:  Disputed as characterized.   The Court's memorandum opinion speaks for itself.

273.   On November 16, 2016, Avilon AG and Karen Kamoevich Avagumyan—but not Mr. Varshavsky—filed an action in New York state court against Mr. Leontiev for fraudulent conveyance and unjust enrichment arising from the same loan agreements and some of the same promissory notes at issue in this case. Exh. 71 (Complaint in *Avilon AG v. Leontiev*, Index No. 656007/2016 (New York State Supreme Court)).

**RESPONSE**:  Undisputed.

274.   On January 5, 2016, eight days before the end of discovery, Mr. Varshavsky admitted in his deposition that he does not have and has never had an assignment of Avilon AG's rights under the Ambika loans or of Karen Avagumyan's rights under his promissory notes or any proprietary interest in those claims. Exh. 9 at 9:3–6, 9:17-20 (Varshavsky Tr.).

**RESPONSE**:  Undisputed to the extent that "assignment" is used to mean a formal legal assignment for consideration.

275.   Mr. Varshavsky admitted that he never had an assignment of any claims from people on whose behalf he purported to negotiate. Exh. 9 at 14:17-22 (Varshavsky Tr.).

**RESPONSE**:  Undisputed to the extent that "assignment" is used to mean a formal legal assignment for consideration.

276.   Mr. Varshavsky testified that he does not know who Diana Karapetyan is. Exh. 9 at 14:8-10 (Varshavsky Tr.).

**RESPONSE**:  Undisputed.

277.   Mr. Varshavsky confirmed that he is not personally owed any money by Mr. Leontiev. Exh. 9 at 9:21-23 (Varshavsky Tr.) ("Q. Are you personally owed any money by Mr. Leontiev? A. No.").

**RESPONSE**:  Undisputed that Varshavsky confirmed that he is not personally owed any money by Leontiev under the loans at issue in this proceeding.

278.   Mr. Varshavsky admitted that the allegation in paragraph 4 of the Complaint that "Mr. Leontiev owes Mr. Varshavsky nothing" is true, despite having denied it in both his Answer and Amended Answer. Exh. 9 at 11:7-10 (Varshavsky Tr.).

**RESPONSE**:  Disputed as mischaracterizing the testimony.  The statement "Mr. Leontiev owes Mr. Varshavsky nothing" is conclusory and indefinite, and Varshavsky was entitled to deny it in his Answer and Amended Answer.  Varshavsky has never asserted that Leontiev owes him personally under the loans, as is evident from the clarifying questions that Varshavsky asked before responding to the same statement at his deposition, and counsel for Leontiev's clarification that the question related to Varshavsky "personally."  Def. Ex. 13 at 10:16-11:11 (Varshavsky Tr.).  Further, the "allegation" states a legal conclusion rather than a statement of fact.

279.   On January 13, 2016, the last day of discovery, Mr. Varshavsky admitted that he did not have a legal assignment of the claims held by Avilon AG, Karen Avagumyan, Igor Renich, or Diana Karapetyan, in his responses to Plaintiff's Requests for Admission. Exh. 46 at Requests 1-4 (Defendant's Response to Plaintiff's Requests for Admission).

**RESPONSE**:  Undisputed that Defendant made such admissions while reserving an objection that the Requests for Admission were vague, ambiguous, and confusing in the use of the term "assign," and noting his admissions were limited to "assign" in the sense of a formal legal assignment for consideration.

## II.  Defendant's Rule 56.1 Statement of Additional Material Facts

**A.**     **Leontiev's and Zheleznyak's Ownership in Probusinessbank and ZAO Financial Group Life**

1.     ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████

2.       ███████████████████████████████████████████████

████████████████████████████████████████████████; Pl.

Ex. 3 (SL0001210, Probusinessbank Group:  Consolidated Financial Statements for the Year

Ended 31 December 2014) at SL0001227 (showing Alivikt with a 51.20% ownership of PRBB

as of December 31, 2014, and Leontiev and Zheleznyak as ultimate shareholders of 40.15% and

11.05% of PRBB, respectively).

3.       Leontiev and Zheleznyak were two of the ultimate shareholders of

Probusinessbank ("PRBB"), ██████████████████████████████████████

████████████████████████.  Pl. Ex. 3 (SL0001210, Probusinessbank Group:

Consolidated Financial Statements for the Year Ended 31 December 2014) at SL0001227; Def.

Ex. 14 at 79:12-16, 132:24-133:4 (Leontiev Tr.); Def. Ex. 15 at 57:2-58:14 (Zheleznyak Tr.).

4.       ███████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

5.       Leontiev told Varshavsky that he and Zheleznyak were business partners.

Def. Ex. 14 at 68:13-21; 69:16-70:24 (Leontiev Tr.); Def. Ex. 22 at 3:18, 12:13-14, 19:10, 31:2-

5, 48:11 (London Tr.).

6.       Zheleznyak represented to Varshavsky and Kamo Avagumyan, when

soliciting loans from them, that the money would be controlled by him and his partner, Leontiev.

Def. Ex. 13 at 155:24-156:11 (Varshavsky Tr.); Def. Ex. 18 at 22:10-23:5, 44:16-45:25, 59:4-60:16, 144:4-19 (Kamo Avagumyan Tr.).

7.      Leontiev and Zheleznyak were understood by others, such as Zubiy and Varshavsky, to be business partners.  Def. Ex. 13 at 25:21-23, 168:20-170:6 (Varshavsky Tr.); Def. Ex. 27 at 20:12-21 (Zubiy Tr.).

**B.      Representations Made by Zheleznyak on behalf of Himself and Leontiev Throughout Avilon AG's Loans to Ambika**

8.      Zheleznyak and Varshavsky have had a long-standing friendship, including at the time Zheleznyak discussed loan terms with Varshavsky in 2008.  Def. Ex. 13 at 88:25-89:2, 156:25 (Varshavsky Tr.); Def. Ex. 15 at 67:17-20 (Zheleznyak Tr.).

9.      In or around December 2008, Leontiev asked Zheleznyak to acquire a large loan from Avilon.  Consistent with that instruction, Zheleznyak then discussed loan terms with Varshavsky.  Pl. Ex. 2 at 62:7-63:4, 66:9-12 (Zheleznyak Tr.).

10.      Zheleznyak told Varshavsky that he and Leontiev had opened Ambika, which was an "offshore company" that had "nothing to do with" PRBB and that a loan to Ambika could offer a higher interest rate than an investment with PRBB.  Pl. Ex. 9 at 29:10-30:7 (Varshavsky Tr.).  Zheleznyak further explained that Leontiev controlled the "offshore companies."  *Id.* at 79:17-18.

11.      Zheleznyak represented to Varshavsky that Ambika had assets and was a company that bought and sold blue chip stocks for investment purposes.  Def. Ex. 15 at 36:3-11 (Varshavsky Tr.).

12.      In addition to the loan negotiated in 2008, Avilon entered into loans with Ambika in 2010 and 2011, and subsequently entered into additional agreements, extending the

terms of the loans.  Pl. SOF ¶¶ 90-94, 97; Pl. Ex. 9 at 56:8-59:17 (Varshavsky Tr.); Pl. Ex. 2 at

117:19-118:11 (Zheleznyak Tr.); Pl. Ex. 13 at 74:2-25 (Monakhova Tr.); Pl. Ex. 24; Pl. Ex. 36.

13.     For all loans between Avilon and Ambika, Varshavsky and Zheleznyak

negotiated the interest rate and the renewable one-year term of the loans and left it to their

representatives to finalize other clauses.  Def. Ex. 13 at 25:7-23, 29:3-30:7, 31:10-18, 56:8-59:17

(Varshavsky Tr.); Def. Ex. 15 at 62:25-63:22, 65:5-13, 66:9-12 (Zheleznyak Tr.); Def. Ex. 21 at

17:20-18:2, 20:16-25 (Monakhova Tr.).

14.     During annual renewal negotiations and throughout the period the loans

were outstanding, Zheleznyak repeatedly represented to Varshavsky that Leontiev had invested

the loaned funds in blue-chip securities, outside of PRBB, and that Avilon's money was secure

and kept "outside of Russia, specifically in London."  Def. Ex. 13 at 36:6-25, 155:16-156:11

(Varshavsky Tr.); *see also infra* Def. SOF ¶ 156.

15.     The principal due on Loan Agreement No. 0109/11 ("2011 Loan

Agreement") (including the amounts rolled into that loan agreement upon the discharge of Loan

Agreement No. 1812/08 ("2008 Loan Agreement")), totaling $27,601,156.17, remains unpaid, as

do the interest payments that ceased being made after August 2015.  Pl. SOF ¶¶ 58-59, 82, 90-

93, 97, 114; Def. Ex. 15 at 64:6-21 (Zheleznyak Tr.); Def. Ex. 26 at 95:10-96:12 (Popov Tr.).

**C.     Zheleznyak also Raised Millions of Dollars from Individual Lenders.**

16.     Zheleznyak and Kamo Avagumyan have been friends for many years, met

regularly (several times a week), and saw each other at weddings and holidays.  Def. Ex. 15 at

127:21-128:2 (Zheleznyak Tr.); Def. Ex. 18 at 14-15, 24:15-17, 46:11-20 (Kamo Avagumyan

Tr.).

17.     Beginning around 2010 or 2011, Zheleznyak solicited Kamo Avagumyan

to lend funds to FGL, which he and "his partner," Leontiev "controlled," and later to a company

called Vennop Trading Ltd. ("Vennop"), which Zheleznyak stated they similarly controlled and described as being "exactly the same business" as FGL.  Def. Ex. 18 at 22:10-24:4, 54:2-55:3, 59:4-11, 61:17-23 (Kamo Avagumyan Tr.).

18.    Zheleznyak represented that Leontiev would invest the loaned funds in securities, ensuring "high percentage rates," and keeping the loaned funds separate and apart from PRBB.  Def. Ex. 18 at 22:10-24:4, 44:25-45:7, 59:4-59:11 (Kamo Avagumyan Tr.).

19.    Zheleznyak personally guaranteed the loans, avowing that this also constituted a guarantee from Leontiev because the two were equal partners.  Def. Ex. 18 at 44:16-45:25 (Kamo Avagumyan Tr.).  Kamo Avagumyan understood Zheleznyak's signature on the notes to represent both Zheleznyak and Leontiev "because I knew that they were partners." Def. Ex. 18 at 59:21-60:3 (Kamo Avagumyan Tr.).

20.    Kamo Avagumyan decided to loan funds, and renewed his loans, relying on that representation and Leontiev's reputed trading skills.  Def. Ex. 18 at 25:15-21, 44:16-45:25, 46:11-15, 60:7-16 (Kamo Avagumyan Tr.).  When discussing the loans with Kamo Avagumyan, Zheleznyak repeatedly stated that Leontiev's investments using the funds were doing very well.  *Id.*

21.    Kamo Avagumyan provided the loaned funds to Leontiev's and Zheleznyak's representatives, Yanna Krisiuk and Natalia Abramova, in cash, in exchange for the FGL promissory notes.  Def. Ex. 18 at 26:24-29:14 (Kamo Avagumyan Tr.).

**D.    Promissory Notes Issued by FGL and Vennop, and Signed by Zheleznyak**

22.    Kamo Avagumyan entered into loans with FGL and later Vennop on behalf of his son, Karen Avagumyan, and he intended the Promissory Notes to be an inheritance. Def. Ex. 18 at 31:5-20 ((Kamo Avagumyan Tr.).

23.     The funds loaned by Kamo Avagumyan to FGL or Vennop under Promissory Notes Nos. 1938, 785, 792, 798, 806, 813, 825, 826, 1902, 1904, 1906, 1907, 1908, 1936, 1937, 1941, 1948, 2000, 1953, 1954, 1962, as well as interest thereunder, remain unpaid. Pl. Ex. 47, Pl. SOF ¶¶ 145, 148, 150, 152, 154, 157, 160, 163, 166, 169, 172, 175, 178, 181, 184, 187, 190, 192, 195, 197, 198; Def. Ex. 18 at 26:17-23; 50:4-52:25; 55:8-22; 122:8-123:15 (Kamo Avagumyan Tr.).

24.     Zheleznyak personally signed at least 60 of the promissory notes issued to Karen Avagumyam.  Promissory Notes Nos. 631, 638, 647, 653, 656, 658, 660, 662, 668, 714, 735, 765, 777, 785, 792, 798, 806, 813, 825, 826, 1902, 1904, 1906, 1907, 1908, 1936, 1937, 1938, 1941, 1948, 2310, 2322, 2323, 2336, 2340, 2344, 2363, 2365, 2369, 2382, 2392, 2399, 2400, 2407, 2408, 2414, 2428, 2444, 2465, 2471, 2489, 2496, 9001, 9077, 9087, 9167, 9179, 9185, 9194, and 9195 were issued to Karen Avagumyan by ZAO FG Life and signed by Zheleznyak.  Pl. Exs. 47-51; Def. Ex. 29 (Promissory Notes Nos. 735, 756, 800, 1937, 1953, 2465).

25.     Kamo Avagumyan agreed to roll over several million dollars of loans in exchange for promissory notes issued by Vennop rather than FGL.  Kamo Avagumyan was told that the name change from FGL to Vennop was the result of an internal restructuring of the companies, that FGL was similar to Vennop and also personally controlled by Zheleznyak and Leontiev, and that it would not substantively change the terms of their arrangement.  Def. Ex. 18 at 54:2-55:22, 59:4-11, 61:17-23, 62:22-63:5 (Kamo Avagumyan Tr.).

26.     In connection with the loans to Vennop, Zheleznyak never mentioned to Kamo Avagumyan that FGL already had entered into liquidation proceedings.  Def. Ex. 18 at 64:10-13 (Kamo Avagumyan Tr.).

E.     **Leontiev's Control Over the Activities of the Offshore Entities and Wonderworks**

27.     Leontiev and Zheleznyak testified that—contrary to Zheleznyak's representations to Varshavsky and Avagumyan that Leontiev would invest the loaned funds in securities, independent of PRBB—the loaned funds were in fact treated as part of PRBB's general treasury.  Def. Ex. 14 at 108:2-20, 311:14–20 (Leontiev Tr.); Def. Ex. 15 at 66:6-8, 120:8-121:8 (Zheleznyak Tr.).  Zheleznyak has additionally described one of the ways the funds were used as "paying out previously attracted deposits and interest."  Def. Ex. 66, AVPE0004384 (email from Zheleznyak to Varshavsky, dated February 18, 2016).

28.



29.

30.     The off-shore entities were not, however, identified as affiliates or related parties on PRBB's audited financial statements, nor were their liabilities reported on PRBB's books.  Pl. Ex. 3 (Probusinessbank Group:  Consolidated Financial Statements for the Year Ended 31 December 2014); Pl. Ex. 4 (Probusinessbank Group:  Consolidated Financial Statements for the Year Ended 31 December 2013); Def. Ex. 14 at 49:10-22, 115:20-118:17 (Leontiev Tr.).

31.     Leontiev had ultimate control over the offshore entities, such as Ambika. Def. Ex. 15 at 94:10-22 (Zheleznyak Tr.).

32.     The offshore entities were created and originally were operated by PRBB employees who reported to Leontiev in his capacity as PRBB's President.  Def. Ex. 14 at 116:16-117:8, 119:17-21, 168:17-170:7 (Leontiev Tr.).



34.     Leontiev established the model that governed the transfer of funds among the offshore entities.  Def. Ex. 15 at 102:12-104:9, 109:20-110:24, 131:19-22 (Zheleznyak Tr.).

38. ███████████████████████████████████████████████

███████████████████████████

39.      Since the founding of Wonderworks in June 2011, Leontiev testified that he has at all times played the role of a Chief Investment Officer ("CIO"), and that he was the sole beneficial owner of Wonderworks.  Def. Ex. 14 at 33:8-21, 175:9-23 (Leontiev Tr.).

40. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

41. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

42.      In February 2016, when Wonderworks sought to open an account at the Bank of Nevis, the Bank of Nevis asked about the license revocation and the Russian Central Bank's findings with respect to "fictitious assets."   In an email dated February 19, 2016, Kolotnikov responded by citing the Covington letter.  Def. Ex. 30 at SL0025793-5.

43. ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

44. ███████████████████████████████

████████████████████████████████████████████████

██████████████████████

45. ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

46.     Zubiy is a cousin of Zheleznyak's wife, and from approximately August 2011 to September 2013, she worked at PRBB in the risk management department.  Def. Ex. 27 at 10:25-11:9, 15:4-18, 17:3-16, 23:15-24 (Zubiy Tr.).

47. ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

48. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████

49.     When PRBB's license was revoked, Zubiy took over management of the "operations" of various offshore entities from Vyulkova, including the management of Ambika, Vermenda, and Valkera.  Def. Ex. 27 at 50:23-52:14 (Zubiy Tr.).

50.     Vyulkova disappeared sometime after PRBB collapsed.  Shcheglyaev Tr. at 43:7-8.  Leontiev similarly testified that he did not know Vyulkova's whereabouts since PRBB's license was revoked.  Def. Ex. 14 at 163:24-164:4 (Leontiev Tr.).

51.     In 2016, Zubiy was an authorized representative for Ambika to communicate with Trident Trust. Def. Ex. 31 at 117:6-119:3 (Kolotnikov Tr.).

52.     ██████████████████████████████████████████
████████████████████████████████████████████████

53.     Kolotnikov also served as Chairman of the National Savings Bank, which was wholly owned by PRBB, at the same time that he began working for Leontiev's company, Wonderworks.  Def. Ex. 31 at 32:17-33:8 (Kolotnikov Tr.).  Kolotnikov worked for the National Savings bank until December 2015.  Def. Ex. 31 at 32:17-33:4 (Kolotnikov Tr.).

54.     ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

55.     ██████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████

**F.      Leontiev Concealed His Control over the Offshore Entities By Using Nominee Owners**

56.      The offshore entities were registered in the names of nominal owners who did not own or control the entities.  Def. Ex. 14 at 140:15-24 (Leontiev Tr.).

57.      The offshore entities, as well as Wonderworks, were stocked with nominal Directors supplied by Trident Trust, a common registrator, who did not exercise independent decision-making authority.  Def. Ex. 14 at 162:2-12, 170:8-20, 177:5-9 (Leontiev Tr.).

58.      Petros Livanios, in his capacity as a Trident Trust employee, also served as both the Director of Ambika, Pl. SOF ¶ 222, ████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████

59.      Alexander Shcheglyaev was listed as the beneficial owner of Ambika.  Def. Ex. 35, SL0018143 (Trident Trust Authorized persons form) at SL0018144; Def. Ex. 14 at 177:16-21 (Leontiev Tr.).

60.      Shcheglyaev was listed as the beneficial owner of Vermenda.  Def. Ex. 36, SL0006048 at SL0006051; Def. Ex. 15 at 35:5 – 35:11 (Zheleznyak Tr.).

61.      Shcheglyaev was listed as the beneficial owner of Valkera Investments Limited. Def. Ex. 46, SL0018192 (Trident Trust Authorized persons form) at SL0018193.

62.      Shcheglyaev was also listed as the beneficial owner for the following companies: Clervaux Investments Limited. SL0018148 (Trident Trust Authorized persons form)

at SLSL0018149. Trigor Trading Limited. SL0018188 (Trident Trust Authorized persons form) at SL0018189. Fervault Assets Limited. SL0018152 (Trident Trust Authorized persons form) at SL0018153. Inakima Holdings Limited. SL0018156 (Trident Trust Authorized persons form) at SL0018157. Ingtine Trading Limited. SL0018160 (Trident Trust Authorized persons form) at SL0018161. Izatelom Investments Limited. SL0018164 (Trident Trust Authorized persons form) at SL0018165. Kevina Holdings Limited. SL0018168 (Trident Trust Authorized persons form) at SL0018169. Lunare Trading Limited. SL0018172 (Trident Trust Authorized persons form) at SL0018173. Madgwick Holdings Limited. SL0018176 (Trident Trust Authorized persons form) at SL0018177. Owena Investments Limited. SL0018180 (Trident Trust Authorized persons form) at SL0018181. Sidran Trading Limited. SL0018184 (Trident Trust Authorized persons form) at SL0018185. Veregar Holdings Limited. SL0018196 (Trident Trust Authorized persons form) at SL0018197. Vesvora Trading Limited. SL0018204 (Trident Trust Authorized persons form) at SL0018205.  Def. Ex. 37.

63.    Zheleznyak asked Shcheglyaev to serve as the beneficial owner "of companies like Ambika, Valkera, other companies".  Def. Ex. 15 at 42:15-24 (Zheleznyak Tr.). Scheglyaev himself described being recruited by a PRBB employee "to become the beneficiary of several companies for a certain remuneration."  Def. Ex. 38 at 12:16-20 (Shcheglyaev Tr.).

64.    Shcheglyaev received a small amount of monetary consideration in exchange for having his name used as the "beneficial" owner.  Def. Ex. 14 at 167:10-25 (Leontiev Tr.); Def. Ex. 15 at 42:22-43:4, 46:6-10 (Zheleznyak Tr.). Def. Ex. 27 at 131:19-132:8 (Zubiy Tr.); Def. Ex. 38 at 13:11-20 (Shcheglyaev Tr.).

65.    ████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████

66.     Shcheglyaev knew that all instructions to the Trident Trust corporate administrators came not from a director or officer of Ambika, but from Aleksandra Vyulkova, who worked at PRBB and ultimately reported to Zheleznyak and Leontiev, or later from Irina Zubiy.  Def. Ex. 15 at 44:3-16 (Zheleznyak Tr.); Def. Ex. 38 at 15:14-16:2, 42:8-24, 91:24-92:5 (Shcheglyaev Tr.).

67.     Further, Zheleznyak could not recall a single instance in which Shcheglyaev himself gave instructions to directors of Ambika or the other companies he "beneficially" owned.  Def. Ex. 15 at 46:25-47:10 (Zheleznyak Tr.).

68.     Shcheglyaev was never given a list of the companies for which he was a "beneficial" owner.  He testified that he could not recall the names of the companies he supposedly owned.  Def. Ex. 38 at 13:21-14:3, 37:15-18 (Shcheglyaev Tr.).

69.     Shcheglyaev was not given access to an email account set up in his name that was used to correspond with Ambika's directors (shcheglyaev@gmail.com).  Def. Ex. 38 at 35:2-22 (Shcheglyaev Tr.).

70.     Until December 2015, Vyulkova's team had access to the shcheglyaev@gmail.com account to communicate with Trident Trust.  Def. Ex. 27 at 186:21-187:4 (Zubiy Tr.).

71.     Zheleznyak introduced Zubiy to Shcheglyaev and instructed Zubiy to communicate with Shcheglyaev.  Def. Ex. 15 at 39:11-22 (Zheleznyak Tr.).

72.     In April 2016, Zubiy sent e-mails purporting to be on behalf of Shcheglyaev using an email account she established with his name at gmail

(Alex.shcheglyaev@gmail.com) in order to communicate with Trident Trust.  Def. Ex. 39, SL0032783; Def. Ex. 27 at 111:5-22, 116:16-117:17 (Zubiy Tr.).

73.     Zubiy did not notify Trident Trust that Shcheglyaev was not the actual sender of the emails. Def. Ex. 27 at 114:12-115:5 (Zubiy Tr.).

74.     In May 2016, after the commencement of this action, and acting on Zheleznyak's request, Zubiy sent Svetlana Mishustina, a former PRBB employee, the Alex.shcheglyaev@gmail.com account name and password so that Mishustina could delete it. Def. Ex. 27 at 117:23-121:3 (Zubiy Tr.).

75.     Zubiy never provided Shcheglyaev the password to the Alex.shcheglyaev@gmail.com email account.  Mishustina was the only other person who was provided with access to the email account and password, for the limited purpose of deleting the account.  Def. Ex. 27 at 118:3-119:9 (Zubiy Tr.).

###     G.     FGL Was Voluntarily Liquidated, and That Liquidation Has Been Reversed Twice.

76.     On February 20, 2015, FGL's sole shareholder, OOO Alivikt, signed a resolution providing for its voluntary liquidation.  Def. Ex. 40, SL0038683.

77.     Leontiev testified that he could not recall the nature or extent of his involvement in the decision to liquidate FGL.  Def. Ex. 14 at 109:2-24, 113:16-115:19 (Leontiev Tr.).

78.     FGL's creditors were not informed of its impending liquidation.  Def. Ex. 18 at 64:10-13 (Kamo Avagumyan Tr.); Def. Ex. 41 at 59:16-19 (Karen Avagumyan Tr.).

79.     FGL's liquidation was finalized on August 5, 2015.  Def. Ex. 42, SL0038698.

80.     The accounting statements prepared in connection with the liquidation of FGL failed to reflect the millions of dollars owed to Avagumyan and instead falsely stated that FGL had no liabilities whatsoever: Despite borrowing millions of dollars on promissory notes, an FGL profit and loss statement dated June 8, 2015 shows absolutely zero financial activity undertaken by FGL between January to June 2014 and between January to June 2015.  Def. Ex. 43, SL0038687.  An interim liquidation balance sheet and a liquidation balance sheet, dated June 8 and June 30, 2015, respectively, both show that FGL on Dec. 31, 2013 had a final balance of 23,000 RUB, on Dec. 31, 2014 it had 9,000 RUB, and by the reporting date in June 2015 there was no balance.  Def. Ex. 44 SL0038685; Def. Ex. 47, SL0038689.  Despite borrowing millions of dollars on promissory notes that remain unpaid, both balance sheets list zero loans and borrowings.  *Id.*

81.     The financial statements show that, as of June 2015, FGL had no assets to repay its obligations under the promissory notes.  Def. Ex. 44 SL0038685; Def. Ex. 47, SL0038689.

82.     The interim liquidation balance sheet dated June 8, 2015 and the liquidation balance sheet dated June 30, 2015 were approved as accurate by Leontiev's and Zheleznyak's company OOO Alivikt as FGL's sole shareholder by resolutions dated June 8, 2015 and June 30, 2015, respectively.  Def. Ex. 48, SL0038691; Def. Ex. 49, SL0038692.

83.     On January 27, 2017, according to the Russian State registrar, the liquidation of FGL has again been cancelled, making it again possible for the company to be placed into bankruptcy proceedings.  Def. Ex. 20 (January 2017 ZAO FG Life Corporate Registry Record).

**H.      The Offshore Entities Engaged in Economically Indefensible Transactions with Wonderworks, for the Ultimate Benefit of Leontiev.**

84.      ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

85.      ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████

86.      ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

1.      *Ambika*

A.      <u>Structure & General Financial Position</u>

87.      As Chairman of Probusinessbank, Leontiev created the financing structure that allowed for offshore entities, and the people responsible for implementing that structure were PBB employees who ultimately reported to him.  Def. Ex. 15 at 101:13-105:4 (Zheleznyak Tr.).

88.     Leontiev ultimately controlled Ambika.  Def. Ex. 15 at 94:14-22 (Zheleznyak Tr.).

89.     As of December 31, 2012, Ambika had no employees and no operating expenses other than licensing fees, brokerage fees and compensation for auditors and other professionals.  Def. Ex. 51 (2012 Ambika Financials, n.6 at AVP0005580).

90.     Ambika had net losses of $17 million in 2011, $37 million in 2012, and $66 million in 2013.  Def. Ex. 52 (2013 Ambika Financials at AVP0005592); Def. Ex. 51 (2012 Ambika Financials at AVP0005571).

91.     As of December 31, 2013, Ambika's share capital was one share valued at two dollars.  Def. Ex. 52 (2013 Ambika Financials at AVP0005604).

92.     Ambika's 2011 Audited Financial Statements contain a "going concern" statement indicating that Ambika was "dependent upon the continuing financial support of its shareholder," "without which there would be significant doubt about its ability to continue as a going concern."  The statement continues, "The shareholder has indicated its intention to continue providing such financial assistance to the Company to enable it to continue as a going concern and to meet its obligation as they fall due."  Def. Ex. 50 (2011 Ambika Financials at AVP0005551).

93.     Ambika's 2012 Audited Financial Statements contain a "going concern" statement indicating that Ambika was "dependent upon the continuing financial support of its shareholder," "without which there would be significant doubt about its ability to continue as a going concern."  The statement continues, "The shareholder has indicated its intention to continue providing such financial assistance to the Company to enable it to continue as a going

concern and to meet its obligation as they fall due." Def. Ex. 51 (2012 Ambika Financials at AVP0005570).

94.     Ambika's 2013 Audited Financial Statements contain a "going concern" statement indicating that Ambika was "dependent upon the continuing financial support of its shareholder," "without which there would be significant doubt about its ability to continue as a going concern." The statement continues, "The shareholder has indicated its intention to continue providing such financial assistance to the Company to enable it to continue as a going concern and to meet its obligation as they fall due." Def. Ex. 52 (2013 Ambika Financials at AVP0005591).

95.     ██████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████; Def. Ex. 52 (2013 Ambika Financials with 2016 Auditor's Letter, AVP0005586-5606).

96.     Neither the reissued 2013 Ambika Audited Financial Statements nor the 2016 Auditor's Letter that accompany them acknowledge that there was a previous set of 2013 Audited Financial Statements or explain a restatement was issued. Def. Ex. 52 (2013 Ambika Financials with 2016 Auditor's Letter, AVP0005586-5606).

97.     ████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████

98.     The 2013 Ambika Audited Financial Statements with 2016 Auditor's Letter report a net loss of $66,363,733 for the year ending December 31, 2013.  Def. Ex. 52 (2013 Ambika Financials with 2016 Auditor's Letter at AVP0005592).

99.     The line "Total equity" on the Statements of Financial Position in Ambika's 2012 Audited Financial Statements shows a negative net equity of $52.9 million for the year ending December 31, 2012. Def. Ex. 51 (2012 Ambika Financials at AVP0005572).

100.     ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

101.     The line "Total equity" on the Statements of Financial Position in Ambika's 2013 Audited Financial Statements accompanying the 2016 Auditor's Letter shows a negative net equity of $52.9 million for the year ending December 31, 2012.  Def. Ex. 52 (2013 Ambika Financials with 2016 Auditor's Letter at AVP0005593).

102.     ████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

103.     Ambika's 2013 Audited Financial Statements accompanying the 2016 Auditor's Letter report accumulated losses of $119,318,448 as of December 31, 2013.  Def. Ex. 52 (2013 Ambika Financials with 2016 Auditor's Letter at AVP0005594).

104.     There is no evidence in the record that Avilon was provided information about Ambika's financial condition, even though it continued to renew its loans to Ambika

during the time when Ambika's financial statements reflected significant negative equity and "going concern" audit opinions.  Def. Ex. 21 at 24:20-25 (Monakhova Tr.).

        B.    <u>Ambika Loans</u>

105.    Ambika and other PRBB offshore entities generally offered lenders interest rates of 12% to 15%.  Def. Ex. 54 at ¶ 23 (Voronin report).  Ambika raised money from Avilon at interest rates of 11% to 15%.  Pl. Exs. 24, 36.



108.    According to Leontiev, Vermenda was an offshore company managed by PRBB employees.  Def. Ex. 14 at 235:7-13 (Leontiev Tr.).

109.    Ambika purchased subordinated debt issued by Probusinessbank that paid out approximately 6.6%.  Def. Ex. 55, SL0035142; Def. Ex. 56, SL0015624.

        2.    *Wonderworks*

        A.    <u>General Information</u>

110.    The first audited financial statements for Wonderworks cover the period of June 20, 2011 to December 31, 2011, and were authorized for issue on April 23, 2012.  Def. Ex. 57 (2011 Wonderworks Financials at AVP0005615).

111.   Wonderworks' total equity as of year end 2011 was negative $21,724. Wonderworks' total equity as of year end 2012 was negative $8,017,746.  Def. Ex. 58 (2012 Wonderworks Financials at AVP0005632).

112.   As of year end 2011, Wonderworks had an operating loss of $21,873.  As of year end 2012, Wonderworks had an operating loss of $4,224,040.  Def. Ex. 58 (2012 Wonderworks Financials at AVP0005631).

113.   Wonderworks' 2011 Audited Financial Statements contains a "going concern" statement.  Def. Ex. 57 (2011 Wonderworks Financials at AVP0005611, AVP0005613).  The report of Wonderworks' Board of Directors and Other Officers accompanying the company's 2012 Audited Financial Statements also contains a "going concern" statement.  Def. Ex. 58 (2012 Wonderworks Financials at AVP0005627).

114.   Wonderworks had no credit history before 2011.  Ex. 57 (2011 Wonderworks Financials).

115.   As of year end 2012, Wonderworks had $94,300,839 in unsecured borrowings at interest rates ranging from 3.2% to 4.5% per year.  Ex. 58 (2012 Wonderworks Financials at AVP0005643).

116.   As of year end 2013, Wonderworks had $141,678,440 in unsecured borrowings at interest rates ranging from 2.1% to 4.5% per year.  Ex. 4 (2013 Wonderworks Financials at AVP0005663).

B.   Wonderworks Loans

117.   ██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

118.   ████████████████████████████████████████████

███████████████████████████████████████████████████████

███

119.   ████████████████████████████████████████████

███████████████████████████████████████████████████████

██████

120.   ████████████████████████████████████████████

████████████████████████████████████████████████████

██████

121.   ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

122.   ██████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

123.    Wonderworks' audited financials for the year ended 2015 list, among its "Payables to related parties," Dunning Finance Inc. and Greenex Trading.  Def. Ex. 62 (2015 Wonderworks Financials at 22).

**I.      PRBB License Revocation and Criminal Investigations**

124.    Following the revocation of PRBB's license in August 2015, a Russian government investigation found evidence of billions of dollars in fictitious or overvalued assets on PRBB's books, including loans to related companies not engaged in any economic activities, and the embezzlement of funds through those companies.  Def. Ex. 3 (February 17, 2016, Announcement on the Official Website of the Investigative Committee of the Russian Federation, http://sledcom.ru/news/item/1017596/).

125.    In a statement dated February 17, 2016 announcing criminal charges against former PRBB executives, the Investigative Committee of the Russian Federation, stated, among other things, that: "investigators believe that unidentified persons among executive officers and employees of the Bank abused their office to embezzle money from the Bank and recruited their subordinates, employees of Life Financial Group as well as CEOs of a number of fictitious commercial organizations to take part in their criminal intent"; "this crime involved extending loans to fictitious enterprises under their control that were not engaged in any economic activities, where these loans were deliberately impossible to recover, were not secured by any property collateral, and were transferred to current accounts held by these fictitious enterprises"; "[l]ater the embezzled funds in rubles were converted in their entirety into US dollars and transferred to various accounts of overseas organizations and physical persons and then used by the perpetrators of the crime at their discretion"; and "[w]hile the documents formalizing the extension of these loans formally appeared legal to make the deals in question look legal as well, in fact the aforementioned documents contained inaccurate information and

all actions of the perpetrators were taken with a view to embezzling funds from the Bank." Def. Ex. 3 (February 17, 2016, Announcement on the Official Website of the Investigative Committee of the Russian Federation, http://sledcom.ru/news/item/1017596/).

126.    The February 17, 2016 statement from the Investigative Committee of the Russian Federation also noted that the "criminal investigation is still under way." Def. Ex. 3 (February 17, 2016, Announcement on the Official Website of the Investigative Committee of the Russian Federation, http://sledcom.ru/news/item/1017596/).

127.    The Russian Central Bank revoked PRBB's license on August 12, 2015, after discovering "signs of performance of illegal actions" in the bank's activities. Those signs of illegal actions included failure to comply with federal bank laws and regulations, capital ratios below two percent, and decrease of capital ratios below the minimum level of charter capital required for PRBB as a state-registered credit institution. Furthermore, according to financial statement data submitted by former PRBB managers, as of the date of the license revocation, PRBB's liabilities exceeded its assets. In light of the revocation of license and insufficient assets, the Central Bank filed an application to the Arbitration Court of Moscow requesting that PRBB be recognized as insolvent (bankrupt). Def. Ex. 1, SL0035954 at SL0035955-56 (Letter from the Russian Central Bank to Y. Chaika, the Prosecutor General of the Russian Federation).

128.    The Central Bank's investigation revealed that "Ambika Investment Limited was practically exclusive (single) counterparty of the Bank in its transactions of purchase and sale of foreign currency and the terms of transactions considerabl[y] differed from the market conditions and were performed by the Bank for technical increase of the profit." An audit of PRBB's financial position showed that PRBB held securities with Brokercreditservie and Otkritie Capital, which in turn provided loans to Ambika and another counterparty called

Merianol.  When Merianol and Ambika failed to fulfill their obligations to Brokercreditservice and Otkritie, PRBB lost assets with a balance value of "not less than 25 billion rubles."  PRBB concealed from authorities the fact that those securities were encumbered.  Def. Ex. 1, SL0035954 at SL0035955 (Letter from the Russian Central Bank to Y. Chaika, the Prosecutor General of the Russian Federation).

129.    The Central Bank's investigation revealed that a number of "technical" economically-affiliated borrowers provided funds totaling 3 billion rubles, which were then transferred out of PRBB into the operating account of "their common counterparty Vermenda Holdings Limited with further transfer to the operating account of mentioned counterparty" at Trasta Komercbanka.  Def. Ex. 1, SL0035954 at SL0035956 (Letter from the Russian Central Bank to Y. Chaika, the Prosecutor General of the Russian Federation).

130.    The Central Bank observed that the PRBB had regular interbank operations with other banks in the FGL banking group, "controlled by Leontiev S.L. and Zheleznyak A.D.," and a high dependency on the funds of individuals, which constituted 88% to 96% of its resource base, "with doubtful (suspicious) quality of assets and performance by the banks of the group high risk loan policy."  Def. Ex. 1, SL0035954 at SL0035956 (Letter from the Russian Central Bank to Y. Chaika, the Prosecutor General of the Russian Federation).

131.    In a request for prosecution to the Prosecutor General of the Russian Federation, the Central Bank concluded that the "facts of withdrawal of assets" from PRBB "proves implementation by owners of banking group of their powers in order to gain profit, benefits and advantages for themselves in spite of legal interests of creditors and depositors, which a reason to suggest presence in their actions of penal criminal acts, set out by the article 159 'Fraud', article 160 'Embezzlement', article 196 'Deliberate bankruptcy' and article 201

'Abuse of powers' of the Penal Code of the Russian Federation."  Def. Ex. 1, SL0035954 at SL0035956 (Letter from the Russian Central Bank to Y. Chaika, the Prosecutor General of the Russian Federation).

132.    The letter from the Russian Central Bank to Yury Chaika, the Prosecutor General of the Russian Federation, was produced by Plaintiff.  It is attached to a January 4, 2016 cover email, showing that it was translated for Zheleznyak by Eugeniya Sokolova.  Def. Ex. 1, SL0035954.  The metadata author for the translation of the Central Bank's Letter is "Evgeniya Sokolova"; the metadata createddate and modifieddate is "2016/01/04"; and the metadata filename is "Application of CB to enforcement bodies.docx."   It is a translation of the Russian version of the Central Bank letter, also produced by Plaintif.  Def. Ex. 1, SL0000496.  The metadata author for the Russian version of the Central Bank's Letter is "Evgeniya Sokolova."

133.    Eugeniya Sokolova is Zheleznyak's "personal translator," who accompanied Zheleznyak at his deposition to assist with translation.  Def. Ex. 15 at 2, 5, 45, 118, 154 (Zheleznyak Tr.).

134.    Plaintiffs' expert witness Vadim Voronin, offered as an expert on Russian banking regulations, testified that Russian Central Bank documents are reliable and generally accurate, and that the Russian Central Bank is a professionally-managed agency.  Def. Ex. 59 at 113:14-114:16 (Voronin Tr.).

135.    On January 14, 2016, the Russian Deposit Insurance Agency ("DIA") submitted to the Russian Federal Security Service a letter with the heading, "Report of a crime, committed by Executives of OAO AKB Probusinessbank."  Def. Ex. 2, SL0032531, at SL0032532-35.  Among the allegations of criminal activity were the creation of bank accounts and loan agreements that diverted hundreds of millions of rubles from PRBB to Vermenda,

through the creation of various intermediaries and assignment of rights of claim to debtors.  The

DIA noted that "there are grounds to believe that the debtors are technical, namely that they are

not performing any actual business and economic activities and they do not have assets sufficient

to repay the debts to the Bank, legal entities, operations on accounts of which were carried out

for the benefit of top managers and owners of the Bank without knowledge and agreement of

persons, mentioned as their directors."  Def. Ex. 2, SL0032531 at SL0032531-34.

  136. The translated letter from the DIA to the deputy head of the FSB was

produced by Plaintiff.  It is attached to a February 25, 2016 cover email, showing that it was

translated for Zheleznyak by Eugeniya Sokolova.  Def. Ex. 2, SL0032531-35.  The metadata

author for the translation is "Evgeniya Sokolova"; the metadata createddate and modifieddate is

"2016/02/25"; and the metadata filename is "DIA_FSB.docx."

  137. In an order dated February 7, 2016, S.A. Novikov, a senior investigator

with the Investigative Committee of the Russian Federation, announced commencement of a

criminal case against former PRBB executives.  Def. Ex. 63, SL0002863 at SL0002863,

SL0002876 (Order on Institution and Commencement of Criminal Proceedings).  The order

revealed that Russia Central Bank staff had discovered "numerous violations."  During the same

period that the Central Bank was reporting those violations and asking PRBB to correct them,

PRBB management and employees instead, "acting for financial gain, for their personal wealth

accumulation developed plan of actions directed to the theft of funds of the Bank in an especially

large amount by means of embezzlement and misappropriation for the benefit of third parties."

Def. Ex. 63, SL0002863 at SL0002864.  The order noted that Vermenda was among the

companies that "did not perform any commercial or any operating activities" but were used for

the purpose of embezzlement of PRBB funds.  Def. Ex. 63, SL0002863 at SL0002864.  The

order described a series of transfers of hundreds of millions of rubles, "directed to the embezzlement of funds of the Bank" and transferred into accounts held by Vermenda and other entities that served no purpose except to wrongfully divert PRBB funds to third parties.  Def. Ex. 63, SL0002863 at SL0002864-SL0002875.

138.    The translated Order on Institution and Commencement of Criminal Proceedings was produced by Plaintiff.  The metadata author for the translation is "Evgeniya Sokolova"; the metadata custodian is Vadim Kolotnikov, Wonderworks' Managing Director; the metadata createdate is "2016/02/24"; the metadata modifieddate is "2016/02/25"; and the metadata filename is "Order of initiation and commencement of criminal proceedings.docx."

**J.    Misrepresentations and Preventative Measures in Furtherance of Leontiev's Scheme**

139.    Leontiev came to the United States in late August or early September 2015 and has remained continuously in the United States since that time.  Def. Ex. 14 at 20:11-23 (Leontiev Tr.).

140.    In or around October 2015, Leontiev and his associates began collecting information and working with Leontiev's immigration lawyer for the purposes of trying to obtain an L-1 visa that would allow Leontiev to work in the United States.  Def. Ex. 27 at 91:10-92:14 (Zubiy Tr.); Def. Ex. 31 at 86:20-25 (Kolotnikov Tr.).

141.    At his deposition on January 3, 2017, Leontiev testified that he obtained an L-1 visa "[a] year ago."  Def. Ex. 14 at 32:6-11 (Leontiev Tr.).

142.    Leontiev obtained his L-1 visa, an intracompany transferee visa for executives of foreign companies that establish a branch in the United States, through his role as an executive of Grid Research, a position that Leontiev testified he began to hold at the same time that he received his L-1 visa.  Def. Ex. 14 at 32:12-33:7 (Leontiev Tr.).

143.    Prior to applying for his L-1 visa, Leontiev played the role of chief investment officer at Wonderworks.  Def. Ex. 14 at 33:8-33:23 (Leontiev Tr.).



148.    At his deposition, Leontiev denied that he was ever the CEO of Wonderworks, insisting that he was the CIO.  Def. Ex. 14 at 33:14-33:18; 194:11-195:3 (Leontiev Tr.).

149.    At his deposition, Kolotnikov repeatedly denied that Leontiev was the CEO or even CIO of Wonderworks.  Def. Ex. 31 at 57:16-58:9, 62:9-63:6, 66:15-66:21 (Kolotnikov Tr.).

150. 

151. ████████████████████████

███████████████████████████████████████

████████████████████████

**K.     Leontiev Repeatedly Acknowledged The Debts And Promised To Repay The Loaned Funds.**

152.     After PRBB's license was revoked in mid-August 2015, Leontiev, Zheleznyak, and Varshavsky met at Avilon's Moscow offices ("Moscow meeting") to discuss the repayment of the funds loaned from Avilon to Zheleznyak and Leontiev in light of PRBB's license revocation.  Def. Ex. 13 at 80:15-81:13 (Varshavsky Tr.); Def. Ex. 14 at 123:17-124:13 (Leontiev Tr.); Def. Ex. 15 at 142:7-13 (Zheleznyak Tr.); Ex. 21 at 132:19-133:10 (Monakhova Tr.).

153.     Other lenders, such as Kamo and Karen Avagumyan and Igor Renich, had asked Varshavsky to negotiate on their behalf.  Def. Ex. 13 at 16:24-17:16 (Varshavsky Tr.); Def. Ex. 18 at 85:11-15 (Kamo Avagumyan Tr.).

154.     Zheleznyak did not perceive any of Mr. Varshavsky's or Mr. Avagumyan's statements throughout the course of the repayment negotiations as threats that would be a cause for concern. Def. Ex. 15 at 114:21-115:25 (Zheleznyak Tr.).  A recording of repayment negotiations in London similarly contains no evidence of threats by Varshavsky against Leontiev.  *See generally* Def. Ex. 22 (London Tr.).

155. Leontiev attended the Moscow meeting to further repayment discussions. Def. Ex. 13 at 80:15-81:2 (Varshavsky Tr.); Def. Ex. 15 at 142:7-13 (Zheleznyak Tr.); Def. Ex. 14 at 123:17-124:13 (Leontiev Tr.); Def. Ex. 21 at 132:19-133:10 (Monakhova Tr.).

156. Prior to this meeting, Zheleznyak informed Mr. Varshavsky that Leontiev had taken control of the borrowed funds and invested them in securities held by Wonderworks, which received the funds via loans from Vermenda; in support, Zheleznyak showed Mr. Varshavsky an Excel schedule showing approximately $123 million invested in Apple, Google, and other blue-chip securities. Def. Ex. 13 138:11-139:25 (Varshavsky Tr.); Def. Ex. 64, AVP0002768.

157. At the Moscow meeting, Leontiev and Zheleznyak acknowledged that Leontiev owed the money, told Varshavsky not to worry because it was invested in securities, and said that Leontiev would fully repay the loans and devise a payment plan for doing so. Def. Ex. 22 at 17:10-13 (London Tr.); Def. Ex. 13 at 80:15-83:13, 87:9-23 (Varshavsky Tr.); Def. Ex. 14 at 142:7-13, 143:2-146:14 (Zheleznyak Tr.); Def. Ex. 21 at 132:13-133:10, 134:16-21, 136:2-9 (Monakhova Tr.).

158. At the end of that meeting, Messrs. Leontiev, Zheleznyak, and Varshavsky all agreed to meet again the following morning to finalize the terms of repayment. Def. Ex.15 at 146:15-18 (Zheleznyak Tr.).

159. Leontiev did not show up for their scheduled meeting the next morning; instead, amidst increasing scrutiny from Russian government officials relating to PRBB's failure, Leontiev Aff. at ¶ 22, Leontiev fled Russia overnight. Def. Ex. 13 at 82:6-83:13 (Varshavsky Tr.); see also Def. Ex. 15 at 147:2-22 (Zheleznyak Tr.).

160.     After Leontiev's departure from Moscow, the parties agreed to meet again in London in August 2015 (the "London meeting").  Leontiev recorded this meeting, during which he Leontiev repeatedly described Zheleznyak as his "partner."  Def. Ex. 22 at 3:18, 6:39, 12:13-14, 19:10, 31:2-5, 48:11 (London Tr.).  Leontiev stated of Zheleznyak, "He and I are partners, and his obligations are my obligations, no doubt about it." *Id.* at 12:13-14 (London Tr.).

161.     Leontiev used the word "we," referring to himself and Zheleznyak, when describing Avilon's contractual counterparty on the loans: "We had a business with you. …We paid interest."  Def. Ex. 22 at 2:26-3:1 (London Tr.).

162.     At the London meeting, Leontiev and Zheleznyak again expressly and repeatedly acknowledged the debt and gave repeated assurances that they would repay the indebtedness.  Def. Ex. 22 at 3:7-13; 9:3-6; 18:16-21; 30:7-8; 38:8-14; 38:23-39:4; 48:3-15 (London Tr.). For example, Leontiev stated that "You can be certain that we will perform our obligations to you" and "I give you my word, we will perform the obligation." Def. Ex. 22 at 13:21-22; 22:22 (London Tr.).

163.     When Mr. Varshavsky noted that he had previously spoken to Zheleznyak seeking assurances of repayment, Leontiev responded that he would have to be the one to make repayment because he had all of the money. Def. Ex. 22 at 12:3-6 (London Tr.) ("He [Zheleznyak] can't repay you … because I have the money.  I manage the business… that part of the business is managed by me.").

164.     The material terms for payment of the debt by Leontiev were agreed upon and confirmed among the parties at the London meeting, including: (1) Leontiev's express personal commitment to pay, as well as the fact that he had the funds to do so; (2) the amount to be paid ($100 million); (3) the fact of Leontiev's partnership with Zheleznyak and Zheleznyak's

responsibility for the debt; and (4) Leontiev's promise to repay the debt over the course of the next two years, without interest, according to a repayment schedule.  Def. Ex. 22 at 3:7-13; 4:9-12; 9:3-6; 12:3-6; 18:16-21; 25:3-6; 30:7-8; 31:6-8; 38:8-14; 38:23-39:4; 48:3-15 (London Tr.).

165.    At issue in the London discussion were a variety of debts that nominally multiple entities, controlled by Leontiev and Zheleznyak, owed to different lenders.  Def. Ex. 22 at 18:17-21, 30:18-31:13 (London Tr.).

166.    The repayment schedule that Leontiev proposed at the London meeting had materially different terms than the underlying loan agreements and Promissory Notes, including freezing interests and paying installments over the course of two years, beginning with 25 million in the first quarter of 2016.  Def. Ex. 22 at 4:9-12, 31:6-9 (London Tr.).

167.    At the London meeting, Leontiev offered a repayment schedule that would give him time to continue trading on what he described as his "personal assets" so that he could make enough money to repay the various obligations that he owed, not only to Avilon but to others.  Def. Ex. 22 at 3:2-13, 14:15-16, 35:8-36:7 (London Tr.).

**L.    Leontiev Partially Repaid the Debts through Valkera, Another Offshore Entity He Controlled.**

168.    ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████

169.   Valkera was used by Leontiev to pay the money Ambika owed to Avilon under the 2010 Loan Agreement because Ambika did not have the money to make the payment itself.  Def. Ex. 15 at 70:6-12 (Zheleznyak Tr.).

170.   Leontiev personally approved the payment of $17 million from Valkera to Avilon.  He covered the payment of the principal and interest due on the 2010 Loan Agreement. Def. Ex. 14 at 138:20-22 (Leontiev Tr.); Def. Ex. 15 at 70:19-23, 71:12-73:16 (Zheleznyak Tr.).

███████████████████████████████████████████████████████████

███████████████████████  The payment instruction could not have been given without Leontiev's agreement, and Leontiev was the only person who could have made the decision. Def. Ex. 15 at 70:24-73:16 (Zheleznyak Tr.).

171.   Although Shcheglyaev was the nominal owner of Valkera, Zheleznyak did not need to check with Shcheglyaev before the $17 million payment from Valkera was made because Shcheglyaev had no decision-making authority with respect to the activities of Valkera. Def. Ex. 15 at 72:17-24 (Zheleznyak Tr.).

172.   From September 2015 to December 2015, representatives of Leontiev, Zheleznyak, and Varshavsky continued to discuss a timetable for the loan repayment.  Maxim Shamis, who represented Leontiev and Zheleznyak in the repayment negotiations, was also involved in the preparation of some of the settlement agreements and payment schedules for the remaining amount, which he sent to Avilon employees.  Def. Ex. 23 at AVPE0006100 (November 30, 2015 Cover email to Pl. Ex. 60 at AVPE0006115-17 (unsigned deed of arrangement); Def. Ex. 24 at AVPE0006123-24 (December 1, 2015 Cover email to Pl. Ex. 61 at AVPE0006126-28 (unsigned surety agreement); Def. Ex. 25 at AVP0002705-17 (November 18, 2015 Cover email to Pl. Ex. at AVP0002718-19 (unsigned deed of arrangement).

173.    On January 15, 2016, Leontiev and Mr. Varshavsky, represented by counsel, met in New York specifically to continue the ongoing discussions regarding the repayment of the funds owed to the Lenders.  Def. Ex. 13 at 80:9-14, 105:14-23. (Varshavsky Tr.).

**K.     While Promising to Repay the Debt, Leontiev Was Secretly Taking Steps to Transfer His Assets Out of the Reach of Creditors.**

174.    

175.

176.

177.

178.    The trust deed governing the Legion Trust contains numerous provisions intended to defeat any attempt by creditors to obtain repayment from the assets of the trust,

including defensive provisions triggered by the receipt of any court order or instruction.  Def. Ex. 28 (Legion Trust agreement), at Ex. C § 4.1 ("Event of Duress").  These provisions provide for a trustee to simply ignore any exercise of powers under the trust deed that the trustee believes was compelled by a court order (*id.* §§ 14.0-14.2); to remove and replace any trustee who potentially could become subject to a court order by virtue of being domiciled in the same country as the settlor (*id.* § 25.11); and even to move the trust or its assets to another jurisdiction altogether in order to avoid the effect of a court order (*id.* §§ 21.2-21.3).

179. █████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████

180. █████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████████

181. █████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████

██████████████████████████████████████████████

████████

182.    Leontiev fled from Moscow and arrived in the United States in late

summer 2015.  Def. Ex. 14 at 20:11-17 (Leontiev Tr.); Def. Ex. 15 at 147:2-22 (Zheleznyak Tr.);

Def. Ex. 13 at 82:6-83:13 (Varshavsky Tr.).

Dated:        New York, New York
              February 10, 2017

                              DEBEVOISE & PLIMPTON LLP

                              _____
                              Sean Hecker
                              Colby Smith
                              William H. Taft V
                              919 Third Avenue
                              New York, New York 10022
                              Tel:  (212) 909-6000
                              Fax: (212) 909-6836
                              shecker@debevoise.com
                              csmith@debevoise.com
                              whtaft@debevoise.com

                              *Counsel to Defendant Alexander Varshavsky*