# EXHIBIT 13

Page 1

1
2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3
    - - - - - - - - - - - - - - - - - - -x
4
    SERGEY LEONTIEV,
5
                    Plaintiff,
6                               Case No. 16-cv-3595
            -against-
7
    ALEXANDER VARSHAVSKY,
8
                    Defendant.
9
    - - - - - - - - - - - - - - - - - - -x
10
                    January 5, 2017
11                  9:41 a.m.
12
13
14
15          Videotaped deposition of
16   ALEXANDER VARSHAVSKY, taken by Plaintiff,
17   pursuant to Notice, held at the offices of
18   Gibson, Dunn & Crutcher LLP, 200 Park
19   Avenue, New York, New York, before
20   Sharon Lengel, a Registered Professional
21   Reporter, Certified Realtime Reporter, and
22   Notary Public of the State of New York.
23
24          *     *     *
25

Page 2

```
 1
 2   A P P E A R A N C E S:
 3
         GIBSON, DUNN & CRUTCHER LLP
 4            Attorneys for Plaintiff
              200 Park Avenue
 5            New York, New York 10166
 6       BY:  ROBERT WEIGEL, ESQ.
              ANDREI MALIKOV, ESQ.
 7            ESTER MURDUKHAYEVA, ESQ.
 8
 9
         DEBEVOISE & PLIMPTON LLP
10            Attorneys for Defendant
              801 Pennsylvania Avenue, N.W.
11            Washington, D.C. 20004
12       BY:  SEAN HECKER, ESQ.
              ALISA MELEKHINA, ESQ.
13
14
15   ALSO PRESENT:
16            WAYNE SALINE, Videographer
17            ROMAN SANIKOV, Interpreter
18            ALEXANDER KULNEV, ESQ.
19
                    *      *      *
20
21
22
23
24
25
```

1                    VARSHAVSKY

2    statements in it to be true?

3         A.    Yes.

4         Q.    Let me direct your attention to

5    paragraph 32, which is on page 7 of the

6    document.

7              The second sentence of

8    paragraph 32 reads, "As of August 1, 2016,

9    the total debt owed to Avilon was

10   approximately 29.6 million, including

11   interest, and the total debt owed to

12   Mr. Avagumyan was approximately

13   $28 million, including interest."

14              Do you see that?

15        A.    Yes.

16              MR. HECKER:  You need to answer

17        verbally.

18        A.    Yes.

19        Q.    Is the statement that the total

20   debt owed to Avilon was approximately

21   29.6 million, including interest, a true

22   statement?

23        A.    Yes.

24        Q.    Is any part of that

25   $29.6 million owed to you personally?

```
                                          Page 9
 1                      VARSHAVSKY
 2        A.    No.
 3        Q.    Do you have any assignment from
 4   Avilon of any rights to collect that
 5   29.6 million?
 6        A.    No.
 7        Q.    Is the statement that
 8   Mr. Avagumyan was owed approximately 28
 9   million, including interest, a true
10   statement?
11             MR. HECKER:  Why don't you --
12        use the interpreter if you need to.
13        A.    Yes.  Yes.
14        Q.    And are you owed any portion of
15   that $28 million personally?
16        A.    No.
17        Q.    Do you have any assignment from
18   Mr. Avagumyan to pursue the claim for the
19   $28 million?
20        A.    No.
21        Q.    Okay.  Are you personally owed
22   any money by Mr. Leontiev?
23        A.    No.  No.
24        Q.    Are you personally owed any
25   money from Probusinessbank?
```

Page 10

```
 1                    VARSHAVSKY
 2      A.    No.
 3            (Plaintiff's Exhibit 60, A
 4      claim, was hereby marked for
 5      identification, as of this date.)
 6      Q.    Mr. Varshavsky, I've handed you
 7  what's been marked as Exhibit 60, which is
 8  the claim that was filed in this action in
 9  the Southern District of New York.
10            Do you have that in front of
11  you?
12      A.    Yes.
13      Q.    Did you had occasion to look at
14  that document?
15      A.    Yes.
16      Q.    Okay.  I'm going to direct your
17  attention to paragraph 4.  There are three
18  sentences in paragraph 4.  I want to
19  direct your attention to the first one.
20  The first one says, "Mr. Leontiev owes
21  Mr. Varshavsky nothing."
22            Do you see that?
23      A.    Yes.
24      Q.    Is that a true statement?
25      A.    Personally.
```

```
                                            Page 11
 1                   VARSHAVSKY
 2      Q.     Personally, yes.
 3      A.     No.  I see the statement.
 4      Q.     There's too many "nos" in that
 5  answer.  Let me see if we can get this
 6  straight.
 7             Is the statement that
 8  "Mr. Leontiev owes Mr. Varshavsky nothing"
 9  a true statement?
10      A.     Yes.
11      Q.     Thank you.
12             MR. HECKER:  Are we done with
13      this document?
14             MR. WEIGEL:  You can set it
15      aside.
16             (Plaintiff's Exhibit 61, An
17      amended answer, was hereby marked for
18      identification, as of this date.)
19      Q.     Do you have Exhibit 61 in front
20  of you?
21      A.     Yes.
22      Q.     Exhibit 61 is the answer that
23  was filed -- the amended answer that was
24  filed on your behalf in this current
25  action that we're sitting here today in --
```

```
                                              Page 14
  1                      VARSHAVSKY
  2       Q.     Anyone else?
  3       A.     Yes.  Some -- some people from
  4   Russia as well.
  5       Q.     Can you give me their names?
  6       A.     Yes.  Anna Babkina, Sergey
  7   Sturov.  I don't remember another name.
  8       Q.     Do you know who Diana Karapetyan
  9   is?
 10       A.     No.
 11       Q.     Was she one of the individuals
 12   who asked you to negotiate on his or her
 13   behalf?
 14             MR. HECKER:  Objection to form.
 15       Foundation.  Go ahead.
 16       A.     I don't know her.
 17       Q.     Okay.  Did any of the
 18   individuals who you -- who asked you to
 19   negotiate on their behalf ever give you an
 20   assignment of their claims against any
 21   entity?
 22       A.     No.
 23             MR. HECKER:  Objection.  You
 24       need to give me a second --
 25             THE WITNESS:  Oh, okay.
```

```
 1                    VARSHAVSKY
 2   soon as the license was revoked.
 3        Q.    Do you remember what he said to
 4   you and you said to him?
 5        A.    No, of course not.
 6        Q.    You said you also spoke to Karen
 7   Avagumyan; correct?
 8        A.    Yes.
 9        Q.    And please excuse my
10   pronunciation.
11        A.    Avagumyan.
12        Q.    I'm sure they're terrible.
13        A.    Okay.
14        Q.    Do you remember when you spoke
15   to him?
16        A.    The same time.
17        Q.    Okay.  And you said you spoke to
18   Renich.  Was that Igor Renich?
19        A.    Yes.
20        Q.    And do you remember when you
21   spoke to Mr. Renich?
22        A.    Also -- all the same time.  It
23   was August 2014, I believe.
24        Q.    Were these -- was this an
25   in-person meeting with Mr. Renich?
```

```
 1              VARSHAVSKY
 2      A.    Yes.
 3      Q.    Do you remember what he said to
 4  you?
 5      A.    Not -- not -- not exactly.
 6      Q.    Do you have any general
 7  recollection of what was said?
 8      A.    General, he said, "We have to
 9  somehow talk to Zheleznyak and Leontiev
10  and get our money back, and I will be
11  talking for my side; you talking from your
12  side, and see who's going to -- who's
13  going to do that first."
14      Q.    Did Mr. Renich promise you any
15  consideration if you were successful in --
16      A.    No.
17      Q.    -- collecting the funds?
18            MR. HECKER:  You need to wait
19      for him to finish answering -- asking
20      a question before you answer.
21            THE WITNESS:  Okay.
22      Q.    Did any of the individuals that
23  you spoke to offer you any consideration
24  if you were successful in collecting funds
25  from Mr. Leontiev or Mr. Zheleznyak?
```

```
 1                   VARSHAVSKY
 2   Avilon, he" -- meaning yourself -- "had
 3   authority to negotiate for repayment of
 4   Avilon's loans on behalf of Avilon."
 5              Do you see that?
 6      A.    Yes.
 7      Q.    Were you the president of
 8   Avilon?
 9      A.    Yes.
10      Q.    Are you currently the president
11   of Avilon?
12      A.    Yes.
13      Q.    When did you become the
14   president of Avilon?
15      A.    Since the first day.
16      Q.    Did you have any written
17   authorization from Avilon to negotiate for
18   the repayment of Avilon's loans on behalf
19   of Avilon?
20              MR. HECKER:  Objection to form.
21      Foundation.  You can answer.
22      A.    No.
23              MR. WEIGEL:  What's the
24      foundation objection?
25              MR. HECKER:  It presupposes that
```

                        VARSHAVSKY

1

2          MR. HECKER:  Objection to form.

3      I'm going to instruct you not to

4      answer that question.

5          MR. WEIGEL:  On what basis?

6          MR. HECKER:  What documents we

7      showed him during his preparation is

8      work product.  It's the same

9      instruction you gave your client.  If

10     you want to ask him if he remembers

11     seeing this document at any point in

12     time, you can ask him that question.

13         MR. WEIGEL:  Sure.

14     Q.    Have you seen this document at

15  any point in time?

16     A.    Specifically this one, no.  I

17  cannot recall.  Maybe -- maybe during the

18  preparation, I saw the document.  But I do

19  not -- I do not recall.

20     Q.    Okay.  Were you aware that New

21  York Motors Moscow and Ambika Invest --

22  made a loan to Ambika Investments Limited

23  in -- on or about December 18, 2008?

24     A.    Yes.

25     Q.    And were you aware that that

```
 1                    VARSHAVSKY
 2   loan was documented in writing?
 3        A.    Yes.
 4        Q.    Did you -- did you ever review
 5   the loan agreement?
 6        A.    No.
 7        Q.    Who would have been responsible
 8   for making sure that the loan was properly
 9   documented?
10        A.    Our CFO.
11        Q.    And who is that?
12        A.    Irina Monakhova.
13        Q.    And who negotiated the terms of
14   the loan with Ambika?
15        A.    Me.
16        Q.    You personally?
17        A.    Yes.
18        Q.    Who did you negotiate those
19   terms with?
20        A.    With Mr. Zheleznyak.
21        Q.    Who is Mr. Zheleznyak?
22        A.    He's the partner of
23   Mr. Leontiev.
24        Q.    Does he have a role at
25   Probusinessbank?  Did he have a role at
```

```
                                              Page 27

 1                    VARSHAVSKY
 2    takeover of the bank and --
 3        A.    No.  Before they stopped paying
 4    the interest and repaying the loan.
 5        Q.    When did that happen?
 6        A.    In August 2015.
 7        Q.    Before that, before August 2015,
 8    you had no idea what Ambika was?
 9        A.    Absolutely.
10        Q.    Did you do any investigation
11    into Ambika's financial condition before
12    you lent it -- before your company lent it
13    $19.9 million?
14        A.    Me personally, not.
15        Q.    Okay.  Did anybody -- well,
16    first off, what is -- what is New York
17    Motors Moscow?
18        A.    It is the company which sells
19    cars.
20        Q.    What is its relationship to
21    Avilon?
22        A.    It was re-branding.  Before, it
23    was New York Motors Moscow.  Then it's
24    Avilon.
25        Q.    All right.  So New York Motors
```

```
                                      Page 28
 1                  VARSHAVSKY
 2   Moscow and Avilon are the same company.
 3       A.    The same.  The same.
 4       Q.    Okay.  Now I understand.  Thank
 5   you.
 6             If I use Avilon for New York
 7   Motors, will you understand what I'm
 8   meaning?
 9       A.    Yeah, absolutely.
10       Q.    Okay.  Who at Avilon was
11   responsible for investigating the
12   financial condition of Ambika prior to
13   making a loan?
14             MR. HECKER:  Objection to form.
15       Foundation.  You can answer.
16       A.    Finance department and the legal
17   department.
18       Q.    And who in the finance
19   department?
20       A.    Irina Monakhova.
21       Q.    Did you ever speak to
22   Ms. Monakhova about whether investing in
23   Ambika was a good idea?
24       A.    No.
25       Q.    How did you make the decision to
```

```
 1                    VARSHAVSKY
 2   make the loan to Ambika?
 3        A.    As I said before, all the
 4   decision been made by -- by finance
 5   department, not by me.  I'm only
 6   negotiating the terms.  The rest, it go to
 7   my legal people and finance people.
 8        Q.    What terms did you negotiate?
 9        A.    I don't remember right now.
10        Q.    But generally, what were the
11   types of terms that you negotiated?
12        A.    What was in the beginning,
13   Avilon was always lending money to
14   Probusinessbank.  And the terms was -- the
15   general terms, like, on the date of the
16   negotiation, the -- the rate, the interest
17   rate.
18             So the one point, Zheleznyak
19   came to me, and he said, "I, with
20   Mr. Leontiev, we opened the company, which
21   also in our group, but it has nothing to
22   do with the bank.  It's offshore company.
23   If you want to have the higher interest
24   rate, you put your money there."  I said,
25   "Okay.  What's the difference?"  He said,
```

```
                                              Page 30
 1                    VARSHAVSKY
 2   "You will have more -- about four, five
 3   percent more than you put your money in
 4   the bank."  I said, "Okay.  Then I will
 5   instruct my finance department, and I will
 6   instruct my legal department.  You talk to
 7   them.  If they feel comfortable, do it."
 8        Q.    Did you ever discuss any terms
 9   with any employee of Avilon or any officer
10   of Avilon?
11             MR. HECKER:  Objection to form.
12        You may answer.
13        Q.    Excuse me.  I misspoke.
14             Did you ever discuss any terms
15   with any officer or employee of Ambika?
16        A.    No.
17        Q.    Okay.  Did you ever visit
18   Ambika's offices?
19        A.    No.
20        Q.    Do you know if anyone from
21   Avilon ever visited Ambika's offices?
22             MR. HECKER:  Objection to form.
23        Foundation.
24        A.    I don't know.  I don't think so.
25        Q.    Were -- is it fair to say that
```

```
                                          Page 31
 1                    VARSHAVSKY
 2    all of your dealings with Ambika were
 3    through employees of Probusinessbank?
 4              MR. HECKER:  Objection to form.
 5         You may answer.
 6         A.    As far as I understand, what we
 7    was dealing with the same people.  So in
 8    other words, we was giving them the money,
 9    as the Probusinessbank, and we have no
10    problem with that.  So then when I
11    negotiated the terms with Mr. Zheleznyak,
12    he -- I don't know what if we've been
13    dealing with the same people or with
14    different people.  But my role was only
15    negotiated terms, as I said before.  Then
16    I will -- I was passing that to my finance
17    people and my legal people.  And with whom
18    they negotiate, I have no idea.
19         Q.    Did you ever personally have
20    dealings with Yanna Krisiuk?
21         A.    Yes.
22         Q.    And she was an employee of
23    Probusinessbank?
24         A.    Yes.
25         Q.    And did you coordinate
```

Page 36

1                    VARSHAVSKY

2    my legal department.  I have no idea.

3        Q.    Did Mr. Zheleznyak tell you that

4    Ambika had any assets?

5        A.    Yes.

6        Q.    What assets did Mr. Zheleznyak

7    tell you was Ambika-owned?

8        A.    It's the company which buy and

9    sell the blue chips, like investment.  And

10   he showed me the list, what they own, what

11   kind of shares from which company.

12       Q.    Did Mr. Zheleznyak show you a

13   list of blue chip stocks that they owned

14   in 2008?

15       A.    No.

16       Q.    Okay.  And when the loan was

17   made in 2008, did Mr. Zheleznyak tell you

18   anything about what assets or liabilities

19   Ambika had?

20       A.    No.  He always was telling me,

21   "Your money is secure.  Your money is

22   guarantee.  We not keeping the money in

23   Russia.  We keeping the money outside of

24   Russia, specifically in London."  He

25   mentioned that many times, but not

```
                                         Page 39
 1                 VARSHAVSKY
 2            MR. HECKER:  That's one of the
 3       easy ones.
 4            MR. WEIGEL:  I know.  I know.
 5       I'm just having real trouble today.
 6       Q.    Do you see that?
 7       A.    Yes.
 8       Q.    Okay.  Was the $19.9 million put
 9  in a foreign currency deposit at
10  Probusinessbank for a year at 14 percent?
11       A.    If it says here, yes, probably
12  yes.
13       Q.    Okay.  And does Exhibit 7, which
14  is the loan agreement between Avilon and
15  Ambika, represent the $19.9 million
16  investment at 14 percent that's referred
17  to in Exhibit 62?
18            MR. HECKER:  Objection to form.
19       A.    Maybe.
20       Q.    Are you aware of another
21  $19.9 million investment at 14 percent
22  that was made on December 18, 2008?
23       A.    I will explain you.  I'm not
24  dealing with any financial or legal terms.
25  I mean, my role is business development
```

Page 40

```
1              VARSHAVSKY
2  and strategy.  The turnover of Avilon
3  close to $2 billion.  I don't remember 19,
4  15, 12 -- I don't remember.
5      Q.    Okay.  Well, as you sit here
6  today, do you have any reason to believe
7  that the $19.9 million that's reflected in
8  the loan agreement that is Exhibit 7 is
9  the same $19.9 million that came from
10 Sveta and was to be placed in a U.S.
11 foreign currency deposit at
12 Probusinessbank, as set forth in
13 Exhibit 62?
14          MR. HECKER:  Objection to form
15     of the question.
16     A.    Possibly.
17     Q.    As you sit here today, do you
18 have any reason to think that that's not
19 the case?
20          MR. HECKER:  Same objection.
21     You can answer.
22     A.    No.
23     Q.    Okay.
24
25
```

```
                                          Page 46
 1                    VARSHAVSKY
 2        Q.     Okay.
 3               (Plaintiff's Exhibit 64, An
 4        email, Bates SL0033715, was hereby
 5        marked for identification, as of this
 6        date.)
 7        Q.     Mr. Varshavsky, I've handed you
 8   what's been marked as Exhibit 64.
 9               Do you have that in front of
10   you?
11        A.     Yes.
12        Q.     And this is an email from
13   Ms. Nazanskaya to Ms. Monakhova.
14               Do you see that?
15        A.     Yes.
16        Q.     And she writes, "On
17   December 20th, the transit loan for
18   19.9 million will expire."
19               Do you understand that to refer
20   to the loan to Avilon?
21        A.     Yes.
22        Q.     By Avilon to Ambika?
23        A.     Yes.
24        Q.     "The rate Probusinessbank is
25   offering for the next year is 11 percent.
```

```
                                        Page 47
 1                  VARSHAVSKY
 2   The existing rate is 15 percent."
 3            Do you see that?
 4       A.    Yes.
 5       Q.    Were you aware that
 6   Probusinessbank was proposing to reduce
 7   the interest rate on the loan?
 8            MR. HECKER:  Objection to form
 9       of the question.
10       A.    It says here what I know and I
11   agreed.  Probably yes.
12       Q.    Okay.  It says here that "Yanna
13   Krisiuk" --
14       A.    Krisiuk.
15       Q.    -- "Krisiuk reported that
16   Alexander is aware of this and agreed to
17   this rate on November 30th."
18            Is that you, the Alexander she's
19   referring to there?
20       A.    Yes.
21       Q.    Okay.  And did you, in fact,
22   agree to a reduction of the rate from
23   15 percent to 11 percent?
24       A.    Probably, yes.
25       Q.    Okay.  And up top, Ms. Monakhova
```

```
 1                    VARSHAVSKY
 2     Q.     Okay.   Are you -- did you
 3  approve the placement of 7 and a half
 4  million dollars at Probusinessbank for
 5  11 percent?
 6            MR. HECKER:  Objection to form.
 7     Foundation.
 8     A.     I only approving the terms.  I'm
 9  not approving where the terms -- my role
10  is approve the terms.  If 11 percent, 12,
11  which I'm negotiating with the -- with the
12  Zheleznyak.  The rest, it goes to our
13  people.  From his side, it goes to
14  Krisiuk.  From my side, it goes to
15  Monakhova.  And they deal between them --
16  between -- they're dealing between them.
17  My role only approve the terms.  That's
18  it.
19            MR. HECKER:  Bob, when you reach
20     a logical breaking point -- we've been
21     going about an hour -- can we take a
22     short break?
23            MR. WEIGEL:  Sure.
24            MR. HECKER:  Thanks.
25            THE VIDEOGRAPHER:  This marks
```

Page 57

```
 1                    VARSHAVSKY
 2      the end of Tape No. 1 in the
 3      videotaped deposition of Alexander
 4      Varshavsky.  We're going off the
 5      record.  The time is 10:47.
 6           (Recess)
 7           THE VIDEOGRAPHER:  This marks
 8      the beginning of Tape No. 2 in the
 9      videotaped deposition of Alexander
10      Varshavsky.  We're going on the
11      record.  The time is 11:03.
12   BY MR. WEIGEL:
13      Q.    Mr. Varshavsky, before the
14   break, we were looking at -- we looked at
15   Exhibit 66.
16           Do you have that in front of
17   you?
18      A.    Yes.
19      Q.    It's dated September 1, 2011,
20   and it's an email from Ms. Nazanskaya, and
21   it says, "The rate Probusinessbank is
22   offering for the placement of the newly
23   received 6,625,000 is 11 percent, same as
24   under existing technical loans."
25           Do you see that?
```

```
                                        Page 58
 1                  VARSHAVSKY
 2      A.    Yes.
 3      Q.    Okay.  I've handed you
 4  Exhibit 12.
 5            Have you ever seen that document
 6  before?
 7      A.    Probably, yes, but I don't
 8  recall.
 9      Q.    Okay.  And that's a loan
10  agreement dated September 1, 2011, between
11  Avilon and Ambika Investments Limited for
12  6,625,000 at 11 percent.
13            Do you see that?
14      A.    Yes.
15      Q.    Okay.  Is that the same loan
16  that Ms. Nazanskaya was referencing on
17  Exhibit 66?
18      A.    Possible.
19      Q.    Okay.  Do you have any reason to
20  doubt that it's a different -- to think
21  it's a different loan?
22      A.    I don't know.
23      Q.    Okay.  As you sit here today,
24  you have no reason to believe this is not
25  the same loan, the same placement; is that
```

```
 1                    VARSHAVSKY
 2  correct?
 3             MR. HECKER:  Objection to form.
 4      You can answer.
 5      A.     Our finance department, they do
 6  the -- they loan money to the bank or to
 7  Ambika almost every month.  So I don't
 8  know if it's the same amount, it's not the
 9  same amount.  But the number is the same.
10  But if it's the same money or not, I
11  cannot tell.
12      Q.     Okay.  Did you negotiate the
13  rate of 11 percent on this 6 point --
14      A.     I always negotiating rates.
15      Q.     Okay.  And you always negotiated
16  those rates with Mr. Zheleznyak?
17      A.     Only.
18      Q.     Okay.  I've handed you
19  Exhibit 13.
20             And do you see that is a
21  guarantee by Probusinessbank of the loan
22  from Avilon to Ambika?
23      A.     Yes.
24      Q.     The same loan that we just
25  looked at that was Exhibit 12?
```

Page 60

1                    VARSHAVSKY

2        A.     The same amount.

3        Q.     Okay.  Did you negotiate this

4    guarantee with Mr. Zheleznyak?

5        A.     No.

6        Q.     Did you insist upon a bank

7    guarantee for the loans you made to

8    Ambika?

9               MR. HECKER:  Objection to the

10        form.

11       A.     Not me personally.

12       Q.     Did you insist upon a bank

13   guarantee for the loans that Avilon made

14   to Ambika?

15       A.     No.  I already explained several

16   times.  I mean, it's not my role.

17       Q.     Okay.

18       A.     I'm only negotiating the terms

19   and, specifically, what I did, I agree

20   with Mr. Zheleznyak two different terms.

21   One term is for bank.  One is for the

22   outside of bank offshore company, which

23   belongs to him and Leontiev.  So two

24   different terms.  That's what I negotiate

25   with Zheleznyak, and I pass all this

Page 61

```
                       VARSHAVSKY
 1
 2    information to Irina Monakhova, and the
 3    rest she's dealing.
 4         Q.    When did you first meet
 5    Mr. Leontiev?
 6         A.    I met him a long time ago, first
 7    time at Zheleznyak's birthday.  But we
 8    didn't even speak -- it was -- I don't
 9    know -- 15, 20 years ago maybe.  And the
10    first time when we was talking, I met him
11    in my office.  It was in August 2015.
12         Q.    Okay.  Before August 2015, you
13    never discussed Avilon's lending to Ambika
14    or its business dealings with
15    Probusinessbank with Mr. Leontiev; is that
16    correct?
17         A.    No.
18         Q.    When did you first discuss
19    Avilon's business dealings with
20    Mr. Leontiev?
21         A.    In my office when I met him.
22         Q.    And when was that?
23         A.    In August 2015.
24         Q.    All right.  I may have asked a
25    bad question.
```

Page 62

```
 1                   VARSHAVSKY
 2            Is it accurate to say that,
 3    prior to August 2015, you had never
 4    discussed Avilon's business with
 5    Mr. Leontiev?
 6        A.    Never.
 7        Q.    Okay.
 8              (Pause)
 9        Q.    Do you recognize Exhibit 15?
10        A.    Yes, probably.
11        Q.    What is it?
12        A.    It's agreement.
13        Q.    Were you involved in any way in
14    negotiating Plaintiff's Exhibit 14 -- 15?
15              MR. HECKER:  Objection to form.
16        A.    Can you repeat your question,
17    please?
18        Q.    Were you involved in any way in
19    negotiating the agreement that's reflected
20    on Plaintiff's Exhibit 15?
21        A.    Terms, probably yes, as I said
22    before.  I'm only involved in the terms.
23        Q.    Were you aware that in 2014, the
24    loans to Ambika from Avilon were
25    consolidated into one loan agreement?
```

Page 63

```
                          VARSHAVSKY
 1
 2        A.     To what?
 3        Q.     Were you aware that in 2014, the
 4   loans from Avilon to Ambika were
 5   consolidated into one -- into one loan
 6   agreement?
 7        A.     No.
 8        Q.     Do you know why that was done?
 9               MR. HECKER:  Objection to form.
10        A.     I don't even know.
11        Q.     Okay.  Exhibit 47 is a
12   promissory note in the amount of
13   $1 million issued by Vennop Trading to
14   Ms. Karapetyan.
15               Do you see that?
16        A.     Yes.
17        Q.     Were you at any point in time
18   trying to collect that loan?
19        A.     Never.
20        Q.     Do you know why your counsel
21   provided that loan to -- note to us as one
22   of the loans you were trying to collect?
23               MR. HECKER:  Objection to the
24        form of the question.  I'll instruct
25        you not to disclose any discussions
```

Page 64

```
 1                    VARSHAVSKY
 2       you've had with counsel.  But if you
 3       have an understanding, you could
 4       answer the question.
 5       A.    As far as I remember, that
 6   information being supplied to my lawyer
 7   from -- Probusinessbank lawyer.  His name
 8   is Shamis Maxim, Maxim Shamis, and
 9   probably accidentally, they supplied with
10   some wrong party which not involved in our
11   case.
12       Q.    Okay.  Do you know -- you were
13   trying to collect at one point in time
14   $100 million from Mr. Leontiev; is that
15   correct?
16             MR. HECKER:  Objection to the
17       form.  You can answer.
18       A.    Yes, but it's not accurate
19   number.  We was always talking around,
20   because we don't know what's the -- the
21   amount, what's the interest.  But we said
22   it's around 100 million.
23       Q.    Okay.  Do you know if these
24   $4 million worth of promissory notes were
25   included in that hundred million dollars?
```

```
                                                   Page 65
 1                      VARSHAVSKY
 2              MR. HECKER:  Objection to form.
 3      This?
 4      A.    Not -- I have no idea who this
 5   person is.  I have no instruction from
 6   these people to collect their money.  So
 7   that -- and they not on our list.
 8      Q.    Okay.  So if this $4 million was
 9   included in the money you were trying to
10   collect, that was just a mistake?
11              MR. HECKER:  Objection to form.
12      Foundation.
13      A.    I never tried -- was trying to
14   collect that money.
15      Q.    Okay.
16              (Plaintiff's Exhibit 67, A
17      service agreement, Bates AVPE0003173,
18      was hereby marked for identification,
19      as of this date.)
20      A.    (Witness perusing document.)
21      Q.    Mr. Varshavsky, have you had a
22   chance to look at Exhibit 67?
23      A.    Yes.
24      Q.    And do you recognize that?
25      A.    Yes.
```

```
 1                    VARSHAVSKY
 2      Q.    And what is it?
 3      A.    It's a service agreement.
 4      Q.    Between European Realty Corp and
 5   Avilon; is that correct?
 6      A.    Yes.
 7      Q.    And this states that European
 8   Realty is going to provide a foreign
 9   specialist to Avilon in exchange for
10   consideration?
11      A.    Yes.
12      Q.    And you are the specialist that
13   was being provided by European Realty; is
14   that correct?
15      A.    I don't know.  Maybe.
16            MR. HECKER:  Do you want him to
17      read the whole agreement?
18      Q.    You can take your time.  But if
19   you look at paragraph 3185 -- page 3185 at
20   the bottom, you get to Annex 1 of the
21   service agreement on provision personnel.
22            MR. HECKER:  Okay.  Why don't
23      you take some time to familiarize
24      yourself with the agreement.
25            THE WITNESS:  Okay.  31.
```

```
 1                    VARSHAVSKY
 2            MR. HECKER:  He's pointing to
 3      the page, the Bates number at the
 4      bottom right.
 5            THE WITNESS:  3185?
 6      Q.    It's in Russian and in English.
 7  It's been tran -- no, I guess it's not
 8  been translated.  It was originally in
 9  Russian.
10            MR. HECKER:  Yeah.
11      A.    (Witness perusing document.)
12            MR. HECKER:  What's the
13      question?
14      Q.    Are you through it?
15      A.    Yes.
16      Q.    Okay.  This is an agreement
17  whereby your services are being provided
18  to Avilon by European Realty; is that
19  correct?
20            MR. HECKER:  Objection.
21      A.    Yes.
22            MR. HECKER:  Objection to form.
23      You can answer.
24      Q.    And do you know why your
25  employment was structured in this fashion?
```

Page 68

```
  1                   VARSHAVSKY
  2      A.    I have no idea.
  3      Q.    And do you see Annex 1 to the
  4   service agreement on Provision of
  5   Personnel No. 45?
  6            Do you see that, page AVPE3185?
  7      A.    Yes.
  8      Q.    And that surname of specialist,
  9   that is you there, Alexander Varshavsky;
 10   correct?
 11      A.    Correct.
 12      Q.    Okay.  It says here that "The
 13   specialist work regime consists not more
 14   than four working hours per day or
 15   20 working hours per week with five
 16   working day weeks and two days off."
 17            Did you observe that contractual
 18   provision?
 19            MR. HECKER:  Objection to form.
 20      Foundation.
 21      A.    I didn't see that agreement
 22   before.
 23      Q.    You've never seen this agreement
 24   before?
 25      A.    No.
```

Page 69

1                    VARSHAVSKY
2        Q.     Do you know if there was a tax
3    reason for doing it this way, setting up
4    your employment this way?
5        A.     I don't think it's -- has
6    something to do with the tax.  It's
7    probably to have the working visa.  I
8    don't think it's --
9        Q.     It goes on to say, "The
10   specialist shall perform the following
11   positions' duties:  Development proper and
12   establish new relationship with state
13   organization key accounts as a customers
14   representative, manage company's
15   reputation amongst government and public
16   affairs audiences, create and manage
17   priority events which build and improve
18   customers, customer companies' brand and
19   reputations."
20             Do you see that?
21       A.     Yes.
22       Q.     Were those duties that you
23   performed for Avilon?
24       A.     Yes.
25       Q.     Did you perform other duties for

Page 77

```
                             VARSHAVSKY
 1
 2     payments and repayments is an accurate
 3     statement?
 4              MR. HECKER:  Objection.  Asked
 5          and answered.
 6          A.    Technically, yes.
 7          Q.    Okay.  It says, "The last loan
 8     repayment of $17 million was made by the
 9     bank three months ago."
10              Is that an accurate statement?
11          A.    I think yes.
12          Q.    It goes on to say, "The funds
13     were used by the bank to 1" -- or dash --
14     "finance the bank's construction
15     projects," dash, "interest payments on
16     other loans, loan repayments and
17     expenses," and dash, "bad debts purchase
18     and costs of arbitrage."
19              Do you see that?
20          A.    Yes.
21          Q.    Was that an accurate statement?
22          A.    Yes.  One of -- one of the all
23     the -- the purpose what they was raising
24     money for.
25          Q.    Okay.  Did Mr. Zheleznyak tell
```

```
 1                    VARSHAVSKY
 2   you that those were the purposes that the
 3   bank was going to use the money for when
 4   you negotiated the rate on the
 5   $19.9 million?
 6       A.    Mr. Zheleznyak -- Mr. Zheleznyak
 7   always was telling me what -- they have
 8   two direction:  One, it's a bank they
 9   using partially for their construction
10   business, some development, some -- some
11   other business, which not related actually
12   to the banking.
13             But some of the money they using
14   for the offshore, how they call, which is
15   controlled and managed by Sergey, because
16   what -- how Zheleznyak explained to me,
17   what -- Zheleznyak runs the banking --
18   bank, and Sergey runs everything which
19   of -- of the bank.  He's not do -- he's
20   not doing any work which is related to the
21   bank.  He's only controlling all the
22   offshore company.
23             That's why even when they rent
24   the bank -- I mean, the space in our
25   building, Sergey wasn't there; only was
```

```
 1                    VARSHAVSKY
 2  Zheleznyak.  So nobody knows Leontiev
 3  like -- except he's the -- formally the
 4  president of the bank.  But nobody knows
 5  him -- or the person who runs the business
 6  day-to-day operation.
 7       Q.     So it's your testimony that
 8  Mr. Zheleznyak told you that Mr. Leontiev
 9  had nothing to do with running
10  Probusinessbank?
11            MR. HECKER:  Objection to form.
12       Mischaracterizes his testimony.
13       A.     No.  He said -- he was telling
14  me always he's formally the president of
15  the bank.  He got the big -- bigger
16  portion of the bank.  But physically,
17  Zheleznyak run the bank.  And Mr. Leontiev
18  runs all offshore companies.
19       Q.     Okay.  Did you ever review a
20  financial statement of Ambika?
21       A.     No.
22       Q.     This email goes on, "The debt
23  was confirmed by Sergey to a number of
24  people."
25            Is that an accurate statement,
```

```
                                              Page 80
 1                    VARSHAVSKY
 2    as you understand it?
 3         A.    Yes.
 4         Q.    What debt are they referring to
 5    there -- is Mr. Stahl referring to?
 6         A.    All the conversation what I have
 7    with Mr. Leontiev, it's in London in my
 8    office.
 9         Q.    Apart from the meeting in your
10    office and in London, did you have any
11    communications with Mr. Leontiev after --
12    and the meeting in Gibson Dunn -- after
13    August 2015?
14         A.    No.
15         Q.    Let's talk about the meeting you
16    had in Moscow with Mr. Leontiev.
17               How did that meeting come about?
18         A.    I called Mr. Zheleznyak and
19    asked him to come with Mr. Leontiev,
20    because always Zheleznyak was telling me
21    what -- all the money is secured,
22    guaranteed by Mr. Leontiev.  He was even
23    giving me the statement from -- from
24    the -- I don't know which company it was,
25    but the company controlled all this -- I
```

Page 81

```
 1                   VARSHAVSKY
 2   will say -- assets.
 3           And they came with Mr. Leontiev.
 4   It was -- I don't remember -- five -- it
 5   was me, Irina Monakhova, Sergey Leontiev,
 6   Zheleznyak -- I think that's it.  Maybe
 7   somebody -- I don't remember if it's
 8   anybody else, but it's not important.  We
 9   was in the office.  And the question was
10   raised, so would they owe us the money,
11   and what's going to be the terms of the
12   repayment of -- payment of the loan back
13   to us.
14           He said, "I know what" -- "I owe
15   you the money, but" -- this was actually
16   about 4:00 or 5:00 in the evening.  He
17   said, "I just got up.  I need a little bit
18   time.  Can we schedule for tomorrow?  I
19   will come with a plan how we going to
20   repay the loan back."
21           So several times, he confirmed
22   what he owes the money.  He said, "You
23   don't have to worry about.  We was taking
24   money -- we was using your money since
25   2008 or even earlier.  We never fail.  We
```

Page 82

1                      VARSHAVSKY

2    always was fulfilling our obligation.  And

3    you don't have to have any doubts.  We

4    will pay you all the money back.  So let's

5    schedule for tomorrow."

6              I remember this was a Friday, I

7    believe.  So -- and we schedule specially

8    on Saturday to meet again in my office to

9    go with a schedule, which I actually was

10   telling them, "We understand what the

11   situation you have right now.  We not

12   desperate.  We not in a rush.  But only we

13   need the plan, how you going to repay us

14   the money back.  Just a plan."

15             He said, "Okay.  I will come

16   with a plan tomorrow.  We will sit down,

17   and we will -- we will agree."

18             So that's how we left that

19   meeting.  It was maybe 15 minutes meeting,

20   maybe 20 -- short meeting.  So we agree

21   we'll meet in my office, if I remember

22   correctly, around 2:00 or 3:00.  He said,

23   "Because I cannot get up early, so let's

24   meet 2:00 or 3:00."

25             So I -- we agreed.  So I call

```
 1              VARSHAVSKY
 2   Zheleznyak around 1:00, and I said, "What
 3   time are you coming?"  He said, "I'm
 4   trying to reach Sergey, but he's not
 5   answering."
 6              So after two hours, he calls me,
 7   and he said, "You know what?  He escaped."
 8   I said, "What do you mean he escaped?"  He
 9   said, "He jumped on the first plane to
10   London, and he went to London.  He's not
11   coming to the meeting."  I said, "And what
12   do we have to do?"  He said, "I don't
13   know.  Let me talk to him."  That's it.
14      Q.    Okay.  So, now, you said
15   Mr. Zheleznyak was telling you that the
16   loans were always secured or guaranteed by
17   Mr. Leontiev.
18              Do you remember that --
19      A.    Yes.
20      Q.    -- testimony you just gave?
21      A.    Yes.
22      Q.    Did Mr. Zheleznyak tell you that
23   they were both secured loans and
24   guaranteed by Mr. Leontiev or one or the
25   other?
```

```
 1              VARSHAVSKY
 2         MR. HECKER:  You need to wait
 3     for him to finish his question and
 4     then verbally answer; not "uh-huh."
 5     A.    Yes.  Yes.
 6     Q.    Okay.  Did you ever tell either
 7  the lawyers or the finance people at
 8  Avilon who were tending to the details of
 9  the loan that they should get a written
10  guarantee by Mr. Leontiev?
11     A.    No.
12     Q.    Okay.  Do you know why Avilon
13  got a written guarantee from
14  Probusinessbank but not a written
15  agreement from Mr. Leontiev?
16     A.    No.
17     Q.    Okay.  Did you reach any
18  agreement with Mr. Leontiev as to
19  repayment of any sums at the meeting in
20  your office in Moscow?
21     A.    No.  He just said, "I need some
22  time.  I will come with a plan, and we
23  will sit down, and we will -- we will sign
24  the -- the agreement."
25     Q.    Okay.  And I think you said that
```

```
 1                    VARSHAVSKY
 2   you contend that he told you that he would
 3   make a repayment back to us.
 4              Who were you representing in the
 5   August meeting at your office?
 6       A.    Avilon, Avagumyan, and Renich.
 7       Q.    Anyone else?
 8       A.    No.
 9       Q.    Okay.  And what was the -- you
10   said Mr. Leontiev said, "I owe you the
11   money."
12              Was the amount of the money
13   discussed at the meeting in Moscow?
14       A.    Yeah, I assume, yes, absolutely.
15       Q.    And what amount of money was
16   discussed at the meeting in Moscow?
17       A.    I don't remember right now.
18       Q.    Did Mr. Leontiev at the meeting
19   say -- say that he owed a particular sum
20   of money?
21       A.    I don't remember right now
22   exactly.  But what I can confirm, he never
23   say he -- he never say no.
24       Q.    Okay.
25       A.    He always confirm what's been
```

```
                                      Page 88

 1                VARSHAVSKY
 2   asked -- we've been asking.
 3        Q.    Okay.  We've seen a couple of
 4   bank guarantees that Avilon had for the
 5   loans to Ambika.
 6             Do you remember that?
 7        A.    Yes.
 8        Q.    Okay.  When the bank was taken
 9   over, did Avilon make any attempts to
10   enforce those bank guarantees?
11        A.    I don't know.
12        Q.    Has Avilon received any money on
13   those bank guarantees?
14        A.    I have no idea.
15        Q.    Who would know if Avilon has
16   received any money on the bank guarantees?
17        A.    Irina Monakhova.
18        Q.    Okay.  Did you ever tell her
19   that she should try and enforce the bank
20   guarantees?
21        A.    You mean after the license was
22   revoked?
23        Q.    Yes.
24        A.    You have to understand.  I mean,
25   Zheleznyak is my friend since 20 years
```

```
                                        Page 89
 1                    VARSHAVSKY
 2   already.  If we would do that, then,
 3   automatically, we would create criminal
 4   investigation against them, because it's a
 5   fraud, because they guarantee for the
 6   offshore company, which they not allowed,
 7   according to Russian law.
 8             And I don't want to -- I don't
 9   want to create any problem from -- for
10   Zheleznyak.  That's why I said if you feel
11   it's going to be some criminal
12   investigation or we have to do -- I mean,
13   if we going to do something, it's creates
14   some -- something uncomfortable for
15   Zheleznyak, don't do it.
16      Q.    So I appreciate that.  Let me
17   ask the question again, though.
18             Did you ever tell anyone at
19   Avilon that they should take steps to try
20   and enforce the guarantees given to Avilon
21   by Probusinessbank?
22      A.    I said to everybody they have to
23   do all the legal action which can help us
24   to get the money back.
25      Q.    Did you ever tell anyone at
```

```
 1                   VARSHAVSKY
 2      Q.     Okay.   How long did the London
 3  meeting go for?
 4      A.     Maybe one hour.
 5      Q.     Okay.   Was any agreement reached
 6  at the London meeting?
 7      A.     Always we reaching the same
 8  agreement -- that he owes the money and he
 9  will pay the money back.
10      Q.     Did you reach any agreement on
11  the terms by which Mr. Leontiev would --
12  would repay the money?
13      A.     He -- we did not reach the
14  agreement at that point, because what he
15  was proposing what he's going to pay in
16  certain installment and what we've been
17  asking, just as you just mentioned, some
18  guarantee, collateral.
19      Q.     And Mr. Leontiev wasn't prepared
20  to give you any guarantee --
21      A.     No.
22      Q.     -- or any collateral; is that
23  correct?
24      A.     No.
25      Q.     I think I may have gotten too
```

Page 105

```
 1                 VARSHAVSKY
 2   many negatives in that.
 3              Was Mr. Leontiev prepared to
 4   give you any collateral at the London
 5   meeting?
 6              MR. HECKER:  Objection to form.
 7        A.    We did not talk about the
 8   collateral.
 9        Q.    Okay.  Did Mr. Leontiev decline
10   to give you any guarantees at the London
11   meeting?
12        A.    He declined to give us the
13   personal guarantee.
14        Q.    Okay.  After the London meeting,
15   did you have any further communications
16   with Mr. Leontiev prior to the meeting at
17   Gibson Dunn?
18        A.    No.
19        Q.    So between the London meeting
20   and the meeting at Gibson Dunn, you never
21   spoke to Mr. Leontiev on the telephone or
22   in person; correct?
23        A.    No.  As far as I remember, he
24   was trying to call me, but I don't want to
25   talk to him.  I don't know if -- maybe,
```

1                    VARSHAVSKY

2        A.     Yes.

3        Q.     What is his job title?

4        A.     I don't remember.

5        Q.     What are his duties?

6        A.     Avilon, it's a holding company

7    which includes Avilon, the car sales, and

8    transportation company, logistics company.

9    Avilon -- Karen Avagumyan, he's in charge

10   of the logistics company, which is also

11   part of the Avilon group, not Avilon

12   itself.  So we have -- so for you to

13   understand, we have Avilon, like, a

14   holding company.

15       Q.     Yes.

16       A.     Then we have Avilon sales

17   company.  Then we have Auto Logistics.

18   It's a logistics company.  It's a

19   different company.  But anyway, it's part

20   of the Avilon group.  So sometimes maybe

21   you can mix up.

22       Q.     So Big Karen is in charge of the

23   Auto Logistics company?

24       A.     Absolutely.

25       Q.     And is the Auto Logistics

```
 1                    VARSHAVSKY
 2   management first.
 3        Q.     I asked a separate question.
 4             Who of the Avilon upper
 5   management has an initial "A" besides
 6   yourself?
 7             MR. HECKER:  Objection to form.
 8        Asked and answered.
 9        A.     Avagumyan.  Two Avagumyan.
10        Q.     Okay.  And who of Avilon's
11   senior management had authority to direct
12   Yanna Krisiuk to make payments?
13             MR. HECKER:  Objection to form.
14        Foundation.
15        A.     Shall I answer?
16             MR. HECKER:  If you can answer
17        that question as framed.
18        A.     If this is referred to
19   Avagumyan, probably him.
20        Q.     Okay.  Do you know if the funds
21   that were advanced by Probusinessbank to
22   Sanbay were ever repaid?
23             MR. HECKER:  Objection to form.
24        Foundation.  Mischaracterizes the
25        document and his testimony.
```

Page 128

1                    VARSHAVSKY

2       A.     No idea.

3       Q.     Okay.  Would this be a good time

4    for lunch?

5             MR. HECKER:  Sure.

6             THE VIDEOGRAPHER:  This marks

7       the end of Tape No. 2 in the

8       videotaped deposition of Alexander

9       Varshavsky.  We're going off the

10      record.  The time is 12:44.

11             (Luncheon recess:  12:44 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   VARSHAVSKY
 2   the other is for 400 -- 4 million even,
 3   one on the 23rd and one on the 24th.
 4              Do you see that?
 5       A.    Yes.
 6       Q.    And both of them also indicate
 7   that they are for payment under the loan
 8   agreement 15/07/15.
 9              Do you see that?
10       A.    Yes.
11       Q.    Okay.  Were you aware that
12   $14.4 million was advanced to Big Karen's
13   company, Sanbay, in mid-July 2015?
14              MR. HECKER:  Objection to form.
15       Foundation.
16       A.    I don't recall.
17       Q.    Do you recall that he was
18   paying -- making progress payments to
19   Benetti for the construction of his yacht
20   at that time?
21       A.    Yes.
22       Q.    Okay.  Do you know if Sanbay has
23   ever repaid that loan?
24              MR. HECKER:  Objection to form.
25       Foundation.
```

Page 135

1                    VARSHAVSKY

2       A.    I have no idea.

3       Q.    Okay.

4             (Plaintiff's Exhibit 75, An

5       email, Bates AVPE0001453, was hereby

6       marked for identification, as of this

7       date.)

8             (Plaintiff's Exhibit 76, An

9       email, Bates AVPE0001439, was hereby

10      marked for identification, as of this

11      date.)

12      A.    (Witness perusing document.)

13      Q.    Have you had a chance to look at

14   Exhibit 76?

15      A.    75.  76 I'm looking at right

16   now.

17      Q.    Yeah.  Please take a look at 76.

18   I'm going to come back to 75.

19      A.    (Witness perusing document.)

20            Yes.

21      Q.    All right.  On October 26, 2015,

22   at 11:04 p.m., Ms. --

23      A.    76 or 75?

24      Q.    I'm looking at 76 now.  I'm

25   sorry.  Ms. Monakhova sends an email to

```
 1              VARSHAVSKY
 2   writing as of December 2015 with
 3   Mr. Zheleznyak; is that correct?
 4        A.    Agreement in writing with
 5   Zheleznyak regarding what?
 6        Q.    The loans to Ambika.
 7        A.    We only -- on all the promissory
 8   notes, all the agreement, we have his
 9   signature.  He sign all that.  I think
10   it's enough.  He signed all the agreement,
11   and all the promissory notes was signed by
12   Zheleznyak himself personally and stamped.
13        Q.    Did he sign any promissory notes
14   individually or as an officer of
15   Probusinessbank?
16        A.    I think he -- he didn't sign,
17   like -- as far as I remember, I can be
18   wrong -- but some of them he signed as the
19   Probusinessbank.  Some of them he signed
20   as his personal, because on a promissory
21   note, which -- it's from the Ambika or
22   from another company, he cannot sign like
23   officer of Probusinessbank.
24        Q.    Is it your understanding that
25   Mr. Zheleznyak personally guaranteed any
```

Page 156

1                    VARSHAVSKY
2  of the money that was at issue in this
3  lawsuit?
4       A.    Not only him.  They both
5  guarantee.  That's what Zheleznyak told
6  me.  It's money -- he was telling me all
7  the time -- not only to me, to
8  everybody -- what "We are the partners.
9  Your money are secured.  And me and
10 Sergey, we guarantee that."  That's what
11 he said all the time.
12      Q.    Was there a personal guarantee
13 from Mr. Zheleznyak on any of the money
14 advanced by Avilon to Ambika?
15      A.    I don't know.
16      Q.    You know what a personal
17 guarantee looks like; correct?
18      A.    It's probably what I was asking
19 Leontiev, the same.
20      Q.    Did you ever get a personal
21 guarantee from Mr. Zheleznyak for any of
22 the money advanced from Avilon to Ambika?
23      A.    I never asked him.
24      Q.    Okay.
25      A.    He was my friend for 20 years.

```
                                         Page 157
 1                    VARSHAVSKY
 2            MR. WEIGEL:  Should we do the
 3      translation and --
 4            MR. HECKER:  What's that?
 5            MR. WEIGEL:  The transcript of
 6      the London meeting and the
 7      translation.  Do you want two exhibits
 8      or --
 9            MR. HECKER:  Two different
10      transcripts, you mean?
11            MR. WEIGEL:  Yeah.  I guess it's
12      a slightly different transcript.  We
13      haven't marked it yet either.
14            MR. HECKER:  We did mark it.
15      You haven't marked it --
16            MR. WEIGEL:  Yeah.
17            MR. HECKER:  -- as the
18      plaintiff's exhibit.
19            MR. WEIGEL:  Yeah.
20            MR. HECKER:  However you want to
21      handle it.
22            MR. WEIGEL:  Okay.  Why don't
23      you just mark it 78 and 79.  It will
24      be easier.
25                We're having a technical
```

```
 1              VARSHAVSKY
 2  yeah.  It's a typical Russian impression.
 3  I mean, you are partners or not the
 4  partners, I don't care.
 5       Q.    You say, "I don't care" or "I
 6  don't know"?
 7       A.    I don't know.  I don't care.  It
 8  doesn't matter.
 9       Q.    What does -- what does the
10  transcript say?
11            MR. HECKER:  Do you want to ask
12       him what he meant, or do you want to
13       just have him read what the transcript
14       says?  I mean, the transcript speaks
15       for itself; right?
16       A.    I don't know.  It says, "I don't
17  know."
18       Q.    Okay.
19       A.    That's what said here.
20       Q.    Okay.  At the time of the London
21  meeting, did you know whether or not
22  Mr. Leontiev and Mr. Zheleznyak were
23  partners?
24            MR. HECKER:  Objection to form.
25       Asked and answered.
```

Page 169

1                    VARSHAVSKY

2      A.    First of all, I knew what they

3   are the partners, but you don't have to be

4   genius for that.  You just open the

5   internet.  You will see that what he is

6   the president of the bank.  He's the vice

7   president or the CEO.

8              I mean -- and Zheleznyak never

9   hide from me what they are the partners.

10  What they know each other for 40 years.

11  They went to school together.  They are

12  partners.  And I never asked who got how

13  much -- what the percentage are.  I never

14  asked that.  But he always telling me,

15  "Leontiev got more than I have, and I have

16  to work all day long in the bank, but he's

17  getting more money."  That's what

18  Zheleznyak was telling me all the time.

19     Q.    When you're using the word

20  "partners," are you using it in the sense

21  of a legally binding partnership agreement

22  between the two of them?

23              MR. HECKER:  Objection to form.

24      He's not a lawyer.  Calls for a legal

25      conclusion.

Page 170

1                       VARSHAVSKY

2       A.      I'm using in words the way I

3   understand.   The partners, they -- so they

4   make money together.   They share money

5   together.   They split the money.   They are

6   partners.

7       Q.      Okay.

8       A.      Leontiev, he admitted what he

9   owes the money, and he's controlling that

10  business.   18:53.

11      Q.      I don't want to be rude.   Your

12  counsel will have an opportunity to ask

13  you questions after the deposition, after

14  I'm done.   And he can ask you whatever

15  questions you'd like on the record.

16      A.      I'm sorry.

17      Q.      That's all right.

18              (Plaintiff's Exhibit 79, Legion

19      Trust Agreement, was hereby marked for

20      identification, as of this date.)

21      Q.      Mr. Varshavsky, have you ever

22  seen Exhibit 79 before?

23      A.      Yes.

24      Q.      What is it?

25      A.      Trust agreement.

Page 183

```
 1                      VARSHAVSKY
 2              (Plaintiff's Exhibit 82, An
 3        email dated November 10, 2016, was
 4        hereby marked for identification, as
 5        of this date.)
 6              THE VIDEOGRAPHER:  This marks
 7        the beginning of Tape No. 4 in the
 8        videotaped deposition of Alexander
 9        Varshavsky.  We're going on the
10        record.  The time is 3:14.
11   BY MR. WEIGEL:
12        Q.     Mr. Varshavsky, at the time that
13   Probusinessbank's license was revoked, did
14   Avilon or any of its related companies owe
15   any money to Probusinessbank?
16        A.     Yes.  Avilon.
17        Q.     How much?
18        A.     300 million Rubles.
19        Q.     Under what credit facility?
20        A.     I don't know.
21        Q.     Was that money ever repaid?
22        A.     Yes.
23        Q.     When?
24        A.     As soon as all the assets and
25   obligation being transferred to Bin Bank,
```

1                    VARSHAVSKY
2  owe to the bank or anybody.  I think it's
3  more technical transaction than the loan
4  what I was taking.  I didn't take any
5  loans.
6       Q.    What do you mean a technical
7  transaction?
8       A.    We, as Avilon, as a group, have
9  the point of credit limit from the
10 Probusinessbank up to $100 million.  So
11 maybe Avilon was taking some money, some
12 money, they decide, so they're going to
13 put under my name personal.  I don't know.
14 I cannot comment on that.
15      Q.    Do you not remember borrowing
16 $22 million from Avilon -- I mean -- from
17 Probusinessbank?
18      A.    I never borrow.  That's what I'm
19 saying.  It's probably the way they
20 structure.  But I think Irina, she will
21 better -- she can explain better.
22      Q.    Well, is that your signature on
23 the last page?
24      A.    I cannot see it.  How can I see
25 it?  It's hardly to see.  If you have a

Page 238

1

2                       CERTIFICATION

3

4      I, SHARON LENGEL, a Notary Public for

5   and within the State of New York, do

6   hereby certify:

7      That the witness whose testimony as

8   herein set forth, was duly sworn by me;

9   and that the within transcript is a true

10   record of the testimony given by said

11   witness.

12      I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage, and that I am

15   in no way interested in the outcome of

16   this matter.

17      IN WITNESS WHEREOF, I have hereunto

18   set my hand this 16th day of January,

19   2017.

20

21   _____

22   SHARON LENGEL, RPR, CRR

23                  *      *      *

24

25