# EXHIBIT 15

# REDACTED CONTENT
# FILED UNDER SEAL

Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------------------
4    SERGEY LEONTIEV,
5                              Plaintiff,
6              -against-
7    ALEXANDER VARSHAVSKY,
8                              Defendant.
9    Case No. 1:16-cv-03595-JSR

     ------------------------------------------
10
11                         December 16, 2016
                           9:50 a.m.
12
13

                    *** CONFIDENTIAL ***
14
15             DEPOSITION of ALEXANDER
16   ZHELEZNYAK, taken by Defendant, pursuant
17   to Notice, held at the offices of
18   DEBEVOISE & PLIMPTON LLP, 919 Third
19   Avenue, New York, New York before Wayne
20   Hock, a Notary Public of the State of New
21   York.
22
23
24
25

Page 2

```
 1
 2    A P P E A R A N C E S:
 3
         GIBSON, DUNN & CRUTCHER LLP
 4       Attorneys for Plaintiff
                 200 Park Avenue
 5               New York, New York 10166
 6       BY:     ROBERT L. WEIGEL, ESQ.
                 rweigel@gibsondunn.com
 7               ANDREI F. MALIKOV, ESQ.
                 amalikov@gibsondunn.com
 8
 9       DEBEVOISE & PLIMPTON LLP
         Attorneys for Defendant
10               919 Third Avenue
                 New York, New York 10022
11
         BY:     SEAN HECKER, ESQ.
12               shecker@debevoise.com
                 PETER S. ROSS, ESQ.
13               pross@debevoise.com
                 WILLIAM H. TAFT V, ESQ.
14               whtaft@debevoise.com
15
16       ALSO PRESENT:
17
                 RONALD MARRAZZO, Videographer
18               ROMAN SANNIKOV, Interpreter
                 EVGENIYA SOKOLOVA
19               VLADIMIR KHRENOV
                 ALEKSEI ROMANOVSKI
20
                     *       *       *
21
22
23
24
25
```

Page 5

```
 1
 2          EVGENIYA SOKOLOVA: Evgeniya
 3     Sokolova on behalf of Alexander
 4     Zheleznyak.
 5          MR. WEIGEL: Evgeniya is not an
 6     attorney, she is Alexander's personal
 7     translator.
 8          MR. MALIKOV: Andrei Malikov,
 9     Gibson Dunn, on behalf of Plaintiff
10     Sergey Leontiev.
11          MR. WEIGEL: Robert Weigel,
12     Gibson Dunn, on behalf of the witness
13     and Sergey Leontiev.
14          THE VIDEOGRAPHER: Very good.
15          Our court reporter is Wayne Hock
16     representing Veritext Legal Solutions.
17          We can now swear in the witness
18     and proceed.
19   R O M A N   S A N N I K O V,
20     the interpreter, having been first
21     duly sworn by a Notary Public,
22     interpreted the testimony as follows:
23   A L E X A N D E R   Z H E L E Z N Y A K,
24       having been first duly sworn by a
25       Notary Public of the State of
```

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2      Q.    Before this lawsuit was filed,
 3  you were familiar with Ambika; weren't
 4  you?
 5      A.    Yes.
 6      Q.    And the same is true for Vennop?
 7      A.    No.
 8      Q.    You didn't know Vennop before
 9  this litigation was filed?
10      A.    I did not.
11      Q.    What about FG Life?
12      A.    I did, I knew it.
13      Q.    What about Valkera?
14      A.    I did.
15      Q.    Who is Alexander Shcheglyaev?
16      A.    He's the beneficiary of a series
17  of companies.
18      Q.    When did you first meet Mr.
19  Shcheglyaev?
20      A.    I don't recall for certain.
21      Q.    Approximately when?
22      A.    Maybe five years ago, but I
23  could be mistaken.
24      Q.    How did you meet him?
25      A.    He became the client of a bank.
```

```
                                    Page 34
 1          A.  Zheleznyak -- CONFIDENTIAL
 2      Q.     What bank?
 3      A.     Probusinessbank.
 4      Q.     How did he become a client of
 5  Probusinessbank?
 6      A.     He was brought in by the
 7  business managers.
 8      Q.     Who in particular brought him
 9  in?
10      A.     I can't remember for sure who it
11  was exactly.  We had thousands of business
12  managers.
13      Q.     Who introduced you to Mr.
14  Shcheglyaev?
15      A.     I don't remember who it was
16  exactly, but it was a meeting, some sort
17  of a meeting with clients and that's where
18  we met.
19      Q.     And Mr. Shcheglyaev is listed as
20  the beneficial owner of Ambika, at least
21  as of September, 2015; is that right?
22      A.     Probably.
23      Q.     And he's also listed as the
24  beneficial owner of Valkera; is that true?
25                 MR. WEIGEL: At what point in
```

```
                                            Page 35
 1          A.  Zheleznyak -- CONFIDENTIAL
 2     time?
 3              THE WITNESS:  What was the
 4     question?
 5     Q.     Do you know that Mr. Shcheglyaev
 6  was at one point a beneficial owner of
 7  Valkera?
 8     A.     I can't remember for sure
 9  whether he was Valkera or not.
10     Q.     What about Vermenda?
11     A.     Oh, yes, Vermenda, yes.
12     Q.     Do you know who set up the
13  e-mail address shcheglyaev@gmail.com?
14     A.     No.
15     Q.     Do you know who had access to
16  that e-mail account?
17     A.     Probably Shcheglyaev.
18     Q.     Do you know how it is that your
19  wife's sister -- your wife's niece, Ms.
20  Zubiy, had access to the documents that
21  were sent and received by
22  shcheglyaev@gmail.com?
23              MR. WEIGEL: I object to the
24     form.  Foundation.
25     Q.     You may answer.
```

```
                                      Page 39
 1          A.  Zheleznyak -- CONFIDENTIAL
 2    some additional time to review, that you
 3    think legalconsu@gmail.com actually
 4    belongs to Maxim Shamis, a different
 5    lawyer?
 6          A.    That's correct.
 7          Q.    And who is he?
 8          A.    He was an attorney at
 9    Probusinessbank.
10          Q.    Okay.
11                Separate and apart from
12    discussions that you had with Irina Zubiy
13    at the direction of your lawyers in order
14    to try to obtain Shcheglyaev's Gmail, so
15    putting that to the side, in the past have
16    you given instructions to Ms. Zubiy to
17    communicate with Mr. Shcheglyaev?
18          A.    Yes, I asked her to communicate
19    with Mr. Shcheglyaev.
20          Q.    And did you introduce Ms. Zubiy
21    to Mr. Shcheglyaev?
22          A.    Yes.
23          Q.    When did you do that?
24          A.    I don't remember exactly.
25          Q.    Where does Ms. Zubiy live?
```

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2   right?
 3       A.    I said that.
 4       Q.    Did she work for Probusinessbank
 5   from London?
 6       A.    She did something remotely for
 7   the risk department.  I think she was but
 8   I can't say for certain.
 9       Q.    How long did she live in London?
10       A.    While she was studying.
11       Q.    How long did she study?
12       A.    I don't know, two or three
13   years.  I don't know.
14       Q.    Okay.
15             We were speaking earlier about
16   Mr. Shcheglyaev.
17       A.    Yes.
18       Q.    Was it your decision to have him
19   serve as the beneficial owner of companies
20   like Ambika, Valkera, other companies?
21       A.    I asked him to.
22       Q.    And was he paid for doing that?
23       A.    He did receive something, yes,
24   yes.
25       Q.    What did he receive for serving
```

```
 1          A.  Zheleznyak -- CONFIDENTIAL
 2  as beneficial owner of those companies?
 3      A.    I don't know exactly but I don't
 4  think it was a lot.
 5      Q.    Okay.
 6            It didn't take much to get him
 7  to put his name down as the beneficial
 8  owner of those companies?
 9            MR. WEIGEL: Objection.
10     Argumentative.
11            Please translate.
12            THE WITNESS:  Yes.
13      Q.    Is it fair to say that Mr.
14  Shcheglyaev made no important decisions
15  when it came to the affairs of Ambika?
16      A.    Correct.
17      Q.    He took instructions from
18  others; correct?
19      A.    Correct.
20      Q.    You gave him those instructions?
21      A.    No.
22      Q.    Ultimately the instructions came
23  from Sergey Leontiev; correct?
24            MR. WEIGEL: I object.
25     Foundation.  Argumentative.
```

Page 44

```
 1          A.  Zheleznyak -- CONFIDENTIAL
 2      Q.     You can answer.
 3      A.     He was instructed by Aleksandra
 4  Vyulkova, received instructions from
 5  Aleksandra Vyulkova, a female.
 6      Q.     So Mr. Shcheglyaev took
 7  instructions from Aleksandra Vyulkova; is
 8  that right?
 9      A.     Correct.
10      Q.     And Ms. Vyulkova worked for
11  Probusinessbank; is that true?
12      A.     Correct.
13      Q.     She ultimately reported to
14  Sergey Leontiev and then to you; is that
15  right?
16      A.     Correct.
17      Q.     So ultimately she acted at the
18  direction of Sergey Leontiev and you when
19  it came to her activities; is that
20  correct?
21          MR. WEIGEL: Objection.
22          MR. MALIKOV: There's a couple of
23      translation -- can I speak in Russian
24      to say the translation issue?
25          THE INTERPRETER: I have to
```

```
                                                        Page 45
 1          A.  Zheleznyak -- CONFIDENTIAL

 2     translate the Russian into English.

 3              EVGENIYA SOKOLOVA: The problem

 4     is that you're translating into

 5     Russian the word "direction" as wishes

 6     but it's not exactly like this, it is

 7     really like a direction.  And the

 8     point is that there was also a word

 9     "with reporting to," there was a

10     mistranslation into Russian.

11              THE INTERPRETER: I take into

12     account the objections.  I will

13     correct the translation of the

14     objections.  I can't comment on the

15     other --

16              MR. HECKER: You're ultimately

17     the one who decides what the

18     translation is.

19              Let me repose the question and

20     you can translate it, there could be

21     an objection if there's an objection,

22     you can translate that, and then we'll

23     get an answer and then we'll find out

24     what that is.

25          Q.    Aleksandra Vyulkova, she acted
```

```
                                          Page 46

 1          A.  Zheleznyak -- CONFIDENTIAL
 2   at the instruction of Sergey Leontiev and
 3   you when it came to her activities; is
 4   that correct?
 5          A.    No.
 6          Q.    Mr. Shcheglyaev received a small
 7   amount for agreeing to have his name
 8   listed as the beneficial owner of Ambika;
 9   is that true?
10          A.    Correct.
11          Q.    In connection with the
12   activities of Ambika and some of the other
13   companies that we'll talk about today,
14   there are e-mails sent and received by a
15   Gmail account shcheglyaev@gmail.com.
16              Have you ever seen those
17   e-mails?
18              MR. WEIGEL: I'm just going to
19       object to the form.
20              You can answer.
21              THE WITNESS:  I possibly saw
22       them, but I don't recall them right
23       now.
24          Q.    Okay.
25              Are you aware of any instance in
```

```
                                        Page 47
 1        A.  Zheleznyak -- CONFIDENTIAL
 2   which Mr. Shcheglyaev himself gave
 3   instructions to directors of Ambika or any
 4   of the other companies that we'll be
 5   talking about today?
 6        A.    I can't recall right now.
 7        Q.    Okay.
 8              You can't think of a single
 9   instance?
10        A.    I can't recall.
11        Q.    Does Aleksandra Vyulkova speak
12   English?
13        A.    Yes, yes.
14        Q.    Is her English better than your
15   English?
16              MR. WEIGEL: I object to the
17        form.
18        Q.    You can answer.
19        A.    Yes, yes.
20        Q.    Can you read and write in
21   English?
22        A.    Not very well.
23        Q.    Okay.
24              Does she, to your knowledge, she
25   being Aleksandra Vyulkova?
```

```
                                         Page 53
 1            A. Zheleznyak -- CONFIDENTIAL
 2       A.    I'm sorry, the other way around,
 3  the reverse.
 4       Q.    Explain.
 5       A.    Could you repeat the question?
 6       Q.    Sure.
 7            You're aware, are you not, that
 8  in September, 2015 there were discussions
 9  about having Valkera repay certain moneys
10  owed to Avilon pursuant to loan agreements
11  with Ambika?
12       A.    Yes, I know that.
13       Q.    And the decision about whether
14  to have Valkera repay moneys to Avilon
15  that were owed pursuant to loan agreements
16  with Ambika was a decision made by Sergey
17  Leontiev; true?
18       A.    He gave his agreement to this.
19       Q.    And Alexander Shcheglyaev had
20  absolutely no decision-making authority
21  with respect to that payment; correct?
22       A.    He did not.
23       Q.    And there's a reference in this
24  e-mail to Fedor.
25            MR. WEIGEL: Can you show it to
```

Page 57

```
 1           A.  Zheleznyak -- CONFIDENTIAL
 2              And ultimately you and Sergey
 3  Leontiev together owned a controlling
 4  interest in Probusinessbank; correct?
 5      A.    Just as Mr. Leontiev with any
 6  other of the owners.
 7      Q.    Well, my question is whether you
 8  and Sergey Leontiev together owned a
 9  controlling interest in Probusinessbank.
10      A.    Yes.
11      Q.    And he held a much larger share
12  than you did; correct?
13      A.    Yes.
14      Q.    About four times as big?
15      A.    Yes.
16      Q.    And the controlling shareholder
17  of Probusinessbank was a company called
18  Alivikt; is that right?
19              THE INTERPRETER: Can you repeat
20      the question, please?
21      Q.    The controlling shareholder of
22  Probusinessbank was technically a company
23  called Alivikt?
24      A.    What do you mean by technically?
25  I don't get that.
```

1        A. Zheleznyak -- CONFIDENTIAL

2        Q.    Well, did Alivikt hold shares in

3    Probusinessbank?

4        A.    Alivikt?  Yes, they owned shares

5    in Probusinessbank.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22              MR. HECKER: I'm going to mark as

23        Defendant's Exhibit 3 the complaint

24        that was filed in the action.

25              (Whereupon, a document entitled

Page 62

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2   organized, those are the ones I'm asking
 3   you about.
 4          Did Sergey Leontiev direct you
 5   to arrange those loans?
 6      A.    Well, what do you mean by
 7   directed?  In 2008, Sergey asked to get a
 8   large loan, to acquire a large loan from
 9   Avilon.
10      Q.    He asked who?
11      A.    Myself.
12      Q.    For what purpose?
13      A.    In 2008, there was a significant
14   world crisis and in Russia that had a
15   significant impact -- reflected
16   significantly on the banks and
17   Probusinessbank was in a difficult
18   situation with respect to the amount of
19   capital it was holding.  We needed a large
20   sum in order to continue business and to
21   increase the capital.  Sergey asked me to
22   try to obtain a large loan from Avilon.
23      Q.    And you did that?
24      A.    Yes.
25      Q.    At Sergey Leontiev's direction?
```

Page 63

```
 1            A. Zheleznyak -- CONFIDENTIAL
 2      A.    At the request, at the request
 3  of Sergey Leontiev I went and I discussed
 4  the terms.
 5      Q.    And that was papered as a loan
 6  that was made to Ambika Investments; is
 7  that right?
 8            MR. WEIGEL: I object.
 9      Argumentative, the term "papered."
10            THE WITNESS:  Subsequently, the
11      loan was signed between Avilon and
12      Ambika.
13      Q.    Okay.
14            And that was based on
15  negotiations that you had with
16  representatives of Avilon?
17      A.    By this, what do you mean?
18      Q.    The loan we're talking about in
19  2008.
20      A.    I only discussed the terms.
21      Q.    With whom?
22      A.    With Alexander Varshavsky.
23      Q.    How much was that loan for?
24      A.    In terms of time frame or sum?
25      Q.    Sum.
```

Page 64

```
 1           A.  Zheleznyak -- CONFIDENTIAL
 2      A.    I don't remember exactly right
 3  now.
 4      Q.    Well, is it identified in this
 5  document?
 6      A.    I think it was nineteen million.
 7  It looks like nineteen million nine
 8  hundred.
 9      Q.    And that money is still owed; is
10  it not?
11           MR. WEIGEL: By whom?
12      Q.    You can answer.
13           MR. WEIGEL: I object.  Vague.
14      Ambiguous.
15           THE WITNESS:  Ambika has not
16      paid off all of the money to Avilon.
17      Q.    Right.
18           Avilon is still owed the money;
19  correct?
20      A.    By Ambika, no, it has not paid
21  off the full amount.
22      Q.    Has anyone paid it off, to your
23  knowledge?
24      A.    Which one?  There's several
25  loans here.
```

Page 65

1           A.  Zheleznyak -- CONFIDENTIAL

2        Q.     The one we're talking about

3   right now.

4        A.     There's a lot of them here.

5        Q.     Well, you said that you recall

6   negotiating the terms of the loan in 2008

7   for approximately $19 million with Mr.

8   Varshavsky.

9             Do you recall that testimony?

10       A.     I don't remember the exact

11   amount but we did discuss with him

12   bringing in a loan and the terms of that

13   loan.

14       Q.     Okay.

15             And -- go ahead.

16       A.     I just don't remember right now

17   what the amount was in -- it was 2008.  I

18   don't remember the amount.  I remember

19   that it was a large amount.

20       Q.     You said you thought it was $19

21   million or so?

22       A.     Yes.

23       Q.     And you said that the purpose of

24   the loan proceeds was to cover a capital

25   shortfall at Probusinessbank?

1       A. Zheleznyak -- CONFIDENTIAL

2            MR. WEIGEL: I object.  Misstates

3       the testimony.

4       Q.    You were nodding.  You need to

5   speak your answers.

6       A.    The money was taken in order to

7   fill the capital -- to add to the capital

8   of Probusinessbank.

9       Q.    And you negotiated the terms of

10  that loan at Mr. Leontiev's request;

11  correct?

12      A.    Yes, because there was a crisis.

13      Q.    And you understood that Mr.

14  Leontiev would take steps to ensure that

15  the moneys were repaid to Avilon; correct?

16           MR. WEIGEL: I object.  Vague.

17      Lacks foundation.

18      Q.    You can answer.

19      A.    Well, bank always wants all of

20  the -- the return of all of the deposits

21  that are outstanding including this one,

22  of course.  Of course we assumed that we

23  would fulfill these obligations.

24      Q.    And you thought Mr. Leontiev

25  would ensure that the money was repaid?

```
                                          Page 67
 1          A.  Zheleznyak -- CONFIDENTIAL
 2              MR. WEIGEL: Objection.  That
 3        question's already been asked.
 4              If you have anything new to add,
 5        feel free.
 6              THE WITNESS:  I said that we
 7        would fulfill all of the -- all of our
 8        obligations -- that we would fulfill
 9        all our obligations to Avilon for --
10        so that I would not be -- so that I
11        wouldn't worry.
12        Q.    Right.
13              Because you had given your word
14     that the money would be repaid?
15              MR. WEIGEL: I object.  Vague.
16        Q.    You can answer.
17        A.    I have a friendly relationship
18     with Alexander Varshavsky and my
19     reputation and my moral standing is not
20     the least of my concerns.
21        Q.    You've been directly involved in
22     discussions regarding the proposed
23     repayment of the loans identified in the
24     document we were just looking at since
25     August of last year; right?
```

```
                                          Page 68
 1           A.  Zheleznyak -- CONFIDENTIAL
 2      A.    Can you repeat the question,
 3  please?
 4      Q.    You were personally involved in
 5  discussions about the proposed prepayment
 6  of the loans that are identified in the
 7  complaint since August of last year;
 8  right?
 9      A.    Yes.  Yes, I was involved in the
10  discussions.
11      Q.    Okay.
12            And those discussions continued
13  because there was still moneys that had
14  not been repaid; correct?
15            MR. WEIGEL: I object.
16  Foundation.
17      Q.    You can answer.
18      A.    Yes, these discussions
19  continued.
20      Q.    There was seventeen million that
21  was repaid in September, 2015; correct?
22      A.    To whom?
23      Q.    Well, are you aware of $17
24  million that was repaid in September of
25  last year?
```

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2      A.     I do.
 3      Q.     Okay.
 4             So you're familiar with that
 5  topic?
 6      A.     I just want to know whether
 7  we're talking about the same thing, about
 8  the same payment.
 9      Q.     Were there multiple $17 million
10  payments made in about September of last
11  year or are you just aware of one of them?
12             MR. WEIGEL: I'm going to object.
13             THE WITNESS:  I only know of
14      one.  I only know of one.
15             MR. WEIGEL: I'm going to object
16      to the question.  You're arguing with
17      the witness.  He's trying his best to
18      help.
19      Q.     Mr. Zheleznyak, my questions
20  concerning the $17 million that was repaid
21  in September of last year.
22      A.     I understand.
23      Q.     Okay.
24             That $17 million was money that
25  was owed by Ambika to Avilon; correct?
```

```
                                          Page 70
 1           A. Zheleznyak -- CONFIDENTIAL
 2      A.    Which amount, the one that was
 3  repaid?
 4      Q.    Yes.
 5      A.    Yes.
 6      Q.    So Ambika didn't have the $17
 7  million; right?
 8      A.    It didn't.
 9      Q.    Okay.
10           So the money was repaid by a
11  company called Valkera; right?
12      A.    Correct.
13      Q.    Okay.
14           And you were involved in the
15  negotiations that led to Valkera making
16  the $17 million available to Avilon even
17  though the money was owed by Ambika?
18      A.    Yes, I participated, yes.
19      Q.    And you testified, I believe,
20  that Sergey Leontiev ultimately agreed to
21  allow Valkera to pay back the $17 million
22  owed by Ambika; correct?
23      A.    Yes.
24      Q.    The $17 million that was repaid
25  by Valkera, that wasn't money that was
```

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2    yours personally; was it?
 3        A.    Yes, absolutely.  Unfortunately.
 4        Q.    It's unfortunate for all of us.
 5              Are you aware that Sergey
 6    Leontiev told Alexander Varshavsky that
 7    you personally repaid the $17 million that
 8    came from Valkera?
 9              MR. WEIGEL: I object.
10    Foundation.
11        Q.    You can answer.
12        A.    I was the one who made the
13    instructions -- who instructed Vyulkova to
14    make the payment, the final instruction to
15    make that payment.
16        Q.    You gave her the final
17    instruction after getting permission from
18    Sergey Leontiev; right?
19        A.    Yes, he gave his agreement, yes.
20        Q.    You couldn't have made that
21    instruction without Sergey Leontiev's
22    agreement; could you?
23        A.    I couldn't, right.
24        Q.    Because ultimately he's the one
25    who is responsible for making decisions
```

```
                                        Page 72
 1         A. Zheleznyak -- CONFIDENTIAL
 2  like that; right?
 3              MR. WEIGEL: I'm going to object.
 4         It's vague and ambiguous as to what
 5         you mean decisions like that.
 6              THE WITNESS:  If you could be a
 7         little bit more specific what you mean
 8         by he's the person who makes these
 9         kinds of decisions.
10    Q.    Let me try it this way.
11          You've testified that you
12  couldn't decide that Valkera would repay
13  the $17 million; correct?
14    A.    Correct.
15    Q.    You had to get Sergey Leontiev's
16  permission to do that; right?
17    A.    Of course.
18    Q.    Did you need to check with Mr.
19  Shcheglyaev before you made that decision?
20    A.    No.
21    Q.    Because he has absolutely no
22  decision-making authority with respect to
23  the activities of Valkera; correct?
24    A.    Yes, I answered that.
25    Q.    Right.
```

```
                                      Page 73
 1         A. Zheleznyak -- CONFIDENTIAL
 2              Did you need to check with
 3   anyone other than Sergey Leontiev about
 4   the decision to instruct Valkera to repay
 5   the $17 million?
 6       A.    Check, what do you mean?
 7       Q.    Did you need permission from
 8   anyone else?
 9       A.    No.
10       Q.    So Sergey Leontiev is the only
11   person who really could make that
12   decision; right?
13       A.    This, what do you mean by this?
14       Q.    The decision for Valkera to pay
15   back the $17 million.
16       A.    Yes.
17       Q.    Okay.
18              Mr. Leontiev ultimately
19   controlled the activities of Valkera, to
20   your understanding?
21              MR. WEIGEL: I object to the
22       form.  Foundation.
23       Q.    You can answer.
24       A.    Valkera was the same type of
25   company as Ambika and the bank controlled
```

Page 74

1          A.  Zheleznyak -- CONFIDENTIAL

2      it.

3          Q.     And Leontiev controlled the

4      bank?

5          A.     Leontiev controlled the bank.

6          Q.     Right.

7               So someone like Vyulkova

8      wouldn't direct Ambika directors of

9      Valkera directors to take action to move

10     significant sums around without Sergey

11     Leontiev being in favor of doing that;

12     right?

13               MR. WEIGEL: Sean, I'm going to

14          object unless you clarify the time

15          frame.

16               Are you talking about the time

17          period before the bank was taken over

18          or after?

19               THE WITNESS: Can my

20          translator --

21               MR. HECKER: No, no.

22               Listen, Mr. Weigel, from now on

23          you can state your objection.  You

24          cannot make speaking objections.  You

25          can't do it.  You're not permitted to

```
                                            Page 91
 1          A. Zheleznyak -- CONFIDENTIAL
 2      A F T E R N O O N   S E S S I O N
 3              December 16, 2016
 4                  1:16 p.m.
 5          THE VIDEOGRAPHER: It is
 6      approximately 1:16 p.m.
 7              We are back on the record.
 8  A L E X A N D E R   Z H E L E Z N Y A K,
 9          having been previously duly sworn by
10          a Notary Public of the State of
11          New York, upon being examined,
12          testified as follows:
13  EXAMINATION CONTINUED BY
14  MR. HECKER:
15      Q.    Mr. Zheleznyak, earlier you
16  testified about a loan that you arranged
17  from Avilon that was documented as a loan
18  to Ambika.
19              Do you recall that testimony?
20      A.    Yes.
21      Q.    That was in 2008, that loan?
22      A.    Yes.
23      Q.    And you said that the reason you
24  were asked to arrange that loan by Mr.
25  Leontiev is because there was a capital
```

```
 1        A. Zheleznyak -- CONFIDENTIAL
 2   deficiency at Probusinessbank; is that
 3   right?
 4        A.    Correct.
 5        Q.    But you didn't arrange a loan
 6   from Avilon to Probusinessbank; right?
 7        A.    It was for Probusinessbank,
 8   correct.
 9        Q.    The loan was made by Avilon to
10   Ambika; correct?
11        A.    Correct.
12        Q.    And Probusinessbank is not the
13   owner of Ambika; right?
14        A.    It is not but it controls it.
15   It's not the legal owner.
16        Q.    Why was Ambika created?
17        A.    Ambika was created -- organized
18   as a brokerage company including as a way
19   of attracting funds, resources for the
20   bank.
21        Q.    Whose idea was it to create
22   Ambika?
23        A.    I don't know whose idea it was.
24        Q.    Are there any employees who work
25   for Ambika?
```

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2      A.    I didn't deal with these
 3   companies.  I wasn't working on these
 4   companies.  This was outside my sphere.
 5      Q.    Are you aware of whether Ambika
 6   had an office?
 7      A.    I don't know.
 8      Q.    And you don't know whether it
 9   had employees?
10      A.    I don't know.
11      Q.    And your testimony is the bank
12   didn't own Ambika but ultimately
13   controlled it?
14      A.    Yes.
15      Q.    And your understanding is that
16   if Ambika borrowed money from Avilon that
17   Probusinessbank could get access to the
18   funds that were loaned to Ambika?
19          MR. WEIGEL: I'm going to object
20      on the grounds that it is vague and
21      ambiguous.
22      Q.    You can answer.
23      A.    Probusinessbank guaranteed the
24   return of the funds.
25      Q.    That wasn't my question though.
```

```
                                      Page 94
 1          A.  Zheleznyak -- CONFIDENTIAL
 2          My question was whether
 3  Probusinessbank could use funds owned by
 4  Avilon to Ambika.
 5      A.    Yes.
 6          (Discussion held in Russian)
 7          MR. HECKER: Let me try
 8      rephrasing it so we don't have a
 9      debate over the translation.
10      Q.    Was it your understanding that
11  Probusinessbank was able to use funds that
12  were loaned by Avilon to Ambika?
13      A.    It could.
14      Q.    And the reason it could, to your
15  understanding, was because Sergey Leontiev
16  ultimately controlled both Ambika and
17  Probusinessbank?
18          MR. WEIGEL: I object.
19      Argumentative.  Lacks foundation.
20      Asked and answered.
21      Q.    You can answer.
22      A.    Controlled, yes.
23      Q.    Okay.
24          Now, how long have you known Mr.
25  Leontiev?
```

```
                                            Page 95
 1          A.  Zheleznyak -- CONFIDENTIAL
 2      A.    Forty-three years.
 3      Q.    How old are you, sir?
 4      A.    Fifty.
 5      Q.    So you met as children?
 6      A.    In school.
 7      Q.    You were school friends?
 8      A.    Yes, yes.
 9      Q.    You grew up together?
10      A.    Yes.
11      Q.    And is the first time that you
12  did work for him when you were a lawyer
13  back in 1991?
14      A.    That's correct.
15      Q.    At what point did you -- at any
16  point did you go into business with Mr.
17  Leontiev?
18      A.    Yes.
19      Q.    When was that?
20      A.    I think it was probably around
21  that time, '91, '92.
22      Q.    And what business did you go
23  into together?
24      A.    Initially?
25      Q.    Sure.
```

```
                                    Page 96
 1          A. Zheleznyak -- CONFIDENTIAL
 2      A.    An international business
 3  center, Probusiness.
 4      Q.    What were the activities of
 5  Probusiness?
 6      A.    Initially it was consultation on
 7  foreign economic activity.  Subsequently
 8  there were different businesses that at
 9  different stages were added to it.
10      Q.    Like what?
11      A.    Business for auto
12  transportation, transportation of cars,
13  servicing of large commercial enterprises,
14  and specifically focused on export of
15  their production.  At a certain point it
16  added tourism business, and so on.
17      Q.    Did you have a division of labor
18  as between you and Mr. Leontiev in terms
19  of who handled what aspects of the
20  businesses?
21      A.    In the bank or in the business?
22      Q.    Well, why don't you start with
23  the business and then you can describe
24  when the bank was created.
25      A.    I handled strictly the legal
```

```
 1          A.  Zheleznyak -- CONFIDENTIAL
 2    by Probusinessbank or any of the other
 3    businesses that you were in with Mr.
 4    Leontiev?
 5              MR. WEIGEL: No, that's not what
 6         the question was in the first
 7         instance.
 8              MR. HECKER: Really?  That's what
 9         the transcript says.
10              MR. WEIGEL: All right.  Let's
11         go.
12              THE WITNESS:  No, I did not
13         participate.
14    Q.    So who made those decisions?
15    A.    Which ones specifically?
16    Q.    Investment decisions.
17              MR. WEIGEL: I'm going to object.
18         It's overbroad.
19              THE WITNESS:  For different
20         types of investment activity there
21         were different departments.
22    Q.    Are you speaking about
23    Probusinessbank in particular?
24    A.    About the whole financial group,
25    about all the banks including
```

1          A.  Zheleznyak -- CONFIDENTIAL
2     Probusinessbank.
3          Q.     Who made investment decisions at
4     Probusinessbank?
5          A.     There were different decisions,
6     so you could buy a car, you could buy
7     bonds.  Each one had a -- each individual
8     had a limit onto what kind of decisions
9     they could -- what sort of decisions they
10    can make.  In other words, everyone was
11    delegated a certain authority to make
12    certain decisions.
13         Q.     You said earlier that you
14    understood that Ambika was set up in order
15    to act as a brokerage firm; is that what
16    you said?
17         A.     Yes, like a broker company, yes.
18         Q.     What do you mean by a broker
19    company?
20         A.     It worked on financial markets.
21         Q.     And who was responsible for
22    making decisions about Ambika's role in
23    the financial markets?
24         A.     The financial departments.
25         Q.     Of?  Financial departments of

```
 1        A. Zheleznyak -- CONFIDENTIAL
 2   what?
 3        A.     Probusinessbank.
 4        Q.     And who was that?
 5        A.     There were several departments
 6   that handled the capital, their
 7   accounting, the plan, the financial
 8   models, forecasting.
 9        Q.     Whose idea was it to establish
10   Valkera?
11        A.     I don't know whose idea it was
12   to establish this company.  There was a
13   department in the financial bloc that was
14   specifically responsible with making these
15   -- taking these actions.
16        Q.     Did that include Aleksandra
17   Vyulkova?
18        A.     It included her, yes, and other
19   individuals as well.
20        Q.     Did it include Fedor Brazhnikov?
21        A.     Fedor Brazhnikov reported to
22   Aleksandra Vyulkova.  He was one of her
23   subordinates.
24        Q.     Who did Aleksandra Vyulkova
25   report to?
```

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2       A.    She was part of the financial
 3  bloc.  They were all very independent
 4  there.  It was a horizontal structure.
 5  There was a specific requirement for
 6  fulfilling a financial model and each head
 7  of each of the departments would then go
 8  and work on fulfilling that requirement.
 9       Q.    Who did Aleksandra Vyulkova
10  report to?  Who was her supervisor?
11       A.    It was this financial bloc and
12  her part was -- her department was part of
13  that financial bloc.  She had her own
14  functions in fulfilling the requirements
15  that were provided to that financial bloc.
16  In other words, the requirements were
17  presented to the whole financial bloc, not
18  to the individual departments within that
19  financial bloc, and that that would then
20  be fulfilled by these individual
21  departments and they would then work on
22  their own piece of that and would then
23  report on that.  The financial director
24  would then report on fulfilling that
25  requirement.
```

```
 1          A.   Zheleznyak -- CONFIDENTIAL
 2      Q.     Was she a financial director.
 3             (Discussion held in Russian)
 4      Q.     Was she a financial director?
 5      A.     No, she wasn't.  She was part of
 6   the financial bloc.
 7      Q.     Who set the requirements for the
 8   financial bloc?
 9      A.     Sergey Leontiev.
10      Q.     So ultimately she reported up to
11   Sergey Leontiev; right?
12      A.     I think he's probably only seen
13   her two times in his life.
14      Q.     She worked for him; right?
15             MR. WEIGEL: I'm sorry, what is
16      the -- excuse me, one second, let me
17      object.
18             I don't understand the laughter.
19      Q.     She worked for Sergey Leontiev
20   ultimately?
21             MR. WEIGEL: I'm going to object
22      on the grounds that you're misstating
23      the testimony and it's vague as to use
24      of the term "ultimately."
25             THE WITNESS:  Even the drivers
```

```
 1        A.  Zheleznyak -- CONFIDENTIAL
 2     worked for Sergey Leontiev.  He's the
 3     CEO of the company.  The cleaning
 4     ladies did as well.
 5        Q.    Who's Maksim Afanasyev?
 6        A.    He worked for Sergey and he
 7  worked in trading, handled trading.
 8        Q.    Trading for what company?
 9        A.    Wonderworks.
10        Q.    What was the relationship, if
11  any, between Wonderworks and
12  Probusinessbank?
13        A.    I'm not aware of what these --
14  this relationship was.  This was beyond my
15  sphere.
16        Q.    Is it your understanding that
17  Wonderworks was another company owned by
18  Sergey Leontiev?
19             MR. WEIGEL: At what point in
20     time?
21             THE WITNESS:  Yes, at what point
22     in time?
23        Q.    What's your understanding of
24  when Sergey Leontiev owned Wonderworks?
25        A.    I don't know exactly when it was
```

1       A.  Zheleznyak -- CONFIDENTIAL
2   created, but he owned it in '14/'15.
3       Q.    And Maksim Afanasyev worked for
4   Wonderworks for Mr. Leontiev?
5       A.    He didn't work there.  He worked
6   for Sergey Leontiev.
7       Q.    And Wonderworks was involved in
8   different investment activities; is that
9   right?
10      A.    Again, this is beyond my sphere
11  of knowledge, but I know that it worked
12  with bonds, with the shares and bonds.
13      Q.    Stocks and bonds?
14      A.    Stocks and bonds.
15      Q.    And do you know who Nataliya
16  Kudryakove is?
17      A.    That's an employee of Aleksandra
18  Vyulkova, but I've never actually seen
19  her.
20      Q.    And what about --
21            MR. HECKER: Strike that.
22      Q.    Is it your understanding that
23  Ms. Vyulkova and employees working for her
24  were able to move assets between some of
25  the different Cyprus entities that had

```
                                          Page 107
```

1          A. Zheleznyak -- CONFIDENTIAL

2    been set up like Ambika and Valkera.

3               (Discussion held in Russian)

4        A.    Yes, yes.

5        Q.    You said that you paid some

6    money to Mr. Shcheglyaev to allow you to

7    use his name as the beneficial owner of

8    certain companies; is that right?

9               MR. WEIGEL: I object.  Vague as

10         to who you mean by you.

11              THE WITNESS:  Yes, yes.

12       Q.    Who asked you to recruit someone

13   to act as the beneficial owner of Ambika,

14   Valkera, other entities?

15       A.    Vyulkova, she was looking

16   herself and she asked me and she asked her

17   people as well to look for someone.

18       Q.    And you were looking for someone

19   who would be willing to let you use their

20   name as the beneficial owner?

21       A.    Yes.

22       Q.    Is there some reason that Ms.

23   Vyulkova didn't want to use her name or

24   the name of some Probusinessbank employee

25   as the beneficial owner?

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2       A.    I can only guess that she was
 3   already -- she already was one somewhere
 4   else, but I am not certain.
 5       Q.    Did Probusinessbank report in
 6   its -- did report publicly that it
 7   controlled these Cyprus entities like
 8   Ambika, Valkera?
 9       A.    I don't know.  That's also
10   beyond my sphere.
11       Q.    Are you familiar with Vermenda
12   Holdings Limited?
13       A.    I've heard that name, yes.
14       Q.    Do you know what its purpose
15   was?
16       A.    No, I don't know.
17       Q.    And I believe you already
18   testified you don't know what Vennop
19   Trading Limited is?
20       A.    No, no, I hadn't even heard of
21   it prior to today, before I saw the
22   documents.
23       Q.    Who is Yanna Krisyuk?
24       A.    She's the vice president of the
25   department for working with VIP clients.
```

1          A. Zheleznyak -- CONFIDENTIAL
2     She is the deputy head of the department
3     for working with VIP clients.
4          Q.     Who is the head of that
5     department?
6          A.     Natalia Abramova.
7          Q.     And did Ms. Krisyuk and Ms.
8     Abramova play any role in raising funds
9     from either entities or individuals who
10    lent money to any of the Cyprus companies
11    we've been talking about?
12         A.     I didn't understand.  If you
13    could repeat it one more time.
14         Q.     Sure.
15              Did either Ms. Krisyuk or Ms.
16    Abramova play a role in raising funds from
17    either entities or individuals who were
18    lending money to the Cyprus entities we've
19    been talking about?
20         A.     They were involved in bringing
21    in the funds, but the companies were
22    determined by Ms. Vyulkova depending or
23    based on the financial model.
24         Q.     Who established the financial
25    model?

```
                                            Page 110

 1            A.  Zheleznyak -- CONFIDENTIAL
 2       A.    Sergey Leontiev, he approved the
 3  financial model for the group and
 4  translated it down.
 5       Q.    And the financial model for the
 6  group included creating the Cyprus
 7  entities that would act as borrowers of
 8  funds that would be used by the group?
 9            MR. WEIGEL: I'm just going to
10       object in terms of it's overbroad, the
11       use of the term "the Cyprus entities."
12            MR. HECKER: Let's hear what he
13       said.
14            (Discussion held in Russian)
15            THE WITNESS:  Yes, including
16       bringing in the funds for the company.
17            MR. HECKER: I think the record's
18       very messy.
19       Q.    Let's -- let me try the question
20  again.
21            Am I correct that Sergey
22  Leontiev ultimately approved the financial
23  model for the group?
24       A.    Correct.
25       Q.    And am I right to understand
```

```
1          A. Zheleznyak -- CONFIDENTIAL
2    that the financial model for the group
3    included creating entities like Ambika and
4    Valkera to act as borrowers of funds that
5    would be raised from entities like Avilon?
6              MR. ROMANOVSKI: Could you
7         translate the whole question again,
8         please?
9              THE INTERPRETER: (Complying).
10             THE WITNESS:  So it wasn't the
11        organization of the entities.  The
12        financial model revolved around
13        bringing in funds.  Yes, it included
14        bringing in funds to these companies.
15        Q.    And your testimony is that Ms.
16   Abramova and Ms. Krisyuk would be involved
17   in raising moneys that Sergey Leontiev had
18   decided should be raised through
19   borrowing?
20             MR. WEIGEL: I object.  Lacks
21        foundation.  It's vague as to what you
22        mean by used in borrowing.
23        Q.    Go ahead.
24        A.    Abramova and Krisyuk sold the
25   product of the bank both to individuals
```

Page 112

1              A.  Zheleznyak -- CONFIDENTIAL

2    and to legal entities and the product was

3    to bring in funds to the balance of the

4    company.

5         Q.    And when you're talking about

6    the products of the bank, you're talking

7    about loans that were made to Ambika and

8    Valkera, for example?

9         A.    Not only those companies.

10        Q.    Others as well?

11        A.    Yes.

12        Q.    Right.

13              And Ms. Vyulkova would decide

14   whether additional entities should be

15   established offshore in Cyprus in order to

16   act as the borrower of those funds?

17        A.    Yes.

18        Q.    But Mr. Leontiev ultimately

19   determined what to do with the moneys that

20   were raised in this manner; correct?

21              MR. WEIGEL: Objection.  Vague as

22        to what you mean by ultimately.

23              THE WITNESS:  Each business had

24        its own requirements, its own needs,

25        and whether to fulfill the ambitions

1        A.  Zheleznyak -- CONFIDENTIAL

2     of each of the businesses was decided

3     by Mr. Leontiev.

4        Q.    And he decided what to do with

5   the moneys that were raised; right?

6            MR. WEIGEL: I object.  Vague.

7     Asked and answered.

8            THE WITNESS:  He either approved

9     or did not approve the proposals from

10     the businesses.  In our case, the

11     businesses would propose and then

12     Sergey would decide ultimately and

13     provide, approve funds to the business

14     that was most profitable.

15        Q.    You attended a meeting in London

16   between Sergey Leontiev, Alex Varshavsky,

17   and others?

18        A.    Yes.

19        Q.    Did you know that Sergey

20   Leontiev was recording the meeting?

21        A.    Yes.

22        Q.    He told you before the meeting?

23        A.    Yes, yes, yes.

24        Q.    Did he tell you why he was

25   recording it?

1                A. Zheleznyak -- CONFIDENTIAL

2        A.    He said that there may be some

3    instigators or instigation and that I want

4    to record it just in case.

5        Q.    Do you understand what

6    instigation means in that context?

7        A.    Well, I think it probably meant

8    something like threats or exerting

9    pressure.

10       Q.    Did that happen in the meeting?

11       A.    No.

12       Q.    Did you tell Alex Varshavsky

13   before the meeting with Mr. Leontiev that

14   Mr. Leontiev was going to be recording the

15   meeting?

16       A.    No.

17       Q.    Did any of the other attendees

18   other than you and Mr. Leontiev know that

19   he was recording the meeting?

20       A.    No, no.

21       Q.    Did Mr. Varshavsky ever

22   communicate any threats to you as it

23   related to the proposal to repay the debt?

24       A.    Varshavsky did not threaten me.

25       Q.    Did you ever tell Mr. Leontiev

```
 1          A.  Zheleznyak -- CONFIDENTIAL
 2    that Mr. Varshavsky had made threats
 3    either to you or to Mr. Leontiev in
 4    connection with the disputed loans?
 5          A.    I told Mr. Leontiev statements
 6    that were made by Alex Varshavsky and Kamo
 7    Avagumyan because they are the ones who
 8    asked me to do so.
 9          Q.    Okay.
10              My question was whether you ever
11    told Mr. Leontiev that Mr. Varshavsky had
12    made threats to you or to Mr. Leontiev in
13    connection with the disputed loans.
14              MR. WEIGEL: Objection.  Asked
15          and answered.
16              THE WITNESS:  I really did
17          answer.  I already answered that I
18          relayed the words of Alex Varshavsky
19          and Kamo Avagumyan at their request to
20          Sergey Leontiev.  How Sergey perceived
21          those words, it would be best to ask
22          Sergey.
23          Q.    You didn't perceive them as
24    threats?
25          A.    I, for myself I did not.
```

Page 117

```
 1            A.  Zheleznyak -- CONFIDENTIAL
 2      Q.     Okay.
 3             And you were involved in
 4   arranging for each of these loans, the
 5   2008 loan and the 2011 loan and the
 6   subsequent agreements.
 7             (Discussion held in Russian)?
 8             THE INTERPRETER: I apologize,
 9      can I get clarification?  Was it
10      stated subsequent loans?
11             MR. HECKER: Subsequent
12      agreements.
13             THE INTERPRETER: Subsequent
14      agreements to other loans or to these
15      loans?  I'm sorry, I just want to make
16      sure I understand what we discussed.
17             Let me get clarification to make
18      sure I'm translating correctly.
19             MR. HECKER: My question is were
20      you involved in arranging each of the
21      loans, the 2008 loan agreement and the
22      2011 loan agreement as well as the
23      subsequent agreements that are
24      identified in appendix B.
25             THE WITNESS:  Well, you see,
```

```
1        A.  Zheleznyak -- CONFIDENTIAL
2     afterwards it was just the work of the
3     manager and the client so -- and then
4     after that, I didn't need to -- after
5     that, Varshavsky, Sasha, he came in,
6     he deposited funds, he withdrew funds.
7     So he didn't need my participation
8     after that.  We already agreed on the
9     terms.  When the term came up, he
10    would either say I'll extend it or he
11    would bring in more money.
12         It wasn't only for Ambika.
13    Sometimes he would go directly to the
14    bank and deposit funds directly as a
15    deposit at the bank.  He brought in
16    some of his friends.  But this was
17    already part of the day-to-day work of
18    the manager with the client.
19         When the question came about the
20    terms, that's when he would reach out
21    to me.
22    Q.   And the terms --
23         EVGENIYA SOKOLOVA: Interest
24    rate.
25         THE INTERPRETER: Interest rate.
```

```
 1            A.  Zheleznyak -- CONFIDENTIAL
 2        Q.     The term meaning the interest
 3    rate that would be paid on the loans?
 4        A.     Yes, for the use of the funds,
 5    yes, the rate.  Or sometimes I would call
 6    him and say the rate is a little high or
 7    let's bring it down a little bit.
 8    Sometimes it would change depending on the
 9    market rates.
10        Q.     You negotiated the interest
11    rate?
12        A.     When that came up.
13        Q.     And over time am I correct that
14    the agreed-upon interest for a period of
15    time was paid on the loans?  The
16    agreed-upon interest was, in fact, paid on
17    these loans for a period of time?
18        A.     Could I just clarify which funds
19    are we talking about right now?
20        Q.     The loans identified in appendix
21    B.
22        A.     Until the license was withdrawn.
23        Q.     Interest was paid on these loans
24    until Probusinessbank's license was
25    withdrawn; is that your testimony?
```

```
 1            A. Zheleznyak -- CONFIDENTIAL
 2        A.    Yes, as far as I understand, to
 3    the very end.
 4        Q.    Do you know what happened to the
 5    moneys that were loaned by Avilon to
 6    Ambika?
 7        A.    No.
 8        Q.    You don't know where the moneys
 9    went?
10        A.    No, this is outside my sphere of
11    competence, but the funds that went into
12    Ambika went into the bank and then were
13    spent on the very -- went to different
14    things.  In other words, the idea was that
15    -- so the general concept was to bring in
16    funds so that they could be added to the
17    general capital and that would be
18    distributed among the businesses.
19            I don't know the specific
20    nuances, of course.
21        Q.    So the general capital -- it
22    would either be brought in and added to
23    the general capital and distributed among
24    the businesses according to the plan that
25    was approved by Sergey Leontiev?
```

```
 1           A.  Zheleznyak -- CONFIDENTIAL
 2       A.    Yes, to the general budget,
 3  treasury, and then the treasury would then
 4  distribute it to the different businesses
 5  in accordance with the financial plan that
 6  was approved.
 7       Q.    By Leontiev?
 8       A.    Yes.
 9       Q.    And do you know how the moneys
10  got from Ambika to the treasury at
11  Probusinessbank?  You don't know?
12       A.    No, I don't know.  Sorry.
13       Q.    And you know that the loans
14  reflected in appendix B still have not
15  been repaid; correct?
16       A.    Well, here you have to add
17  things up.  Part of it was repaid, part of
18  it wasn't.
19       Q.    The seventeen million is what
20  you're referring to?
21       A.    Yes.
22       Q.    Okay.
23            Do you have Exhibit A in front
24  of you?
25       A.    What is that?  Which is that?
```

1          A.  Zheleznyak -- CONFIDENTIAL

2   recognize these to be promissory notes

3   that are listed in the chart in appendix

4   A?

5               MR. WEIGEL: Counsel, are you

6          representing that the document you

7          just handed us, Exhibit 5 is it,

8          contains all the promissory notes that

9          are identified in Exhibit A or do you

10         want the witness to actually go

11         through it one by one?

12              MR. HECKER: No, my understanding

13         is this represents all of those that

14         are listed in appendix A.

15              MR. WEIGEL: And no others?

16              MR. HECKER: Correct.

17              THE WITNESS:  I recognize them,

18         yes.

19         Q.    And a number of these are signed

20   by you; right?

21         A.    Yeah, it looks very similar,

22   yes.

23         Q.    No, I'm asking if you see your

24   signature on this.

25         A.    I see it.  It's part of them,

1           A.  Zheleznyak -- CONFIDENTIAL
2    some of them.
3           Q.    And why did you sign the ones
4    you signed?
5           A.    Either -- there were two
6    reasons.  Either the client asked that I
7    sign or I may have just been in the office
8    at the time as a signatory.  I wasn't
9    always at the office.
10          Q.    You signed on behalf of FAO
11   Life, Financial Group Life?
12          A.    Yes.
13          Q.    What was your position at
14   Financial Group Life?
15          A.    At which point in time?
16          Q.    At any time.
17                Did you have different positions
18   in Financial Group Life at the time?
19          A.    I had the power of attorney from
20   Financial Group Life to be a signatory.
21          Q.    Okay.
22                Who suggested to you that you
23   should sign these on behalf of Financial
24   Group Life?
25          A.    The setup was organized a little

1           A. Zheleznyak -- CONFIDENTIAL

2    differently.  The deposits were brought

3    in, Vyulkova would identify the company,

4    and then documents were prepared.  The

5    documents would then just be brought in to

6    me for signature and then they had the

7    visas or rather the approval from the

8    authorized individuals and the power of

9    attorney and I would sign them.

10        Q.    Did you personally have

11   discussions with Karen Avagumyan about

12   certain of these promissory notes?

13        A.    Never.

14        Q.    Have you ever met Karen

15   Avagumyan?

16        A.    That's Kamo's son.

17        Q.    Have you ever met him?

18        A.    Of course.

19        Q.    But you never discussed the

20   promissory notes with Karen?

21        A.    The money wasn't Karen's, it was

22   Kamo's money.

23        Q.    Did you have discussions with

24   Kamo Avagumyan about the promissory notes?

25        A.    It was the same.  We had one

1        A. Zheleznyak -- CONFIDENTIAL

2   conversation.  He said that I will be just

3   like Alexander, I would be depositing

4   funds just like Alexander and are my terms

5   going to be the same, my percentage going

6   to be the same.  Yes, okay.

7            Sometimes he would have more,

8   sometimes he would have less, but I

9   wouldn't verify each and every amount with

10  him.  That was what the manager handled.

11       Q.    And did you talk with Kamo

12  Avagumyan about certain of the loans in

13  the June, 2015 time period?

14       A.    There was just a general

15  discussion not about any specific loans,

16  we were just talking in general.

17       Q.    Certain of these notes were

18  signed in June, 2015.  So for example, if

19  you want to look at note number 1953 which

20  has a Bates number of 961.

21       A.    I don't have 961.  I have 962.

22  57, 58, 62.

23            MR. WEIGEL: Sean, my version

24       goes from 61 to 63, so apparently they

25       were --

```
                                          Page 127
 1           A.  Zheleznyak -- CONFIDENTIAL
 2               MR. ROMANOVSKI: If you look at
 3       the top, there are numbers.
 4               THE WITNESS:  Oh, 53?
 5               Yes, so the question?
 6       Q.    So this was a note that was
 7   signed in June, 2015; right?
 8       A.    I don't know.  That's not my
 9   signature.
10       Q.    It's not your signature on this
11   one, that's right.
12               But this was a promissory note
13   that was issued in June of 2015 payable to
14   Kamo Avagumyan's son Karen; right?
15       A.    Judging by the promissory note,
16   yes, that's correct.
17       Q.    And were you in regular
18   discussions with Kamo Avagumyan about
19   these loans in June, 2015?
20       A.    I don't know about these
21   promissory notes.  We have been friends
22   for many years so we meet regularly.  I
23   just can't remember that there were
24   discussions about these promissory notes,
25   just that I meet with him very frequently,
```

1          A.  Zheleznyak -- CONFIDENTIAL
2    several times a week.
3          Q.    Did you inform Kamo Avagumyan in
4    or around June of 2015 that FG Life had
5    filed for liquidation?
6          A.    I just don't know when it filed.
7          Q.    Well, if I represent to you that
8    it filed for liquidation in March, 2015,
9    does that sound accurate from your
10   recollection?
11         A.    I just don't know.  I'm not the
12   one who handled it.  It's possible.
13         Q.    Did you tell Kamo Avagumyan that
14   FG Life was filing for liquidation prior
15   to the time that these promissory notes
16   were signed?
17              MR. WEIGEL: One second.
18              MR. HECKER: Wait, I want him to
19         translate what was said.  You can
20         interpose your objection --
21              MR. WEIGEL: I'm putting my
22         objection on the record when you say
23         these notes --
24              MR. HECKER: The ones we just
25         looked at signed in June of 2015.

1          A.  Zheleznyak -- CONFIDENTIAL

2              MR. WEIGEL: It's by another

3      company called Vennop, so I hope

4      you're not trying to mislead the

5      witness.

6              MR. HECKER: I'm not.

7              MR. WEIGEL: The June 22, 2015

8      note is in the name of Vennop, not in

9      the name of Financial Group Life.

10             MR. HECKER: You're correct.  I

11     stand corrected.

12             Hang on one second.

13             I stand corrected.  I apologize.

14     Q.     The one we were just looking at

15 with Vennop Trading was the one you didn't

16 know existed until you were preparing for

17 your deposition?

18     A.     Yes, correct.

19     Q.     Do you have any idea who

20 arranged for the promissory note we just

21 looked at that was executed with Vennop

22 Trading?

23     A.     I don't have any idea, but I

24 think that probably happened the way it

25 usually does.

```
 1          A.  Zheleznyak -- CONFIDENTIAL
 2       Q.     And so who would have knowledge
 3   about that, from your understanding?
 4       A.     About what?
 5       Q.     About the note with Vennop
 6   Trading signed at the end of June of 2015.
 7       A.     Definitely Vyulkova.
 8       Q.     What about Mr. Leontiev?
 9       A.     No.
10       Q.     He wouldn't know about Vennop
11   Trading?
12       A.     I don't think so.  I don't think
13   so.  I doubt that he knows the specific
14   companies.  That's Vyulkova's sphere of
15   competence.
16       Q.     In terms of whether to set up
17   additional offshore companies?
18       A.     Yes.
19       Q.     But regardless of what actually
20   mechanically was involved in setting them
21   up, in terms of giving them direction
22   about taking steps like this, isn't that
23   ultimately something that Sergey Leontiev
24   would have to approve?
25          MR. WEIGEL: I'm going to object
```

Page 131

```
 1        A.  Zheleznyak -- CONFIDENTIAL
 2     to the form of the question, it's
 3     vague, what you mean by steps like
 4     this.
 5            THE WITNESS:  As to how to --
 6            THE INTERPRETER: Could you read
 7     back the question?  I'll make sure
 8     that it's translated properly.  I
 9     apologize.
10            (Whereupon the requested portion
11     was read back by the reporter)
12            THE WITNESS:  Which steps?  I
13     don't understand which steps.
14     Q.    Setting up a company like Vennop
15  in order to issue promissory notes.
16     A.    Leontiev did not create these
17  companies, did not instruct to create the
18  companies.  That was done by Vyulkova.
19  Leontiev approved the model, how much to
20  bring in, and then how much -- how to
21  distribute it.  He's the one who approved
22  that.
23     Q.    Right.
24            So, for example, when Valkera's
25  going to make a repayment of $17 million,
```

1           A.  Zheleznyak -- CONFIDENTIAL
2      your testimony is Leontiev would have to
3      approve the movement of those funds,
4      that's not something Vyulkova could do on
5      her own; right?
6                MR. WEIGEL: I object as vague.
7                THE WITNESS:  Yes, of course.
8                MR. HECKER: Do you want to take
9           a break?
10                MR. WEIGEL: I was hoping to but
11           I don't know if we got this question
12           right.
13                THE WITNESS:  Yes, of course
14           that Vyulkova cannot make that
15           decision.
16                MR. HECKER: Go ahead.
17                Go off the record.
18                THE VIDEOGRAPHER: It is
19           approximately 2:36 p.m.
20                We are going off the record.
21                (Whereupon a break was taken)
22                THE VIDEOGRAPHER: It is
23           approximately 2:53 p.m.
24                We're back on the record.
25           Q.    Mr. Zheleznyak, on August 14, am

Page 138

1            A. Zheleznyak -- CONFIDENTIAL



Page 139



Page 140



```
23        Q.     And Vermenda is one of the
24   Cyprus shell companies for which Mr.
25   Shcheglyaev served as the beneficial
```

Page 141

1        A.  Zheleznyak -- CONFIDENTIAL

2   owner?

3       A.    Yes.

4       Q.    So it's another company

5   ultimately controlled by Mr. Leontiev;

6   right?

7            MR. WEIGEL: I object to the

8       form.  Argumentative.  Misstates the

9       record.

10      Q.    You can answer.

11      A.    The bank controlled this whole

12  company and so this was one of these

13  corresponding companies.

14

15

16

17

18

19

20

21

22

23

24

25

1          A.  Zheleznyak -- CONFIDENTIAL

2    table of securities controlled by Mr.

3    Leontiev to try to persuade him that Mr.

4    Leontiev had assets from which he could

5    repay these outstanding loans; right?

6          A.    Correct.

7          Q.    And in fact, you then set up a

8    meeting between Mr. Varshavsky and Mr.

9    Leontiev; right?

10         A.    Correct.

11         Q.    Then you met at Avilon's

12   offices?

13         A.    Yes.

14         Q.    And was anyone else present

15   aside from you, Leontiev, and Varshavsky?

16         A.    I believe Irina Monakhova came

17   by later on.

18         Q.    And who is Irina Monakhova?

19         A.    I don't know her exact title,

20   but she's like the financial director of

21   the Avilon group.

22         Q.    Okay.

23               So she participated in part of

24   the meeting?

25         A.    I think part of it.

```
                                    Page 143
 1          A.  Zheleznyak -- CONFIDENTIAL
 2      Q.     Okay.
 3             And did Mr. Leontiev acknowledge
 4  his responsibility to repay the debt owed
 5  to Avilon at the meeting at Avilon's
 6  offices?
 7      A.     He said he's ready to pay it all
 8  back but he has to think about the way to
 9  organize it, to construct it.  He need
10  some time to figure out to come up with a
11  proposal about how to do it.  I think that
12  was -- actually, I think that was when
13  Monakhova showed up so that they could
14  agree to discuss these proposals, to
15  discuss these proposals.
16             I think that's when it was
17  discussed how these obligations could be
18  guaranteed using this paper.
19      Q.     In other words, using the
20  securities that Mr. Leontiev owned?
21      A.     Yes, that issue was discussed.
22  But there was some sort of problem with
23  the construction of the resolution.
24      Q.     Okay.
25             And was there structure, how to
```

1          A.  Zheleznyak -- CONFIDENTIAL
2    structure the resolution?
3              MR. ROMANOVSKI: Construction or
4        structure?
5        Q.    There was a question about how
6    to structure the repayments.
7              MR. WEIGEL: That's not a
8        question.
9              THE WITNESS:  Yes, how to
10       structure -- how to put the proposal
11       down on paper.
12       Q.    Okay.
13             So is it fair to say there were
14   questions about how to document Mr.
15   Leontiev's agreement to repay the moneys?
16             MR. WEIGEL: Objection.  Let me
17       get my objection out, please.  It
18       lacks foundation.  Misstates the
19       record.
20             MR. HECKER: But his testimony
21       was what?
22             THE WITNESS:  The agreement,
23       yes, how to put together the
24       agreement.
25       Q.    Okay.

```
 1         A. Zheleznyak -- CONFIDENTIAL
 2      A.    Or how to formulate the
 3  agreement.
 4      Q.    Okay.
 5            Let's get this down again.
 6            Is it fair to say that there
 7  were questions about how to document Mr.
 8  Leontiev's agreement to repay the moneys?
 9            MR. WEIGEL: Asked -- I'm going
10      to object.  You just asked the exact
11      same question.  You apparently didn't
12      like the answer.  Asked and answered.
13            THE WITNESS:  The question was
14      about how to structure the transaction
15      that was going to be proposed by
16      Sergey.  There was no -- they did not
17      come to a resolution.  They didn't --
18      there was no understanding about what
19      to structure.
20      Q.    Is it fair to say there was no
21  agreement on how to structure the
22  repayment but there was no dispute that
23  Mr. Leontiev was going to repay the funds?
24            MR. WEIGEL: I'm going to object.
25      Again, you keep asking the same
```

Page 146

1          A. Zheleznyak -- CONFIDENTIAL

2      question.

3              MR. HECKER: Mr. Weigel, you can

4      object but state the objection.

5              MR. WEIGEL: Asked and answered.

6      Q.     Go ahead.

7      A.     That's correct.  But the

8   conditions of the transaction, they

9   couldn't come to a resolution of the terms

10   of this -- of the agreement, of the

11   transaction.  Sergey asked for a day to

12   think it over and to come up with a

13   proposal and after that, he proposed -- he

14   did come up with proposals.

15      Q.     Now, am I right that the meeting

16   ended with a plan to meet the next day

17   again to discuss the proposal?

18      A.     That's correct.

19      Q.     Did Mr. Leontiev show up the

20   next day?

21      A.     No.  Well, we had an agreement

22   in theory to meet the next day, so there

23   was no set time or place.  It was like

24   let's get together tomorrow and discuss

25   it.

```
 1          A.  Zheleznyak -- CONFIDENTIAL
 2      Q.    Why didn't you meet the next
 3  day?
 4      A.    By you, who do you mean?
 5      Q.    Well, you left with an agreement
 6  in theory to meet the next day; right?
 7      A.    Yes, Sergey flew somewhere.
 8  What was the point of me meeting with him?
 9  I met with him every day as it was.
10      Q.    Where did Sergey fly?
11      A.    Sergey flew to London for a
12  meeting with the attorneys.
13      Q.    Okay.
14            And do you know why Sergey left
15  Moscow?
16      A.    He had another meeting with
17  attorneys.  In general, he flew there
18  frequently to meet with attorneys.
19      Q.    After he left Moscow on
20  August 15, to your knowledge, did he ever
21  return to Russia?
22      A.    No, never.
23      Q.    When did he come to the United
24  States, to your knowledge?
25      A.    I can't say for certain.  It was
```

1      A. Zheleznyak -- CONFIDENTIAL
2  2015.  I can't say for certain but it was
3  in 2015.
4      Q.    And since he's been in the
5  United States, to your knowledge, he
6  hasn't returned to Russia?
7      A.    He did not return.
8      Q.    Now, we spoke earlier about the
9  meeting that you had in London, I believe
10 it was August 21, 2015?
11     A.    August 15?  August, 2015.  I
12 don't know if it was the twenty-first.
13     Q.    Was there more than one meeting
14 in London or just the one?
15     A.    One.  With Varshavsky.  One.
16     Q.    This was the one that was
17 recorded by Mr. Leontiev?
18     A.    Yes.
19     Q.    And who else attended that
20 meeting?
21     A.    Myself, Boris Zuev, Alexander
22 Varshavsky, Galena Malygina.  I'm sorry,
23 Ekaterina Malygina.
24            I think that's it.
25     Q.    Who's Boris Zuev?

1          A.  Zheleznyak -- CONFIDENTIAL
2               THE  WITNESS:   She  was  there  so
3       that -- well, yes, to put everything
4       down  on  paper, to  resolve  the  final --
5       the  settlement, to  finalize  the
6       settlement.
7          Q.    At the meeting Mr. Leontiev
8    acknowledged that the obligation it repay
9    the  moneys  dated  back,  in  the  case  of
10   Avilon,  to  2008;  right?
11               MR.  WEIGEL:  I  object.   Vague  as
12       to  whose  obligation  you're  referring
13       to.
14          Q.    You  can  answer.
15          A.    So  this  all  came  down  to  the
16   meeting  that  they  couldn't  come  to  an
17   agreement  about  how  to  structure  Sergey's
18   settlement  because  Varshavsky,  Alexander
19   would  not  agree  to  the  proposal  without
20   certain  specific  guarantees.   He  wanted  to
21   receive  some  sort  of -- he  wanted  to
22   receive  some  sort  of  a  guarantee,  a --
23               EVGENIYA  SOKOLOVA:  Collateral?
24               THE  WITNESS:   Collateral.
25       Everything  came  down  to  that.

Page 173

1    A. Zheleznyak -- ATTORNEYS' EYES ONLY



Page 174

8      Q.    And by protecting the assets,
9  you mean make them unavailable to
10  creditors like Mr. Varshavsky?
11      A.    No, I didn't say to hide.  It's
12  to defend them.  It's a long story, but
13  you don't understand that in Russia right
14  now there's this illegal process going on.
15          They took away our bank which is
16  part of our life which is something we
17  worked on for twenty-five years where
18  sixteen thousand people were employed.
19  They threw them all out in the street.
20  They stole all the assets and arrested
21  people who were not guilty, innocent
22  people.  But this is a separate story.
23  But this goes to why we have reason we
24  need to defend ourselves -- we have things
25  that we have to defend ourselves from.

Page 186

```
 1        A.  Zheleznyak -- CONFIDENTIAL
 2   to mean?
 3        A.    So that there's no criminal
 4   investigation or criminal charges.  He
 5   said that he has very powerful attorneys
 6   who can resolve this issue.
 7        Q.    Of the criminal investigation
 8   against whom?
 9        A.    I think that it was against our
10   guys who are over there.
11        Q.    What attorneys?
12        A.    Russian.
13        Q.    Do you know who they are?
14        A.    No.
15        Q.    And you reported this to Mr.
16   Leontiev?
17        A.    Yes, but I asked Alexander in
18   advance is this something I should tell
19   Leontiev.  He said yes.
20        Q.    At the meeting in London did Mr.
21   Varshavsky threaten to institute criminal
22   charges against Leontiev?
23        A.    No.
24
25
```

Page 187



```
21      Q.    I'm just going to ask you
22  whether you are familiar with a few other
23  entities.
24            Have you heard of Trigor Trading
25  Limited?  Trigor Trading Limited, do you
```

```
 1          A. Zheleznyak -- CONFIDENTIAL
 2    know it?
 3         A.    No.
 4         Q.    Finbay Group Limited?
 5         A.    No.
 6         Q.    Greenex Trading Limited?
 7         A.    No.
 8         Q.    You've never heard of these
 9    entities?
10         A.    No, these, no, never heard of
11    them.
12         Q.    Dunning Finance, Inc.?
13         A.    No.
14         Q.    Greater Divide Limited?
15         A.    No.
16         Q.    Clervaux, Clervaux Investments
17    Limited?
18         A.    Never.
19         Q.    Are you familiar with the e-mail
20    address wonderlandtree@gmail.com?
21    Wonderlandtree.
22         A.    No.  It's the first time I'm
23    hearing that.
24         Q.    Are you still in touch with
25    Alexander Shcheglyaev?
```

Page 202

1

2              CERTIFICATION BY REPORTER

3

4       I, Wayne Hock, a Notary Public of the

5    State of New York, do hereby certify:

6       That the testimony in the within

7    proceeding was held before me at the

8    aforesaid time and place;

9       That said witness was duly sworn

10   before the commencement of the testimony,

11   and that the testimony was taken

12   stenographically by me, then transcribed

13   under my supervision, and that the within

14   transcript is a true record of the

15   testimony of said witness.

16       I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, that I am not

19   interested directly or indirectly in the

20   matter in controversy, nor am I in the

21   employ of any of the counsel.

22       IN WITNESS WHEREOF, I have hereunto

23   set my hand this 19th day of December,

24   2016.

25