# EXHIBIT 26

Page 1

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK

3

   - - - - - - - - - - - - - - - - - - -x

4

   SERGEY LEONTIEV,

5

                   Plaintiff,

6                                    Case No. 16-cv-3595

        -against-

7

   ALEXANDER VARSHAVSKY,

8

                   Defendant.

9

   - - - - - - - - - - - - - - - - - - -x

10

                   January 9, 2017

11                  9:40 a.m.

12

           *** CONFIDENTIAL ***

13

14

15          Videotaped deposition of

16  VITALIY POPOV, taken by Plaintiff,

17  pursuant to Notice, held at the offices of

18  Roschier Asianajotoimisto Oy, Keskuskatu

19  7A, Helsinki, Finland, before

20  Sharon Lengel, a Registered Professional

21  Reporter, Certified Realtime Reporter, and

22  Notary Public of the State of New York.

23

24          *     *     *

25

Page 2

```
 1
 2   A P P E A R A N C E S:
 3
         GIBSON, DUNN & CRUTCHER LLP
 4            Attorneys for Plaintiff
              200 Park Avenue
 5            New York, New York 10166
 6       BY:  MARSHALL KING, ESQ.
              ANDREI MALIKOV, ESQ.
 7
 8
 9
         DEBEVOISE & PLIMPTON LLP
10            Attorneys for Defendant
              801 Pennsylvania Avenue, N.W.
11            Washington, D.C. 20004
12       BY:  NICHOLAS C. TOMPKINS, ESQ.
              COLBY A. SMITH, ESQ.
13
14
15   ALSO PRESENT:
16            DAVID ROSS ELLIOTT, Videographer
17            PAVEL KHOKHLACHEV, Interpreter
18            VICTOR POTAPOV, Check Interpreter
19
                   *      *      *
20
21
22
23
24
25
```

1              POPOV - CONFIDENTIAL

2    BY MR. KING:

3        Q.    Good morning, Mr. Popov.

4        A.    Good morning.

5        Q.    Could you state your full name,

6    please, for the record.

7        A.    Popov Vitaliy Nikolaevich.

8        Q.    Where are you employed?

9        A.    A company called Akita.

10       Q.    How long have you been employed

11   by Akita?

12       A.    Since January 2016.

13       Q.    And is that when Akita was

14   created?

15       A.    It was created not long before

16   that.

17       Q.    Prior to January of 2016, where

18   were you employed?

19       A.    I worked for a company called

20   Avilon Automobile Group.

21       Q.    How long did you work for

22   Avilon?

23       A.    I worked for that company since

24   May 2012 -- 2013.  And before that, I had

25   been working for the company for two

                    POPOV - CONFIDENTIAL

1      years, since 2008 to 2010.

2          Q.    Okay.  During 2008 to 2010, what

3      was your job for Avilon?

4          A.    I was the head of the legal

5      department.

6          Q.    And then in 2010, where did you

7      go work?

8          A.    I moved to another company.  The

9      company was called -- group of

10     companies -- Russian Sea.

11         Q.    And you worked there until May

12     of 2013?

13         A.    Yes.

14         Q.    And then you returned to work

15     for Avilon?

16         A.    Yes.

17         Q.    Was the company called Russian

18     Sea related in any way to Avilon?

19         A.    No.

20         Q.    So beginning in May of 2013,

21     what was your job at Avilon?

22         A.    Head of the legal department.

23         Q.    How many employees worked in the

24     legal department between 2013 and 2016?

1          POPOV - CONFIDENTIAL

2     A.     The number kept changing.  At

3  one time, it was 18 people.  Now it is 13

4  people.

5          THE INTERPRETER:  Sorry.

6     A.     Twelve.

7     Q.     How many of those -- how many

8  lawyers in the legal department?

9     A.     Nine.

10     Q.     Is the structure of the legal

11  department at Akita the same as it was at

12  Avilon immediately prior to the formation

13  of Akita?

14     A.     Did you mean the legal

15  department structure?

16     Q.     Yes.

17     A.     No.  The structure has changed.

18     Q.     How has the structure changed?

19     A.     So it was the purpose of the

20  management company to consolidate.  So if,

21  before, we used to have a legal department

22  for -- or separate lawyers for car

23  business and separate lawyers for leasing

24  business, now they decided to put them

25  together.

```
 1              POPOV - CONFIDENTIAL
 2      Q.     So when you said there's now 12
 3  people, you mean 12 -- 12 people in the
 4  legal department of Akita?
 5      A.     Yes.
 6      Q.     Who owns Akita?
 7      A.     It belongs to Alexander
 8  Varshavsky and Kamo Avagumyan through
 9  other legal persons.
10      Q.     Through what other legal
11  persons?
12      A.     Company Maxbond.
13      Q.     Is there a contractual
14  relationship between Akita and Avilon
15  Automobile Group?
16      A.     Yes.
17      Q.     And what's the nature of that
18  contractual relationship?
19      A.     It's a mixed contract with
20  elements of management and consulting.
21      Q.     Do you have any ownership
22  interest in Akita?
23      A.     No.
24      Q.     Do you have any ownership
25  interest in Avilon?
```

POPOV - CONFIDENTIAL

1
2   and pass it on for signature to the
3   shareholders.
4       Q.      You're aware that, in December
5   of 2008, Avilon, or as it was then known,
6   New York Motors Moscow, made a loan to a
7   company called Ambika; is that correct?
8       A.      Yes.
9       Q.      Did you have any involvement in
10  the transaction?
11      A.      Yes.
12      Q.      What was your involvement?
13      A.      We received a draft contract --
14  I received a draft contract from Yanna
15  Krisiuk.  We possibly made some
16  amendments.  I don't remember exactly.
17  And after that, our mission in this regard
18  was over.
19      Q.      How did you find out that the
20  transaction was happening?
21      A.      That it was happening or it had
22  happened?
23      Q.      That it was happening.
24      A.      First, it was Irina Monakhova
25  who phoned me, and she said that we are

```
 1              POPOV - CONFIDENTIAL
 2   signing this contract, and I need to --
 3   and I need to agree.  I need to look at
 4   it, approve it.  And after that, we
 5   communicated with Yanna.  We were
 6   exchanging some documents.  And we also
 7   communicated with Aleksander Vyulkova.
 8        Q.     Aleksandra.
 9        A.     Aleksandra.
10        Q.     What did Ms. Monakhova tell you
11   was the transaction?
12        A.     That our shareholders decided to
13   provide a loan to the shareholders of
14   Probusinessbank.
15        Q.     Did she say how much your
16   shareholders had decided to provide?
17        A.     I don't remember figures outside
18   of my -- outside of my responsibility.
19        Q.     Did she tell you what the terms
20   of the loan were going to be?
21        A.     Possibly, at the time we were
22   discussing this.  I don't remember.  But
23   most likely, there was a term of the loan,
24   conditions of the loan, and other
25   parameters, maybe the interest rate.
```

Page 16

1          POPOV - CONFIDENTIAL
2      Q.     When she said that your
3   shareholders had decided to provide a
4   loan, who was she referring to?
5      A.     At the time, we had two main
6   shareholders -- Alexander Varshavsky and
7   Igor Bakonenko.
8      Q.     Was Mr. Avagumyan a shareholder
9   at the time?
10      A.     In 2008, no.  He was a
11   shareholder in another company.  He was a
12   shareholder in European Realty.
13      Q.     Okay.  So when Ms. Monakhova
14   told you that your shareholders had
15   decided to provide a loan, did she mean
16   both Mr. Varshavsky and Mr. Bakonenko?
17          MR. SMITH:  Objection to form.
18      A.     It's difficult for me to answer
19   this question.  It was ten years ago.  And
20   what she meant -- and what she meant at
21   the time is not clear.  But most likely,
22   yes.
23      Q.     Before the loan agreement was
24   finalized, did you have any conversations
25   about the loan with Mr. Varshavsky?

```
                                          Page 17
 1              POPOV - CONFIDENTIAL
 2      A.     No.  At that time, I practically
 3   did not communicate at all with Alexander.
 4      Q.     Did Ms. Monakhova tell you why
 5   the shareholders had decided to provide a
 6   loan?
 7      A.     No.  At least I don't remember.
 8      Q.     Had you ever heard of the
 9   company Ambika prior to that time?
10      A.     No.
11      Q.     Did Ms. Monakhova tell you
12   anything about Ambika?
13      A.     Well, she said that this is a
14   company that belonged to the shareholders
15   of Probusinessbank, and I can find out all
16   the details from Yanna and Aleksandra
17   Vyulkova.
18      Q.     Who was Yanna?
19      A.     Yanna was the head of VIP
20   department.
21      Q.     For who?
22      A.     She was communicating with
23   corporate clients, as far as I remember.
24      Q.     Corporate clients of
25   Probusinessbank?
```

```
 1            POPOV - CONFIDENTIAL
 2      A.    At that time, yes, after that
 3  Financial Group "Life" was created and
 4  their signature then said Financial Group
 5  "Life."
 6      Q.    And who was Ms. Vyulkova?
 7      A.    I don't know what her position
 8  was.  But she was handling the
 9  companies -- foreign companies that
10  belonged to the shareholders of the bank.
11      Q.    Had you had any dealings with
12  her prior to the loan in December of 2008?
13      A.    I don't remember.
14      Q.    How did you come to learn that
15  she was handling foreign companies that
16  belonged to the shareholders of the bank?
17      A.    I was told by Yanna Krisiuk.
18  She introduced me.  She gave me her
19  number, and she said that all the matters
20  to do with foreign companies have to go
21  through her.
22      Q.    Okay.  Let me show you what has
23  previously been marked as Plaintiff's
24  Exhibit 7.
25            Mr. Popov, take a moment to look
```

Page 19

1                POPOV - CONFIDENTIAL

2    at the documents that are part of

3    Exhibit 7.  And I ask you if the first

4    three pages -- sorry -- first three pages

5    of that are the contract that you worked

6    on in conjunction with Ms. Krisiuk in

7    December of 2008.

8                MR. SMITH:  Objection to form.

9        A.    It looks like, yes.

10       Q.    Do you recall who drafted the

11   initial version of the agreement?

12       A.    I don't remember, but it seems

13   to me that it was Yanna who sent the

14   initial version.

15       Q.    Okay.  What do you recall of

16   your discussions with Yanna about the

17   contract?

18       A.    I don't remember any of the

19   details at all.

20       Q.    Did you have an understanding of

21   what the company called Ambika did?

22       A.    No, but we understood that there

23   was some financial company that was

24   connected to the shareholders of the bank.

25       Q.    Okay.  And who told you that?

```
 1              POPOV - CONFIDENTIAL
 2      with a document, I think.
 3              MR. SMITH:  Okay.
 4      A.      Possibly, you mean that it
 5  wasn't settled, but that the liability
 6  from the original loan agreement was
 7  adjoined to the subsequent loan agreement.
 8      Q.     Yeah.  And do you know why that
 9  was done?
10      A.     No.
11      Q.     Did you have any involvement in
12  documenting that change?
13      A.     I don't remember specifically.
14      Q.     At the time the 2008 loan was
15  originally entered into, do you recall any
16  discussions about whether there would be
17  guarantees provided for repayment of the
18  loan?
19      A.     I remember that we were
20  discussing with Yanna the actual text of
21  this guarantee, because finance people
22  needed that guarantee.
23      Q.     What do you recall about those
24  discussions?
25      A.     I just remember that there was
```

```
 1              POPOV - CONFIDENTIAL
 2   some exchange of documents, and we passed
 3   those documents on to the finance
 4   department.
 5       Q.    And so is it the case that
 6   Ms. Monakhova told you that the terms of
 7   the transaction involved getting a
 8   guarantee?
 9       A.    No.  I do not -- no.  I do not
10   remember this.  It's just that, for
11   finance people, all the transactions have
12   to be secured.  But I do not have -- but I
13   don't remember specific discussion about
14   the guarantee.  I don't remember the fact
15   that a guarantee was a condition of the
16   transaction.
17       Q.    Why do you say that the finance
18   people needed to have all the transactions
19   secured?
20       A.    I didn't -- I am not a
21   specialist on this.  I only know this from
22   what Yulia Semenova said to me.
23       Q.    So Ms. Semenova told you this at
24   what point in time?
25       A.    I don't remember specific
```

1           POPOV - CONFIDENTIAL

2   guarantee that appears at page SL66 in

3   Exhibit 9, did you show that guarantee to

4   anyone in the financial department?

5           MR. SMITH:  Objection.  Lack of

6       foundation.

7       A.    I am -- I'm not even sure I

8   received this guarantee directly.  It

9   could have been received by the finance

10  department, and then I could have just

11  seen the text when they came with a draft

12  of the agreement.

13      Q.    Did you ask Ms. Krisiuk whether

14  there would be a written guarantee

15  directly from the shareholders of the

16  bank?

17      A.    No, I didn't.

18          MR. KING:  I think we should

19      take a short break so that we can

20      change the tape.

21          MR. SMITH:  Sure.

22          THE VIDEOGRAPHER:  Thank you.

23      This is the end of Media 1, Volume I,

24      in the video deposition of Mr. Vitaliy

25      Popov off.  Going off the record at

```
 1              POPOV - CONFIDENTIAL
 2   of the Russian ERK?
 3        A.    As far as I know, Kamo
 4   Avagumyan.
 5        Q.    Who is Svetlana Geris?
 6        A.    Svetlana Geris was the manager
 7   of New York Motors Corporation.
 8        Q.    And what was New York Motors
 9   Corporation?  How did it fit into the
10   structure that you've just described?
11        A.    In 2008, this company was the
12   only shareholders -- shareholder of New
13   York Motors Moscow.
14        Q.    And how did New York Motors
15   Corporation relate, if it did, to European
16   Realty Corporation, the American entity?
17        A.    They had the same shareholders.
18        Q.    And that would be Mr. Varshavsky
19   and Mr. Bakonenko?
20        A.    Yes.
21        Q.    Did Ms. Geris have any role at
22   European Realty Corporation?
23              MR. SMITH:  Either entity or --
24              MR. KING:  The American entity.
25        A.    I -- I don't remember exactly.
```

Page 76

1                 POPOV - CONFIDENTIAL
2    company.
3         Q.    Have you ever had a conversation
4    with Mr. Leontiev?
5         A.    No.
6         Q.    Have you ever communicated with
7    him in any way?
8         A.    No.
9         Q.    What was your involvement in the
10   payment by Valkera?  What was your
11   involvement in that transaction?
12        A.    They sent a draft of agreement,
13   and I did the review of the document.  I
14   made some amendments.  They were mixing up
15   the names of the companies, the amounts,
16   and they were even prepared to pay under
17   the agreement, about which we have these
18   proceedings.  There were some technical
19   mistakes there also.  So with Maxim
20   Shamis, we prepared the final text.  Apart
21   from that, I communicated with Ekaterina
22   Malygina, because we needed to get legal
23   opinion from PwC.
24        Q.    Let's take a step back.
25              You had a call with

1          POPOV - CONFIDENTIAL

2      A F T E R N O O N   S E S S I O N

3                2:20 p.m.

4          THE VIDEOGRAPHER:  This is the

5      beginning of Media 4, Volume I, in the

6      video deposition of Vitaliy Popov.

7      We're back on the record at 2:20 p.m.,

8      as indicated on the video screen.

9  BY MR. KING:

10     Q.    After Avilon received payment of

11 the $17 million from Valkera, you

12 continued to have negotiations with

13 Mr. Shamis concerning repayment of the

14 2008 and 2011 loans; is that right?

15     A.    Yes.  And not only with Shamis.

16     Q.    Who else?

17     A.    With Zheleznyak.

18     Q.    You continued to negotiate the

19 documentation concerning the repayment; is

20 that right?

21     A.    Yes.  We prepared drafts for the

22 following -- for the following tranches.

23     Q.    Okay.  And you recall that there

24 were a number of different structures that

25 were exchanged; is that right?

1              POPOV - CONFIDENTIAL

2       A.     Yes.

3       Q.     Did you ever reach agreement on

4  the terms of payment?

5       A.     My objective was to prepare

6  drafts of documents.  I did not conduct

7  negotiations specifically on the schedule

8  of the payments.  I needed to prepare

9  drafts of the documents for the next

10  tranche of 27 million and overall

11  framework agreement, which would include

12  the schedule of payments.

13       Q.     What was the total amount to be

14  paid under the framework agreement that

15  you drafted?

16       A.     I don't recall exactly.

17       Q.     Did that include payments that

18  were to be made to parties other than

19  Avilon?

20       A.     I said already that I don't

21  remember the figure.  Figures are not my

22  specialty.

23       Q.     Okay.  Did it include

24  payments -- regardless of the figures, did

25  it include payments that were to be made

Page 97

1          POPOV - CONFIDENTIAL
2    to parties other than Avilon?
3        A.    Again, it only had the overall
4    amount.  It didn't have the basis for
5    payments.
6        Q.    And who was payment to be made
7    to under the framework agreement that you
8    drafted?
9        A.    As far as I remember, to Avilon
10   and to Avagumyan.
11            MR. KING:  Let's mark this as
12        the next exhibit.
13            (Plaintiff's Exhibit 99, An
14        email, Bates AVPE0004194, was hereby
15        marked for identification, as of this
16        date.)
17       Q.    Exhibit 99 is another email
18   chain, the original of which is in
19   Russian.  And I want to direct your
20   attention first to the very first email on
21   the chain, meaning all the way at the
22   bottom of the chain, at the end of the
23   chain.
24            Do you see that's an email from
25   Ms. Monakhova dated October 20, 2015?

1           POPOV - CONFIDENTIAL

2     Q.    You didn't look into whether

3  these amounts were owed to Avilon or owed

4  to Mr. Avagumyan or owed to others?

5     A.    No.  This was not important.

6  What was important is the overall schedule

7  of payments.

8     Q.    Why do you say what was

9  important was the overall schedule of

10  payments?

11     A.    I don't understand the question.

12     Q.    Why was it not important to know

13  to whom the money was owed?

14         MR. SMITH:  Objection to form.

15     A.    Because at this stage, we were

16  preparing a draft of the framework

17  agreement, which was establishing the

18  overall amount owed.  And at a later

19  stage, there would be more specific

20  agreements that would identify which

21  amounts were owed to who.

22     Q.    Who did you have a discussion

23  with about the idea that there would be

24  more specific agreements at a later date?

25     A.    With everyone -- with Monakhova,

```
                                            Page 108
 1              POPOV - CONFIDENTIAL
 2    million; is that correct?
 3              MR. SMITH:  Objection to form.
 4       A.    Most likely, yes.  I don't
 5    remember the specific amount.
 6       Q.    Did Mr. Leontiev and
 7    Mr. Zheleznyak sign that agreement?
 8       A.    I am not aware of it.
 9              MR. KING:  Let's mark as
10       Exhibit 100 another email chain.
11              (Plaintiff's Exhibit 100, An
12       email, Bates AVPE0004204, was hereby
13       marked for identification, as of this
14       date.)
15       Q.    The email on the bottom here
16    from Mr. Shamis dated November 29th says,
17    "For RIF, approximately 3 million was
18    paid.  However, the promissory notes have
19    not been returned yet."
20              Do you know what that -- do you
21    know what Mr. Shamis was referring to?
22       A.    No.
23       Q.    Did you ask him what he was
24    referring to?
25       A.    No.
```

1              POPOV - CONFIDENTIAL
2       Q.     Did you factor that into your
3    drafting of the agreements?
4       A.     No.
5       Q.     Do you know who Diana Karapetyan
6    is?
7       A.     No.
8              MR. KING:  Let's mark the next
9       exhibit.
10             (Plaintiff's Exhibit 101, An
11       agreement, Bates AVPE0006134, was
12       hereby marked for identification, as
13       of this date.)
14       Q.     Exhibit 101 is a document Bates
15    numbered AVPE6134 to 36.
16             Do you recognize that as one of
17    the documents that you drafted?
18       A.     No.  I did not prepare this
19    document.
20       Q.     Do you know if someone at Avilon
21    prepared this document?
22       A.     As I said before, it is possible
23    that I asked my employees to prepare
24    drafts of documents for transactions, for
25    various options of transactions.

Page 113

POPOV - CONFIDENTIAL

1  to prepare specific agreements for each

2  transaction.

3     Q.    Did Mr. Shamis or Mr. Zheleznyak

4  ever get back to you to tell you that the

5  draft framework agreement that you had

6  prepared was acceptable?

7           MR. SMITH:  Objection to form.

8     A.    Yes.  There was a letter

9  somewhere from Shamis where he said that

10 he was happy with everything, and then he

11 passed it on somewhere.

12    Q.    But did he tell you -- did he

13 get back to you to say whether the draft

14 framework agreement was acceptable to

15 Mr. Leontiev?

16    A.    I don't remember specifically

17 whether it got to Leontiev.

18    Q.    Who were you waiting on approval

19 from?

20          MR. SMITH:  Objection to form.

21    Asked and answered.

22    A.    I was waiting for Maxim Shamis

23 for the final confirmation that everyone

24 was happy with everything.

1        POPOV - CONFIDENTIAL

2    Q.    Who is "everyone," Mr. Popov?

3          MR. SMITH:  Same objection.

4    A.    I mean all the lawyers who were

5    involved.

6    Q.    The lawyers for who?

7    A.    Of Zheleznyak and Leontiev.

8    Q.    And did Mr. Shamis ever get back

9    to you to tell you that everyone was happy

10   with the framework agreement that you had

11   drafted?

12   A.    He was saying that there are no

13   disagreements, in principle, but they are

14   asking for additional documents.

15   Q.    What documents did he tell you

16   they were asking for?

17   A.    So it was the same every time --

18   loan agreements, additional agreements,

19   promissory notes.

20         MR. KING:  Mark this as the next

21     exhibit, please.

22         (Plaintiff's Exhibit 102, A

23     surety agreement, Bates AVPE0006126,

24     was hereby marked for identification,

25     as of this date.)

```
 1                POPOV - CONFIDENTIAL
 2      Q.     Do you recognize Exhibit 102,
 3  Mr. Popov?
 4      A.     Yes.  It is likely that it was
 5  also prepared by my staff.
 6      Q.     And did you send it to anyone?
 7      A.     I don't remember.
 8      Q.     Did anyone draft a surety
 9  agreement with Mr. Leontiev's name on it?
10      A.     Most likely, yes.
11      Q.     And who drafted that?
12      A.     Also Galina Lipina.
13      Q.     And what obligations did -- were
14  included in the surety agreement with
15  Mr. Leontiev's name on it?
16             MR. SMITH:  Objection to form.
17      A.     This doesn't matter.  All of
18  this was included just as an initial
19  draft.
20      Q.     In other words, it had never
21  been agreed to by Mr. Leontiev?
22             MR. SMITH:  Objection to form.
23      A.     What was -- what had never been
24  agreed by Mr. Leontiev?
25      Q.     Did Mr. Leontiev ever agree to
```

1                POPOV - CONFIDENTIAL

2    sign a surety agreement with his name on

3    it?

4              MR. SMITH:  Objection to form.

5        Lack of foundation.

6        A.    As far as I'm aware, there is no

7    such written document.

8        Q.    Did there come a time in

9    December of 2015 when you told

10   Mr. Zheleznyak that Avilon needed an

11   immediate payment of about $11.8 million?

12       A.    Yes, I did write a letter like

13   that.

14       Q.    What was the reason that Avilon

15   needed an immediate payment of

16   $11.8 million?

17       A.    Because it was the end of the

18   year, and there was a date for maturity of

19   some loan agreement, and we urgently

20   needed that money.

21       Q.    Did you get the money?

22       A.    No.

23       Q.    How did you deal with your loan

24   agreement?

25       A.    Maybe we borrowed money from

```
 1              POPOV - CONFIDENTIAL
 2    you didn't want an agreement to exist
 3    until it was fully signed?
 4        A.    The disclaimer was there because
 5    we did not know who the assignee would be,
 6    and we did not want to have a party that
 7    we did not know.
 8        Q.    Meaning that the agreement was
 9    not finalized yet; is that right?
10        A.    No doubt this was just a draft.
11              MR. KING:  Let's mark that.
12              (Plaintiff's Exhibit 108, An
13        email, Bates AVPE0006232, was hereby
14        marked for identification, as of this
15        date.)
16        Q.    Let me know if you recognize
17    this email chain, Mr. Popov.
18        A.    Yes.
19        Q.    Okay.  Could you turn to
20    page 6236.  And I want to ask you about
21    Ms. Semenova's email.
22              Did you have an understanding of
23    what she meant when she said, "Perhaps
24    it's possible to cement the Ambika loan
25    for 27 million, and if the money arrives,
```

Page 178

1

2                    CERTIFICATION

3

4       I, SHARON LENGEL, a Notary Public for

5    and within the State of New York, do

6    hereby certify:

7       That the witness whose testimony as

8    herein set forth, was duly sworn by me;

9    and that the within transcript is a true

10   record of the testimony given by said

11   witness.

12      I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage, and that I am

15   in no way interested in the outcome of

16   this matter.

17      IN WITNESS WHEREOF, I have hereunto

18   set my hand this 17th day of January,

19   2017.

20

     _____

21

22   SHARON LENGEL, RPR, CRR

23                *      *      *

24

25