# EXHIBIT 31

## REDACTED CONTENT FILED UNDER SEAL

Page 1

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------------------

4    SERGEY LEONTIEV,

5                          Plaintiff,

6              -against-

7    ALEXANDER VARSHAVSKY,

8                          Defendant.

9    Case No. 1:16-cv-03595-JSR

     ------------------------------------------

10

11                       January 12, 2017

                         9:45 a.m.

12

13

                  *** CONFIDENTIAL ***

14

15           DEPOSITION of VADIM KOLOTNIKOV,

16   taken by Defendant, pursuant to Notice,

17   held at the offices of DEBEVOISE &

18   PLIMPTON LLP, 919 Third Avenue, New York,

19   New York before Wayne Hock, a Notary

20   Public of the State of New York.

21

22

23

24

25

Page 2

1
2    A P P E A R A N C E S:
3
         GIBSON, DUNN & CRUTCHER LLP
4        Attorneys for Plaintiff
                  200 Park Avenue
5                 New York, New York 10166
6        BY:      ROBERT L. WEIGEL, ESQ.
                  rweigel@gibsondunn.com
7                 ESTER MURDUKHAYEVA, ESQ.
                  emurdukhayeva@gibsondunn.com
8
9
         DEBEVOISE & PLIMPTON LLP
10       Attorneys for Defendant
                  919 Third Avenue
11                New York, New York 10022
12       BY:      SEAN HECKER, ESQ.
                  shecker@debevoise.com
13                NATHAN S. RICHARDS, ESQ.
                  nsrichards@debevoise.com
14
15
         ALSO PRESENT:
16
17                RONALD MARRAZZO, Videographer
                  ANNA MAZUROVA, Interpreter
18                VLADIMIR KHRENOV
                  ALEKSEI ROMANOVSKI
19
20                    *       *       *
21
22
23
24
25

1      V. Kolotnikov -- CONFIDENTIAL

2    communications with either Mr. Leontiev or

3    Mr. Zheleznyak in the last week about your

4    deposition testimony?

5      A.    Yes.

6      Q.    And can you tell me about the

7    substance of those communications?

8      A.    They wished me good luck for

9    today.

10     Q.    Nothing substantive about facts

11   historically that occurred that were the

12   subject of the litigation?

13     A.    Correct.

14     Q.    Okay.

15          Have you provided documents

16   related to this case to the attorneys at

17   Gibson Dunn as part of the effort to

18   produce documents in the litigation?

19     A.    Yes.

20     Q.    Did you search your e-mail files

21   as part of that collection and production

22   effort?

23     A.    No.

24     Q.    No?  Did you provide your e-mail

25   to Gibson Dunn?

```
                                      Page 30
 1         V. Kolotnikov -- CONFIDENTIAL
 2      A.    Yes.
 3      Q.    Which e-mail accounts did you
 4   use that included information relevant to
 5   the case?
 6      A.    All that I had.
 7      Q.    Which ones?
 8      A.    Kolotnikov at Gmail, Vadim
 9   Kolotnikov Wonderworks.  I don't recall
10   all of them.  I have many e-mail accounts.
11      Q.    Was one of them
12   mrjackislander@gmail.com?
13      A.    Yes, that was mine.
14      Q.    And when did you create that
15   e-mail?
16      A.    I don't recall exactly.
17      Q.    Prior to 2015?
18      A.    No, most likely in the 2015,
19   possibly in the beginning of 2016.
20      Q.    Why did you create it?
21      A.    Because one e-mail account was
22   too little for me.
23      Q.    Right.
24            You testified that you had two
25   different Kolotnikov -- you had one
```

```
                                          Page 31
 1          V. Kolotnikov -- CONFIDENTIAL
 2     kolotnikov@gmail.com address, one
 3     Kolotnikov at Wonderworks, and so now you
 4     needed another e-mail address for what
 5     purpose?
 6          A.    Yes, my idea was to separate
 7     between personal messages and more
 8     work-related messages in Gmail.
 9          Q.    And which one was personal and
10     which one was work-related?
11          A.    Jack Islander was more related
12     to work.
13          Q.    To work.
14                And who is Jack Islander?
15          A.    Just a name.
16          Q.    Why did you choose that name?
17          A.    Because I ran out of names
18     including Kolotnikov.
19          Q.    When you sent e-mail from Jack
20     Islander, did you always indicate that it
21     was Vadim Kolotnikov sending the e-mails?
22                MR. WEIGEL: I'm going to object.
23       It's overbroad and vague.
24          Q.    You can answer.
25          A.    It was always clear that that
```

1          V. Kolotnikov -- CONFIDENTIAL

2    was me.

3         Q.    Okay.

4               Any other e-mail addresses that

5    you used during the time period 2012 to

6    2016 in connection with your work-related

7    activities?

8         A.    Yes.

9         Q.    What other e-mails?

10        A.    Kolotnikov@nbsrf.ru.

11   Vkolotnikov@nbsrf.ru, the same, just the

12   V.

13        Q.    Was that a work e-mail address?

14        A.    Yes.

15        Q.    For which institution?

16        A.    National Savings Bank.

17        Q.    When did you work for National

18   Savings Bank?

19        A.    From 2008 to 2015.

20        Q.    When in 2015 did you stop

21   working at National Savings Bank?

22        A.    End of November or beginning of

23   December, 2015.

24        Q.    So until the end of 2015 you

25   were still an employee of National Savings

```
 1          V. Kolotnikov -- CONFIDENTIAL
 2   Bank?
 3       A.    I would say up until December,
 4   2015.
 5       Q.    Okay.
 6             And is National Savings Bank a
 7   bank that was owned by Probusinessbank?
 8       A.    Yes.
 9       Q.    And who owned Probusinessbank?
10       A.    At what time?
11       Q.    During the period 2008 until
12   2015.
13             MR. WEIGEL: I'm going to object.
14       It's overbroad.  As you know, it
15       changed during that period.
16             MR. HECKER: He can explain.
17             THE WITNESS:  Can you repeat the
18       question, please?
19       Q.    Sure.
20             During the time period 2008
21   until 2015, who owned Probusinessbank?
22   And if that changed over time, you can
23   explain that.
24       A.    The owner of Probusinessbank?  I
25   don't recall whether there were any
```

```
                                              Page 37
 1          V.  Kolotnikov -- CONFIDENTIAL
 2   at National Savings Bank in the 2008 to
 3   2015 period, did you make it a practice to
 4   read the financial statements of
 5   Probusinessbank?
 6       A.    Sometimes.
 7       Q.    In connection with reviewing
 8   those financial statements, did you ever
 9   take note of the fact that the largest
10   ultimate beneficial owner of
11   Probusinessbank was Mr. Leontiev?
12       A.    I don't recall reading any such
13   documents.
14       Q.    Do you recall reading that in
15   Mr. Zheleznyak's or Mr. Leontiev's
16   deposition testimony which you read?
17       A.    Read about what?
18       Q.    As you sit here now, are you
19   aware that Mr. Leontiev was the largest
20   single ultimate beneficial owner of
21   Probusinessbank during the period 2008 to
22   2015?
23          MR. WEIGEL: Objection.  Asked
24      and answered.
25          THE WITNESS:  As I sit here, I
```

```
                                          Page 39
 1         V. Kolotnikov -- CONFIDENTIAL
 2              MR. WEIGEL: My objections are
 3       perfectly proper.
 4              MR. HECKER: No, they aren't.
 5              MR. WEIGEL: Let's move on,
 6       please.  You've been wasting a lot of
 7       time this morning on things that you
 8       already know the answer to.
 9              MR. HECKER: Can I have the
10       question read back, please.
11              (Whereupon the requested portion
12       was read back by the reporter)
13              THE WITNESS:  What do you mean
14       when you say business partners?
15       Q.    Do you know what it means to be
16    business partners with someone?
17       A.    It's always different.
18       Q.    What's your understanding?
19       A.    For instance, when people
20    decided to set up a business together.
21       Q.    Did you understand that Mr.
22    Leontiev and Mr. Zheleznyak had, in fact,
23    set up Probusinessbank together?
24       A.    No, I cannot say so.
25       Q.    You don't know how
```

```
                                             Page 42

 1          V. Kolotnikov -- CONFIDENTIAL
 2   Probusinessbank?
 3       A.    I don't believe the dates are
 4   correct.
 5       Q.    What dates --
 6             MR. HECKER: Well, strike that.
 7       Q.    Did you at some point work as a
 8   vice president of strategic development
 9   for Probusinessbank?
10       A.    Yes.
11       Q.    When?
12       A.    I don't exactly recall when the
13   name changed.  Let us say 2007/2008.
14       Q.    Who did you report to when you
15   worked as vice president of strategic
16   development at Probusinessbank?
17       A.    Sergey Leontiev.
18       Q.    You reported to him directly?
19       A.    Yes.
20       Q.    Did you continue to report to
21   Mr. Leontiev during the time that you
22   worked at National Savings Bank?
23       A.    I reported to the board of
24   directors of the National Savings Bank.
25       Q.    Did you also keep Mr. Leontiev
```

```
 1            V. Kolotnikov -- CONFIDENTIAL
 2   informed of your activities?
 3       A.    Yes.
 4       Q.    And in the period that you said
 5   that you worked as vice president for
 6   strategic development reporting to Mr.
 7   Leontiev, what were your duties?
 8       A.    I was responsible for the
 9   implementation of a balanced KPI system,
10   key efficiency indicators.
11       Q.    Is this an incentive system?
12       A.    This is more like performance
13   assessment system.
14       Q.    Okay.
15             Who was ultimately responsible
16   for signing off on the performance
17   assessment system at Probusinessbank
18   during the time that you worked there?
19       A.    This is a complicated question.
20             Can you repeat it, please?
21       Q.    Sure.
22             Who was responsible ultimately
23   for the performance assessment system that
24   you worked on at Probusinessbank?
25             MR. WEIGEL: I'm going to object.
```

Page 45



Page 46

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 48



Page 49



Page 51

1          V. Kolotnikov -- CONFIDENTIAL

2               MR. HECKER: Is it your position

3          in the litigation that a ruling about

4          the scope of document discovery

5          affects what I'm allowed to ask this

6          witness in this deposition?

7               MR. WEIGEL: I made my

8          instruction.  Let's go on.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 52



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24     Q.     Okay.
25            And did you stop being managing
```

Page 57

1              V. Kolotnikov -- CONFIDENTIAL
2    there who were moving from place to place
3    same as me and they went to work at that
4    office.
5         Q.    Did you work from home during
6    the time that you were working for
7    Wonderworks beginning in late September,
8    2015?
9         A.    Yes, from home as well.
10        Q.    And where did Mr. Leontiev work
11   beginning in late September, 2015?
12        A.    Are you talking about the office
13   he went to?
14        Q.    Where did he --
15              MR. HECKER: Strike that.
16        Q.    Am I correct that, when you
17   began working as managing director in late
18   September, 2015, that Mr. Leontiev worked
19   for Wonderworks?
20        A.    I never saw in any Wonderworks
21   papers Mr. Leontiev being an employee
22   working for Wonderworks.
23        Q.    When you went to work for
24   Wonderworks in late September, 2015, did
25   you understand Mr. Leontiev to work for

```
                                     Page 58
 1         V. Kolotnikov -- CONFIDENTIAL
 2   Wonderworks?
 3       A.    He did not work for Wonderworks.
 4   He was involved with Wonderworks
 5   activities but he did not work for
 6   Wonderworks.
 7       Q.    He wasn't an employee of
 8   Wonderworks?
 9       A.    As far as I know, no.
10       Q.    Okay.
11             Did he hold a position at
12   Wonderworks?
13       A.    As far as I know, he did not.
14       Q.    Was he an officer of
15   Wonderworks?
16             MS. MURDUKHAYEVA: I think
17        officer, that's not the right
18        translation for officer.
19             THE WITNESS:  Whether he was an
20        officer?  As far as I know, he was
21        not.
22       Q.    Okay.
23             And during the time that you
24   were managing director beginning in late
25   September, 2015, did you understand that
```

```
                                          Page 62
 1          V. Kolotnikov -- CONFIDENTIAL
 2   on Cyprus.
 3        Q.    Did you ever see him there?
 4        A.    No.
 5        Q.    Was he the CEO of Wonderworks?
 6        A.    I never saw any papers
 7   testifying to the fact that he had any
 8   position.
 9        Q.    Okay.
10              I mean, you were managing
11   director in September of 2015 of
12   Wonderworks; correct?
13        A.    Yes.
14        Q.    Did you know in that position
15   who had positions at Wonderworks?
16        A.    As of September, 2015, yes.
17        Q.    And as of that time, your
18   testimony is Mr. Leontiev was not CEO of
19   Wonderworks; right?
20        A.    Correct.
21        Q.    And he also did not have the
22   position of chief investment officer at
23   Wonderworks during the time that you were
24   managing director; correct?
25        A.    The position, no.
```

```
                                              Page 63
 1           V. Kolotnikov -- CONFIDENTIAL
 2      Q.      In fact, he wasn't employed by
 3  Wonderworks in any position.
 4              That's your testimony?
 5      A.      He was not employed by
 6  Wonderworks in any position.
 7      Q.      Are you familiar with an e-mail
 8  address at Wonderworks called
 9  director@wonderworksinvestments.com?
10      A.      Yes.
11      Q.      Who used that e-mail address?
12      A.      The Wonderworks team.
13      Q.      Any particular person?
14      A.      Anna Frolova, for example.
15      Q.      Anyone else that you know used
16  that e-mail address?
17      A.      That's possible.
18      Q.      Did you use it?
19      A.      As far as I recall, I did not.
20      Q.      Are you familiar with an e-mail
21  address wonderlandtree@gmail.com?
22      A.      Can I look at it?
23      Q.      Look at what?
24      A.      Whatever you are looking at
25  because I don't --
```

```
                                          Page 66
 1           V. Kolotnikov -- CONFIDENTIAL
 2    you believe this document was, in fact,
 3    provided to one or more banks?
 4         A.    It is possible.
 5         Q.    Do you see under number three,
 6    managers?  Are you with me?
 7         A.    Yes.
 8         Q.    The first sentence says,
 9    "beneficial owner of Wonderworks, Mr.
10    Sergey Leontiev, is acting as a chief
11    investment officer and the chief executive
12    officer of Wonderworks."
13               Do you see that?
14         A.    Yes.
15         Q.    Am I correct though your
16    testimony is that Mr. Leontiev, in fact,
17    never held a position as chief investment
18    officer or as CEO of Wonderworks; correct?
19         A.    He did not hold the position of
20    chief executive officer or chief
21    investments officer at Wonderworks.
22         Q.    So the statement that he was
23    acting as chief investment officer and as
24    CEO of Wonderworks was false; correct?
25         A.    No.
```

```
                                        Page 83
 1          V. Kolotnikov -- CONFIDENTIAL
 2   perspectives.
 3       Q.    When was that?
 4       A.    In November, 2015 or anyway in
 5   fall 2015.
 6       Q.    And do you know what prompted
 7   his questions?
 8       A.    He said that was an ordinary
 9   procedure for talking to the beneficiary
10   owner of the company.
11       Q.    Who is Philipp Balobanov?
12       A.    One of the members of
13   Wonderworks team.
14       Q.    What did he do for Wonderworks?
15       A.    He's an analyst.
16       Q.    He analyzes stocks?
17       A.    Including stock as well.
18       Q.    Where did he work?
19            MR. WEIGEL: What point in time?
20       Q.    Where did he work for
21   Wonderworks?
22       A.    At what point in time?
23       Q.    At my point in time.
24            During the time that you knew he
25   worked at Wonderworks, where did he work?
```

```
                                                Page 86
 1            V. Kolotnikov -- CONFIDENTIAL
 2        If you know, you can give an answer.
 3              MR. HECKER:  That's an improper
 4        objection.
 5        Q.    You can answer the question.
 6        A.    Which question am I supposed
 7   to --
 8        Q.    Was the purpose of this document
 9   to assist Mr. Leontiev in obtaining a visa
10   in the United States?
11              MR. WEIGEL: And again, I'm going
12        to caution you not to reveal
13        communications with counsel.  If you
14        know of the purpose from some other
15        way other than through communications
16        with counsel, you can reveal it.
17              THE WITNESS:  Most likely an
18        immigration lawyer requested that this
19        letter be prepared.
20        Q.    In October of 2015, were you
21   personally involved in assisting in the
22   process of trying to help Mr. Leontiev
23   obtain a visa in the United States?
24        A.    We responded to questions asked
25   by his immigration lawyer.
```

Page 87



```
                                        Page 101
 1           V. Kolotnikov -- CONFIDENTIAL
 2    of Ambika Investments Limited?
 3        A.    Over what period of time?
 4        Q.    At any time.
 5        A.    Yes, sometimes the company was
 6    mentioned in our discussions.
 7        Q.    Okay.
 8              And in what context did you talk
 9    to Mr. Zheleznyak about Ambika Investments
10    Limited?
11              MR. WEIGEL: Again, I'm going to
12        object as overbroad.
13        Q.    You can answer.
14        A.    For instance, as we discussed,
15    the document prepared by Covington.
16        Q.    Do you know why the document
17    prepared by Covington was prepared?
18        A.    No, I don't.
19        Q.    Did you use the document that
20    was provided by Covington for any purpose
21    in connection with your work as a director
22    at Wonderworks?
23        A.    Yes.
24        Q.    Why?
25        A.    For instance, to help bank
```

```
 1        V. Kolotnikov -- CONFIDENTIAL
 2    accounts open.
 3        Q.    Did you have personal knowledge
 4    about whether the information that
 5    Covington relied upon in providing the
 6    Covington document was accurate or
 7    inaccurate?
 8              MR. WEIGEL: I object.
 9        Foundation.
10        Q.    You can answer.
11        A.    I do not know what documentation
12    was provided to Covington.
13        Q.    Do you know who provided
14    information to Covington in connection
15    with preparation of Covington's
16    memorandum?
17        A.    No.
18        Q.    Do you know how Wonderworks
19    initially obtained financing for its
20    operations?
21        A.    At the time it was set up?
22        Q.    Yes.
23        A.    I saw Wonderworks' financial
24    statements.  I'm not sure about the
25    earlier time but probably started with
```

Page 114

1          V. Kolotnikov -- CONFIDENTIAL
2     Q.     Okay.
3            And when you did hear about Mr.
4  Shcheglyaev in the fall of 2016, what did
5  you understand his role to be?
6     A.     I was told that he was the
7  beneficiary of several companies.
8     Q.     Who told you that?
9     A.     Irina Zubiy.
10    Q.     So the knowledge you have about
11  the role played by Mr. Shcheglyaev as a
12  named beneficial owner for certain
13  companies comes only from Ms. Zubiy?
14    A.     Yes, as far as I recall that's
15  true.
16    Q.     Have you ever asked Mr.
17  Zheleznyak about Mr. Shcheglyaev's role?
18    A.     No, I don't recall that.
19    Q.     What about Mr. Leontiev?
20    A.     No, I don't recall that.
21    Q.     Do you know the name Nataliya
22  Kudryakove?
23    A.     I have heard the name.
24    Q.     In what context?
25           MR. HECKER: Let me re-frame it.

```
 1        V. Kolotnikov -- CONFIDENTIAL
 2     Q.    Who is Nataliya Kudryakove?
 3     A.    I don't know.
 4     Q.    You've just heard the name?
 5           MR. WEIGEL: You have to answer
 6     verbally.
 7           THE WITNESS:  Yes.
 8     Q.    Do you know whether she worked
 9  at Probusinessbank at some point?
10     A.    No, I don't.
11     Q.    Do you know whether she
12  performed any services for Wonderworks?
13     A.    No, I don't.
14     Q.    Do you know whether Ms. Vyulkova
15  provided any services for Wonderworks?
16     A.    No, I don't.
17     Q.    When did you first meet Irina
18  Zubiy?
19     A.    In fall 2015.
20     Q.    And how did you meet her?
21     A.    I don't recall.
22     Q.    Did someone introduce you to
23  her?
24     A.    I don't recall.
25     Q.    Did you know she was a relative
```

```
 1          V. Kolotnikov -- CONFIDENTIAL
 2    of Mr. Zheleznyak's wife?
 3          A.    I learned about it a little
 4    later.
 5          Q.    When you read deposition
 6    testimony or prior to that?
 7          A.    No, a little earlier.
 8          Q.    Did she tell you?
 9          A.    No.
10          Q.    How did you learn?
11          A.    I don't recall.  Somebody told
12    me.
13          Q.    What exactly do you recall them
14    telling you?
15          A.    That she was in one way or
16    another related to Mr. Zheleznyak's wife.
17    I mean, they were relatives.
18          Q.    But you don't remember who told
19    you that?
20          A.    No, I don't.
21          Q.    Did you understand at some point
22    Ms. Zubiy became an authorized person to
23    provide instructions to Trident Trust
24    regarding the activities of Ambika?
25                MR. WEIGEL: I object.
```

```
 1        V. Kolotnikov -- CONFIDENTIAL
 2     Foundation.
 3        Q.    You can answer.
 4        A.    Can you repeat the question,
 5   please?
 6        Q.    Did you understand that at some
 7   point Ms. Zubiy became an authorized
 8   person to provide instructions to Trident
 9   Trust regarding the activities of Ambika?
10        A.    I found out that she was
11   authorized to communicate with Trident.
12        Q.    On behalf of Ambika?
13        A.    Yes.
14        Q.    And do you know who authorized
15   her to communicate with Trident Trust on
16   behalf of Ambika?
17        A.    I know that from her.
18        Q.    And did you also learn that she
19   was an authorized representative to
20   communicate with Trident Trust on behalf
21   of Wonderworks?
22        A.    Yes.
23        Q.    Okay.
24              So just so the record's clear,
25   Ms. Zubiy was an authorized representative
```

```
 1              V. Kolotnikov -- CONFIDENTIAL
 2      to communicate with Trident Trust on
 3      behalf of both Ambika and Wonderworks at
 4      least in the fall of 2015; is that right?
 5              MR. WEIGEL: I object.
 6          Foundation.
 7          Q.    What time period was she the
 8      authorized representative?
 9              MR. ROMANOVSKI: I'm sorry, the
10          witness also made a short answer.
11              THE INTERPRETER: No.
12              THE WITNESS:  Can you repeat the
13          question, please?
14              MR. HECKER: Sure.
15              Let me see if I can clarify it.
16          Q.    You testified that you learned
17      from Ms. Zubiy that she was an authorized
18      representative for Ambika to communicate
19      with Trident Trust; correct?
20          A.    Yes, in 2016.
21          Q.    In 2016.
22              You learned that in 2016; is
23      that your testimony?
24          A.    I learned in 2016 that she was
25      authorized to communicate with Trident
```

```
 1          V. Kolotnikov -- CONFIDENTIAL
 2   Trust on behalf of Ambika learning it from
 3   her.
 4      Q.    Okay.
 5           And do you know what time period
 6   she was authorized to act on behalf of
 7   Ambika in dealings with Trident Trust?
 8      A.    No, I don't know.
 9      Q.    She didn't tell you that?
10      A.    No, she did not.
11      Q.    What about with respect to
12   Wonderworks?  Do you have an understanding
13   of when she was authorized to act on
14   behalf of Wonderworks in communications
15   with Trident Trust?
16      A.    My understanding was that at the
17   time I became Wonderworks' director she
18   was authorized so that Trident Trust
19   considered her an authorized person on
20   behalf of Wonderworks.  As I was preparing
21   for the deposition, I saw a letter
22   authorizing Irina to communicate with
23   Trident Trust on behalf of Wonderworks.
24      Q.    And who -- do you know who
25   authorized her to act as Wonderworks'
```

```
                                      Page 120
 1          V. Kolotnikov -- CONFIDENTIAL
 2    authorized representative in
 3    communications with Trident Trust?
 4        A.    Can I look at the letter?
 5        Q.    We'll undertake to find it and
 6    I'll show it to you if we can find it
 7    quickly.
 8              You don't remember who
 9    authorized her?
10        A.    No.
11        Q.    Who is Mr. Afanasyev?
12        A.    I heard the name.
13        Q.    Do you know who he is?
14        A.    No.
15        Q.    Did you know him to be someone
16    who worked at Wonderworks?
17        A.    Sergey Leontiev told me that he
18    was the leader of the Wonderworks team at
19    one point in time.
20        Q.    Did you know whether Mr.
21    Afanasyev gave instructions to Irina Zubiy
22    to act on behalf of Wonderworks in
23    communications with Trident Trust?
24        A.    I don't know.
25        Q.    Okay.
```

```
                                        Page 122
 1          V. Kolotnikov -- CONFIDENTIAL
 2   company between June, 2011 and September,
 3   2015?
 4       A.    I don't know anything about it.
 5       Q.    Did you have an employment --
 6   were you employed by Wonderworks?
 7             MR. HECKER: Strike that.
 8       Q.    Were you an employee of
 9   Wonderworks?
10       A.    Yes.
11       Q.    Do you know whether other
12   employees --
13             MR. HECKER: Strike that.
14       Q.    Were there other employees of
15   Wonderworks besides you when you began
16   work there in September of 2015?
17       A.    Not as far as I know.
18       Q.    So the other traders who were
19   working on behalf of Wonderworks, were
20   they employed by someone else?
21       A.    Right.
22
23
24
25
```

1          V. Kolotnikov -- CONFIDENTIAL

2      Q.    Was that a company owned by Mr.

3   Leontiev?

4      A.    I don't know.

5      Q.    Do you know who owned Life

6   Investments?

7      A.    No, I don't.

8      Q.    Did you know who controlled it?

9      A.    No, I don't know.

10      Q.    Do you know where that company

11   got the money to pay the employees who

12   were working on behalf of Wonderworks?

13      A.    They did not work on behalf of

14   Wonderworks.

15      Q.    Am I correct that there were

16   traders who made investment decisions

17   maybe after consulting with Mr. Leontiev

18   on behalf of Wonderworks Investments

19   Limited?

20      A.    Yes, there were authorized to

21   trade on behalf of Wonderworks.

22      Q.    But they weren't Wonderworks

23   employees?

24      A.    No.  To be authorized, you don't

25   have to be an employee.

Page 124



1          V. Kolotnikov -- CONFIDENTIAL

2    representations in the fall of 2015 that

3    Wonderworks had no employees between June,

4    2011 and September of 2015?

5          A.    (In English) I don't remember.

6          Q.    Well, did Wonderworks have any

7    employees working for Wonderworks between

8    June, 2011 and September, 2015?

9          A.    I don't know anything about it.

10         Q.    So you don't know whether

11   Wonderworks had employees between June,

12   2011 and September, 2015?

13         A.    No, I don't.

14         Q.    And you don't know whether

15   you've ever represented to anybody for any

16   purpose that Wonderworks had no employees

17   between June, 2011 and September, 2015?

18         A.    I do not recall this.

19               (Whereupon, a multi-page

20         document was marked Defendant's

21         Exhibit 56 for identification.)

22         Q.    Defendant's Exhibit 56 which is

23   in front of you bears Bates 2769

24   through 2774 and I'll represent that an

25   English-only version of this document was

V.  Kolotnikov -- CONFIDENTIAL

1         V.  Kolotnikov -- CONFIDENTIAL
2    which are referenced at the bottom on the
3    first page.
4              Are you with me, checked boxes
5    or unchecked boxes?
6         A.    Yes.
7         Q.    What is this -- what are these
8    references to?
9         A.    Well, obviously to what it says
10   here.
11        Q.    Where did these files exist?
12        A.    I don't know.
13        Q.    Well, when you were managing
14   director of Wonderworks beginning in
15   September, 2015, did you have access to
16   these documents?
17        A.    I don't recall.  This is
18   possible.
19        Q.    If you look at the third page of
20   the document, there's an organizational
21   chart of the company.
22              Do you see that?
23        A.    Yes.
24        Q.    Do you believe that chart to
25   accurately reflect employees at the

```
                                    Page 136
 1          V. Kolotnikov -- CONFIDENTIAL
 2   company as of approximately the fall of
 3   2015?
 4       A.    You are talking about the
 5   Wonderworks company?
 6       Q.    This document purports to be a
 7   company description for Wonderworks, so
 8   yes.
 9       A.    This chart is describing the
10   roles played by different people.  This
11   chart is not a description of the
12   positions held by these people.
13       Q.    This chart is called the
14   organizational chart of the company;
15   correct?
16       A.    Yes.
17       Q.    The first page of the document
18   under company description describes
19   Wonderworks Investments LTD, Wonderworks,
20   as the company that this document purports
21   to describe?
22       A.    Correct.
23       Q.    You agree with me this chart
24   purports to be an organizational chart for
25   Wonderworks?
```

Page 139

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 140



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          V. Kolotnikov -- CONFIDENTIAL

2   financial assistance to the company to

3   enable it to continue as a going concern."

4          Do you see that?

5      A.    This is what it says.

6      Q.    Okay.

7          And do you understand the

8   reference to the shareholder to be a

9   reference to Mr. Leontiev?

10     A.    Yes, this is possible.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 155



23      MR. WEIGEL: I object.

24    Foundation.

25    Q.    You can answer.

Page 178

1          V. Kolotnikov -- CONFIDENTIAL

2

3

4            Do you see that?

5     A.     Yes.

6     Q.     Read that paragraph and the next

7  two paragraphs.

8     A.     (Reviewing).

9     Q.     You've read that?

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 179



Page 180

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 181



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 182

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 183



Page 186



Page 187



                                        Page 188

1              V. Kolotnikov -- CONFIDENTIAL

2

3

4

5

6

7

8       Q.    Were any other members of the

9    Wonderworks team, as you named it, still

10   working for Probusinessbank companies on

11   September 1, 2015?

12       A.    What companies?

13       Q.    Companies owned by

14   Probusinessbank.

15       A.    This is a very general question.

16   Even Mr. Leontiev himself was working for

17   Probusinessbank in September.

18       Q.    Understood.

19             Any other members of the

20   Wonderworks team working for

21   Probusinessbank companies other than you

22   and Mr. Leontiev on September 1, 2015?

23       A.    I don't remember who worked for

24   whom at that point in time, the entire

25   list.

1        V. Kolotnikov -- CONFIDENTIAL

10            MR. WEIGEL: Counsel, it's

11       getting late.  You've asked this

12       question several times.

13            MR. HECKER: We could make it a

14       lot quicker if he testified consistent

15       with his recollection, candidly.

16            MR. WEIGEL: There's no reason

17       for comments like that.  The witness

18       is trying his best.

19            MR. HECKER: I beg to differ.

20            MR. WEIGEL: Well, you can have

21       your opinions, but there's no point in

22       insulting the witness.

23            MR. HECKER: So can you.

24            MR. WEIGEL: Why don't you ask a

25       new question and let's move on.

1           V. Kolotnikov -- CONFIDENTIAL

2               MR. HECKER: No, I'm going to ask

3       the same question.  I'm going to ask

4       him to look at this document for as

5       long as he needs to and tell me if he

6       thinks this account reference is a

7       reference to an account other than

8       Valkera.  That's my question.

9               MR. WEIGEL: It's been asked and

10      answered.

11      Q.    You can answer it.  Take your

12  time.

13              MR. WEIGEL: If you have anything

14      else to say, go ahead.

15              MR. HECKER: How long have we

16      been going on the video?

17              THE VIDEOGRAPHER: We've been

18      going a little under five and fifty,

19      about 5:40.

20              MR. HECKER: Thank you.

21      Q.    Go ahead.

22      A.    What was the question?

23      Q.    Look at this document for as

24  long as you need to to get the context and

25  tell me if you think the reference to the

1          V. Kolotnikov -- CONFIDENTIAL

2               MR. WEIGEL: You can ask him what

3       he understands the text message to be

4       but you can't ask him about

5       communications with counsel.

6          Q.    Tell me what your understanding

7    of the text message is.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      V. Kolotnikov -- CONFIDENTIAL

2      actually have the court reporter read

3      the original Russian?

4          MR. ROMANOVSKI: We can use the

5      Russian version because the reporter

6      translates the translation.

7          MR. HECKER: Okay.

8          So my request for you is to read

9      the first part of the Russian version,

10     translate it into English.

11         THE INTERPRETER: To read in

12     Russian?

13         MR. HECKER: You don't need to

14     read in Russian, you can just

15     translate.

16

17

18

19

20

21

22

23

24

25

Page 205



```
22        Q.      Okay.

23                So who is Tarando?

24        A.      Tarando is a paintball team

25   coach.
```

```
 1        V. Kolotnikov -- CONFIDENTIAL
 2        Q.    What did you understand that to
 3   mean?
 4        A.    A transfer from the brokerage
 5   account to the current Valkera account.
 6        Q.    Turn to the next page.
 7              Do you see the only text there
 8   -- well, the first text there begins
 9   September 9, 2015 at 18:46:32?
10        A.    What page is this?
11        Q.    34394.
12        A.    I don't have it.
13        Q.    It's the next page after the
14   page we were just looking at.
15        A.    Okay.
16        Q.    Do you see where you say, "are
17   we still waiting for Valkera?"
18        A.    Yes.
19        Q.    Mr. Leontiev responds, "you can
20   pay for Valkera."
21              Do you see that?
22        A.    Yes.
23        Q.    Did you understand that that was
24   Mr. Leontiev approving a $17 million
25   payment from Valkera?
```

Page 210

1           V. Kolotnikov -- CONFIDENTIAL

2       A.      No, I understood that as a

3   transfer of moneys from the brokerage

4   account to the bank account.

5       Q.      Why don't you flip back to

6   page --

7           MR. HECKER: Strike that.

Page 211

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



16    A.    And what was the question?

17    Q.    The question is were you aware

18  that included in the discussions between

19  Mr. Leontiev and Mr. Varshavsky was

20  repayment of $17 million not as part of

21  your spreadsheet but that was available at

22  Valkera?

23              MR. WEIGEL: I object to the

24      form.  Lacks foundation.

25              THE WITNESS:  No, I don't know.

1          V. Kolotnikov -- CONFIDENTIAL

2        I did not participate in a discussion.

3        Q.    Are you aware, as you sit here

4    now, that $17 million was, in fact,

5    transferred from Valkera to Avilon?

6        A.    I am aware that there were

7    transfers, but I don't know whether they

8    were transferred to Avilon.

9        Q.    And you knew that at the time of

10   the moneys being transferred from Valkera;

11   right?

12       A.    No, you were asking me whether I

13   am aware of it now as I'm sitting here and

14   I said yes, I am.

15

16

17

18

19

20

21

22

23

24

25

Page 214

16      Q.      And that required Mr. Leontiev's

17   okay?

18      A.      A transfer from the brokerage

19   account to Valkera bank account?   Yes.

20      Q.      Okay.

21              And do you know who approved the

22   money moving from the bank account to

23   Avilon?

24      A.      No.

Page 215



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25          A.      No, he was not responsible for

Page 216



Page 217



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 219



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 220

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 245

1        V. Kolotnikov -- ATTORNEYS' EYES ONLY

2        A.     Not exactly.

3        Q.     Well -- go ahead.

15        A.     Yes, of course.

16               (Whereupon, an e-mail dated

17        April 19, 2016 was marked Defendant's

18        Exhibit 68 for identification.)

19        Q.     You've been shown what's been

20   marked as Defendant's Exhibit 68 bearing

21   Bates 6224 to 32.

22               I direct your attention to the

23   document with Bates 6225.  It appears that

24   you're writing on March 4, 2016, so two

25   days after the last e-mail we were looking

Page 255

1

2                CERTIFICATION BY REPORTER

3

4       I, Wayne Hock, a Notary Public of the

5    State of New York, do hereby certify:

6       That the testimony in the within

7    proceeding was held before me at the

8    aforesaid time and place;

9       That said witness was duly sworn

10   before the commencement of the testimony,

11   and that the testimony was taken

12   stenographically by me, then transcribed

13   under my supervision, and that the within

14   transcript is a true record of the

15   testimony of said witness.

16       I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, that I am not

19   interested directly or indirectly in the

20   matter in controversy, nor am I in the

21   employ of any of the counsel.

22       IN WITNESS WHEREOF, I have hereunto

23   set my hand this 25th day of January,

24   2017.

25