# EXHIBIT 60
## REDACTED CONTENT FILED UNDER SEAL

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ——————————————————————————————————————————
 4   SERGEY LEONTIEV,
 5                           Plaintiff,
 6            -against-
 7   ALEXANDER VARSHAVSKY,
 8                           Defendant.
 9   Case No. 1:16-cv-03595-JSR

     ——————————————————————————————————————————
10
11                           January 11, 2017
                             10:04 a.m.
12
13

              *** CONFIDENTIAL ***
14
15            DEPOSITION of CHARLES W.
16   LAURENCE, taken by Defendant, pursuant to
17   Notice, held at the offices of DEBEVOISE &
18   PLIMPTON LLP, 919 Third Avenue, New York,
19   New York before Wayne Hock, a Notary
20   Public of the State of New York.
21
22
23
24
25
```

Page 2

```
 1
 2   A P P E A R A N C E S:
 3
        GIBSON, DUNN & CRUTCHER LLP
 4      Attorneys for Plaintiff
                200 Park Avenue
 5              New York, New York 10166
 6      BY:     ALISON L. WOLLIN, ESQ., of
                counsel
 7              awollin@gibsondunn.com
                RACHEL BROOK, ESQ.
 8              rbrook@gibsondunn.com
                HANNAH KIRSHNER, ESQ.
 9              hkirshner@gibsondunn.com
10
11
        DEBEVOISE & PLIMPTON LLP
12      Attorneys for Defendant
                919 Third Avenue
13              New York, New York 10022
14      BY:     WILLIAM H. TAFT V, ESQ.
                whtaft@debevoise.com
15              MEGAN CORRARINO, ESQ.
                mcorrarino@debevoise.com
16
17
18
        ALSO PRESENT:
19
                RONALD MARRAZZO, Videographer
20
21                      *       *       *
22
23
24
25
```

Page 28

1              C. W. Laurence -- CONFIDENTIAL
2                  THE WITNESS:  It's mathematical,
3          your example.  So as I explained, yes,
4          if you get -- if you consistently make
5          deals that don't get you the return of
6          your costs then that's cumulative
7          negatives which is a loss.
8          Q.    We've been describing some of
9     your work as -- or sorry, we've been
10    discussing some of your work for clients
11    as a forensic accountant and consultant
12    with respect to valuing loans.
13                  Have you ever been recognized as
14    an expert for purposes of trial with
15    respect to the valuation of loans?
16          A.    I have not testified with
17    respect to that, no.
18          Q.    And have you ever been
19    recognized as an expert for purposes of
20    trial with respect to the valuation of
21    other financial instruments?
22          A.    I have not.  We went through my
23    prior testimony.
24          Q.    Are all of the documents you
25    relied on for purposes of your report

1          C. W. Laurence -- CONFIDENTIAL

2    reflected in appendix seven to your

3    report?

4         A.    Yes, they are.

5         Q.    Since issuing your report, have

6    you reviewed any documents not listed on

7    appendix seven that are related to this

8    case?

9         A.    I have.

10        Q.    Which documents were those?

11        A.    I reviewed -- I reviewed

12   financial statements for Wonderworks and

13   for Ambika and for Vermenda Holdings.

14        Q.    Do you remember the dates --

15   sorry, the years covered by those

16   financial statements for Wonderworks?

17        A.    I believe it was the years

18   ending December 31, 2011 through the years

19   ending December 31, 2014.

20        Q.    Okay.

21              And do you recall the years

22   covered by the financial statements for

23   Ambika that you reviewed?

24        A.    As best I recall, it was the

25   years ending December 31, 2011 through

```
 1          C. W. Laurence -- CONFIDENTIAL
 2      fact, what I would highlight different
 3      to say if the fact pattern was I can't
 4      compare these, there's sixteen
 5      million, there's fourteen million.
 6          Here it's quite specific, as I
 7      was explaining a few moments ago.  I
 8      am able to tie the fourteen million,
 9      approximately, most of that through to
10      these statements.  So my observation
11      would be that there are sixteen
12      million of identified -- sixteen-plus
13      million of identified net settlements
14      of which fourteen million are
15      supported by the bank statement
16      activity that I've seen.
17      Q.    And leaving that difference of
18  2.6 million which the netting confirmation
19  packages suggest should have been paid but
20  which, when you look at the bank
21  statements, are not evidenced by the bank
22  statement; correct?
23      A.    That's correct.
24      Q.    You also considered entries on
25  Ambika's bank statements reflecting
```

```
                                     Page 40
 1         C. W. Laurence -- CONFIDENTIAL
 2    credits and debits with Probusinessbank;
 3    correct?
 4         A.    That's correct.
 5         Q.    And what was the purpose of that
 6    analysis?
 7         A.    My expectation, my understanding
 8    was that -- of this relationship was that
 9    while Wonderworks had these forward
10    transactions with Ambika, that Ambika was
11    an intermediary in this such that there
12    would be an equivalent offsetting
13    agreement between Probusinessbank and
14    Ambika.  So my analysis was to analyze how
15    that relationship worked so to try and
16    determine and analyze through the bank
17    statement detail as I didn't have the
18    trading detail between Probusinessbank and
19    Ambika to use the cash flows excluding
20    cash flows from Probusinessbank that are
21    specific with Ambika but that relate to
22    other things such as loans and FX so
23    therefore identifying the forward
24    trading-related activity and analyzing
25    those net inflows and outflows to support
```

1             C. W. Laurence -- CONFIDENTIAL

2    my expectation that these were an offset.

3        Q.    So you had -- you say you had an

4    expectation or an understanding of the

5    relationship between the

6    Wonderworks/Ambika transactions and the

7    Ambika/Probusinessbank transactions.

8                 What was that understanding

9    based on?

10       A.    I had discussions with Gibson

11   Dunn for sure, definitely discussions.  I

12   think I saw a schedule that described

13   something like that.

14       Q.    Were you asked to make any

15   assumptions for purposes of this analysis

16   that these were -- that Ambika was acting

17   as an intermediary and that there were

18   offsetting agreements with

19   Probusinessbank?

20       A.    My understanding that the Ambika

21   transactions would have been supported by

22   a transaction for Probusinessbank to have

23   dealt through Ambika with similar

24   transactions led me to perform the

25   analysis I performed.

```
                                          Page 48
 1           C. W. Laurence -- CONFIDENTIAL
 2   going.
 3       Q.    So it's possible that Ambika had
 4   a neutral economic --
 5              MR. TAFT: Strike that.
 6       Q.    So it's possible that, by
 7   entering into offsetting transactions with
 8   Probusinessbank, Ambika had a neutral
 9   economic position with respect to these
10   forward contracts?
11       A.    I think it's possible, yes.
12       Q.    But you haven't established that
13   in your report?
14       A.    I performed an analysis which I
15   think suggests that it's directionally
16   that way or it's close to that.
17       Q.    In order to support your opinion
18   that the pricing of the forward contracts
19   between Ambika and Wonderworks was
20   commercially reasonable, you looked at the
21   trade date for -- I'm sorry, you looked at
22   the closing price for the securities
23   covered by a given forward contract on the
24   date that contract was entered into;
25   correct?
```

Page 49

```
 1          C. W. Laurence -- CONFIDENTIAL
 2      A.    Yes.
 3      Q.    And that's just for the equity
 4  securities?
 5      A.    Yes.
 6      Q.    And for the fixed income
 7  securities, you looked at the -- how did
 8  you determine that the forward contracts
 9  relating to fixed income securities were
10  commercially reasonable?
11      A.    I compared the pricing to
12  Bloomberg.
13      Q.    On the date that the contract
14  was entered into?
15      A.    Yes.
16      Q.    Did you do any other analysis to
17  support your conclusion that the pricing
18  on these forward contracts was
19  commercially reasonable?
20      A.    On the equity portion, I
21  compared -- first my view is that the
22  pricing is commercially reasonable because
23  these trades have relatively short
24  expirations.  But in any event, these are
25  one of the key -- I think the most
```

1        C. W. Laurence -- CONFIDENTIAL

2   important element of determining price in

3   forward contracts like this is the press

4   at that time and the fact that comparing

5   those prices, these equities are

6   consistently priced at the pricing on the

7   day that they're entered into gives me

8   comfort that they're commercially

9   reasonable.

10            I validated the settlement

11   prices by looking at Bloomberg data to

12   make sure that therefore the settlement

13   was also -- that the pricing was

14   reasonable and that the settlement was

15   correctly calculated.

16       Q.    And did you do any further

17   analysis to determine that the pricing on

18   the fixed income forward contracts was

19   commercially reasonable?

20       A.    I'd say I confirmed the pricing

21   with Bloomberg both from the date of trade

22   as well as settlement.

23       Q.    And looking at the settlement,

24   the settlement date, that's just -- that

25   has nothing to do with the terms when the

```
                                           Page 53
 1          C. W. Laurence -- CONFIDENTIAL
 2      A.     That's correct.
 3      Q.     You can put Defendant's
 4  Exhibit 45 aside.
 5
 6
 7
 8
 9
10      A.     Commercially reasonable to me is
11  when there is reasonableness to the terms
12  from a commercial perspective.
13      Q.     Is that a term of art in
14  accounting?
15      A.     It is not.
16      Q.     Did you cite any authorities
17  that discuss what commercial
18  reasonableness means with respect to
19  future contracts or loans?
20      A.     I don't believe the term itself
21  is formally defined, although it is
22  frequently used.
23      Q.     My question was did you cite any
24  authorities in your report that discuss
25  what commercial reasonableness means with
```

1           C. W. Laurence -- CONFIDENTIAL

2   respect to future contracts or loans.

3        A.    No.  As I said, I don't believe

4   there's a specific definition.

5        Q.    So if two experts were to be

6   asked whether a transaction were

7   commercially reasonable, could there be

8   any certainty that they were applying the

9   same standard to that inquiry?

10        A.    It would depend on the facts and

11   circumstances.

12        Q.    Is it fair to say that you have

13   not provided a definition of what you mean

14   by commercially reasonable in the -- in

15   your report?

16        A.    To my mind, this context is

17   quite self-evident.

18        Q.    You said that it's -- you've

19   just told me that commercially reasonable

20   means to you that there is reasonableness

21   to the terms from the commercial

22   perspective.

23           What do you mean by

24   reasonableness?

25        A.    Reasonableness that there's some

Page 72

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 73



Page 86



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 87

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 88

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 89

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 90



Page 91

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 125

1

2                   CERTIFICATION BY REPORTER

3

4       I, Wayne Hock, a Notary Public of the

5   State of New York, do hereby certify:

6       That the testimony in the within

7   proceeding was held before me at the

8   aforesaid time and place;

9       That said witness was duly sworn

10   before the commencement of the testimony,

11   and that the testimony was taken

12   stenographically by me, then transcribed

13   under my supervision, and that the within

14   transcript is a true record of the

15   testimony of said witness.

16       I further certify that I am not

17   related to any of the parties to this

18   action by blood or marriage, that I am not

19   interested directly or indirectly in the

20   matter in controversy, nor am I in the

21   employ of any of the counsel.

22       IN WITNESS WHEREOF, I have hereunto

23   set my hand this 17th day of January, 2017.

24                        Wayne Hock

25