# EXHIBIT 13

(Supplement)

```
                                                      Page 1

 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3
      - - - - - - - - - - - - - - - - - - - -x
 4
      SERGEY LEONTIEV,
 5
                  Plaintiff,
 6                                  Case No. 16-cv-3595
            -against-
 7
      ALEXANDER VARSHAVSKY,
 8
                  Defendant.
 9
      - - - - - - - - - - - - - - - - - - - -x
10
                       January 5, 2017
11                     9:41 a.m.
12
13
14
15          Videotaped deposition of
16    ALEXANDER VARSHAVSKY, taken by Plaintiff,
17    pursuant to Notice, held at the offices of
18    Gibson, Dunn & Crutcher LLP, 200 Park
19    Avenue, New York, New York, before
20    Sharon Lengel, a Registered Professional
21    Reporter, Certified Realtime Reporter, and
22    Notary Public of the State of New York.
23
24             *     *     *
25
```

```
 1
 2   A P P E A R A N C E S:
 3
        GIBSON, DUNN & CRUTCHER LLP
 4            Attorneys for Plaintiff
              200 Park Avenue
 5            New York, New York 10166
 6      BY:   ROBERT WEIGEL, ESQ.
              ANDREI MALIKOV, ESQ.
 7            ESTER MURDUKHAYEVA, ESQ.
 8
 9
        DEBEVOISE & PLIMPTON LLP
10            Attorneys for Defendant
              801 Pennsylvania Avenue, N.W.
11            Washington, D.C. 20004
12      BY:   SEAN HECKER, ESQ.
              ALISA MELEKHINA, ESQ.
13
14
15   ALSO PRESENT:
16            WAYNE SALINE, Videographer
17            ROMAN SANIKOV, Interpreter
18            ALEXANDER KULNEV, ESQ.
19                    *      *      *
20
21
22
23
24
25
```

```
                                                   Page 15
 1                    VARSHAVSKY
 2          MR. HECKER:  -- to hear the
 3     question.  Objection to form.  You can
 4     answer.
 5     A.    No.
 6     Q.    Did you ever get any written
 7  authorization from any of those
 8  individuals to negotiate on behalf -- on
 9  their behalf to seek repayment of their
10  claims?
11          MR. HECKER:  You can answer.
12     You can always answer.
13     A.    No.
14     Q.    Okay.  Which Avagumyan -- I
15  understand there are two.  There are
16  probably many.  But what is the first name
17  of the Avagumyan individual who asked you
18  to negotiate on his or her behalf?
19     A.    Both, father and son.
20     Q.    And what are their names?
21     A.    Kamo and Karen.
22     Q.    When did you -- when did
23  Mr. Kamo Avagumyan first ask you to
24  negotiate to resolve his claims?
25     A.    Two -- a year and a half ago, as
```

1  VARSHAVSKY
2  says, "Yes, except we need them to work in
3  the same area, both with respect to ERK
4  and Avilon without any forward contracts
5  in Rubles."
6       Do you see that?
7  A.  Yes.
8  Q.  What is ERK?
9  A.  European Realty Corporation.
10 Q.  And do you understand what that
11 sentence means?
12 A.  No.
13 Q.  Did ERK have loans to
14 Probusinessbank or any of the offshore
15 entities?
16 A.  I don't know.  Maybe.
17 Q.  Okay.
18       (Plaintiff's Exhibit 65, An
19       email, Bates SL0033745, was hereby
20       marked for identification, as of this
21       date.)
22 A.  (Witness perusing document.)
23 Q.  So Exhibit 65 starts out with an
24 email from Yanna Krisiuk, who is at
25 Probusinessbank, to yourself, dated

Page 49

1           VARSHAVSKY
2  August 31, 2011.
3           Do you see that?
4      A.   Yes.
5      Q.   It says, "Alexander, good
6  evening.  Sending to you the report
7  accounting for replenishment of assets."
8           Do you see that?
9      A.   Yes.
10     Q.   Do you know if Probusinessbank
11 or Ambika had paid down some of the --
12 some of the $19.9 million loan at this
13 point in time?
14          MR. HECKER:  Objection to form.
15     Compound.  You may answer.
16     A.   I have no idea.
17     Q.   Do you know what Ms. Krisiuk is
18 referring to when she speaks of
19 replenishment of assets?
20     A.   No.
21     Q.   Okay.  The email on top is from
22 Ms. Monakhova to Yanna.
23          Do you see that with a CC to
24 you?
25     A.   Yes.

Page 50

1         VARSHAVSKY
2    Q.    It says, "Yanna, please send the
3  rate for the new placement, 6,625,000."
4         Do you see that?
5    A.    Yes.
6    Q.    Did you make a -- did Avilon
7  make a new loan to Ambika of 6,625,000 at
8  or around August 2011?
9    A.    I don't see where it says to
10 Ambika.  Maybe it was to a different
11 company, maybe for Probusinessbank.  I
12 have no idea.
13   Q.    You have no idea.
14         Okay.  All right.
15         (Plaintiff's Exhibit 66, An
16    email, Bates SL0033741, was hereby
17    marked for identification, as of this
18    date.)
19   A.    (Witness perusing document.)
20   Q.    Exhibit 66 at the bottom is an
21 email from Ms. Nazanskaya to Ms. Monakhova
22 with a CC to Ms. Krisiuk.
23         Do you see that?
24   A.    Yes.
25   Q.    It's all dated

```
                                                    Page 51
 1                      VARSHAVSKY
 2   September 1, 2011?
 3        A.    Yes.
 4        Q.    It seems to be referring to that
 5   same 6.625 million that we were discussing
 6   on the previous exhibit.
 7             Do you see that?
 8        A.    Yes.
 9        Q.    Okay.  And the email to -- from
10   Ms. Nazanskaya says, "The rate
11   Probusinessbank is offering for the
12   placement of newly received 6.625 million
13   is 11 percent, same as under existing
14   technical loans."
15             Do you see that?
16        A.    Yes.
17        Q.    That 11 percent is the same rate
18   that you agreed the loan to Ambika would
19   be reduced to; correct?
20        A.    I cannot comment right now.  I
21   don't remember.
22        Q.    We just looked at it.
23        A.    I don't know -- I don't know --
24             MR. HECKER:  Objection.  He
25        testified he didn't remember
```

Page 52

1                    VARSHAVSKY
2       11 percent.
3       Q.    Okay.  Let's go back to
4    Exhibit 64.
5            Do you see that it states there
6    that "The rate Probusinessbank is offering
7    for the next year is 11 percent.  The
8    existing rate is 15 percent.  Yanna
9    Krisiuk reported that Alexander is aware
10   of this and agreed to the rate on
11   November 30th."
12           Do you see that?
13      A.    Yes.
14      Q.    Okay.  Now, in Exhibit 66, it
15   states that "The rate Probusinessbank is
16   offering for the placement of the newly
17   received 6,625,000 is 11 percent, same as
18   under existing technical loans."
19           Do you see that?
20      A.    Yes.
21      Q.    Okay.  Is that the same
22   11 percent that was referred to in
23   Exhibit 64?
24           MR. HECKER:  Objection to form.
25      Foundation.

Page 73

1           VARSHAVSKY
2           (Plaintiff's Exhibit 68, An
3      email, Bates SL0000080, was hereby
4      marked for identification, as of this
5      date.)
6      Q.   Mr. Varshavsky, I've handed you
7  Exhibit 68, which is an email from
8  Mr. Robert Stahl to Robert Weigel with a
9  CC to Rich Sapinski.
10          Who is Mr. Stahl?
11     A.   My attorney.
12     Q.   And he's represented you for a
13 number of years; is that correct?
14     A.   Correct.
15     Q.   Okay.  Did you review this email
16 before it was sent?
17          MR. HECKER:  Objection to the
18     form of the question.  I'm going to
19     caution you -- if you can answer that
20     question without disclosing
21     communications you had with Mr. Stahl
22     as your counsel, you can answer that
23     question.  But I want you to be
24     careful about not disclosing
25     discussions you had or communications

```
                                              Page 84
 1                 VARSHAVSKY
 2           MR. HECKER:  Objection to form.
 3      Compound.
 4      A.   We never using the word
 5   "secure."  We always was using the word of
 6   "guarantee."  All the loan was guaranteed
 7   by Mr. Leontiev.
 8      Q.   Okay.  As a businessman, you
 9   know what the concept of secured lending
10   is; correct?
11      A.   That's actually what we've been
12   asking Leontiev lately.
13      Q.   Right.  But Avilon probably has
14   some secured financing with regard to its
15   inventory perhaps?
16      A.   That's not my business.
17      Q.   Okay.  But you know what a
18   secured loan is.  It's like a mortgage on
19   a house; right?
20      A.   Yes.
21      Q.   All right.  You provide
22   collateral, and you can go after that
23   collateral if, in fact, the loan isn't
24   repaid; right?
25      A.   Yes.
```

1                    VARSHAVSKY
2        Foundation.
3        A.    I can repeat several times.
4    When it comes to the money transfer --
5    it's not what I'm doing.  I cannot help
6    with that.  I don't know.
7        Q.    What does "VKS" stand for in
8    line 3?
9        A.    That's also -- I was thinking
10   right now I cannot find the explanation.
11              MR. HECKER:  No.  No.  Wait for
12       the question.
13       Q.    Can you just look at it in
14   Russian and see if that helps?
15       A.    I looked at it in Russian
16   specifically.  I don't know.
17       Q.    It says, "to be sent to the
18   U.S. -- to be sent not to the U.S. but to
19   Sanbay as per the letter."
20             Do you see that?
21       A.    Yes.
22       Q.    Why is Avilon discussing sending
23   money to Sanbay?
24       A.    I don't know.
25       Q.    Did Avilon owe money to Sanbay?

Page 139

1          VARSHAVSKY
2     A.    I don't know.
3     Q.    Who is Irina Meshkova?
4     A.    She is the chief comptroller or
5  chief accountant.
6     Q.    Okay.  She writes to Yulia with
7  a CC to Irina Monakhova.  "Yulia, we need
8  about US 1.05 million for the remainder of
9  the year."
10          Do you see that?
11    A.    Yes.
12    Q.    "Including the yacht, U.S.
13 dollars 520,000, the airplane, U.S.
14 dollars 530,000."
15          Do you see that?
16    A.    Yes.
17    Q.    What airplane are we talking
18 about?
19    A.    I don't know.  Maybe it's
20 referring to the Sanbay, the plane owned
21 by Karen.
22    Q.    Did you own an airplane?
23    A.    Me?
24    Q.    Yes.
25    A.    No.

Page 180

1        VARSHAVSKY
2  if it went to Ambika or a different
3  company what he has.  But I know
4  definitely it went to Zheleznyak and
5  Leontiev company.
6        Q.    How do you know that?
7        A.    Zheleznyak was telling me all
8  the time.
9        Q.    Do you know -- but you didn't
10 even know what company the money was being
11 lent to; is that correct?
12       A.    No.  He was telling me it was
13 going to the company in Cyprus.  He was
14 telling me a lot of story about that, what
15 they was purchasing some real estate
16 there, because they was applying for --
17 for the Cyprus passport.  They said, "We
18 need the money over there."  He was
19 telling me a lot of story.
20       Q.    When did Mr. Zheleznyak tell you
21 he was applying for a Cyprus passport?
22       A.    Two years ago.  Maybe a year or
23 maybe -- yeah, around a year before
24 they -- they left Russia.
25       Q.    Okay.

```
                                        Page 181
  1                   VARSHAVSKY
  2       A.     In 2014, maybe '15.  I don't
  3   remember exactly.
  4       Q.     And when did Avilon make the
  5   first loan to Ambika?
  6       A.     I don't remember that.
  7       Q.     If I told you 2008, would that
  8   refresh your recollection?
  9       A.     Yeah, maybe.
 10       Q.     Do you have any reason to
 11   believe that the money that Avilon
 12   advanced to Ambika in 2008 was used by
 13   Mr. Zheleznyak to get a passport in
 14   Cyprus?
 15       A.     No, not at that time.
 16       Q.     Do you have any reason to
 17   believe that the money that Avilon
 18   advanced in 2011 was used by
 19   Mr. Zheleznyak to get a passport in
 20   Cyprus?
 21       A.     I have a lot of conversation
 22   with Zheleznyak.  He was -- just was
 23   trying to explain me why and how they
 24   using the money.  He say -- he was telling
 25   me what the some of the money they put for
```

Veritext Legal Solutions
212-267-6868             www.veritext.com             516-608-2400

```
                                              Page 182
 1                    VARSHAVSKY
 2    the real estate; some of the money Sergey
 3    work on a stock exchange; some of the
 4    money use for something else.
 5            And one time, he was telling me
 6    what they are buying real estate in
 7    Cyprus.  They need the money right now to
 8    the Cyprus, because they have to buy to
 9    have the Cyprus passport, five people.
10       Q.    Do you have any reason to
11    believe that it was money from Avilon that
12    was used to purchase or to invest in
13    Cyprus to get passports for five people?
14       A.    No.  No.
15            MR. HECKER:  Objection to form.
16        Foundation.
17       Q.    Okay.  We've been going at it
18    quite a while.  Why don't we take a short
19    break.
20            THE VIDEOGRAPHER:  This marks
21        the end of Tape No. 3 in the
22        videotaped deposition of Alexander
23        Varshavsky.  We are going off the
24        record.  The time is 2:53.
25            (Recess)
```